Anthony J. Costantini
John Dellaportas
Brian Damiano
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Plaintiff Drew Scientific, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

DREW SCIENTIFIC, INC.,

                   Plaintiff,

        -v-

POINTCARE TECHNOLOGIES, INC.,

                 Defendant.

-------------------------------------------------------x

Judge Hellerstein

08 CV 1490

**COMPLAINT**

FEB 13 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Drew Scientific, Inc. ("Drew"), by and through its attorneys Duane Morris LLP, and

for its Complaint against defendant PointCare Technologies, Inc. ("PointCare") alleges the

following:

        1.      Drew is a company organized and existing under the laws of the State of

Texas. Its principal place of business is located at 4230 Shilling Way, Dallas, Texas.

        2.      PointCare is a company organized and existing under the laws of the

Commonwealth of Massachusetts. Its principal place of business is located at 181 Cedar

Hill Street, Marlborough, Massachusetts.

        3.      There is a complete diversity of citizenship between the parties hereto and

the amount in controversy far exceeds the jurisdictional amount of $75,000. There is thus

subject matter jurisdiction under 28 U.S.C. § 1332.

1

4.    Both parties conduct business activities within this District and in a Manufacturing, Distribution and Co-Marketing Agreement dated June 2006 (the "Agreement"), they have agreed, among other things, that "[A]ny legal action filed pursuant to and/or related to this Agreement or its interpretation shall be filed in the U.S. District Court for the Southern District of New York." The parties have thus agreed that this Court has personal jurisdiction over them, and the venue of this action in this District is proper pursuant to 28 U.S.C. § 1391.

5.    The primary purpose of this action is to permanently enjoin the defendant from distributing or attempting to distribute certain equipment in the United States and any other territories assigned to Drew or otherwise violating the Agreement, to obtain the return of certain equipment to Drew, to otherwise compel compliance with the Agreement, and to recover damages for any violations of the Agreement that have occurred to date. A complete copy of the Agreement and its accompanying Annexes is attached hereto as Exhibit 1.

## FACTUAL BACKGROUND

6.    The Agreement was entered into in June 2006, and it combined the efforts of the parties in two significant and related respects. In the first respect, Drew agreed to modify its Excell 22 TM hematology platform to accommodate PointCare's proprietary CD4 Lymphocyte Assay, CD4 sure.TM The integrated device (also referred to as the high throughput ("HT") platform), which was to be developed primarily at Drew's expense, is to be used to measure CD4 Lymphocyte levels in patients infected with HIV. CD4 lymphocyte levels are indicative of the success or lack thereof of current treatment.

2

7.     By the terms of the Agreement, development of the HT platform was to be a joint effort, with Drew and PointCare each having allocated responsibilities (e.g., PointCare being responsible for assuring that the CD4 assay is compatible with the Drew HT instrumentation). Two different versions of the integrated HT platform device are to be marketed and sold by the respective parties in assigned territories. To date, Drew has invested more than $1,000,000 in this development collaboration and afforded  PointCare personnel complete access to Drew's confidential, proprietary technological information and know-how relative to the Excell 22$^{TM}$ platform. Drew has also shared its confidential marketing plans and sales strategies with PointCare. Under the terms of the Agreement, PointCare is prohibited from using this information without Drew's consent, even if the Agreement should be terminated. In the event the Agreement is terminated, however, PointCare may develop and distribute its own HT platform. Furthermore, Drew's distribution rights to the NP system discussed below are contingent upon its successful development and marketing of the HT system. As discussed further below, PointCare has intentionally acted in bad faith to frustrate Drew's ability to complete the HT platform project and has used this conduct to improperly refuse to recognize Drew's rights relative to the Near Patient system.

8.     The second significant aspect concerns PointCare's Near Patient ("NP") platform, which permits the same type of HIV patient testing to be performed locally, i.e., in a non-hospital environment. PointCare agreed to enter into a third party Development and Manufacturing Agreement to manufacture this device, which would then be purchased by PointCare, and privately labeled and sold to Drew, which

3

was granted certain distribution rights to the NP platform, including the right to be the

entity primarily responsible for the marketing and sales of the NP platform in the

United States, the United Kingdom, Europe and much of Asia. Drew has already

expended more than $50,000 to date relative to marketing the NP platform, has lined

up potential customers, and PointCare has been provided with unfettered access to

Drew's marketing plans for its territories. There is a significant technological

overlap between the HT and NP devices, and to some extent, they are competitive.

For this reason, the Agreement allocates territories to the parties and the party

designated for a specific territory is primarily responsible for the marketing and sale

of both systems in that assigned territory.

     9.     On information and belief, PointCare has recently received approval by

the Food and Drug Administration ("FDA") for the NP platform, using Drew's

hematology system to produce the hematology data relied upon in its FDA submission.

PointCare's conduct to date has contributed significantly to the delays experienced with

respect to the HT program and PointCare has intentionally and in bad faith stymied

Drew's efforts to finalize the HT platform for FDA submission by asserting conditions

precedent to the performance of its obligations which are not included in the Agreement

between the parties.

     10.     Of the two platforms (HT and NP), development of the HT platform is the

more challenging due to its complexity, requiring substantial input and cooperative

efforts by the research and development teams of both PointCare and Drew. These teams

did not always agree on how to address critical technical, development and design issues.

The time that it took for the teams to reach consensus, as well as technical challenges

4

experienced by both PointCare and Drew during project development did cause the project to fall behind the initially projected timeline. However, since the parties were collaborating jointly and PointCare's experts were intimately involved in and were making recommendations relative to the project, it was clear that the development teams of both parties knew of, acknowledged, and contributed to such delays. Illustrative of PointCare's role in timeline delays are the delays caused by its software development constraints during the early stages of the project. Further, PointCare's insistence that Drew use its gold reagent and certain materials in the HT platform, against the advice of Drew's engineers, as well as actions that PointCare took while in possession of the HT platform, ultimately played significant roles in the failure of the HT platform to perform properly during testing that PointCare conducted with the HT platform during the Spring of 2007. As a result, Drew had to repair the instrument and make significant instrument modifications. Nonetheless and despite the frustrations, Drew thought the parties were working cooperatively through the issues until the American Association for Clinical Chemistry ("AACC") convention of July 15-19, 2007, when PointCare's President and CEO complained to the President and CEO of Escalon Medical Corp. ("Escalon"), Drew's corporate parent, and followed up the oral complaint with an e-mail dated September 13, 2007.

11.    Escalon's President and CEO conducted an investigation and furnished a detailed reply on October 3, 2007. No substantive response was received from PointCare until October 26, when PointCare asked, for the first time, that the Agreement be modified in ways that were significantly advantageous to PointCare and detrimental to Drew. Specifically, PointCare sought to reverse the original transaction by reallocating

marketing responsibilities for key territories, with the net effect potentially of creating competition between Drew's and PointCare's marketing of the two devices.

12.    Prior to that response, PointCare's President complained that Drew's distributor in Russia, a territory assigned to Drew under the Agreement, was missing out on an NP tender by Russian authorities. Drew's distributor denied that such a tender was taking place. Drew then requested from PointCare specific information about the purported tender and an appropriate certification of the NP technology (without which a response to the purported tender could not be made).

13.    Significantly, PointCare's President did not respond to these requests. Escalon's President called on October 18 to discuss the relationship between the parties and to reiterate the requests. This call was not returned by PointCare's President, who sent the October 26 e-mail (about proposed contract modifications) instead.

14.    At about the same time (Fall, 2007), PointCare was, upon information and belief, experiencing financial distress and was looking for new investors or ways to gain additional capital. In this regard, Drew received reports that at least one distributor was approached by PointCare executives at the AACC convention about the potential to secure marketing rights from PointCare relative to the NP Product in geographic territories assigned to Drew under the Agreement. In addition, PointCare reportedly sought to market the NP product to an entity within Drew's United States territory with a view toward transshipments to PointCare territories - - an intentional, bad faith attempt to circumvent Drew's rights under the Agreement and to market said rights for its own financial gain. Such approaches would make no sense unless PointCare was planning to disavow the Agreement.

6

15.     Shortly thereafter, PointCare also signaled its intent to breach the Agreement by refusing to return an NP device to Drew that Drew had sent to PointCare, at its request, so that PointCare could perform a software modification. The device was located at Drew's Dallas headquarters and was being used by Drew to train its personnel so that they would be able to effectively market the NP device upon FDA approval. When PointCare requested return of the machine for a software upgrade, it promised to re-deliver the instrument to Drew by November 2, before the next round of training was scheduled to begin. Instead, Drew was informed on November 1 that at the direction of PointCare's President, the NP device would not be returned to Drew. Repeated requests for the return of the NP instrument have been rebuffed, in violation of both the explicit and implicit cooperation provisions of the Agreement.

16.     When an explanation for this aberrant behavior was sought, PointCare's President sent an e-mail unilaterally declaring the Agreement "null and void" and suspending all PointCare participation in fulfilling the Agreement until after a meeting on her contractual modification demands. This conduct violates the Agreement in several respects.

17.     In response, an e-mail was sent on November 7, requesting a clarification of the "null and void" letter. At a November 8 meeting, PointCare's President demanded a proposed modification to the Agreement, saying that PointCare would formally terminate the Agreement if Drew was unwilling to modify the Agreement by unilaterally abandoning its potentially most lucrative territories in favor of PointCare. These assertions served to confirm to Drew its suspicions that PointCare was intentionally and

wrongfully taking measures aimed at taking away Drew's lawful rights so that PointCare could then re-market such rights to others to alleviate its own financial pressures.

18.    Later that same day, Drew rejected the proposed modification and asked for the notice of material breach required under Section 6.9 of the Agreement, with as much specificity as possible so that it could determine (i) whether there was a breach and (ii) if so, whether it could be cured within the sixty days allocated under the Agreement. Drew also asked that PointCare immediately return the NP device to Drew so that the device could be used for demonstration at a then-upcoming international conference. Because of the immediacy of the situation, Drew requested that PointCare respond by Friday, November 9.

19.    The next day, PointCare purported to give the requisite Default Notice, claiming Drew's supposed failure to comply with the HT development schedule in the Agreement (which had been modified several times) as a material breach. The Notice did not address the return of the NP device. Subsequent attempts by Drew to get a substantive response from PointCare as to this latter issue received various "explanations", the most recent of which is that the device would not be returned until the HT platforms were marketable.

20.    On the same day that PointCare acknowledged that the Agreement was still operative, it unilaterally removed references to Drew on its website. PointCare's refusal to cooperate and to perform its obligations relative to the HT program continued and continue to date.

21.    Under the Notice, Drew had sixty days to correct any default. Although Drew does not believe it is in default under the Agreement, it nonetheless took all steps

8

that it could take to expedite its part in the finalization of the project. On December 7, 2007, Drew notified PointCare that it had developed the HT platform to the point where PointCare had to perform its obligations and determine whether its assay and the HT platform would interface and operate together effectively. Drew further noted that an independent expert that had previously been endorsed by PointCare's technical team, Dr. Chow, had been present while Drew tested the instrument, that he had verified its performance and that Drew was ready to ship the HT instrument to PointCare for delivery during the week of December 10, 2007, well within the sixty-day "cure" period allegedly triggered by the Default Notice provided by PointCare.

22.     Since that time, Drew has made several attempts to arrange for (i) the shipment of the HT device to PointCare; (ii) PointCare's access to the data relied upon by the expert, Dr. Chow; and (iii) consultation between PointCare and Dr. Chow with respect to his report. On each occasion, PointCare has refused to take delivery on several pretenses and has refused to even speak with Dr. Chow, in effect leaving Drew in a position where it is unable to "cure" any alleged default and move forward with its FDA submission for the HT platform.

23.     One of the false pretenses asserted by PointCare relates to its demand for underlying test data. Even though Drew is under no obligation to provide such confidential information, Drew did provide PointCare with Dr. Chow's test report, which clearly showed the data that he relied upon when stating the instrument was ready to be shipped to PointCare, and even offered direct access to Dr. Chow to discuss his findings.

24.     Despite receipt of the Chow report and Drew's offer to set up a teleconference with Dr. Chow, PointCare continued to refuse delivery of the HT

platform, falsely claiming, among other things, that Dr. Chow's report noted device failures and that Drew had not performed needed accuracy tests. Moreover, PointCare even went so far as to bemoan the lack of testing that was PointCare's responsibility under the Agreement (and the very reason the device was being shipped to them.) Finally, PointCare insisted, prior to any delivery, on Drew providing additional confidential data; data that is utterly unnecessary for and has no relation to the testing that PointCare is contractually obligated to conduct. At the same time, PointCare advised Drew that the Agreement between the parties was terminated for failure to cure a material breach – timely development of the HT platform.

25.      As mentioned above, Drew has also attempted on several occasions to secure the return of its NP device from PointCare. PointCare has steadfastly refused to return the device on the stated premise that the device can only be used to support Drew's marketing efforts and that those marketing efforts can only be pursued when the HT platform receives FDA approval. PointCare's recalcitrance has created the perfect Catch-22 situation, i.e., since PointCare won't accept HT delivery and conduct tests of compatibility, Drew cannot complete the HT platform development and establish that the HT device meets specifications. Therefore and due to no fault on its part, Drew's ability to complete its FDA submission and fulfill its contractual obligation relative to the HT platform is frustrated. As a consequence of PointCare's own actions, PointCare then asserts that Drew is in breach, refuses to cooperate, thus risking the entire HT program, as well as Drew's substantial investment in it and also refuses to return the NP device to Drew or allow it to begin selling the NP devices in its territories.

26.     Upon information and belief, PointCare has received FDA approval of the NP device, after submitting data generated using one of Drew's machines. Since Drew has the primary responsibility for marketing the NP device in the United States, this means that Drew could commence marketing and selling the device in the United States where it has many potential customers once the HT device meets specifications. By refusing to accept delivery of the HT device and fulfilling its obligations, PointCare is effectively preventing Drew from securing FDA approval to market its HT instrument and from successfully selling the NP device in its assigned territories, including the United States, as the parties agreed.

27.     Upon information and belief, Drew asserts that PointCare's true underlying motive is to reclaim primary sales and marketing rights for territories which contractually belong to Drew by mutual agreement of the parties, including but not limited to the United States, Russia, the European Union, and much of Asia. Such bad faith conduct has and will continue to deprive Drew of the marketing rights that were mutually agreed upon and bargained for and will irreparably harm Drew's reputation within the medical device distribution community. (Drew has exhibited a prototype of the NP platform at trade shows on several occasions and, via its efforts, generated a good deal of interest).

28.     Moreover, the intentional blocking of Drew's HT product development by PointCare and any effort by PointCare to develop an alternative HT platform with another manufacturer, especially if it shares Drew's technologies and know-how with a third party for such a purpose, will also cause Drew irreparable harm. Drew, which has expended more than $ 1 million on this project to date, will have to find a suitable

11

replacement for the CD4 assay, redesign the HT machine so that it is compatible with the new assay, and then catch-up to the marketing lead that PointCare is attempting to create for itself. Additionally, any loss of its intellectual property would significantly and irreparably damage Drew.

29.    Since, upon information and belief, PointCare does not have the expertise necessary to manufacture the HT, Drew has bona fide concerns that PointCare may provide Drew's proprietary information to PointCare's putative manufacturer, thus irreparably harming Drew and directly violating the terms and conditions of the Agreement.

30.    As to the distribution with respect to both products, Drew is concerned, based upon information and belief, that PointCare has and intends to continue to approach distributors in territories assigned to Drew under the Agreement to solicit their interest in licensing such rights from PointCare, undermining Drew's efforts, causing confusion in the distribution channel and damaging Drew's image and reputation among its distributors and customers. Whether these are presently Drew distributors or competitors of Drew distributors, Drew's distributor relationships will be severely harmed and distributors and customers will certainly come to the negative and inaccurate impression that Drew's important joint venture with PointCare has failed and that the failure is Drew's fault. If PointCare is successful in enticing any Drew distributor to market the NP system, it will also have the effect of putting that distributor in violation of its distribution agreement with Drew because of the competitive overlap mentioned previously. On a larger scale, Drew will be deprived of territories awarded to it under the

Agreement as a trade-off for the considerable investment Drew has made to develop the integrated HT technology and to market both products.

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT- DAMAGES

31.    Drew repeats and realleges paragraphs 1 - 30 above.

32.    The Agreement is a valid contract entered into by Drew and PointCare.

33.    Drew has fully performed its obligations under the Agreement and remains ready, willing and able to continue to perform its obligations under the Agreement.

34.    PointCare has materially breached the Agreement by, *inter alia,* communicating defamatory information to Drew's distributors, by disclosing Drew's highly confidential technological information and marketing plans that the Agreement specifically obligates PointCare to protect, and by otherwise:  1) failing to live up to its responsibilities under the Agreement such as taking delivery of the HT system and conducting tests it is contractually responsible to perform; 2) wrongfully terminating the Agreement in bad faith with the intent of wrongful gain; 3) wrongfully refusing to cooperate with Drew to complete the HT development; 4) improperly soliciting distributors to license distribution rights from PointCare that are the lawful property of Drew under the Agreement; 5) wrongfully refusing to return the NP machine to Drew and support its efforts to market and sell the NP within the Drew territories; 6) knowingly violating Drew's intellectual property rights; 7) knowingly violating its non-disclosure obligations to Drew,  and 8) acting in bad faith to intentionally delay or destroy Drew's HT platform development program.

13

35.    PointCare's misconduct to date has caused and will continue to cause Drew to suffer irreparable injuries, as well as substantial monetary damages. Drew also faces the total loss of the substantial investment it has made in both the HT and NT platforms. On information and belief, the amount of monetary damages well exceeds $1,000,000.

## SECOND CAUSE OF ACTION

## BREACH OF CONTRACT – PERMANENT INJUNCTION

36.    Drew repeats and realleges paragraphs 1 - 35 above.

37.    The Agreement is a valid contract entered into by Drew and PointCare.

38.    Drew has fully performed its obligations under the Agreement and remains ready, willing and able to continue to perform its obligations under the Agreement.

