Anthony J. Costantini
John Dellaportas
Brian Damiano
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Plaintiff Drew Scientific, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

DREW SCIENTIFIC, INC.,                    :          08 CV 1490 (AKH)
                                          :
                    Plaintiff,            :
                                          :
          -v-                             :
                                          :
POINTCARE TECHNOLOGIES, INC.,             :
                                          :
                    Defendant.            :
--------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

DUANE MORRIS LLP
1540 Broadway
New York, NY 10036
(212) 692-1000
*Attorneys for Plaintiff*

# **TABLE OF CONTENTS**

Page

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES..........................................................................................ii

PRELIMINARY STATEMENT......................................................................................1

STATEMENT OF FACTS.............................................................................................3

ARGUMENT................................................................................................................20

      THIS COURT SHOULD GRANT DREW A PRELIMINARY INJUNCTION......20

    A.    The Standard...................................................................................................20

    B.    Drew is Likely to Succeed on the Merits......................................................21

        1.    PointCare has Breached the Agreement and Its Fiduciary Duties.....21

        2.    Drew is Entitled to Specific Performance...........................................26

    C.    Drew is Facing Immediate and Irreparable Harm ........................................27

        1.    PointCare is Damaging Drew's Business
            Relationships and Reputation.............................................................27

        2.    PointCare is Destroying Drew's Chance to be First to the Market....30

        3.    PointCare is Misappropriating Drew's Confidential Information......31

    D.    The Failure to Grant Injunctive Relief Would Harm Drew Far More Than
        PointCare if Such Relief were Granted...........................................................34

CONCLUSION.............................................................................................................36

# TABLE OF AUTHORITIES

## CASES

page

1800PostCards, Inc. v. Morel,
153 F. Supp. 2d 359 (S.D.N.Y. 2001)............................................................24

Abdul Wali v. Coughlin,
754 F.2d 1015 (2d Cir. 1985)......................................................................21

Adirondack Appliance Repair, Inc. v. Adirondack Appliance Parts, Inc.,
148 A.D.2d 796 (3d Dep't 1989).................................................................32

Bay Ridge Fed. Sav. & Loan Ass'n v. Morano, 199 A.D.2d 354 (2d Dep't 1993)........................35

BGW Dev. Corp. v. Mount Kisco  Lodge No. 1552,
247 A.D.2d 565 (N.Y. App. Div. 2d Dep't 1998) ........................................23

Brunswick Corp. v. Jones,
784 F.2d 271 (7th Cir. 1986) .....................................................................21

Cablevision Systems Corp. v. Town of East Hampton,
862 F. Supp. 875 (E.D.N.Y. 1994) .............................................................20

Carvel Corp. v. Diversified Management Group, Inc.,
930 F.2d 228 (2d Cir. 1991)................................................................10, 24

Castlewood (US), Inc. v. National Indemnity Co.,
2006 U.S. Dist. Lexis 77634 (S.D.N.Y. Oct. 24, 2006)..............................19

Clark Oil Trading Co. v. Amerada Hess Trading Co.,
1993 U.S. Dist. Lexis 10801 (S.D.N.Y. Aug. 4, 1993) ..............................26

Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497 (2d Cir. 1989).....................10

Dodge v. County of Orange,
282 F. Supp. 2d 41 (S.D.N.Y. 2003)...........................................................20

DoubleClick, Inc. v. Henderson,
1997 WL 731413 (Sup. Ct., N.Y. County 1997) ........................................32

Ecolab Inc. v. Paolo,
753 F. Supp. 1100 (E.D.N.Y. 1991) ......................................................21, 35

Experience Hendrix, LLC v. Chalpin, 461 F. Supp. 2d 165 (S.D.N.Y. 2006)..............................33

Fabkom, Inc. v. R.W. Smith & Assocs.,
1996 U.S. Dist. Lexis 13686 (S.D.N.Y. Sept. 19, 1996) .................................................32

Gjoni v. Home Depot, Inc.,
2001 U.S. Dist. Lexis 2264 (S.D.N.Y. March 7, 2001) ..................................................25

Global Switching Inc. v. Kasper,
2006 U.S. Dist. Lexis 44450 (E.D.N.Y. June 29, 2006) .................................................30

Global Telesystems, Inc. v. KPNQwest, N.V.,
151 F. Supp. 2d  478 (2d Cir. 2001) ...............................................................................35

Hamilton Watch Co. v. Benrus Watch Co.,
206 F.2d 738 (2d Cir. 1953) ...........................................................................................21

Hawes Office Sys. v. Wang Labs.,
580 F. Supp. 812 (E.D.N.Y. 1984) .................................................................................24

Intermetal Fabricators, Inc. v. Losco Group, Inc.,
2000 U.S. Dist. Lexis 11622 (S.D.N.Y. Aug. 14, 2000) ................................................23

Khayyam v. Diplacidi, 167 A.D.2d 300 (1st Dep't 1990) ...............................................35

Lumex v. Highsmith,
919 F. Supp. 624 (E.D.N.Y. 1996) .................................................................................31

Lurzer GMBH v. American Showcase, 77 F. Supp. 2d 370 (S.D.N.Y. 1997) ...............25

Meinhard v. Salmon, 164 N.E. 545 (N.Y. 1928) ......................................................10, 21

MxEnergy Inc. v. Rochester Gas & Elec. Corp.,
2006 U.S. Dist. Lexis 13958 (W.D.N.Y. March 10, 2006) ............................................30

National Kitchen Products, Inc., v. Kelmort Trading & Company, et. al.,
1992 U.S. Dist. Lexis 657 (S.D.N.Y. Jan. 24, 1992) .....................................................30

Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99 (2d Cir. 2002).................33

Reuters, Ltd. v. United Press Int'l, Inc., 903 F.2d 904 (2d Cir. 1990)...........................30

Sokoloff v. Harriman Estates Dev. Corp.,
96 N.Y.2d 409 (2001) .....................................................................................................26

Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.,
5 Misc. 3d 285 (Sup. Ct., N.Y. County 1997) ..........................................................31, 32

Time Warner Cable v. Bloomberg L.P.,
118 F.3d 917 (2d Cir. 1997)............................................................................20

Travellers Int'l, A.G. v. Trans World Airlines, Inc.,
41 F.3d 1570 (2d Cir. 1994)........................................................................22, 23

Ulla-Maija, Inc. v. Kivimaki,
2005 U.S. Dist. Lexis 22249 (S.D.N.Y. Sept. 30, 2005) ...............................25

Warner-Lambert Co. v. Northside Dev. Corp.,
86 F.3d 3 (2d Cir. 1998).................................................................................30

Wisdom Imp. Sales Co. v. Labatt Brewing Co.,
339 F.3d 101 (2d Cir. 2003)............................................................................20

Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.,
946 F.2d 1003 (2d Cir. 1991)..........................................................................23

In re WorldCom, Inc. Sec. Litig.,
354 F. Supp. 2d 455 (S.D.N.Y. 2005)..............................................................20

Zeising v. Kelly,
152 F. Supp. 2d 335 (S.D.N.Y. 2001). ...........................................................21

Zulawski v. Taylor,
11 Misc. 3d 1058A (Sup. Ct., Erie Cnty. 2005)..............................................21

**RULES**

Fed. R. Civ. P. 65 ...............................................................................1, 20, 31

Plaintiff Drew Scientific, Inc. ("Drew") respectfully submits this Memorandum of Law in further support of its motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 as against defendant PointCare Technologies, Inc. ("PointCare").[1]

## PRELIMINARY STATEMENT

The June 2006 Manufacturing, Distribution and Co-Marketing Agreement (the "Agreement"), which is Exhibit 1 to the Complaint, in dispute between Drew and PointCare encompasses two medical devices that are both complementary and competitive. One device is the so-called NP ("Near Patient") device, which is portable and administers a CD4 test individually.[2] The other device is the so-called HT ("High Throughput") device, which, as the name implies handles a large number of tests in a high volume, including the same CD4 test administered on the NP.

One of the devices, the HT, was a joint development between Drew and PointCare under the Agreement. The NP was a development between PointCare and a third-party. To encourage a necessarily large investment by Drew in the HT, Drew was granted marketing rights in both the HT and the NP in many of the more economically advanced countries of the world. In order to mitigate the competitive effect, Drew had the rights to market both machines in the territories assigned to it. According to PointCare, Drew's marketing rights were contingent upon the successful development of the HT.

---

[1] Drew also respectfully incorporates by reference herein the Complaint and Affidavit of Richard J. DePiano, Sr. in Support of Order to Show Cause (the "DePiano Aff."), both of which were filed on February 13, 2008. At the February 19, 2008 hearing on Drew's Order to Show Cause, this Court granted Drew interim relief without issuing a formal Order, and instructed the parties to proceed with expedited discovery and to submit briefing in connection with Drew's motion for a preliminary injunction. As seen further below, PointCare was at best slow to cease its prohibited activities.

[2] The amount of CD4 in the blood stream is a marker useful for AIDS monitoring and treatment. (See Krauledat Tr. at 55:6-55:22).

