UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No. 08 CVs 1490-AKH

_____
                                                    )
DREW SCIENTIFIC, INC.,                              )
                        Plaintiff                   )
vs.                                                 )
                                                    )
POINTCARE TECHNOLOGIES, INC,.                       )
                        Defendants.                 )
_____)

POINTCARE'S MEMORANDUM OF LAW IN OPPOSITION TO
DREW'S MOTION FOR A PRELIMINARY INJUNCTION

TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................... i

TABLE OF AUTHORITIES ............................................................................. iii

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................. 4

ARGUMENT ...................................................................................................... 24

    I.      THE STANDARD ................................................................................ 24

    II.     DREW HAS NOT MET ITS HEAVY BURDEN OF
           DEMONSTRATING IRREPARABLE HARM...................................... 26

           A.     Drew Offers No Evidence That Its Business Relations Or
                 Reputation Have Been Damaged. ................................................. 27

                 1.      Drew Offers No Evidence Of Harm (Irreparable Or
                        Otherwise) Due To Drew's Inability To Ship
                        Instruments…................................................................27

                 2.      Drew Faces No Harm If Pointcare Is First To Market.......29

                 3.      Drew Cannot Establish Irreparable Harm Based On
                        "Possibly" Illicit Use Of Confidential Information" .........29

    III.    DREW HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS
           ON THE MERITS OF THE PARTIES' DISPUTE .................................. 31

           A.     Drew Failed To Demonstrate That Pointcare Breached The
                 Agreement Or Any Supposed Fiduciary Duty............................. 31

                 1.      Point Care Did Not Owe Drew A Fiduciary Duty.............31

                       a.       Drew Pled A Contract Claim, Not A Fiduciary Duty
                              Claim.................................................................. 31

                     b.       The Parties Are Not Joint Venturers. .................... 32

                 2.      PointCare Did Not Violate Its Contractual Obligations To
                      Drew. .............................................................................34

                     a.       PointCare Did Not Abandon The HT Project In
                                Favor Of The NP Project. ..................................... 34

b.    PointCare Did Not Interfere With Drew's Attempts To Solve The Gold Adherence Problem............... 34

c.    PointCare Gave Drew Proper Notice Of Drew's Material Breach..................................................... 35

d.    Drew Failed To Cure Its Material Breach............ 37

e.    Drew Refused To Provide Pointcare With Test Data Substantiating Drew's Claim That The HT Was Ready To Be Shipped To PointCare..................... 38

f.    Drew Has No Likelihood Of Success On Its Contract Claim Related To NP Marketing Rights. ................................................................... 40

g.    Drew Has No Likelihood Of Success On Its Allegations Of Violations Of Drew's "Rights" As A Market Leader. ...................................................... 40

h.    PointCare Has Not Violated Any "Market Leader" Rights. ................................................................... 40

i.    PointCare Did Not Violate The Agreement With Respect To Sales To Non-Governmental Organizations. ...................................................... 42

3.    Drew Cannot Vary The Agreement's Terms With Prior Oral Representations. ........................................................... 43

4.    Drew Is Not Entitled To Specific Performance. ........................... 44

IV.    DREW CANNOT MEET ITS BURDEN OF DEMONSTRATING THAT THE BALANCE OF HARDSHIPS TIPS IN ITS FAVOR..................... 46

V.    DREW'S REQUEST FOR EQUITABLE RELIEF IS DEFEATED BY ITS UNCLEAN HANDS........................................................................ 46

VI.    IF AN INJUNCTION IS GRANTED, DREW MUST GIVE SECURITY. ........................................................................................... 47

CONCLUSION.................................................................................................48

TABLE OF AUTHORITIES

**Cases**

Amarant v. D'Antonio, 197 A.D.2d 432 (1st Dep't 1993) ........................................ 25, 46

Arias v. Solis, 754 F. Supp. 290 (E.D.N.Y. 1991) ........................................................... 48

Automatic Radio Mfg. Co. v. Ford Motor Co., 272 F.Supp. 744 (D. Mass. 1967) .......... 27

Barrett v. Harwood, 967 F. Supp. 744 (N.D.N.Y. 1997) ................................................. 26

Bass v. Richardson, 338 F.Supp. 478 (D.C.N.Y.1971) ................................................... 48

Bell & Howell: Marniya Co. v. Masel Supply Co., 719 F.2d 42  (2d Cir. 1983) ............ 26

Citizen's Coach Co. v. Camden Horse R..R.. Co., 29 N.J. Eq. 299 (1878) ..................... 24

Concert Radio v. GAF Corp., 108 A.D. 2d  273 (1st Dep't 1985) .................................. 45

Dunlop-McCullen v. Local 1-S, 149 F.3d 85  (2d Cir. 1998), .......................................... 47

Ecolab, Inc. v. Paolo,  753 F. Supp. 1100 (E.D.N.Y. 1991) ........................................... 46

Feit & Drexler, Inc., 760 F.2d 406 (2d Cir. 1985) ......................................................... 25

Global Telesystems, Inc. v. KPNQwest, N.V., 151 F. Supp. 2d 478 (S.D.N.Y. 2001).... 46

Helios & Matheson N. Am., Inc. v. Vegasoft Oy, 2007 U.S. Dist. LEXIS 38206
(S.D.N.Y. 2007) ............................................................................................................ 26

Hudson Global Res. Holdings, Inc. v. Hill, 2007 U.S. Dist. LEXIS 38326
(W.D. Pa. 2007) ............................................................................................................ 48

Instant Delivery Corp. v. City Stores Co., 284 F.Supp. 941 (E.D. Pa. 1968) .................. 27

Int'l Controls Corp., v. Vesco, 490 F.2d 1334 (2d Cir. 1974) ......................................... 48

Jackson Dairy, Inc. v. H.P. Hood & Sons, 596 F.2d 70  (2d Cir. 1979) (per curiam) ...... 25

Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher, 417 N.E.2d 541  (N.Y. 1981) ...... 44

JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75 (2d Cir. 1990) ............................... 24

Kaplan v. Bd. of Educ. of City School Dis., 759 F.2d 256 (2d Cir. 1985) ....................... 27

Kidz Cloz, Inc. v. Officially For Kids, Inc., 320 F. Supp. 2d 164 (S.D.N.Y. 2004). ....... 32

Kleinberg v. Radian Group, Inc., 2002 U.S. Dist. LEXIS 20595 (S.D.N.Y. 2002) ......... 44

Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108 (2d Cir. 2006).......... 25

Loveridge v. Pendleton Woolen Mills, Inc., 788 F.2d 914 (2d Cir. 1986) ...................... 26

Manganaro v. InteropTec Corp., 874 F.Supp. 660 (E.D. Pa. 1995) ............................... 28

Modern Computer Sys., Inc. v. Modern Banking Inc., 871 F.2d 734 (8th Cir. 1989)...... 27

Phillips Petroleum Co. v. Rexene Corp., No. 95-1451, 82 F.3d 435 (Table),
1996 WL 137536 (Fed. Cir. May 20, 1996) ....................................................... 36

Phoenix Racing, LTD v. Lebanon Valley Auto Racing Corp., 53 F. Supp. 2d
199 (N.D.N.Y. 1999) ........................................................................................... 44

Pkfinans Intl. Corp. v. Black Star Enter., 1987 U.S. Dist. LEXIS 5372
(S.D.N.Y. 1987)................................................................................................... 44

RBFC One, LLC v. Zeeks, Inc., 367 F. Supp. 2d 604 (S.D.N.Y. 2005) ........................ 36

Reuters Ltd. v. United Press Int'l. Inc., 903 F.2d 904 (2d Cir. 1990) ............................ 26

Sanofi-Synthelabo v. Apotex, Inc., 488 F. Supp. 2d 317 (S.D.N.Y. 2006), .................... 47

Sokoloff v. Harriman Estates Dev. Corp., 754 N.E.2d 184 (N.Y. 2001) ........................ 45

South Rd. Assocs., LLC v. IBM, 826 N.E.2d 838 (N.Y. 2005) ...................................... 43

Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27 (2d Cir. 1995)........................ 25

Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969 (2d Cir. 1989) ............. 26, 30

United for Peace and Justice v. Bloomberg, 2004 NY Slip Op. 24389; 5 Misc. 3d
845, 849 (NY Sup. Ct., NY County August 25, 2004);.................................... 47

W.W.W. Assoc., Inc. v. Giancontieri, 556 N.E.2d 639 (N.Y. 1990).............................. 44

## Other Authorities

NY Jur. 2d., Evidence and Witnesses,  § 569 (February, 2008)................................ 43, 44

# PRELIMINARY STATEMENT[*]

Drew's position rests on nothing more than speculative and unsubstantiated beliefs about future harms that may befall Drew if the Court refuses to issue a mandatory injunction compelling PointCare to set aside its justified termination of the parties' Agreement due to Drew's material breach. Drew lacks any concrete support to justify its fears. This showing utterly fails to meet Drew's heavy burden to show that it will suffer irreparable harm absent injunctive relief.

Drew's showing regarding likelihood of success fairs no better. Drew utterly failed to fulfill its obligations under the Parties' Agreement. Specifically, Drew failed to develop the HT instrument within the time period required by the Agreement. PointCare properly terminated the parties' Agreement based on Drew's material breach. Drew's primary claim of breach of contract lacks merit.

Regrettably, in a vain attempt to create grounds for extraordinary injunctive relief, Drew repeatedly mischaracterizes the record, including the parties' Agreement, sometimes even resorting to obvious falsehoods. A few examples suffice:

Drew claims that the Agreement's HT development timetable was merely "preliminary" because Drew President Harry Rimmer did not initial it. (Drew Brief p. 9). Drew ignores that when Mr. Rimmer sent the signed Agreement to PointCare CEO Petra Krauledat, he alerted her that he had not initialed the HT timetable due to colleagues' vacations, but he assured her: "Don't be concerned[.] I realize that time is your most important criteria." Putting the lie to any suggestion that the timetable was merely

---

[*] Deposition transcripts, deposition exhibits, and one other document not attached to the supporting affidavits of Krauledat, Hansen, Barry, Waite, and Desrosiers, but cited herein, are attached to the Affidavit of Michael P. Twohig.

preliminary, Mr. Rimmer acknowledged that Drew was "recruiting additional resources to meet the <u>necessary timetables</u>." (Krauledat Aff., Exh. 4).

Drew strenuously argues that PointCare had an obligation to *guide* Drew's efforts to modify its existing Excell 22 instrument to accommodate PointCare's proprietary CD4 assay.  Such obligation appears nowhere in the parties' Agreement, which could not be any clearer in describing Drew's obligations with respect to developing the HT instrument: "DREW agrees to modify its current Excell 22 hematology platform to accommodate POINTCARE's proprietary Lymphocyte Enumeration Assay, CD4sure."