39.    PointCare has materially breached the Agreement by, *inter alia*, communicating defamatory information to Drew's distributors and by disclosing Drew's highly confidential technological information and marketing plans that the Agreement specifically obligates PointCare to protect. It is also on the verge of damaging Drew's relationships with its distributors by offering products competitive to Drew's and it is severely hampering Drew's development of the HT system by its unwarranted refusal to conduct compatibility tests. As a result, Drew is threatened with substantial and irreparable harm that cannot be compensated by money damages alone.

40.    PointCare should be permanently enjoined from violating its Agreement with Drew and communicating with distributors for territories assigned to Drew under the Agreement, with respect to either the HT or NP platforms.

14

## THIRD CAUSE OF ACTION

## DECLARATORY JUDGMENT

41.     Drew repeats and realleges paragraphs 1 - 40 above.

42.     An actual controversy exists between Drew and PointCare regarding PointCare's misconduct and purported termination of the Agreement.

43.     Drew seeks a declaration from this Court that PointCare's misconduct and purported termination of the Agreement constitute material breaches thereof.

## FOURTH CAUSE OF ACTION

## SPECIFIC PERFORMANCE

44.     Drew repeats and realleges paragraphs 1 - 43 above.

45.     The Agreement is a valid contract which exists between Drew and PointCare.

46.     Drew has substantially performed its obligations under the Agreement and remains ready, willing and able to continue to perform its obligations under the Agreement.

47.     PointCare is able to perform its obligations under the Agreement.

48.     Drew does not have an adequate remedy of law for PointCare's various breaches of the Agreement, including its disclosure of Drew's confidential technological information and marketing plans, and cannot mitigate its damages. With respect to completion of the HT project, PointCare is the sole source provider of the CD4Sure assay, controls its patent rights, possesses the expertise relative to the assay and is able to complete the necessary compatibility testing with little capital cost.  Drew, on the other

15

hand, cannot move the project forward unless and until PointCare satisfactorily completes its obligation.

49.     As a result, PointCare should be ordered to specifically perform the Agreement until such time as it or Drew validly terminates the Agreement.

### FIFTH CAUSE OF ACTION

### FRAUDULENT INDUCEMENT

50.     Drew repeats and realleges paragraphs 1 - 49 above.

51.     By stating that it needed to reacquire the NP device to perform purported software upgrades thereto, PointCare knowingly misrepresented a material fact to Drew.

52.     In reliance on PointCare's misrepresentation, Drew permitted PointCare to retrieve the NP device from Drew's Dallas headquarters.

53.     PointCare's failure to return the NP device to Drew has resulted in significant detriment to Drew.

### SIXTH CAUSE OF ACTION

### CONVERSION

54.     Drew repeats and realleges paragraphs 1 - 53 above.

55.     Drew has a right of possession to the NP device.

56.     PointCare has converted the NP device and is in the unauthorized possession thereof.

### SEVENTH CAUSE OF ACTION

### CONSTRUCTIVE TRUST

57.     Drew repeats and realleges paragraphs 1 - 56 above.

58.    Having entered into a joint marketing agreement involving highly sensitive technological information and confidential marketing plans, Drew and PointCare maintain a confidential or fiduciary relationship.

59.    In reliance on PointCare's promise to perform a purported software upgrade on the NP device, Drew transferred possession of the device to PointCare, which has unlawfully retained possession thereof.

60.    As a result of this misconduct, PointCare has been unjustly enriched at the expense of Drew.

## EIGHTH CAUSE OF ACTION

## TORTUOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

61.    Drew repeats and realleges paragraphs 1 - 60 above.

62.    The Agreement is a valid contract knowingly entered into by Drew and PointCare.

63.    Through its misconduct in unlawfully communicating with Drew's distributors about marketing the NP device in geographic territories assigned to Drew, PointCare is intentionally procuring a breach of the their distribution agreement with Drew.

64.    As a direct result of PointCare's interference with Drew's current and potential clients and business partners, Drew has suffered significant monetary and other damages.

## NINTH CAUSE OF ACTION

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

65.    Drew repeats and realleges paragraphs 1 - 64 above.

17

66.    The Agreement is a valid contract which exists between Drew and PointCare and which is governed by New York law.

67.    Drew has substantially performed its obligations under the Agreement and remains ready, willing and able to perform its obligations under the Agreement.

68.    PointCare is able to perform its obligations under the Agreement.

69.    By failing to return Drew's NP device, disclosing highly confidential technological information and marketing plans, unlawfully communicating with Drew's distributors about marketing the NP device in geographic territories assigned to Drew, and violating its obligations to assist Drew by performing necessary testing of the CD4 assay's compatibility with the HT system, PointCare has breached the express terms and conditions of its Agreement with Drew as well as implied covenants of good faith and fair dealing that are implicit in every contract governed by New York law.

## PRAYER FOR RELIEF

WHEREFORE, Drew demands as follows:

(a)    Judgment in its favor and against PointCare;

(b)    Permanent injunctive relief to prevent PointCare from seeking to distribute or soliciting the distribution of HT and NP products in territories assigned to Drew, terminating or otherwise violating its Agreement with Drew and communicating defamatory information to Drew's distributors;

(c)    Damages, to the extent determinable, in an amount to be proven at trial;

(d)    Declaratory judgment that PointCare's misconduct and purported termination of the Agreement constitute material breaches thereof;

(e)    PointCare's specific performance of the Agreement, including the conducting of necessary testing of the HT machine and the return of the NP machine, until such time as it or

18

Drew validly terminates the Agreement;

     (f)     Pre-judgment interest as allowed by law;

     (g)     Post-judgment interest as allowed by law;

     (h)     Attorneys' fees and costs of court;

     (i)     Such other, further and different relief as this Court may deem just and proper.

Dated: New York, New York
       February 13, 2008

DUANE MORRIS LLP

By: _____

    Anthony J. Costantini
    John Dellaportas
    Brian Damiano
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000
Facsimile: (212) 692-1020
*Attorneys for Plaintiff Drew Scientific, Inc.*

Exhibit 1

COPY    Manufacturing, Distribution and Co-Marketing Agreement

This Agreement, together with *Annexes 1 to 6* attached hereto and incorporated by reference ("**Agreement**") is made this _____ **day of June, 2006** by and between PointCare Technologies, Inc., a company organized and existing under the laws of the Commonwealth of Massachusetts, with offices at 121 Cedar Hill Street, Marlborough, Massachusetts, USA (**"POINTCARE"**), and **DREW SCIENTIFIC INC.**, a company organized and existing under the laws of Texas, with offices at 4230 Shilling Way, Dallas, Texas, USA ("**DREW**"). POINTCARE and DREW are sometimes hereinafter collectively referred to as the "Parties".

### RECITALS

**WHEREAS,** POINTCARE develops, manufactures, and sells medical diagnostics that enable near patient care testing to be performed effectively, including POINTCARE'S proprietary CD4 Lymphocyte Enumeration Assay, CD4sure™.

**WHEREAS,** DREW, among other things, develops, manufactures, and sells *in vitro* diagnostic instrumentation platforms, including the Excell 22™, and associated consumables.

**NOW THEREFORE,** in consideration of the mutual promises and conditions herein contained, the Parties agree as follows:

### Art. 1.  Diagnostic Platform Development

**1.1**    DREW agrees to modify its current Excell 22™ hematology platform to accommodate POINTCARE'S proprietary CD4 Lymphocyte Enumeration Assay, CD4sure™.  DREW will manufacture one modified version, called the 'HTc', which will be a full five part system that will be marketed and sold by DREW, and a second version, called the 'HTw', which be marketed and sold by POINTCARE for use in the treatment of patients with HIV infection.  For purposes of this Agreement, these platforms will be referenced collectively as the 'high throughput' (HT) platform or individually as noted above.  Among other things, a description of the two (2) diagnostic instrumentation platforms ('platforms'), as well as : (a)  platform and assay specifications ; (b)  development responsibilities ; (c)  allocation of development costs ; (d) development timetables ; (e) performance parameters of the present CD4sure™ Assay and a

newly developed CD4Lymphocyte Enumeration Assay, as well as other assay-related performance standards ; (f) performance parameters of the instrumentation platforms, as well as other platform-related performance standards ; (g) responsibility for transfer of the developed platforms, the present CD4sure™ Assay, and the newly developed CD4 Lymphocyte Enumeration Assay into manufacturing ; and (h) responsibility for incurred costs, as well as future costs, are set forth in **Annex 1** ("Specifications and Development Timelines for the DREW HT Platform and the POINTCARE CD4sure™ Lymphocyte Enumeration Assay Kit ")  which is hereby included in this Agreement by reference.

POINTCARE hereby agrees to enter into a Development and Manufacturing agreement with a third party medical device manufacturer to jointly develop and manufacture the Near Patient (NP) instrumentation platform.  Once developed, POINTCARE agrees that it will purchase, private label, and sell the NP instrumentation platform to DREW at prices, terms and conditions as noted in **Annex 2**.  Further, POINTCARE shall grant DREW non-exclusive worldwide distribution rights for such NP platform. Such distribution rights will be conditional upon the successful development and marketing of the HT platform.  A description of the NP platform, as well as : (a)  platform and assay specifications ; (b)  development responsibilities ; (c)  allocation of development costs ; (d) development timetables ; (e) performance parameters of the CD4sure™ Assay, as well as other assay-related performance standards ; (f) performance parameters of the instrumentation platform, as well as other platform-related performance standards ; and (g) responsibility for transfer of the developed platform and the CD4sure™ assay into manufacturing are set forth in **Annex 2** ("Specifications and Development Timelines for the NP Instrumentation Platform and the POINTCARE reformulated Lymphocyte Enumeration Assay Kit ").

*MMR  PBR*                              2

**1.2**    **Diagnostic Instrumentation Platform & CD4 Lymphocyte Enumeration Assay Kit Modifications.**

**1.2.1**   Except as otherwise provided in this Agreement, no instrumentation platform delivered by DREW, POINTCARE, or a third party manufacturer pursuant to this Agreement shall be modified or deviate from the agreed upon specifications noted in *Annex 1* and/or *Annex 2*, except as may be jointly agreed upon by the Parties in writing.  If an instrumentation platform is modified, the cost of developing the modified platform shall be allocated as stated in *Annex 1* and/or *Annex 2*, as applicable.  Any instrumentation platform unit price adjustment resulting from an agreed upon modification shall be negotiated in good faith by the Parties and shall be no more than the actual development and manufacturing costs.  Any modification of the Platforms under this Article 1 shall be properly documented in writing and the corresponding *Annex* shall be modified accordingly.

**1.2.2**   Except as otherwise provided in this Agreement, no CD4 Lymphocyte Enumeration Assay Kit delivered by POINTCARE hereunder shall be modified or deviate from the agreed upon specifications noted in *Annex 1* and/or *Annex 2*, except as may be jointly agreed upon by the Parties in writing.  If a CD4 Lymphocyte Enumeration Assay Kit is modified, the cost of developing the modified platform shall be allocated as stated in *Annex 1* and/or *Annex 2*, as applicable.  Any CD4 Lymphocyte Enumeration Assay Kit unit price adjustment resulting from an agreed upon modification shall be negotiated in good faith by the Parties and shall be no more than POINTCARE'S actual development and manufacturing costs.  Any modification of the CD4 Lymphocyte Enumeration Assay Kit under this Article 1 shall be properly documented in writing and the corresponding *Annex* shall be modified accordingly.

1.3    **Conformity and Compliance Standards.**

**1.3.1** POINTCARE represents and warrants that the CD4sure™ Assay, the reformulated CD4 Assay to be developed, and the NP instrumentation platform, will be manufactured, sold and distributed to DREW pursuant to the terms of this Agreement, will fully conform to all agreed upon specifications, and will fully conform to and comply with all applicable laws, rules and regulations of the United States, including but not limited to relevant provisions of the U.S. Food, Drug and Cosmetic (FD&C) Act and rules, regulations, guidelines and advisories issued pursuant to the FD&C Act. POINTCARE shall be solely responsible for all costs associated with securing any necessary U.S. FDA approvals to market and sell the CD4 Lymphocyte Enumeration Assays that will be used and/or developed for use with the HT and NP diagnostic instrumentation platforms unless otherwise agreed upon in writing by the Parties. Further, POINTCARE shall be responsible for all costs associated with securing U.S. FDA approval to market and sell the NP diagnostic instrumentation platforms developed under this Agreement unless otherwise agreed upon in writing by the Parties.

**1.3.2** DREW represents and warrants that any HT diagnostic instrumentation platforms manufactured, sold and distributed to POINTCARE pursuant to the terms of this Agreement, will fully conform to agreed upon specifications, and will conform to and comply with all applicable laws, rules and regulations of the United States, including but not limited to relevant provisions of the U.S. Food, Drug and Cosmetic (FD&C) Act and rules, regulations, guidelines and advisories issued pursuant to the FD&C Act. DREW shall be solely responsible for all costs associated with securing U.S. FDA approval to market and sell the HT diagnostic instrumentation platforms developed under this Agreement unless otherwise agreed upon in writing by the Parties.

**1.3.3** POINTCARE and DREW, at their respective option, may seek regulatory approvals or effect registrations necessary to sell and distribute the assays and the platforms in certain countries that are encompassed within the marketing and sales territories, as defined in **Annex 3**. POINTCARE and DREW agree to act in good faith to support the other Party's efforts to obtain such approvals or effect such registrations by supplying information in their possession that is necessary for the preparation of



4

submissions to relevant regulatory agencies and by providing consultations through knowledgeable technical representatives upon written request in accordance with the terms set forth in *Annex 3*.

**1.3.4** Both Parties to this Agreement shall have the right to appoint any of their respective subsidiaries, affiliates, distributors and/or sub-distributors, to resell or market the products encompassed within this Agreement, consistent with the terms and conditions of this Agreement.

**1.3.5** DREW and POINTCARE represent and warrant that they have secured or will secure the necessary International Standards Organization ("ISO") certification for medical devices for the instrumentation platforms developed pursuant to this Agreement (DREW will secure for the HT platforms and POINTCARE will secure for the NP platform). During the Term of this Agreement, DREW and POINTCARE will comply with applicable ISO requirements with respect to the diagnostic instrumentation platforms. DREW and POINTCARE shall require that a device history record be properly maintained and kept for each diagnostic instrumentation platform that is manufactured and sold to a Party pursuant to this Agreement and further agree that such records shall be made available to each Party for review upon reasonable request, during normal business hours..

**1.3.6** POINTCARE and DREW shall cooperate in meeting applicable requirements and the guidelines published by the FDA, ISO and other relevant governmental regulatory agencies. POINTCARE and DREW shall use their best efforts and work cooperatively to answer specific questions relating to quality assurance that are received from any government or regulatory agency. In the event that either POINTCARE or DREW receives notice of non-compliance with any applicable government or quasi-government law or regulation, the notified Party shall immediately provide the other Party with written notice of such purported non-compliance. Each Party shall notify the other Party promptly in writing if it becomes aware of any defect or condition which may render any CD4 assay or platform that is a part of this Agreement pursuant to *Annex 1* and/or *Annex 2* to be in violation of any applicable law or regulation.



**1.3.7** The Parties agree to label the products manufactured pursuant to this Agreement in compliance with applicable laws and regulations, as well as the terms and conditions contained in **Annex 4** of this Agreement.

## Art. 2.  Terms of Purchase and Supply.

**2.1** During the Term of this Agreement and subject to the terms and conditions included in this Agreement, DREW shall purchase all CD4 test kits for use with the HT and NP instrumentation platforms exclusively from POINTCARE as set forth in **Annex 5**.

**2.2** During the period that this Agreement remains effective and subject to the terms and conditions included in this Agreement, POINTCARE shall purchase the HTw instrumentation platform, as well as any replacement or spare parts for the HTw instrumentation platform, exclusively from DREW for use with POINTCARE's CD4 Lymphocyte Enumeration Assay Kits as set forth in **Annex 5**.

**2.3** POINTCARE agrees to fill with reasonable promptness, all orders from DREW for its CD4 Lymphocyte Enumeration Assay Kits and NP instrumentation platforms that are approved and accepted by POINTCARE. Upon receipt of an order from DREW, POINTCARE will acknowledge receipt and provide an estimated date of shipment. At no time during the term of this Agreement shall the period between acceptance of a DREW purchase order and the shipment by POINTCARE to DREW exceed eight (8) weeks, unless mutually agreed upon by the Parties. In the instance of a supply limitation, POINTCARE agrees to ship a pro rata percentage of its existing inventory and production capacity at the time of supply limitation to DREW on the basis of each Party's average monthly volume requirements during the past three (3) months (or less if such shortage should occur before a full three months of supply information is available).

**2.4** DREW agrees to fill, with reasonable promptness, all orders from POINTCARE for its HTw instrumentation platform that are approved and accepted by DREW. Upon receipt of an order from POINTCARE, DREW will acknowledge receipt and provide an estimated date of shipment. At no time during the term of this Agreement shall the period between acceptance of a POINTCARE purchase order and the shipment by DREW of its HTw instrumentation



platform to POINTCARE exceed eight (8) weeks, unless mutually agreed upon by the Parties. Delivery terms for spare/replacement parts and other consumables shall be confirmed by DREW upon receipt of a written purchase order from POINTCARE. DREW will use its best efforts to deliver HTw instrumentation platforms or spare parts purchased hereunder within the delivery terms requested by POINTCARE, subject to the Warranty (Article 3) and other applicable provisions of this Agreement.

POINTCARE agrees that any agreement that it enters with a third party developer/manufacturer relative to the development and manufacture of the NP instrumentation platform shall require said third party manufacturer to fill with reasonable promptness, all orders from POINTCARE for the NP instrumentation platform that are approved and accepted. Upon receipt of an order from POINTCARE, the third party manufacturer shall be required to acknowledge receipt and provide an estimated date of shipment.