1

Both machines use a gold assay as a reagent. Prior to entering into the Agreement in June 2006, PointCare had "invented" the assay, which it claimed to be both proprietary and patentable. It also had manufactured a forerunner machine, which used the assay in conjunction with optical scanning. Both parties entered into the Agreement in reliance upon feasibility studies conducted by PointCare which determined that Drew's pre-existing HT instrument was compatible with the assay with only minor modifications - - studies that turned out to be dramatically wrong. The Agreement was entered into by Drew only on the express assurance that PointCare, based on its knowledge and expertise with the gold assay, would guide Drew through the process of modifying its pre-existing HT instrument.

After a year of working closely together, it became evident that the PointCare HT feasibility studies had missed a serious problem that was resisting resolution: the volume of the HT machine caused a build-up of the gold residue from the assay which blocked the "vision" of the Drew optical sensors.

Either because this problem was resisting resolution or because of pique over a failed merger attempt, beginning in June 2007 PointCare breached both the contract and its duties by effectively abandoning the HT project and shifting its resources to the NP project beginning in June 2007. Cooperation all but ceased, and Drew was left to solve remaining HT problems without the promised guidance. With what can only be characterized as chutzpah, Drew was even blamed for the gold adherence problem that should have been detected by PointCare, and it appears that PointCare even went so far as to sabotage Drew's efforts to address that problem.

PointCare's impermissible diversion of resources enabled the NP program to succeed, while the HT project, abandoned by PointCare, floundered. PointCare then began an intensive effort to market and sell the NP units in territories assigned to Drew.

2

The abandonment of the HT project was made particularly evident when Drew solved the problems it could solve and made an HT instrument available for delivery to PointCare, so that PointCare could make overdue software adjustments and perform the testing required of PointCare under the Agreement. However, rather than take delivery of the instrument, which Drew arranged to be accompanied by a test report of an independent expert recommended by Drew, PointCare made demands both unjustified and impossible.

PointCare then blithely used its own lack of cooperation to accuse Drew of breaching the contract in order to justify its invasions of Drew territories. The damage to Drew's credibility and reputation is obvious, and its distribution network is at best shaken by PointCare's misconduct.

The purpose of this motion is to return the parties to where they should be under the Agreement. PointCare should be compelled to complete its obligations under the HT program, and it should be enjoined from further violating the NP marketing and sales provisions and/or making further NP sales. In addition, it should be compelled to reallocate to Drew the revenues from sales of the NP instrument that it has made in violation of the Agreement.

## STATEMENT OF FACTS

The focal point of this litigation is the Agreement entered into between Drew and PointCare in early June 2006, which obligates the parties to, inter alia, jointly develop the HT machine. (See Exhibit 1 to Complaint). It is, however, important to understand both how the Agreement came to be, and how it was implemented (and then renounced by PointCare).

PointCare was founded in late 2002 by, inter alia, two eminent scientists, Peter Hansen and Petra Krauledat, who are also husband and wife. (See Hansen Tr. at 10:8-10:14; Krauledat Tr. at 36:19-36:21). It was the third science-based company founded by the two of them since they left Johnson & Johnson in 1989. (See Hansen Tr. at 58:13-59:3; Krauledat Tr. at 55:2-

3

55:16). The company was founded specifically to find better means to monitor the CD4 blood counts of AIDS-affected patients, which is a marker useful for AIDS monitoring and treatment. (See Hansen Tr. at 58:13-62:5; Krauledat Tr. at 55:1-65:11). Indeed, the company was founded after a fact-finding trip by Dr. Hansen and Dr. Krauledat in which they evaluated a need suggested to them by others concerned with the AIDS crisis and their own ability to invent medical devices that would address the need. (See Hansen Tr. at 58:13-62:5; Krauledat Tr. at 55:1-65:11). Agreeing that there was a need, and that they had the scientific ability to address it, the decision to found PointCare was made. (See Hansen Tr. at 85:12-85:21; Krauledat Tr. at 58:10-58:16).

Of particular relevance to this decision was Dr. Hansen's credentials. (See Krauledat Tr. at 45:24-47:25, 55:23-56:25, 88:10-90:9; Exhibit 1 to Krauledat Dep. at pp. 13-14). He had successfully invented a number of medical devices and procedures, and was an expert in flow cytometry, optical scanning, and a gold-based chemical assay, all of which were capabilities crucial to the development of the inventions designed to address the need. (See Hansen Tr. at 36:2-41:24, 74:10-75:24; Krauledat Tr. at 47:3:-47:25, 60:22-61:20, 88:10-90:9). Indeed, Dr. Hansen had, while with one of the Hansen-Krauledat predecessor companies, invented (and patented) the first commercial multiplex immunoassay system in flow cytometry. (See Hansen Tr. at 74:10-75:24; Krauledat Tr. at 47:13-47:23).

Armed with this knowledge, Dr. Hansen set out to build a machine that addressed the need he had perceived. This machine was named the AURICA because of its use of the gold reagent[3] and its base was an analyzer made by a company named IDEXX Laboratories, Inc. (Dr. Hansen was very familiar with the IDEXX analyzer since he had designed the optical lens for the

---

[3] The designation of gold in the periodic table is AU. (See Hansen Tr. at 96:6-96:23).

4

analyzer during one of the prior Hansen-Krauledat ventures). (See Krauledat Tr. at 103:21-
103:25, 104:1-104:7; Hansen Tr. at 147:3-147:12). With respect to the gold reagent, Dr. Hansen
further refined his prior work and applied for a patent that covered the fundamentals of the CD4
assay principle, i.e. using the gold reagent to "flag" blood cells that could then be detected by the
optical scanner.[4] (See Krauledat Tr. at 71:5-71:25).

Notably, it took at least a year and a half to develop both the machine and the assay to the
point where regulatory requirements were met. (See Hansen Tr. at 145:3-148:23; Krauledat Tr.
at 96:15-96:25, 97:1-97:14). In fact, it was not until late 2005/early 2006 (a three-year time
period) that sales of the AURICA device were actually made, and PointCare was able to sell 65
devices in a three-month period. (See Krauledat Tr. at 105:8-105:25, 106:1-106:14).

Sales then came to an abrupt halt when PointCare ran out of inventory. According to Dr.
Krauledat, IDEXX, the manufacturer of the analyzer, had simultaneously relaxed its quality
standards and raised its prices in contravention of the parties' agreement. (See Hansen Tr. at
115:6-115:11; Krauledat Tr. at 106:15-108:3). The quality issues compelled PointCare to rebuild
the analyzer prior to sale, increasing PointCare's internal costs to the point where the AURICA
machine could no longer be built and sold economically. (See Krauledat Tr. at 106:17-106:25,
112:6-112:20).

The fall-out with IDEXX became evident in September 2005. (See Krauledat Tr. at
106:25-108:3). PointCare was thus in a position where it had developed a viable device and a

---

[4] The patent was applied for in 2004, but has not yet been granted. In fact, the application has been
rejected on two occasions by the Patent Office because of existing prior art that made the
"invention" obvious. Dr. Hansen is now challenging the latter determination. (See Krauledat Tr.
at 71:5-73:24; Patent & Trademark Office Rejection Letters). The first rejection occurred on
May 17, 2007, when the parties were in merger discussions. No disclosure was made to Drew.
(See Krauledat Tr. at 75:24-76:2).

viable assay, but had no means to manufacture it. That is because PointCare adjudged itself incapable of duplicating the IDEXX analyzer, which was the foundation of the AURICA device. In other words, PointCare had developed the requisite knowledge and expertise, but lacked the means to convert that knowledge and expertise into a saleable product. (See Krauledat Tr. at 110:18-111:18, 118:13-118:25).

Confronted with these circumstances, PointCare's senior management made a hurried search of available medical devices to determine which device could, in its judgment, be most easily converted to work with the gold assay "invented" by Dr. Hansen. (See Hansen Tr. at 230:14-233:25; Krauledat Tr. at 121:8-123:12). Senior management then traveled to the MEDICA conference, an international conference of medical device manufacturers held annually in Dusseldorf, Germany during the month of November, to see some of the devices first-hand. (See Hansen Tr. at 157:5-157:22; Krauledat Tr. at 124:20-125:4). They visited a number of candidates and observed the equipment, and ultimately scheduled meetings and site visits with a few candidates they had selected, including Drew. (See Hansen Tr. at 177:7-181:17; Krauledat Tr. at 123:3-144:25).

At the time that Drew and PointCare first met at the MEDICA conference in November 2005, Drew was a well-respected manufacturer of medical and veterinarian devices. (See DePiano Tr. at 52:18-53:19). It was particularly well known as an expert on optics, but had never worked with a material like the gold reagent, which was a process pioneered by Dr. Hansen. (See DePiano Tr. at 116:14-117:18). Thus, Drew had a good deal of relevant manufacturing expertise, but no relevant chemical expertise. (See DePiano Tr. at 192:3-193:4). It also had built an instrument, the Excell 22, which had a multiple-angle light scatter similar to the one built for the AURICA and it was a high throughput machine, which

6

meant that it processed many more samples than the AURICA could in the same amount of time.[5] (See Matuszak Tr. at 197:16-199:21). Drew had been acquired in December 2004 by Escalon Medical Corp. ("Escalon"), a U.S.-based public company, and it was then in the process of restructuring its operations with a particular focus on its then-existing product lines. (See DePiano Tr. at 39:10-40:11). The state of flux was sufficient that PointCare's sales manager specifically recommended against PointCare entering into a joint venture with Drew. (See Krauledat Tr. at 137:11-137:16).