When Drew brought this action, Escalon CEO Richard DePiano, Sr. represented to the Court: "[B]y December 7, I was able to advise PointCare that an HT platform that *met specifications* would be ready for delivery by the week of December 10." (DePiano Aff. ¶ 19) (emphasis added).  This is false.  The test report of Drew's independent consultant Dr. Herbert Chow (attached to Mr. DePiano's Affidavit at Exhibit U), reflects that Dr. Chow tested only a small fraction of the specifications for the instrument.

Drew devotes an entire section of its Brief to the notion that PointCare owed it a fiduciary duty because the parties' relationship was "akin to a joint venture."  This is a Drew concoction of very recent vintage.  There is no allegation in the complaint for breach of fiduciary duty or that Drew and PointCare were part of a joint venture.  Also, Drew never addresses the legal standard for joint venture, which, when applied, clearly leads to the conclusion that this was not a joint venture.

Drew scurrilously and falsely accuses PointCare of failing to honor its representation to the Court that PointCare would refrain from contacting distributors in territories where Drew was "Market Leader."  Drew insults the Court's intelligence by

making this accusation based on an email that a distributor sent to PointCare. Drew omits the uncontradicted testimony of the email's recipient that she immediately contacted the distributor and stated that she could have no further contact due to ongoing legal proceedings. PointCare has honored its word to the Court and takes umbrage at Drew's false accusation.

Such dubious conduct is disappointing but not surprising given the revelation in discovery that management at the highest levels of Escalon/Drew actively plotted with disgruntled former PointCare Vice President Daniel O'Connor for various illicit purposes. Over the course of multiple emails and phone conversations with Mr. O'Connor, Drew VP of Sales Francis Matuszak, part of Escalon/Drew's senior management team, obtained, among other things, PointCare confidential financial information, PointCare confidential customer information, and information about potential PointCare deals that Drew could get for itself. (Matuszak Dep. pp. 170-71). Mr. Matuszak obtained all this information from Mr. O'Connor despite knowing full well that Mr. O'Connor had a duty of confidentiality to PointCare. (Matuszak Dep. pp. 263-64). Mr. Matuszak also plotted with Mr. O'Connor to go around PointCare CEO Krauledat and open direct discussions with PointCare's board of directors about a possible merger transaction, an option the parties had explored and abandoned a few months earlier. (Matuszak Dep. pp. 273-74).

Matuszak knew that what he was doing was wrong. (Matuszak Dep. p. 296). His conduct was contrary to any standard of good faith dealing between contracting parties. Even more disturbing, Mr. Matuszak kept his boss, Escalon CEO Richard DePiano,

informed of his efforts (Matuszak Dep. pp. 283-84) (DePiano Dep. pp. 204-06, 215-17), and Mr. DePiano never put a stop to the chicanery. (DePiano Dep. pp. 217-22).

In support hereof, PointCare relies on the affidavits of its CEO Petra Krauledat, Chief Science Officer Peter Hansen, HT Project Leader Donald Barry, Software Manager Andrea Desrosiers, and Software Engineer Jennifer Waite, submitted herewith, as well as the Affidavit of Petra Krauledat that PointCare filed with the Court at the outset of this action, and the Affidavit of Michael P. Twohig, submitted herewith.

## STATEMENT OF FACTS

### PointCare

In 2002, Drs. Peter Hansen and Petra Krauledat came out of retirement in order to invent and commercialize a blood testing device that would help address the world HIV/AIDS crisis in developing nations. (Hansen Aff. ¶¶ 5-17). Drs. Hansen and Krauledat used part of their retirement savings to pursue their mission by founding PointCare. In two years, they built a company from zero staff, attracted outside investors, invented an assay for CD4 testing (called the CD4Sure™ assay), developed a blood testing instrument (the PointCare "AuRICA") to perform the CD4Sure™ assay, and got FDA approval for the AURICA and CD4Sure™ assay. (Id. ¶¶ 18-24).

In 2005, after serving approximately 100,000 patients with approximately 65 AuRICAs, PointCare terminated its relationship with the outsourced manufacturer of the AuRICA for business reasons. PointCare was in danger of not delivering on the hope that it had generated around the world. PointCare urgently needed to find a new manufacturer who could quickly develop and bring to market an instrument that was compatible with PointCare's proprietary assay. (Id. ¶¶ 25-26).

## Drew

Unbeknownst to PointCare until discovery in this action, Drew assessed itself as a poorly run company with an outdated product line. (Drew Marketing Plan DR31619-39). New products were imperative to Drew's growth. (Id.)  Drew's upper management was fully aware of Drew's precarious situation, which threatened its very survival. (Young Dep. Exh. 12).

## Initial Discussions Between PointCare And Drew

A chance meeting in November 2005 led to discussions between senior management of Drew and PointCare.  The opportunity on the table was for Drew to modify its existing Excell 22 platform to accommodate PointCare's proprietary assay. (DePiano Dep. p. 122).

PointCare made Drew aware that it had recently severed its relationship with its instrument manufacturer.  Dr. Krauledat, Dr. Hansen and Vice President of Business Development Daniel O'Connor made it clear to their counterparts at Escalon and Drew that PointCare "urgently" needed a new supplier that could develop and commercialize a new instrument "quickly." (Matuszak Dep. pp. 111-15; DePiano Dep. p. 160). Escalon/Drew responded that it was willing to work with PointCare toward that end. (Matuszak Dep. pp. 116-18).  Mr. Bouree of Drew told Dr. Hansen that Drew had an experienced engineering staff and a strong experimental machine shop that designed and developed mechanical modules for new products and that they could design a CD4 module. (Hansen Aff. ¶ 35).  The parties decided that senior technical people from each side would work together to determine if Drew's existing hematology platform appeared compatible with PointCare's proprietary assay. (Krauledat Aff. ¶ 8).

Unbeknownst to PointCare, Escalon CEO Richard DePiano, was "extremely skeptical" about undertaking the HT development project because Drew personnel did not have the ability to perform the work required by the project. (DePiano Dep. pp. 116-17, 134-35; Drew Brief p. 8). No one shared this concern with PointCare. (Krauledat Aff ¶ 15).

Drew also said that they wanted marketing rights for another product that PointCare was developing together with another instrumentation manufacturer, C2. This was a small and portable hematology instrument that also would perform the PointCare CD4 test. This instrument was particularly well suited for resource poor environments (it was later called the NP, shorthand for "near patient"). Drew said that it would be willing to bear the entire cost for the HT development if PointCare agreed to such marketing rights. (Krauledat Aff. ¶ 11).

### Feasibility Testing

Drew (Roger Bouree) and PointCare (Hansen and Barry) jointly conducted feasibility testing from January to March 2006. Both sides concluded that it was possible to modify the Excell 22 instrument quickly to perform the PointCare CD4sure assay. (Krauledat Aff. ¶ 14; Hansen Aff. ¶¶ 38-45).[1]

### The Agreement

The parties proceeded to negotiate a written contract under which Drew would modify its instrument to accommodate PointCare's assay. Contrary to Drew's assertion, Dr. Hansen *never* said that he (or his colleagues) would guide Drew's efforts to modify their platform to accommodate PointCare's assay. Dr. Hansen said he would help, not

---

[1] Drew distorts the record in claiming that "overly optimistic feasibility studies *conducted by Dr. Hansen and Mr. Barry* became the basis for both companies' decision to go forward." (Drew Brief p. 8) (emphasis added).

guide, Drew, who would be ultimately responsible to modify the instrument. (Hansen Aff. ¶ 51; Krauledat Aff. ¶ 15). No one at Drew or Escalon asked PointCare to guide Drew through the process of modifying its instrument. (Hansen Aff. ¶ 51; Krauledat Aff. ¶ 15). Nowhere in the Agreement does it set forth or suggest such an obligation.

The Agreement could not be any clearer in describing Drew's responsibilities with respect to the HT: "DREW agrees to modify its current Excell 22 hematology platform to accommodate POINTCARE's proprietary CD4 Lymphocyte Enumeration Assay, CD4Sure." *Nowhere* does the Agreement impose a "mutual mirror-image obligation" on PointCare to "modify" its assay to accommodate Drew's instrument.

This was fully understood by Escalon CEO DePiano before the Agreement was signed:

> Q: To your understanding, whose responsibility was it under this contract to modify Drew's existing platform to accommodate PointCare's assay?
> A: Under the contract, as it was written, Drew bore the expense and the responsibility for modifying the 2280.
> Q: To accommodate PointCare's assay?
> A: Yes.
> Q: And going into the contract, you knew that Peter Hansen and perhaps other colleagues at PointCare had the skills to help Drew in that regard, correct?
> A: Yes.
> Q: But ultimately, you understood under the contract that the responsibility fell on Drew to modify its platform to work with PointCare's assay, correct?
> A: Yes. And at the time, the responsibility was fixed because of the costs associated with it. We should bear that.

(DePiano Dep. p. 129).

When the Agreement was signed, the CD4Sure[TM] assay was an existing, FDA approved assay. Annex 1 does not say that PointCare will modify its existing FDA cleared assay. What PointCare would do was prove to the FDA that

the CD4Sure assay worked on Drew's HT as well as it worked on the PointCare

AuRICA, and pay for it. (Hansen Aff. ¶ 55).  There is no mirror image obligation

between the parties as Drew asserts in its brief.

### Timeline

Attachment 1 to Annex 1 is the HT Development timeline.  Pursuant to the

timeline, Drew was required to complete development of hardware modules for the HT

by the end of June 2006. (Agreement, Attachment 1 to Annex 1 at lines 14-18).  At the

same time, Drew was supposed to integrate the various hardware modules into an HT

prototype system (id. at lines 23-27), which would then be subjected to in-house testing,

followed by field testing and "reworks" by October 31, 2006. (Id. at lines 32-34; Hansen

Aff. ¶ 99).  Drew was then to undertake the "manufacturing engineering" of the

instrument  and transfer the instrument to manufacturing by March 5, 2007, at the latest.

(Attachment 1 to Annex 1 at line 36).

Drew President Harry Rimmer overnighted four copies of the Agreement to Dr.

Krauledat on June 2, 2006.  He emailed her that he had initialed all pages except the HT

development timeline due to vacations of technical colleagues, with whom he would

meet soon.    "Don't be concerned," he assured her, "I realize that time is your most

important criteria."  He explained that Drew was recruiting additional personnel to meet

the "necessary timetable." (Krauledat Aff. ¶ 18 and Exh. 4 thereto).[2]

---

[2] Drew refers to Attachment 1 to Annex 1 as a "preliminary timetable", apparently relying on the fact that it was not initialed. (Drew Brief pp. 9-10 and fn. 6).  This suggestion is obviously false in light of Mr. Rimmer's e-mail.

PointCare told Drew that "it was critical to adhere as closely as possible to the timeline in the contract." (Matuszak Dep. p. 226). Mr. Matuszak knew full well that it was "critical to PointCare for the HT to get to market as soon as possible." (Id.).