**2.5**    The prices that POINTCARE shall pay to DREW for the purchase of DREW's HTw instrumentation platform, as well any spare/replacement parts that are requested, and the price that DREW shall pay to POINTCARE for the purchase of POINTCARE's NP instrumentation platform, as well any spare/replacement parts that are requested, and its CD4 Lymphocyte Enumeration assay kits are set forth in *Annex 5*. Said costs shall include the cost of proper packaging for shipment per the specifications included in *Annex 1* and *Annex 2*. The Party that orders the product shall be fully responsible for the actual cost of shipping and insurance. Title to the purchased product(s) and the risk of loss or damage shall shift to the purchaser upon delivery to the purchaser, the purchaser's agent, the purchaser's representative, or a mutually acceptable transport company.

**2.6**    Any price adjustments sought by either Party relative to a product or service that is included in this Agreement must be in accordance with the terms and conditions set forth in *Annex 5*.

**2.7**    The payment terms that are applicable to any product or service that is included in this Agreement are included in *Annex 5*.

7

**2.8**    During the Term of this Agreement, POINTCARE shall not manufacture, market, sell or distribute any instrumentation platform that is substantially equivalent with the DREW HT diagnostic instrumentation platforms with regard to test menu and performance, without DREW'S prior express written agreement, which will not be unreasonably withheld. Further, POINTCARE shall not distribute, market or sell any diagnostic instrumentation platform under any trade name, trademark or logo that is the legal property of DREW without first obtaining DREW's prior written consent.

**2.9**    In case of a change of control of POINTCARE, DREW shall have the option to manufacture, or have manufactured, all reagents necessary to perform the CD4 Lymphocyte Enumeration Assay. POINTCARE will fully cooperate with DREW and execute an appropriate license agreement for the transfer by POINTCARE of know-how and technologies that are necessary to manufacture the CD4 Lymphocyte Enumeration Assay Kits provided that DREW and its third party manufacturer recognize in the license agreement the legal rights which POINTCARE possesses with respect to any know-how or technology. Such license agreement shall include a provision that acknowledges DREW's obligation to pay POINTCARE a continuing licensing royalty equal to five (5) percent of the sales price of each CD4 Lymphocyte Enumeration Assay Kit which it sells for use with the HT or NP instrumentation platforms.

**2.10**   In case of a change of control of POINTCARE, DREW shall also have the right to directly enter into an agreement with the third party manufacturer of the NP instrumentation platform, C2D, at any time that it deems appropriate and to purchase the NP instrumentation platform directly from said manufacturer rather than POINTCARE.

### Art. 3.  Warranty:

**3.1**    POINTCARE hereby represents and warrants to DREW that the NP instrumentation platforms and CD4 Lymphocyte Enumeration Assay Kits that it sells or otherwise provides to DREW hereunder will conform to the Product Specifications set forth in *Annex 2.* Further, POINTCARE hereby represents and warrants to DREW that any modifications thereto, will be in compliance with all applicable laws and regulations and will be free from defects in material,



workmanship and design. If any POINTCARE CD4 Lymphocyte Enumeration Assay Kit sold to DREW is recalled by POINTCARE or its third party manufacturer and otherwise is not capable of being legally sold or used with the HTc or NP instrumentation platforms through no fault or error on the part of DREW, POINTCARE agrees to promptly replace said CD4 testing kit(s), at its full expense (including the cost of shipping and insurance), provided such CD4 testing kit(s) are not beyond the expiration date noted on said CD4 testing kit(s) at the time when DREW places POINTCARE on notice of such product return. DREW agrees to return any CD4 testing kits that it cannot sell for the above noted reasons directly to POINTCARE or its designated agent, at POINTCARE's cost. Further, NP instrumentation platforms and parts that are sold or otherwise provided by POINTCARE to DREW under this Agreement shall be warranted for a period of fifteen (15) months from the date of shipment from POINTCARE to DREW or for a period of twelve (12) months from the date that the NP instrumentation platform or part was provided to DREW's customer or end-user, whichever expires first. DREW agrees to secure, maintain and provide to POINTCARE, upon request, a certification, signed by a representative of the customer and/or end-user that confirms the date of customer and/or end user receipt.

3.2    DREW hereby agrees that any HTw instrumentation platform and spare/replacement parts sold or otherwise provided hereunder shall conform to the Product Specifications set forth in **Annex 1**, as applicable. Further, DREW agrees that any HTw instrumentation platform or parts modifications shall be in compliance with all applicable laws and regulations and will be free from defects in material, workmanship and design. DREW instrumentation platforms and parts that are sold or otherwise provided to POINTCARE under this Agreement shall be warranted for a period of fifteen (15) months from the date of shipment from DREW to POINTCARE or for a period of twelve (12) months from the date that the instrumentation platform or part was provided to POINTCARE's customer or end-user, whichever expires first. POINTCARE agrees to secure, maintain and provide to DREW upon request, a certification, signed by a representative of the customer and/or end-user that confirms the date of customer and/or end user receipt.

3.3    Neither POINTCARE nor DREW provides the other Party with any other warranties, whether expressed or implied. In no event will DREW or POINTCARE be liable to each other or any other person for direct or indirect, remote or consequential damages related to the



incorrect use of their respective instrumentation platforms, including but not limited to commercial losses and tort claims of any kind.

**3.4**    Notwithstanding any contrary terms in this Agreement, POINTCARE agrees to indemnify, defend and hold DREW harmless from and against any and all losses, claims, actions, costs, expenses and damages, including reasonable attorney's fees and expenses, that arise out of a breach of any warranty contained in this Agreement or out of any product liability claim or action that relates to any POINTCARE product sold or otherwise provided pursuant to this Agreement, except to the extent that such loss, claim, action, cost, expense, or damage arises from:  a) acts or omissions that are negligent, reckless or deemed to represent willful misconduct on the part of DREW or its subsidiaries or any of their agents or distributors; or, b) representations made by DREW or its subsidiaries or any of their agents or distributors beyond those made by POINTCARE.  In connection with such indemnifications, DREW agrees to notify POINTCARE of any such claim, pursuant to the Notice provisions of this Agreement, within five (5) business days of receipt of notice by DREW's legal counsel and to cooperate with POINTCARE, at POINTCARE'S expense, in the defense of any such claim.

**3.5**    Notwithstanding any contrary terms in this Agreement, DREW agrees to indemnify, defend and hold POINTCARE harmless from and against any and all losses, claims, actions, costs, expenses and damages, including reasonable attorney's fees and expenses, that arise out of a breach of any warranty contained in this Agreement or out of any product liability claim or action that relates to any DREW product sold or otherwise provided pursuant to this Agreement, except to the extent that such loss, claim, action, cost, expense, or damage arises from a):  acts or omissions that are negligent, reckless or deemed to represent willful misconduct on the part of POINTCARE or its subsidiaries or any of their agents or distributors; or, b) representations made by POINTCARE or its subsidiaries or any of their agents or distributors beyond those made by DREW.   In connection with such indemnifications, POINTCARE agrees to notify DREW of any such claim, pursuant to the Notice provisions of this Agreement, within five (5) business days of receipt of notice by POINTCARE's legal counsel and to cooperate with DREW, at DREW's expense, in the defense of any such claim.

**3.6**    POINTCARE agrees to procure and maintain product liability and general liability insurances naming DREW as an additional insured, with minimum limits of coverage as noted



10

in **Annex 5**. POINTCARE shall, on or before delivery of NP instrumentation platforms and/or CD4 Lymphocyte Enumeration Assay Kits, furnish DREW with certificates of insurance evidencing the foregoing coverages and limits. Such insurance policies shall not be cancelled or changed without adequate replacement and without providing DREW with thirty (30) days advance written notice of such replacement.

**3.7**    DREW agrees to procure and maintain product liability and general liability insurances naming POINTCARE as an additional insured, with minimum limits of coverage as noted in **Annex 5**. DREW shall, on or before delivery of its HTw instrumentation platform, furnish POINTCARE with certificates of insurance evidencing the foregoing coverages and limits. Such insurance policies shall not be cancelled or changed without adequate replacement and without providing POINTCARE with thirty (30) days advance written notice of such replacement.

**3.8**    POINTCARE agrees to require the third party manufacturer of the NP instrumentation platform to procure and maintain product liability and general liability insurances.

## Art. 4.  Installation, maintenance and repairs of Instrumentation Platforms.

**4.1**    POINTCARE and/or its agents, representatives and/or affiliates, shall be responsible for the installation, set-up, and repair of all DREW HTw instrumentation platforms purchased pursuant to this Agreement at all POINTCARE customer or end-user facilities. POINTCARE also assumes responsibility to provide any needed maintenance service and to provide requested technical support to its customers and end-users relative to the operation, use, care and maintenance of DREW HTw instrumentation platforms. Unless specifically set forth in **Annex 6** of this Agreement, DREW shall not be responsible for installing or repairing DREW HTw instrumentation platforms provided to POINTCARE under this Agreement. Further, unless specifically noted in **Annex 6**, DREW shall bear no responsibility to provide technical support or training to POINTCARE'S employees, agents, representatives, customers or end-users.

DREW and/or its agents, representatives and/or affiliates, shall be responsible for the installation, set-up, and repair of all POINTCARE NP instrumentation platforms purchased

MMR  PBK                     11

pursuant to this Agreement at all DREW customer or end-user facilities.  DREW also assumes responsibility to provide any needed maintenance service and to provide requested technical support to its customers and end-users relative to the operation, use, care and maintenance of POINTCARE NP instrumentation platforms.  Further, unless specifically noted in *Annex 6*, POINTCARE shall bear no responsibility to provide technical support or training to DREW's employees, agents, representatives, customers or end-users.

**4.2**    POINTCARE agrees that it shall only use spare/replacement parts purchased from DREW to repair or service any DREW instrumentation platform procured pursuant to this Agreement.    In the event that POINTCARE or its employees, agents, representatives, customers or end-users use parts purchased from a person or entity not related to DREW, without the specific written approval of DREW, any and all warranties, including but not limited to the warranty against material defects and manufacturing flaws, shall be deemed null and void.

DREW agrees that it shall only use spare/replacement parts purchased from POINTCARE to repair or service any POINTCARE instrumentation platform procured pursuant to this Agreement.  In the event that DREW or its employees, agents, representatives, customers or end-users use parts purchased from a person or entity not related to POINTCARE, without the specific written approval of POINTCARE, any and all warranties, including but not limited to the warranty against material defects and manufacturing flaws, shall be deemed null and void.

**4.3**    DREW does maintain a competent team of technical specialists that are knowledgeable concerning its instrumentation platforms. DREW agrees to reasonably consider a request for technical assistance by POINTCARE that is not agreed upon in *Annex 6* and to make a reasonable effort to provide an application/service specialist to support POINTCARE and its customer or end-user pursuant to the relevant reimbursement and support terms contained in *Annex 6*.

## Art. 5.    Intellectual property.

**5.1**    All patents, trademarks, trade names, labels and copyrights currently proprietary to POINTCARE ("POINTCARE Intellectual Property") shall remain the exclusive property of



12

POINTCARE. POINTCARE shall have the exclusive right to all future modifications and additions to POINTCARE'S Intellectual Property, as well as intellectual property developed in the future by POINTCARE provided such modifications, additions, and/or developments are not the result of the direct involvement or financial assistance of DREW. DREW shall not have the right to and shall not apply for any patent(s) relating to POINTCARE Intellectual Property that is solely developed by POINTCARE, at its own cost, during the term of this Agreement and thereafter.

5.2    All patents, trademarks, trade names, labels and copyrights currently proprietary to DREW ("DREW Intellectual Property") shall remain the exclusive property of DREW. DREW shall have the exclusive right to all future modifications and additions to DREW'S Intellectual Property as well as intellectual property developed by DREW provided such modifications, additions, and/or developments are not the result of the direct involvement or financial assistance of POINTCARE. POINTCARE shall not have the right to and shall not apply for any patent(s) relating to DREW Intellectual Property which is solely developed by DREW, at its own cost, during the term of this Agreement and thereafter.

5.3    All intellectual property that is jointly developed by the Parties during the Term of the Agreement shall be deemed to be jointly owned by the Parties, provided that a brief summary of the invention is described in writing within 10 business days from the date of the invention and signed by both Parties. Subsequently, both Parties shall agree to a percent ownership of the invention. If such an agreement can not be reached after reasonable discussions among the Parties, the ownership of the invention shall be finally determined by an arbitrator as provided below in this section. The Parties shall be responsible for all costs incurred in the protection or defense of the intellectual property according to their percent ownership of the intellectual property. Both Parties shall be free to use the joint invention and develop, make and sell products based on the jointly owned intellectual property, without seeking the consent of the other Party. Each Party agrees to negotiate a reasonable royalty to be paid to the other Party based upon sales that it makes or that its licensee makes, of products and/or processes that use or incorporate the intellectual property. The percent ownership in the intellectual property, the cost of product development and other reasonable factors shall be considered in the determination of a reasonable royalty. Should the Parties be unable to agree on a royalty rate, they will submit the issue to binding arbitration as described below in this Section.

13

If a Party should desire to sell its rights to any intellectual property that was jointly developed pursuant to this Agreement, the Parties will act in a commercially reasonable manner to achieve a valuation of the property rights of the Party that seeks to divest its rights and the other Party shall have the right of first refusal with respect to said property. If, after best efforts, an agreement cannot be reached between the Parties regarding a commercially appropriate valuation, the Parties agree that they will select a mutually acceptable arbitrator to establish a valuation that will be deemed binding upon the Parties. The costs of the arbitrator, as well as the arbitration proceeding, will be equally divided between the Parties. The arbitrator will have the authority to set forth guidelines for the submission of evidence, expert reports and testimony. However, it is agreed that no oral testimony will be included in the proceeding and that the Federal Rules of Civil Procedure and Evidence will otherwise govern such proceedings. Each Party will be responsible for its own costs associated with resolving such a disagreement.

5.4     Notwithstanding the other provisions of this Article 5, POINTCARE shall supply to DREW, in electronic, editable format (such as Microsoft Word), information, manuals and documentation sufficient for DREW'S development of its own product manuals, promotional materials and related documentation for distribution to its agents, distributors and current or prospective end-users. DREW shall have the exclusive right to copyright the manuals, promotional materials and other documentation that develops. All of the documents developed and distributed under this Article 5.4 shall bear DREW's logo and/or trade dress unless the Parties agree otherwise in writing.

5.5     Notwithstanding the other provisions of this Article 5, DREW shall supply to POINTCARE, in electronic, editable format (such as Microsoft Word), information, manuals and documentation sufficient for POINTCARE'S development of its own product manuals, promotional materials and related documentation for distribution to its agents, distributors and current or prospective end-users. POINTCARE shall have the exclusive right to copyright the manuals, promotional materials and other documentation that it develops. All of the documents developed and distributed under this Article 5.5 shall bear POINTCARE'S logo and/or trade dress unless the Parties agree otherwise in writing.



14

## Art. 6.    Term and Termination

**6.1**    With respect to combined use of DREW'S HT instrumentation platforms and POINTCARE'S CD4sure™ assays, this Agreement shall be effective for a term of five (5) years commencing on the date that DREW receives U.S. FDA approval to sell the HTc and HTw platforms, as modified to accommodate POINTCARE's CD4sure™ assay, or POINTCARE receives U.S. FDA approval to sell its modified CD4sure™ assay, whichever approval is later received ('Anniversary Date'), and end on the fifth anniversary of the Anniversary Date.  Unless lawfully terminated, the provisions of this Agreement pertaining specifically to the supply to DREW by POINTCARE of its CD4 Lymphocyte Enumeration Assay Kits for use with the HTc shall be automatically renewed at the option of DREW for a successive five (5) year period unless DREW provides POINTCARE with written notice of its desire not to renew the Agreement no less than ninety (90) days prior to Anniversary Date. DREW shall have the right to renew this Agreement with respect to the aforementioned CD4 Lymphocyte Enumeration Assay Kits for a total of three (3) successive five (5) year periods following the initial term with the proviso that if POINTCARE no longer desires to manufacture and sell  CD4 Lymphocyte Enumeration Assay Kits to DREW, it shall provide DREW, at no cost, with the licenses, know-how and technical support necessary to allow DREW or its designated third party manufacturer to manufacture and sell the CD4 Lymphocyte Enumeration Assay Kits and DREW shall agree to pay POINTCARE a royalty in the amount of five percent (5%) of the sales price per CD4 Lymphocyte Enumeration Assay Kit sold.

**6.2**    With respect to combined use of the NP instrumentation platform and CD4 Lymphocyte Enumeration Assay Kits that POINTCARE shall develop, this Agreement shall be effective for a period of five (5) years ("NP Term") commencing on the date that U.S. FDA approval is received to sell the NP platform or the date that POINTCARE receives FDA approval to sell its modified CD4 Lymphocyte Enumeration Assay Kits for the NP instrumentation platform in the United States, whichever approval is later received ('NP Anniversary Date') and ending on the fifth anniversary of the NP Anniversary Date.  Unless the Agreement is lawfully terminated in accordance with the provisions of this Agreement, the provisions of this Agreement pertaining to the supply to DREW by POINTCARE of the NP instrumentation platform shall be capable of renewal for successive five (5) year terms, at the option of DREW, provided that DREW provides notice no less than thirty (30) days prior to the expiration of an NP Term, that C2 will



15

continue to supply the NP instrumentation platform to POINTCARE, and the Parties, acting in good faith, reach consensus on renegotiated pricing terms. With respect to the modified CD4 Lymphocyte Enumeration Assay Kit for use with the NP platform, it is agreed that DREW has the right to renew this Agreement for successive five (5) year terms provided that DREW provides notice no less than thirty (30) days prior to the expiration of an NP Term and that POINTCARE desires to continue to manufacture and sell said CD4 Assay Kits to DREW. If, after the initial term of this Agreement, POINTCARE no longer desires to supply DREW with the CD4 Assay Kits for use with the NP platform, it shall provide DREW, at no cost, with the licenses, know-how and technical support necessary to allow DREW or its designated third party manufacturer to manufacture and sell the modified CD4 Lymphocyte Enumeration Assay Kits for use with the NP instrumentation platform and DREW shall agree to pay POINTCARE a royalty in the amount of five percent (5%) of the sales price per CD4 Lymphocyte Enumeration Assay Kit sold.