Despite this recommendation, Dr. Krauledat, PointCare's CEO, decided to go forward with feasibility studies conducted by Dr. Hansen and Don Barry, Jr., a PointCare Project Manager. (See Krauledat Tr. at 142:8-143:11; Exhibit 2 to Krauledat Dep.). The two traveled to Drew's main U.S. facility in Dallas, Texas on at least two occasions in early 2006, and tested the use of the gold assay on Drew's Excell machine. (See Hansen Tr. at 180:7-182:16; Krauledat Tr. at 141:20-145:24). The tests were purportedly successful, and Dr. Hansen and Mr. Barry enthusiastically reported that the Drew machine could be adapted for PointCare's use, with minor modifications. (See Exhibit 1 to Barry Dep.; Hansen Tr. at 180:7-181:10; Krauledat Tr. at 144:19-145:11; DePiano Tr. at 182:9-183:14; Exhibit 2 to Krauledat Dep.). As recounted by PointCare's CEO, the feasibility studies indicated that it was "a relatively low risk to convert the Drew machine in a short time." (See Krauledat Tr. at 157:7-157:12). However, Dr. Hansen either missed or downplayed what came to be the most critical issue in the development of a successful HT machine: the adherence of the gold reagent which caused a build-up that

---

[5] The Drew machine also tested blood samples for several characteristics, and thus was far more versatile than the AURICA, which was focused solely on the CD4 count. The Excell 22 was in the process of being modified to a more dynamic model, the Excell 2280, at the time the parties first met. (See Coughlin Tr. at 47:24-48:2).

obscured the ability of the Drew optical scanners to detect the presence of the gold assay. (See Exhibit 12 to Hansen Dep.; Krauledat Tr. at 209:13-211:21; Exhibit 9 to Krauledat Dep.; Exhibit 4 to Barry Dep.; Barry Tr. at 96:16-99:18). The overly-optimistic feasibility studies conducted by Dr. Hansen and Mr. Barry became the basis for both companies' decision to go forward. (See DePiano Tr. at 128:13-128:25; Krauledat Tr. at 153:4-153:19).

Drew could not enter into a major cooperative venture without the approval of its corporate parent, Escalon. (See DePiano Tr. at 54:24-55:15). Thus, the responsibility to make this decision fell primarily on Escalon's CEO, Richard DePiano, Sr. Mr. DePiano had major reservations about the joint venture, beginning with the fact that his business strategy for Drew focused Drew on its existing products and new products already under development. (See DePiano Tr. at 66:16-68:10). Mr. DePiano felt rather strongly that he did not want to commit time and resources to the development of a completely new product at this juncture in Drew's history. (See DePiano Tr. at 66:16-68:10). Mr. DePiano was also concerned that Drew did not have the ability to successfully work with a product so foreign to it as the gold reagent. (See DePiano Tr. at 116:14-117:18).

Mr. DePiano's concern on the first issue was assuaged by the purported uniqueness of the PointCare product, the gold reagent. (See DePiano Tr. at 123:16-124:6). Dr. Hansen personally assured Mr. DePiano that the product was proprietary to PointCare and that it was a patentable invention. (See DePiano Tr. at 123:16-124:6). Indeed, the only other devices capable of using the gold reagent were said to be the abandoned AURICA machine and the NP device then being developed by PointCare. (See DePiano Tr. at 116:14-117:25; 119:4-119:15). In order to address Mr. DePiano's concerns about the potentially competitive nature of the NP device, PointCare offered to make Drew the primary distributor (i.e., "Market Leader") of both the HT and NP

8

devices in the more-advanced countries of the world, so that there would be little competitive conflict. (See DePiano Tr. at 226:21-227:19).

As to Mr. DePiano's second expressed concern, i.e., whether Drew could successfully manufacture a product using an assay unfamiliar to it, Dr. Hansen again provided comfort. (See DePiano Tr. at 131:17-132:24). After explaining that his feasibility studies showed that only minor adjustments to the Excell were necessary, he reminded Mr. DePiano that PointCare had already successfully developed the AURICA product and that PointCare had the knowledge and expertise, particularly with respect to the gold reagent, to guide Drew through the process, and Dr. Hansen further assured Mr. DePiano that such guidance would be provided here. (See DePiano Tr. at 128:13-128:25). Mr. DePiano's permission for Drew to go forward was based directly upon Dr. Hansen's assurances because he did not believe Drew could manufacture the device without the promised guidance. (See DePiano Tr. at 131:17-132:24, 134:3-134:21).

The Agreement entered into shortly thereafter reflects the discussions on the concerns raised by Mr. DePiano. Annex 1, the key contractual provision on the HT, states that Drew is responsible for developing the HT device so that it is compatible with the PointCare assay, and conversely that <u>PointCare is responsible for making the assay compatible with the hardware</u>. (See Exhibit 1 to Complaint at Annex 1, emphasis added). This is a clearly mutual mirror-image obligation, which implies the high degree of cooperation discussed. The preliminary timetable[6]

---

[6] This timetable is the sole document in the Agreement not signed or initialed by Drew's President. Undoubtedly, he was waiting for PointCare to deliver the NP timetable, due June 30, 2006, <u>but</u> not delivered until May 7, 2007. (See Exhibit 4 to Krauledat Dep.; Krauledat Tr. at 161:14-162:22). PointCare eventually completed the NP project six months later than the date estimated in May. (See Krauledat Tr. at 166:21-167:2). By way of comparison, the AURICA project and the assay project took over two years to complete. (See Krauledat Tr. at 95:5-11, 97:12-14). Against this background, PointCare's reported dissatisfaction with the rate of progress on the HT is an unmistakable pretense.

on the HT device, which is Attachment 1 to Annex 1, allocates responsibility to both PointCare

and Drew personnel for some of the earlier activities necessary to the HT development (no

allocation at all was made for the later half of listed activities.) (See Exhibit 1 to Complaint, at

Attachment 1 to Annex 1; Hansen Tr. at 56:18-57:3, 190:19-193:3).

On the NP side, PointCare had the responsibility to develop the product in conjunction

with a third-party manufacturer, but Drew became the primary Market Leader for the sale of both

instruments in the developed world. (See Exhibit 1 to Complaint at Annex 3 at bullet point 8;

Krauledat Tr. at 175:9-176:4). Drew's right to market and distribute the NP was, according to

PointCare, contingent upon the successful development of the HT machine, which surely puts on

PointCare a heavy responsibility to provide the cooperation and guidance promised. See Carvel

Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 231 (2d Cir. 1991); accord Cross &

Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989). Meinhard v.

Salmon, 164 N.E. 545, 546 (N.Y. 1928) ("Joint Adventurers, like copartners, owe to one

another...the duty of finest loyalty...Not honesty alone, but the punctilio of an honor the most

sensitive, is then the standard of behavior.") The Agreement does not address how to resolve

any conflicts in the development schedule of the two products, which also places a significant

burden on PointCare, which essentially controlled both projects, to be fair and even-handed in

the resolution of any conflicts, i.e., without favoring what it perceived to be its own best interest.

(See id.).

The HT preliminary timetable quickly proved to be overly optimistic, primarily

because PointCare was slow to develop even the most rudimentary software for the device.

(See Chappell Tr. at 146:12-149:2; see DR00031493, see Matuszak Tr. at 201:13-202:22).

In fact, Drew's Vice-President for R&D pointed out that PointCare had missed three

10

successive deadlines for the completion of the most elemental software, which was not finished until the end of 2006 -- putting the project off-schedule. (See Chappell Tr. at 147:19-149:2; DR00031493). At about the same time, Dr. Hansen successfully "ordered [the Drew R&D head] to be removed from any management over the team for this project" on the ostensible grounds that the R&D head spent most of his time in the U.K. (where Drew also had facilities) and not in Dallas, where the HT work was being done. (See Exhibit 2 to Coughlin Dep.; see DePiano Tr. at 105:14-106:11). Notably, Dr. Hansen assured Mr. DePiano about the quality of the Drew engineers in Dallas. (See DR00000752). He also reiterated that he would take personal responsibility for providing them with the guidance necessary. (See DePiano Tr. at 120:23-121:17; 139:11-140:11).

Despite the slow start on the software, the projects moved forward in other ways. At Drew's expense (because PointCare was in a cash-poor position), the parties exhibited mock-ups of both machines at an AIDS convention in Toronto in August 2006 and the NP machine at the CAAS convention in Barbados in September 2006, which were met with much interest. (See Rockingham Tr. at 44:16-18, 59:2-5; Matuszak Tr. at 259:17-259:21). Shortly thereafter, PointCare did successful patient testing in Barbados, making use of an existing, unmodified Excell machine (the unmodified 22 version) and its own gold assay. (See Krauledat Tr. at 191:19-199:25; Exhibit 7 to Krauledat Dep.).

After the rudimentary software was delivered to Dallas, the Drew engineers made the changes thought necessary by PointCare and prepared first a "unit number zero, test bed" machine and then two pre-prototype machines. (See Chappell Tr. at 61:2-63:23; Young Tr. at 43:20-44:5, 46:6-20, 47:15-48:2, 121:7-122:6). PointCare sent one of their technicians (styled as a "spy" by her superior); see Exhibit 2 to Coughlin Dep.) to Dallas for a two-month period

11

to oversee the automation of the machine, after which the initial machine, and the pre-prototypes, were shipped to Boston for further testing, as PointCare's CEO had requested the year prior. (See Exhibit 2 to Krauledat Dep.; DR00021766 to 21768). Curiously, Mr. Barry, the PointCare Project Manager who had accompanied Dr. Hansen on the feasibility studies the year before, wrote in February 2007 that the basic "assumption" of the project was that "CD4 analysis is possible with modified Excell 22 optics" -.- an "assumption" clearly at odds with Dr. Hansen's positive assurances on the subject made a year earlier. (See Exhibit 8 to Krauledat Dep. at p.3., subheading C(i)).