### Drew Rejects PointCare's AuRICA As Model For HT

In June 2006, Drew and PointCare held an HT engineering planning meeting at Drew. (Hansen Aff. ¶ 57). Drew's engineering group agreed that the optical cytometer modified by Mr. Bouree could be readily turned into a manufacturable design and no further engineering development work was needed on it. (Id. ¶ 59). PointCare then described its CD4sure assay and how its AuRICA device performed the assay with computer driven needle and syringe technology, similar to Drew's own D3 device. (Id. ¶ 61).

The Drew engineering group rejected the AuRICA/D3 technology as a model for the HT, and instead sketched out a different design for the "CD4 module." (Id. ¶¶ 62-63). Despite PointCare's concerns about the proposed Drew design, the Drew engineering group assured PointCare that based on Drew's experience and familiarity with the technology they were proposing to use, they could build their idea more quickly. (Id. ¶¶ 63-64; 66-75). PointCare deferred to Drew's engineering decision to use the Drew CD4 Module design concept. (Id. ¶ 65).

### Software Planning

In the discussion about software at the meeting, Drew insisted it would not share its Excell 22 software source code with PointCare, and that Drew would have to manage the software development effort. (Id. ¶¶ 76-80). PointCare's analytical software (the algorithm from the AuRICA) worked with the modified Excell 22, but it needed to be

integrated into the HT.  Because Drew would not share its Excell source code, only Drew could do this integration. (Id. ¶¶ 81).  It was agreed that Drew's Karl Gu would manage the entire software development effort for Drew and PointCare and that he would be responsible for the final integration. (Id. ¶¶ 80-81).  To effectuate the integration, Gu proposed creating a "dll." (Id. ¶ 81).  PointCare deferred to Gu and Drew on this matter. (Id.)  In the meeting, PointCare learned that Drew was understaffed in the software department. (Id. ¶¶ 77-78).

### Drew Delays Start Of Software Development

Drew's Mr. Gu delayed more than a month after the technical meeting in early June before beginning the HT software development effort. (Id. ¶ 85).  Drew failed to garner the resources it needed for the effort, which had been promised by Mr. Rimmer. (Hansen Aff. ¶ 87; Krauledat Aff. ¶ 18 and Exh. 4 thereto).

### Drew Fails To Create And Implement "DLL" Integration Software

It was not until October of 2006 that Gu finally delivered a "dll" to PointCare, but instead of containing the PointCare algorithm as it was supposed to (and which had previously been transmitted to him by PointCare), it contained an insufficient substitute. (Hansen Aff. ¶ 88; Waite Aff. ¶ 12; Desrosiers Aff. ¶ 6).  This led to months of delay in the software integration as PointCare's software group blindly tried to complete the "dll" and effectuate the integration without the necessary cooperation from Drew. (Hansen Aff. ¶¶ 89-90; Waite Aff. ¶ 13).

### Drew Delays HT Hardware Development

By the end of August 2006, Drew should have delivered a completed HT prototype ready for in-house testing.  (Hansen Aff. ¶ 95-96; Agreement, Attachment 1 to

Annex 1 at line 32). Instead, Drew delivered a new part for the modified Excell 22. (Hansen Aff. ¶¶ 95-96). Drew could not get an HT prototype working properly with its CD4 module. (Id. ¶¶ 97-98).

### PointCare Sends Help To Dallas At Its Expense

From approximately December 2006 to March 2007, PointCare had staff (including its project leader, Donald Barry) on site at Drew's facility in Dallas almost constantly —at PointCare's expense—to help diagnose and solve the problems Drew was having with the HT hardware development. (Id. ¶¶ 97-99). Although the project was falling well behind the timeline (Agreement, Attachment 1 to Annex 1 at line 32), and PointCare was concerned, Drew's HT project leader seemed unconcerned and, as we now know, only accepted PointCare's help to placate. (Hansen Aff. ¶ 100.).

Drew had no explanation for the problems it was having with the HT hardware development, so Dr. Hansen himself traveled to Dallas to evaluate the situation. (Id. ¶ 102). After assessing the situation and realizing that the Drew engineers had no idea what the problem was and appeared ill equipped to analyze it, Dr. Hansen suggested that Drew send one of Drew's HT pre-prototype devices to PointCare for troubleshooting and that one of Drew's engineers also go. (Id. ¶¶ 103-104). Drew sent the machine but not the engineer. (Id.).

### PointCare Diagnoses Gold Staining Problem Caused By Drew's CD4 Module Design

With the engineering prototype/pre-prototype HT at PointCare, PointCare was soon able to get good test results from the machine. (Id. ¶ 106). However, PointCare discovered a more troubling problem. (Id. ¶ 107). After running several tests on the machine, PointCare noticed that the immunogold was coating (or staining) the surface of

11

a tube in the immunogold delivery part of Drew's CD4 module. (Id.). This was causing Drew's optical sensor to malfunction. (Id.). PointCare reported this problem immediately to Drew. (Id. ¶ 108).

**Drew Refuses Or Delays In Implementing Solutions To The Gold Staining Problem**

To solve the problem, Drew needed either to make a tube with a smoother inner surface to avoid gold adherence, or find an alternative to the optical sensor which could not "see" the gold through the stained tube. (Barry Aff. ¶ 9). PointCare suggested making the tube by molding materials known for their smoothness and lack of stickiness. (Hansen Aff. ¶ 108). Drew rejected using any materials that required molding. (Id. ¶ 109). PointCare suggested using an ultrasonic sensor (which would not need to "see" the gold) as an alternative to the optical sensor. (Id. ¶ 111; Barry Aff. ¶ 9). It was not until four months later that Drew agreed to try an ultrasonic sensor. (Hansen Aff. ¶ 111; Barry Aff. ¶ 9).

**PointCare Diagnoses Another Problem With The HT Engineering Prototype**

In testing with the HT engineering prototype, PointCare learned that its optical cytometer did not remain stable over the course of the day, which caused test results to vary for the same blood sample. (Hansen Aff. ¶ 115). Drew eventually sent a technician to PointCare who reported that the optical cytometers were defective. (Id. ¶ 116). Drew never provided PointCare with a clear resolution to this issue, which lingered through November 2007. (Id. ¶ 117).

**The Engineering Prototype Goes Back To Drew To Redesign The CD4 Module And The Optical Cytometer**

PointCare and Drew jointly concluded that the HT engineering prototype needed significant redesign at Drew and, in June 2007, the machine was sent back to Drew.

(Hansen Aff. ¶ 118).  Months passed with Drew reporting little progress. (Hansen Aff. ¶¶

119-120).  PointCare continued to be available to assist Drew and continued to supply

Drew with expensive immunogold reagent for testing. (Hansen Aff. 121).

In September 2007, Drew project leader, Gary Young, informed Dr. Hansen that

the problems had been solved and the instrument would be shipped back to PointCare on

September 18. (Id. ¶¶ 122-123).  Drew did not ship the instrument due to additional

problems. Id.

### Drew Commits Insufficient Resources To HT Project

Drew understood prior to signing the Agreement that it would need to find

additional resources to fulfill its HT development tasks. (Young Dep. Exh. 7).  Drew

promised to recruit additional resources to meet the necessary timetable with the signing

of the Agreement. (Krauledat Aff. ¶ 18).  Weeks after signing the Agreement, it became

apparent to PointCare that Drew was short of resources and had no plans to hire

additional staff. (Hansen Aff. ¶¶ 76-77).  Drew immediately fell behind schedule with

both hardware and software development. (Id. ¶¶ 95-96; 85).  As Drew expressed

generally in its Plan, its lack of resources "resulted in poor product quality and little or no

investment in new product development." Drew Marketing Plan (DR31619-39).

### Lack Of Management At Drew

In September/October 2006, Drew's own top management admitted that the

HT/CD4 project was "[s]econd priority" and stated "[w]e must catch up with the

timeline." (Young Dep. Exh. 12 at DR28390).  According to Drew, there was no money

for additional resources and the company must make due with existing employees. (Id. at DR28389).

Management oversight was a problem for Drew. (Krauledat Aff. ¶ 30 and Exh. 7 thereto). Drew's purported project leader for the HT project, Gary Young, had no authority over his development team members. Indeed, Drew's Chief Engineer, George Chappell, testified that Drew never had a project leader for the HT project. (Chappell Dep. p. 79:13-20). Young himself testified that while he was Drew's project manager (Young Dep. pp. 23:14-24:4), he had no supervisory role over Karl Gu, who was Drew's software project manager on the HT project. (Id. pp. 24:22-25:10).

While Drew's management expressed some urgency, the Drew project leader and Drew's chief engineer did not share this sense of urgency. They did not feel any time pressure or the lack of resources. (Id. pp. 69-71).

In July of 2007, Drew responded to PointCare's concerns about the lack of progress on the HT project and a request for better management oversight with a factually incorrect letter from Escalon's general counsel. (Krauledat Aff. ¶ 74; Hansen Aff. ¶¶ 125-135). Unbeknownst to PointCare, Drew's management was well aware throughout the course of the HT project that Drew had a pervasive problem with failure to meet deadlines. (Young Dep. Exh. 13). When PointCare pushed for timeliness, Drew looked for ways to placate PointCare and "get them to back off" rather than living up to Drew's contractual commitments. (Hansen Aff. Exh. 15).

### Drew's HT Problems

During the first joint technical planning meeting in June 2006, PointCare recommended the use of proven technology for the automated handling of PointCare's

14

unique gold reagent, namely the use of a design that had been previously implemented in

PointCare's AuRICA product which, at the time, had already been successfully deployed

with customers and had not experienced any problems in connection with the gold

reagent. A similar design had been implemented in one of Drew's own products, the D3.

Drew rejected the idea of utilizing this proven technology and opted instead to try

different, unproven technology for automating handling of the gold reagent in the HT.

(Hansen Aff. ¶¶ 61-62).

　　　　PointCare warned Drew in that initial meeting that Drew could encounter

materials incompatibilities. (Id. ¶ 63 and Exh. 7 thereto). In March of 2007, PointCare's

warning proved to be prescient as PointCare discovered such materials incompatibilities,

which it immediately reported to Drew. Rather then switching to the proven AuRICA

technology, Drew persisted with its unproven CD4 module design. PointCare supported

Drew in this effort with suggestions as best it could, though Drew refused to implement

them. (Hansen Aff. ¶ 107-108; Barry Aff. ¶ 7). Drew refused to consider any of

PointCare's materials suggestions that, to PointCare's knowledge from first-hand

experience, would work. (Hansen Aff. ¶¶ 109-110; Barry Aff. ¶ 9).

　　　　During feasibility work, Drew was able to deliver an experimental optics module

that worked well with PointCare's CD4 test and, according to Drew's Mr. Bouree, would

be "very easy to modify." (Hansen Aff. Exh. 2). Drew later delivered this modified

optics module and PointCare successfully tested it in a field evaluation in Barbados.

(Hansen Aff. ¶ 96; Complaint, Exh. R). Subsequent optics modules experienced

significant instability and would not work reliably. (Hansen Aff. ¶¶ 97-99). Until late in

15

2007, Drew was unable to determine why the optics modules were so unreliable.