6.3     With respect to DREW HTw instrumentation platform purchases by POINTCARE and POINTCARE NP instrumentation platform purchases by DREW, it is agreed that if this Agreement is lawfully terminated or at the conclusion of its initial term, each Party shall respectively have an independent option to purchase said instrumentation platforms from any manufacturer that they choose or to continue in the relationship defined by this Agreement. Notice must be provided in accordance with the terms of this Agreement. Further, the Parties agree that DREW and POINTCARE shall, upon lawful termination or at the conclusion of the Agreement's initial term, have an independent option to negotiate an agreement upon substantially similar terms that will allow each Party to continue to distribute products provided by the other party in the Territories as agreed upon herein or as amended in writing. While no Party shall be required to enter into such an arrangement, the Parties acknowledge that consent to enter into such an arrangement shall not be unreasonably withheld.

6.4     Neither Party shall be liable to the other for damages resulting from the lawful expiration or termination of this Agreement pursuant to this Article 6.

6.5     POINTCARE shall be obligated to manufacture and supply to DREW all NP instrumentation platforms and spare/replacement parts, as well as CD4 Lymphocyte Enumeration Assay Kits, ordered by DREW pursuant to this Agreement prior to the expiration



16

or termination of this Agreement, provided that such order was received and accepted by POINTCARE prior to such expiration or termination.

**6.6.**    DREW shall be obligated to manufacture and supply to POINTCARE all HTw instrumentation platforms and spare/replacement parts ordered by POINTCARE pursuant to this Agreement prior to the expiration or termination of this Agreement, provided that such order was received and accepted by DREW prior to such expiration or termination.

**6.7**    If a Party fails to submit any payment due hereunder more than five (5) days after the due date, a written non-payment notice of such non-payment may be issued to the delinquent Party. If a Party has issued three (3) successive notices of non-payment to the other Party, it may terminate this agreement five (5) days after receipt of the third notice, pursuant to Sections 8.4 and 8.5, unless the deficiency is fully satisfied prior to receipt of the written termination notice.

**6.8**    Notwithstanding any provision in this Agreement to the contrary, upon expiration or termination of this Agreement for any reason, each Party shall continue to supply requested product for a period of up to seven years if legally necessary to comply with any applicable laws and regulations of countries in which a Party sells the CD4 Lymphocyte Enumeration Assays Kits, the DREW HT instrumentation platforms and/or the POINTCARE NP instrumentation platform.

**6.9**    Either Party may terminate this Agreement:

        (a)    in the event of a material breach by the other Party of any of the terms and conditions of the Agreement, excepting breach resulting from non-payment of any disputed amounts due hereunder, by giving the other Party written notice of such breach, and provided that such breach shall not have been cured within sixty (60) days of such notice; or

        (b)    Immediately, by written notice thereof, if any of the following events or an event analogous thereto occurs:



17

(i)    an adjudication has been made that the other Party is bankrupt or insolvent;

(ii)    the other Party has filed bankruptcy proceedings or has had such proceedings filed against it, except as part of a bona fide scheme for reorganization;

(iii)    a receiver has been appointed for all or substantially all of the property of the other Party;

(iv)    the other Party has assigned or attempted to assign this Agreement for the benefit of its creditors; or

(v)    the other Party has begun any proceeding for the liquidation or winding up of its business affairs.

**6.10**   In the event that DREW is unable to deliver to POINTCARE its requirements of DREW HTw diagnostic instrumentation platforms as required under the terms of this Agreement, including but not limited to the product specifications included in **Annex 1** and to the extent that DREW's inability to perform under this Agreement is not excused by this Agreement or a subsequent written agreement of the Parties, POINTCARE shall have the right to directly manufacture the diagnostic instrumentation platforms or to have the platforms manufactured by a mutually acceptable third party. DREW will fully cooperate with POINTCARE and execute an appropriate license agreement for the transfer by DREW of know-how and technologies that are necessary to manufacture the diagnostic instrumentation platforms provided that POINTCARE and its third party manufacturer recognize in the license agreement the legal rights which DREW possesses with respect to any know-how or technology. The Parties will negotiate an appropriate licensing fee in good faith. If, after best efforts, the Parties cannot agree to a mutually acceptable licensing fee and agreement, the Parties shall select a mutually acceptable arbitrator and proceed in accordance with the arbitration process that is included in Section 5.3 of this Agreement.

18

Moreover, should DREW close down or otherwise divest its manufacturing facility or facilities that are necessary for the manufacture of the DREW HTw diagnostic instrumentation platform, POINTCARE shall have the right of first refusal to purchase said facility/facilities at fair market value, which shall be set by a mutually agreed upon third party appraiser.  If DREW is unable to meet its obligations to POINTCARE as a result of the sale of its manufacturing facility/facilities and POINTCARE would choose not to purchase the facility/facilities but still desires to secure its requirements of the DREW HTw diagnostic instrumentation platform, DREW will agree to provide POINTCARE with a license under which DREW shall transfer the know-how and technologies that are necessary to manufacture the HTw diagnostic instrumentation platform.  The Parties will negotiate an appropriate licensing fee in good faith.  If, after best efforts, the Parties cannot agree to a mutually acceptable licensing fee and agreement, the Parties shall select a mutually acceptable arbitrator and proceed in accordance with the binding arbitration process that is included in Section 5.3 of this Agreement.

**6.11**    In the event that POINTCARE is unable to deliver to DREW its requirements of POINTCARE CD4 Lymphocyte Enumeration Assay Kits, as required under the terms of this Agreement, including but not limited to the product specifications included in **Annex 1** and **Annex 2**, and to the extent that POINTCARE's inability to perform under this Agreement is not excused by this Agreement or a subsequent written agreement of the Parties, DREW shall have the right to directly manufacture the CD4 Lymphocyte Enumeration Assay Kits or to have the CD4 Lymphocyte Enumeration Assay Kits manufactured by a mutually acceptable third party.  POINTCARE will fully cooperate with DREW and execute an appropriate license agreement for the transfer by POINTCARE of know-how and technologies that are necessary to manufacture the CD4 Lymphocyte Enumeration Assay Kits provided that DREW and its third party manufacturer recognize in the license agreement the legal rights which POINTCARE possesses with respect to any know-how or technology.  The Parties will negotiate an appropriate licensing fee in good faith.  If, after best efforts, the Parties cannot agree to a mutually acceptable licensing fee and agreement, the Parties shall select a mutually acceptable arbitrator and proceed in accordance with the binding arbitration process that is included in Section 5.3 of this Agreement.

Moreover, should POINTCARE close down or otherwise divest its manufacturing facility or facilities that are necessary for the manufacture of the CD4 Lymphocyte Enumeration Assay

19

Kits, DREW shall have the right of first refusal to purchase said facility/facilities at fair market value, which shall be set by a mutually agreed upon third party appraiser. Should POINTCARE receive a credible offer to buy all of its operations or a portion of its operations that would affect its ability to supply DREW'S requirements for CD4 Lymphocyte Enumeration Assay Kits, POINTCARE agrees that DREW shall have the right to make an offer that exceeds the other credible offer and that POINTCARE shall be obligated to accept such offer from DREW. If POINTCARE is unable to meet its obligations to DREW as a result of the sale of its manufacturing facility/facilities and DREW would choose not to purchase the facility/facilities but still desires to secure its requirements of the CD4 Lymphocyte Enumeration Assay Kits, POINTCARE will agree to provide DREW with a license under which POINTCARE shall transfer the know-how and technologies that are necessary to manufacture the CD4 Lymphocyte Enumeration Assay Kits. The Parties will negotiate an appropriate licensing fee in good faith. If, after best efforts, the Parties cannot agree to a mutually acceptable licensing fee and agreement, the Parties shall select a mutually acceptable arbitrator and proceed in accordance with the binding arbitration process that is included in Section 5.3 of this Agreement.

**6.12**   Following the termination of this Agreement (whether by non-renewal or termination pursuant to Article 6), each Party to this Agreement shall have the right to continue distributing the diagnostic instrumentation platforms and/or the CD4 Lymphocyte Enumeration Assay Kits as follows:

**6.12.1**   DREW agrees that it will sell to POINTCARE its requirements of accessories, supplies and spare parts for the HTw platform at all times during the Term and for seven (7) years after the termination of this Agreement at pricing and terms that are in accordance with this Agreement. Such sales shall be governed by the terms of this Agreement, even though this Agreement may have been terminated. Should the Agreement be terminated and DREW cannot deliver spare parts within the agreed time frame, POINTCARE may repair, or refurbish or source from third parties equivalent spare parts for the HTw platform. DREW shall furnish to POINTCARE all information necessary to enable POINTCARE to source such parts and, if necessary, actively support POINTCARE's effort to do so. In such cases, DREW shall bear no risk and shall not be subject to any liability for any such product that it does not directly sell to POINTCARE.

**6.12.2**   POINTCARE agrees to sell to DREW its requirements of accessories, supplies and spare parts for the NP instrumentation platform, as well as the CD4 Lymphocyte Enumeration Test Kits for the HTc platform and the NP platform at all times during the



20

Term, and for seven (7) years after the termination of this Agreement at the pricing and the terms provided herein. Such sales shall be governed by the terms of this Agreement, even though this Agreement may have been terminated. Should the Agreement be terminated and POINTCARE cannot deliver such NP instrumentation platforms and/or CD4 assay kits within the agreed time frame, DREW may source the undeliverable product from third parties. POINTCARE shall furnish to DREW all information necessary to enable DREW to source such instrumentation platform and/or CD4 assay kits and, if necessary, actively support DREW's effort to do so. In such cases, POINTCARE shall bear no risk and shall not be subject to any liability for any such NP instrumentation platforms and/or CD4 Assay Kits that it does not directly sell to DREW.

**6.13** Termination or non-renewal of this Agreement shall not in any way operate so as to impair or destroy any of the rights or remedies of POINTCARE or DREW, whether at law or in equity, nor shall it relieve the Parties of their obligations pursuant to Articles 3, 5, and 7 and Sections 8.1, 8.4, and 8.5 of this Agreement.

## Art. 7    Confidentiality:

**7.1** Each Party shall maintain in confidence both the terms of this Agreement and any information received from the other Party in writing during the term of this Agreement and shall neither publish, disseminate nor disclose such information to any third Party nor use such information except for the furtherance of the purposes of this Agreement, without the prior express written permission of such other Party. This obligation shall not apply to any information which: (i) now or hereafter comes into the public domain, except by breach of this Agreement, or (ii) is already in the possession of the receiving Party other than as a result of having received it from the disclosing Party as evidenced by written records, or (iii) is independently developed by the receiving Party without use of or access to the information of the disclosing Party, or (iv) which is required to be provided to a governmental regulatory agency in order to secure the necessary regulatory approvals to manufacture or market the products, or (v) is required to be disclosed by a Subpoena issued from a court of competent jurisdiction, a Court Order or a civil investigative demand; provided that the receiving Party, subject to such requirement of this subparagraph (v): (a) promptly notifies the other Party and co-operates with efforts to make such disclosure in confidence or subject to a suitable Protective Order; and (b) the receiving Party discloses only so much of the confidential information as its counsel advises is required to comply with such requirement; or (vi) is



21

intended to be used by an agent, affiliate and/or end-user of DREW or POINTCARE. The obligations of this Article 7 shall extend to any agent, employee, affiliate, and/or end-user that is provided, in whole or in part, with this Agreement. Moreover, the obligations of Article 7 shall continue for five (5) years after the expiration or termination of this Agreement. Upon expiration or termination of this Agreement, each Party shall, at the other's request, destroy or return to the other Party all copies of any information provided pursuant to this Agreement, including all information provided to any agent, employee, affiliate, and/or end-user. However, counsel for each Party to this Agreement may retain one (1) copy of such information solely for the purpose of monitoring compliance with the obligation of confidentiality under this Agreement.

7.2    Each Party agrees not to recruit any member of staff or employee of the other Party for a possible employment or independent assignment within their organization or any affiliated organizations, either as an employee or independent consultant or in any other capacity, without the previous agreement of the other Party. These obligations shall remain in force during the term of this Agreement and for a period of one (1) year after expiration or termination of this Agreement.

### Art. 8.    MISCELLANEOUS

8.1    **Binding Effect and Assignment**. This Agreement shall inure to the benefit of and be binding upon each of the Parties hereto and their respective successors and assigns. Nevertheless, neither this Agreement, nor any right or obligation of a Party arising from this Agreement, may be assigned by such Party without the prior written approval of the other Party, such approval not to be unreasonably withheld, except that DREW may assign this Agreement and such rights and obligations to a purchaser or other transferee of its entire business, without such written approval from POINTCARE  The benefits to DREW under this Agreement are also available to DREW'S subsidiaries and affiliate companies, and DREW shall be responsible for any such subsidiary or affiliate to POINTCARE hereunder, if same are not met.

8.2    **Entire Agreement and Modifications**. This Agreement (including the Annexes hereto), together with the Confidentiality Agreement between the Parties dated November 18, 2005, sets forth the entire Agreement between the Parties and supersedes any and all prior or



contemporaneous negotiations, agreements, representations, understandings and commitments concerning the subject matter hereof. This Agreement shall take precedence over all conflicting or inconsistent terms, conditions or provisions on any invoice or purchase order. Any alteration, amendment or modification to any term or provision of this Agreement shall be in writing and signed by duly authorized officers of POINTCARE and DREW.

8.3     **Force Majeure.** If the full or partial performance of this Agreement or any obligation hereunder is prevented, restricted or interfered with by reason of any cause beyond the control of the affected Party, including, but not limited to fire, strikes, or any law, regulation or policy of any government, or any subdivision, authority or agency thereof that is enacted subsequent to the execution of this Agreement, the Party so affected, upon written notice to the other Party, shall be excused from such performance to the extent of such prevention, restriction or interference, provided that the Party so affected shall use all reasonable efforts to avoid or remove such cause or causes of nonperformance, and shall continue performance hereunder with all reasonable dispatch when such cause or causes are removed. Failure to adhere to or comply with existing laws, rules and regulations, such as but not limited to the U.S. FD&C Act and its good manufacturing practice (GMP) regulations will not be considered a Force Majeure event and will not relieve a Party of its performance obligations pursuant to this Agreement.

8.4     **Methods of Notice.** Any notice, or other communications which are required or permitted hereunder shall be in the English language, shall be written and shall be deemed given on the date received by the receiving Party, if and when : (i) delivered personally with a signed receipt of such delivery, or (ii) sent by registered mail or certified mail, postage prepaid, return receipt requested, or (iii) sent by overnight courier with an internationally recognized courier, or (iv) sent via facsimile or electronic (e-mail) transmission, the receipt of which has been confirmed in a separate writing by the receiving Party.



**8.5    Addresses for Notices**. Unless and until such addresses may be changed by written notice to the other Party, complying with the terms of this Section 8.5, all notices to DREW shall be addressed to:

Drew Scientific, Inc.
4230 Shilling Way
Dallas, TX  75237-1093
USA

Attention:  President

Fax:  214-210-4949

Copy to:  General Counsel
Escalon Medical Corp.
565 E. Swedesford Road
Suite 200
Wayne, PA  19087
Fax:  610-688-6830

and all notices to POINTCARE shall be addressed to:

PointCare Technologies, Inc.
181 Cedar Hill Street
Marlborough, MA  01752

Attention:     Petra Krauledat, Ph.D.
               President & Chief Executive Officer
Fax:   1-508-281-6390

24

8.6    **Governing Law: Arbitration**.  This Agreement shall be construed, interpreted and enforced in accordance with the substantive laws of the state of New York.  Any legal action filed pursuant to and/or related to this Agreement or its interpretation shall be filed in the U.S. District Court for the Southern District of New York.  The Parties shall make a good faith effort to attempt to amicably resolve any disagreements, involving their respective Presidents, before any legal action is filed by a Party to this Agreement.

8.7    **Severability.**  If any provision of this Agreement becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction, (a) this Agreement and the remaining provisions hereof shall continue in full force and effect and (b) the Parties shall negotiate in good faith such amendments to the provisions found to be invalid, illegal or unenforceable as are necessary to eliminate such invalidity, illegality or unenforceability.

8.8    **No Waiver of Subsequent Breach**.  No waiver of any breach of this Agreement or any obligation arising under this Agreement by either Party shall constitute a waiver of any subsequent breach or breaches, whether such breaches are of a similar or dissimilar nature.

8.9    **Nature of Relationship**.  Unless otherwise expressly agreed upon in writing, neither Party to this Agreement shall be in any way the agent or representative of the other Party for any purpose whatsoever, and shall have no right to create or assume any obligation or responsibility of any kind, whether express or implied, in the name of or on behalf of the other Party or to bind the other Party in any manner whatsoever.

8.10    **Reading and Understanding**.  Each party warrants that, prior to executing this Agreement, it carefully read the Agreement in its entirety, had the opportunity to seek legal advice, and that it understood all of the terms contained herein.

8.11    **Counterparts**.  This Agreement may be signed in counterparts, each of which shall be an original, but all of which shall be deemed to be one and the same instrument, and shall be valid and binding when so signed.

MMR PBK

25

IN WITNESS WHEREOF, this Agreement has been executed by the duly authorized officers of POINTCARE and DREW effective as of the date and year first above written.