The reason for Mr. Barry's "assumption" came quickly to light as Drew began to discover a critical problem: that the PointCare gold reagent, when runs continuously through a HT machine, built up a residual that obscured the vision of the Drew optical sensor. (See Krauledat Tr. at 209:13-211:21; Barry Tr. at 94:9-96:7; Chappell Tr. at 138:2-139:21; Exhibit 9 to Krauledat Dep.; Young Tr. at 98:22-99:6; 104:21-105:8). Mr. Barry apologized for this, saying that it was his fault and confessing that the problem had stumped him and four outside engineers he had consulted about the problem. (See Exhibit 4 to Barry Dep.). Clearly, this realization had not happened overnight; Mr. Barry at least had a passing familiarity which had not been disclosed to Drew. For the next three months, however, both Drew and PointCare worked diligently on this and the myriad other problems that arise in a normal product development. (See Exhibits 18, 19 to Chappell Dep.; Exhibit 11 to Krauledat Dep; Exhibits 3, 4 and 7 to Coughlin Dep.; Chappell Tr. at 128:15-145:4; Young Tr. at 117:15-123:7; Coughlin Tr. at 141:7-144:4). With respect to the gold adherence problem, Drew acting with PointCare's guidance, tried several different types of materials in a doomed attempt to address the adherence problem. (See Chappell Tr. at 144:3-144:23; Young Tr. at 139:5-142:15; Coughlin Tr. at 159:3-

12

15).  While the parties initially worked together with cooperation and friendliness, this changed dramatically in mid-June of 2007 as detailed below.

At the same time, progress with the NP machine was very slow.  (See Exhibit 2 to Matuszak Dep.).  Despite several occasions when resources were diverted by PointCare from the HT project to the NP project (the PointCare HT and NP teams were virtually identical) (see Krauledat Tr. at 181:21-181:24; Coughlin Tr. at 124:4-25; 148:8-16), the NP machine was thought to be considerably behind the HT machine in its development.  (See Exhibit 2 to Matuszak Dep.)  This state of affairs also changed dramatically in the late spring of 2007.

From March through mid-June 2007, Drew and PointCare had been actively discussing a merger.  (See DePiano Tr. at 192:4-192:9; Krauledat Tr. at 200:4-8; 213:15-22 ).  There were several face-to-face meetings and much information was exchanged.  (See DePiano Tr. at 194:17-195:22; Krauledat Tr. at 213:21-214:22).  Since Escalon was a public company, Mr. DePiano hired an analyst to evaluate PointCare's stock so that a fair stock-for-stock ratio could be established.  (See DePiano Tr. at 195:6-196:15; Krauledat Tr. at 215:9-215:24).  The analyst could not become comfortable with PointCare's projections because of the paucity of sales history, and he consequently came to a valuation of PointCare far less than Dr. Krauledat thought reasonable.  (See DePiano Tr. at 195:6-196:15; Krauledat Tr. at 216:3-216:22).  When informed of the evaluation, Dr. Krauledat wrote Mr. DePiano a letter on June 20, 2007, calling off the merger discussions.  (See DePiano Tr. at 195:6-196:15; Exhibit 10 to Krauledat Dep.).

Whether acting out of a fit of pique over the failed merger negotiation, a realization that no solution to the gold adherence problem was yet in sight, or embarrassment that Dr. Hansen had failed to detect or solve the gold adherence problem, PointCare then took a course inconsistent with its duties under the Agreement.  Dr. Hansen, who as recently as June 12, 2007

13

had been saying that the parties were making great progress (see Exhibit 11 to Hansen Dep.), suddenly began blaming Drew for every delay, including the adherence problem he had failed to detect or solve. (See Exhibit 1 to DePiano Dep.; DePiano Tr. at 197:20-198:3; Exhibit 14 to Krauledat Dep.; PointCare Supp. 01718-01720 (D. Barry e-mail of June 27, 2007 to G. Young;)). Mr. Barry, who had been previously forthcoming, began insulting Drew's Project Engineer with Dr. Hansen's enthusiastic approval. (See PointCare Supp 05257 to 05260).

Even more ominously, Dr. Hansen unilaterally suspended the HT development. (See Exhibits 8 (e-mail dated June 28, 2007 from P. Hansen to D. Barry), and 9 to Barry Dep. (e-mail dated July 10, 2007 from M. Doire to L. Rockingham and D. Barry); Hansen Tr. at 256:3-257:20; Desrosiers Tr. at 94:19-95:25).[7] Acting without apparent provocation, he told Barry that Drew was "wasting our time" and that Barry should not engage in e-mail communications until he formulated PointCare's position. (See Exhibit 8 to Barry Dep.). His nasty (and unjustified) letter of July 2 followed (See Ex 1 to DePiano Dep.) While internally he was said to have "pulled the plug" on the HT project (see Exhibit 9 to Barry Dep.) and to have put the project "on hold" (see Exhibit 4 to Hansen Dep.), he assured the PointCare Board on July 12 that a temporary delay in the project was attributable solely to the decision to expand the Patient ID Software, and did not mention any problems with Drew. (See Exhibits 4, 5 to Hansen Dep.)[8] Similarly, he did not disclose to Drew his unilateral decision to abandon the project.

---

[7] While the motivations behind PointCare's conduct are unexplained, Mr. DePiano has speculated that PointCare is trying to increase its "value" by restoration of the lucrative territories allocated to Drew under the Agreement so that it could attract badly-needed capital. (See DePiano Tr. at 285:22-286:9).

[8] Dr. Hansen denies the accuracy of the Board Minutes and later Board Minutes that say the same thing. (See Exhibits 4, 5 to Hansen Dep.; Hansen Tr. at Hansen Tr. at 250:5-252:10; 254:7-18). He made no attempt to correct the Minutes, however. (See Hansen Tr. at 252:11-252:13.)

PointCare did not merely stop cooperating with Drew. Rather, it started actively obstructing Drew's efforts. When a Drew representative tried to speak to a gold supplier about the adherence problem, the supplier was quickly reminded by PointCare that he had a Confidentiality Agreement with them. (See Barry Tr. at 115:4-115:20; Exhibit 8 to Barry Dep. at p. 1).

At the same time, the PointCare HT software development team was transferred *en masse* to the NP Project, and Drew was told that 2 ½ weeks were needed to do previously scheduled NP software work. See Hansen Tr. at 255:6-258:10; Exhibit 8 to Hansen Dep.). The software team, however, never returned to complete the work, which remains unfinished to the day and which greatly hampers testing of the instrument. (See Hansen Tr. at 255:6-258:10; Desrosiers Tr. at 94:19-95:20). Whether because of the "reallocation" of resources or other reasons (Drew suspects an illicit transfer of technology is involved)[9], the NP Development went from zero to sixty overnight. (See Matuszak Tr. at 243:7-243:9; Young Tr. at 157:10-158:9). Because the NP was not a high-volume machine, it did not experience the same gold adherence problems as the HT (see Desrosiers Tr. at 80:18-82:13). The NP device thus was ready for sale by October 2007, and the FDA approved it in January 2008, notably with testing done using (without permission) a Drew HT instrument located at PointCare. (See Krauledat Tr. at 166:21-167:2, Matuszak Tr. at 251:12-255:9). To date, PointCare has sold at least 125 NP machines, many in territories allocated to Drew, as discussed further below. (See Krauledat Tr. at 170:1-171:15).

_____

[9] The dramatic change in the NP status raises questions. As of this date, and despite repeated promises, PointCare has not produced the complete design history of the NP product necessary for an outside expert to review the issue. (See Costantini Letter of April 9, 2008; draft joint March 24, 2008 letter to the Hon. Alvin K. Hellerstein). It also appears that PointCare has shared confidential Drew information with a possible merger candidate, Orasure Technologies, Inc. (See DePiano Tr. at 282:19-284:9).

As to the HT, PointCare participation ground to a virtual halt. (See Chappell Tr. at 146:22-149:2; Young Tr. at 157:10-158:9). Acting without the promised guidance, Drew engineers overcame the gold adherence problem by switching from optical sensors to ultrasonic sensors, a switch that necessitated a redesign of the device. (See Chappell Tr. at 193:3-193:14; Young Tr. at 143:17-144:9; 145:2-145:11). Many other problems were solved solely by Drew, and the Drew engineers were comfortable that they had a machine ready to be shipped to PointCare on November 9, 2007. (See DePiano Tr. at 171:10-172:18; Exhibit 26 to Chappell Dep.; Young Tr. at 77:12-78:5). The machine would then have to be tested by PointCare, and PointCare would have to upgrade its still-unfinished software so that validation could be done. (See Chappell Tr. at 180:1-181:19; Young Tr. at 77:18-80:9; Chow Tr. at 235:8-235:13).