(Chappell Dep. pp. 130:10-133:21).

### Drew's Delays

Drew started software and hardware development work late and was consistently late with its responsibilities on the HT project. (Hansen Aff. ¶¶ 85, 95-96). Unbeknownst to PointCare, this was consistent with Drew's internal assessment of its performance on this and other projects. (Drew Marketing Plan DR31619-39).

Drew's chronic tardiness continued throughout the life of the project, as its own President Doug Nickols admitted in an internal e-mail to Mr. Young on October 31, 2007:

> we don't have 2 to 3 weeks, since 2 to 3 weeks turns into 4 to 6 or longer
> for this project...We've got to show results and quickly.

(Young Dep. Exh. 13).

### Drew's Lack Of Communication

One major problem Drew inflicted on itself was a lack of internal communication regarding the HT project. Drew's Chief Engineer, George Chappell, who worked on the HT project from early summer 2006 until March 2008, was never aware that Drew was subject to any contractual deadlines on the project. (Chappell Dep. p. 75:9-19). During the feasibility testing phase prior to signing the Agreement, Drew kept Mr. Chappell completely in the dark about the proposed HT project. (Chappell Dep. p. 64:6-11). Gary Young, Drew's purported HT project leader, saw Don Barry's extensive March 27, 2006 feasibility report (which Dr. Hansen had forwarded to Drew's Mr. Bouree on April 5, 2006) for the first time at his deposition in April 2008. (Young Dep. pp. 41:23-42:16).

## PointCare's Performance On HT Development

At all times, Dr Krauledat encouraged the PointCare technical team to work closely with Drew and assist wherever they could.  In December of 2006, for example, she authorized PointCare engineer Amy Coughlin to work at Drew's facility in Dallas for approximately two months (at PointCare's cost) to assist in troubleshooting the HT prototype, which clearly was a Drew responsibility.  At the time, this help was requested by Drew's engineers and seemed to be greatly appreciated by them.  Additional shorter visits by other members of the PointCare technical team complemented Ms. Coughlin's work at Drew. (Krauledat Aff. ¶31).

## PointCare's Assay

PointCare had developed its CD4 assay for use with the AuRICA prior to commencing the HT project. (Hansen Aff. ¶¶ 15-19).  Drew's and PointCare's joint feasibility studies determined that PointCare's assay was compatible with the proposed HT. (Id. ¶ 41).  PointCare only needed to adjust the manufacturing and packaging of its assay for use with the planned HT.  PointCare successfully did this in a timely manner and Drew never said otherwise. (Id. ¶ 46).

## PointCare's Software

As part of Drew's modification of the Excell 22 into the HT, Drew needed to add and modify certain software.  At the parties' project kick-off meeting in June 2006, the parties agreed, at Drew's insistence, that Drew would manage the HT software development project through its software manager, Karl Gu.  PointCare agreed that its software development team would assist and report to Drew. (Id. ¶ 80).  Specifically, Drew understood it was entirely responsible for the HT's instrument control software and

service software. (Waite Aff. ¶4). PointCare agreed to prepare the user interface software under Drew's supervision and send the CD4 algorithm to Mr. Gu for him to integrate via a"CD4 dll", which he was also supposed to create. (Id. ¶¶ 4, 9; Hansen Aff. ¶ 81).

PointCare worked diligently to develop the software it was responsible for developing, despite the fact that there was no working HT instrument to run it on. Mr. Gu delivered the dll but reneged on his promise to integrate the CD4 algorithm into it. (Waite Aff. ¶ 11). In an effort to move the software development along, PointCare did Mr. Gu's job and worked diligently to integrate the CD4 algorithm into his dll. This task was made unnecessarily difficult by Drew because Drew refused to share its software source-code with PointCare, knowledge of which is essential for integration. (Id. ¶¶ 11-13).

Contrary to Drew's assertions at p. 10 of its brief, the rudimentary software required to develop the HT engineering prototype was the instrument control and service software which Drew was responsible for developing. The software PointCare was responsible for (the user interface and the CD4 algorithm/analytical software) was *not* needed for Drew's development of the HT engineering prototype. Any software-related delay in the development of the HT engineering prototype was caused by Drew's failure to timely and effectively develop the "rudimentary" software it was responsible for. (Desrosiers Aff. ¶¶ 3-4).

PointCare fulfilled its obligations to develop the user interface software and the CD4 algorithm in a timely manner. Any delay or inability to complete development of PointCare's software development tasks was attributable to Drew's failure to complete its

hardware and software tasks which were necessary prerequisites to completing PointCare's tasks. (Desrosiers Aff. ¶ 5; Waite Aff. ¶¶ 19-21). Throughout the course of the HT project, PointCare's software team worked diligently in a cooperative and collaborative spirit to complete the software development tasks corresponding to PointCare and to assist Drew with the software development tasks corresponding to Drew. Drew failed to reciprocate. (Desrosiers Aff. ¶ 6).

By June 2007, PointCare had delivered to Drew all software it had agreed to develop and could develop given the status of Drew's software and hardware; in fact, Drew's hardware failures impeded any further software development by PointCare. (Waite Aff. ¶ 16-21). Drew had everything it needed to begin software validation. (id. ¶ 15). Drew never did anything with the software PointCare developed. (Krauledat Aff. ¶ 76).

### The NP Project

The HT and the NP projects had been carefully planned to avoid resource conflicts. (Krauledat Aff. ¶ 22). From the very beginning of the PointCare-Drew business relationship, Drew was informed of the parallel (HT-NP) effort at PointCare. (Id.) In fact, one of the conditions for Drew to enter into the Agreement was the receipt of marketing rights for the NP. (Id. ¶ 11). The Agreement (§ 1.1 at p. 2) specifically provides that PointCare will develop the NP platform with a third-party medical device manufacturer. (Krauledat Aff. ¶ 22).

PointCare CEO Krauledat was critically aware at all times that PointCare not only had contractual responsibilities to Drew with regard to the HT project, but also needed to deliver the NP system (with modified assay) for Drew to market in a timely fashion.

Therefore PointCare needed to manage both the HT and the NP projects in parallel and avoid resource conflicts. She did her best to manage both projects and avoid resource conflicts despite the fact that Drew never adhered to the agreed upon timeline. (Id. ¶ 24).

Neither the HT nor the NP project experienced any significant delays because of resource conflicts at PointCare. Indeed, on only one occasion did PointCare need to advise Drew of a brief shift in priority to the NP, which only lasted one and a half weeks. (Id. ¶ 25). This eight day priority shift in no way explains Drew's delay of more than a year.

Contrary to Drew's position (Drew Brief p. 2), the HT and NP were *not at all* competitive, as they are designed for use in radically different settings. (Id. ¶ 11).

### Merger Discussions

In or about early March of 2007, Dr. Krauledat told Mr. DePiano that she was concerned about Drew's ability to fulfill its obligations regarding the engineering of the HT instrument in a timely fashion. Mr. DePiano fully agreed with her concerns. (Id. ¶ 33).

Mr. DePiano proposed a merger of the two companies, where one of the merger goals was to increase the "notoriously slow pace" (Mr. DePiano's words) of Drew engineering and raise standards of their technical output to the standard of PointCare. Dr. Krauledat was "very dogmatic" about staying on a definitive time table to get the due diligence done. (DePiano Dep. p 194). Merger talks ended when the parties could not agree on valuations of their respective companies. (Krauledat Aff. ¶ 40).

### Drew Marketing Failures And Breaches

In addition to its technical failures to develop the HT, Drew also failed to perform its marketing duties under Annex 3 of the Agreement. Drew never submitted the required sales plan for territories where it was designated "Market Leader." (Id. ¶ 43). Drew utterly failed to follow up on sales leads in Drew territories that PointCare gave to Drew. (Id. ¶¶ 44-52). Drew's V.P. of sales and marketing even instructed his staff to "break into Africa" and sell in Central America, both PointCare territories. (Id. ¶¶ 53-54).

### Notice Of Termination

After PointCare ended merger discussions in June 2007, Drew's technical progress on the HT ground to a virtual halt. In response to PointCare's continuous requests for progress reports, Drew, instead of responding with a progress report, responded with accusatory and factually incorrect letters, first from Escalon's general counsel and later from Escalon's CEO Richard DePiano. (Id. ¶¶ 74, 80; Hansen Aff. ¶¶ 128-135). With no progress forthcoming, PointCare decided to propose a new agreement that would permit the parties to move forward despite Drew's evisceration of the original timeline. (Krauledat ¶ 81). Mr. DePiano flatly refused any discussions of a new agreement, and began threatening litigation. (Id. ¶ 82). Faced with a complete lack of cooperation from Drew and an expensive and long overdue HT project that appeared dead in the water, PointCare saw no other course but to provide Drew with notice of material breach, which it did on November 9, 2007. (Id. ¶ 82).

### Offer To Deliver HT

Following the termination, Drew seemed to frantically resume HT development activities. In rapid succession, Drew began sending an unusually large volume of

experimental data along with requests for analysis by PointCare. (Young Dep. Exh. 18; Hansen Aff. Exh. 6). PointCare promptly analyzed the data and informed Drew that their HT prototype was still not functioning properly and that the data was unrecognizable. All of a sudden in early December 2007, Escalon's CEO announced that Drew had a fully functioning HT prototype that was ready for shipment to PointCare for testing. Given the history of Drew's HT hardware failures and Drew's false accusations that PointCare had damaged prior HT prototypes, PointCare requested validation reports and other data (required by FDA regulations) indicating that the machine was in fact functional prior to taking delivery. (DePiano Aff. Exh. N). In response, Drew informed PointCare that it had no duty to provide such test data. (Id. Exh. Q).

<u>**Drew's Failure To Meet Timeline Deadlines**</u>

Drew has still not completed its hardware modification tasks for the HT. As of March 2008, Drew's own chief engineer, George Chappell, who worked on the HT/CD4 project from the early summer 2006 through March 2008, and was very involved in virtually all of the hardware modifications, admitted that Drew had not yet completed its HT hardware modification tasks. (Chappell Dep. pp. 12: 17-24; 27:3-25; 40:6-41:13; 42:12-44:12).[3] Chappell testified that as of March 2008, to complete the hardware modification tasks on the HT project, Drew would still need to complete environmental testing, regulatory testing, reliability testing of each of the various hardware components of the HT (which would require several weeks for each component), and verification

---

[3] Chappell understood that it was Drew's responsibility to modify its 2280 platform to accommodate PointCare's CD4 assay, and that Drew was responsible for all hardware modifications (valves, sensors, pumps, etc.), the addition of any electronics that were necessary for those hardware modifications, and the firmware to go with the additional electronics. (Chappell Dep. p. 36: 2-8, 13-22; 38:12-40:5).

22

testing of the integrated HT system. (Id. pp. 42:12-55:5). Drew would then need to do

validation testing. (Id. pp. 46:16-47:3; 47:16-24).