**DREW SCIENTIFIC, INC**

By: _____

Name: H.M. RIMMER

Title: PRESIDENT

Date: June 2nd, 2006

**POINTCARE TECHNOLOGIES, INC.**

By: _____

Name: Petra B. Kränledat

Title: CEO

Date: June 5th, 2006

COPY

26

*List of Annexes*

## List of Annexes

**Annex 1:**   Specifications and Development Timelines for the DREW HTc and HTw Instrumentation Platforms & the POINTCARE CD4sure™ Lymphocyte Enumeration Assay Kit

**Annex 2:**   Specifications and Development Timelines for the POINTCARE NP Instrumentation Platform & the reformulated POINTCARE Lymphocyte Enumeration Assay Kit

**Annex 3:**   Sales and Marketing Territories

**Annex 4:**   CD4 Lymphocyte Enumeration Assay Kit
and Diagnostic Instrumentation Platform Labelling Terms & Conditions

**Annex 5:**   Pricing Terms and Conditions; Requirements Forecasts

**Annex 6:**   Warranty, Technical Support & Training

*Annex 1*

## ANNEX 1

**Specifications and Development Timelines for the DREW HTc and HTw Instrumentation
Platforms & the POINTCARE CD4sure™ Lymphocyte Enumeration Assay Kit**

**HTw Instrumentation Platform:**

- Drew is responsible for and will bear the costs associated with and related to the development and approval for sale in the United States of the HTc and HTw diagnostic instrumentation platforms that will be compatible with PointCare's CD4sure™ Lymphocyte Enumeration assay.
- Drew is responsible for and will bear all costs associated with and related to the transfer of a HT diagnostic instrumentation platforms that are compatible with PointCare's CD4sure™ Lymphocyte Enumeration Assay Kit into DREW's manufacturing organization.
- Any software problems that are detected with respect to the HTw instrumentation platform shall be jointly investigated. Both Parties will work cooperatively and in good faith to achieve consensus towards a satisfactory solution to any potential software issues and will establish a written process for ascertaining the equitable division of costs associated with the resolution of any software issue that is confirmed by both Parties.
- Development timetable – attached as **Attachment 1** to **Annex 1**
- HTw Instrumentation Platform Specifications: See **Attachment 2** to **Annex 1**

**POINTCARE CD4sure™ Assay Test Kit**

- Pointcare is responsible for and will bear the costs associated with and related to the development and approval for sale in the United States of PointCare's CD4sure™ Lymphocyte Enumeration assay that will be compatible with Drew's HTc and HTw diagnostic instrumentation platforms.
- PointCare is responsible for and will bear all costs associated with and related to the development and transfer into Pointcare's manufacturing organization of a reformulated Lymphocyte Enumeration assay that shall be compatible with and operate with Drew's HTc and HTw diagnostic instrumentation platforms.
- **Development timetable and POINTCARE Lymphocyte Enumeration assay kit [CD4Sure™ and the reformulated versions] Specifications:** <u>See Attachment 3 to Annex 1</u>

*Attachment 1
to Annex 1*

ATTACHMENT 1 TO ANNEX 1

| ID | Description | Start | End |
|---|---|---|---|
| 1 | Analysis and Planning | 2/02/2006 | 4/28/2006 |
| 2 | Compatibility Testing | 2/02/2006 | 2/15/2006 |
| 3 | Business Strategy | 2/16/2006 | 4/14/2006 |
| 4 | Staffing/scheduling | 3/16/2006 | 3/31/2006 |
| 5 | Product Requirements | 2/16/2006 | 3/31/2006 |
| 6 | Product Requirement Review | 4/04/2006 | 4/07/2006 |
| 7 | Quality marriage | 3/16/2006 | 4/28/2006 |
| 8 | Feasibility of select modules | 3/01/2006 | 4/06/2006 |
| 9 | Right angle scatter modification | 3/16/2006 | 3/31/2006 |
| 10 | Test right angle scatter modification. | 3/28/2006 | 3/29/2006 |
| 11 | Lyse mixing modification | 3/01/2006 | 3/31/2006 |
| 12 | Test lyse mixing modification | 4/03/2006 | 4/06/2006 |
| 13 | Development of selected modules | 3/20/2006 | 6/30/2006 |
| 14 | Mixing | 4/05/2006 | 5/26/2006 |
| 15 | Immunogold delivery module | 4/12/2006 | 6/16/2006 |
| 16 | CD4 controls | 4/12/2006 | 6/30/2006 |
| 17 | Fluid routing | 4/05/2006 | 5/31/2006 |
| 18 | Optical module | 4/12/2006 | 5/31/2006 |
| 19 | Sample age extension | 4/12/2006 | 6/30/2006 |
| 20 | Analytical software for CD4 | 3/20/2006 | 6/30/2006 |
| 21 | User Interface | 4/12/2006 | 6/16/2006 |
| 22 | Integration of system | 3/23/2006 | 10/31/2006 |
| 23 | Hardware Integration | 3/23/2006 | 6/29/2006 |
| 24 | CD4 mixing module | 3/23/2006 | 6/29/2006 |
| 25 | Immunogold delivery module | 3/23/2006 | 6/29/2006 |
| 26 | CD4 fluid routing | 3/23/2006 | 6/29/2006 |
| 27 | modified optics | 3/23/2006 | 6/29/2006 |
| 28 | Software Integration | 3/23/2006 | 7/20/2006 |
| 29 | analytical software for CD4 | 3/23/2006 | 6/29/2006 |
| 30 | software for sample age extension | 3/23/2006 | 6/29/2006 |
| 31 | user interface | 3/23/2006 | 6/29/2006 |
| 32 | In-house testing | 8/01/2006 | 8/31/2006 |
| 33 | Field Testing | 9/04/2006 | 9/29/2006 |
| 34 | Reworks | 8/01/2006 | 10/31/2006 |
| 35 | Manufacturing engineering | 9/01/2006 | 3/05/2007 |
| 36 | Instrument manufacturing engineering | 10/02/2006 | 2/29/2006 |
| 37 | Reagent manufacturing engineering | 10/02/2006 | 12/29/2006 |
| 38 | QA procedures, manuals, labelling | 9/01/2006 | 12/29/2006 |
| 39 | Transfer to manufacturing - aggressive | 12/29/2006 | 1/18/2007 |
| 40 | Transfer to manufacturing - conservative | 1/01/2007 | 3/05/2007 |
| 41 | Regulatory | 12/01/2006 | 7/27/2007 |
| 42 | 510k data and submission - aggressive | 12/01/2006 | 1/26/2007 |
| 43 | 510k data and submission - conservative | 5/01/2007 | 7/27/2007 |
| 44 | Relase to Market (non-510k) | 1/05/2007 | 1/05/2007 |
| 45 | Release to Market (510k) - aggressive | 3/09/2007 | 3/09/2007 |
| 46 | Release to Market (510k) - conservative | 7/27/2007 | 7/27/2007 |

6/02/2006



*Attachment 2*
*to Annex 1*

ATTACHMENT 2 TO ANNEX 1

## PRODUCT SPECIFICATIONS FOR HT INSTRUMENT

| CR/BR No. | Customer or Business Requirement | PR No. | Product Requirement | Requirement Importance |
|---|---|---|---|---|
| CR-008-001 | Parameters reported: WBC, Lym, Lym %, Mono, Mono %, Neut, Neut %, Eo, Eo %, Hgb, CD4, CD4%. | PR-008-001 | Instrument capable of producing 4-pt WBC differential, plus hemoglobin, plus CD4. | Mandatory φ1 |
| CR-008-002 | Additional parameters reported RBC, RDW, MCV, Hct, MCH, MCHC, Plt, MPV, PDW, Pct Baso, Baso %. | PR-008-002 | Instrument capable of producing 5-part differential, plus RBC and Plt histogram. 5-part differential obtained by flow cytometer, RBC and Plt parameters obtained by impedance. | Desirable φ1<br>Mandatory φ2 |
| CR-008-003 | CD4 lymphocyte reportable range from 50/μL to 6,000/μL | PR-008-003 | Large dynamic range of CD4 cell enumeration with precision at 200/μL ± 25/μL (where ±25/μL is max acceptable SD). | Mandatory φ1 |
| CR-008-004 | CD4% of total lymphocyte reportable range from 1% to 80% | PR-008-004 | Large dynamic range of CD4 cell enumeration with precision at lym > 1500/uL and 15% ± 2% (where ±2% is max acceptable SD). | Mandatory φ1 |
| CR-008-005 | Only CD4 lymphocytes reported | PR-008-005 | CD4 monocytes excluded from analysis | Mandatory φ1 |
| CR-008-006 | WBC reportable range from 500/uL to 150,000/uL | PR-008-006 | Large dynamic range for WBC.  Precise WBC count obtained by impedance with precision at 8,000/uL <2% | Mandatory φ1 |
| CR-008-007 | Lym reportable range from 300/uL to 17,000/uL | PR-008-007 | Large dynamic range for lymphocytes with precision at 2,000/uL <3% | Mandatory φ1 |
| CR-008-008 | Mono reportable range from 0 to 80% | PR-008-008 | Large dynamic range for monocytes with CV% at 7% is ≤7% for a total WBC count > 8,000/uL | Mandatory φ1 |
| CR-008-009 | Neut reportable range from 1 to 95% | PR-008-009 | Large dynamic range for neutrophils with CV% at 60% is < 3% for a total WBC count > 8,000/uL | Mandatory φ1 |
| CR-008-010 | Eo reportable range from 0.1 to 90% | PR-008-010 | Large dynamic range for eosinophils with CV% at 7% is <7% for a total WBC count > 8,000/uL | Mandatory φ1 |
| CR-008-011 | Hgb reportable range from 4 g/dL to 24 g/dL | PR-008-011a | Large dynamic range for hemoglobin with precision at 7 g/dL <2% | Mandatory φ1 |
|  |  | PR-008-011b | Hgb reportable range from 3 g/dL to 24 g/dL | Desirable φ2 |
| CR-008-012 | RBC reportable range from 0.02 to 9.99 M/uL | PR-008-012 | Large dynamic range for RBC with CV% at 5M/uL <1% | Desirable φ1<br>Mandatory φ2 |
| CR-008-013 | MCV reportable range from 40-150 fl | PR-008-013 | Large dynamic range for MCV with CV% at 90 fl <1% | Desirable φ1<br>Mandatory φ2 |
| CR-008-014 | RDW reportable range from 10 to 25% | PR-008-014 | Large dynamic range for RDW with CV% at 15% <5% | Desirable φ1<br>Mandatory φ2 |

## PRODUCT SPECIFICATIONS FOR HT INSTRUMENT

| | | | | |
|---|---|---|---|---|
| CR-008-015 | Plt reportable range from 10-2000 K/uL | PR-008-015 | Large dynamic range for Plt with CV% at 250K/uL < 3% | Desirable φ1 / Mandatory φ2 |
| CR-008-016 | MPV reportable range from 2-25 fl | PR-008-016 | Large dynamic range for MPV with CV% at 10 fl <5% | Desirable φ1 / Mandatory φ2 |
| CR-008-017 | 32 hour sample age for CD4 and CD4%. 8 hours for all other parameters. | PR-008-017 | Sample age extension for CD4 and CD4% from 8 hour age requirement | Desirable φ1 / Mandatory φ1 |
| CR-008-018 | System warns user if results possibly compromised by aged sample. | PR-008-018 | Mitigation factors for sample age, such as data entry for draw time, flagging for scatter plots, and training | Mandatory φ1 |
| CR-008-019 | System does not report results if compromised by aged sample. | PR-008-019 | Absolute internal control for sample age | Desirable φ1 |
| CR-008-020 | Minimum of 100 samples (including controls) in 7.5 hours | PR-008-020 | 4.5 minutes per sample | Mandatory φ1 |
| CR-008-021 | Instrument may operate for minimum of 1 hour or 30 samples unattended | PR-008-021 | Cap piercing autoloader capable of processing up to 30 samples | Desirable φ1 |
| CR-008-022 | Autoloader capable of handling standard tube sizes | PR-008-022a | Currently standard 5mL size tubes can be used | Mandatory φ1 |
| | | PR-008-022b | Expand possibilities to other sizes for future development | Desirable φ2 |
| CR-008-023 | Choice of CBC/CD4 or CBC only | PR-008-023 | Choice of sequence from menu or separate worklist. Barcode could be design to determine which sequence to be used | Mandatory φ1 |
| CR-008-024 | Minimum 5-pt WBC differential with CD4 | PR-008-024 | Two passes through flow cytometer—WBC differential without immunogold and CD4% with immunogold. Lym count to be determined either by impedance or optical without gold. | Mandatory φ1 |
| CR-008-025 | Minimal sample volume used in assay | PR-008-025a | 180 uL for CBC and an additional 45 uL for CD4 | Mandatory φ1 |
| | | PR-008-025b | Minimum 1.5mL sample volume supplied | Mandatory φ1 |
| CR-008-026 | No handling of open blood tubes | PR-008-026 | Automated cap piercing blood sampling (with autoloader) | Mandatory φ1 |
| CR-008-027 | Touch screen computer operation | PR-008-027 | Touch screen computer specified | Mandatory φ1 |
| CR-008-028 | Mitigation of computer theft | PR-008-028 | Option for security cable for computer | Mandatory φ1 |
| CR-008-029 | Printable results in black and white | PR-008-029a | B&W printer specified | Mandatory φ1 |
| | | PR-008-029b | Color printer specified | Optional φ1 |
| CR-008-030 | Local languages available for each market | PR-008-030 | English, French, Portuguese, Spanish, Chinese, Thai, Vietnamese, and Russian screens | Desirable φ1 / Mandatory φ2 |

## PRODUCT SPECIFICATIONS FOR HT INSTRUMENT

| | | | | |
|---|---|---|---|---|
| CR-008-031 | Protected software for simple operation without tampering | PR-008-031 | Three levels of operation—service mode (through separate software), supervisor mode, and limited operator mode with identity of who "logs on" | Mandatory φ1 |
| CR-008-032 | Limited data entry | PR-008-032 | Barcoded sample and control entry | Mandatory φ1 |
| CR-008-033 | Reagent use and expiration tracking | PR-008-033 | Barcoded reagent entry and low reagent alarms | Mandatory φ1 |
| CR-008-034 | Non-editable numerical data and clusters on screen and on printouts | PR-008-034 | Automated cluster gating | Mandatory φ1 |
| CR-008-035 | Automatic QC tracking of CBC and CD4 controls with control chart display | PR-008-035 | Levey-Jennings control plots generated and easily printable | Mandatory φ1 |
| CR-008-036 | Control material appropriate for all parameters in system | PR-008-036 | Control materials including CD4 and CD4% in capped tubes with barcodes. Possibility of multiple control materials. | Mandatory φ1 |
| CR-008-037 | Data storage > 100,000 patients | PR-008-037 | Appropriate data storage and hardware capability | Mandatory φ1 |
| CR-008-038 | Searchable patient history | PR-008-038 | User interface designed to facilitate easy patient management | Mandatory φ1 |
| CR-008-039 | Easy daily startup and shutdown | PR-008-039a | Fully automated startup/shutdown < 5 minutes each with no customer intervention after thermal equilibrium | Mandatory φ1 |
| | | PR-008-039b | Thermal equilibrium achieved in < 30 minutes | Desirable φ1 |
| CR-008-040 | Assurance of gold reagent activity for every sample | PR-008-040 | Software driven internal control for gold reagent activity | Mandatory φ1 |
| CR-008-041 | Indeterminate samples denoted by a general flag symbol | PR-008-041a | Strict flag criteria for automated software gating. | Mandatory φ1 |
| | | PR-008-041b | Specific flag types for φ2 | Mandatory φ2 |
| CR-008-042 | Steady sample flow profile for analysis | PR-008-042 | Flow irregularity alerts and instructions how to proceed | Desirable φ1 / Mandatory φ2 |
| CR-008-043 | Instrument operation appropriate for all lab settings. | PR-008-043 | External temperature operating range 16–32°C (61–90°F). Relative humidity operating range 10% – 90%, non-condensing. Bulk gold reagent bottle is expected to remain on the instrument for ≤ 5 days. Heater at may be needed for immunogold reaction. | Mandatory φ1 |
| CR-008-044 | Operation with all electrical sources | PR-008-044 | 90-250V, 47-63 Hz. | Mandatory φ1 |
| CR-008-045 | Battery backup available | PR-008-045 | UPS specified with the ability to finish cycle and shutdown completely. | Mandatory φ1 |
| CR-008-046 | All preventative maintenance driven by software and performed by customer | PR-008-046 | No field service or manipulation of components for preventative maintenance. | Desirable φ1 |

R.B



## PRODUCT SPECIFICATIONS FOR HT INSTRUMENT

| | | | | |
|---|---|---|---|---|
| BR-008-001 | Automatic and manual calibration options | PR-008-047 | Calibration by factory, field service, or customer. Calibration only for total WBC count. | Mandatory φ1 |
| BR-008-002 | CD4 reagents must have minimum 2 months room temperature (4-30°C) stability upon arrival at end user | PR-008-048a | Minimum 4 months stability at room temperature for CD4 reagents | Mandatory φ1 |
| | | PR-008-048b | Minimum 1 year stability at room temperature for CD4 reagents | Desirable φ2 |
| BR-008-003 | Troubleshooting done with minimal service visits | PR-008-049a | File download and instrument control capability for remote troubleshooting. | Desirable φ1 |
| | | PR-008-049b | Bidirectional ASTM or equivalent acceptable with future planning for "peer to peer" file sharing. | Desirable φ2 |
| BR-008-004 | Software upgrades performed by customer | PR-008-050 | Automated downloadable software upgrades for UI and analytical software | Desirable φ1 |
| BR-008-005 | Installation performed without experienced operator | PR-008-051 | Field service installed | Mandatory φ1 |
| BR-008-006 | Gold reagent bottle capacity sufficient for average daily throughput | PR-008-052 | Lyophilized or desiccated bulk gold reagent bottle reconstituted by convenience package without any skilled steps by customer. | Mandatory φ1 |
| BR-008-007 | Instrument conforms to international regulatory standards | PR-008-053a | CE/UL mark for product launch | Mandatory φ1 |
| | | PR-008-053b | FDA 510(k) for market expansion | Mandatory φ2 |

END OF DOCUMENT

*Attachment 3*
*to Annex I*

ATTACHMENT 3 TO ANNEX 1

# Synopsis of PointCare Technologies Assay for the Identification of CD4 Positive Lymphocytes:

## Expression as Percentage of Lymphocyte Count ("CD4%") and CD4 Lymphocyte Count ("CD4 Absolute")

(Two-Page Document)

### SAMPLE

1. Sample is 45µl of whole blood in EDTA.
2. Cells must be suspended according to standard hematology practice.
3. Proceed to sample immunolabeling

### SAMPLE IMMUNOLABELING

1. Add 45µl whole blood to 20µl PointCare CD4 Immunogold and 45µl of PointCare accelerant. The order in which these reagents are combined is not important.
2. Mix by "vortex" action at approximately 1700 rpm or by similar method for approximately 5 seconds.
3. Depending on efficiency of mixing method, incubation at 37C may be required up to 180 seconds.
4. Proceed to sample lysing.