Beginning at least as early as July, PointCare began speaking to distributors about representing PointCare on NP sales in Drew territories. (See Rockingham Tr. at 120:21-121:7).[10] PointCare's sales manager admitted talking to a representative of Block Industries at the AACC July Convention in San Diego about Block becoming the NP distributor in Russia. (See Rockingham Tr. at 120:21-121:7). Subsequently, Block was sent a distribution agreement to sign. (See PointCare Supp. 09192 to 09193). The sales manager had traveled to the Convention with Dr. Krauledat, who swore that such conversations had not occurred at the Convention in an Affidavit submitted to this Court. (See Affidavit of Petra B. Krauledat in Opposition to Order to Show Cause dated February 19, 2008 (the "Krauledat Aff.") at ¶ 65).

---

[10] PointCare's Business Plan, dated June 2007, states that PointCare had already opened discussions with a Russian distributor. (See Exhibit 1 to Krauledat Dep. at p. 9) PointCare's Marketing Manager could not explain the basis for this statement. (See Rockingham Tr. at 224:2-17).

PointCare's efforts to find a Russian distributor has continued, even after[11] counsel represented to this Court that there would be no contact with distributors in Drew territories. Several potential Russian distributors have been contacted, and Dr. Krauledat met with at least two at the MEDICA 2007 conference, despite her express assurances that she would not meet distributors there (and her subsequent assurances to this Court that she had not done so). (See Rockingham Tr. at 154:4-23; 163:18-164:4; Exhibit 3 to Rockingham Dep.; see also Krauledat Aff. at ¶ 66; Exhibit J to DePiano Aff.) PointCare has also withheld information, which Drew had specifically requested, about a Russian tender. (See DePiano Tr. at 233:2-25).

PointCare also attempted to retain a NP distributor in Malaysia, another Drew territory. (See Exhibit 4 to Rockingham Dep.). This attempt was made through the U.S. Department of State's Gold Key Program, established for products of 51% U.S. manufacture. (See Rockingham Tr. at 201:2-204:19). The NP, which is primarily manufactured in France, would not seem to qualify. (See Desrosiers Tr. at 54:13-54:23).

Many of PointCare's NP sales are violative of the Agreement. PointCare has made sales to Biomedical Inc., which is located in Florida, and TTM, which is located in Germany. (See Krauledat Tr. at 170:13-170:19, 173:3-173:15; Rockingham Tr. at 108:18-110:11, 182:9-184:8). While the products are apparently destined to be distributed in the Caribbean and Africa, there is no exception to the Agreement that permits such sales in assigned territories; instead, the sales opportunity needed to be referred to Drew, the U.S. and German Market Leader. (See Exhibit 1 to Complaint at Annex 3 at bullet points 3 and 8). Similarly, sales have been made to U.S. based

---

[11] The representation was made in Court on February 19, 2008. (See 2/19/08 Hearing Tr.). Compare Exhibit 3 to Rockingham Dep. (dated March 10, 2008), which shows that communications continued after the date of the representation. Ms. Rockingham testified that she was not told to cease discussions with potential Russian distributors until after the date of her letter - - a full three weeks after the court appearance. (See Rockingham Tr. at 159:18-163:7).

NGOs (Non-Government Organizations) such as the Centers for Disease Control, Walter Reed Hospital and the Catholic Relief Services. (See Rockingham Tr. at 182:9-184:2; Krauledat Tr. at 170:16-173:2; Exhibit 1 to Complaint at Annex 3 at bullet point 6). While such sales are allowed under the Agreement, installation, services and reagent supply stay with the U.S. Market Leader, Drew. (Id.) Despite this fact, no attempt was made to even contact Drew.

As mentioned above, PointCare's cooperation on HT development has all but ceased since Dr. Krauledat called off the parties' merger negotiations in mid-June 2007. (See Exhibit 10 to Krauledat Dep.; see Chappell Tr. at 146:22-149:2; DePiano Tr. at 255:9-255:18; Young Tr. at 157:10-158:9; Matuszak Tr. at 242:18-243:9, 253:10-254:12; DePiano Tr. at 255:9-18;). Drew, as also mentioned, has developed the HT instrument as far as it could without PointCare's input and software improvements, and it was ready to ship an instrument to PointCare by November 9. (See DePiano Tr. at 171:10-172:18; Exhibit 26 to Chappell Dep.; Young Tr. at 77:16-78:18). Just prior to shipment, however, Dr. Krauledat pronounced Drew to be in default under the Agreement, the only way for PointCare to legally break the Agreement. (See Exhibit H to DePiano Aff.). Under the Agreement, Drew had sixty days to "cure" the purported breach. (See Exhibit 1 to Complaint at ¶ 6.9(a)).

Rather than just sending the instrument on the basis of the testing of its own engineers, Drew brought in an independent expert recommended by PointCare to conduct an independent evaluation. (See Chow Tr. at 33:6-8, 122:24-123:10; DePiano Tr. at 171:11-172:23). The expert, Dr. Chow, successfully tested the instrument to the extent possible without a finished copy of the software or an appropriate reference instrument.[12] (See Chow Tr. at 147:12-148:8,

---

[12] Drew had ordered seven NP machines from PointCare, but PointCare had only delivered one despite a clear contractual obligation to deliver under each Purchase Order accepted. (See Matuszak Tr. at 243:16-25, 260:17-261:6; Exhibit 8 to Rockingham Dep.). This machine, which could have been used

(Continued...)

149:13-150:9; Exhibits 3 and 4 to Chow Dep.). Dr. Chow found the instrument was ready for the further work to be done by PointCare, and Drew informed PointCare that the machine would be shipped the week of December 10, provided that the testing at PointCare be done under certain restrictions designed to assure neutral testing. (See Exhibit M to DePiano Aff.).

After saying that it would not be ready to accept shipment until January 2008, PointCare made the unjustified, and impossible, demand that it be furnished with specified test data before it would accept shipment. (See Exhibits N and P to DePiano Aff.). Unjustified, because the delivery of test data is not required under the Agreement and is not needed for PointCare to do its work. Impossible, because PointCare requested, inter alia, validation data, data which could not be accumulated without the updated software that PointCare had yet to deliver and/or the reference instrument that PointCare had improperly taken hostage. (See Chow Tr. at 155:17-25, 157:19-24). Indeed, validation was one of the very reasons that the item needed to be shipped to PointCare. (See Chow Tr. at 187:5-187:16). PointCare also requested patient testing data despite the fact that patient testing was its responsibility. (See Exhibits N and P to DePiano Aff.).

Despite its own unwarranted failure to cooperate in testing, PointCare unilaterally declared that Drew had failed to cure the breach, and that the Agreement was therefore at an end. (See Exhibit V to DePiano Aff.) By doing so, PointCare freed itself to market the NP anywhere

---

(Continued...)

as a reference instrument (see Chow Tr. at 150:19-155:25), was sent back to PointCare at PointCare's request in late October so that its software could allegedly be "updated". (See DePiano Tr. at 275:13-275:25). PointCare then refused to return the machine, thus preventing the testing that otherwise could have been done. (See Chow Tr. at 150:19-155:16, 168:11-18).

it wanted, but left Drew without rights to a product in which it had invested over $1,000,000.

(See DePiano Tr. at 191:2-192:2).  This lawsuit ensued.

## ARGUMENT

## THIS COURT SHOULD GRANT DREW A PRELIMINARY INJUNCTION

### A.   The Standard

A party seeking a preliminary injunction under Federal Rule of Civil Procedure 65 must "demonstrate that absent injunctive relief, it will suffer irreparable harm, and that either (a) it is likely to succeed on the merits, or (b) there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in its favor." In re WorldCom, Inc. Sec. Litig., 354 F. Supp. 2d 455, 463 (S.D.N.Y. 2005) (emphases added); accord Castlewood (US), Inc. v. Nat'l Indem. Co., 2006 U.S. Dist. Lexis 77634, at *13 (S.D.N.Y. Oct. 24, 2006) accord Wisdom Imp. Sales Co. L.L.C. v. Labatt Brewing Co., 339 F.3d 101, 108 (2d Cir. 2003); accord Time Warner Cable v. Bloomberg L.P., 118 F.3d 917, 923 (2d Cir. 1997); see also Fed. R. Civ. P. 65.  "In applying this test, the showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Castlewood, 2006 U.S. Dist. Lexis 77634 at *13.  As discussed below, Drew more than sufficiently satisfies each of these requirements in this case, and a preliminary injunction is therefore warranted. [13]

---

[13] Although Drew by the instant motion seeks preliminary injunctive relief, it explicitly reserves its right to move for the permanent injunctive relief sought in the Complaint.  "Permanent injunctive relief is appropriate when a plaintiff (1) shows that an inadequate remedy is available at law, such as by showing that irreparable harm would result if an injunction were not granted, and (2) succeeds on the merits of his claim." Dodge v. County of Orange, 282 F. Supp. 2d 41, 71 (S.D.N.Y. 2003).  "Thus, the standard for a permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed on the merits." Dodge, 282 F. Supp. 2d 41 at 71; accord Cablevision Sys. Corp. v. Town of E. Hampton, 862 F. Supp. 875, 888 (E.D.N.Y. 1994) (granting permanent injunctive relief where plaintiff established "actual success on the merits" and "irreparable harm" as "money damages, as a matter of law, [were] not available").