### Drew's Independent Expert Confirms Drew's Failure To Meet Timeline Deadlines

Dr. Chow testified at deposition that the HT project was far from complete as of

his testing in December 2007. Dr. Chow put the HT on a timeline for product release of

at best six more months with no "hiccups" and no FDA clearance. (Chow Dep. pp. 269-

74). This would stretch 90 to 180 days longer with FDA clearance. (Id. p. 274).[4] Thus,

based on the testimony of Drew's own expert, Drew did not come anywhere close to

curing its material breach within the 60 day cure period.

### Drew Bad Faith

Documents produced by Drew in discovery revealed the true motive behind

Drew's refusal to consider negotiating a new agreement and Drew's hostile attitude

toward PointCare that began shortly after PointCare ended the merger discussions. Drew

was intent on getting its hands on PointCare one way or another. Drew actively sought to

depress PointCare's value during the merger negotiations. (Krauledat Aff. ¶¶ 39, 41, 84).

Drew then engaged in illicit communications with a former PointCare executive

in an attempt to acquire confidential PointCare financial information and to communicate

directly with PointCare's Board to effect a hostile takeover of PointCare. (Id. ¶¶ 86-87).

---

[4] According to Dr. Chow, the following HT development work remained when he performed his
tests: two to three more months of work (in the best case scenario with no "hiccups") on system integration
(Chow Dep. p. 269); approximately four months on clinical trials (including negotiating contracts with labs
to conduct the trials) (Chow Dep. p. 270-72); two to three weeks to prepare an FDA submission (Chow
Dep. p. 274); and ninety days to FDA approval (unless the FDA asks more questions, in case it will take
another ninety days) (Chow Dep. p. 274).

From July 2007 to January 2008, Drew's V.P. of sales and marketing made repeated illicit attempts to obtain confidential PointCare information about potential PointCare customers from PointCare's former head of sales, and even offered to hire the former PointCare executive in an attempt to steal one particularly large potential customer from PointCare. (Id. ¶¶ 85, 88). Drew's lack of attention to the HT project after the end of merger talks may be explained by Drew's continued hope that PointCare would go "belly up" so Drew could exercise its right of first refusal under § 6.11 of the Agreement and purchase PointCare in a fire sale. (Id. ¶¶ 89-92).

After Drew received PointCare's notice of material breach, with Drew facing a possible loss of access to PointCare's proprietary CD4 assay, Drew's VP of Sales Francis Matuszak, recommended to a senior colleague at Drew that Drew "should...find another manufacturer of the gold antibodies forCD4" and also "get the accelerant analyzed to see what is in it." (Matuszak Dep. Exh. 5; Matuszak Dep. pp. 300-306). Matuszak did this despite understanding at all times that PointCare's CD4 test was proprietary and that PointCare owned the intellectual property in the test. (Matuszak Dep. p. 129)(DePiano Dep. p. 125)(same).

## ARGUMENT

### I.    THE STANDARD

"[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 80 (2d Cir. 1990). "'There is no power, the exercise of which is more delicate, which requires greater caution, deliberation and sound discretion, and which is more dangerous in a doubtful case, than the issuing of an injunction.'" Citizen's Coach Co. v. Camden Horse

R..R.. Co., 29 N.J. Eq. 299, 303 (1878) (quoting Bonaparte v. Camden & Amboy R.R.

Co., 3 F. Cas. 821, 827 (No. 1,617) (CC NJ).

      The standard in the Second Circuit for injunctive relief calls for a showing of (a)

irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently

serious questions going to the merits to make them a fair ground for litigation and a

balance of hardships tipping decidedly toward the party requesting the preliminary relief.

Jackson Dairy, Inc. v. H.P. Hood & Sons, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam).

To obtain injunctive relief, the harm cannot be "remote or speculative but . . . actual and

imminent." Jackson Dairy, Inc., 596 F.2d at 72 (citation omitted).  Further, as a general

rule, a party may not obtain injunctive relief where it is claiming a loss that can be

adequately remedied by an award of money damages. Feit & Drexler, Inc., 760 F.2d 406,

416 (2d Cir. 1985).

      The movant must "meet a higher standard where...an injunction will alter, rather

than maintain, the status quo. . . ." Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d

27, 33 (2d Cir. 1995).   "[A] mandatory injunction" such as requested here "should issue

'only upon a clear showing that the moving party is entitled to the relief requested, or

where extreme or very serious damage will result from a denial of preliminary relief.'"

Id. (citation and quotation omitted); see also Louis Vuitton Malletier v. Dooney &

Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006); Abdul Wali v. Coughlin, 754 F.2d 1015,

1025 (2d Cir. 1985).

      Finally, a party such as Drew cannot obtain the equitable remedy of a preliminary

injunction when it comes to the Court with unclean hands. Amarant v. D'Antonio, 197

A.D.2d 432, 434 (1st Dep't 1993).

II.    **DREW HAS NOT MET ITS HEAVY BURDEN OF DEMONSTRATING IRREPARABLE HARM.**

Courts in this Circuit have regularly held that "'the single most important prerequisite'" for issuance of a preliminary injunction is a demonstration of irreparable harm if the injunction is not granted. Bell & Howell: Marniya Co. v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983) (citation omitted); see also Barrett v. Harwood, 967 F. Supp. 744, 746 (N.D.N.Y. 1997).

> Because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.

Reuters Ltd. v. United Press Int'l. Inc., 903 F.2d 904, 907 (2d Cir. 1990) (internal quotation marks and citation omitted).

The irreparable harm shown must be "'neither remote nor speculative, but actual and imminent[,]'" and the alleged injury must be one incapable of being remedied by monetary damages. Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989) (citations omitted); see also Loveridge v. Pendleton Woolen Mills, Inc., 788 F.2d 914, 917-18 (2d Cir. 1986). Hence, as this Court has emphasized, "a mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." Barrett, 967 F. Supp. at 746 citing Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 934 F.2d 30, 34 (2d Cir. 1991).

Drew's claims of irreparable harm related to its customers, distributors and confidential information are unsubstantiated and wildly speculative and come nowhere near satisfying Drew's burden to obtain injunctive relief. See, e.g., Helios & Matheson N. Am., Inc. v. Vegasoft Oy, 2007 U.S. Dist. LEXIS 38206 (S.D.N.Y. 2007) (denying

injunction and noting the importance of the evidence of harm and other compelling

factors such as attempting to sabotage defendant); Modern Computer Sys., Inc. v.

Modern Banking Inc., 871 F.2d 734 (8th Cir. 1989) (distributor failed to demonstrate

irreparable harm where company would survive pursuing other avenues of business);

Kaplan v. Bd. of Educ. of City School Dis., 759 F.2d 256 (2d Cir. 1985) (injunction not

granted where fears of havoc and unrest too speculative); Automatic Radio Mfg. Co. v.

Ford Motor Co., 272 F.Supp. 744 (D. Mass. 1967) (failure to show irreparable harm

where no showing of decline of sales due to defendant's actions); Instant Delivery Corp.

v. City Stores Co., 284 F.Supp. 941 (E.D. Pa. 1968) (although termination of service

would cause some inconvenience and losses, no irreparable injury where plaintiff would

survive and loss compensable by money damages).

     **A.**    **Drew Offers No Evidence That Its Business Relations Or Reputation Have Been Damaged.**

     Drew argues that it faces immediate and irreparable harm because PointCare "is

damaging" Drew's business relationships and reputation. (Drew Brief p. 27-30).  None of

Drew's scattershot allegations are supported by facts or evidence.  This complete failure

of proof is particularly telling given that the parties have engaged in extensive document

production and have taken numerous depositions pursuant to the expedited discovery

schedule ordered by the Court at Drew's request.

     **1.**    **Drew Offers No Evidence Of Harm (Irreparable Or Otherwise) Due To Drew's Inability To Ship Instruments.**

     Drew asserts that its inability to sell NP and HT instruments to distributors "has

hurt Drew's credibility with a number of its distributors." (Drew Brief pp. 27-28)

(emphasis added).  This contention fails because Drew offers no evidence to support it.

Drew has not submitted any testimony from a distributor stating that it thinks any less of Drew. Drew has not even been able to muster an affidavit from someone in its sales or marketing departments claiming that any distributor has contacted them to complain (or even express a concern) about anything related to this matter. Despite having produced 80,000+ pages of materials in discovery, Drew cannot offer a single piece of correspondence from a distributor evidencing any damage to Drew's reputation. It would be difficult to imagine a claim with less proof than Drew offers here.

Drew's allegations of actual harm to its business relations suffer the same shortcoming of proof. No distributor has come forward to aver that it won't do business with Drew (or that it will do less business with Drew, or even that it is thinking of doing less business with Drew), because Drew is not prepared to deliver NPs or HTs. No Drew employee has offered an affidavit stating that he or she has been contacted by a distributor pulling business from Drew (or even threatening to pull business from) Drew. The single distributor who contacted Mr. Matuszak (Matuszak Aff. ¶3) apparently has not voiced a complaint or concern in any of their weekly phone calls, as Mr. Matuszak surely would have included such information in his affidavit.

Drew's position rests entirely on the self-serving and non-specific allegations of its Vice President of Sales, Francis Matuszak. Mr. Matuszak offers no facts or evidence to support his conclusory averment that Drew's inability to deliver HT instruments "has hurt our credibility with a number of our distributors," (Matuszak Aff. ¶2), or that its inability to deliver NPs "has severely hurt our credibility with distributors..." (Id. ¶ 3). Saying it, of course, does not make it so. Mr. Matuszak's bald assertions fall well short of meeting Drew's burden to prove irreparable harm. See Manganaro v. InteropTec

Corp., 874 F.Supp. 660 (E.D. Pa. 1995) (owners of support software failed to show irreparable harm if injunction not entered ordering return of source code where relying on hypothetical customers and failing to state how source code will assist customers).

In any event, if Drew salespeople gave their distributors false hope that Drew would be able to deliver HT products by the end of 2007, as alleged by Mr. Matuszak, the fault for any disappointed expectations lies with Drew's HT development team, who failed to deliver the instrument on schedule, not PointCare.

### 2.     Drew Faces No Harm If PointCare Is First To Market.

Drew contends that PointCare destroyed Drew's chance to be first to market by "leapfrogging the NP over the HT..." (Drew Brief pp. 30-31).  This claim rests exclusively on Mr. Matuszak's bald assertion that the NP and HT are "competitive products to some extent." (Matuszak Aff. ¶4).  Mr. Matuszak's assertion deserves no weight.  He fails to provide any specifics, explanation or support for his contention. Further, it is squarely refuted by the affidavits of Peter Hansen at ¶37 and Petra Krauledat at ¶11, who explain that the two instruments are not intended to be competitive; the NP is designed for sale to small, rural clinics, and the HT is designed for sale to hospital labs with heavy testing loads.

Having failed to establish that the two instruments are competitive, Drew faces no harm if the NP reaches market before the HT.