### SAMPLE LYSING

1. Add 300µl Erythrolyse II (Beckman Coulter) to the blood/gold/accelerant mixture to initiate red cell lysis.
2. Mix by "vortex" action at 1700 rpm for 10 seconds. In contrast to Step 2 in "Sample Immunolabeling", these conditions are critical, and if alternative mixing is used, the effect must mimic the effect of "vortexing".
3. Immediately add 133µl of Stabilyse (Beckman Coulter) to stop red cell lysis.
4. Mix by "vortex" action at 1700 rpm for 10 seconds. Again, in contrast to Step 2 in "Sample Immunolabeling", these conditions are critical, and if alternative mixing or timing is used, the effect must mimic the effect of "immediate addition" and "vortexing".
5. Sample is now stable and isotonic diluent can be added if required for fluid handling by instrumentation system.
6. Proceed to Optical Cytometer Analysis.

### OPTICAL CYTOMETER ANALYSIS

1. Optical cytometer must clearly distinguish lymphocytes from monocytes as both cell types carry CD4 antigens.
2. CD4+ versus CD4- lymphocyte discrimination is performed using the parameter commonly termed "Side Scatter" in flow cytometry. Discrimination improves, as "Back Scatter" collection angles are included.

1

R3

## COMPUTATION OF CD4 "Percent" AND CD4 "Count"

1. Make the <u>CD4 Percent</u> computation from the Optical Cytometer analysis by counting events in the CD4+ lymphocyte cluster and dividing by the total number of CD4+ and CD4- lymphocyte events in both optically determined clusters.
2. Make the <u>CD4 Count</u> computation by multiplying the CD4 Percent (expressed as a decimal fraction) from the Optical Cytometer by the lymphocyte count obtained by impedance, or other non-optical, counting of the same sample.

### FLUID VOLUME TOLERANCES

| Reagent | Optimal Volume (μl) | Volume Range Allowed |
|---------|--------------------|--------------------|
| Whole blood | 45 | ±10% |
| Accelerant | 45 | ±30% |
| Immunogold | 20 | ±30% |
| Erythrolyse II | 300 | ±10% |
| Stabilyse | 133 | ±10% |

END

2

*Annex 2*

<u>Annex 2</u>

Specifications and Development Timelines

for the NP Instrumentation Platform & the reformulated

<u>POINTCARE Lymphocyte Enumeration Assay Kit</u>

**NP Diagnostic Instrumentation Platform:**

- Pointcare to negotiate a Development and Manufacturing Agreement with C2 or another third party manufacturer that incorporates the specifications and development timetables included in **Attachment 1** to **Annex 2** (Near Patient Instrument for Developing World Market, by D. Barry, May 4, 2006).

**POINTCARE CD4sure™ Assay Test Kit**

- Pointcare is responsible for and will bear the costs associated with and related to the development and approval for sale in the United States of PointCare's Reformulated CD4sure™ Lymphocyte Enumeration assay that will be compatible with the NP diagnostic instrumentation platform and, as appropriate, Drew's HTc and HTw diagnostic instrumentation platforms.
- PointCare is responsible for and will bear all costs associated with and related to the development and transfer into Pointcare's manufacturing organization of a reformulated Lymphocyte Enumeration assay that shall be compatible with and operate with the NP diagnostic instrumentation platform and, as appropriate, Drew's HTc and HTw diagnostic instrumentation platforms.
- Development timetable and Product Specifications are attached hereto as **Attachment 2** to **Annex 2** and incorporated by reference (**_TO BE DELIVERED BY POINTCARE BY JUNE 30, 2006 AND AGREED UPON BY THE PARTIES BY JULY 30, 2006)._**



*Attachment 1*
*to Annex 2*

| PointCare Technologies Inc. | CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS | Document No.: CBPR-007 | Rev. A |
|---|---|---|---|
| **Effective Date:** DRAFT | TITLE: NEAR PATIENT SYSTEM FOR DEVELOPING WORLD MARKET | Page: 1 of 6 | |

### Attachment 1 to Annex 2

| | |
|---|---|
| Title of Program: | Near Patient Instrument for Developing World Market |
| Date: | May 4, 2006 |
| Author: | Don Barry |

1. **Purpose and Scope**

   This document describes the customer and business requirements for the Near Patient System and the translation into product requirements. This system is to be co-developed by PointCare Technologies and a third party. The design controls for this project will be maintained separately by PointCare Technologies and the third party per their respective design control system.

2. **Product Overview**

   The Near Patient System is a flow-based and impedance-based system that will allow for analysis of CD4, CD4%, and certain hematology parameters to economically manage monitoring of HIV Antiretroviral Therapy. Designed for smaller clinics and remote testing venues, the system will support small patient sample volumes. It is comprised of the Near Patient Instrument and its associated reagents.

3. **Customer, Business and Product Requirements**

   The following requirements will ensure development of the above described Near Patient System.



FROM: KATHY 2142104950 To: HARRY RIMMER          DATE: 6/2/06 TIME: 10:02:06 AM          PAGE 9 OF 10

| PointCare Technologies Inc. | CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS | Document No.: CBPR-007 | Rev. A |
|---|---|---|---|
| | TITLE: NEAR PATIENT SYSTEM FOR DEVELOPING WORLD MARKET | Page: 2 of 6 | |

Effective Date: **DRAFT**

| CR/BR No. | Customer or Business Requirement | PR No. | Product Requirement | Requirement Importance |
|---|---|---|---|---|
| CR-007-001 | Parameters reported: WBC, Lym, Lym %, Mono, Mono %, Neut, Neut %, Eo, Eo %, Hgb, CD4, CD4%. | PR-007-001 | Instrument capable of producing WBC and a 4-pt WBC differential, plus hemoglobin, plus CD4. | Mandatory |
| CR-007-002 | CD4 lymphocyte reportable range from 50/uL to 6,000/uL. | PR-007-002 | Large dynamic range of CD4 cell enumeration with precision at 200/uL < 10% CV. | Mandatory |
| CR-007-003 | CD4% of total lymphocyte reportable range from 1% to 80%. | PR-007-003 | Large dynamic range of CD4 cell enumeration with precision at 15% < 10% CV | Mandatory |
| CR-007-004 | Only CD4 lymphocytes reported | PR-007-004 | CD4 monocytes excluded from analysis | Mandatory |
| CR-007-005 | WBC reportable range from 500/uL to 100,000/uL | PR-007-005 | Large dynamic range for WBC.  Precise WBC count obtained by impedance at 6,000/uL <2.5% CV | Mandatory |
| CR-007-006 | Lymphocyte reportable range from 1 to 95% | PR-007-006 | Large dynamic range for lymphocytes with precision at 15% <5% CV | Mandatory |
| CR-007-007 | Monocyte reportable range from 0 to 80% | PR-007-007 | Large dynamic range for monocytes with precision at 7% <10% CV | Mandatory |
| CR-007-008 | Neutrophil reportable range from 1 to 95% | PR-007-008 | Large dynamic range for neutrophils with precision at 50% <4% CV | Mandatory |
| CR-007-009 | Eosinophil reportable range from 0.1 to 90% | PR-007-009 | Large dynamic range for eosinophils with precision at 5% <10% CV | Mandatory |
| CR-007-010 | Hemoglobin reportable range from 0.5 g/dL to 24 g/dL | PR-007-010 | Large dynamic range for hemoglobin with precision at 12 g/dL < 1.5% CV | Mandatory |
| CR-007-011 | Minimum 32 hour sample age for CD4 and CD4%.  Minimum 8 hours for all other parameters. | PR-007-011 | Sample age extension for CD4 and CD4% from 8 hour minimum age requirement. | Mandatory |
| CR-007-012 | System warns user if results possibly compromised by aged sample. | PR-007-012 | Mitigation factors for sample age, such as data entry for draw time, flagging for dot-plots, and training. | Mandatory |
| CR-007-013 | System does not report results if compromised by aged sample. | PR-007-013 | Absolute internal control for sample age through dot plot flagging.  Can be a post launch upgrade. | Desirable |





| PointCare Technologies Inc. | CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS | Document No.: CBPR-007 | Rev. A |
|---|---|---|---|
| | TITLE: NEAR PATIENT SYSTEM FOR DEVELOPING WORLD MARKET | Page: 3 of 6 | |

Effective Date:
DRAFT

| CR-007-014 | Daily throughput appropriate for Near Patient market | PR-007-014 | Minimum of 50 samples plus controls in 7.5 hours | Mandatory |
|---|---|---|---|---|
| CR-007-015 | Minimal cycle time to allow for reruns when necessary | PR-007-015 | <5 minute cycle time | Mandatory |
| CR-007-016 | WBC differential not to be compromised by CD4 gold reagent | PR-007-016 | Two passes through optical analysis chamber — one pass to obtain WBC differential without immunogold, another pass to obtain CD4% with immunogold. | Mandatory |
| CR-007-017 | No handling of open blood tubes | PR-007-017 | Automated cap piercing blood sampling from manually introduced sample tubes (no autoloader) | Mandatory |
| CR-007-018 | Keypad with integrated computer operation | PR-007-018 | Keypad and integrated computer design | Mandatory |
| CR-007-019 | Use of instrument in outdoor setting | PR-007-019 | Screen readable in full sunlight | Desirable |
| CR-007-020 | Printable results | PR-007-020 | Printer to be specified by instrument manufacturer | Mandatory |
| CR-007-021 | Local languages available for each market | PR-007-021 | English, French, Portuguese, Spanish, Chinese, Thai, Vietnamese, and Russian screens. Can be post launch upgrade. | Desirable |
| CR-007-022 | Protected software for simple operation without tampering | PR-007-022 | Three levels of operation – service mode, supervisor mode, and limited operator mode | Mandatory |
| CR-007-023 | Limited data entry | PR-007-023 | RFID or barcode sample and control entry | Mandatory |
| CR-007-024 | Reagent use and expiration tracking | PR-007-024 | RFID or barcode for reagent use tracking | Mandatory |
| CR-007-025 | Minimal reagent waste | PR-007-025 | Attention to small fluid volume usage | Mandatory |
| CR-007-026 | Numerical data output with no visual interpretation | PR-007-026 | Automated cluster gating | Mandatory |
| CR-007-027 | Automatic QC tracking of controls with control chart display | PR-007-027 | Levey-Jennings control plots generated and easily printable. Can be post launch upgrade. | Desirable |
| CR-007-028 | Data storage > 100,000 patient results | PR-007-028 | 1000 patient results available on instrument. Expandable data storage by optional external USB key and external computer. Can be post launch upgrade. | Desirable |
| CR-007-029 | Searchable patient history | PR-007-029 | User interface on external computer designed to facilitate easy patient management. Can be post launch upgrade. | Desirable |

| PointCare Technologies Inc. | CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS | Document No.: CBPR-007 | Rev.: A |
|---|---|---|---|
| **Effective Date:** **DRAFT** | **TITLE: NEAR PATIENT SYSTEM FOR DEVELOPING WORLD MARKET** | **Page: 4 of 6** | |

| | | | |
|---|---|---|---|
| CR-007-030 | Easy daily startup and shutdown | PR-007-030 | Fully automated startup/shutdown <5 minutes each with no customer intervention | Mandatory |
| CR-007-031 | Assurance of gold reagent activity for every sample | PR-007-031 | Software driven internal control for gold reagent activity by monitoring monocytes. | Mandatory |
| CR-007-032 | Indeterminate samples denoted by a general flag symbol | PR-007-032 | Strict flag criteria for automated software gating. Flag explanation available in administration and service mode. | Mandatory |
| CR-007-033 | Instrument operation appropriate for all lab settings. | PR-007-033 | External temperature operating range 18-34°C (64-93°F). Relative humidity operating range 10% - 80% at 32°C, non-condensing. A thermoelectric cooler for gold reagent bottle may need to be added. | Mandatory |
| CR-007-034 | Ability to operate in arid regions with airborne dust | PR-007-034 | Protected mixing chambers, optical assembly, and electronics | Mandatory |
| CR-007-035 | Tamper proof operation of instrument | PR-007-035 | Door and cover sensors to prevent operation when open | Mandatory |
| CR-007-036 | Multiple use gold reagent bottle | PR-007-036 | Lyophilized or desiccated bulk gold reagent bottle reconstituted by instrument. Manual reconstitution in a convenience package is an alternative if instrument reconstitution is not feasible. | Mandatory |
| CR-007-037 | Container available for easy transport | PR-007-037 | Weight < 50 lbs in approved container. | Desirable |
| CR-007-038 | Instrument can be moved by customer without service call. | PR-007-038 | Durable hardware capable of shock/vibration resistance. No optical/mechanical adjustment after transportation in approved container. | Mandatory |
| CR-007-039 | Small footprint | PR-007-039 | Size < 35 cm x 25 cm x 34 cm | Desirable |
| CR-007-040 | Ability to participate in proficiency programs. | PR-007-040 | Can be post launch upgrade. Requires collaboration with proficiency program managers as they have to make proficiency samples compatible with light scatter based system. | Desirable |
| CR-007-041 | Operation with all electrical sources | PR-007-041 | 90-250V, 47-63 Hz, all commonly used connectors available | Mandatory |



FROM: KATHY 2142104950 To: HARRY RIMMER          DATE: 6/2/06 TIME: 10:02:06 AM          PAGE 2 of

| PointCare Technologies Inc. | CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS | TITLE: NEAR PATIENT SYSTEM FOR DEVELOPING WORLD MARKET | Document No.: CBPR-007 | Page: 5 of 6 | Rev. A |
|---|---|---|---|---|---|

**Effective Date: DRAFT**

| | | | |
|---|---|---|---|
| CR-007-042 | Capability to operate from alternative energy sources (generator, solar power). | PR-007-042 | Line conditioning to be specified by instrument manufacturer. Can be post launch upgrade. | Desirable |
| CR-007-043 | Battery backup available | PR-007-043 | UPS specified with the ability to finish cycle and shutdown completely. | Mandatory |
| CR-007-044 | All preventative maintenance performed by customer. | PR-007-044 | Manipulation of components for preventative maintenance done by customer guided by on screen instructions. | Mandatory |
| BR-007-001 | No calibration done by customer | PR-007-045 | Calibration by factory with possible adjustment by installer. | Mandatory |
| BR-007-002 | Minimize lab space | PR-007-046 | Diluent, lyse, clean, gold, and accelerant reagents contained and handled on board of instrument. | Mandatory |
| BR-007-003 | All reagents must have minimum 2 months room temperature (4-30°C) stability upon arrival | PR-007-047 | Minimum 4 months stability at 30°C. | Mandatory |
| BR-007-004 | Allow only PointCare reagents to be used | PR-007-048 | RF ID or barcode encryption to prevent counterfeit reagents | Mandatory |
| BR-007-005 | Cyanide-free hemoglobin method | PR-007-049 | Hemoglobin determined by cyanide-free reagent | Mandatory |
| BR-007-006 | Troubleshooting done with minimal service visits | PR-007-050 | File download capability for remote troubleshooting. | Mandatory |
| BR-007-007 | Software upgrades performed by customer | PR-007-051 | Automated downloadable software upgrades | Mandatory |
| BR-007-008 | Installation performed by field service | PR-007-052 | Field service or distributor installed | Mandatory |
| BR-007-009 | Multiple use gold reagent bottle | PR-007-053 | Lyophilized or desiccated gold reagent bottle for multiple uses within open vial stability limits. Potentially several sizes will be necessary dependent on average customer usage. | Mandatory |
| BR-007-010 | Instrument conforms to international regulatory standards | PR-007-054 | CE/UL mark for product launch. FDA 510(k) for market expansion. | Mandatory |

MMR  PBK

FROM: KATHY  2142104950  TO: HARRY RIMMER          DATE: 6/2/06  TIME: 10:02:06 AM          PAGE 3 OF 4

| PointCare Technologies Inc. | CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS | Document No.: CBPR-007 | Rev. A |
| --- | --- | --- | --- |
| Effective Date: DRAFT | TITLE: NEAR PATIENT SYSTEM FOR DEVELOPING WORLD MARKET | Page: 6 of 6 | |

END OF DOCUMENT

MMR  PBK

*Attachment 2
to Annex 2*

*Annex 3*

<u>Annex 3</u>
<u>**Sales & Marketing Territories**</u>

The Parties agree as follows;

- DREW will have non-exclusive worldwide rights to market and sell the HTc platform and the NP platform and the respective CD4 lymphocyte enumeration test kits under the DREW label. POINTCARE will have non-exclusive worldwide rights to market and sell the HTw platform and the corresponding CD4 lymphocyte enumeration kit under the POINTCARE label. POINTCARE will have non-exclusive worldwide rights to market and sell the NP platform and the corresponding CD4 lymphocyte enumeration kit under the POINTCARE label as well as other labels, one of which may be the Beckman Coulter label.

- Notwithstanding the above, the Parties agree that each company will lead the marketing and sales effort in certain territories (the "Market Leader") while the other company will support the Market Leader's efforts in such territory (the "Supporter").