**B.**    **Drew is Likely to Succeed on the Merits**

For purposes of obtaining a preliminary injunction, the standard for demonstrating a

likelihood of success on the merits is well established in the Second Circuit:

> a movant seeking to avail himself of [this] first alternative need not show that
> success is an absolute certainty.  He need only make a showing that the
> probability of his prevailing is better than fifty percent.  There may remain
> considerable room for doubt.

Ecolab Inc. v. Paolo, 753 F. Supp. 1100, 1109-1110 (E.D.N.Y. 1991) quoting Abdul Wali v.

Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985); see also Hamilton Watch Co. v. Benrus Watch

Co., 206 F.2d 738, 740 (2d Cir. 1953).  Moreover, "[w]here the movant can show that the

balance of hardships tips strongly in his favor, the required showing of the probability of its

success is reduced." Ecolab, 753 F. Supp. 1100 at 1110.  "It is enough that the plaintiff's

chances are better than negligible." Id., quoting Brunswick Corp. v. Jones, 784 F.2d 271, 275

(7th Cir. 1986).

**1.**    **PointCare has Breached the Agreement and Its Fiduciary Duties**

There could be little doubt, from reading the Agreement, that the HT project is akin to a

joint venture between Drew and PointCare.  Under long-established New York law, joint

venturers owe fiduciary duties to each other. See, e.g. Meinhard v. Salmon, 164 N.E. 545, 546

(N.Y. 1928) ("Joint adventurers, like copartners, owe to one another, while the enterprise

continues, the duty of the finest loyalty"); Zeising v. Kelly, 152 F. Supp. 2d 335, 347 (S.D.N.Y.

2001) ("Principles of partnership law control the analysis of joint venture agreements, and,

coventurers, like co-partners, owe each other the finest loyalty and the utmost good faith

throughout the course of the enterprise."); Zulawski v. Taylor, 11 Misc. 3d 1058A, **5-6 (Sup.

Ct., Erie Cnty. 2005) (" Partners in joint ventures, however constituted..., owe one another a

fiduciary duty of loyalty. The duty includes an obligation not to favor one's own interests over those of the joint venture, to unfairly manipulate or control corporate processes ... to appropriate for oneself an opportunity that belongs to the joint venture." (citation omitted)).

PointCare did not come close to fulfilling its duties. It abandoned the HT project precipitously and instead turned all attention to its own NP project, clearly putting what it perceived to be its own interests ahead of Drew's. Put simply, New York law does not permit PointCare the choice it made.

PointCare's abandonment of the Agreement and de facto renunciation of the HT in favor of the NP is particularly abhorrent in light of the fact that Drew was beholden to PointCare. It was not only a joint project; it was a project where Drew was dependent upon PointCare's far greater knowledge and experience with respect to the gold reagent and its express determination that the assay would work with Drew's optics. Indeed, courts in this Circuit have repeatedly held that where a party to a contract abandons the collaborative effort or ceases to cooperate in furtherance of such contract, it is squarely in breach thereof.

The Second Circuit faced a similar set of facts in Travellers Int'l, A.G. v. Trans World Airlines, 41 F.3d 1570 (2d Cir. 1994). That case involved a joint venture between an airline and a tour operator for the mass marketing of foreign leisure escorted tours. Id. at 1571. The District Court found that TWA breached the implied duty of good faith and fair dealing to its joint venture partner, a tour operator, under the parties' agreement by failing to produce and distribute a sufficient number of tour brochures. Id. at 1575. On appeal, TWA argued that its decision to reduce the number of brochures was "a good faith exercise of business judgment." Id. at 1576. The Second Circuit rejected this argument, noting that: "TWA was not trying to maximize the profits from the ... joint venture; rather, TWA was trying to maximize its profits by eliminating

22

[[plaintiff tour operator] as the middleman." Id. at 1577. Here too, PointCare may not cut Drew out simply to maximize its own profits.

In Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1008-1009 (2d Cir. 1991), the Second Circuit held that plaintiff had materially breached the contract where its "high-handed demands . . . as a condition for completion of its work, coupled with its sudden, drastic reduction of manpower on the job, established that [plaintiff] had constructively abandoned the project." ). PointCare's unilateral decision to transfer the entire HT team en masse to the NP project represents this same "drastic reduction of manpower" and constructive abandonment that the Second Circuit has unequivocally deemed to be a material breach. Accord Intermetal Fabricators, Inc. v. Losco Group, Inc., 2000 U.S. Dist. Lexis 11622, at **22-23 (S.D.N.Y. Aug. 11, 2000) (holding that plaintiff breached a contract where it "substantially delayed and abandoned work on the project"); see also BGW Dev. Corp. v. Mount Kisco Lodge No. 1552 of the Benevolent Order of Elks of the United States, 247 A.D.2d 565, 568 (2d Dep't 1998) (holding that defendant "breached its contractual duty of good faith and fair dealing by failing to cooperate with the plaintiff's efforts to recruit joint venturers . . . and by actively attempting to dissuade interested persons from joining with the plaintiff.").

Furthermore, the Second Circuit has repeatedly emphasized that a party's duty of good faith cooperation is particularly important where, as here, that party has a substantial degree of discretion or control with respect to the performance thereof:

> [E]ven in a discretionary . . . contract, the obligation of good faith remains, and the particular duties of each party are derived both from the common expectations of the parties and from the relationship of those parties as structured by the contract.

Travellers Int'l, A.G. v. Trans World Airlines, 41 F.3d 1570, 1577 (2d Cir. 1994) (holding that defendant's contractually-obligated promotional efforts "were not conducted in good faith but

were in fact influenced by the improper motive to eliminate" plaintiff's involvement in the joint

venture); accord Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 232 (2d

Cir. 1991) ("Since the contract gave [plaintiff] considerable discretion with regard to matters like

advertising campaigns, store location and wholesale sales . . . even if it acted within the bounds

of its discretion, [plaintiff] would be in breach if it acted unreasonably.") (emphasis added).  As

PointCare abused its discretion and acted in a wholly unreasonable manner, it has put itself

squarely in breach of the Agreement.

    Additionally, PointCare's sabotage of the development of the HT platform (i.e., its

attempted interference with Drew's attempts to solve the gold adherence problem) constitutes a

per se breach of the Agreement, regardless of whether PointCare believed Drew to be in breach

thereof.  1800PostCards, Inc. v. Morel, 153 F. Supp. 2d 359, 365 (S.D.N.Y. 2001) (noting that

"even a material breach [by the other party] would not permit [defendant] to interfere with the

business of the allegedly defaulting party.")  As the court in Morel explained:

> [An] aggrieved party to contract could not sabotage [the] business of [the]
> breaching party because [the] time honored principle of contract law that allows
> an aggrieved party to walk away from the contract does not allow someone to
> maintain contractual relations and violate the basic requirements necessary to
> fulfill ongoing contractual relations.  If it did, contractual relations
> would degenerate into the law of the jungle.

Id.; accord Hawes Office Systems, Inc. v. Wang Laboratories, Inc., 580 F. Supp. 812, 814

(E.D.N.Y. 1984) (finding that party breached "joint marketing" venture where it tried to

"sabotage" plaintiff's company by inter alia, "interference with [plaintiff's] customers")

(applying Massachusetts law).

    PointCare seeks to justify its mid-June abandonment of the HT project by reference to its

belated notice of breach dated November 9, 2007, which in turn retroactively claims that the

breach occurred on January 5, 2007, presumably a reference to some date on the never-initialed

24

preliminary timetable that is part of Annex 1 to the Agreement. Even putting aside the fact that PointCare had delayed the preliminary timetable by its missing a slew of software deadlines in 2006, and the fact that PointCare had worked cooperatively on the HT through mid-June of 2007, the "Notice of Default" lacks any specificity as to what needs to be done to "cure" the purported default – other than a reference to the Agreement's requirement that Drew manufacture an HT that could accommodate PointCare's assay (without reference to PointCare's mirror obligation to accommodate its assay to the Drew machine). This task was accomplished by December 10, but PointCare refused delivery.

In order for a notice to cure to comply with New York law, it must set forth the substance of each alleged default and specify the actions necessary to cure. For example, in Lurzer GMBH v. American Showcase, 77 F. Supp. 2d 370, 374 n.1 (S.D.N.Y. 1997), the court found that a notice alleging failure to make payment under the parties' contract did not "identify the alleged breach with sufficient detail to permit [defendant] to cure that breach"); accord Ulla-Maija, Inc. v. Kivimaki, 2005 U.S. Dist. LEXIS 22249, at **11-12 (S.D.N.Y. Sept. 30, 2005) (notice claiming "failure to perform material obligations under the agreement" lacked specificity and was therefore invalid). The "notice" here is no better.

Moreover, PointCare's refusal to allow Drew to even attempt to cure its purported "breach" of the Agreement further demonstrates that Drew is very likely to succeed on the merits of its breach of contract claim. Where a party alleging a breach of contract does not provide an opportunity to cure, any claims for breach of contract are ineffective, even in cases where the opportunity is not a contractual requirement as it is here. In Ulla-Maija, Inc. v. Kivimaki, 2005 U.S. Dist. Lexis 22249, at **11-12 (S.D.N.Y. Sept. 30, 2005), a purported termination of a licensing agreement was held to be invalid where it was "meaningless insofar as [not] providing

an opportunity to cure any alleged breaches." Similarly, in <u>Gjoni v. Home Depot, Inc.</u>, 2001 U.S.