### 3.     Drew Cannot Establish Irreparable Harm Based On "Possibly" Illicit Use Of Confidential Information."

Drew argues that it "faces irreparable injury due to PointCare's *possibly* illicit use of Drew's highly sensitive proprietary information." (Drew Brief p. 31) (emphasis

added).  Yet Drew has nothing more than "suspicions" that PointCare "may" have shared

Drew confidential information with other parties. (DePiano Dep. pp. 282-83).  On its

face, Drew's claim falls well short of the Second Circuit's requirement that the

irreparable harm shown must be "neither remote nor speculative, but actual and

imminent." Tucker Anthony Realty Corp., 888 F.2d at 969 (quotation omitted).

> Drew speculates about various ways its confidential information may have been

misused.  Drew's showing is woefully deficient.  Drew offers mere "suspicion" that

PointCare may use Drew confidential information *if* PointCare develops its own high

throughput instrument in the future.  Drew's suspicions are unwarranted.  In the event

that PointCare decides to develop its own high throughput instrument, it can and will do

so without using any Drew technology. (Krauledat Aff. ¶ 98).  Drew maintains that the

"mind-blowing pace" of NP development raises "serious questions" about whether

PointCare used Drew's proprietary information in developing the NP. (Drew Brief p. 32).

The answer to these questions is a resounding "no," as Drew's notion that the NP was

developed at a "mind-blowing pace" is pure fiction.  (Krauledat Aff. ¶¶94-97).

> Drew says that it "appears" that PointCare has shared Drew confidential

information with a possible merger candidate.  (Drew Brief pp. 32-33).  This is false.

(Krauledat Aff. ¶ 98).

> Grasping at one final straw, Drew suggests that PointCare's "non-production of

the NP *design history*, despite repeated promises to do so, creates an unmistakable

presumption that violation has occurred..." (Drew Brief p. 32) (emphasis added).  Drew

has mischaracterized the discovery record.  In discovery, Drew asked PointCare to

produce the "device history" for the NP, not the "design history."  Indeed, both of the

letters placed in the record by Drew plainly state that Drew asked PointCare to produce

the "device history" for the NP. (Exhs. 18 and 19 to Costantini Declaration).  Contrary to

Drew's assertion in its Brief that PointCare repeatedly promised to produce the "design

history" for the NP, the record submitted by Drew shows that PointCare actually agreed

to produce the "device history" (not design history) for the NP. (Exh. 19 to Costantini

Decl.).  As Drew surely knows, a design history file and a device history file are two

distinct sets of records under FDA regulations.

## III.    DREW HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF THE PARTIES' DISPUTE

### A.    Drew Failed To Demonstrate That PointCare Breached The Agreement Or Any Supposed Fiduciary Duty

#### 1.    Point Care Did Not Owe Drew A Fiduciary Duty

Curiously, Drew argues that it has a strong likelihood of prevailing on its *breach

of contract claim* because PointCare allegedly violated *fiduciary duties*. (Drew Brief p.

21-26).  Without citing any legal authority, Drew brazenly asserts that the contract claim

should be measured under the standard of fiduciary duties: "There could be little doubt,

from reading the Agreement, that the HT project is akin to a joint venture." (Drew Brief

p. 21).  As explained below, Drew's position fails because it has not pled a claim of

fiduciary duty or joint venture and, in any event, the parties were *not* joint venturers.

##### a.    Drew Pled A Contract Claim, Not A Fiduciary Duty Claim

Drew's argument fails because it relies on the wrong legal standard.  Drew has

not pled a claim for breach of fiduciary duty.  Drew has not even alleged in its complaint

that the parties engaged in a joint venture.  A claim for breach of fiduciary duty is not

before the Court.  The breach of contract claim pled by Drew is not measured by fiduciary duty standards.  Drew has no likelihood of succeeding on the merits of a claim that it has not pled and that simply is not part of this lawsuit.

### b.    The Parties Are Not Joint Venturers.

Even if Drew had pled a joint venture giving rise to a fiduciary duty, Drew would have no likelihood of success on such a claim.  Drew cannot satisfy the elements of a joint venture required by New York law.

Drew timidly suggests that the parties' relationship was "akin to a joint venture...." (Drew Brief p. 21).  "In formulating an agreement to be joint venturers, 'the parties must be clear that they intend to form a joint venture, which is a fiduciary relationship, and not a simple contract.'"  Kidz Cloz, Inc. v. Officially For Kids, Inc., 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004. quoting Precision Testing Labs. v. Kenyon Corp., 644 F. Supp. 1327, 1349 (S.D.N.Y. 1986).

A party arguing for the existence of a joint venture must satisfy *each* of the following elements: "(1) two or more parties entered an agreement to create an enterprise for profit, (2) the agreement evidences the parties' mutual intent to be joint venturers, (3) each party contributed property, financing, skill, knowledge, or effort to the venture, (4) each party had some degree of joint management control over the venture, and (5) there was a provision for sharing of both losses and profits."  Kidz Cloz, Inc., 320 F. Supp. at 171 citing ITEL Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd., 909 F.2d 698, 701 (2d Cir. 1989).  Importantly, "[t]he absence of any one element 'is fatal to the establishment of a joint venture.'"  Kidz Cloz, Inc., 320 F. Supp. 2d at 171, citing Zeising

v. Kelly, 152 F. Supp. 2d 335, 347 (S.D.N.Y. 2001).  Drew fails to establish any of the elements.

### i.    No Agreement To Create An Enterprise For Profit.

The parties did not create an "enterprise for profit."  No new joint entity was created.  Each party operated through its own corporation.  PointCare operated as PointCare, and Drew operated as Drew.  This, alone, defeats a claim of joint venture.

### ii.    No Mutual Intent To Be Joint Venturers.

Drew offers no evidence that the parties mutually intended to form a joint venture.  This is not surprising.  When the parties entered the Agreement, they were quite clear that they were entering a "Manufacturing, Distribution and Co-Marketing Agreement."  The term "joint venture" is never used in the Agreement.  If the parties had intended to enter a joint venture or partnership agreement, they would have described it as such.  The failure of this element independently defeats a claim of joint venture.

### iii.    No Provision To Share Profits And Losses.

The Agreement has no provision for sharing profits or losses.  This is so because the parties entered a distribution arrangement, not a joint venture.  Under the Agreement, PointCare was to sell its instrument (the NP) and reagents to Drew.  Drew would resell PointCare's products, and keep 100% of the profits or losses.  Similarly, Drew was to sell its instrument (the HT) to PointCare.  PointCare would resell Drew's instrument, and keep 100% of the profits or losses.  The Agreement contains a schedule of prices that PointCare charged Drew to purchase its products, and that Drew charged to PointCare for its product. (Agreement, Annex 5).

Absent a sharing of profits and losses, there can be no joint venture. <u>Kidz Cloz, Inc.</u>, 320 F. Supp. 2d at 171 ("The requirement that the parties have agreed to share in the profits and losses is "an indispensable essential of a contract of partnership or joint venture.").

### 2. PointCare Did Not Violate Its Contractual Obligations To Drew.

Drew's six-page discussion of fiduciary duty case law contains a few specific allegations of breach of contract. (Drew Brief p. 21-27). None of them have merit.

### a. PointCare Did Not Abandon The HT Project In Favor Of The NP Project.

Drew repeatedly accuses PointCare of "effectively abandoning the HT project and shifting its resources to the NP project beginning in June 2007." (Drew Brief pp. 2, 22-23). This conclusory, unsupported allegation does not come close to meeting Drew's burden to establish a strong likelihood of success on the merits.

PointCare CEO Krauledat and Chief Science Officer Hansen attest in their affidavits that they did everything reasonably within their power to allocate personnel needed for the HT project as well as the NP project. (Krauledat Aff. ¶24; Hansen Aff. ¶¶ 149-57). The occasions on which it was necessary to reallocate personnel from the HT project to the NP project were few and far between. (Id.) Other PointCare staff attest to PointCare's diligent efforts throughout the life of the HT project. (Barry Aff. ¶17; Desrosiers Aff. ¶6; Waite Aff. ¶3).

### b PointCare Did Not Interfere With Drew's Attempts To Solve The Gold Adherence Problem.

Drew accuses PointCare of "sabotage[ing]" development of the HT platform by "its attempted interference with Drew's attempts to solve the gold adherence problem...."

(Drew Brief p. 24). This unsupported accusation is false. Upon being contacted by Drew, the supplier contacted PointCare to ask if the supplier was authorized to disclose information in light of the party's non-disclosure agreement. In reply, PointCare authorized the supplier to release information to Drew. (Barry Aff. ¶14). PointCare cooperated fully with Drew's attempt to obtain information from PointCare's gold supplier.

<div style="text-align:center">

**c.    PointCare Gave Drew Proper Notice Of Drew's Material Breach.**

</div>

Contrary to Drew's position (Drew Brief, p. 25-26), PointCare gave Drew proper notice of material breach and sixty days to cure. The Agreement's termination clause is clear and unambiguous. It requires PointCare to do only one thing in order to terminate the Agreement in the event of material breach by Drew: provide "written notice of such breach, and provided that such breach shall not have been cured within sixty (60) days of such notice." (Agreement § 6.9(a)).

On November 9, 2007, after PointCare had repeatedly and explicitly notified Drew that its HT prototypes failed to perform and that Drew was substantially behind schedule, and with no visible signs of progress on Drew's part, PointCare gave Drew formal notice of material breach. (Exhibit H to *Affidavit Of Richard J. Depiano, Sr. In Support Of Order To Show Cause* dated February 13, 2008).

The notice clearly advised Drew that PointCare was providing "notice of material breach under Section 6.9(a)" of the Agreement. (Id.). The notice explained why Drew was in default:

> Section 1.1 of the Agreement calls for Drew to "modify its current Excell 22 platform to accommodate PointCare's proprietary CD4 Lymphocyte Assay." The timetable incorporated in the Agreement by reference

<div style="text-align:center">35</div>

> specifies a date of 1/06/07 for completion of this modification.  As we
> have discussed and as documented in the correspondence between
> PointCare and Drew, none of the prototypes provided to PointCare
> function as required by the Agreement.

(Id.)  PointCare noted that each communication sent to Drew after January 5,

2007 documenting the failure of HT prototypes to perform was effectively a

notice of material breach, and PointCare already had provided Drew with ten

months to cure. (Id.).  PointCare nonetheless provided Drew with an additional

sixty day cure period. (Id.).

Drew now claims that PointCare's notice of material breach lacks information

about Drew's defaults and what it needed to do to cure. (Drew Brief, p. 25-26), Tellingly,

Drew did not raise any such issue in a series of letters that its counsel wrote immediately

following the notice of material breach.  (See, e.g., Exhibit O, Q, S and W to Affidavit of

Richard J. DePiano, Sr. dated February 13, 2008).

This notice amply satisfies the Agreement's requirement to provide Drew with

"written notice of [its] breach." Agreement §6.9(a).  Nothing more was required. See

Phillips Petroleum Co. v. Rexene Corp., No. 95-1451, 82 F.3d 435 (Table), 1996 WL

137536, *2 (Fed. Cir. May 20, 1996)  ("[L]arge commercial entities . . . are well able to

provide for as much or as little in the way of notice as they want.'"); RBFC One, LLC v.