- The Market Leader shall have the right and responsibility to develop a distribution and customer service capability in a defined territory. The Market Leader shall not only diligently promote the products offered under its own label but also offer the products under the Supporter's label whenever applicable and not competitive to the Market Leader's product. The Supporter shall promptly refer all sales leads from the Market Leader's territories to the Market Leader. The Market Leader shall diligently pursue such sales leads and report progress on a regular basis to the Supporter. The Market Leader agrees to sell and service the Supporter's products within its territories; to the extent it is reasonably able. The Supporter shall promptly provide, upon request from the Market Leader, product information, testimonials from opinion leaders, references from customers and any other supporting information that is requested. The Market Leader will bear all costs related to the marketing and sales effort in its respective territories, including the reimbursement of all reasonable expenses incurred by the Supporter. Only expenses that have been pre-approved by the Market Leader shall be reimbursable.



- The Market Leader shall propose a "Sales Plan" for each territory for which it is responsible which shall detail the distribution channels, customer support facilities, pricing, target sales volumes and any other relevant information. The Parties shall discuss the Sales Plan and the Market Leader shall incorporate any reasonable input and suggestions from the Supporter. Progress shall be reviewed against such Sales Plan.

- The Market Leader shall retain its rights and responsibilities in a territory for an initial 18 months from the date of product introduction in said territory. During this period the Parties will review progress against the Sales Plan every six months. After the initial 18 months, the Market Leader shall retain its position for additional 12 month periods if the Sales Plan was fulfilled or exceeded. Should the Supporter have an agreement with a distributor that commits to selling at least 50% more instruments during a twelve (12) month period than the commitment of the Market Leader, and the Supporter's distributor issues a non-cancellable purchase order for twenty-five (25) percent of the twelve month sales commitment, the Supporter shall have the right to initiate its own sales and service efforts in said territory.

- Should a Party to this Agreement or its authorized agent obtain a Purchase Order from a Non-Government Organization ('NGO'), or a similar organization that is located within a territory in which the other Party is the Market Leader, the Market Leader and/or its authorized agent(s) shall support the installation, servicing and reagent supply for the instruments sold to the NGO or similar organization within its territories. The Market Leader or its authorized agent(s), at the direction of the Market Leader, shall be compensated at its respective standard rates for such services. Such a Purchase Order will not entitle the Party securing such a Purchase Order to otherwise market in the territory of the Market Leader unless otherwise permitted by this Agreement.

- "Product Introduction" shall be defined as the point in time when the Market Leader formally offers the product for sale and is accepting purchase orders. The Market Leader must offer product for sale at least two (2) months before the product is available and can be legally sold or distributed within the territory. At all times and in all territories within its scope of responsibility, the Market Leader shall make best efforts to fulfil all necessary duties to prepare for product distribution and sale within its territories and as agreed upon as

_MMR_  _PBK_

quickly as is commercially reasonable, including but not limited to achieving compliance with applicable laws and regulations. If the Market Leader unreasonably delays the Product Introduction into a territory, the Supporter shall have the right to initiate its own sales and service efforts in that territory.

- DREW will be the Market Leader in the following territories at the time of initial Product Introduction: USA, Russia, China, The European Union, Philippines, Hong Kong, Taiwan, Thailand, Malaysia, Vietnam, Korea, Egypt, Pakistan, Bangladesh, and Turkey.

- POINTCARE will be the Market Leader in the following territories at the time of initial Product Introduction: Canada, Sub-Saharan Africa, Central America and the Caribbean Island Nations.

- Both Parties will independently sell and market products under their own label in India.

- From time to time, both Parties shall discuss territories not covered at the time of the Agreement. Both Parties shall make reasonable efforts to begin distribution in territories not covered at the time of the Agreement. At any time during the Agreement, either Party shall have the right to propose Market Leadership in a new territory. If a Sales Plan is proposed that can not be significantly exceeded by the other Party, the proposing Party shall have the right to assume the Market Leader position.

- With respect to Trade Shows and other exhibit and sales presentation venues, it is acknowledged that each Party shall attend certain Trade Shows and public events ("Shows") where it will seek to merchandise the products covered under this Agreement. To provide efficient coverage of such Shows and minimize redundancies and sales presentation overlap, it is agreed that DREW will attend those Shows that are related to clinical diagnostics, as well as regional distributor Shows within its Territories. POINTCARE shall be responsible for attending Shows that are specifically related to HIV treatment. While each company shall bear its own costs associated with attending and/or participating in a Show, the Parties also agree that they will provide reasonable support to each other, as requested during such Shows, including but not limited to the provision of appropriate personnel, instrumentation, assay/reagent kits, and scientific and marketing literature. The Parties further

_MMR PBK_

agree that by the fifth (5th) day of the fourth calendar quarter of every year, they will submit to each other a list of the Shows which they propose to attend in the coming year. The Parties will then discuss these proposals and work cooperatively to allocate needed personnel and resources to support the proposed programs. It is recognized that additional Shows may be added to the schedule of a Party during the course of the calendar year. Each Party will make a best effort to provide at least sixty (60) days notice of the scheduling of an additional Show. The notified Party will make a best effort to provide any needed support should such timely notice be received. If less than sixty (60) days of notice is provided, the receiving Party is under no obligation to assist but should make as reasonable an effort as possible to assist.

- The Parties agree to work cooperatively to develop a brochure and CD presentation that can be used to communicate the benefits of using the HTc, HTw and NP diagnostic instrumentation platforms and CD4 Lymphocyte Enumeration assay kits developed under this Agreement. The Parties shall jointly agree upon and equally share all costs associated with such a brochure and CD presentation development effort. The Parties will work cooperatively to develop a budget, as well as a concept that can be jointly utilized by the Parties in their respective territories.

*Annex 4*

## Annex 4
## Product Labelling Terms & Conditions

The Parties agree as follows:

- Drew shall have the right to market and sell the HTc and NP diagnostic instrumentation platforms and the CD4 Lymphocyte Enumeration assay kits under its own labelling.

- POINTCARE shall have the right to market and sell the HTw and NP diagnostic instrumentation platforms and the CD4 Lymphocyte Enumeration assay kits under its own labelling.

- Each Party agrees to assist the other Party and to cooperate as reasonably necessary, granting any licenses that are required, in order that each Party can, if it chooses, market and sell the above noted products under its own brand and with its own labelling. However, it is acknowledged that if DREW deviates from any labelling recommendations made by POINTCARE with respect to its NP diagnostic instrumentation platform or CD4 Lymphocyte Enumeration assay kits and/or if POINTCARE would deviate from the labelling recommendations of DREW relative to DREW'S HTw diagnostic instrumentation platforms, the Party that chooses to modify the labelling assumes the full risk and responsibility for any damages, injuries, regulatory and/or any other actions that may result and hereby agrees to fully defend and indemnify the other Party against any and all resulting claims or legal actions, threatened or actual.

- Subject to the liability disclaimers included in this Agreement, including but not limited to this *Annex 4*, POINTCARE shall package its NP instrumentation platform and CD4 Lymphocyte Assay kits which are ordered for purchase by DREW in accordance with the labelling specifications provided to POINTCARE by DREW.

- Subject to the liability disclaimers included in this Agreement, including but not limited to this *Annex 4*, DREW shall package its HTw diagnostic instrumentation platforms which are ordered for purchase by POINTCARE in

accordance with the labelling specifications provided to DREW by POINTCARE.

- DREW agrees to provide reasonable cooperation to POINTCARE should POINTCARE request that labelling requirements of a POINTCARE customer be included on any HTw diagnostic instrumentation platform that DREW manufacturers for sale to POINTCARE. POINTCARE agrees to accept and pay any and all reasonable and documented costs for such modifications and to provide DREW with full defense and indemnity for any and all resulting claims or legal actions, threatened or actual, that may result from the labelling change(s) requested by POINTCARE.

MMR PBK

Annex 5

## Annex 5
## Pricing Terms & Conditions; Requirements Forecasts

- DREW agrees to sell HTw diagnostic instrumentation platforms to POINTCARE that are labelled in accordance with POINTCARE'S specifications at a price that shall not exceed USD $23,700. Further, DREW agrees to sell HTw diagnostic instrumentation platform spare/replacement parts and accessories to POINTCARE, in quantities that are sufficient to meet its requirements, at a discount of forty-five (45) percent off of the current published list price. The spare parts list is attached hereto as *Attachment 1 to Annex 5*. DREW shall provide POINTCARE with its experience and assistance in ascertaining the type and quantity of spare/replacement parts and accessories that POINTCARE should consider maintaining in its inventory. Further, in order that POINTCARE is able to develop a system of "loaner" diagnostic platforms that it can provide to its customers and end-users to temporarily replace platforms that are under repair, DREW will also allow POINTCARE to purchase one HTw diagnostic instrumentation platform at DREW'S standard cost for every ten (10) HTw diagnostic instrumentation platforms purchased by POINTCARE

- POINTCARE agrees to sell NP diagnostic instrumentation platforms to DREW that are labelled in accordance with DREW'S specifications at a price that shall not exceed USD $ 14,000 . Further, POINTCARE agrees to sell spare/replacement parts and accessories to DREW, in quantities that are sufficient to meet its requirements, at a discount of forty-five (45) percent off of the current published list price (price list will be supplied). POINTCARE shall provide DREW with its experience and assistance in ascertain the type and quantity of spare/replacement parts and accessories that DREW should consider maintaining in its inventory. Further, in order that DREW is able to develop a system of "loaner" diagnostic platforms that it can provide to its customers and end-users to temporarily replace platforms that are under repair, POINTCARE will also allow DREW to purchase one NP diagnostic instrumentation platform at POINTCARE'S standard cost for every ten (10) NP diagnostic instrumentation platforms purchased by DREW.



- POINTCARE also agrees to sell CD4 Lymphocyte Enumeration Assay Kits for use on the HTc platform to DREW that are labelled in accordance with DREW'S specifications according to the following price schedule:

  o Cost of $4.00 per test for total sales volumes of up to 500,000 CD4 tests per year, based upon the relevant Anniversary Date.
  o Cost of $3.50 per test for total sales volume between 500,001 and 1 million CD4 tests per year, based upon the relevant Anniversary Date
  o Cost of $3.00 per test for total sales volume above 1 million tests per year, based upon the relevant Anniversary Date

- POINTCARE agrees to sell CD4 Lymphocyte Enumeration Kits for use on the NP platform to DREW that are labelled in accordance with DREW's specifications according to the following pricing schedule. Should DREW experience price erosion averaging twenty-five percent (25%) or more within its Territories, on average, using average revenue per test as the measure during any twelve month period, as compared to the average revenue per test during the initial twelve month period of sales, the Parties agree to renegotiate the pricing terms for the assay tests (kits) on a good faith basis.
  o Cost of $4.00 per test for sales volumes of up to 1 million CD4 tests per year, based upon the relevant Anniversary Date.
  o Cost of $3.50 per test for sales volumes of up to 3 million CD4 tests per year based upon the relevant Anniversary Date.
  o Cost of $3.00 per test for sales volumes above 3 million CD4 tests per year based upon the relevant Anniversary Date.

- POINTCARE agrees to pay DREW USD $ 0.30 per CD4 Lymphocyte Enumeration test that POINTCARE sells for use on a DREW manufactured HTw diagnostic instrumentation platform.
- It is understood that each CD4 Lymphocyte Enumeration Assay Kit may contain more than one test per kit, and that the pricing noted in this *Annex* is per test, not per assay kit.

- The Parties will provide each other with rolling twelve (12) month forecasts of their purchase requirements. The first month of the initial forecast shall be considered a firm commitment to purchase. Seventy (70) % of the second month forecast that was included in the initial forecast shall also be considered a firm purchase commitment. The remaining ten (10) months of the initial forecast are considered to be for planning purposes only. However, each Party is required to provide their rolling forecast to the other Party by the fifteenth (15th) day of every month and one hundred (100) % of said forecast for the following month shall be considered a firm purchase commitment. No less than seventy (70) % of the following month's forecast shall also be considered a firm purchase commitment. [Example – On May, 14, 2007, POINTCARE issues an updated "rolling" 12 month forecast that includes an order for 10 HTw units in June, 2007 and 10 HTw units in July, 2007. Pointcare would be committed to purchase at least 10 units in June and at least 7 units in July.].

- The Parties agree that payment for any purchases made under this Agreement shall be delivered to the other Party within forty-five (45) days of receipt of the invoice. No invoices will be issued by either Party before delivery of goods. Notwithstanding the above, DREW will agree to allow POINTCARE to extend the payment term to sixty (60) days, rather than forty-five (45) days, for the initial six (6) month period commencing when POINTCARE receives the first invoice from DREW for the HTw platform.

- Insurance:  Both Parties agree to maintain the following insurance coverages:
  - Products Liability Coverage:  Minimum amount of USD $1,000.000.00 per occurrence and USD $3,000,000.00 in the aggregate.
  - General Liability Insurance:  Minimum amount of USD $1,000.000.00 per occurrence and USD $2,000,000.00 in the aggregate.

UMR PBK

*Attachment 1*
*to Annex 5*

ATTACHMENT 1 TO ANNEX 5

| PN | Excell22 Parts Price List May 2006 Description | | 06 list US$ | 45% discount price US$ |
|---|---|---|---|---|
| FRU-2705-019 | Low Vacuum Reservoir Assy. w/bracket | ea. | 392.65 | 215.95 |
| FRU-2705-020 | TUBING,TYGON,1/16ID,Red  50 ft roll | ft | 26.84 | 14.76 |
| FRU-2705-021 | TUBING,TYGON,1/8ID,1/16W   50 ft roll | ft | 100.27 | 55.15 |
| FRU-2705-022 | TUBING,TYGON,1/32ID,1/32W   50 ft roll | ft | 25.36 | 13.95 |
| FRU-2705-023 | TUBING,TYGON,1/16ID,1/8OD   50 ft roll | ft | 29.43 | 16.18 |
| FRU-2705-024 | TUBING SILASTIC .062  50 ft roll | ft | 197.51 | 108.63 |
| FRU-2705-025 | TUBING, TYGON, MICRO, .060 X 0.020  50 ft roll | in | 66.99 | 36.84 |
| FRU-2705-026 | TUBING, TYGON, 5/32 X 3/32 50 ft roll | ft | 64.68 | 35.57 |
| FRU-2705-028 | TUBING,TYGON 5/16 X 3/16      10 ft roll | ft | 46.86 | 25.77 |
| FRU-2705-029 | TUBING,TYGON 1/8 ID, Red      50 ft roll | ft | 98.18 | 54.00 |
| FRU-2705-031 | TUBING, TYGON .04ID X .13OD  100 ft roll | ft | 215.60 | 118.58 |
| FRU-8100-005 | WBC Aperture Assy. | ea. | 166.93 | 91.81 |
| FRU-8400-005 | Pressure Reservoir Assy. | ea. | 287.93 | 158.36 |
| FRU-8400-008 | Valve, 12V, 2W, 1/16 port | ea. | 233.67 | 128.52 |
| FRU-8400-009 | Valve, 12V, 3W, 1/8 port | ea. | 243.51 | 133.93 |
| FRU-8400-010 | Valve, 12V, 2W, 1/8 port, Membrane | ea. | 254.79 | 140.13 |
| FRU-8400-013 | Valve, 12V, Pinch Valve Normally Open | ea. | 213.29 | 117.31 |
| FRU-8400-016 | Valve, 9V, 3W, 5/32 port, Red Leads | ea. | 404.16 | 222.29 |
| FRU-8400-024 | Valve, 12V, 3W, Manifold Mtd. | ea. | 296.67 | 163.17 |
| FRU-8400-025 | Valve, 12V, 2W, Manifold (round) | ea. | 365.42 | 200.98 |
| FRU-8400-026 | Valve, 12V, 3W, Manifold, Coil (square) | ea. | 288.20 | 158.51 |
| FRU-8400-034 | RED indicator Lamp, pkg of 2 | ea. | 34.87 | 19.18 |
| FRU-8400-035 | WHITE indicator Lamp, pkg of 2 | ea. | 34.87 | 19.18 |
| FRU-8400-038 | 3/32" x 2" O-Ring, 10" Reservoirs Pkg of 5 | ea. | 15.00 | 8.25 |
| FRU-8400-039 | 3/32 X 2.5" O-Ring-5PSI Reservoir, Waste Jar Pkg of 5 | ea. | 15.00 | 8.25 |
| FRU-8400-045 | Wave Spring Washer, HGB Systems   Pkg of 10 | ea. | 15.00 | 8.25 |
| FRU-8400-046 | FILTER, FLUID, 25MM DIA.    Pkg of 5 | ea. | 64.90 | 35.70 |
| FRU-8400-055 | 540 NM OPT BANDPASS FILTER | ea. | 105.57 | 58.06 |
| FRU-8400-059 | WESCOR Check Valve Pkg of 5 | ea. | 29.65 | 16.30 |
| FRU-8400-070 | Valve, 12V, 2 Way, 1/16 Port, Wet Sleeve, EPDM Seal (sheath) | ea. | 211.04 | 116.07 |
| FRU-8400-073 | Clamp, 1 Ear w /Liner, new Guard Block Pkg of 10 | ea. | 20.00 | 11.00 |
| FRU-8400-079 | Metering Tube, 3.5" Lg | ea. | 61.77 | 33.97 |
| FRU-8400-130 | Paint, Touch Up, Drew Ash Gray | ea. | 28.74 | 15.81 |
| FRU-8400-131 | Paint, Touch Up, Drew Green | ea. | 52.25 | 28.74 |
| FRU-8516-004 | Delay Line assy., (Silencer) | ea. | 640.15 | 352.08 |
| FRU-8516-005 | RBC Aperture Excell, AL 8X8, 3000 Excell 22 | ea. | 184.86 | 101.67 |
| FRU-8516-010 | WBC Transducer Excell Series | ea. | 305.64 | 168.10 |
| FRU-8516-025 | "O" ring Kit, Apertures Excell, AL 8X8, ATAC, 3000 | ea. | 69.58 | 38.27 |
| FRU-8516-030 | Needle Assy., W/Nut & O-ring (New Style) | ea. | 327.58 | 180.17 |
| FRU-8516-059 | Guard Block Assy Modification Kit | ea. | 84.87 | 46.68 |
| FRU-8516-073 | HGB LED REPLACEMENT KIT | ea. | 101.97 | 56.08 |
| FRU-8516-078 | Dual Metering Tube Board, Excell Series | ea. | 321.09 | 176.60 |
| FRU-8516-081 | O_RING 2mm X 4mm Pkg of 10 | ea. | 20.00 | 11.00 |
| FRU-8516-084 | Battery, Lithium, 3V, Coin | ea. | 15.00 | 8.25 |
| FRU-8516-087 | Check Valve, 1/8" In Line, Hi Flow  Pkg of 5 | ea. | 30.25 | 16.64 |
| FRU-8516-089 | Electronic Potentiometer, Z-3  Pkg of 4 | ea. | 54.21 | 29.81 |
| FRU-8516-090 | Sensor, Pressure/Vacuum, Solid State | ea. | 175.45 | 96.50 |
| FRU-8516-097 | Guard Electrode Block Assy.,. | ea. | 146.25 | 80.43 |
| FRU-8516-115 | Nut, Retainer Needle, Excell Series Pkg of 5 | ea. | 59.90 | 32.94 |
| FRU-8516-218 | Z55 - Metering tubes/keyboard Ctrl XL seles & XL22 | ea. | 185.79 | 102.18 |
| FRU-8740-032 | Transfer Tube, EXSAM, XL22 (For Dual Core Needle) | ea. | 67.88 | 37.33 |
| FRU-8740-033 | Rinse Line (Red), EXSAM | ea. | 35.92 | 19.75 |
| FRU-8808-001 | WOC Acquisition Board | ea. | 2,099.96 | 1,154.98 |
| FRU-8808-003 | Lan-Ethernet, PC104, (Network Adapter Card) | ea. | 667.87 | 367.33 |
| FRU-8808-004 | Reagent Detector Board | ea. | 377.41 | 207.58 |
| FRU-8808-006 | Extension/PMT, Pre-AMP board | ea. | 496.38 | 273.01 |
| FRU-8808-007 | Detector Array, Pre-AMP Board | ea. | 1,037.52 | 570.64 |