Dist. Lexis 2264, at **3-4 (S.D.N.Y. March 6, 2001), the court found a genuine issue of material

fact as to defendant's purported "breach" where plaintiff "refused to schedule delivery for

[defendant's] items, thereby denying [defendant] the opportunity to cure any defects."); <u>accord</u>

<u>Clark Oil Trading Co. v. Amerada Hess Trading Co.</u>, 1993 U.S. Dist. Lexis 10801, at *47

(S.D.N.Y. Aug. 4, 1993) (holding that "[a]s a matter of law, this Court has found that [defendant]

improperly denied [plaintiff] the opportunity to cure.")

PointCare's excuse for not taking delivery is patently absurd. PointCare asked for

information which they know was their responsibility under the Agreement (<u>i.e.</u>, validation data

and patient testing data) and other information not either required under the Agreement or

necessitated at the current juncture. In short, it was a demand designed to create an excuse for

PointCare's own prior breach.

Because PointCare has similarly purported to terminate the Agreement in violation of its

clear terms based on unsubstantiated claims of non-performance relating to its own failure to

recognize or address the gold adherence problem, Drew is likely to succeed on the merits of its

claim for breach of contract.

2.    <u>**Drew Is Entitled to Specific Performance**</u>

Drew is also likely to establish that it is entitled to an award of specific performance

ordering PointCare to fulfill the terms of the Agreement and to cease those improper and bad

faith activities that are in breach thereof.    Specific performance is appropriate where the plaintiff

cannot be made whole by money damages and thus has no adequate remedy at law. <u>Sokoloff v.</u>

<u>Harriman Estates Dev. Corp.</u>, 96 N.Y.2d 409, 415 (2001). "In determining whether money

damages would be an adequate remedy, a trial court must consider, among other factors, the

difficulty of proving damages with reasonable certainty and of procuring a suitable substitute

performance with a damages award." Id. at 415 (citing Restatement (Second) of Contracts § 360). Thus, specific performance is the proper remedy for a breach of contract involving goods or services that are "unique in kind, quality or personal association [and] where suitable substitutes are unobtainable or unreasonably difficult or inconvenient to procure." Id.

Drew clearly qualifies for such relief. The HT platform and the NP device are each unique in kind, and indeed, it is well-nigh impossible for Drew to finalize and market the HT platform in the absence of PointCare's contractually-obligated cooperation. Any monetary damages award would not procure for Drew a suitable substitute, and would not serve to make Drew whole. Thus, the only way to afford Drew adequate relief is to order that PointCare specifically perform the Agreement and fulfill its obligations to Drew therein.

## C.    **Drew is Facing Immediate and Irreparable Harm**

### 1.    **PointCare is Damaging Drew's Business Relationships and Reputation**

If PointCare had not effectively abandoned the HT project, Drew would be in a position today to deliver on many of the orders and expressions of interest it has received. (See Affidavit of Francis Matuszak dated April 15, 2008 (the "Matuszak Aff.") at ¶ 2; DePiano Tr. at 241:2-13.) Based on the progress of the development through mid-2007, the Drew sales team has assured a number of distributors expressing an interest that Drew would be able to deliver HT products by the end of 2007. (See Matuszak Aff. at ¶ 2; DePiano Tr. at 239:1-240:21). The inability to do so has hurt Drew's credibility with a number of its distributors, especially since it is well known that PointCare is now selling the NP device which was being developed simultaneously with the HT. (See Matuszak Aff. at ¶ 2).

Drew has also received numerous expressions of interest in the NP machine and has, as long ago as July 2, 2007, placed a purchase order for seven NP machines, six of which were intended for resale to our distributors. (See Matuszak Aff. at ¶ 3). No NP machine has been

delivered to Drew, except for a single "training" machine that was later "recalled" by PointCare for "software upgrading." (See Matuszak Aff. at ¶ 3). PointCare's refusal to ship machines to Drew has severely hurt Drew's credibility with distributors in its territories since Drew has previously informed them that the NP machine would be available for sale in the last quarter of 2007, and Drew now cannot even show them the product. (See Matuszak Aff. at ¶ 3). This is especially harmful because Drew's distributors know that PointCare is selling the NP product and are raising questions as to why Drew is not selling the product to them. (See Matuszak Aff. at ¶ 3). For example, Drew receives weekly calls from a distributor in the United States who has committed to 30 units in 12 months. (See Matuszak Aff. at ¶ 3). The distributor has secured orders at several HIV government funded clinics who undoubtedly will look to contact PointCare for placement of the NP into these sites. (See Matuszak Aff. at ¶ 3).

Furthermore, PointCare has contacted distributors in territories assigned to Drew. (See Matuszak Aff. at ¶ 5). The fact that PointCare has done so impairs Drew's relationship with its distributors in those same territories, who are justifiably upset by these contacts. (See Matuszak Aff. at ¶ 5). Additionally, some of Drew's distributors have advertised the CD4 capabilities in their countries. (See Matuszak Aff. at ¶ 5). Given that Drew cannot now not give an estimated shipment date Drew will be forced to tell them that the unit will not be available. (See Matuszak Aff. at ¶ 5). This will lower the value of Drew's overall catalog to these distributors due to the reduced overall product offering. (See Matuszak Aff. at ¶ 5).

PointCare has made shipments to Biomedical, Inc., a distributor located in Miami, Florida, which is purportedly planning to sell the machines in the Caribbean. (See Matuszak Aff. at ¶ 6). Under the Agreement, this is a sale in a Drew Territory, the United States, and should have been referred to Drew. (See Matuszak Aff. at ¶ 6; Rockingham Tr. at 181:1-184:17). Any

28

such sales to U.S.-based foreign distributors will encourage other such activities and can only have the effect of damaging Drew's relationships with its U.S. distributors, especially if any NP device finds its way back to the United States. (See Matuszak Aff. at ¶ 6). In Drew's experience, this is a frequent occurrence in such situations. (See Matuszak Aff. at ¶ 6). Similar sales have been made to GTZ, a German company located in a Drew territory. (See Rockingham Tr. at 182:9-184:8).

PointCare has also made sales to U.S.-based Non-Government Organizations ("NGOs.") (See Matuszak Aff. at ¶ 7). While PointCare is permitted to make such sales under the Agreement, the Agreement also provides that Drew will install, service and supply the machines thus sold. (See Matuszak Aff. at ¶ 7). Drew has not been contacted on any such sale and has thus already lost initial revenues. (See Matuszak Aff. at ¶ 7). More significantly, these services are being provided by PointCare, and it will be very difficult to dislodge them, thus further hurting Drew's relations with its U.S. Distributors who have every reason to expect these sales. (See Matuszak Aff. at ¶ 7).

PointCare's unabashed breaches and wrongful purported termination of the Agreement as described above are having an immediate and highly detrimental impact on Drew's customer relationships and business reputation. Courts in this Circuit have consistently held that these types of harms justify the issuance of a preliminary injunction. See, e.g., Warner-Lambert Co. v. Northside Dev. Corp., 86 F.3d 3, 8 (2d Cir. 1996) (granting preliminary injunction where plaintiff would suffer "loss of consumer goodwill" from violation of distribution agreement); Reuters, Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 908 (2d Cir. 1990) (granting preliminary injunction where "speculative loss may cause immediate irreparable harm to [plaintiff's] good will" from breach of distribution agreement); MxEnergy Inc. v. Rochester Gas & Elec. Corp.,

29

2006 U.S. Dist. Lexis 13958, at **11-12 (W.D.N.Y. March 10, 2006) (granting preliminary injunction where irreparable harm ensued from "not only the potential loss of future sales, but damage to [plaintiff's] reputation"); Global Switching Inc. v. Kasper, 2006 U.S. Dist. Lexis 44450, at **36-38 (E.D.N.Y. June 29, 2006) (loss of clients and "immediate and immeasurable" damage to reputation constituted irreparable injury justifying issuance of preliminary injunction); see also National Kitchen Products, Inc., v. Kelmort Trading & Co., 1992 U.S. Dist. Lexis 657, at *6 (S.D.N.Y. Jan. 24, 1992) (granting preliminary injunction where it was "almost inconceivable that Plaintiff's reputation for reliability as a distributor, its relationships with actual and potential sub-distributors, and its ability to reap the rewards of its ongoing investment. . . [were] not imminently threatened by Defendants' repudiation . . .").

The immediate and highly detrimental impact on Drew's customer relationships and business reputation from PointCare's misconduct presents irreparable harm that can only be rectified through the issuance of preliminary injunctive relief.

## 2. PointCare is Destroying Drew's Chance to be First to the Market

The NP and HT are competitive products to some extent. (See Matuszak Aff. at ¶ 4). It was obviously intended that both products would be ready for the market at or about the same time in July 2007 (compare Exhibit 1 to Complaint at Attachment 1 to Annex 1 to Exhibit 4 to Krauledat Dep.). Instead, PointCare leapfrogged the NP over the HT by focusing its efforts thereon. The time-lead that PointCare is building in NP sales will make it more difficult to sell the HT product when it does become available since the NP will become entrenched. (See Matuszak Aff. at ¶ 4). Accordingly, Drew faces irreparable injury due to PointCare's untrammeled rush to launch the NP device prior to completion of the HT platform.