Zeeks, Inc., 367 F. Supp. 2d 604, 617 (S.D.N.Y. 2005) (declining to "construe the notice

provision as if it were a common law pleading requirement under which every slip would

be fatal").

There is no question that Escalon/Drew readily understood the grounds of the

notice of material breach.  Escalon CEO Richard DePiano accurately described the

grounds of the termination when he acknowledged the notice on November 10, 2007.

36

(Exhibit I to *Affidavit Of Richard J. DePiano, Sr.* dated February 13, 2008).  Tellingly, Mr. DePiano did not complain that the notice lacked information needed to understand the grounds of material default.

<div align="center">

**d.    Drew Failed To Cure Its Material Breach.**

</div>

Drew failed to cure its material breach within the sixty day cure period.  This is so for several reasons.

<div align="center">

**i.    Drew Was So Far Behind Schedule Its Breach Was Not Curable.**

</div>

Drew materially breached the Agreement by failing to modify its instrument to accommodate PointCare's assay by January 6, 2007, the deadline established by the Agreement's HT development timetable.  Agreement, Attachment 1 to Annex 1 at line 44).  At the time of notice of material breach, Drew was ten months beyond its deadline, a material breach that could not be cured.

<div align="center">

**ii.    Drew Was *Not* Prepared To Deliver A Workable HT To PointCare Within The Cure Period.**

</div>

Even setting aside Drew's material breach of the HT development timetable, Drew was *not* prepared to deliver a workable HT to PointCare within the cure period.

Contrary to Mr. DePiano's representation to the Court (DePiano Aff. ¶19), Dr. Chow tested only a small fraction of the specifications for the instrument. (Test Report, attached to Mr. DePiano's Affidavit at Exhibit U).  Contrary to Mr. DePiano's representation to PointCare that Drew had Dr. Chow "validate" the HT's operation (DePiano Aff. Exh. M), Dr. Chow did *not* conduct validation testing on the HT prototype.

<div align="center">

37

</div>

This was a significant omission, as, absent validation testing, Dr. Chow could not know whether his test results were "hitting the target." (Chow Dep. pp. 150-51, 155-57, 165).[5]

### iii. The HT Prototype Was At Least Six To Seven Months From Completion When Drew Claimed It Was Validated And Ready To Be Delivered To PointCare.

Even if the HT prototype had been ready to be delivered to PointCare in mid-December 2007, this would not have cured Drew's breach within 60 days. The HT project was far from complete when Dr. Chow tested it in December 2007. Dr. Chow put the HT on a timeline for product release of at best six more months with no "hiccups" and no FDA clearance. (Chow Dep. pp. 269-74). This would stretch 90 to 180 days longer with FDA clearance. (Id. p. 274). Thus, based on the testimony of Drew's own expert, Drew did not come anywhere close to curing its material breach within the 60 day cure period.

### e. Drew Refused To Provide PointCare With Test Data Substantiating Drew's Claim That The HT Was Ready To Be Shipped To PointCare.

When Drew announced it was ready to ship an HT prototype to PointCare, PointCare requested test data that substantiated Drew's position. (Email from Peter Hansen to Gary Young dated 12/11/07: DePiano Aff. Exhibit N). Drew initially "agreed

---

[5] It is difficult to fathom why Drew relies on Dr. Chow's self-serving opinion that the instrument was ready to be delivered to PointCare. Dr. Chow was hardly "independent." When Drew retained Dr. Chow on the HT project, he was under contract with Drew to perform consulting work on an hourly basis (Chow Dep. Exh. 1, tab 8), and he had two ongoing projects with Drew. (Chow Dep. p. 19). Further compromising Dr. Chow's independence, when Drew's Francis Matuszak first spoke with Dr. Chow about the HT, he told Chow that Drew was "ready to ship this piece of equipment to their collaboration partner, and they need a third party independent opinion of whether the instrument is ready to be shipped." (Chow Dep. p. 117). Mr. Matuszak made it clear that Drew urgently needed his test results. (Chow Dep. p. 131-32) ("the sooner, the better.") Having been told his client's desired outcome at the outset of his engagement, Dr. Chow exercised his sole discretion to decide which contract specifications to test. (Chow Dep. p. 123-24). It is not surprising that Dr. Chow decided to test a small fraction of the HT specifications contained in the Agreement. Finally, by Dr. Chow's own admission, his opinion was not based upon the contract between the parties. (Chow Dep. p. 255-58). So, what is the opinion worth?

to provide PointCare with access to the data it collected while working with Dr. Chow..."
(Letter from Anthony Costantini to Normand Smith 1/14/08: Exhibit S to DePiano Aff.)
(see also DePiano Exhs. Q and U) (same). Drew later reneged, and produced Dr. Chow's
test report but not the underlying data. (DePiano Exh. U).   Drew now contends it was
"patently absurd" for PointCare to request HT development test data before taking
delivery of the HT prototype. (Drew Brief. p. 26).

        According to Escalon CEO DePiano, however, in the context of developing an
FDA-compliant instrument, it is reasonable to ask a business partner to provide
underlying test data documentation that supports its assertion that tests have been passed.
(DePiano Dep. pp. 272-73 ).  Indeed, Drew made the very same request for "supporting
data" when PointCare notified Drew that it had achieved satisfactory clinical results in
testing. (DePiano Dep. pp. 271-72; DePiano Aff. Exhibit B, p. 2, issue 3).  Drew
requested the final test data "for FDA reasons."[6] (DePiano Dep. p. 272).  Drew believed
it had a "legitimate business purpose" in doing so. (DePiano Dep. pp. 272-73);

         PointCare sought Drew's HT development test data for the very same legitimate
reasons that Drew sought test data from PointCare. (Hansen Aff. ¶ 140).  Like Drew,
PointCare had every right to request test data before accepting the HT prototype for
testing.  Drew's refusal to comply with PointCare's request undermined Drew's ability to
cure.

_____

        [6] The FDA requires companies to keep detailed records of their development process of an
instrument in order to get FDA approval. (DePiano Dep. p. 260).  Failure to maintain such records is
"suicidal" according to Dr. Chow.  (Chow Dep. p. 89).

        **f.     Drew Has No Likelihood Of Success On Its Contract Claim Related To NP Marketing Rights.**

Although Drew has not briefed the issue (Drew Brief p. 21-25), Drew has claimed in the past that it has a likelihood of success on its breach of contract claim related to rights to market PointCare's NP device.  This argument fails for the simple reason -- admitted in Drew's complaint that "Drew's distribution rights to the NP system...are contingent on its successful development of the HT system." (Complaint ¶7) (Agreement §1.1, p. 2: Drew's distribution rights for the NP platform are "conditional upon the successful development and marketing of the HT platform.") (DePiano Dep. pp. 170:16 - 171:9).[7]  Given Drew's failure to successfully develop the HT system, Drew has no rights to market the NP.

        **g.     Drew Has No Likelihood Of Success On Its Allegations Of Violations Of Drew's "Rights" As A Market Leader.**

In the introduction of its brief, Drew says that it seeks to enjoin any violations of the NP marketing and sales provisions of the Agreement (Drew Brief p. 3).  Yet Drew advances no argument supporting a likelihood of success on such claim. (Drew Brief pp. 21-26).  This is so because the claims lack merit.

        **h.     PointCare Has Not Violated Any "Market Leader" Rights.**

The Agreement grants Drew "*non-exclusive* worldwide rights" to market and sell the HT and NP platforms and their assays. (Annex 3 to Agreement, first bullet point) (emphasis added).  The Agreement provides that each company will "lead" the marketing and sales effort in certain territories (the 'Market Leader')." Id. (second bullet point).

---

[7] Given the crystal clear contract language, and Drew's admission in its complaint, it is at best disingenuous for Drew to state: '*According to PointCare,* Drew's marketing rights were contingent upon the successful development of the HT."(Drew Brief pp. 1, 10).

40

Nowhere in the Agreement is there a prohibition against either party having or soliciting a distributor in a territory where the other party is the Market Leader. The Agreement specifically contemplates that a party may solicit distributors in the other party's Market Leader territory. Annex 3 to the Agreement (in bullet point 5) specifies that in the case that the market "Supporter" can show a commitment from a distributor that exceeds the commitment of the Market Leader by at least 50%, the Supporter shall have the right to initiate its own sales efforts in said territory. How could the Supporter ever obtain such a commitment if it was not allowed to have discussions with distributors in the Market Leader's territory? (Krauledat Aff. ¶ 68).

Any exploratory contacts between PointCare and distributors in Drew market leader territories Russia and Malaysia (none of which resulted in any distribution agreements or sales) simply do not violate the terms of the Agreement. This likely explains why Drew did not protest when Dr. Krauledat notified Drew in writing that, due to Drew's inability to follow up on the Russian lead, PointCare would no longer rely on Drew in Russia but would find its own distributor. (Krauledat Aff ¶51 and Exh. 14 thereto).

Drew accuses PointCare of engaging in "efforts to find a Russian distributor ... even after counsel represented to this Court that there would be no such contact with distributors in Drew territories." (Drew Brief p. 17 and fn. 11; id. at p. 1, fn 1). This scurrilous allegation is false, and Drew knows it to be false.

On February 23, 2008, Dr. Krauledat gave written instructions to Linsey Rockingham, who is in charge of signing up distributors for PointCare, to stop any activity in "Drew Territories" until further notice from Dr. Krauledat. (Krauledat Aff. ¶

61 and Exh. 21 thereto).  Ms. Rockingham did so.  When Ms. Rockingham received an e-mail from a potential distributor for Russia on March 10, 2008 (Exh. 22 to Krauledat Aff., cited in Drew's brief as evidencing PointCare's continued communications after the Court's directive), Ms. Rockingham immediately phoned the distributor and told him that the discussions had to be put on hold. (Exh. 23 to Krauledat Aff., a true copy of Rockingham Dep. pp. 162:19-163:7).

Drew claims that PointCare violated Drew's territorial rights under the Agreement by selling instruments to Biomedical International, Inc., PointCare's distributor for the Caribbean and for Central America, whose head office is located in Florida. (Drew Brief pp. 28-29).  The products sold to Biomedical, Inc. were destined to be distributed in the Caribbean, a PointCare territory. (Krauledat Aff ¶ 62).

Nowhere in the Agreement does it say that a distributor for a certain territory has to be located in that territory.  Drew was well aware of Biomedical's role as PointCare's distributor and never expressed any concerns until this lawsuit. (Krauledat Aff. ¶ 63).

Drew makes the same allegation for a PointCare sale to TTM, a German based NGO.  This instrument was destined for the Democratic Republic of Congo and was shipped there from Germany.  (Krauledat Aff. ¶ 65). There is no language in the Agreement that gives Drew any rights whatsoever to a sale to an NGO (no matter where the NGO is located) that is destined for Africa, a PointCare territory.