| | | | | |
|---|---|---|---|---|
| FRU-8808-008 | Sequencer/ Impedance Amp Board (2.2.2 Firmware) | ea. | 2,808.74 | 1,544.81 |
| FRU-8808-009 | Sequencer Interface Board | ea. | 876.98 | 482.34 |
| FRU-8808-010 | Pump / Dilutor Cont. Board (2.2.2 Firmware) | ea. | 1,248.50 | 686.68 |
| FRU-8808-011 | Valve Driver Board #1, Front Panel | ea. | 337.10 | 185.40 |
| FRU-8808-012 | Wash Block / Slide Valve Controller Board | ea. | 839.60 | 461.78 |
| FRU-8808-014 | Laser Temp Sensor Board, Fan Assy, XL22 | ea. | 258.17 | 141.99 |
| FRU-8808-020 | EX-Flo Reservoir Assy Excell22 | ea. | 458.59 | 252.22 |
| FRU-8808-021 | Exzyme Reservoir Assy Excell22 | ea. | 459.91 | 252.95 |
| FRU-8808-022 | EX-Iso Reservoir Assy Excell22 | ea. | 330.77 | 181.92 |
| FRU-8808-023 | Slide Valve, Rear Pad Excell22 | ea. | 1,888.15 | 1,038.48 |
| FRU-8808-024 | Slide Valve, Front Pad, Excell22 | ea. | 2,320.29 | 1,276.16 |
| FRU-8808-025 | Rinse Block Excell22 | ea. | 159.06 | 87.48 |
| FRU-8808-026 | Slide Valve Bushing w / Drive Shaft and Gear | ea. | 466.62 | 256.64 |
| FRU-8808-027 | Slide Valve Motor w/ Gear, Excell22 | ea. | 839.30 | 461.62 |
| FRU-8808-028 | 0.2 Micron Filter Assy, Excell22 (Diluent) | ea. | 332.04 | 182.62 |
| FRU-8808-030 | Rinse Block Motor Assy | ea. | 907.28 | 499.00 |
| FRU-8808-032 | High Vac / Waste Reservoir | ea. | 183.65 | 101.00. |
| FRU-8808-033 | Low Vac Reservoir | ea. | 258.12 | 141.96 |
| FRU-8808-034 | WOC Mixing Motor Assy | ea. | 349.09 | 192.00 |
| FRU-8808-035 | RBC Mixing Motor Assy | ea. | 349.09 | 192.00 |
| FRU-8808-036 | WIC Cuvette Assy | ea. | 406.62 | 223.64 |
| FRU-8808-037 | WOC Cuvette Assy | ea. | 1,451.67 | 798.42 |
| FRU-8808-038 | Pre-Mix Cuvette Assy | ea. | 1,004.19 | 552.30 |
| FRU-8808-039 | RBC Cuvette Assy w / Silencer | ea. | 741.13 | 407.62 |
| FRU-8808-040 | Linear Actuator 12VDC WOC Injector | ea. | 317.74 | 174.75 |
| FRU-8808-041 | Linear Actuator 12VDC, 0.001 STP (Sample Aspirator) | ea. | 326.98 | 179.84 |
| FRU-8808-042 | Barrier Filter Assy. Excell22 | ea. | 81.40 | 44.77 |
| FRU-8808-043 | Dilutor O-ring Kit Excell22 | ea. | 65.78 | 36.18 |
| FRU-8808-044 | Dilutor Motor, Excell22 | ea. | 498.25 | 274.03 |
| FRU-8808-045 | Vacuum Pump, Excell22 | ea. | 821.92 | 452.06 |
| FRU-8808-046 | Pressure Pump,Excell22 | ea. | 1,148.35 | 631.59 |
| FRU-8808-047 | Laser Assy, Excell 22 | ea. | 1,365.08 | 750.80 |
| FRU-8808-049 | WOC Tubing Kit Upgrade | ea. | 65.23 | 35.88 |
| FRU-8808-051 | WOC Flow Cell Adjustment Tool | ea. | 49.50 | 27.23 |
| FRU-8808-053 | WIC Cuvette Assy | ea. | 1,709.29 | 940.11 |
| FRU-8808-055 | UPS 400 VA 230 VAC, International | ea. | 3,043.15 | 1,673.73 |
| FRU-8808-056 | UPS 400VA 110VAC, Domestic | ea. | 2,607.55 | 1,434.15 |
| FRU-8808-057 | PMT Assy | ea. | 3,242.31 | 1,783.27 |
| FRU-8808-058 | Power Supply Assy | ea. | 1,582.13 | 870.17 |
| FRU-8808-059 | Power Supply 5V / 50W | ea. | 323.51 | 177.93 |
| FRU-8808-060 | Power Supply 12V / 10W | ea. | 511.34 | 281.23 |
| FRU-8808-061 | Diluter/Aspirator/ Injector assy. W Diluter/pump controller | ea. | 7,246.03 | 3,985.32 |
| FRU-8808-062 | Coax Cable, Optics | ea. | 45.60 | 25.08 |
| FRU-8808-063 | I2C Network / Communication Board | ea. | 202.18 | 111.20 |
| FRU-8808-065 | Microcontroller, SV / WB, U-5 | ea. | 43.62 | 23.99 |
| FRU-8808-067 | Dilutor Block and Drive Assy | ea. | 3,059.93 | 1,682.96 |
| FRU-8808-068 | Filter Assy, .2 Micron (new - sheath) | ea. | 307.67 | 169.22 |
| FRU-8808-069 | Sheath Filter & Valve Upgrade | ea. | 549.84 | 302.41 |
| FRU-8808-070 | Cooling Fan Retrofit Kit Excell 22 | ea. | 745.25 | 409.89 |
| FRU-8808-072 | Flow Cell Assy w / Injector 2 ports | ea. | 2,254.84 | 1,240.16 |
| FRU-8808-073 | Optic Head Assy (Current rev.) | ea. | 10,945.28 | 6,019.90 |
| FRU-8808-074 | Flow Cell Injector 2 ports (not for old flow cell) | ea. | 179.74 | 98.86 |
| FRU-8808-075 | Start switch W leads & Microswitch with arm | ea. | 96.03 | 52.82 |
| FRU-8808-076 | Injector Barb fittings connectors(5 /pkg) | ea. | 71.94 | 39.57 |
| FRU-8808-078 | Optic head power cable | ea. | 106.98 | 58.84 |
| FRU-8808-079 | V37 adapter block | ea. | 197.89 | 108.84 |
| FRU-8808-080 | Tube clamps & hose clamps pkg of 10 ea | ea. | 456.67 | 251.17 |
| FRU-8808-081 | Fan with wiring | ea. | 95.92 | 52.76 |
| FRU-8808-082 | Float switch waste sensor | ea. | 454.96 | 250.23. |
| FRU-8808-083 | Excell 22 Cleaning line | ea. | 102.36 | 56.30 |

| | | | | |
|---|---|---|---|---|
| FRU-8808-084 | Ethernet Cable, Shielded | ea. | 75.19 | 41.35 |
| FRU-8808-092 | V36 adapter block for SSD | ea. | 182.55 | 100.40 |
| FRU-8808-100 | Retrofit Kit, Ex-Sam XL 22 | ea. | 94.00 | 51.70 |
| FRU-8808-102 | Bar Code Reader, XL 22 (Keyboard Wedge) | ea. | 722.92 | 397.61 |
| FRU-8808-104 | Opticon Barcode Reader, XL22 | ea. | 722.92 | 397.61 |
| FRU-8808-115 | Preventative Maintenance Kit, XL22 | ea. | 2,747.53 | 1,511.14 |
| FRU-8808-116 | Pump / Dilutor Cont. Board for UI before 2.2.2 | ea. | 1,303.28 | 716.80 |
| FRU-8808-117 | Sequencer/ Impedance Amp Board before 2.2.2 | ea. | 2,852.08 | 1,568.64 |
| FRU-8808-118 | Disk on Chip - 2.2.2 UI | ea. | 521.29 | 286.71 |
| FRU-8808-119 | Disk on Chip - prior 2.2.2 UI | ea. | 396.00 | 217.80 |
| FRU-8808-120 | 386SX CPU - PC 104 W disk on chip -rev 2.2.2 | ea. | 1,854.88 | 1,020.18 |
| FRU-8808-121 | Front Cover, XL22 | ea. | 813.51 | 447.43 |
| FRU-8808-122 | 386SX CPU - PC 104 W disk on chip - prior rev 2.2.2 | ea. | 1,673.87 | 920.63 |
| FRU-8808-123 | Programmed Flash, XL 22 - V 2.2.2 (Z53 & Z54) | ea. | 238.21 | 131.01 |
| FRU-8808-124 | Programmed Flash, XL 22 - V 3.0.0 (Z53 & Z54) | ea. | 174.90 | 96.20 |
| FRU-8808-125 | Sequencer/ Impedance Amp Board  V 3.0.0 | ea. | 2,979.24 | 1,638.58 |
| FRU-8808-126 | PC104 DISK-ON-A-CHIP  (rev 19) | ea. | 423.06 | 232.68 |
| FRU-8808-127 | .SX CPU, PC104, W OPTC20 | ea. | 1,772.27 | 974.75 |
| FRU-8808-128 | Switch, Microswitch w / Arm | ea. | 45.00 | 24.75 |
| FRU-8808-129 | Sensor, Pressure 14.5 PSI | ea. | 57.75 | 31.76 |
| FRU-8808-130 | Install Cables, RJ45 & Parallel Printer | ea. | 23.11 | 12.71 |
| FRU-8808-131 | Cable Assy, I2C, Shielded, 60" (XL 22  Post-date 4/01) | ea. | 39.33 | 21.63 |
| FRU-8808-132 | Programmed Eprom, WB/Slide Valve, XL22 (Z-1) | ea. | 144.38 | 79.41 |
| FRU-8808-133 | Programmed Eprom, Dilutor Controller, (Z-4) | ea. | 153.12 | 84.22 |
| FRU-8808-134 | Programmed EPLD, Excell22 Add Dec (U11) | ea. | 154.17 | 84.79 |
| FRU-8808-135 | Piston, Aspiration, XL22 | ea. | 72.30 | 39.76 |
| FRU-8808-136 | Piston, Diluent, XL22 | ea. | 40.41 | 22.23 |
| FRU-8808-137 | Piston, Injector, XL22 | ea. | 72.30 | 39.76 |
| FRU-8808-138 | Piston, Lyse, XL22 | ea. | 30.19 | 16.60 |
| FRU-8808-139 | Piston, Sheath, XL22 | ea. | 35.21 | 19.37 |
| FRU-8808-202 | User Interface V 2.2.2 upgrade kit  - XL22 with SP1 | ea. | 144.21 | 79.32 |
| FRU-8808-302 | Service CD Rev. Win 2000 service packs (V 2.2.2) | ea. | 49.78 | 27.38 |
| FRU-9000-001 | Vacuum/Press. Gauge | ea. | 1,769.63 | 973.29 |
| FRU-9000-002 | Nut Driver 1/4" | ea. | 37.81 | 20.80 |
| FRU-9000-003 | Nut Driver 11/32" | ea. | 40.84 | 22.46 |
| FRU-9000-004 | U.S. Standard Ball Allen Wrench Set | ea. | 37.81 | 20.80 |
| FRU-9000-005 | Digital Multi-Meter | ea. | 320.65 | 176.36 |
| FRU-9000-006 | Test Lead Black | ea. | 25.71 | 14.14 |
| FRU-9000-007 | Test Lead Red | ea. | 25.71 | 14.14 |
| FRU-9000-008 | Flat Blade and Phillips Screw Driver Set | ea. | 139.15 | 76.53 |
| FRU-9000-009 | Needle Nose Pliers | ea. | 72.60 | 39.93 |
| FRU-9000-010 | Diagonal Cutting Pliers | ea. | 63.53 | 34.94 |
| FRU-9000-011 | Precision Knife | ea. | 19.66 | 10.81 |
| FRU-9000-012 | E-Prom Extractor | ea. | 42.35 | 23.29 |
| FRU-9000-013 | Curved 6" Hemostats | ea. | 30.25 | 16.64 |
| FRU-9000-014 | Precision Knife Replacement Blades | ea. | 13.61 | 7.49 |
| FRU-9000-015 | 3/8" Open/Box End Wrench | ea. | 29.40 | 16.17 |
| FRU-9000-016 | Standard Hardware Kit | ea. | 214.17 | 117.79 |
| FRU-9000-017 | Hydraulic Fittings Kit | ea. | 330.99 | 182.04 |
| FRU-9000-018 | US Std Punch Set | ea. | 170.91 | 94.00 |
| 4205-A | Particles, 5.01 | ea. | 1,633.50 | 898.43 |
| 4207-A | Particles, 6.992 | ea. | 1,633.50 | 898.43 |
| DC-111 | Dow Corning 111 Compound | ea. | 48.58 | 26.72 |
| M-XL22 | Manual, Operator, Excell22 | ea. | 125.00 | 68.75 |
| M-XL22-S | Manual, Service , Excell 22 (printed copy) | ea. | 125.00 | 68.75 |
| MIXL22 | Manual, Operator, Excell22, Infolab | ea. | 250.00 | 137.50 |
| R-001L | Lubricant Slide | ea. | 63.69 | 35.03 |
| R-005C | Light Pipe Cleaner | ea. | 121.99 | 67.09 |
| R-005L | Lubriplate | ea. | 17.71 | 9.74 |
| S-0002 | Waste Container | ea. | 15.00 | 8.25 |

*Annex 6*

## Annex 6

## Warranty, Technical Support & Training

In addition to the terms and conditions included in Article 3 of this Agreement, it is agreed that:

- If a DREW platform that is under warranty cannot be repaired by POINTCARE, POINTCARE may send such platform to DREW's manufacturing facility for diagnosis and possible repair. POINTCARE will assume full responsibility for all costs associated with the transport of the platform to and from DREW'S manufacturing facility, including but not limited to shipping and insurance charges.

- In the event that DREW HTw platforms sold to POINTCARE incur a material manufacturing defect that is epidemic in nature, DREW agrees to bear the commercially reasonable and documented incremental costs of service incurred by POINTCARE to correct the malfunction.

- If POINTCARE experiences an "out of the box" malfunction of a DREW HTw platform, DREW and POINTCARE's field maintenance personnel shall work cooperatively to ascertain the nature of the problem and the best course of action to promptly resolve the problem.

- Drew agrees to provide complementary initial training to a mutually agreed upon number of POINTCARE's designated technicians and distributors relative to the repair and maintenance of the HTw diagnostic instrumentation platforms. The training will take place at a DREW manufacturing facility. POINTCARE shall bear responsibility for the travel, meals, lodging and other costs incurred by its personnel and agents. Said training will be conducted at as mutually agreed upon during the duration of this Agreement.

- POINTCARE agrees to provide complementary initial training to a mutually agreed upon number of DREW's designated technicians and distributors relative to the use of POINTCARE'S NP instrumentation platform and its CD4 Lymphocyte Enumeration Assay kits at a location to be determined. DREW

shall bear responsibility for the travel, meals, lodging and other costs incurred by its personnel and agents.

- POINTCARE agrees that it shall bear sole responsibility for providing its customers, distributors and other end-users with installation, service and maintenance of the HTw diagnostic instrumentation platforms and that it shall provide all "first" and "second" level support to its customers, distributors and other end-users. First level support is defined as hotline support by either a POINTCARE distributor or POINTCARE directly, during which assistance is provided to the customer in diagnosing the problem in order to troubleshoot large component failures. Second level support is defined as either direct field service repair or delivery of a loaner while the unit is taken back to base for repair. A trained technician would be required to troubleshoot and repair the system in second level support. During the time that this Agreement remains in effect, DREW shall agree to provide "third level" support to POINTCARE, assisting POINTCARE in those few situations where POINTCARE is unable to satisfactorily resolve an issue after utilizing its existing resources. Such support shall be provided by DREW to POINTCARE via telephone or electronic transmission at DREW'S reasonable and customary charge for such service. If a DREW support specialist is requested to provide field support, POINTCARE agrees to pay all costs associated with DREW'S effort to satisfy its request.