In <u>Lumex Inc. v. Highsmith</u> 919 F. Supp. 624, 629 (E.D.N.Y. 1996), the court granted a preliminary injunction and noted that "[t]ime of the introduction of a product is important because a new or innovative machine has a selling advantage. The goal is to be 'first to the market'." <u>See also</u> <u>Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.</u>, 5 Misc. 3d 285, 299 (Sup. Ct., N.Y. County 1997) ("the loss of the advantage of being a pioneer and a market leader, may constitute irreparable harm."). Indeed, PointCare is gaining an incalculable advantage by its introduction of the NP device into the medical device community ahead of the HT. As the two products are directed at an overlapping customer base, Drew's HT platform will likely be viewed as a late comer to this highly competitive market, and its marketing and sales potential will be vastly reduced. PointCare's unilateral abandonment and sabotage of the HT development while it pushed the NP device forward at warp speed has destroyed Drew's valuable, bargained-for right to at least have both projects introduced to the market simultaneously, as the parties originally intended.

### 3.    PointCare is Misappropriating Drew's Confidential Information

Furthermore, Drew faces irreparable injury due to PointCare's possibly illicit use of Drew's highly sensitive proprietary information. In <u>Fabkom, Inc. v. R.W. Smith & Assocs.</u>, 1996 U.S. Dist. Lexis 13686, **2, 33-38 (S.D.N.Y. Sept. 18, 1996), for example, plaintiff software developer was granted a preliminary injunction that "prohibited defendants from marketing or distributing software . . . [that] was unlawfully copied from [plaintiff's] own software." In <u>Fabkom</u>, the parties had entered into a licensing agreement, through which defendant "misappropriated the content, if not the source code, of [plaintiff's] software." <u>Id.</u> at *15. The court found that plaintiff was threatened with irreparable harm, finding that "losses from the unauthorized copying cannot be measured monetarily." <u>Id.</u> at **15-16.

31

Similarly, in <u>Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.</u>, 5 Misc. 3d 285, 299

(Sup. Ct., N.Y. County 1997), the court granted preliminary injunctive relief where "defendants

have been refusing to return plaintiffs' Molds, defendants have been selling their own [products],

and preventing plaintiffs from entering the market." The court in <u>Sylmark</u> held in no uncertain

terms that "[t]he damage that is being inflicted upon [plaintiff] by defendants' exploitation of

plaintiffs' proprietary information . . . is impossible to quantify in dollars." <u>Id.</u>; <u>see also</u>

<u>Adirondack Appliance Repair, Inc. v. Adirondack Appliance Parts, Inc.</u>, 148 A.D.2d 796, 798

(3d Dep't 1989); <u>see also</u> <u>DoubleClick, Inc. v. Henderson</u>, 1997 WL 731413, **3-7 (Sup. Ct.,

N.Y. County 1997).

In the instant case, in connection with the parties' joint venture, PointCare personnel

gained highly confidential technical know-how with respect to the inner workings of the HT

platform. When PointCare's HT development team was transferred <u>en masse</u> to the NP project

without any consultation with Drew, the NP development progressed at a mind-blowing pace, so

much so that it raises serious questions about PointCare's sharing of Drew's proprietary

information with the third-party manufacturer of the NP device. PointCare's non-production of

the NP design history, despite repeated promises to do so, creates an unmistakable presumption

that a violation has occurred, since an expert reviewing the design history should be able to make

a judgment as to whether a transfer has occurred. Courts in this Circuit have repeatedly held that

"[a]n adverse inference may be drawn. . .from a party's failure to produce evidence in breach of

its discovery obligations." <u>Experience Hendrix, LLC v. Chalpin</u>, 461 F. Supp. 2d 165, 172

(S.D.N.Y. 2006) (<u>citing</u> <u>Residential Funding Corp. v. DeGeorge Financial Corp.</u>, 306 F.3d 99,

107 (2d Cir. 2002) ("Where, as here, the nature of the alleged breach of a discovery obligation is

the non-production of evidence, a district court has broad discretion in fashioning an appropriate

32

sanction, including the discretion to . . . proceed with a trial and give an adverse inference instruction."). In addition, FDA approval for the NP device was achieved in connection with testing done with the use (but not with its permission) of a Drew HT instrument located at PointCare's facilities.[14]

Indeed, PointCare's February 2008 Business Plan raises further suspicion as to its sharing of Drew's confidential HT information, as it states that "[i]n 2009 PointCare plans to round out its instrumentation offering and add a High Thoroughput hematology and immune hematology analyzer which will be used in larger and more complex centralized laboratories." (See PointCare Supp 2065 to 2083 at p. 7). Additionally, PointCare's January 24, 2008 Board of Directors Meeting Minutes reveal that "[t]he search for another High-Thoroughput vendor may not happen until the 4th Quarter of this year." (See PointCare Supp 2003 to 2004 at p.2). PointCare has no manufacturing capacity, and must turn to a Drew competitor to produce an HT platform. Finally, it also appears that PointCare has shared confidential Drew information with a possible merger candidate, Orasure Technologies, Inc. (See DePiano Tr. at 282:19-284:9; PointCare Supp 04068 to 04104). Clearly, there is imminent danger that HT technology will be transferred to a Drew competitor, which will manufacture machines for PointCare. Since such a technology transfer is difficult to prove, Drew faces irreparable injury due to its well-founded fears about PointCare's improper use of Drew's highly sensitive proprietary information.

For all of these reasons, Drew will suffer irreparable harm as a matter of law if PointCare is not immediately enjoined from continuing its non-compliance with the Agreement.

---

[14] A reference instrument is needed for such an FDA submission, and the HT is the most appropriate reference instrument. The irony of PointCare using the HT as a reference instrument (without Drew's permission) while depriving Drew of the same opportunity by hijacking the Drew NP should not be lost on the Court.

### D.    The Failure to Grant Injunctive Relief Would Harm Drew Far More Than PointCare if Such Relief were Granted

The hardship that PointCare's many breaches presently impose on Drew far outweigh whatever inconvenience PointCare might claim to suffer from being ordered to fulfill the obligations of the Agreement to which it was a voluntary and willing party, and from which it continues to benefit. Indeed, the damage and loss that Drew will face if injunctive relief is denied is not merely hypothetical. Rather, as addressed at length above, Drew is facing immediate, significant and irreparable harm to the extent that its reputation in the medical device community may be permanently damaged. On the other hand, PointCare will suffer no hardship whatsoever if the injunctive relief is granted, and it will merely be bound by an Agreement that it has already agreed to. If this Court orders that the Agreement be preserved, PointCare stands to benefit from its potentially profitable relationship with Drew. It is difficult to see how PointCare is harmed by a continuation of the joint venture established by the Agreement. Certainly, such an argument would not rise to the level of the sort of disproportionate burden necessary to deny specific performance as a remedy for a breach of contract.

For example, in Ecolab, Inc. v. Paolo, 753 F. Supp. 1100, 1114 (E.D.N.Y 1991), the court found that the "balance of hardships tips heavily in favor" of plaintiff where the only "hardship" to defendant would be "enforcement of the covenant" to which defendant agreed in writing. Similarly, in Bay Ridge Fed. Sav. & Loan Ass'n v. Morano, 199 A.D.2d 354, 355-356 (2d Dep't 1993), the court granting specific performance of the agreement even though the terms of the contract were "no longer beneficial to defendant as a result of changing circumstances"); accord Khayyam v. Diplacidi, 167 A.D.2d 300, 301 (1st Dep't 1990) (holding that specific performance of a contract will not be precluded for lack of equity "simply because [a contract is] unreasonable or unprofitable" for one party).

34

In addition, courts in this Circuit have repeatedly found that the balance of hardships tipped in favor of the movant where such movant had "entrusted [defendants] with confidential information which [was] of significant competitive value to it and to other actors in the market." Ecolab, 753 F. Supp. 1100 at 1114; see also Global Telesystems, Inc. v. KPNQwest, N.V., 151 F. Supp. 2d 478, 483 (S.D.N.Y. 2001) (granting specific performance of agreement and finding that "balance of hardships tips decidedly in favor of [movant]" where non-movant had "intimate knowledge regarding [movant's] business"). As Drew entrusted PointCare with its proprietary information with respect to the HT device, which PointCare is alleged to have improperly used to gain a significant competitive edge in the medical device market, the balance of hardships tips further in favor of Drew.

Compared to the harm Drew faces if its request for a preliminary injunction is denied, PointCare will suffer no harm by this Court's entry of such an Order. Thus, the balance of equities clearly weighs in Drew's favor.

35

## CONCLUSION

For all of the foregoing reasons and for the reasons set forth in the Complaint and Drew's earlier filings, Drew respectfully requests that the Court issue a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, directing PointCare to fully comply with the terms of the Agreement and requiring PointCare to cease all related misconduct.

Dated: New York, New York
      April 16, 2008

Respectfully Submitted,

DUANE MORRIS LLP

By:    /s Anthony J. Costantini
        Anthony J. Costantini
        John Dellaportas
        Brian Damiano
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000
Facsimile: (212) 692-1020
*Attorneys for Plaintiff*

Of Counsel:

Ben Kuruvilla, Esq.
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, Massachusetts 02210-260030
(857) 488-4209

Enrico Pagnanelli, Esq.
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, Pennsylvania 19103-9146
(215) 979-1928