### i.     PointCare Did Not Violate The Agreement With Respect To Sales To Non-Governmental Organizations.

Drew admits that PointCare was permitted to make sales to NGOs Center for Disease Control, Walter Reed Hospital, and Catholic Relief Services under the Agreement, but Drew claims that is entitled under the Agreement to install, service and

supply the machines thus sold. (Drew Brief p. 29).   There is nothing in the Agreement

that justifies such a claim.  All of these NGO sales were shipped either directly to

PointCare territories or are destined to be shipped to PointCare territories. (Krauledat Aff.

¶ 66).  Under the Agreement, PointCare had the right to pursue a sale to a NGO

independent of territory (Annex 3 to the Agreement, bullet point 6).

> **3.    Drew Cannot Vary The Agreement's Terms With Prior Oral Representations.**

Drew strenuously asserts that it entered the Agreement in reliance on verbal

assurances by Peter Hansen that he would guide Drew to meet its contractual obligation

to modify its platform to accommodate PointCare's assay.  This claim fails on the facts

and the law.

First, Dr. Hansen *never* told Mr. Depiano (or anyone else at Drew or Escalon) that

he would guide them to meet their responsibilities.  (Hansen Aff ¶ 51).  Richard

DePiano's testimony, Drew's sole support for this contention, is belied by his utter

inability to recall the circumstances of this supposedly pivotal representation; at

deposition, Mr. DePiano could not say when this representation was made; where it was

made; or whether it was made in person or on the phone. (DePiano Dep. pp. 135-36, 38).

Even if such representations were made, they would not be admissible.  Under the

parol evidence rule, Drew is not be permitted to show a prior or contemporaneous

understanding or representation at variance with an unambiguous and apparently

complete written contract.  NY Jur. 2d., Evidence and Witnesses,  § 569 (February,

2008).  "Extrinsic and parol evidence is not admissible to create an ambiguity in a written

agreement which is complete and clear and unambiguous upon its face." South Rd.

Assocs., LLC v. IBM, 826 N.E.2d 806, 838 (N.Y. 2005) citing W.W.W. Assoc., Inc. v. Giancontieri, 556 N.E.2d 639, 642 (N.Y. 1990).

Where a contract contains a merger or integration clause, as this contract does (see Agreement §8.2), the parol evidence rule is particularly strong.  NY Jur. 2d, § 569, citing to Bruni v. County of Otsego, 192 A.D.2d 939 (3d Dep't 1993).  See e.g., Kleinberg v. Radian Group, Inc., 2002 U.S. Dist. LEXIS 20595 (S.D.N.Y. 2002) (merger clause is "definitive proof of integration."); Phoenix Racing, LTD v. Lebanon Valley Auto Racing Corp., 53 F. Supp. 2d 199, 213 (N.D.N.Y. 1999) (noting purpose of merger clause is to apply full application of parol evidence rule);   Pkfinans Intl. Corp. v. Black Star Enter., 1987 U.S. Dist. LEXIS 5372, *3 (S.D.N.Y. 1987) citing Orth-O-Vision, Inc. v. Home Box Office, 474 F. Supp. 672, 679 (S.D.N.Y. 1979) ("Under New York law, the existence of a merger clause within the subject agreement creates a 'strong presumption ... that the parties intended their agreement to be a complete integration of their mutual promises.'" ).  Thus, Drew cannot rely on any representations outside the contract.

The Agreement unambiguously requires *Drew* to modify its instrument to accommodate PointCare's assay.  Nowhere does the Agreement require PointCare to guide Drew in fulfilling its contractual responsibilities.  Because Dr. Hansen's supposed representation is at variance with the parties' integrated agreement, the representation is barred by the parol evidence rule.

### 4.    Drew Is Not Entitled to Specific Performance.

Specific performance is an "extraordinary" remedy.  Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher**,** 417 N.E.2d 541, 544 (N.Y. 1981).   "In general, specific performance will not be ordered where money damages 'would be adequate to

protect the expectation interest of the injured party'") Sokoloff v. Harriman Estates Dev. Corp., 754 N.E.2d 184, 188 (N.Y. 2001) citing Restatement (Second) of Contracts § 359 [1].  Further, "[s]pecific performance will not be granted where it would cause unreasonable hardship or injustice to the party, even if it was the one who breached the contract."  Concert Radio v. GAF Corp., 108 A.D. 2d 273, 278 (1st Dep't 1985), affd 73 NY2d 766, citing (Restatement [Second] of Contracts § 364).

      Specific performance is unwarranted here.  An order of specific performance would not simply hold PointCare to the deal it originally struck.  Changed circumstances caused by Drew make it impossible to resurrect the bargain that the parties entered.  First, the Agreement required *Drew* to be responsible for, and to bear the cost of, modifying its existing platform to accommodate PointCare's assay. (Agreement §1.1 and Annex 1, first bullet point).  Drew's attempt to re-write the Agreement to require PointCare to provide extensive "guidance" would impose extensive burdens on PointCare's personnel and monetary resources for which the parties did not bargain.

      Second, PointCare contracted with Drew to quickly develop its existing platform for release to market between January 1, 2007 and July 27, 2007. (Agreement, Attachment 1 to Annex 1, lines 44-46).  This timetable was critical because the technology in Drew's existing platform was not new, and medical device technology quickly becomes dated. (DePiano Dep. p. 63) (medical diagnostic products becomes "dated" with respect to manufacturing after three years).  Here, the circumstances that induced PointCare to enter its Agreement have significantly changed due to Drew's material breach of the HT development timetable.  It would be unfair to issue a mandatory injunction compelling PointCare to assist Drew in bringing to market a

product that is far older than it should have been because of Drew's delays on HT development.

## IV.    DREW CANNOT MEET ITS BURDEN OF DEMONSTRATING THAT THE BALANCE OF HARDSHIPS TIPS IN ITS FAVOR.

Whereas Drew will not be harmed by denial of the injunction, entry of the requested injunction will harm PointCare by preventing PointCare from marketing in certain territories its NP platform, which is functional, operable and on the market. (Krauledat Aff. ¶ 100). If the Court were to enjoin PointCare not to terminate the Agreement despite Drew's abysmal track record under the Agreement, this would force PointCare to devote its limited human, technological and financial resources to an effort which to date has proven fruitless, for which Drew admittedly is not up to the task, and the continuation of which may ruin this start-up company. Entry of the injunction would also harm persons within rural regions of the globe who will not have access to NP platforms for as long as Drew fails to develop the HT platform. Such a result may even lead to needless human suffering and death.[8]

## V.    DREW'S REQUEST FOR EQUITABLE RELIEF IS DEFEATED BY ITS UNCLEAN HANDS.

The record reflects repeated and egregious bad faith conduct by Drew. It comes to Court with unclean hands. This is an independent ground to deny injunctive relief.

A party such as Drew cannot obtain the equitable remedy of a preliminary injunction when it comes to the Court with unclean hands. Amarant, 197 A.D.2d at 434;

---

[8] Drew's authorities are readily distinguishable. In Ecolab, Inc. v. Paolo, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991), the movant, unlike Drew, offered concrete proof it had suffered damage, not mere speculation. Ecolab, Inc. v. Paolo, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991) (non-competition case where evidence showed former employees used confidential information resulting in customers no longer purchasing from former employer). In Global Systems, the court found that disclosure of trade secrets is inevitable when an employee goes to work for a competitor, a situation not present here. Global Telesystems, Inc. v. KPNQwest, N.V., 151 F. Supp. 2d 478, 482-483 (S.D.N.Y. 2001).

United for Peace and Justice v. Bloomberg, 2004 NY Slip Op. 24389; 5 Misc. 3d 845,

849 (NY Sup. Ct., NY County August 25, 2004); see also Dunlop-McCullen v. Local 1-

S, 149 F.3d 85, 90 (2d Cir. 1998), citing 11A C. Wright, A. Miller, M. Kane, Federal

Practice and Procedure: Civil 2d § 2946, at 108 (1995) ("The doctrine of unclean hands is

based on the principle that 'since equity tries to enforce good faith in defendants, it no

less stringently demands the same good faith from the plaintiff.'" ); "[H]e who seeks

equity must do equity. . ."  Sanofi-Synthelabo v. Apotex, Inc., 488 F. Supp. 2d 317. 348

(S.D.N.Y. 2006), citing Koster v. Lumbermens Mut. Cas. Co., 330 U.S. 518, 522 (1947).

**VI.    IF AN INJUNCTION IS GRANTED, DREW MUST GIVE SECURITY.**

Rule 65(c) provides in pertinent part: "No restraining order or preliminary

injunction shall issue except upon the giving of security by the applicant, in such sum as

the court deems proper, for the payment of such costs and damages as may be incurred or

suffered by any party who is found to have been wrongfully enjoined or restrained.'"

Fed.R.Civ.P.65(c).

Here, PointCare would suffer extensive financial harm if it were wrongfully

enjoined.  First, given Drew's admitted inability to complete the HT development project,

PointCare will be required to devote extensive personnel at great costs to finishing the

project (even though the Agreement requires Drew to bear the costs of HT development).

Second, if the Court were to enjoin PointCare from marketing in territories where Drew

is the "Market Leader," this would deprive PointCare of extensive sales opportunities.

"The failure to post a bond may warrant dismissal, and court's failure to require

the posting of a bond or other security has been held reversible error."  Wright, Miller &

Kane, Federal Practice and Procedure: Civil 2d sec. 2954 [collecting cases]; Arias v. Solis, 754 F. Supp. 290, 295-96 (E.D.N.Y. 1991) (noting rule mandatory and failure to require has been found reversible error); Hudson Global Res. Holdings, Inc. v. Hill, 2007 U.S. Dist. LEXIS 38326, *31 (W.D. Pa. 2007) (noting security bond generally required and exceptions so rare that requirement is almost mandatory).  A security will generally issue unless the non-moving party faces no risk of monetary loss or the moving party is financially unable.  See Int'l Controls Corp., v. Vesco, 490 F.2d 1334 (2d Cir. 1974); Bass v. Richardson, 338 F.Supp. 478 (D.C.N.Y.1971).

## CONCLUSION

For all the foregoing reasons, the Court should deny Drew's request for a preliminary injunction.

<div style="margin-left:40%">

POINTCARE TECHNOLOGIES, INC.,
By its attorneys,

By:  /s/ Michael P. Twohig
Andrew F. Caplan (MA Bar: #564127)
Admitted Pro Hac Vice
Michael P. Twohig (MA Bar: #648079)
Admitted Pro Hac Vice
**BURNS & LEVINSON LLP**
125 Summer Street
Boston, MA 02110
Tel:  617.345.3000

Howard Miller, (HM:4538)
**BOND SCHOENECK & KING, PLLC**
1399 Franklin Avenue, Suite 200
Garden City, New York 11530-1679
Tel: 516.267.6300

</div>

Dated: April 30, 2008
01238809

48