UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No. 08 CV 1490-AKH

|  |  |
|---|---|
| DREW SCIENTIFIC, INC.,<br>             Plaintiff<br>vs.<br><br>POINTCARE TECHNOLOGIES, INC,.<br>             Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AFFIDAVIT OF PETRA B. KRAULEDAT IN OPPOSITION
TO PRELIMINARY INJUNCTION**

I, Petra B. Krauledat, Ph. D., declare:

1.      I am Chief Executive Officer of PointCare Technologies, Inc. ("PointCare").  I

make this affidavit on personal knowledge, except where specifically stated.

2.      I gave an overview of PointCare's history and background in the affidavit I

submitted to the Court on February 18, 2008.  I will not repeat myself here.

**PointCare's Initial Hematology Instrument and Test**

3.      In the fall of 2005, PointCare had developed, manufactured and sold its first

products, a hematology instrument[1] (trade named AuRICA) and a proprietary diagnostic test

(trade named CD4sure) that was performed on the AuRICA instrument.  The test counted a

particular blood cell, named CD4 positive lymphocyte, which is important in the proper function

of the human immune defense.  This test is used in the diagnosis and therapy of HIV and AIDS.

These PointCare products were approved by the United States Food and Drug Administration

(FDA) and similar regulatory bodies in Europe.

---

[1] A hematology instrument is an instrument that automatically distinguishes and counts
human blood cells for the purpose of diagnosing diseases and disorders.

4.    PointCare outsourced the manufacture of the AuRICA instrument to a company called Idexx. In November of 2005, PointCare ended its relationship with Idexx because it had increased prices while failing to maintain the quality of the instrument.

5.    After parting ways with Idexx, PointCare searched for other companies to manufacture an instrument that could perform PointCare's unique CD4sure test. PointCare sought a company that manufactured a human blood hematology instrument whose design could be modified within a short period of time to accommodate PointCare's CD4sure test.

**Pre-Agreement Business Relationship between PointCare and Drew**

6.    PointCare set up meetings with a number of candidate instrument manufacturing companies during an international trade show in Germany in November of 2005. Drew was not on the list of candidate companies.

7.    Following a chance meeting with Drew at the trade show, PointCare's Chief Scientific Officer Dr. Peter Hansen, our then-head of sales Daniel O'Connor and I met with Drew's President Harry Rimmer, Drew's Vice President of Sales and Marketing Francis Matuszak, and Roger Bouree, a senior technical person at Drew. The parties discussed that PointCare had recently severed its relationship with its instrument manufacturer and PointCare was looking for a company that could quickly modify its existing hematology platform to accommodate PointCare's proprietary assay.

8.    During these initial meetings, we made it very clear to Drew that time was of the essence for PointCare and that PointCare's financial sustainability depended on a very fast replacement of its lost instrument manufacturer. Dr. Hansen and Drew's Roger Bouree made an initial assessment that Drew's existing hematology instrument (trade named Excell 22) might be a candidate instrument that could be modified within a very short period of time to accommodate

2

PointCare's CD4sure test. Both sides agreed to explore a possible business relationship. The parties agreed that senior technical people from each side would work together to determine if Drew's existing hematology platform appeared to be compatible with PointCare's proprietary assay.

9.      Dr. Hansen and PointCare Scientist Don Barry visited Drew's Dallas, Texas facility in January and early February. They reported to me that they carried out initial feasibility studies with Drew's Roget Bouree and ascertained that is was possible to modify the Excell 22 instrument quickly to accommodate the PointCare CD4sure test.

10.     A business meeting between Mr. Rimmer, Mr. DePiano, the CEO of Escalon (Drew's parent company), and I followed. In this meeting, Drew represented that they were an instrument company with many years of specific experience in developing and manufacturing hematology instrumentation. They stated that hematology instrumentation was a low profit margin business and that they were attracted to PointCare because its CD4sure test was a much higher profit margin product. They stated that they would be willing to modify their Excell 22 instrument in order to work with our CD4sure test, but only if they could obtain marketing rights for both the modified Excell 22 (which later on was called the HT) and the CD4sure test.

11.     Drew also said that they wanted marketing rights for another product that PointCare was developing together with another instrumentation manufacturer, C2. This was a small and portable hematology instrument that also would perform the PointCare CD4 test. This instrument was particularly well suited for resource poor environments (it was later called the NP, shorthand for "near patient"), which lack laboratory facilities. It would complement the HT which was suited for hospitals with laboratory facilities, not compete with it. Drew said that they

would be willing to bear the entire cost for the HT development if I agreed to such marketing rights.

12.    Mr. Rimmer and Mr. DePiano represented that Drew had a well established distribution network in certain territories and they asked to have preferred marketing rights in these territories.  At the time, PointCare's sales activities focused on Africa and Central America. I therefore welcomed Drew as a distributor that claimed to have distribution capacity in territories that PointCare had not yet entered.

13.    I agreed with Drew's conditions in principal and proceeded to draft a term sheet for a potential business agreement between Drew and PointCare.  This first draft of a term sheet refers to a timeline and I specifically stated to Mr. Rimmer that I wanted the timeline (and also responsibilities and product requirements) "to be as detailed as possible so that we both have a good understanding of what we are committing to."  See Exhibit 1 hereto (DR53607), a true copy of an email between me and Harry Rimmer.

14.    Technical activities continued to proceed rapidly under a good faith belief that a definitive agreement would be reached.  In early April 2006, Drew's Mr. Bouree brought a modified Excell 22 instrument to PointCare for further feasibility work.  The technical contact person at Drew continued to be Mr. Bouree.  PointCare concluded its studies with a report that was sent to Mr. Bouree by April 5, 2006.  See Exhibit 2 hereto, a true copy of Exhibit 1 from Barry Dep.  This feasibility report included PointCare's recommendations as to the modifications PointCare believed Drew needed to make to the Excell 22 instrument in order to accommodate the CD4 test. See id. at PointCare Supp 05512.

15.    In early April, further business meetings were held at the PointCare facility in Marlborough, MA, with DePiano, Rimmer and Matuszak in attendance from Drew.  I was very

4

surprised to read on page 8 and 9 of Drew's brief that during the April 2006 time frame, Mr.

DePiano had major concerns about Drew's ability to perform the instrument modification work

contemplated. He claims that he stated these concerns to Dr. Hansen and that Dr. Hansen and

PointCare represented to Mr. DePiano that Dr. Hansen personally would "guide" Drew through

the development process of modifying the Excell 22. See Exhibit 3 hereto, a true copy of

excerpts from DePiano Dep. pp 116 to 142. I never attended any meeting in person or via phone

where Mr. DePiano or anyone else from Drew made any statements as to the lack of Drew's

ability to perform the contemplated work. I never represented to Drew that PointCare would

have responsibility for "guiding" the Drew engineers through the development process. I never

heard Dr. Hansen or anyone else from PointCare make such a representation.

     16.    A definitive agreement was drafted by Drew in April of 2006. Between mid-

April and the signing of the agreement, substantially all negotiations about the wording in the

agreement and its annexes were between me and Mr. Rimmer. During this time, we had multiple

communications about the timeline, which later became an Annex to the Agreement, and the fact

that time was of the essence for PointCare. Negotiations about the final wording of the

Agreement and the exchange of legal drafts stretched over more than six weeks. Both

companies' technical staff continued to work in good faith and certain technical progress was

made before the Agreement was signed.

     17.    Mr. Rimmer signed the Agreement on June 2 and I signed it on June 5.

     18.    Every page of the Agreement was initialed by both parties except for the HT

instrumentation development timeline in Attachment 1 to Annex 1. Mr. Rimmer did not initial

the timeline due to vacation absence of his key technical staff. He advised me that he was going

to speak with his technical staff about the timeline upon their return from vacation. "Don't be

concerned," he assured me, "I realize that time is your most important criteria." He explained

that Drew was recruiting additional resources to meet the "necessary timetable." See Exhibit 4

hereto (DR 11), a true copy of an email between me and Harry Rimmer.

19.    The Agreement was complete except for the NP timeline that was not ready at the

time of signing. PointCare delivered the NP timeline to Drew in approximately April/May of

2007. See Exhibit 5 hereto, a true copy of Exhibit 4 from Krauledat Dep. The NP project was

very different from the HT project. The NP included significant new technology that never

existed before. Feasibility studies for the NP therefore took until early 2007. Only when

feasibility testing is completed is a formal timeline put together. I spoke to Mr. Rimmer and Mr.

Pina, a Drew lawyer, on multiple occasions in 2006 and early 2007 and explained why the NP

timeline was not yet available. They understood the reason and did not express any concerns.

### The HT project versus the NP project

20.    Drew appointed Gary Young official project leader for the HT instrument

development. PointCare appointed Don Barry as project leader for all activities at PointCare.

Mr. Barry's responsibilities included the coordination of all development efforts performed at

PointCare and all day-to-day communications with Drew. It was Mr. Barry's responsibility to

drive the agreed-upon timeline on the PointCare side. He also was to communicate with Mr.

Young, who was responsible for the timeline on the Drew side, about Drew's progress towards

the agreed-upon timeline and report any timeline related concerns to Dr. Hansen or me.

21.    Mr. Barry also had project leader responsibilities for the NP development project,

which PointCare performed in collaboration with C2 Diagnostics of Montpellier, France. I

personally attended several meetings at PointCare where Mr. Barry and the entire PointCare

technical staff were advised by either Dr. Hansen or myself that it was very critical for everyone

6

to adhere to timelines on the HT and NP projects not only because it was vital to PointCare's financial future to have these new products in the market as soon as possible, but also to avoid resource conflicts between the HT and the NP projects.

22.    The HT and the NP projects had been carefully planned to avoid such resource conflicts. From the very beginning of our business relationship, Drew was informed of the parallel effort at PointCare. In fact, one of the conditions for Drew to enter into the Agreement was the receipt of marketing rights for the NP. The Agreement (§ 1.1 at p. 2) specifically provides that PointCare will develop the NP platform with a third-party medical device manufacturer.

23.    I advised my staff at all times to report resource shortages to me so that I could find the needed resource as quickly as possible. I personally have led many technical projects from start to product introduction, many of them in companies that I co-founded and led to success. I consider myself an expert on managing resources to enable technical teams to complete a project within a planned time frame.

24.    I was critically aware at all times that PointCare not only had contractual responsibilities to Drew with regard to its CD4 test for use with the HT instrument, but also needed to deliver the NP instrument and its compatible CD4 test for Drew to market in a timely fashion. Therefore PointCare needed to manage both the HT and the NP projects in parallel and avoid resource conflicts. I did my best to manage both projects and avoid resource conflicts despite the fact that Drew failed to adhere to the agreed upon timeline for the HT project.

25.    Neither the HT nor the NP project experienced any significant delays because of resource conflicts at PointCare. As a matter of fact, I am aware of only one occasion where there was a resource conflict and the NP project took priority over the HT. It was communicated to

7

Drew at the time that the shift in priority would last two and one half weeks. See Exhibit 6

hereto, a true copy of Exhibit 8 from Hansen Dep. It turned out that it lasted only one and a half

weeks. This eight day priority shift can hardly be the reason for Drew being more than a year

behind schedule.

### Business Relationship during the First Nine Months of the Agreement

26.    In August of 2006, PointCare attended the International AIDS Conference in

Toronto, Canada. During this conference, PointCare unveiled the HT and the NP product

concept to the public. Non-working instrument models of both instruments, the HT and the NP,

were shown at a booth during the conference. I attended the entire conference. Mr. Rimmer and

Mr. Matuszak from Drew attended part of the conference and spent some time at the PointCare

exhibit booth.

27.    On page 11 of its Brief, Drew claims that the cost for exhibiting at the AIDS

conference was borne by Drew because PointCare was in a cash poor position. Drew did not pay

for exhibiting at the conference, PointCare did. PointCare was not in a cash poor position.

Drew's belief that PointCare was cash poor seems to have been a guiding factor in its entire

conduct from about March 2007 until today as I will explain further below.

28.    During the AIDS conference, Mr. Rimmer and Mr. Matuszak jointly and

independently expressed their skepticism to me that Drew's international distributor network had

an understanding of the AIDS patient testing field. They stated that a lot of work needed to be

done in educating their distributors. They asked if PointCare was willing to help in this task.

This was the first time that Drew admitted that they did not have the strong distribution network

that they had represented during the Agreement negotiations.

29.    I had little contact with Mr. Rimmer following the Toronto conference. In or around October, I was informed by Mr. DePiano that Mr. Rimmer was no longer with Drew and that from now on, Mr. DePiano was PointCare's business contact with Drew.

30.    I received some encouraging reports from Dr. Hansen and Mr. Barry about technical successes achieved by the parties' technical groups. On the other hand, they brought to my attention that the Drew technical team was slower than anticipated in the timeline and that it took a lot of pushing from the PointCare side to get tasks completed. Dr. Hansen complained about a lack of management oversight at Drew. I encouraged Dr. Hansen to bring his concerns to Mr. DePiano's attention which he did on November 9, 2006. See Exhibit 7 hereto (DR 752), a true copy of an email between Peter Hansen and Richard J. DePiano. In a phone meeting that I attended, Mr. DePiano promised better management oversight for the HT project.

31.    At all times, I encouraged the PointCare technical team to work closely with Drew and assist wherever they could. In December of 2006, for example, I authorized PointCare engineer Amy Coughlin to work at Drew's facility in Dallas for approximately two months (at PointCare's cost) to assist in troubleshooting the HT prototype, which clearly was a Drew responsibility. At the time, this help was requested by Drew's engineers and seemed to be greatly appreciated by them. Additional shorter visits by other members of the PointCare technical team complemented Ms. Coughlin's work at Drew.

32.    In or around early March of 2007, I attended Drew's annual international sales meeting at the Drew facility in Dallas, Texas.

33.    During the sales meeting, I had a private meeting with Mr. DePiano where I voiced my concern about Drew's ability to fulfill its obligations regarding the engineering of the HT instrument in a timely fashion. At that meeting, Mr. DePiano fully agreed with my concerns

and proposed a merger of our two companies, where one of the merger goals was to increase the "notoriously slow pace" (Mr. DePiano's words) of Drew engineering and raise standards of their technical output to the standard of PointCare.

## Merger Negotiations between PointCare and Drew

34.    When Mr. DePiano proposed a merger, I immediately asked about the financial basis for such a merger, as I knew from the annual report of Escalon (Drew's parent corporation) that Escalon lost more than $3 million in its last fiscal year, most of which was attributable to losses from the Drew subsidiary.

35.    Mr. DePiano explained that he had just settled a lawsuit and received more than $9 million in cash from this settlement. He proposed that Escalon would provide a loan to the newly merged PointCare/Drew business entity to assure cash flow until the new entity was profitable.

36.    As one of the first steps, I drafted a timeline for the merger process which was attached to a Memorandum of Understanding (MOU) that the parties signed on or about April 18, 2007. See Exhibit 8 hereto (DR 46537 to 46541), a true copy of an email between me and Richard J. DePiano and a Memorandum of Understanding for Proposed Merger of Point Care Technologies and Drew Scientific, Inc. into New Co. The timeline called for a six week period to perform due diligence and all other activities necessary in order to sign a definitive merger agreement. Mr. DePiano, in his deposition, stated that I "dogmatically" pushed everyone involved to adhere to the time line. It is indeed my usual business practice to take time commitments very seriously and adhere to them stringently. I believe that part of my professional success is due to this attitude.

37.     Financial due diligence proceeded very rapidly.  However, when financial planning documents for the new entity were required, I could not get any response from the Escalon CFO.  He found one excuse after another for not being able to respond to my requests.  I experienced an equal reluctance from Mr. Matuszak to provide the required sales forecasts.  The promised draft of a definitive agreement never materialized from Escalon's general counsel.

38.     At the time, I was puzzled by Escalon/Drew's reluctance to adhere to the mutually agreed upon timeline.  During discovery, I believe I found an explanation in a document where Mr. Matuszak wrote to Mr. De Piano as early as March 20, 2007, just after merger discussions began. See Exhibit 9 hereto, a true copy of Exhibit 2 from Matuszak Dep..

39.     Mr. Matuszak expresses his disdain for PointCare and maintains that it would be better for Drew to compete with PointCare rather then collaborate.  He concludes that, in his opinion, the Drew/PointCare Agreement puts PointCare in a seriously disadvantaged financial position and recommends that merger negotiations should be actively slowed down in order to get a better deal for Drew/Escalon.  In his deposition Mr. Matuszak confirmed that he advised Mr. DePiano that Drew "should slow down the timeframe [of the merger discussions] and let them come to us" and that he was suggesting that, given PointCare's cash position, Drew would have increasing leverage over PointCare. See Exhibit 10 hereto, a true copy of excerpts from Matuszak Dep. pp 234 to 238, and Exhibit 9 hereto.

40.     Mr. DePiano's valuation expert provided an opinion where PointCare was valued at less than $2 million and gave no valuation for Drew. The valuation expert that PointCare retained provided an opinion where PointCare was valued at just over $12 million and Drew at about $7 million.  PointCare's valuation expert's opinion was vetted by a most recent investment that PointCare had received at a valuation of $11.5 million.  I immediately wrote to Mr. DePiano

11

that this valuation discrepancy was prohibitive to proceeding with merger negotiations and that we should go back to working as business partners under the existing Agreement.

41.     Knowing what I know today, I believe that the merger negotiations were carried out by Escalon/Drew entirely in bad faith with the primary goal to gain as much knowledge as possible about PointCare's financial past, present and future.  It appears that Mr. DePiano's goal was to get hold of PointCare at the lowest possible price and that he was willing to use any means possible either directly or indirectly to actively depress PointCare's value.  I will elaborate in more detail below how I came to this conclusion.

### Drew's Failure to Perform its Sales and Marketing Duties

42.     Annex 3 of the Agreement defines certain territories where either party to the Agreement will act as the "Market Leader."  During the negotiations of the Agreement, Drew represented that it had particular sales and marketing strength in the territories where it is named the Market Leader (see ¶ 12 of this affidavit).

43.     Annex 3 of the Agreement delineates the sales and marketing duties and rights of the parties in certain territories.  The first duty for both parties was to propose a sales plan for each territory for which the party is the Market Leader.  PointCare provided its sales plan to Drew in the April/May time frame of 2007.  Mr. DePiano in his affidavit admits to this. See Exhibit 11 hereto, a true copy of Exhibit B to DePiano's first affidavit filed in this case.  Drew has never provided a sales plan to PointCare.  In a letter to me on October 3, 2007, Mr. DePiano admits that Drew did not provide a sales plan and promises that a sales plan will be provided. See Exhibit 11 hereto.  This never happened.

44.     The Agreement requires the Market Leader in a given territory to diligently pursue sales leads that have been given by the Supporter.  Moreover the Market Leader must

12

give regular progress reports on such sales leads to the Supporter. PointCare gave two significant sales leads to Drew, one in Malaysia and one in Russia. Drew failed to pursue both of these leads.

45.     During the International AIDS meeting in Toronto in August of 2006, I informed Mr. Matuszak and Mr. Rimmer that I had heard from staff members of the US Center for Disease Control about the Malaysian government's plan to roll out HIV clinics throughout the major islands of the country. Island states are ideal markets for the NP product. There was no additional information available from my source. I requested that Drew find out about this lead from their distributor(s) in Malaysia. Drew never reported about any follow up.

46.     During a tradeshow in Bangalore, India in December 2006, I spoke to Andrew Buck, Drew's sales manager responsible for South East Asia. He told me that Drew was having great difficulties with their distributors in Malaysia and that he had not been able to get them interested in an HIV related product. He said that he would try to find out about the lead I had given to Drew. I never heard from him or anyone else from Drew again about this matter.

47.     During merger discussions between PointCare and Drew, Mr. Matuszak and Mr. DePiano independently admitted that Drew had all but lost its distributors in Malaysia due to its inability to deliver a new Drew Diabetes analyzer (called the DS 360) in a timely fashion. Moreover, Mr. Matuszak told me that Drew's Andrew Buck had forecasted that Drew would sell one NP instrument in Malaysia. See Exhibit 12 hereto (DR 52347 to 52350), a true copy of an email between Simon Rowe and Frank Matuszak.

48.     In or about January of 2007, a contact of mine in the public health field mentioned that the Russian government was expected to equip between forty and sixty HIV clinics and a

tender for CD4 instrumentation would be issued some time in 2007. (A tender is a formal request to suppliers to make an offer).

49. Drew was the Market Leader in Russia and I referred this lead to Drew for follow up. Specifically, I informed Mr. Matuszak during a meeting at PointCare on or about January 23, 2007 about this significant sales opportunity. I relied on Drew and its Russian distributor to pursue this tender. On at least one occasion during the spring of 2007, Mr. Matuszak requested more information about the Russian tender. I explained that PointCare had no more information since we did not have a distributor in Russia and it is not possible for a foreign based company to obtain tender information from Russia.

50. In early October 2007, I heard again about this tender. I wrote an urgent e-mail to Mr. Matuszak and DePiano and demanded that they follow up on this lead. See Exhibit 13 hereto (DR1450 to 1451), a true copy of an email between me and Frank Matuszak and Richard J. DePiano. Drew repeated the circular argument that they needed more information from me in order to follow up. They reported that their distributor in Russia could not find out about a tender.

51. At the time, it seemed to me that Drew either had lost or had misrepresented their distribution capability in Russia. I informed Drew in writing that, due to Drew's inability to follow up on the Russian lead, PointCare would no longer rely on Drew in Russia but would find its own distributor. See Exhibit 14 hereto (DR50926), a true copy of an email between me and Frank Matuszak and Linsey Rockingham. I never received any response to this letter and took this as an admission by Drew that they were not capable of assuming the role of Market Leader in Russia. I instructed my staff to find a distributor in Russia for PointCare.

52.    In August of 2007, PointCare's Linsey Rockingham sent three additional leads to Drew, which included names of the interested parties, phone numbers and e-mail addresses. Two interested parties even claimed that they had funding for a purchase  See Exhibit 15 hereto (DR44241).  During document discovery, I came across an e-mail from Mr. Matuszak to his sales team where he requests responses from these leads and points out to his team that, "We need to make sure that PointCare has the feeling they are being worked." See Exhibit 16 hereto (DR44682 to 44683).  This language implies to me that Drew was putting up a show but was not seriously pursuing these leads.  To my knowledge, PointCare was never informed about any progress with these leads.

53.    On April 4, 2007, Mr. Matuszak wrote to two members of his sales team about the Market Leader territories as they are defined in the Agreement.  See Exhibit 17 hereto (DR47793 to 47794).  He informed them that they "should start working on NGO's in the EU as this will give us a chance to break into Africa as NGO's are fair game" (an NGO is a not-for-profit Non-Government Organization such as the Red Cross).  He correctly transmits the information that each party has the right to pursue NGO's no matter what territory the NGO is located in. (Annex 3 to the Agreement, bullet point 6).  He fails to point out, however, under the Agreement, if the instrument's final destination is in a territory where PointCare is the Market Leader, PointCare shall install and service such instrument and sell reagents to the site.  This provision in the Agreement was designed so that each party would be able to negotiate with NGOs that buy centrally but deploy the products in many different countries.  In other words, if an instrument's final destination is in the Market Leader's territory, the Market Leader has the right to enjoy all profits from the CD4 test sales.

54.     Finally, in February of 2008, one of Mr. Matuszak's staff members asked if he could sell CD4 in Central America, a PointCare territory. Matuszak replied "yes." See Exhibit 18 hereto (DR46309 to 46310). Drew sales to Central America are a direct violation of the terms of the Agreement where Central America is defined as a PointCare territory (Annex 3 to the Agreement, bullet point 9).

### PointCare's Alleged Sales in Drew Territory

55.     On page 16 of Drew's Brief, Drew alleges that in July of 2007 "PointCare began speaking to Distributors about representing PointCare on NP sales in Drew territories." They specifically refer to a contact PointCare had made in Russia. I personally made this contact and I believe that I acted completely within PointCare's rights under the Agreement.

56.     I specifically spoke to a company named Block Scientific during a trade show (called the AACC) in July of 2007. Earlier that month, I had been informed by a staff member of the World Health Organization (WHO) that the WHO was planning to deploy a new HIV/AIDS treatment effort into more remote sections of certain countries, one of which would be Russia. This effort would include CD4 testing. The NP instrument was ideally suited for this purpose. I knew from previous dealings with Block Scientific that they claimed to have a strong distribution connection in Russia and I wanted to find out if this was indeed the case and if this distributor could help PointCare and Drew to get the WHO contract.

57.     The WHO is a Non Government Organization (NGO), and, under the Agreement, PointCare had the right to pursue such a sale independent of territory (Annex 3 to the Agreement, bullet point 6). It was necessary for PointCare to have local representation specifically in Russia in order to receive the contract from the WHO. This is the reason why we tried to find a distributor in Russia. If PointCare had succeeded in receiving a contract from the

16

WHO with instrument placements in Russia, then after PointCare had sold the instruments, it would have been Drew's right and responsibility to install, service and supply reagents to these instrument sites in Russia (Annex 3 to the Agreement, bullet point 6). Unfortunately the WHO did not go through with its plans and we dropped activities to find a distributor in Russia for that purpose.

58.    Drew fails to explain that they were well aware of my activities. In fact, during the AACC trade show, I personally informed Drew's Simon Rowe, who is responsible for Russia, about the WHO opportunity and asked him if Drew's Russian distributor had the capability to support the instruments in the field should we get the tender. Rowe told me that he was unhappy with his Russian distributor but he was looking for a better one and hopefully by the time this sale would happen Drew would have the capacity to support these instruments. I told Rowe that I was talking to Block Scientific to help secure this sale and encouraged him to tap into Block as a resource for finding a better distributor in Russia. He later visited the Block booth and spoke to them about PointCare. See Exhibit 19 hereto, a true copy of Matuszak Dep. 156:12-158:21.

59.    In footnote 10 of Drew's Brief, Drew alleges that "PointCare's Business Plan, dated June 2007" states that "PointCare had already hired a Russian distributor." See Exhibit 20 hereto, a true copy of Exhibit 1 to Krauledat Dep., p. 9. This statement misrepresents the wording in the Business Plan where it says that "PointCare has *opened discussions* with one of the largest equipment distributors in Russia." PointCare's Dan O'Connor, then VP of Business Development, had reported to me that he had opened such discussions together with Drew's Frank Matuszak and that the two of them had actually planned a joint trip to Russia.

17

60.    When O'Connor's relationship with PointCare was terminated, I asked him for details about this Russian connection which I never received due to the hostile nature of O'Connor's departure. When I tried to find out more from Matuszak, he said that he would check his notes but never got back to me. I later assumed that this was nothing but salesman bravado and dropped my inquiries. This lead was deleted from the PointCare Business Plan later in 2007.

61.    In footnote 11 of Drew's Brief, Drew alleges that PointCare continued its effort to find a Russian distributor even after PointCare's counsel represented in Court that we would stop soliciting distributors in Drew territories until further decisions by the Court. Drew's representation is completely false and misleading. The Court hearing was on February 19, 2008. On February 23, 2008, I gave written instructions to Ms. Rockingham, who is in charge of signing up distributors for PointCare, to stop any activity in "Drew Territories" until further notice from me. See Exhibit 21 hereto (PointCare 4/18/08 0001), a true copy of my email to Linsey Rockingham. She did so. When she received an e-mail from a potential distributor for Russia on March 10, 2008 (see Exhibit 22 hereto, a true copy of Exhibit 3 to Rockingham Dep., cited in Drew's brief as evidencing PointCare's continued communications after the Court's directive), she immediately phoned the distributor and told him that the discussions had to be put on hold. See Exhibit 23 hereto, a true copy of Rockingham Dep. 162:19-163:7.

62.    Drew claims that PointCare violated Drew's territorial rights under the Agreement by selling instruments to Biomedical International, Inc., PointCare's distributor for the Caribbean and for Central America, whose head office is located in Florida. The products sold to Biomedical, Inc. were destined to be distributed in the Caribbean, a PointCare territory.

Nevertheless Drew claim that this sales opportunity needed to be referred to Drew, the US Market Leader.

63.     Nowhere in the Agreement does it say that a distributor for a certain territory has to be located in that territory. As a matter of fact, it is customary in the industry for Caribbean distributors to be located in Miami because almost all transportation in the Caribbean is conducted via Miami.

64.     Biomedical, Inc. has been PointCare's distributor since the spring of 2007 and is listed on PointCare's website. During the summer of 2007, PointCare introduced Drew to Biomedical as Drew was looking for a Caribbean distributor for its hematology products. In the fall of 2007 a joint training class was held at Biomedical's Miami facility involving Drew, PointCare and Biomedical staff. Drew was well aware of Biomedical's role and never expressed any concerns until this lawsuit. To the contrary, Drew asked for a helping introduction.

65.     Drew makes the same allegation for a PointCare sale to TTM, a German based NGO. This instrument was destined for the Democratic Republic of Congo and was shipped there from Germany. There is no language in the Agreement that gives Drew any rights whatsoever to a sale to an NGO (no matter where the NGO is located) that is destined for Africa, a PointCare territory.

66.     Drew lists PointCare sales to other NGO's (Center for Disease Control, Walter Reed Hospital, Catholic Relief Services) all of which were shipped either directly to PointCare territories or are destined to be shipped to PointCare territories, and claims that "installation, services and reagent supply stay with the US Market Leader." There is nothing in the Agreement that justifies such a claim.

19

67. Drew alleges that PointCare had discussions with distributors in Drew territories in violation of the Agreement. Nowhere in the Agreement is there a prohibition for either party to have or solicit a distributor in a territory where the other party is the Market Leader.

68. The Agreement specifically contemplates that a party may solicit distributors in the other party's Market Leader territory. Annex 3 to the Agreement in bullet point 5 specifies that in the case that the market "Supporter" can show a commitment from a distributor that exceeds the commitment of the Market Leader by at least 50%, the Supporter shall have the right to initiate its own sales efforts in said territory. It would be difficult for the Supporter to ever come up with such a commitment if it was not allowed to have discussions with distributors in the Market Leader's territory.

**Drew's Conduct after Merger Negotiations had Failed**

69. Drew alleges that the business relationship between the parties deteriorated in the May/June 2007 timeframe. This is indeed true. What is not true are Drew's explanations for the deterioration.

70. In late May of 2007, PointCare staff reported to me that troubleshooting at PointCare had revealed two major problems with Drew's design of the HT device that prevented it from operating on a continuous and reliable basis.

71. On or about June 5, 2007, it was mutually agreed that one of the HT prototypes at PointCare was to be returned to Drew so Drew could eliminate these design flaws.

72. At about the same time (June 8, 2007), PointCare sent the entire software source code of the software pieces that were PointCare's responsibility to Drew so that it could integrate the entire HT system and verify the system's functionality and adherence to the specifications.

73.     From this point on, there was little more to do for PointCare staff other than wait for Drew to make progress on fixing the identified problems, integrate the software and verify the successful completion of these tasks. Only after a fully integrated prototype instrument was ready would PointCare have had the obligation to resume any further work.

74.     When Drew staff fell silent on progress reports, Dr. Hansen, with my encouragement, sent a letter to Mr. DePiano on July 2, 2007 pointing out the slow progress and requesting a management review of the situation. See Exhibit 24 hereto, a true copy of Exhibit 1 to DePiano Dep. Instead of agreeing to devote management attention to the problems pointed out by Dr. Hansen, Drew responded to him with a letter from Escalon's General Counsel ful of distortions and outright falsehoods. From PointCare's perspective, it was this lawyer letter of July 13, 2007, that marked the beginning of the deterioration of the relationship. See Exhibit 25 hereto (DR 14 to 16), a true copy of an email between Richard J. DePiano and Peter Hansen.

75.     There was a great deal of frustration among PointCare's staff members and management about Drew's slow progress. Nonetheless we patiently awaited progress from Drew.

76.     It is now clear from reviewing the documents that Drew produced for this litigation that Drew stopped all software work after it had received the source code from PointCare in early June. Karl Gu, Drew's software manager, acknowledges receipt of the software from PointCare on June 8, 2007. See Exhibit 26 hereto (DR 27756 to 27757. After that there is no sign of any software related activity at Drew. Drew produced many communications between June 2007 and today in which its software group is very active on a Drew project totally unrelated to the HT project. During the same timeframe there is no communication that would indicate that Drew even so much as tried to test the software PointCare delivered.

21

77.     In Drew's document production for this litigation, there are frequent e-mail communications among the members of the technical staff at Drew and PointCare until August 2, 2007. After that date there is little to no communication from Drew to PointCare or within Drew that would show activity on the HT project until September 13, 2007, when Dr. Hansen sends an e-mail wondering about the silence and requesting an update on progress. See Exhibit 27 hereto (DR44148), a true copy of an email between Peter Hansen and Gary Young produced by Drew in discovery. Only after this request does communication resume.

78.     On September 13, 2007, I wrote a letter to Mr. DePiano (see Exhibit 28 hereto, Exhibit A to first DePiano Affidavit), apprising him of my view of the rather grave situation with regard to lack of progress on the technical front and the unfortunate hostilities started by Drew's General Counsel. I told him that PointCare remained committed to perform the remaining tasks that were PointCare's duty under the Agreement.

79.     I once again asked for the "sales plan" that Drew owed PointCare under the Agreement. I expressed my concerns about Drew's low forecast and stated that I had been approached by distributors in Drew' territories that had much higher forecasts. I requested a discussion with Drew about this problem as I believed that PointCare could gain the Market Leader position (as provided for in Annex 3 to the Agreement) in certain Drew territories due to possibly having distributors that would exceed Drew's forecast very significantly.

80.     When Mr. DePiano responded, almost three weeks later, he agreed that we needed better communication and suggested regular meetings for the future. He then proceeded in an elaborate and lengthy fashion to continue what his general counsel had started in July, namely blaming PointCare for everything that had gone wrong. There was nothing in his letter that indicated that he was willing to move forward speedily, neither on the technical end nor in sales

and marketing.  He did promise the requested sales plan, which PointCare never received.  See
Exhibit 11 hereto.

81.    On October 26, 2007, after another month without any technical progress, I
finally decided that it would be best for the two parties to uncouple the relationship.  I wrote
another letter and suggested that Drew continue to work at its own pace on the HT project and
PointCare continue to give the support required under the Agreement.  I suggested that, as a
result of PointCare giving up its demand for timely completion of the HT, PointCare would no
longer market the HT but Drew would have exclusive rights to all HT sales.  PointCare would
become the sole distributor for its own NP product.  I believe that I made a very fair proposal for
a change of the Agreement, given Drew's lack of performance. See Exhibit 29 hereto, a true
copy of Exhibit C to DePiano's first affidavit in this case.

82.    In a face-to-face meeting with Mr. DePiano on November 8, 2007, I broadened
my proposal and added non-exclusive marketing rights for the NP to my previous proposal. See
Exhibit 30 hereto (PointCare 1207), a true copy of contemporaneous notes prepared by me and
PointCare's Controller, Eric Newman.  Instead of addressing my concerns, Mr. DePiano openly
threatened litigation if PointCare was not willing to stay with the existing Agreement.  He
admitted that the HT product was far from being complete, nevertheless he demanded that Drew
be given the NP product to market right away.  When I pointed out that the Agreement gave
Drew NP marketing rights only after the HT product was complete and ready to market, he said
that it would be up to the lawyers to decide this.  It was clear to me that there was no good faith
in anything that Mr. DePiano said or did and I decided to terminate the Agreement due to Drew's
complete failure to adhere to the HT development timetable in the Agreement.

**Drew's Bad Faith**

23

83. During document discovery in this litigation, I believe I found the reason for Mr. De Piano's unwillingness to discuss a new agreement and for the hostilities that ensued shortly after I had called off the merger negotiations.

84. As outlined above, Mr. DePiano and his senior staff seemed to have used the merger negotiations as a means to actively depress PointCare's value in the hope that Escalon/Drew would be able to get hold of PointCare at the lowest possible price. See Exhibit 10 hereto. When PointCare ended the merger discussions on June 20, 2007, Escalon/Drew did not give up the idea of getting hold of PointCare's assets.

85. On July 13, 2007, the same day Drew's general counsel wrote his letter to Dr. Hansen, Mr. Matuszak approached Mr. O'Connor, PointCare's former VP of Business Development, with a proposal to hire Mr. O'Connor into Drew to try to take a large potential customer (Abbott Laboratories) away from PointCare and bring it to Drew. See Exhibit 31 hereto, a true copy of Exhibit 3 from Matuszak Dep. Mr. Matuszak was well aware from the confidential merger discussions that O'Connor had been terminated for cause and that the relationship between O'Connor and PointCare was not friendly. He also knew about PointCare's negotiations with Abbott who he now tried to take from PointCare to Drew even though the entire Abbott deal was in Africa, a PointCare territory.

86. In further discussions between Matuszak, DePiano and O'Connor, they contemplate approaching PointCare's board of directors about a hostile takeover of PointCare. See Exhibit 32 hereto, a true copy of Exhibit 4 of Matuszak Dep. Mr. Matuszak in the same e-mail requests PointCare confidential information from O'Connor, which Mr. O'Connor promises he will try to obtain and later on, after obtaining it from a PointCare employee, transmits to

24

Matuszak. See Exhibit 33 hereto (DR46964), a true copy of an email between Daniel O'Connor and Frank Matuszak produced by Drew in discovery.

87.    Matuszak in his deposition admitted to having PointCare takeover discussions with O'Connor. See Exhibit 34 hereto, a true copy of excerpts from Matuszak Dep. (292:9-25). He also admitted to have received confidential information from O'Connor about PointCare's financial status. See id. (293:6-299;24).  Discussions between Matuszak and O'Connor continued through August 2007, with Drew trying to obtain more information about PointCare's financial status.  When O'Connor suggested that "Rich [DePiano] should send a note to the board indicating his interest in exercising his option to acquire the company in the event of bankruptcy," Matuszak responded by suggesting that PointCare's Controller should go to the PointCare board with this information.  See Exhibit 35 hereto (DR 53817-53821), a true copy of an email between Daniel O'Connor and Frank Matuszak produced by Drew in discovery.

88.    Throughout January of 2008, Matuszak continued to tap O'Connor for PointCare confidential information, including information about existing and potential customers and PointCare product performance in certain customer's laboratories. See Exhibit 36 hereto (DR51553 to 51559), a true copy of an email between Daniel O'Connor and Frank Matuszak produced by Drew.

89.    It appears to me that Escalon/Drew management never gave up hope that they could enhance Drew's value (Drew lost almost $4 million in its last fiscal year) by a PointCare takeover.  Drew's lack of attention to the HT project after the merger negotiations had been terminated, befits the apparent plan to get hold of PointCare as cheaply as possible.  Without the revenue from HT sales (which PointCare expected to have starting in May/June of 2007) PointCare would, in the hopes of Drew management, go "belly up." See Exhibit 37 hereto

(DR28254). This would then allow Drew to exercise its rights under section 6.11 of the Agreement and fulfill its management's takeover dreams.

90.     In light of the above, it is easy to see why Mr. DePiano resisted even the most generous offer from me to negotiate a new agreement. He needed the Agreement to be intact as it gave him preferred rights to PointCare assets.

91.     In the litigation threat he leveled at me during our November 8, 2007 meeting, he was careful to point out how expensive a lawsuit would be and even gave an opinion that PointCare could not afford litigation.

92.     Finally, in this litigation, Drew tried to subpoena financial information from the most recent investor in PointCare, the Brook Venture Fund. This subpoena was issued only two days after Mr. O'Connor had received shareholder information about the planned investment by Brook. I believe that Drew hoped that Brook would back away from the planned investment out of fear of getting dragged into a lawsuit.

**PointCare did not breach confidentiality**

93.     In its Brief, Drew makes several direct and indirect allegations that PointCare has breached confidentiality. These allegations are pure speculation by Drew and false.

94.     For reasons unknown to me, Drew's management convinced itself that progress on the NP project was very slow. See Drew brief p. 13 and Exhibit 9 hereto. In fact, the NP project proceeded swiftly and was reasonably on schedule at all times. In its Brief (page 15), Drew states –without offering any evidence whatsoever -- that the "NP Development went from zero to sixty overnight." This statement is a complete fabrication. Quite to the contrary, the NP development experienced a number of small problems shortly before its release to market which caused the release to slip from July to October.

95.     Drew expresses that the NP Development went from zero to sixty overnight (which it did not) because of an illicit transfer of technology (p. 15, footnote 9). Drew gives absolutely no evidence for this suspicion. No Drew technology has ever been transferred into the NP. In fact, Drew had an NP instrument in its facilities for an entire month and could easily observe that the NP technology does not resemble anything that Drew has. Drew's service engineers were given training on the NP during which the instrument was inspected and described in great detail. Drew's service engineers are in possession of all descriptions, drawings and other materials that were given out at the training.

96.     It appears that Drew management and engineering staff have developed their own completely unfounded theory for PointCare's successful development of the NP instrument. They first convince themselves that progress with the NP machine was very slow (which is not true at all), and then they develop a theory that the NP development went from "zero to sixty" overnight (which is equally false). Drew presents these statements to the Court as if they were true without any supporting evidence.

97.     In footnote 9 Drew also alleges that it "appears that PointCare has shared confidential Drew information with a possible merger candidate, Orasure Technologies, Inc." Orasure last year evaluated a potential investment into PointCare. In that context it was aware of PointCare's business relationship with Drew which was public information. To the best of my knowledge, all information that Orasure was given by PointCare about Drew was publicly available.

98.     Drew makes further allegations on page 33 of the brief that it suspects PointCare of sharing Drew's confidential HT information. Drew cites PointCare's February 2008 business plan as well as board meeting minutes from the same time frame in support of its allegation. See

27

Exhibit 16 to Declaration of Anthony J. Costantini in Support of Plaintiff's Motion for

Preliminary Injunction hereto (PointCare Supp 2065 to 2083 and PointCare Supp 2003 to 2004).

Drew's allegation is false and misleading. The two documents describe PointCare's plans for

2009 to begin development of a high throughput instrument that will test hematology parameters

and CD4. There is no description in these documents as to the technology PointCare plans to

use. PointCare does not plan to use any technology owned or used by Drew. Drew's technology

is dated (the Excell 22 instrument that the HT was based on was initially developed in 1997) and

will be obsolete by 2010/2011 when PointCare plans to launch its own high throughput system.

**Drew compares the HT timeline with the NP and with AuRICA**

99.    In an attempt to justify its own tardiness, Drew makes false and misleading

comparisons to other PointCare projects.

100.    In footnote 6, Drew says that "PointCare eventually completed the NP project six

months later than the date estimated in May." The original timeline for the NP project

communicated to Drew  anticipated market release without FDA approval in June of 2007 and

FDA approval in August of 2007. See Exhibit 5 hereto. NP market release without FDA

approval occurred in October 2007, four months behind the original schedule. The NP

development project began in December of 2006 and was completed with release to market in

October of 2007 which makes it an 11 month project. See id.  Moreover, the NP instrumentation

technology is entirely new and has never been used before in the industry.

101.    In an effort to justify its own failure to deliver the HT in a timely fashion, Drew

on page 5 and in footnote 6 of its brief compares the HT project to the AuRICA project which,

Drew represents, took "over two years to complete." Drew has no knowledge of the AuRICA

project. In truth, it took from about May 2003 to November 2004 to develop and obtain FDA

28

approval for the AuRICA instrument and the CD4 test. This was a first in the industry, something that had never been done before. Based on this 18 month experience with a first time development, it was more than reasonable to expect the completion of a mere repeat development (no new technology was incorporated into the HT) within the 13 month timeline agreed to in Annex 1 of the Agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this *25th* day of April, 2008, in Boston, Massachusetts.

Petra B. Krauledat, Ph.D.

01239099

# EXHIBIT 1

**From:** Harry Rimmer
**Sent:** 2/23/2006 3:40:39 PM
**To:** Petra Krauledat
**CC:** Richard J. DePiano
**Subject:** RE: termsheet draft

Petra, thank you for the term sheet and business plan. We need to work on the plan ouselves before our next meeting.
I expect to be back to you by the middle of next week.
Regards
Harry
President
Drew Scientific

———

From: Petra Krauledat [mailto:pkrauledat@pointcaretechnologies.com]
Sent: Wednesday, February 22, 2006 2:17 PM
To: Harry Rimmer
Subject: termsheet draft

Harry,
As announced earlier here is my first stab at a term sheet. No lawyer has been involved here, I just wanted to put all the point on the table we discussed and a few more that came to mind. I am most concerned about the last two points on the term sheet, the buy out rights. Obviously we both have to be very sensitive to do this in a manner that we do not limit each others flexibility too much. I suggest that we (you, Rich and I) first talk about these points before we consult legal people (I am always trying to save money).

The document refers to another document, the timelines and responsibilities and product requirements. Peter and I are still working on this one. I want it to be as detailed as possible so that we both have a good understanding of what we are committing to. I will send this document later this week or first thing next week.

I look forward to your comments.
Petra

Petra B. Krauledat, Ph.D.
CEO
PointCareTechnologies, Inc.

HIGHLY CONFIDENTIAL

EXHIBIT 2

From: Peter Hansen
To: Roger Bourree; rbourree@MWI-DAWAM.COM
Subject: Don's Report
Date: 4/5/2006 6:27:51 PM

Attachment N1: HT-0001 System Mod Feasibility.doc

Title of Project:        High Throughput System for Developing World Market

Date:            March 27, 2006

Author:          Don Barry

Approvals:

| APPROVALS | | | | |
|---|---|---|---|---|
| name | Signature | date | Title | Document Approval Function |
| Don Barry | | | Scientist/Engineer | Originator/Project Manager |
| Romiya Glover | | | Scientist | Technical Review |
| Maurice Doire | | | Director, QA/QC | QA/QC |

Confidential

PointCare Supp 05489



Abstract

The Excell 22 (Drew Scientific) has been identified as an instrument that can be adapted to accommodate a CD4 immunogold assay. This system has the potential for becoming a high throughput analyzer for approximately 100-150 hematology plus CD4 samples per day.

The PointCare lysing system (Erythrolyse/Stabilyse) has proven to be more effective in CD4 cluster presentation than the Drew lyse. The Drew lyse will remain onboard for the gold-free 5-part leukocyte differential. The Drew paddle mixers can be used to lyse samples for CD4 analysis with the Erythrolyse. Further optimization is to be done in the Excell 22 mixing chamber.

The Excell 22 optics has been modified to accommodate the CD4 immunogold assay. A new "Right-Angle Scatter" (RAS) detector has been added to the optical assembly for improved CD4 analysis over the Excell 22 "Super-Wide Angle" (SWA) Detector. A black matte finish has been applied to the interior of the optical assembly to reduce stray light. The Excell 22 does not currently have any integration on the detectors, but this may have to be implemented for enhanced CD4 cluster presentation.

Fluid delivery modules will have to be added to the Excell 22 to accommodate the addition reagents required for the CD4 immunogold assay. A gold reagent and accelerant delivery module as well as delivery for the Erythrolyse and Stabilyse will have to be implemented. There is an auto-sampler that PointCare would like to use for all systems being sold for CD4 analysis. This would allow the system to be operated for 30 samples without interruption.

Modifications to the Excell 22 analytical software will have to be made for CD4 cluster recognition as well as flagging criteria. The Excell 22 user interface will also have to be modified for CD4 analysis of patients and controls.

Some of the components of the Excell 22 are open and susceptible to dust and particulate collection. These components will have to be examined for the environment that PointCare plans to place these instruments. Internal control points for temperature, humidity, and door and cover sensors will also have to be addressed.

Confidential

PointCare Supp 05490

1. Purpose

   a. Drew Scientific currently sells an instrument by the name "Excell 22" that has the potential to utilize a CD4 gold assay. The purpose of this investigation is to examine the possibility of adapting the Excell 22 to analyze a CD4 gold assay and determine the necessary hardware modification to do so.

2. References and Attachments

   b. PointCare Lab Notebook PCT-1035, pages 1-2, 20-32

   c. PointCare Lab Notebook PCT-1040, pages 16-19

   d. Drew Scientific Visit Report 010506

   e. Drew Scientific Visit Report 021006

   f. Bikoue, A., et al. *Quantitative Analysis of Leukocyte Membrane Antigen Expression: Normal Adult Values*. Cytometry. Vol. 26: pages 137-147. 1996.

3. Test Results

   g. Description and Status of Testing:

| Task # | Test Task | Critical Element | Schedule | Responsibility |
|---|---|---|---|---|
| 1. | Decide between Drew RBC lysing reagent and PointCare RBC lysing reagent | Lysability and CD4 cluster separation | 2/10/06 | D. Barry |
| 2. | Evaluate Excell 22 paddle mixers | Lysability and CD4 cluster separation | 3/31/06 | D. Barry |
| 3. | Evaluate Excell 22 optics as platform for PointCare immunogold assay | CD4 cluster separation | 3/31/06 | D. Barry/ P. Hansen |
| 4. | Evaluate Excell 22 data handling electronics and sample handling electronics | Flexibility necessary for CD4 assay | 2/10/06 | D. Barry |
| 5. | Determine design options for immunogold dispensing | Small volume (~10 uL) fluid delivery | 3/31/06 | D. Barry |
| 6. | Determine gates and regions for analytical software development | New gates for CD4 lymphocytes | 3/31/06 | D. Barry |
| 7. | Evaluate Excell 22 user interface | CD4 analysis capability | 3/31/06 | D. Barry |

Confidential

| 8. | Determine dust-sensitive components of Excell 22 | Particulate interference | 2/10/06 | D. Barry |
| 9. | Determine compatibility of auto-sampler | Throughput expected, number of samples held, and sample volume delivered | 2/10/06 | D. Barry |
| 10. | Evaluate internal control points in Excell 22 | Complete hardware and assay control points | 3/31/06 | D. Barry |

    h. **Significant Test Results**

        i. Both the Drew five-part differential lysing reagent and the PointCare lysing reagent (Erythrolyse II) are acceptable for red cell lysis. The PointCare lysing reagent did however produce greater CD4 cluster separation than the Drew lyse (figure 1). Please see below a legend for Excell 22 parameter numbers:

| Parameter Number | Description | Angle |
| --- | --- | --- |
| 1 | Low Angle Scatter (LAS) | ~3° |
| 2 | Extinction (EXT) | 0° |
| 3 | Wide Angle Scatter (WAS) | ~8° |
| 4 | Super Wide Angle Scatter (SWA)/ Right Angle Scatter (RAS) | ~30° - 45° for SWA, 65° ~ 115° for RAS |

Confidential

PointCare Supp 05492



*Figure 1:* The plots above demonstrate that both the Drew lyse (left) and the PointCare lyse (right) can produce clean RBC lysis, but only the PointCare lyse presents a clear CD4 cluster.

ii.     The paddle mixer and mixing sequence that exists in the Excell 22 did not provide sufficient mixing to completely lyse the red cells and present CD4 cluster separation similar to off line vortex mixing. A breadboard of the paddle mixer with a stepper motor to control mix speeds and times was developed to evaluate if the paddle mixer could be used with a different sequence.

The vortex sequence of 3 seconds mix with blood, gold, and diluent, then add lyse and vortex for 8 seconds, then add quench and vortex for 10 seconds is considered to be the standard to compare to [PCT-1035: 1-2]. All vortexing is done at 1700 rpm. The standard volumes are 50 μL whole blood, 50 μL diluent (PBS with 0.1% polybrene), 20 μL gold, 300 μL Erythrolyse II, and 133 μL Stabilyse [PCT-1035: 1-2]. An example of this sequence using an AuRICA for the analysis portion can be seen in figure 2.

Confidential

PointCare Supp 05493



*Figure 2:* The plot above shows the Erythrolyse when vortexing is used to lyse the sample.

When the same sequence is used with the paddle mixer, a clean leukocyte differential can be seen when no gold or diluent are used (figure 3). When gold is added, the CD4 cluster is present, but there are some unlysed RBCs present (figure 3).

Confidential

PointCare Supp 05494





Confidential

PointCare Supp 05495



*Figure 3:* The left plot shows that when the paddle mixer is used with no gold or diluent, a clean WBC differential can be seen. The right plots shows that with the same sequence but with gold added, the CD4 cluster is present, but unlysed RBCs are present as well.

It is still possible to use the paddle mixer to obtain both an easily discernable CD4 cluster and a clean leukocyte differential. Some options for modification of the lyse sequence include lyse and quench volume adjustment, lysing time adjustment, and lyse mixing speed. Complete results from testing using these sequences can be found in notebook PCT1035: 20-32.

Confidential

PointCare Supp 05496



Confidential

PointCare Supp 05497



Confidential

PointCare Supp 05498



*Figure 4:* The left plot shows that when the lyse volume is increased from 300 to 400 μL, the RBCs are decreased. The center plot shows that when the mix speed is increased from 1700 to 3400 RPM, the RBCs disappear, but it looks like there may be some platelet aggregates or possibly agglutination of leukocyte fragments or protein. The right plot shows that when the lyse mix time is extended to 12 seconds, but the mix speed and volumes are the same, the RBCs tend to disappear.

Optimization of the paddle mixer should be done using the Drew Excell 22 mixing chamber. The geometry and material of the chamber is different than that of a 12mm polypropylene culture tube and the mixing may be slightly different. It may be necessary to modify the Excell 22 mixing chamber so that no reagent is lost through the bottom of the cuvette.

iii.     The existing optics in the Excell 22 had to be modified to accommodate the CD4 assay. The Excell 22 optics currently has a " super-wide angle" detector that has a mask to detect eosinophils at 30° to 45°

Confidential

PointCare Supp 05499

(figure 5). To be able to see the CD4+ cells separate from the CD4-, the mask had to be removed to allow an angle of 30° to ~90°.



*Figure 5:* The plot above shows PointCare lyse with Excell 22 optics as manufactured today with a mask on the super-wide angle detector.

In order to see an improved CD4 cluster presentation, the gain for the super-wide scatter detector was nearly doubled. This did improve the visibility of the CD4 cluster, but also added noise. The scatter gain was then brought down to about 1.5 times the original gain and similar results were seen with slightly less signal (figure 6).

Confidential

PointCare Supp 05500



*Figure 6:* The left plot shows the mask removed and the gain doubled on the super-wide angle detector. The right plot shows a gain of 1.5 times the original. In both cases, an increased noise is seen.

The Excell 22 laser normally runs at about 2 mW. When the laser power was increased from approximately 3 mW to 4 mW (1.9V), cluster definition was improved without a significant increase in noise (figure 7). It may be necessary to use a higher powered laser to easily define a CD4 cluster. PointCare currently uses a laser running at 8 mW to visualize a CD4 cluster. The Drew system does have a PMT that may prevent the need for a higher powered laser. The beam profile in the Excell 22 optics is 200 μm wide by 20-25 μm tall. This appears to be acceptable for sizing the cells as well as producing enough signal for all detectors.

Confidential                                                    PointCare Supp 05501



*Figure 7:* The above plot shows an increased CD4 separation by increasing the laser power without increasing the gains.

The PMT for the super-wide angle has a light collection lens. We removed this lens to see if we could eliminate an extra alignment step in manufacturing, as well as the need for an extra part (figure 8). It does appear that even with the lens removed, a CD4 cluster can be seen. Just to note, a different gold lot was used that may account for differences in CD4 separation from previous analysis.

Confidential



*Figure 8:* The above plot shows the CD4 cluster without a light collection lens.

There was a modified optical assembly at Drew with the internal walls of the optics covered with a matte black finish to reduce stray light. This increased the signal of the clusters and should help us in locating the CD4 clusters (figure 9).





| Region # | # of Events | % of Gated Cells |
|---|---|---|
| None | 1410 | 100.0 |
| 1 | 1410 | 100.0 |
| 2 | 745 | 52.84 |
| 3 | 0 | 0.0 |

*Figure 9:* The above plot shows the CD4 cluster with a blackened interior and without a light collection lens.

In order to analyze both eosinophils (by use of the mask) and the CD4 cluster, an additional detector (PMT) was added to the other side of the Excell 22 optics. It is possible to identify eosinophils without the mask (figure 10), but the mask is an enhancement. The interior of the optical assembly does have a black finish to reduce stray light. The additional detector does have a light collection lens but there is no mask. The lens may not be necessary for the RAS detector, but more testing paying close attention to noise will have to be done. This detector is repositioned to be centered at 90° with a range at approximately 65° to 115°. A CD4 cluster could be easily seen using this optical assembly (figure 11) when the laser is

Confidential

PointCare Supp 05504

run at 1.5 mW. Although it is difficult to determine if increasing the laser power improved cluster definition in the case, previous testing has shown that this may be an improvement. It may be necessary to further increase the laser power for larger CD4 cluster separation.





*Figure 10:* The plot above shows that when the Drew 5-part differential lyse is used with a sample without gold, the eosinophils are easily distinguished, even without the mask.



*Figure 11:* The left plot shows that when using the additional right-angle scatter (RAS) detector without a mask, a CD4 cluster can be seen. The right plot shows an increased laser power from 1.5 to 2 mW.

The current PointCare electro-optics design on the AuRICA System uses a higher power (8mW) laser and has analog integration on the RAS preamp. A slight improvement to the CD4 cluster presentation can be seen with higher laser power, but the majority of the enhancement is done by the integration (figure 12). For this reason, it may be necessary to add integration to the Drew optics for optimal cluster presentation.

Confidential



Confidential

PointCare Supp 05507

 

Confidential

PointCare Supp 05508



*Figure 12:* The three plots above are examples of a manual preparation of the Erythrolyse/Stabilyse system. The left and center plot is a sample analyzed with the PointCare optics and the right is using the Drew optics. The center plot demonstrates the increased cluster presentation when using integration. For this reason, it may be necessary to add integration or increase laser power on the Drew system for increased signal.

Additional information including testing procedures and results can be found in *Drew Scientific Visit Report 010506, Drew Scientific Visit Report 021006,* and *PCT 1040, pages 16-19.*

iv.    The Excell 22 is currently going through a revision to replace obsolete electronics that may have been a concern to PointCare for future manufacturability.

The need to add the PointCare lyse reagents and gold delivery module present the need for I/O ports in the Excell 22. These ports are available for implementation of the CD4 assay fluid handling.

There is a new power supply design that will meet the PointCare business and marketing needs. A power budget of the Excell 22 is acceptable so that in case of a power failure, a sample may be completed and the system may

Confidential

safely be shutdown with the presence of an Uninterruptible Power Supply (UPS). The possible use of an automobile battery pair for daily operation is still to be determined.

The data collection electronics only have peak detection (no integral channel). There is a benefit to adding integration due to increased CD4 cluster presentation. This will have to be explored further.

An onboard processor and touch screen monitor would be desirable for a future revision, but an external touch screen should be acceptable at this time.

v.      The immunogold dispensing does not have to be done at a high precision (only ~10%). Syringes for immunogold and accelerant will have to be added to the Excell 22 for CD4 analysis. Because of the small volumes used, it may be necessary to add a pipetting system for the gold and accelerant reagents. The pipetting mechanism would also be necessary for the dried gold reconstitution. Attention to fluid line lengths and internal diameters are needed to ensure minimal loss of gold reagent to waste. In-line mixing may be needed for the blood, gold, and accelerant mixture.

A temperature control module for the bulk gold reagent will need to be added to the Excell 22. The bulk reagent temperature specifications have not yet been determined, but it is expected to be 2-25° C.

vi.     The gates and regions for analytical software have been established for CD4 analysis. The lymphocyte gate can be placed in the low angle vs. wide angle scatter parameters. After gating on lymphocytes, the CD4 cluster can be seen using extinction vs. a modified super-wide angle (right-angle scatter). Because analysis will be dual platform, a conservative (small CV) gate can be chosen for purity of lymphocytes to obtain a CD4%. This can then be applied to the lymph count obtained by either the impedance channel or the gold-free lymph count from the cytometer.

vii.    The Excell 22 user interface (UI) will have to be modified to accommodate a CD4 testing option, as well as a hematology only test. The UI will also need to be modified for CD4 and external controls.

viii.   Currently, the Excell 22 has open cuvettes that may allow dust to enter the mixing chamber. A cover will have to be developed to prevent contamination to mixing chambers.

ix.     The auto-sampler in existence for the Excell 22 can operate uninterruptible for 30 samples at a time. This is an expected time of 90 minutes of automated operation for a CD4 test. There is a barcode reader for positive sample identification. No testing has been done, but modification for a CD4 assay appears favorable.

x.      Internal control points may have to be implemented. Currently, door

Confidential                                                      PointCare Supp 05510

and cover sensors, reagent level sensing, database verification, and volume check (auto-sampler only) exist, but some anticipated hardware controls for temperature and humidity are to be introduced later. There are existing flags for hematology parameters but new flagging criteria and control points for CD4 analysis will have to be included as well.

i.   Other Test Results

n/a

4.   Discussion

j.   The integration may be necessary to overcome differences in CD4 cluster presentation. Patient to patient variability can be as much as 30% due to number of CD4 antigen sites. A study done on normal patients by Bikoue et al. found that the average number of CD4 antigen sites on a T-Lymphocyte is 47,000 ± 14,000 (±30%). The difference in number of CD4 antigen sites could present differences in CD4 cluster presentation. A patient with a low number of antigen sites could have large overlap between CD4- and CD4+ which would be difficult to resolve.

The integration also would decrease noise on the RAS channel. The CD4 absolute count is less than 50 counts/μL in many patients who are in late stage AIDS. This is in the range of noise on the RAS detector when using peak detection only. By adding integration, the low CD4 counts should be easier to detect.

5.   Conclusions

k.   The Excell 22 system can be modified to accommodate a CD4 immunogold assay. The Excell 22 can be adapted to meet the needs of a developing world market for high volume CD4 analysis.

Confidential                                         PointCare Supp 05511

6. Recommendations

l. The Erythrolyse II/Stabilyse lysing system should be used to obtain a CD4 cluster on the Excell 22. The Erythrolyse II produced a larger separation between the CD4- and CD4+ clusters than the Drew lyse.

m. The mixing sequence with the Drew Excell 22 paddle mixer needs to be optimized for the mixing chamber to be used. This can be developed using the mixer breadboard and an AuRICA instrument and compared to vortexing as a standard.

n. The Excell 22 optics can be used for the CD4 immunogold assay with the following modifications:

   i. An additional PMT now should be placed on the opposite side of the " super-wide angle" detector to act as a "right-angle scatter" detector. There should be no mask on this side and testing will need to be done to determine the need for a light collection lens.

   ii. The interior of the optical assembly should have a black finish.

   iii. A power increase or change to the current Excell 22 laser may be necessary. This should be pursued as part of assay and system optimization when rapid sample delivery is available. Options for integration on the RAS detector will also have to be examined. The beam size appears to be appropriate for CD4 analysis.

o. Create new module for handling PointCare lyse reagents and gold delivery module. Data handling for the additional detector must be addressed as well.

p. A bulk gold reagent must be developed for this system. Number of uses, reagent drying method, reconstitution method, and temperature control must be developed at PointCare.

q. Gating strategies for the CD4 cluster need to be developed for the Excell 22. Only a CD4% will be necessary for this part of the analysis. There currently is no integration for scatter parameters in the Excell 22. This will create more globular cell clusters (CD4- and CD4+) and may be more easily analyzable by histogram analysis methods.

r. Modifications to the Drew UI must be done to accommodate CD4 whole bloods and controls.

s. Dust covers for open cuvettes should be designed to prevent particulate interference.

t. The auto-sampler sequence will have to be modified to allow sampling for CD4 analysis.

u. Internal control points for hardware and flagging criteria for CD4 analysis must be

Confidential

implemented.

Dear Roger,

Our meetings here with Rich, Harry, and Frank really moved right along, and I think everyone is on the same page.

I have attached Don Barry's report regarding the system work that you, Romiya, and he did in Dallas. I think that there is one very important new conclusion which you can read on Page 14 and 16. I can summarize it here:

Make no change in laser power from the current Excell 22 configuration. The advantage is of course that no current hematology analysis will need to be changed in the new system. However, even though with the current laser power there are two clusters, there really is insufficient CD4 cluster separation. If, however one was to add an integrator to the new PMT electronics, the cluster separation should be fine.

Here is why we say the cluster separation is "insufficient". The problem with CD4 analysis is that there is a 30% CV in the mean number of CD4 receptors on lymphocytes from patient to patient. It has nothing to do with HIV or the stage of the disease. This means that the CD4 positive cluster position on the right angle scatter axis moves plus and minus about 50% if you take into account extreme cases. For this reason, you need a pretty big valley between populations when you are looking at the "average" patient in order to deal with the extreme low antigen density patients.

If you look at Don's dot plots on page 14, you will see the following illustration: The left-hand plot is the PointCare optics and peak detection for the signals. The right-hand plot is the Drew (new) optics and also peak detection for the signals. The plots are similar inasmuch as there is not a wide valley between the two clusters. The middle plot is the same sample and same run as the left-hand plot with PointCare optics, but analyzed through an integrator (we get both peak and integral outputs on PointCare). You can see the dramatic improvement in the size of the valley with the integrator.

Don and I propose that we include an integrator on the new PMT output. We have had a lot of experience with flow cytometry integrators, and in fact we have an excellent contractor near here that builds them for us. I am sure that he could design and build the appropriate board for you very quickly.

Let either Don or me know if there are any changes or additions that you would like to make to the report.

Thanks, and we are looking forward to seeing you in Boston.

Confidential                                      PointCare Supp 05513

Peter

Confidential                                        PointCare Supp 05514

# EXHIBIT 3

Page 1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   ----------------------------------------X

    DREW SCIENTIFIC, INC.,

4

                        Plaintiff,

5

                -against-        Case No. 08 CV 1490-AKH

6

    POINTCARE TECHNOLOGIES, INC.,

7

                        Defendants.

8   ----------------------------------------X

9

10

11          DEPOSITION OF RICHARD J. DePIANO

12                New York, New York

13              Wednesday, April 2, 2008

14

15

16      *CONFIDENTIAL PORTIONS - ATTORNEYS' EYES ONLY*

17                  PAGES 89-91

18

19  Reported by:

20  Angela M. Shaw-Crockett, CSR, RPR

21  Job No. 15877

22

23

24

25

Page 114

R. DePIANO - 4/2/08
1
2  was the possibility that was under discussion?
3      A.  They were going to bring a consumable
4  which would be available for us to market in the US
5  and other places.
6      Q.  Were there other parts of the deal under
7  discussion when you learned about it?
8      A.  Yes.  That we would modify, with their
9  help, our 2280 existing platform machine.
10     Q.  When you learned about this possible
11  collaboration, were there any other parts of the
12  transaction, to your knowledge?
13     A.  Other parts?
14     Q.  Yes.
15     A.  Yes.
16     Q.  Okay.  I'm sort of saying early on when
17  you first learned that there's a discussion between
18  Drew and PointCare, you've described a couple
19  components of the discussion.
20         Are there other components of the
21  discussion early on, to your memory?
22     A.  Most of the discussions between PointCare
23  and Drew were handled directly by Harry Rimmer, and
24  he would apprise me of what was going on.
25     Q.  Was there anyone else on behalf of Drew or

Page 115

R. DePIANO - 4/2/08
1
2  Escalon who was part of a negotiation team for
3  this -- relative to PointCare along with Mr. Rimmer?
4      A.  Well, at one point I was introduced to the
5  process.  The negotiations -- I'm not sure who else
6  participated with Harry in negotiations, but there
7  was a Ken Pina, an attorney, who was working for us
8  who assisted Harry in the actual creation of the
9  documents.
10     Q.  Do you recall that an agreement was signed
11  in approximately June of 2006?
12     A.  Oh, yes.
13     Q.  And prior to that signing of the contract,
14  what was your personal involvement either with the
15  negotiations or behind the scenes or in any other
16  respect?
17     A.  I was very critical of the prospect on the
18  basis that the focus at the time of our business
19  plan was to continue along the path of improving the
20  existing products.  And this would have created a
21  reallocation of resources, and I wanted to explore
22  more of what the impact would be on our business.
23     Q.  That was your position prior to an
24  agreement being entered?
25     A.  Yes.  During this five, six, whatever

Page 116

R. DePIANO - 4/2/08
1
2  number of months it took to negotiate the contract.
3      Q.  And Mr. Rimmer was Drew's primary contact
4  with PointCare for contract negotiations?
5      A.  Yes.
6      Q.  And Mr. Rimmer kept you apprised of the
7  discussions?
8      A.  Yes.
9      Q.  And you gave him feedback along the lines
10  of what you've just told us?
11     A.  Uh-huh.  Yes.
12         MR. COSTANTINI:  She can't do "uh-huh."
13  BY MR. CAPLAN:
14     Q.  So you expressed the view to Mr. Rimmer
15  that you were very critical of the prospect of a new
16  arrangement with PointCare because the focus of
17  Drew's business plan at the time was to continue on
18  the path of improving existing products.
19         What did you say to him about that?
20     A.  Well, I was -- first of all, we were
21  approached by PointCare, who indicated -- and I was
22  part of that discussion after it was started; I
23  don't remember the exact dates -- that our machine
24  was indicative of a platform that could be modified
25  to take their specific reagent, and they were very

Page 117

R. DePIANO - 4/2/08
1
2  much interested in getting a machine to actually
3  provide the platform for the reagent or the
4  proprietary -- quote, proprietary technology that
5  they had developed.
6          And I was extremely skeptical, because I
7  had asked our people whether we had knowledge --
8  enough knowledge to actually handle the project
9  ourselves and was made aware of the fact we had
10  never worked with gold or did anything like the CD4
11  type of reagent.
12         So my concern was, you know, how would we
13  be able to get this accomplished.
14         And I was reassured that -- after the due
15  diligence was done on the fact that our platform was
16  capable of being adapted or appeared to be capable
17  of being adapted, that the expertise lied at
18  PointCare to assist in that development.
19     Q.  You understood that the business
20  proposition under discussion was a possible
21  arrangement between PointCare and Drew where
22  PointCare brought to the table its proprietary
23  reagent, and the notion was that a preexisting Drew
24  platform could be modified to work with the reagent?
25     A.  Correct.

Page 118

R. DePIANO - 4/2/08

Q. And when that business proposition was brought to you, you were skeptical?

A. I wanted to know what Drew's capability was to get that project complete. And then I was told that since PointCare had already had one system or machine in the marketplace, even though they weren't happy with the machine, that they were able to get a machine to work and do the reagent -- whatever the reagent was to do -- and therefore they would be the ones helping us convert our platform and, you know, change the machine sufficiently to be able to do the CD4, which we wouldn't do now. Our current machine, you can't just take the reagent and get a result.

And I only remember some conversations very early on about the fact that a mixer -- and don't ask me to get technical, but there was a mixer, some kind of machine in the machine, and it was not robust enough to handle the CD4 reagent, and that that had to be modified, but wasn't a big deal, and these other things had to be changed, and that was not a big deal. And I was led to believe, as well as I think some of our people, that PointCare had the expertise to assist us and guide us in those

Page 119

R. DePIANO - 4/2/08

changes. And with that, I agreed to go make the investment.

Q. If I could just go back over some of the information you provided.

You've told us that you were concerned about Drew's ability to modify its platform to work with PointCare's assay, and you've mentioned that Drew's folks had never worked with gold or anything like CD4 reagents.

And I take it that you're saying that because you understood that PointCare's proprietary assay involved gold and involved CD4 reagents, correct?

A. Right.

Q. So, in other words, you had some concerns about Drew's capabilities because they had never modified a platform to work with a reagent like the proprietary reagent PointCare was bringing to the table.

A. Yes.

Q. Were there any other reasons that you had concerns about Drew's capability to modify its platform to work with the PointCare assay?

A. Costs.

Page 120

R. DePIANO - 4/2/08

Q. How so?

A. Well, it wasn't one of those dollars I intended to expend back before I made the acquisition, and now there's going to be a commitment of resources, and those resources translate into money.

Q. And money was somewhat scarce at the time?

A. It was not scarce, but there was better applications. You know, this was not part of any program. We were approached by PointCare. We did not approach PointCare. Unlike C2, where we found C2 and we approached them to do something, PointCare approached us, and they gave us comfort that this was achievable.

Q. When you were concerned about Drew's ability to modify its platform to work with PointCare's assay, was your concern at all based upon your knowledge of the competence and skillsets and so forth, of the folks in Drew's development and R&D department?

A. No. No. That was not the concern.

Q. At the time, what was your evaluation of the capabilities of Drew's R&D department to either bring a new product to market or to modify an

Page 121

R. DePIANO - 4/2/08

existing product?

A. My opinion -- I'm not a technocrat, so I can't really tell you what their credentials translate into, but I can tell you that when Peter finished his analysis of our machine, he was quite impressed with the capabilities of the engineering group in Dallas who had designed and created the 2280.

And I would say, since he has all the credentials in that area and he's purported the expert, he should know more about engineering skillsets than I do. So I relied on that one aspect of it.

MR. COSTANTINI: Just for the record, "Peter" is Peter Hansen?

THE WITNESS: Peter Hansen. I'm sorry.

BY MR. CAPLAN:

Q. That wasn't quite my question.

My question was -- well, let me re-put a question.

At the time that the PointCare opportunity came to your attention, what was your evaluation of the capabilities of Drew's R&D department to modify an existing instrument for a new application?

Page 122

```
 1          R. DePIANO - 4/2/08
 2       MR. COSTANTINI:  You mean before Peter
 3   opened his mouth, what he thought.
 4   BY MR. CAPLAN:
 5       Q.  Did you understand my question, sir?
 6       A.  Yes.
 7          My impression was that they were capable
 8   of doing the work that they had been doing up to
 9   that point in time, which was on hematology
10   equipment that was in our basic product line.
11          This was moving us into another product
12   line, as I was told, doing something we had never
13   done before.  So the skillsets that existed in my
14   opinion were very good for what they were doing.
15   This is something new.  I had no way of evaluating
16   whether or not their skillsets were adequate to take
17   on a new project.
18       Q.  And you understood that the opportunity on
19   the table was for Drew to modify its existing 2280
20   platform to accommodate PointCare's proprietary
21   assay?
22       A.  Yes.
23       Q.  And when you describe it as a proprietary
24   assay, what do you mean by that?
25       A.  I was led to believe that the CD4 assay,
```

Page 123

```
 1          R. DePIANO - 4/2/08
 2   which was their -- or Peter's and Petra's; I'm not
 3   sure which one developed it -- but it was -- Peter
 4   was, you know, an intellectual property, capably
 5   patented and would not be available to the rest of
 6   the market -- competitive marketplace.
 7          So when I was first introduced to the
 8   concept, we have an opportunity to be one of the
 9   only other people besides PointCare that has this
10   particular assay and would give us a competitive
11   position in the marketplace, because other than
12   PointCare, nobody else would have access to that
13   product; and we would have a competitive advantage
14   in the marketplace against competitors that we
15   viewed in hematology.
16       Q.  And you had that understanding that
17   PointCare's assay was proprietary when Drew entered
18   its agreement with PointCare, correct?
19       A.  Yes.  I thought it was patentable at that
20   point in time and was unique, relying again on the
21   expertise of Peter and his credentials that this was
22   the case.  Otherwise, for a me-too product, if
23   anybody else can make the same thing, it would have
24   definitely been totally unattractive and I would
25   never have went forward with the project if I
```

Page 124

```
 1          R. DePIANO - 4/2/08
 2   thought that was the case.
 3       Q.  Was it important and valuable to you that
 4   PointCare's assay was proprietary?
 5       A.  Absolutely.  That was the one of the key
 6   factors for us going into this transaction.
 7       Q.  And did you or your people do any due
 8   diligence on that fact prior to entering this
 9   agreement?
10       A.  I did not.  I believe Harry did talk --
11   and I think there is a patent pending or filed or
12   something like that, but I don't think it was issued
13   at the time.
14       Q.  And did Mr. Rimmer report back you to the
15   results of his due diligence regarding the
16   proprietary nature of PointCare's assay?
17       A.  Yes.  He believed that based on people he
18   spoke to, and Peter -- I don't know who else he
19   spoke to -- that, yes, this was, you know, actually
20   going to be out of the general public's domain and
21   very limited.
22       Q.  And did you understand once Drew entered
23   this agreement with PointCare that the assay
24   remained PointCare's proprietary property?
25       A.  Yes.
```

Page 125

```
 1          R. DePIANO - 4/2/08
 2       Q.  The time frame of my next question starts
 3   from when PointCare entered its contract with Drew,
 4   June of 2006, until the time that Drew filed this
 5   lawsuit.
 6          So from the time that the contract was
 7   signed until this lawsuit got started, was it your
 8   understanding throughout that time period that
 9   PointCare's assay was proprietary to it?
10       A.  Yes.
11       Q.  Has that understanding changed since then?
12       A.  Yes.
13       Q.  How so?
14       A.  Through the process of this discovery, if
15   that's the right term, or litigation, I was advised
16   that the patent, which we didn't know, was denied.
17       Q.  Who told you that?
18       A.  The host of people that have been reading
19   the documents.  It could have been one of four
20   people.  I'm not sure exactly which comment was
21   made.  It could have been Frank Matuszak and/or one
22   of my attorneys that said in the documents supplied
23   there was an indication that the technology was that
24   prior art existed and therefore it was questionable;
25   and that ultimately it did get rejected.
```

32

Page 126

R. DePIANO - 4/2/08

Q. Do you have expertise in the patent law area, sir?

A. I don't have expertise in anything.

Q. Do you have an understanding whether the alleged denial of PointCare's patent application on its assay -- whether that's final or subject to further review?

A. I don't know.

Q. So at least for the entire time of the business relationship between Drew and PointCare, at least until the filing of the lawsuit, you understood as CEO of Escalon that Drew's -- strike that -- that PointCare's assay was proprietary to it, correct?

A. Yes. That was my understanding.

Q. And, as such, it would have violated PointCare's proprietary rights in its assay for someone to try to copy it, for example, or reverse engineering.

Do you agree with that?

A. Yes.

Q. Prior to the contract being signed, do you recall personally attending any meetings with any representatives of PointCare?

Page 127

R. DePIANO - 4/2/08

A. The dates escape me, but I know we had dinner in Marlboro. I don't know if it was before the signing or -- it was early on, but I don't remember the exact timing. In Marlboro we had dinner. I was not in attendance when -- I think it was just Peter or Peter and one of his co-workers went to Dallas to look at the machine, and that was before the contract was signed.

I'm sure there was a meeting or two. I just don't remember the dates.

Q. Just more broadly, do you remember having any direct communications, either in person or on the phone or e-mail, or however, with Peter, Petra or any of the folks from PointCare before signing a contract?

A. I remember telephone conversations with Harry and Petra where I was in the room and we were going -- they were negotiating different aspects.

Q. Do you remember any substance of that conversation?

A. It was around pricing. Mostly around pricing, as I recall. There was a lot of issues around the reagent pricing and structure of the deal.

Page 128

R. DePIANO - 4/2/08

Q. Do you remember anything else from that conversation?

A. From that particular conversation, no. That's that sticks out mostly in my mind.

Q. And, again, prior to the contract between the parties being signed, do you remember any other direct communications between yourself, Peter, Petra or anyone else from PointCare in person, on the phone, however?

A. There probably was discussions. I don't know if they were all in person or by phone.

Q. As we sit here today, do you remember the substance of any communications between yourself and any folks at PointCare prior to signing this contract?

A. Only the one discussion that's centered on the fact that -- and I think it was with Peter and Petra together that we talked about their ability to fix any problems we would have in getting our machine converted.

Q. And what was said about that?

A. That Peter could solve those problems; that's what Peter did; and Peter was very good at that.

Page 129

R. DePIANO - 4/2/08

Q. To your understanding, whose responsibility was it under this contract to modify Drew's existing platform to accommodate PointCare's assay?

A. Under the contract, as it was written, Drew bore the expense and the responsibility for modifying the 2280.

Q. To accommodate PointCare's assay?

A. Yes.

Q. And going into the contract, you knew that Peter Hansen and perhaps other colleagues at PointCare had the skills to help Drew in that regard, correct?

A. Yes.

Q. But ultimately you understood under the contract that the responsibility fell on Drew to modify its platform to work with PointCare's assay, correct?

A. Yes. And at the time, the responsibility was fixed because of the costs associated with it. We should bear that.

Q. So Drew bore responsibility for the costs of accommodating its platform to PointCare's assay, correct?

Page 130

R. DePIANO - 4/2/08

2  A.  Yes.

3  Q.  And you understood under the contract that
4  Drew also bore the technical and manufacturing and
5  R&D responsibilities to modify its platform to
6  accommodate PointCare's assay, correct?

7      MR. COSTANTINI:  I'm going to object.
8  We've gone several times, and he's told you
9  that it's unacting [sic] under PointCare's
10  direction.  How many times do you want to go
11  over the same --

12      MR. CAPLAN:  Tony, that's a talking
13  objection, coaching the witness, and I would
14  ask you to state --

15      MR. COSTANTINI:  That's the fourth time by
16  my count that you've gone down this same road.

17      MR. CAPLAN:  Tony, when you don't like the
18  answer your client is giving, you give
19  speeches, and I would appreciate it if you
20  would refrain from that you.  You know that
21  that's not permitted under the rules.  It's a
22  different question.  I'd like an answer,
23  please.

24      MR. COSTANTINI:  It's the same question.
25  And the next time you go down this road, I'll

Page 131

R. DePIANO - 4/2/08

2  prove it to you by shutting it off.  And then
3  you can complain to the judge about it.  Okay.
4  Do it one more time --

5      MR. CAPLAN:  Could I have that question
6  read back that was interrupted by
7  Mr. Costantini, please.

8      (The last question was read back by the
9  Reporter.)

10  A.  My understanding didn't go to that level.
11  My understanding, maybe overly simplified, was that
12  as the CEO of the company, I made a decision based
13  on certain facts.  The facts were that, A, I didn't
14  want initially to get involved in a transaction
15  which we didn't really have any experience or
16  know-how to deal with.  A.

17      B, I was assured that our equipment could
18  be easily modified.  That "easily modified" came
19  from due diligence done by Peter and his colleague.
20  I'm not sure who the person was.  And I was given
21  assurances that this could be done quickly, and they
22  had the knowledge and know-how to guide Drew through
23  these machinations that would require the changes.
24  They knew -- I don't know whether they're called
25  optical heads or whatever they're called in there,

Page 132

R. DePIANO - 4/2/08

2  that system, plus the mixer, I remember that
3  discussion, they could all be changed out.  Some of
4  the stuff that they had the knowledge of, because
5  they already had a machine that worked in the
6  marketplace, but they weren't happy with either the
7  vendor or the machine at the time.

8      So I would have never gone down this path,
9  because we would have never gotten there on our own.
10  And, literally, we're dependent upon PointCare and
11  their expertise to guide the development process.
12  And that development process and cooperation did
13  exist in the beginning.  And there were many
14  problems encountered that, in our opinion, PointCare
15  should have known about before they occurred,
16  because we were not familiar with that reagent, and
17  they were.  And they were actually using it for a
18  while with install-based machines.  I believe over
19  60 machines were installed or more than that were
20  installed in the marketplace by PointCare, utilizing
21  that reagent.  And they had sufficient knowledge.
22  And to find out some of the issues that we found out
23  after the fact just leaves me very suspect as to
24  what level they did have.

25  Q.  Out of fairness, that was a long answer,

Page 133

R. DePIANO - 4/2/08

2  but I just want to focus on a couple of parts of it.

3      You testified -- part of your answer was
4  that PointCare had the knowledge and know-how to
5  guide Drew regarding the modification of its
6  platform, but that wasn't quite my question.

7      Understanding your position that PointCare
8  had the know-how to guide Drew, my question is, who
9  ultimately was responsible to modi- -- and putting
10  aside cost, because we've already covered cost, but
11  who ultimately was responsible in all other respects
12  to modify Drew's platform in order to accommodate
13  PointCare's assay?

14  A.  In my mind, we had the responsibility for
15  paying for those modifications using our expertise
16  in the machinery, but it was solely dependent upon
17  PointCare's representation to me that they would
18  know how to make this thing work.  They knew how to
19  work that project.

20      Other than that, that whatever the
21  contract says, I'm telling you my -- you know, what
22  I'm representing to you right now is the fact that
23  my understanding was we could never get this machine
24  to work without their direct input, and we took all
25  the appropriate steps to give them the latitude to

R. DePIANO - 4/2/08

1 do that.

2     **Q. So you expected a lot of help from**

3 **PointCare?**

4     A. Absolutely. We never would have went into

5 this, because it was totally out of -- foreign to

6 anything we had ever done before.

7     **Q. And understanding that you expected a lot**

8 **of help from PointCare, isn't it a fact that you**

9 **understood that ultimately Drew was responsible for**

10 **the successful modification of the platform to**

11 **accommodate the assay?**

12     A. I'd have to answer that no.

13     **Q. Why not?**

14     A. Because we couldn't do it. I knew we

15 couldn't do it the day when I went in there. And I

16 told you my objection for not getting involved in was

17 didn't have the expertise. So the responsibility

18 for having the knowledge was because it was

19 represented by PointCare that they had that

20 knowledge and could do it.

21     **Q. So it's your position that the day that**

22 **Drew signed this manufacturing, distribution and**

23 **co-marketing agreement with PointCare, Drew did not**

24 **have the technical skills on its own to modify its**

R. DePIANO - 4/2/08

1 **platform to accommodate PointCare's assay, correct?**

2     A. Correct. That was my understanding.

3     **Q. I know we've covered a lot of ground, but**

4 **let me just try to ask you a general question.**

5     **You've described to us PointCare's**

6 **representations about its capabilities to assist**

7 **PointCare.**

8     **My question to you is, who specifically at**

9 **PointCare made those representations to you?**

10     A. To assist PointCare? I don't --

11     MR. COSTANTINI: I think you got tangled

12 up in your question. If you want it read back.

13     MR. CAPLAN: It took me until 2:30 to get

14 tangled up. I'm having a good day.

15     (A discussion was held off the record.)

16     MR. COSTANTINI: You want her to read it

17 back?

18     MR. CAPLAN: No. Being told my question

19 was bad is bad enough. I don't need to hear it

20 again.

21 BY MR. CAPLAN:

22     **Q. Who at PointCare represented to Drew or**

23 **Escalon that PointCare had these various**

24 **capabilities to assist Drew in adopting the**

R. DePIANO - 4/2/08

1 **platform?**

2     A. Peter Hansen.

3     **Q. Did he say that to you personally?**

4     A. Yes.

5     **Q. Where and when?**

6     A. I don't remember where it was. It was

7 either -- one of the conversations we had during

8 this period of time.

9     You got to remember that PointCare

10 solicited us, and we had a basic machine that they

11 wanted modified. They had the reagent that was

12 supposedly their business premise. They wanted to

13 sell this reagent, and they needed another platform

14 other than the one they had, so they solicited us.

15     We didn't have any knowledge of CD4 in

16 terms of applying it in our business prior to

17 meeting PointCare. So everything we did to get

18 enticed into this arrangement was based on the

19 knowledge that they represented to us that they

20 possessed.

21     **Q. What exactly did Peter Hansen say to you,**

22 **as best as you can remember?**

23     A. Our platform was a well-constructed

24 machine. And it is very capable with modifications

R. DePIANO - 4/2/08

1 to handle what they wanted into a fast throughput or a

2 more speedy throughput of their product versus a

3 slower one.

4     I don't know exactly what that means,

5 but ...

6     And I remember the conversation dealt with

7 a mixer. I didn't even know we had a mixer in

8 there. I had no idea what the mixing was all about;

9 but mixing something, and it needed to be more

10 robust.

11     And they talked about the idea of a --

12 replacing some parts that would be more beneficial,

13 more efficient, or do things better. It had to do

14 with an optinet (phonetic) or a camera or something

15 like that.

16     And that was the conversation where they

17 assured me, yes, you guys know how to build them,

18 and you can build them after you got a platform that

19 we could start from, these modifications can be

20 done, and they were going to do all the assistance

21 needed to get that to work, and we needed their

22 chemistries and their software.

23     But, literally, Peter was going to have a

24 hands-on responsibility for doing that. Otherwise,

1    R. DePIANO - 4/2/08
2 I had no intention at that stage in the company to
3 divert the resources which we did have away from
4 projects that they were working on. Because this
5 was totally new. It was nothing we were -- on our
6 drawing board or that I even knew about was
7 something we wanted in the future. It was an
8 opportunity brought to us by PointCare. And based
9 on that, we decided to move forward.
10    **Q. When did Peter Hansen say that to you?**
11    A. I don't remember.
12    **Q. Before or after June of '06?**
13    A. I think it was before.
14        I wasn't willing to do this project unless
15 we had some comfort regarding our ability to
16 perform.
17    **Q. Do you have a clear memory that Peter**
18 **Hansen made these representations to you before**
19 **Mr. Rimmer signed the contract for Drew?**
20    A. I'm pretty sure he did.
21    **Q. Is that on the phone or in person?**
22    A. I don't remember.
23    **Q. Do you remember anything about the**
24 **conversation, the circumstances of the conversation?**
25    A. I just remember the mixer, because I

1    R. DePIANO - 4/2/08
2 didn't know we had a mixer.
3        It's the only word I understood in the
4 whole conversation.
5    **Q. I've had those conversations myself.**
6        **So it's your testimony that Peter Hansen**
7    **gave you a comfort that he and his people would**
8    **assist Drew to adopt their platform to accommodate**
9    **PointCare's assay, right?**
10    A. Yes.
11    **Q. Did Peter Hansen ever represent to you**
12 **that PointCare would be ultimately responsible to**
13 **modify Drew's platform to accommodate PointCare's**
14 **assay?**
15    A. Not to modify.
16    **Q. That was Drew's responsibility?**
17    A. To modify. He represented that he would
18 be able to guide our people through the process and
19 show them how to get it done. He had the knowledge.
20    **Q. So in a nutshell, you understood from**
21 **talking to Mr. Hansen that he and his people would**
22 **help Drew to modify the platform to accommodate the**
23 **assay and that Drew would be responsible to do that**
24 **work?**
25    A. To pay for it.

1    R. DePIANO - 4/2/08
2    MR. COSTANTINI: I think the word is
3 "guide." I think the wording in his testimony
4 was "guide," not "help."
5    MR. CAPLAN: Could I have the question
6 back, please.
7    (The last question was read back by the
8 Reporter.)
9    A. To actually physically do the work under
10 his guidance, and we would be responsible for paying
11 for it.
12    **Q. Did Peter Hansen or anyone else at**
13 **PointCare ever represent to you that PointCare would**
14 **be responsible to modify the platform to accommodate**
15 **the assay?**
16    A. No. PointCare never took that
17 responsibility to modify it. They took
18 responsibility for providing knowledge to modify it.
19    MR. COSTANTINI: Is this a logical break
20 time?
21    MR. CAPLAN: Read my body language.
22    (Recess at 2:31 p.m.)
23    (Deposition resumes at 2:51 p.m.)
24 BY MR. CAPLAN:
25    **Q. Prior to Drew signing the contract with**

1    **R. DePIANO - 4/2/08**
2 **PointCare, aside from speaking with Peter Hansen,**
3 **did you do anything to satisfy yourself that Drew**
4 **had the capabilities to monitor its platform to**
5 **accommodate PointCare's assay?**
6    MR. COSTANTINI: You mean "modify"? I
7 think you said "monitor."
8    THE WITNESS: Monitor the platform?
9 BY MR. CAPLAN:
10    **Q. I meant to say "modify."**
11    A. Modify the platform?
12    **Q. Why don't I start again, because we**
13 **probably lost the question.**
14        **Prior to signing the contract, did you do**
15 **anything other than talking to Peter Hansen to**
16 **satisfy yourself as the Escalon CEO that Drew had**
17 **the capabilities to modify its existing 2280**
18 **platform to accommodate PointCare's assay?**
19    A. I personally did not do anything.
20    **Q. Did you ask any of your subordinates to do**
21 **anything to satisfy yourself of Drew's capabilities**
22 **to modify its platform to accommodate PointCare's**
23 **assay?**
24    A. I was given assurances by Harry that --
25 Harry Rimmer, who was then president of Drew, that

Page 142

```
1              R. DePIANO - 4/2/08
2   with the direction and expertise of PointCare, it
3   could be done.
4       Q.  And you relied upon Mr. Rimmer in that
5   regard?
6       A.  I relied on Mr. Rimmer in that regard.
7       Q.  Aside from that assurance from Mr. Rimmer
8   and your conversation with Peter Hansen, did anyone
9   else provide you with information that assisted you
10  to get a comfort level that Drew had the
11  capabilities to modify its platform to accommodate
12  PointCare's assay?
13      A.  Petra may have also given me some comfort
14  in various conversations that that could be
15  accomplished.
16      Q.  Well, when you say she may have, do you
17  have any specific memory as we sit here today that
18  Petra gave you any such assurances?
19      A.  Date, time, place, no.
20          MR. COSTANTINI:  I think he's asking you
21      if you have any recollection at all, and
22      then --
23  BY MR. CAPLAN:
24      Q.  As we sit here today, do you have any
25  recollection of Petra -- that Petra actually assured
```

Page 143

```
1              R. DePIANO - 4/2/08
2   you -- provided you with any assurances about
3   PointCare assisting Drew in modifying the platform
4   before the contract was signed?
5       A.  I had many conversations with Petra before
6   and after the contract was signed.  I don't remember
7   when those conversations would have run to their
8   expertise in providing solutions to the problems
9   that were presented.
10      Q.  Fair enough.
11          So those conversations with Petra might
12  have happened before or after the contract was
13  signed; you can't remember?
14      A.  I can't remember.
15      Q.  And prior to the contract being signed,
16  did you ever have any discussions with any folks at
17  PointCare about the possibility that you might
18  invest money into PointCare?
19          MR. COSTANTINI:  He personally?
20          MR. CAPLAN:  Correct.
21      A.  Yes.
22      Q.  And what was that discussion or
23  discussions?
24      A.  That was a discussion with Petra.  Peter
25  didn't talk money.  He doesn't like to talk money.
```

Page 144

```
1              R. DePIANO - 4/2/08
2   Petra and I had a conversation, and the subject of
3   investing came up, and I said that myself, as long
4   as some of my business friends were investors in
5   different transactions, that I also had a small
6   venture fund out in Vancouver, and we did certain
7   investing.  And I said, you know, I might be
8   interested if you do another round.  And she was
9   thinking about doing another round I think at the
10  time.
11      Q.  Did you receive a business plan from
12  PointCare in connection with that possible
13  investment?
14      A.  I believe I received a dated business
15  plan.  It wasn't one put together just for that
16  purpose.  It was one that was used I believe in a
17  former raise.  But I'm not a hundred percent sure of
18  the date on it.
19      Q.  And when, as best can you recall, did you
20  have this discussion or discussions with Petra about
21  possibly making a personal investment into
22  PointCare?
23      A.  Again, I'm not sure whether it was before
24  or after the contract was signed.  On a personal
25  level.
```

Page 145

```
1              R. DePIANO - 4/2/08
2       Q.  And what happened about that?
3       A.  Never happened.
4       Q.  Any reason why not?
5       A.  No.  No particular reason.
6       Q.  Did you review the contract before it was
7   signed by Harry Rimmer?
8           MR. COSTANTINI:  What do you mean by
9       "review"?  Did he personally read it or did
10      someone summarize it?  "Review" can mean
11      different things to different people.
12          MR. CAPLAN:  Right.
13  BY MR. CAPLAN:
14      Q.  Did you read the contract before Harry
15  Rimmer signed it?
16      A.  I was given sections of the contract, but
17  I didn't read the entire contract at the time it was
18  executed.  I was involved prior to the execution in
19  different pieces and different issues that were
20  being debated between I believe it was Petra and
21  Harry.  I don't know what involvement Peter Hansen
22  may have had in the contract or not.  I don't think
23  so.
24      Q.  Mr. Rimmer gave you reports about his
25  negotiating contract terms with Petra?
```

# EXHIBIT 4

**From:** Harry Rimmer
**Sent:** 6/2/2006 8:40:20 PM
**To:** Petra Krauledat
**CC:** Ken Pina
**Subject:** Agreement is on its way

Petra, four copies of the agreement are being Fedexed to you. I have signed it and initialed each page. I have also had each member of my team sign off on their commitments to the agreement. Unfortunately both Andrew Kenney and Gary Young have been on vacation this week so I was unable to get a final OK from them on the timeline page. So this is the one page I did not initial. Don't be concerned I realize that time is your most important criteria, I will be with Andrew on Monday.
We are in the process of recruiting additional resources to meet the necessary timetable.
I will be in WI with the rest of my team from Monday to Wednesday. My cell phone will be off most of the time, but I will be picking up messages, and will have access to my email.
I should also prepare a press release, but I'm still preparing my budget for next year.
I'll be in touch next week
Regards
Harry

HIGHLY CONFIDENTIAL

# EXHIBIT 5

**From:** Eric Newman
**Sent:** 5/7/2007 10:10:26 PM
**To:** Terri L. Roseberry
**CC:** Petra Krauledat
**Subject:** C2 Agreement Exhibits

Terri,

Petra asked me to provide to you Exhibits A and C for the "Development and Supply Agreement" between C2 and PCT. Please let us know if you or Rich have any questions.

Best regards,

Eric


Eric J. Newman, CPA
Controller

PointCare Technologies, Inc.
181 Cedar Hill Street
Marlborough, MA 01752

Phone: (508) 281-6925, Ext. 25
Fax: (508) 281-6930

---

Upgrade Your Email - Click here!


Attachment: Exhibit A - Product Specifications.doc
Attachment: Exhibit C - Development Time Line.doc



PLAINTIFF'S
EXHIBIT
Krauledat 4
4/4/08

**PointCare** Technologies Inc.

**Page: 1 of 5**

## EXHIBIT A

## CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS

## PRODUCT SPECIFICATIONS

| CR/BR No. | Customer or Business Requirement | PR No. | Product Requirement | Requirement Importance | Management |
|---|---|---|---|---|---|
| CR-007-001 | Parameters reported: WBC, Lym, Lym %, Mono, Mono %, Neut, Neut %, Eo, Eo %, Hgb, CD4, CD4%. | PR-007-001 | Instrument capable of producing 4-pt WBC differential, plus hemoglobin, plus CD4 parameters | Mandatory | N.A. |
| CR-007-002 | CD4 lymphocyte reportable range from 50/uL to 6,000/uL. | PR-007-002 | Dynamic range of CD4 cell enumeration appropriate for pediatrics with precision at 200/uL < 10% CV. | Mandatory | PCTI |
| CR-007-003 | CD4% of total lymphocyte reportable range from 1% to 80%. | PR-007-003 | Large dynamic range of CD4 cell enumeration with precision at 15% < 10% CV | Mandatory | PCTI |
| CR-007-004 | Only CD4 lymphocytes reported | PR-007-004 | CD4 monocytes excluded from analysis | Mandatory | PCTI |
| CR-007-005 | WBC reportable range from 500/uL to 100,000/uL | PR-007-005 | Large dynamic range for WBC. Precise WBC count obtained by impedance at 6,000/uL < 2.5% CV (GOAL) | Mandatory | C2 |
| CR-007-006 | Lymphocyte reportable range from 1 to 95% | PR-007-006 | Large dynamic range for lymphocytes with precision at 15% < 5% CV | Mandatory | C2 |
| CR-007-007 | Monocyte reportable range from 0 to 80% | PR-007-007 | Large dynamic range for monocytes with precision at 7% < 10% CV | Mandatory | C2 |
| CR-007-008 | Neutrophil reportable range from 1 to 95% | PR-007-008 | Large dynamic range for neutrophils with precision at 50% < 4% CV | Mandatory | C2 |
| CR-007-009 | Eosinophil reportable range from 0.1 to 90% | PR-007-009 | Large dynamic range for eosinophils with precision at 5% < 10% CV | Mandatory | C2 |
| CR-007-010 | Hemoglobin reportable range from 0.5 g/dL to 24 g/dL | PR-007-010 | Large dynamic range for hemoglobin with precision at 12 g/dL < 1.5% CV | Mandatory | C2 |
| CR-007-011a | Blood samples for analysis may be up to 8 hours old for all parameters | PR-007-011a | 8 hour minimum age requirement | Mandatory | PCTI |

This document is confidential and the property of PointCare. It may not be reproduced in any form without the written consent of the owner. All copies shall be returned to PointCare upon request.

**PointCare**
Technologies Inc.

# CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS

Page: 2 of 5

| | | | | |
|---|---|---|---|---|
| CR-007-011b | Blood samples for analysis may be up to 32 hours old for CD4 and CD4%. | PR-007-011b | Sample age extension for CD4 and CD4% from 8 hour minimum age requirement | Desirable | PCTI |
| CR-007-012 | System warns user if results possibly compromised by aged sample. | PR-007-012 | Mitigation factors for sample age, such as data entry for draw time, flagging for scatter plots, and training | Mandatory | PCTI |
| CR-007-013 | System does not report results if compromised by aged sample. | PR-007-013 | Absolute internal control for sample age through dot plot flagging. Can be a post launch upgrade. | Desirable | PCTI |
| CR-007-014 | Daily throughput appropriate for Near Patient market | PR-007-014 | Minimum of 50 samples including controls in 7.5 hours | Mandatory | PCTI |
| CR-007-015 | Minimal cycle time to allow for reruns when necessary | PR-007-015 | <6 minute cycle time | Mandatory | PCTI |
| CR-007-016 | WBC differential not to be compromised by CD4 gold reagent | PR-007-016 | Two passes through optical analysis chamber—one pass to obtain WBC differential without immunogold another pass to obtain CD4% with immunogold. | Mandatory | PCTI |
| CR-007-017 | No handling of open blood tubes | PR-007-017 | Automated cap piercing blood sampling from manually introduced sample tubes (no autoloader) | Mandatory | C2 |
| CR-007-018 | Keypad with integrated computer operation | PR-007-018 | Keypad and integrated computer design | Mandatory | C2 |
| CR-007-019 | Use of instrument in outdoor setting | PR-007-019 | Screen readable in full sunlight | Desirable | C2 |
| CR-007-020 | Printable results | PR-007-020 | Printer to be specified by instrument manufacturer | Mandatory | C2 |
| CR-007-021 | Local languages available for each market | PR-007-021 | English, French, Portuguese, Spanish, Chinese, Thai, Vietnamese, and Russian screens. Can be post launch upgrade. | Desirable | C2 |
| CR-007-022 | Protected software for simple operation without tampering | PR-007-022 | Three levels of operation—service mode, supervisor mode, and limited operator mode | Mandatory | C2 |
| CR-007-023 | Limited data entry | PR-007-023 | RF ID or barcode sample and control entry | Mandatory | C2 |
| CR-007-024 | Reagent use and expiration tracking | PR-007-024 | RF ID or barcode for reagent use tracking | Mandatory | C2 |

This document is confidential and the property of PointCare. It may not be reproduced in any form without the written consent of the owner. All copies shall be returned to PointCare upon request.

**PointCare**
Technologies Inc.

| | CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS | | Page: 3 of 5 | |
|---|---|---|---|---|
| CR-007-025 | Minimal reagent consumption | PR-007-025 | Attention to small fluid volume usage | Desirable | C2 |
| CR-007-026 | Numerical data output with no visual interpretation | PR-007-026 | Automated cluster gating | Mandatory | PCTI |
| CR-007-027 | Automatic QC tracking of controls with control chart display | PR-007-027 | Levey-Jennings control plots generated and easily printable. Can be post launch upgrade. | Desirable | C2 |
| CR-007-028 | Data storage ≈ 100,000 patients | PR-007-028 | 1000 patient results available on instrument. Expandable data storage by optional external USB key and external computer. Can be post launch upgrade. | Desirable | C2 |
| CR-007-029 | Searchable patient history | PR-007-029 | User interface on external computer designed to facilitate easy patient management. Can be post launch upgrade. | Desirable | C2 |
| CR-007-030 | Easy daily startup and shutdown | PR-007-030 | Fully automated startup/shutdown <5 minutes each with no customer intervention | Mandatory | C2 |
| CR-007-031 | Assurance of gold reagent activity for every sample | PR-007-031 | Software driven internal control for gold reagent activity. | Desirable | PCTI |
| CR-007-032 | Indeterminate samples denoted by a general flag symbol | PR-007-032 | Strict flag criteria for automated software gating. Flag explanation available in administration and service modes. | Mandatory | PCTI |
| CR-007-033 | Instrument operation appropriate for all lab settings. | PR-007-033 | External temperature operating range 18-34°C (64-93°F). Relative humidity operating range 10% - 80% at 32°C, non-condensing. | Mandatory | C2 |
| CR-007-034 | Ability to operate in arid regions with airborne dust | PR-007-034 | Protected mixing chambers, optical assembly, and electronics | Mandatory | C2 |
| CR-007-035 | Tamper proof operation of instrument | PR-007-035 | Door and cover sensors to prevent operation when open | Mandatory | C2 |

This document is confidential and the property of PointCare. It may not be reproduced in any form without the written consent of the owner. All copies shall be returned to PointCare upon request.

## PointCare
Technologies Inc.

## CUSTOMER, BUSINESS AND PRODUCT
## REQUIREMENT SPECIFICATIONS

Page: 4 of 5

| | | | | |
|---|---|---|---|---|
| CR-007-036 | Multiple use gold reagent bottle | PR-007-036 | Lyophilized or desiccated bulk gold reagent bottle reconstituted by instrument. Manual reconstitution in a convenience package without skilled steps by customer. | Mandatory | PCTI |
| CR-007-037a | Shipping available to remote areas | PR-007-037a | Shipping crate designed to survive shock and vibration testing (ISTA Norm procedure 2A) | Mandatory | C2 |
| CR-007-037b | Container available for easy transport without service call. | PR-007-037b | Customer carrying case designed with weight < 50 lbs | Desirable | PCTI |
| CR-007-038 | Instrument can be moved by customer without service call. | PR-007-038 | Durable hardware capable of shock/vibration resistance. No optical/mechanical adjustment after transportation in approved container | Mandatory | C2 |
| CR-007-039 | Small footprint | PR-007-039 | Size < 35 cm x 25 cm x 34 cm | Desirable | C2 |
| CR-007-040 | Ability to participate in proficiency programs | PR-007-040 | Can be post launch upgrade. Requires collaboration with proficiency program managers as they have to make proficiency samples compatible with light scatter based system. | Mandatory | PCTI |
| CR-007-041 | Operation with all electrical sources | PR-007-041 | 90-250V, 47-63 Hz, all commonly used connectors available | Mandatory | C2 |
| CR-007-042 | Capability to operate from alternative energy sources (generator, solar power) | PR-007-042 | Line conditioning to be specified by instrument manufacturer. Can be post launch upgrade. | Desirable | PCTI |
| CR-007-043 | Battery backup available | PR-007-043 | UPS specified with the ability to finish cycle and shutdown completely. | Mandatory | PCTI |
| CR-007-044a | All preventative maintenance performed by customer | PR-007-044a | Basic preventative maintenance performed by customer | Mandatory | PCTI |
| CR-007-044b | All scheduled service performed by field service or installer | PR-007-044b | Manipulation of components for preventative maintenance and regular service done by field service or installer | Mandatory | PCTI |

This document is confidential and the property of PointCare. It may not be reproduced in any form without the written consent of the owner. All copies shall be returned to PointCare upon request.

This document is confidential and the property of PointCare. It may not be reproduced in any form without the written consent of the owner. All copies shall be returned to PointCare upon request.

## PointCare
Technologies Inc.

## CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS

Page: 5 of 5

| | | | | | |
|---|---|---|---|---|---|
| BR-007-001 | No calibration done by customer (except for HGB & WBC) | PR-007-045 | Calibration by factory with possible adjustment by installer | Mandatory | PCTI |
| BR-007-002 | Minimize lab space | PR-007-046 | Diluent, lyse, clean, gold, and accelerant reagents contained and handled on board | Desirable | PCTI |
| BR-007-003 | All reagents must have minimum 2 months room temperature (4-30°C) stability upon arrival | PR-007-047 | Minimum 4 months stability at room temperature | Mandatory | PCTI |
| BR-007-004 | Allow only PointCare reagents to be used | PR-007-048 | Barcode encryption to prevent counterfeit reagents | Mandatory | PCTI |
| BR-007-005 | Cyanide-free hemoglobin method | PR-007-049 | Hemoglobin determined by cyanide-free reagent | Mandatory | C2 |
| BR-007-006 | Troubleshooting done with minimal service visits | PR-007-050 | File download and instrument control capability for remote troubleshooting. | Mandatory | C2 |
| BR-007-007 | Software upgrades performed by customer | PR-007-051 | Automated downloadable software upgrades | Mandatory | C2 |
| BR-007-008 | Installation performed by field service | PR-007-052 | Field service or distributor installed | Mandatory | PCTI |
| BR-007-009a | Multiple use gold reagent bottle | PR-007-053a | Lyophilized or desiccated gold reagent bottle for multiple uses within open vial stability limits. Potentially several sizes will be necessary dependant on average customer use. | Mandatory | PCTI |
| BR-007-009b | Minimal gold reagent consumption | PR-007-053b | Design assay for small fluid volumes for immune reaction | Mandatory | PCTI |
| BR-007-010 | Instrument conforms to international regulatory standards | PR-007-054 | CE mark for product launch. FDA 510(k) for market expansion | Mandatory | PCTI : FDA C2 : CE Mark |

# EXHIBIT C

## DEVELOPMENT TIME LINE

### Project Timeline

| Description | Design Input Phase | Due Date |
|---|---|---|
| Customer Business and Product Requirements (CBPR)* | 1 | 12/6/06 |
| Feasibility Report(s) | 1 | 12/22/06 |
| Development Project Plan* | 1 | 12/8/06 |
| Phase 1 Design Review Minutes* | 1 | 1/8/07 |

| Description | Design Verification Phase | Due Date |
|---|---|---|
| System Requirement Specification | 2 | 2/23/07 |
| Design Verification Plan/Protocol(s)* | 2 | 1/12/07 |
| Design Verification Report(s)* | 2 | 3/16/07 |
| Design Verification Traceability Matrix* | 2 | 3/23/07 |
| Code Review Meeting Minutes | 2 | 3/23/07 |
| Risk/Hazard Analysis Report*     (Draft) | 2 | 3/23/07 |
| Phase 2 Design Review Minutes* | 2 | 3/23/07 |

| Description | Design Validation Phase | Due Date |
|---|---|---|
| Inventory Plan | 3 | 3/23/07 |
| Design Validation Traceability Matrix* | 3 | 4/27/07 |
| Code Review Meeting Minutes | 3 | 4/27/07 |
| Risk/Hazard Analysis Report*     (update as needed) | 3 | 4/20/07 |
| Design Validation Plan/Protocol(s)* | 3 | 3/30/07 |
| Design Validation Report(s)* | 3 | 4/27/07 |
| Product Labeling  (Draft) | 3 | 4/06/07 |
| Phase 3 Design Review Minutes* | 3 | 4/30/07 |



| Description | Process Validation Phase | Due Date |
|---|---|---|
| Pilot Build | 4 | 5/25/07 |
| Process Validation Plan/Protocol(s)* | 4 | 4/30/07 |
| Process Validation Report(s)* | 4 | 5/30/07 |
| Code Review Meeting Minutes  (Final) | 4 | 5/11/07 |
| Risk/Hazard Analysis Report*     (Final) | 4 | 5/11/07 |
| Product Labeling (update as needed) | 4 | 5/18/07 |
| Commercialization Plan (Draft) | 4 | 3/7/07 |
| Patent Disclosure(s) | 4 | 4/7/07 |
| Phase 4 Design Review Minutes* | 4 | 6/1/07 |

| Description | Design Transfer Phase | Due Date |
|---|---|---|
| Manufacturing Documentation | 5 | 4/25/07 |
| Commercialization Plan (final) | 5 | 4/27/07 |
| Clinical Evaluation Plan/Protocol | 5 | 4/6/07 |
| Clinical Evaluation Report | 5 | 5/2/07 |
| Regulatory Submission Package | 5 | 5/11/07 |
| Product Labeling (final)* | 5 | 5/25/07 |
| MSDS | 5 | 5/7/07 |
| Design Transfer Checklist* | 5 | 5/7/07 |
| Phase 5 Design Review Minutes* | 5 | 5/30/07 |

| Description | Market Release Phase | Due Date |
|---|---|---|
| Regulatory Agency File # Memo from FDA | 6 | 6/15/07 |
| Release to Market* | 6 | 6/1/07 † 7/13/07 |
| Phase 6 Design Review Minutes* | 6 | 7/20/07 |

*Minimum Deliverables per SOP-003          † Pertains to aggressive timeline for release to developing world market only (non 510k)

# EXHIBIT 6

**From:** William Ross
**Sent:** 5/30/2007 1:46:18 PM
**To:** Doug Nickols; Gary Young; George Chappell
**CC:**
**Subject:** FW: HT Software

Let me know when the smoke clears on this.....

———

From: Peter Hansen [mailto:phansen@pointcaretechnologies.com]
Sent: Tuesday, May 29, 2007 6:01 PM
To: Gary Young; William Ross; Karl Gu; Doug Nickols
Cc: Don Barry; Andrea Desrosiers; Jennifer Waite; Dorothy Branco
Subject: HT Software
Importance: High

Hello All,

We have hit a snag in the HT project schedule. Here is the situation.

As you know we are behind schedule on the HT because the CD4 subsystem still has hardware problems. Amy has made a lot of progress in finding the problems and solving them. In the end we will be OK, but what has happened from a schedule perspective is not OK.

The HT was scheduled to be ahead of our AuRICA NOW C2/PCT project at all times, but in fact the HT has slipped to the point where the NOW is significantly ahead of the HT. Consequently, whatever is happening on the HT these days is happening at the very point where we are very busy with the NOW. If all had gone to plan on the HT, we would have had no conflict for resources.

The main conflict for resources is in software. I will have to stop HT software work at PCT for approximately 2 1/2 weeks from today in order to meet long standing, scheduled obligations for our software group on the NOW. I will work with the group to find a way to minimize the overall HT schedule impact.



DEPOSITION EXHIBIT
Hansen 8
3-26-08
PENGAD 800-631-6989

HIGHLY CONFIDENTIAL

DR00027393

In the meantime please understand that the critical path for this project still lies through solving the hardware problems in the CD4 subsystem, and not through software. No system validation is possible until those problems are solved. When we met last at Drew I believe that was well understood by Gary and George and they have been responsive to the needs of the project.

I will ask Don Barry to send Gary the most recent schedule revision in our PCT Development Plan for discussion. It is still valid and acceptable to us despite any hold ups in software.

If there are any questions in this matter please contact me directly. My mobile is 518 253 8643. I am frequently out and about and away from my desk phone.

By the way I don't mean to annoy anyone by asking for a "read" confirmation, but you all have such a wide variety of emailboxes ranging from Escalon, to MWI Danam, to Drew, to ATT that I am never sure that I hit them right.

Thank you,

Peter

HIGHLY CONFIDENTIAL

# EXHIBIT 7

**From:** Peter Hansen
**Sent:** 11/9/2006 8:43:41 PM
**To:** Richard J. DePiano
**CC:**
**Subject:** CD4 Project

Dear Richard,

I have a concern and with your new role in the management of the Dallas group I feel it is best addressed to you. The PointCare CD4 project has received excellent attention from the Dallas group, and Gary Young has served as an excellent interface with Don Barry, his counterpart at PointCare. We have recently experienced some delays that can be corrected and managed in Dallas, but the implementation has been impeded because things seem to need to be passed through Andrew Kenny in the UK. I have no rancor with Andrew, but in the first weeks of planning this project I had asked and thought that I had agreement that for efficient management this would only be a Dallas effort. I knew that time zones and lack of physical presence only work against a fast moving program. I am asking that you reinforce this agreement and consolidate the project and its management in Dallas.

On a positive note. We have tried the system in a semi manual mode on 300+ samples in Barbados with excellent results. The rest is only a matter of timeline management and attention to detail. We at PointCare enjoy our work with the Dallas engineers and look forward to continued success. I think that Gary and Don have worked out a revision to our plan that will get us back on schedule by Jan 1.

Please let me know if you have any questions.

Sinceely,

Peter Hansen
Sent wirelessly via BlackBerry from T-Mobile.

HIGHLY CONFIDENTIAL

# EXHIBIT 8

**From:** Richard J. DePiano Jr.
**Sent:** 4/18/2007 6:30:30 PM
**To:** petra.krauledat@tmo.blackberry.net
**CC:** Richard J. DePiano; Rob O'Connor; Richard J. DePiano Jr.
**Subject:** MOU

Dear Petra:

Attached is the MOU and revised timeline. Use of Other Party in the timetable provides for confidentially.  Please contact me with any questions or comments, concerning the MOU or timetable. Thank you.

Regards,

Rich, jr.


ESCALON MEDICAL CORP

By: Richard J. DePiano, Jr., Esquire

Chief Operating Officer & General Counsel

565 East Swedesford Road

Suite 200

Wayne, PA  19087

610 254-8930 Direct Telephone

610 688-5278 Direct Fax

610 688-6830, Extension 103

THIS COMMUNICATION MAY CONTAIN CONFIDENTIAL AND/OR OTHERWISE PROPRIETARY MATERIAL and is thus for use by the intended recipient. If you received this e-mail in error, please contact the sender and delete the e-mail and its attachments from all computers.


Attachment: MOU.DOC

HIGHLY CONFIDENTIAL

Attachment: Escalon Sample tr schedule by week (time and responsibility).DOC

HIGHLY CONFIDENTIAL

**4/18/07**

# Memorandum of Understanding for Proposed Merger of
# Point Care Technologies and Drew Scientific, Inc into New Co.

## April 18, 2007
## CONFIDENTIAL

This Memorandum of Understanding (MOU) outlines the basis of a merger between Point Care Technologies and Drew Scientific, Inc into New Co. a privately held corporate entity to be formed and is for discussion purposes only. This MOU is an expression of certain nonbinding understandings only, does not express the agreement of the parties, is not meant to be legally binding on the parties now or at any point in time in the future, and is meant to be used as a negotiation aid by the parties. The parties must complete negotiations on the points set forth in this MOU as well as on points well beyond the scope of the proposed matters described herein, which negotiations may also cause the understandings set forth in this MOU to be further negotiated and changed. Accordingly, the parties will not be bound and no party shall have any liability to the other party with respect to the matters described herein, until a fully integrated definitive agreement (the "Definitive Agreement") and other related documents, are prepared, authorized, executed and delivered by and between all parties. If a Definitive Agreement is not prepared, authorized, executed and delivered for any reason, no party shall have any liability to the other party based upon, arising from, or relating to this MOU.

*Valuation & Structure*

- Drew Scientific, Inc. ("Drew") and Point Care Technologies ("Point Care") would contribute their assets into New Co. a new privately held corporate entity. The final determination of ownership interest in stock shall be based on the agreed terms in the Definitive Agreement concerning the assets acquired valued by independent valuation experts. The valuation work will include a written valuation documenting the usage of all well-recognized analytical approaches. The valuations will determine the fair market value of each business. The underlying valuation assignment will be based on the intrinsic value of each business.

- Escalon Medical Corp. ("Escalon"), Drew's parent will provide financial support by way of a loan or similar funding vehicle to New Co in accordance with an agreed upon business plan to be attached as an exhibit to the Definitive Agreement.

- Escalon will provide support New Co with appropriate business systems services, legal services and management contract with financial services, including but not limited to fundraising to support the agreed upon business plan to be attached as an exhibit to the Definitive Agreement.

<< AUTO PATH >>

HIGHLY CONFIDENTIAL

DR00046539

MOU
August 13, 2004
Page 2

| | |
|---|---|
| *Employees* | New Co intends to maintain the Drew and Point Care operations, including staffing, as they are presently conducted in each business. New Co will employ at a minimum Petra B, Krauledat, Ph.D. and W. Peter Hansen, Ph.D. and to be determined additional staff to continue to provide services to the combined entity and would provide them written employment arrangements. |
| *Exclusive Dealing* | Until June 30, 2007, Point Care and Drew will not enter into any agreement, discussion, or negotiation with, or provide information to, or solicit, encourage, entertain or consider any inquiries or proposals from, any other corporation, firm or other person with respect to (a) the possible disposition of a material portion of the assets of Drew or Point Care or Drew's or Point Care's clients, or (b) any business combination involving either Drew or Point Care, whether by way of merger, consolidation, share exchange or other transaction. |
| *Confidentiality* | Prior to commencing any negotiations or due diligence review in connection with the proposed Transaction, Drew and Point Care, each affirm its obligations under the Confidential Agreement executed between Drew and Point Care. |
| *Indicative Timing* | • Both parties will use best efforts to achieve the milestones set forth on the attached time and responsibility schedule. (See attached schedule hereto and incorporated thereby as if fully set forth herein.) |
| *Principal Conditions* | Conditions to signing the Definitive Agreement would include, among others:<br>• Satisfactory conclusion of mutual due diligence;<br>• Negotiation of satisfactory terms and conditions, including those related to the matters outlined in this MOU; and<br>• Approval by the Boards of Directors of Point Care, Drew and Drew's Parent Escalon Medical Corp.<br><br>Conditions to the Closing would include, among others:<br>• Affirmative vote of the shareholders of Point Care;<br>• Representations or warranties of Drew or Point Care materially accurate as of signing and closing;<br>• No material breach of covenants of Drew or Point Care; and<br>• Execution of employment agreements for Petra B, Krauledat, Ph.D. and W. Peter Hansen, Ph.D. |
| *Reps, Warranties and* | The Definitive Agreement would contain customary representations, |

DR00046540

**MOU**
**August 13, 2004**
**Page 3**

*Covenants*                    warranties and covenants.

*Fees and Expenses*            In the event the companies do not reach a Definitive Agreement, each
                               party would pay its own fees and expenses in connection with the
                               evaluation of the Transaction.


        IN WITNESS WHEREOF, the parties hereto have caused this MOU to be duly executed
as of the day and year first above written.

ATTESTED BY                              Point Care Technologies


_____         BY:_____

                                        Name
                                        Title



ATTESTED BY                              Drew Scientific, Inc.


_____         BY:_____

                                        Name
                                        Title



ATTESTED BY                              Escalon Medical Corp.


_____         BY:_____

                                        Name
                                        Title

HIGHLY CONFIDENTIAL                                                      DR00046541

# EXHIBIT 9

**From:** Frank Matuszak
**Sent:** 3/20/2007 11:35:46 PM
**To:** Richard J. DePiano
**CC:**
**Subject:** pointcare response

Rich,

General comments are directly below while specific comments are imbedded in Petra's email further down below in green:

In reviewing the entire email it appears to me that again we are being asked to air all of our dirty laundry and the requestor is not allowing for the same in return. I would suggest that we not show them any pricing until they provide us with the financials for last year so we can compare them against the projected numbers they shared with us last year.

I believe that Pointcare has realized they signed a bad deal with us and are about to get their clock cleaned for several reasons.

1) The C2 unit is behind schedule and Pointcare realizes that we can make a 2280 for not much more than the c2 unit. Our whole goal behind this project was to beat them (C2 small unit) to the market with a unit that we could make decent margins around 40% and sell the reagents at a good margin as well 50% and increase that margin as we sold more tests. While doing this we would sell more hematology systems and improve our margin since we would have a fully utilized reagent facility in Barrow

2) The cost for our 22 with CD4 will be around $14k we can sell this to distributors for 24k-30k Pointcare's price is 23k which will make it hard for them to sell HT units. We can buy the c2 unit for 13k so I would tend to sell the HT in order to keep our plant fully utilized. So we will be selling most of the HT units and paying Pointcare just $4 a test when they where expecting $6 or $7. In my opinion they realize that given the agreement with us they cannot achieve the forecasted goals as outlined in the business plan they sent us last year. In that plan they forecasted 40 HT units and to date I have no firm forecast from them and talked about numbers are in the area of 8-10 for the year.

Our unit is a few months away from shipping and we will beat them to the punch on every deal. It is our time to slow down the timeframe and let them come to us.

Lastly there is no doubt that we can add some real firepower with Peter's addition but I wonder at what cost to Drew.

Frank Matuszak



DEPOSITION EXHIBIT
Matuszak 2
5-28-08
PENGAD 800-631-6989

HIGHLY CONFIDENTIAL

DR00001193

VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

---

From: Richard J. DePiano
Sent: Tuesday, March 20, 2007 5:02 PM
To: Frank Matuszak
Subject: FW: dates for meeting and discussion points

ESCALON MEDICAL CORP
By: Richard J. DePiano
Chief Executive Officer
565 East Swedesford Road
Suite 200
Wayne, PA  19087
610 688-6830, Extension 101
610-688-3641 (Fax)

THIS COMMUNICATION MAY CONTAIN CONFIDENTIAL AND/OR OTHERWISE
PROPRIETARY MATERIAL and is thus for use by the intended recipient. If you received this e-
mail in error, please contact the sender and delete the e-mail and its attachments from all
computers.

---

From: Petra Krauledat [mailto:pkrauledat@pointcaretechnologies.com]
Sent: Tuesday, March 20, 2007 12:55 PM
To: Richard J. DePiano
Subject: dates for meeting and discussion points

Dear Rich,

HIGHLY CONFIDENTIAL

I very much enjoyed our very straight forward discussion last Friday and look forward to taking next steps.

Here are several dates when Peter and I could meet in Europe. We are available 3/26 and 3/27 in Germany (Bremen). Next availability is the entire week of 4/16 either in Germany or any other place convenient for you. 4/24 and 4/25 we are in France and could meet there (but I would rather do it sooner). Please let me know what works for you. I believe that we may want to schedule 2 days as there is a lot to go over.

To get us thinking, here a several points to consider and discuss:

The first one is most delicate but adresses our mutual concern about confusing the market place. An African distributor of Drew's has been quoted a transfer price of $6 per CD4 test which is more than $1 less then we are receiving from our African distributor in the exact same region (East Africa). The Drew distributor was turned over to us, as our Agreement calls for, but only after this quote was given (I believe by Andy Buck). Obviously I have no intention to instruct the Drew sales force about pricing but I do believe that this illustrates a problem that should move you and I to acting fast as confusion in the market will cost money.

Agreed we are having confusion regarding the pricing due to the fact that this unit is being pre-sold without any hard and fast data, this was a mistake and will not be repeated no discussions will be had with customers regarding price until official release for sale. The $6 figure is an apples and oranges comparison and resulted around around the fact that Pointcare was going to sell the cd4/cbc at $10 a test all inclusive including our reagents, since we are planning to sell the system as hematology system that does CD4 we priced our reagents separately and the reagent costs exceeded the extra $1.00 a test so in fact we had identical if not higher pricing.

As for quoting prices to countries that we did not have responsibility for we did do this in this case, this was a mistake due to the fact that we did not convey contract requirements to the sales force prior to talking about it this is being addressed .

I would like to bring up a point here that we did not bring up but needs to be addressed as it pertains to pricing and competition and this has happened on more than one occasion. Dan O'Connor was heard at the HIDA show ,which Drew paid for, offering our competitors Abbott and others access to the chemistry on CD4 this did not help our relationship and forced us as a sales force to push him aside and view him as a competitor so if there is a problem with downward price pressure this rests squarely on his shoulders.

HIGHLY CONFIDENTIAL

There is another concern that I have in the sales arena, which is the introduction of too many distribution middle men. For example, Drew would like to sell the small CD4 instrument to Boule. In principle I have no problem with that but I am concerned about cutting the pie into too thin slices and Drew receiving the thinest slice of all. Here is the calculation: PointCare sells CD4 reagents to Drew for $4, the price quoted to the distributor that delivers to the end user is $6, so there will only be $2 to be shared between Drew and Boule. That does not sound good to me. I would like to talk to you in person about the money that should be made with these pemium reagents.

No reagent pricing was discussed with Boule about cd4 so Petra needs to first correct her assumptions. Also Boule did not discuss the small unit nor do I think they know about it. They did inquiry about the HT unit and as a Hematology company they are looking at the added feature to sell more units at a higher margin just as we saw this opportunity when Pointcare presented it. I do not know if they have any intention of selling the small unit however when I spoke to Petra about it last week she agreed that if there was an interest in the HT unit that we could carve out certain territories for them however I do not recall mentioning the small unit as part of the Boule deal.

As for what she believes can be made on the reagents that remains to be seen. I would like to point out that other than a few pockets of direct business in Africa and the Caribbean they have not spoken to or dealt with many distributors. I believe that there is a case in point with respect to India when I spoke with Petra on Friday she indicated to me that Pointcare has decided not to pursue a distributor in India as we have identified a distributor there. It would seem to me that since India has the highest number of HIV patients they would not want to pull out of this market until they can be assured that our distributor will work out. I believe that the reason for this sudden withdrawal is that despite Pointcare assertion that they can claim $10 a test this in India is not an option.

In closing we always price our products based on what the market can bear in each country and not based on one uniform pricing scheme. To give an example units that we sell for $15k in Turkey are sold for $18k in Russia and $24k in the US.

I did take a closer look at the reported Drew gross profit which is well below industry standard. Diagnostic instrumentation alone should at least yield 50% GP and diagnostic systems (instrumentation and reagents) should be at 70% or better. Peter and I would like to understand in

HIGHLY CONFIDENTIAL

detail, product by product, why the cost of goods are so high. Let me give you a common example from the diagnostics industry where COGS can go out of control. If a product has marginal performance, it will have trouble getting through QC to the shipping dock. One common "remedy" is to have engineers come in and tinker with the instrument untill it passes. Another, equally undesirable "remedy" is to keep the instrument in QC well beyond whatt is cost effective until one gets a "lucky run"" and the machine passes. We believe that a timelined plan to improve cost of goods by looking into areas such as these is essential and products with a very disadvantageous ratio may have to be phased out as quickly as possible.

I would like to see more detailed numbers in our next meeting than published on the net, specifically in the area of expenses by department (including number of people emlpoyed in each department), margins given to distributors by region (I was very disturbed by the remark during the sales meeting that Drew distributors typically take 40% to 50% while industry standard is 30%) and the cost for the various locations and the consolidation plans (you did mention that further consolidation is desired, do I remember this correctly?). I will certainly bring the same financial detail from PointCare to our meeting and also some numbers from the reagent company I am trying to aquire.

My ultimate goal for our meeting is a draft financial outline of potential profitability and a timeframe in which this can be acchieved.

I look forward to seeing you soon.

Petra

Petra B. Krauledat, Ph.D.

CEO

PointCareTechnologies, Inc.

Frank Matuszak

HIGHLY CONFIDENTIAL

VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

HIGHLY CONFIDENTIAL

# EXHIBIT 10

00001

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------X

5    DREW SCIENTIFIC, INC.,

6          Plaintiff,    Case No. 08 CV 1490-AKH

          -vs-

7    POINTCARE TECHNOLOGIES, INC.,

8          Defendants.

9    -------------------------------X

10

11          DEPOSITION OF FRANCIS MATUSZAK

12             New York, New York

13             March 28, 2008

14

15

16

17

18

19

20

21   Reported by:

     Bonnie Pruszynski, RMR

22   JOB NO. 15874

01235571

Page 234

```
1              F. Matuszak
2  have to?
3      Q    So, in your salesman bravado kind of
4  way, you were saying Drew was going to out sell
5  PointCare in regard to HTs?
6      A    HTs and every aspect of it. We were
7  fully confident we were going to be able to do
8  that.
9      Q    You were saying you were confident
10 Drew was going to win the competition between Drew
11 and PointCare?
12     A    It always happens. You asked me
13 earlier in the day, did I know what my other sales
14 managers did, and, of course, I did. Because
15 although we didn't have -- we had exclusive
16 territories, we always looked to see what the
17 other guy was going to do and see if we could beat
18 them.
19     Q    From your perspective under this
20 arrangement, PointCare and Drew were competitors?
21     A    Rivals, I would say. Rivals in the
22 form of a competitive sales nature.
23     Q    Next sentence you said, "It is our
24 time to slow down the timeline and let them come
25 to us."
```

Page 235

```
1              F. Matuszak
2  What did you mean by that?
3      A    Surrounding the merger.
4      Q    So, what did you mean?
5      A    Things were moving way too fast, in
6  terms of cash, wanting to -- PointCare wanting
7  cash from Escalon. And I was basically stating,
8  you know, let's not give our cash away.
9      Q    So, let's slow down the merger
10 discussions?
11     A    Yes.
12     Q    Is the time frame the merger
13 discussions and let PointCare come to us?
14     A    Yes.
15     Q    PointCare, in connection with merger
16 discussions, PointCare was coming to Drew looking
17 for a cash infusion; correct?
18     A    That was my understanding, yes.
19     Q    What did you understand was
20 PointCare's financial situation at that point?
21     A    I had no direct knowledge because it
22 wasn't my part of the due diligence, but it
23 appeared to be an issue.
24     Q    PointCare appeared to have some
25 urgent need for cash?
```

Page 236

```
1              F. Matuszak
2      A    Yes.
3      Q    And, hence, they came with hat in
4  hand to Drew for a possible merger?
5      A    I wouldn't say hat in hand. You
6  know, there was definitely some benefits. The
7  last sentence, I clearly admire Peter Hansen and
8  the work that he does, and I thought that it
9  would -- there was definitely some benefit, what
10 we had to weigh was the costs associated versus
11 the benefit. It was a business decision.
12     Q    When you say you admire Peter Hansen,
13 how so?
14     A    Earlier I mentioned that I didn't
15 that that Andrew Kenny had a vision; I think Peter
16 Hansen has a vision. And that's, I think an
17 important quality in somebody, in anything they
18 do.
19     Q    In your business dealings with Peter,
20 did you find him to be a man of integrity?
21     A    Yes, for the most part.
22     Q    Any instances in which you found he
23 did not act with complete integrity?
24     A    No.
25     Q    So, when you were advising Mr.
```

Page 237

```
1              F. Matuszak
2  Matuszak to slow down the timeline on the merger
3  discussions and let PointCare come to us -- I
4  don't even know who I said, but apparently it
5  wasn't the right person.
6      A    It was me. Two places at ones.
7      Q    When you told Mr. DePiano, when you
8  advised him that Drew should slow down the
9  timeline of the merger discussions and let
10 PointCare come to us, were you suggesting that,
11 given PointCare's cash position, Drew would have
12 increasing leverage over PointCare as more time
13 went on?
14     A    Among other things.
15     Q    What else were you suggesting?
16     A    Possible other deals besides just
17 giving cash, shared resources. The discussions
18 were just at the very beginning stages at that
19 point in time. So there were -- it wasn't just
20 strictly a merger at that time. I think there
21 were a couple of different ways we could have
22 addressed it.
23     Q    Your advice was if Drew was to slow
24 down the timeline of the negotiation with
25 PointCare, then Drew might get a better deal,
```

Page 238

1          F. Matuszak
2   whatever form that deal might take.
3       A    I think it would be more that we
4   would get the correct deal.
5       Q    Did you think, in advising him to
6   slow down the timeline on the merger discussions,
7   were you seeking any advantage under the existing
8   contract between the parties?
9       A    No.
10      Q    Do you recall hearing from Dr. Hansen
11  in the spring of '07 that Drew's engineers were
12  struggling to get beyond a pre-prototype level to
13  the next stage?
14      A    Yes, I recall, but not all the
15  details. So, if you have something that can
16  refresh my memory --
17      Q    I may go on big picture instead of
18  details at this late hour.
19      A    Sure. Okay.
20          MR. COSTANTINI: When you get to a
21  logical point --
22          MR. CAPLAN: Sure.
23      Q    Do you recall, from time to time,
24  Peter Hansen complaining about the competence, the
25  skills of the folks who were actually in the

Page 239

1          F. Matuszak
2   development department at Drew working on the HT?
3   Do you recall those type of complaints from Dr.
4   Hansen?
5       A    I think I seem to recall that there
6   was positives and negatives at the same time, but
7   I don't remember all the details. So, there was
8   some benefits, some things are going well on one
9   side, and there are some problems on the other
10  side, and probably that relates to how all
11  instruments are developed.
12      Q    Did Drew have any other instrument
13  under development in '06 and '07?
14      A    Yes.
15      Q    What?
16      A    The DS 360.
17      Q    Was that an instrument that Drew's
18  R&D department was in charge of developing and
19  bringing to market?
20      A    Yes.
21      Q    And did they meet their timelines?
22      A    No.
23      Q    Was that a source of concern to you?
24      A    Yes.
25      Q    And did you discuss that concern with

Page 240

1          F. Matuszak
2   Dr. Hansen from time to time?
3       A    Yes. And that was one of the reasons
4   why I thought he would be good as a visionary.
5       Q    And from time to time you discussed
6   with Dr. Hansen your displeasure with the
7   performance of Drew's R&D in terms of its ability
8   to develop products and get them to market; do
9   recall those conversations?
10      A    Yes, I did; however, in retrospect,
11  after this week, I was probably a bit -- more than
12  a bit harsh.
13      Q    Well, at least at the time prior to
14  this lawsuit, as Vice President of Sales at Drew,
15  you were not overly impressed with the quality of
16  the folks in the Drew R&D Department, wouldn't you
17  agree with me, and you discussed that with Dr.
18  Hansen?
19      A    Yes.
20          MR. CAPLAN: Tony can have his break.
21          MR. COSTANTINI: Thank you.
22          (Recess taken.)
23  BY MR. CAPLAN:
24      Q    What's your phone number at work?
25      A    I have it on my e-mail. It's my

Page 241

1          F. Matuszak
2   mobile phone number. (732)768-9694.
3       Q    Do you have a land line at work or do
4   you work off the cell phone number?
5       A    Work off the cell phone.
6       Q    Who is your cell phone provider?
7       A    Cingular/AT&T.
8       Q    To whom do they send the bills, to
9   you or someone at Drew?
10      A    To me.
11      Q    And do you keep copies of those on
12  file?
13      A    I don't keep copies of them on file.
14      Q    Does someone?
15      A    I have no knowledge.
16      Q    Do you turn them into Drew for
17  reimbursement?
18      A    Yes.
19      Q    I'm not even going to ask if you fill
20  out a form for that.
21          We agree that Drew and PointCare
22  never merged?
23      A    Yes.
24      Q    Why not?
25          MR. COSTANTINI: Obviously, he's

# EXHIBIT 11



Escalon Medical Corp.
555 E. Swedesford Road
Suite 200
Wayne, PA 19087-1625
Tel. 610-688-6830 Fax 610-688-3641

Richard J. DePlano
CEO & Chairman
Direct Dial (610) 254-2994
E-Mail· rjdeplano@escalonmed.com

October 3, 2007

<u>**VIA E-MAIL**</u>

Petra Krauledat
PointCare Technologies, Inc.
181 Cedar Hill Street
Marlborough, MA 01752

Dear Petra:

Per my recent correspondence, I have reviewed the issues noted in your September 13, 2007 letter with members of the Drew team. While I will attempt to provide you with some more structured feedback below, I first want to share a few opening comments/insights from my perspective.

Firstly, I want you to know that neither I nor Rich appreciate what we perceive to be the personal attack/slights that were included in the recent correspondence from both you and Peter. Rich's correspondence was intended to provide accurate and honest feedback to the concerns raised by Peter. I believe that Rich's correspondence accomplished this goal and that it did so in a professional manner. I would hope for nothing less in return in the future.

Secondly, my review of the present situation suggests that there are things that both Drew and PointCare could have done a bit better or differently in hindsight (as it seems with all things in life).

Finally, it seems to me that if we are going to prove successful, we need to look forward and put a focused effort on communications, coordination and cooperation. Both you and I need to lead this effort. I would suggest that we have bi-weekly conference calls, with respective project leader participation, to review the status of open items and to make sure that issues and frustrations are properly vetted. Hopefully, this will eliminate some of the present frustrations and enhance overall team productivity.

With this preface, below are the issues that I identified in your correspondence, as well as my perceptions after discussing your concerns with the Drew project team. I apologize in advance if I have missed any issues and invite your feedback if this is the case.

**Issue 1:** Drew project timeline - I understand that our respective project leaders have met and discussed this issue (Gary for Drew and Peter and Don Barry for PointCare). The project development timeline experienced a setback when Drew had to perform repairs and some re-design work after its instrument was returned by PointCare. Obviously, our personnel have some significant differences of opinion relative to this issue. Rather than continue the debate, I have instructed the Drew team to "agree to disagree" and work cooperatively to get the project to the finish line as quickly as possible. I trust that you will do the same with your team. To this end, a revised projected timeline is attached. It will remain dependant upon both parties providing their respective deliverables in line with projections. We can discuss at your convenience.

**Issue 2:** Issues with the optics - Petra, I have looked into this issue and do not agree with your assessment that the problems were entirely of Drew's making. As far as I can tell, issues related to the optics can be traced to actions/inactions on the part of both the Drew and the PointCare development teams. While not wishing to belabor the issue, it is also my sense that PointCare was responsible for many of the technical issues that were encountered. This being said, I see little value in continuing the debate, have told this to my team, and would suggest that we collectively move on.

**Issue 3:** PointCare's work on the CD4 assay development is "on-track" - I am gratified to hear that PointCare has achieved satisfactory clinical results with manual sample preparation. Could you please forward the supporting data to Frank? Hopefully, you will see repeatability over a prolonged period.

**Issue 6:** Machine problems - Needless to say, I too am disappointed that we have experienced challenges in the development of the instrument. Per my comments above, I don't believe that we will ever agree relative to some of the issues that have led to the delay and I personally do not see much value in "finger pointing" at this stage. Hopefully, our mutual participation in bi-weekly calls will help keep our respective project teams on-track so that we can get the project completed as quickly as possible. Let me know if you have any issues with the time line that Drew has included with this correspondence.

Additionally, it is my understanding that Drew was ready to ship one CD4 instrument back to PointCare. However, in his September 18, 2007 e-mail, Peter requested that Drew further refine the results to reduce the "level of red cell "contamination" present in the R1 region that I see in the plots . . . " Drew is currently working on this issue per Gary Young's e-mail of the same date. Once the additional refinement is made, Drew will be prepared to ship and would propose to have one of its field engineers install the instrument at PointCare's facility upon delivery to avoid further issues.

**Issue 7:** Insufficient communications from Drew about project progress as well as an expected project completion date - Petra, I don't get the sense that Drew has been dilatory in responding to PointCare inquiries. The feedback that I have received indicates that Peter only sent a single inquiry to Gary while Peter was in Barbados. The last e-mail from Peter that Gary has a record of dates back to the

end of July. He also received a correspondence from Don in early August. Gary promptly responded. Gary does not have a record of an e-mail from Peter dated August 30, 2007. Perhaps there was a technical issue that prevented delivery? Regardless, if we conduct bi-weekly status sessions, I trust that this concern will be addressed.

**Issue 9:** Withdrawal by PointCare of its forecast for the PointCare COMPLETE and cessation by PointCare of its product promotional activities – I am concerned that PointCare is taking the unilateral decision to cease its marketing activities for this product until 2008. As you well know, the completion timeline for the instrument is dependant upon the resolution of multiple technical issues, some of which are under Drew's control and some of which are under the control of PointCare. Should our teams work cooperatively and should no further technical challenges be encountered, we would expect to stay on schedule with the revised time line. This being said, I fully expect that PointCare will respect and comply with all of its contractual obligations, especially since PointCare is "seeing considerable interest in the field." Alternatively, and as you have offered, please provide the names of all sales leads from PointCare territories so that Drew can immediately begin to follow-up. Drew reserves all of its rights under the Agreement.

**Issue 10:** PointCare will discontinue work on clinical evaluations for the FDA 510K filing pending receipt of operational instruments – It remains our position that Drew provided PointCare with two working instruments, which PointCare then disassembled without Drew's permission and subsequently damaged. Drew is now working to resolve the hardware issues identified during PointCare's assay development process, to repair the instruments, and to provide them back to PointCare as noted in the attached timetable. As I understand, Drew is presently ready to ship back one instrument to PointCare. It remains my expectation that PointCare will fully honor all of its obligations under the Agreement. Please advise if it remains PointCare's position that it is suspending its clinical efforts.

**Issue 11:** PointCare has shipped the first system to Drew – Acknowledged, although no reagents were included in the shipment. Drew reconfirms its order of 7 CE marked instruments for Q3 of 2007 as well as its forecast for another 8 units for the remainder of 2007, pending FDA approval for marketing and sale.

**Issue 12:** PointCare has not received a "Sales Plan" for each of the Territories from Drew: PointCare provided a detailed sales plan (commercialization plan) to Drew – As I understand, Drew has provided PointCare with a list of all of Drew's distributors in its Territories, as well as a forecast, the receipt of which you have previously acknowledged (see your May 21, 2007 correspondence to Frank). Additionally, Frank has been in touch with the PointCare team on at least a bi-weekly basis seeking updates relative to the status of the "small" PointCare system (Aurica NOW) being manufactured by C2. As PointCare has been unable to provide Frank with feedback as to when the instrument will be commercially available, it is obviously difficult for Drew in turn to provide PointCare with a more detailed commercial plan. However and importantly, Drew does already have its distribution network in place and confirmed. Once PointCare has firmed

up its manufacturing issues, Drew will be in a position to provide a more comprehensive commercial sales plan. In light of your request, however, Frank will provide you with an interim tentative sales/commercialization plan document that will summarize, update and consolidate the information previously provided by the Drew team.

With respect to your comment that PointCare has provided Drew with its detailed sales plan. our understanding is as follows: As a part of the due diligence process that was undertaken earlier in the year, PointCare provided Drew with a presentation. While the presentation provides an overview of the commercialization effort that PointCare proposes to undertake, it only describes the distribution network that PointCare anticipates putting into effect. As I understand, despite the timelines described in the presentation, PointCare does not currently have this network of distributors in place and confirmed. Is this correct? Additionally, can PointCare confirm that its projections and timetables within its Territories remain effective?

Issue 14: PointCare has been approached by several distributors from the Drew assigned territories with projections that far exceed the Drew forecasts – I found this comment to be at odds with your assertions above, where you claim that Drew has not provided a sales plan. This being said, PointCare, as you are aware, is contractually bound to forward such sales leads in Drew Territories, including Distributors, to Drew. Has this been done? According to Frank, he has previously been in contact with you seeking information relative to potential tenders and customers in the Drew Territories but has not received any response (see Frank's May 29, 2007 e-mail to you. Additionally, Frank has not received a reply to his inquiry relative to the Walter Reed Medical Center customer. Can you have your team immediately provide this information to Frank for follow-up?). If these leads prove valuable, Drew will revisit its forecasts and provide updated information.

As you are aware, Drew has promptly turned over leads to PointCare relative to potential sales leads in the PointCare Territories (see, for example, the March 19, 2007 correspondence from Frank to you and Dan O'Connor and the June 24, 2007 correspondence from Frank to you and Peter).

Petra, two additional issues in closing. Firstly, it has come to my attention that PointCare may not be marketing the Complete HT system (AuRICA HT) as agreed since it did not physically show the system at the last two trades shows that PointCare attended. Drew has, on the other hand, fulfilled its commitment by showing the AuRICA NOW system at the AACC.

Finally, Drew has significant concerns relative to PointCare's continuing ability to honor its contractual obligations and properly support the AuRICA HT system in the field in light of the ongoing personnel lay-offs at PointCare. As you know, Drew has spent a significant amount of time and money to train service staff that PointCare has now released. I would like your assurances that PointCare remains ready and able (financially and otherwise) to fulfill its contractual obligations to Drew. Moreover, should additional training by Drew be needed as a result of PointCare's personnel decisions, I trust that

PointCare will agree to reimburse Drew at actual cost for additional support services that PointCare might require.

I will ask Terri to arrange for our first teleconference.

Regards.

Richard J. DePiano
Chairman and CEO



| ID | Description | Start | End |
|---|---|---|---|
| 1 | Design Complete | 3/19/2007 | 3/19/2007 |
| 2 | Prototype Complete (Preliminary) | 3/26/2007 | 4/09/2007 |
| 3 | Complete Preliminary BOM | 3/26/2007 | 3/19/2007 |
| 4 | Design Review to release preliminary BOM | 3/19/2007 | 3/20/2007 |
| 5 | Complete & Release Final BOM | 3/19/2007 | 11/23/2007 |
| 6 | BOD's Compiled | 10/26/2007 | 11/23/2007 |
| 7 | Complete & Release Drawings | 3/19/2007 | 11/23/2007 |
| 8 | Complete Desks | 4/09/2007 | 6/08/2007 |
| 9 | | 4/09/2007 | 1/29/2007 |
| 10 | Procurement for 3 pre-production units | 3/19/2007 | 5/28/2007 |
| 11 | Build 3 pre-production units | 1/29/2007 | 11/23/2007 |
| 12 | BOM & Drawing Corrections | 5/02/2007 | 11/23/2007 |
| 13 | Create/modify Work Instructions | 11/23/2007 | 12/07/2007 |
| 14 | Create/modify QC procedure | 12/01/2007 | 12/21/2007 |
| 15 | Inspection List of new parts | 11/21/2007 | 11/21/2007 |
| 16 | | 9/14/2007 | 11/21/2007 |
| 17 | Reliability testing of prototype | 1/29/2007 | 1/29/2007 |
| 18 | EMC Testing | 9/05/2007 | 11/23/2007 |
| 19 | Electrical Safety Testing | 11/23/2007 | 1/04/2008 |
| 20 | Write Software Validation Protocol | 11/23/2007 | 12/29/2007 |
| 21 | Software Validation Study & Report | 11/16/2007 | 11/16/2007 |
| 22 | Reagent Consumption Study & Report | 11/09/2007 | 12/28/2007 |
| 23 | Write CBC Equivalence Study Protocol | 11/19/2007 | 11/18/2007 |
| 24 | Perform the CBC Equivalence Study & Report | 11/28/2007 | 12/10/2007 |
| 25 | Write CD4 Clinical Study Protocol | 12/04/2007 | 12/10/2007 |
| 26 | CD4 Clinical Study & Report | 12/04/2007 | 12/03/2007 |
| 27 | Prepare 510 (k) submission and File Report | 1/29/2007 | 2/21/2008 |
| 28 | | 7/25/2007 | 7/25/2007 |
| 29 | Convert 2280 Manual to the CD4 version | 8/01/2007 | 10/19/2007 |
| 30 | Proof Read and Release CD4 User Manual | 10/19/2007 | 11/09/2007 |
| 31 | Manuals Produced and Printed | 11/23/2007 | 11/23/2007 |
| 32 | Create Standard Cost | 11/23/2007 | 1/30/2008 |
| 33 | New Vendor Approvals | 3/19/2007 | 11/23/2007 |
| 34 | Maintenance Schedule Documented | 5/22/2007 | 11/16/2007 |
| 35 | Killing in place and checked for correctness | 3/19/2007 | 11/23/2007 |
| 36 | Software documented and in-place | 3/19/2007 | 12/14/2007 |
| 37 | Work Instructions in place | 8/27/2007 | 11/30/2007 |
| 38 | Assembly Training complete and documented | 7/02/2007 | 11/30/2007 |
| 39 | Top Level part numbers in place | 3/19/2007 | 12/31/2007 |
| 40 | Configurations known to Sales Staff | 4/23/2007 | 10/12/2007 |
| 41 | Accessories and options known to Sales Staff | 3/19/2007 | 11/30/2007 |
| 42 | Spare Parts List Complete | 8/09/2007 | 11/23/2007 |
| 43 | | 12/31/2007 | 12/31/2007 |
| 44 | Write Service Manual | 12/28/2007 | 12/28/2007 |
| 45 | Proof and release Service Manual | 12/28/2007 | 1/17/2008 |
| 46 | Risk Analysis | 9/27/2007 | 12/31/2007 |
| 48 | Final Design Review, Sign Off, and Release for Sale | 10/4/2008 | 1/08/2009 |

10/02/2007

# EXHIBIT 12

**From:** simon rowe
**Sent:** 5/23/2007 12:46:11 PM
**To:** Frank Matuszak
**CC:** Andy Buck
**Subject:** Fwd: CD4

Simon

These are the most likely early adopters with higher demand

Russia 2/1

Turkey 2/1

Spain 1/1

Greece 1/0

CZ 1/0

---------- Forwarded message ----------
From: Andy Buck
Date: 23-May-2007 12:00
Subject: CD4
To: fmatuszak@escalonmed.com
Cc: simonrow@gmail.com


Forecaste by CD4 instruments NOW/HT till end of calendar 2007


China    0/0

Registration will take at least 10 months


Vietnam        1/1

Will require evaluation and registration.

HIGHLY CONFIDENTIAL

Laos and Cambodia        0/0

Provided by NGO exclusively


Philippines        1/0

Will require evaluation


Thailand        3/1

Dependant on PCL setting up separate company


Malaysia        1/0

Will require evaluation by opinion leader prior to registration.


Singapore


Indonesia        1/0

Purchase by Government tender.


Australia and New Zealand        0/0

No human distribution


Bangladesh        0/0

New distribution to be appointed


HIGHLY CONFIDENTIAL                    DR00052348

India    3/1

Deal closure with Wipro required

Pakistan      1/0

Sri Lanka     1/0

These very modest numbers are dependant on the product working and white papers being available. Heavy incentives will be necessary (discounts) early on as distributors are by no means convinced CD4 is a way they want to go.

Best Regards,

Andrew Buck
Asian Business Manager
Drew Scientific
Tel : ++44 (0)1229 432089
Fax : ++44 (0)1229 432096

skype  -   andrew.buck1958
Visit our updated website www.drew-scientific.com
email : andyb@drew-scientific.com
Drew Scientific is a subsidiary of
Escalon Medical Corporation

--
Best wishes,

HIGHLY CONFIDENTIAL

Simon Rowe
Export Manager
Drew UK

HIGHLY CONFIDENTIAL

# EXHIBIT 13

**From:** Petra Krauledat
**Sent:** 10/5/2007 6:26:44 PM
**To:** Frank Matuszak; Richard J. DePiano
**CC:** Linsey Rockingham; Petra Krauledat
**Subject:** tender in Russia

Dear Richard and Frank,

First I want to acknowledge the receipt of Richard's letter dated October 3, 2007. I will respond to it point by point at a later time.

For now I need to address a sales matter in one of the Drew territories which has become an emergency.

Frank, in a meeting in December of 2006 at PointCare you were informed that there was a tender for 30 to 50 near patient CD4 instruments to be expected in Russia. We had received that information from our contacts at the CDC and Health Canada as a heads up. I reiterated this information at the sales training at Drew in early 2007 and specifically alerted Simon about this tender when he was introduced to me as the person in charge of Russia. When I met Simon at the AACC in July I asked him about the tender and was told that he had no information.

The tender has once again came to my attention through our international research collaborations and I am told that it will close in the very near future. When we made some inquiries into the Russian authorities we were informed that they were very disappointed that our product was not entered into the tender. Obviously PointCare can not do anything about this tender as it has no representation in Russia. Please forward Drew's plan for participation in this tender.

For your information, two of our distributors, one in Africa and one in India are actively participating in tenders one of which has closed several month ago. It is not necessary to demonstrate an instrument in order to participate in a tender, all one needs are detailed specifications which Drew had earlier than any one of our other distributors.

Now to "Issue14" in Richard's October 3, 2007 letter which is related to this topic and can be put to rest right now: I indeed received an e-mail request from Frank about tenders I was aware of. In a phone call I reiterated the Russian tender as well as government initiatives in Morocco and Turkey I had heard of. Unfortunately I did not respond in writing which I now realize was a mistake. During the same conversation I informed Frank about the Walter Reed opportunity. I reiterate: This is a research interest which will, if it materializes, include custom development efforts which Drew can not undertake. Frank and I agreed that only PointCare can move forward on this as the interest was strictly in the near patient platform. An additional topic was discussed, where Frank was aware of a tender in Ivory Coast which also would include Drew hematology products. Here we agreed that Drew would continue with this lead for reasons of efficiency although it was in our territory. You also request in your letter that we turn over distributor inquiries from your territories. This seems a very odd request in so far as Drew has represented that it has a distributor network in its territories. If that is no longer the case Drew should inform us about this and we will have to take that region off the list of Drew territories.

HIGHLY CONFIDENTIAL

As mentioned above, I will address other "issues" as well as the topic of Drew's distribution capabilities in more detail in a separate letter. I hope to hear from you at your earliest convenience what you plan to do about the Russian tender. It has been 10 month since we first told you about the Russian tender. We are now just weeks away from the deadline. If I do not receive written proof that Drew is participating in this tender within 5 business days I will need to protect PointCare's business interests by other means.

Sincerely

Petra B. Krauledat, Ph.D.
CEO
PointCareTechnologies, Inc.

HIGHLY CONFIDENTIAL

# EXHIBIT 14

**From:** Petra Krauledat
**Sent:** 10/11/2007 4:34:55 PM
**To:** Frank Matuszak; Linsey Rockingham
**CC:**
**Subject:** RE: tender in Russia

Dear Frank,

As I pointed out in my previous e-mail, PointCare made its first alert to Drew about a tender in Russia as early as December 2006. From your company's lack of response to our repeated proddings, and your e-mail below it is apparent that Drew has made no effort to follow up on this information. and get the details for the tender. Even more so, you are now requesting PointCare to furnish details about the tender as a condition for Drew to pursue it. PointCare has no detailed information about the tender since it has no distributor representation in Russia.
In April of 2006 , during the negotiations of our Co-Marketing Agreement, Drew represented that they had strong distributor representation in Russia. From your e-mail I must conclude that this is no longer the case. PointCare agreed that Drew would become the "Market Leader" in Russia, but in the light of your inaction, Pointcare will now have to move forward to find its own representation in Russia not to lose the sizable opportunities in this territory.

Regards
Petra

Petra B. Krauledat Ph.D.
President and CEO
phone 518-253-8642
fax 508-281-6930

─── ───

From: Frank Matuszak [mailto:fmatuszak@escalonmed.com]
Sent: Wednesday, October 10, 2007 5:36 PM
To: Linsey Rockingham
Cc: Petra Krauledat
Subject: RE: tender in Russia

Linsey,

We have not received a reply regarding the email I sent earlier in the week about the Russian tender and this was just a resend in case you did not receive the first email.

Frank Matuszak

HIGHLY CONFIDENTIAL

# EXHIBIT 15

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | First Name | Last Name | Title | Company / Account | Phone | Email | Description | Funding Available | Country |
| 1 | | | | | | | | | |
| 2 | | | | | | | | | |
| 3 | George | Kankiamidze | Clinical Director | RE1 Research and Rehabilitation Center | (995 32)320303 | gia_rea@geo.net.ge | He would like to buy an AuricaNOW, he did not think the price was very expensive. He asked if we have a distributor in Germany that we can contact, as he does not trust any other sources. | ? | Georgia |
| 4 | Tudor Ana | Maria | | Matei Bals Institute for Infectious Diseases | +40 21 318 6100 | tudoramamaria@yahoo.com | | Yes | Romania |
| 5 | Anthony | Morice | | Cox | (602) 955-8700 | mikeandy@cox.net | | Yes | USA |

HIGHLY CONFIDENTIAL

# EXHIBIT 16

**From:** Frank Matuszak
**Sent:** 10/19/2007 9:15:45 PM
**To:** Sam Hill; simonrow@gmail.com
**CC:**
**Subject:** FW: Leads

Sam and Simon,

Have we gotten any response from these leads.
We need to make sure Pointcare has the feeling they are being worked.

Thanks

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

--------

From: Linsey Rockingham [mailto:lrockingham@pointcare.net]
Sent: Tuesday, August 28, 2007 3:14 PM
To: Frank Matuszak
Subject: RE: Leads

Hi Frank,
Please find attached the leads from the Australian conference. I am sorry I am just sending them
to you. I will work on a better system in future, so I can get them to you sooner.
Please contact me if you have any questions.
Regards,
Linsey

--------

From: Frank Matuszak [mailto:fmatuszak@escalonmed.com]
Sent: Tue 8/28/2007 11:36 AM
To: Linsey Rockingham
Subject: Leads

HIGHLY CONFIDENTIAL

DR00044682

Linsey,

Thank you for having the price list sent. We would like to request that the leads you have for our areas be sent to us as we will need them in order to fulfill the forecast we have sent to you.

Regards,

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak


Attachment: Drew leads from IAS conference australia.xls

HIGHLY CONFIDENTIAL

# EXHIBIT 17

**From:** Frank Matuszak
**Sent:** 4/4/2007 11:17:41 AM
**To:** Simon Rowe; Andy Buck
**CC:**
**Subject:** FW: CD4

Andy and Simon,

Attached is the pricing that Pointcare will go with let's not go lower on these until you speak to me about all deals. Of course we can do better on the HT system which is the reworked 2280 but talk with me first. Also please note the countries we can and cannot sell into:

Drew Countries
USA, Russia, China, the EU, Philippines, Hong Kong, Taiwan, Thailand, Malaysia, Vietnam, Korea, Egypt, Pakistan, Bangladesh and Turkey

Pointcare countries

Canada, Sub Saharan Africa, Central America and the Caribbean Island nations.

All other areas are open and fair game. We should start working on NGOs in the EU as this will give us a chance to break into Africa as NGOs are fair game as well.

Lastly you may want to start using the Cd4 as a lock out spec on bid tenders since nobody will have it and the cost to make the unit will not be that much greater than our current 2280.

Let me know if you have any questions

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

From: Daniel O'Connor [mailto:djo3349@new.rr.com]
Sent: Monday, March 19, 2007 11:27 AM
To: Frank Matuszak
Subject: RE: CD4

HIGHLY CONFIDENTIAL

Frank;

Thanks for the understanding on this matter.  I have sent you the price list that is in progress (we have yet to send it on to our distributors) and perhaps you could help me out so that I align up with your list prices as well.  Could you provide me the list prices you use for the AuRICA HT regents, calibrators and controls?  To date we have not allowed our distributors any sort of discount on the controls, because we essentially sell them at our cost.  I want to make sure that I don't cause you problems, and I would also like to know what our costs for these will be from you.  Thanks for your help on this!

Dan

––––––

Attachment: PCT PRICE LIST- 3 08 2007.xls

DR00047794

# EXHIBIT 18

**From:** Frank Matuszak
**Sent:** 2/4/2008 7:48:21 PM
**To:** Sam Hill
**CC:**
**Subject:** RE: pricing

yes to all

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

———

From: Sam Hill
Sent: Monday, February 04, 2008 1:04 PM
To: Frank Matuszak
Subject: pricing

Can I give the following to my new servicing distributor for Central America pricing?

2280 with computer/printer $19,900

2280 $17,000

D3 $6,500

CD4 $15,500

2280wCD4 $24,000

Any suggestions? Can we sale CD4 to central America?

Sam

HIGHLY CONFIDENTIAL

DR00046309

Sam Hill

North America Sales Manager

Drew Scientific, Inc. USA

Toll Free: 800.433.0945 Ext. 4901

Cell: 203.592.0094

Fax: 214.210.4949

shill@escalonmed.com

www.drew-scientific.com

HIGHLY CONFIDENTIAL

DR00046310

# EXHIBIT 19

Page 1

1

2              UNITED STATES DISTRICT COURT

3             SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------X

5    DREW SCIENTIFIC, INC.,

6              Plaintiff,    Case No. 08 CV 1490-AKH

         -vs-

7    POINTCARE TECHNOLOGIES, INC.,

8              Defendants.

9    -------------------------------X

10

11         DEPOSITION OF FRANCIS MATUSZAK

12              New York, New York

13              March 28, 2008

14

15

16

17

18

19

20

21   Reported by:

     Bonnie Pruszynski, RMR

22   JOB NO. 15874

23

24

25

Page 154

F. Matuszak

1
2   they were allowed to provide a price quote for the
3   HT or NP to distributors from PointCare's market
4   leader territories?
5       A    No.
6       Q    You have told us about the Andy Buck,
7   the example of Andy Buck giving a price range
8   quote to a distributor from PointCare's Africa
9   market leader territory, and I think you mentioned
10  there was another example of that.
11      What was the other example?
12      A    There was a territory, I forgot
13  exactly where, but it was in Africa, and the
14  distributor came to us, and we immediately
15  contacted PointCare and said, how -- this is your
16  territory. They want also Drew products, not
17  specifically NP or HT. And we said we would be
18  more than happy to allow them to sell the entire
19  Drew range, if that was the desire. And PointCare
20  replied, no, you can sell.
21      Q    Was it you that had that conversation
22  with PointCare or one of your people?
23      A    No. I had it with Petra Krauledat
24  via e-mails.
25      Q    But she gave you the green light?

Page 155

F. Matuszak

1
2       A    Yes.
3       Q    Are you aware of any other examples
4   of Drew, or any of its salespeople, trying to
5   market, distributor sell NPs or HT's in PointCare
6   market leader territories?
7       A    No.
8       Q    Have you reviewed some of the
9   discovery materials that PointCare has produced in
10  this lawsuit?
11      A    Yes.
12      Q    If I could ask you if it's possible
13  to put out of your mind what you have learned
14  through the lawsuit --
15      A    Yes.
16      Q    -- and my question concerns what you
17  knew at the time the lawsuit was filed.
18      A    Okay.
19      Q    At the time the lawsuit was filed,
20  did you have any knowledge or information of any
21  PointCare representative ever trying to market,
22  distribute or sell HTs or NPs in Drew market
23  leader territories?
24      A    Directorially or indirectly?
25      Q    First, in any fashion.

Page 156

F. Matuszak

1
2       A    Not directly.
3       Q    How about otherwise?
4       A    Indirectly, yes.
5       Q    Tell me about that.
6       A    2007, at ACC, I had a report, and
7   then followed up with another report late
8   September, I believe, from one of my salespersons,
9   Simon Rowe, that Block Scientific was marketing
10  PointCare products specifically for a tender in
11  Russia.
12      Q    Simon Rowe was one of your
13  salespeople?
14      A    Yes.
15      Q    And he attended the AACC in 2007?
16      A    Yes, he did.
17      Q    And he said that Block Scientific was
18  marketing PointCare products for a tender in
19  Russia?
20      A    Yes. Well, that they were involved
21  in a tender in Russia, and that they were trying
22  to obtain the instruments from PointCare, but no
23  instruments were available from PointCare because
24  they hadn't been developed yet.
25      Q    I'm sorry. I didn't hear the tail

Page 157

F. Matuszak

1
2   end of that.
3       A    Because the instrument had not been
4   developed yet.
5       Q    What instruments were being
6   discussed?
7       A    The NP.
8       Q    Let me back up.
9       Who was Block Scientific relative to
10  Drew and PointCare?
11      A    They are a distributor in the U.S,
12  and they had prior -- in 2005, they had the
13  original PointCare unit, the Eureka in their
14  booth.
15      MR. COSTANTINI: In a booth where?
16      A    In Block Scientific's booth in
17  Medica, 2005.
18      MR. COSTANTINI: You just mentioned
19  AACC and I just wanted you to be specific
20  for the record.
21      Q    So, Simon Rowe tells you he went to
22  AACC, and did someone tell him -- did he have a
23  discussion with someone?
24      A    Yes.
25      Q    Who did he have a discussion with?

Page 158

F. Matuszak

1
2     A     I believe it was the owner of Block
3   Scientific.
4     Q     Do you know who that person is?
5     A     I don't know the first name.  His
6   last name is Block.
7         MR. COSTANTINI:  And how did the
8     company get its name?
9         MR. CAPLAN:  Mr. Block.
10    Q     And what did Simon Rowe report to you
11  was said to him by Mr. Block?
12    A     Basically, that he had heard that
13  there was this bid in Russia; however, there was
14  going to be no way that he was going to be able to
15  bid on it.  He claimed to be a distributor of
16  PointCare, but he could not bid on the bid because
17  there was no instruments available.
18    Q     So, Rowe tells you that Block said
19  that Block was interested in bidding on a Russian
20  tender; that is one thing that Rowe said?
21    A     Yes.
22    Q     And Rowe tells you that Block
23  purportedly represented himself as a PointCare
24  distributor?
25    A     Yes.

TSG Reporting - Worldwide    877-702-9580

Page 159

F. Matuszak

1
2     Q     And Rowe tells you Block was
3   interested in responding to the Russian tender on
4   behalf of PointCare?
5     A     Yes.
6     Q     And Rowe tells you Block said he
7   would have participated in the tender, but for the
8   fact that PointCare could not supply him with NPs?
9     A     Yes.
10    Q     That is the sum and substance?
11    A     Yes.
12    Q     Did Rowe tell you anything else about
13  that matter?
14    A     That is all I remember from that.
15    Q     Did you ever investigate or receive
16  any other information to figure out whether what
17  Rowe was telling you was true or not true?
18    A     It seemed plausible, based on the
19  fact that we had supplied two badges to PointCare
20  for AACC, and the two badges that we supplied, in
21  order for us to have PointCare representatives in
22  the booth the year prior there were PointCare
23  representatives in the Drew booth at AACC.
24  PointCare representatives chose to only spend
25  about five-minutes in the Drew booth in 2007 at

TSG Reporting - Worldwide    877-702-9580

Page 160

F. Matuszak

1
2   AACC, which is a U.S. based clinical chemistry
3   show.
4     Q     So, from that you surmised what?
5     A     Well, from an inference, it would be
6   highly unlikely to believe that someone would go
7   to that show and not speak with distributors.
8     Q     So, you assume, by the fact -- and do
9   you know who, from PointCare, used those badges
10  and went to AACC in '07?
11    A     Yes.  Linsey Rockingham and Petra
12  Krauledat.
13    Q     So, if I am following you, you have a
14  report, you have the report from Rowe, and let me
15  ask you, when does he give you this report?
16    A     At AACC, and there were a
17  follow-up e-mail towards the end of September, I
18  believe, early October.  I'm not exactly sure of
19  the time frame.
20    Q     So, Rowe gives you the report we have
21  discussed, input number one; input number two is
22  you only see Petra and Rockingham for five minutes
23  or so with the Drew badges, and you assume they
24  are doing what?
25    A     And I made no assumptions at the

TSG Reporting - Worldwide    877-702-9580

Page 161

F. Matuszak

1
2   time.  It's only during the course of the
3   following months that it appears that distributors
4   are being actively courted by PointCare.
5     Q     So, just to go back to my original
6   question being, you know, what information did you
7   have as of the time the lawsuit was filed about --
8   strike that.
9         What information did you have at the
10  time the lawsuit was filed as to whether or not
11  PointCare either marketed, sold or distributed
12  into Drew lead marketer territories or efforts to
13  expand it, had impermissible dealings with Drew
14  distributors in Drew marketing territory, what
15  information did you have beyond Mr. Rowe's report
16  and the short appearance of the PointCare
17  representatives at AACC?
18    A     We also had an e-mail from Petra
19  Krauledat.
20    Q     I'm sorry.  If I could just clarify
21  my question.
22    A     Sure.
23    Q     Why don't we stick with the issue of
24  whether or not there was, in fact, any Russian
25  tender issue?

TSG Reporting - Worldwide    877-702-9580

# EXHIBIT 20

# PointCare Technologies Business Plan

## COMPANY HISTORY

PointCare Technologies, Inc. (PointCare) was founded in October of 2002 with the mission to provide medical diagnostics in settings where near patient testing to direct immediate action is the only viable means to achieve effective medical care. At the same time the worldwide AIDS crisis finally began to receive the international attention necessary to begin providing AIDS therapy and care globally and not just in a few privileged industrialized nations.

The real breakthrough in AIDS therapy has been the understanding that, no matter what drugs are used, they can only be effective in patients that have received regular diagnostic testing of their immune status. Without this testing leading up to therapy, drugs are effective in about one out of five patients and with this testing this rate rises to about 90% of patients. The world community achieved an important victory in reducing the price of drugs for AIDS therapy to a globally affordable level, but the necessity for equally affordable diagnostics to accompany the therapy has been overlooked.

"Affordable diagnostics" is a term that needs definition. In contrast to drugs, simply lowering the price for diagnostic systems used in industrialized nations is not an option. The design of these systems is predicated on use in laboratories where highly skilled labor is available to operate complex instrumentation and handle complicated biochemical reactions. Timely transportation to such centralized laboratories is also assumed to be readily available. Looking now to the regions hardest hit by the AIDS crisis neither sufficient quantities of skilled labor nor the necessary transportation system to a centralized laboratory is available, or will be available for decades, no matter how much money one might be willing to spend.



1

PointCare Technologies Business Plan    CONFIDENTIAL    June 2007

With these facts in mind, "affordable diagnostics" has a new, more general, meaning. It means diagnostics that not only have low manufacturing and distribution costs, but also can be deployed within existing infrastructures of transportation and training in the developing world; where almost all of the 50 million infected patients reside.

In this dilemma PointCare proposed the solution for truly "affordable diagnostics": Based on new science, the Company designed and developed novel instrumentation and test reagents that can be operated by unskilled labor with minimal training. In addition, PointCare's new diagnostic system is robust enough to be transported to and operated in remote, near-patient sites so that the need for reliable transportation of patient samples to a central "skill center" and the transfer of results back to the patient days or weeks later is obviated. PointCare's new product has moved the meaning of "affordable diagnostics" from cheap instruments and cheap reagents to an integrated solution for better patient care where the patient, test results, and medical guidance are all in one place at one critical time.

Today PointCare provides the **only** AIDS therapy monitoring diagnostic that can be used on a global basis in every kind of care setting. An instrument is sold under the name of AuRICA, reagents under the name of CD4*SURE*. For more detailed product information please visit the PointCare web-site www.pointcare.net. Market acceptance has been instant and purchase orders for PointCare's CD4 testing system have been received from all over Africa and Central America. Competitive systems have not answered true customer needs and government tenders in several countries have been placed on hold in order to include the PointCare product into the bidding process.

Since its inception PointCare has
- performed extensive market research to determine the customer needs,
- developed it`s first product, based on novel and proprietary technology,
- built a manufacturing organization that adheres to internationally accepted quality standards (ISO 13485),
- received regulatory clearance from the Food and Drug Administration (FDA)
- shipped product to 7 African countries and 2 Central American countries

2

PointCare did sign a distribution and service Agreement with Beckman Coulter, the world's largest hematology company, in 2004. The size and organizational differences between PointCare and this very large organization turned out to be insurmountable in a timeframe that was acceptable for PointCare even though customer interest in the PointCare product was fast and very significant (purchase orders for 69 instruments were received by Beckman Coulter sales personnel in a 3 months time frame in Africa alone). In addition, new management at Beckman Coulter decided to refocus their company towards larger and well established businesses rather then breaking new ground in new markets. The companies have dissolved their relationship by mutual agreement. Beckman Coulter, however, remains interested in doing business with PointCare at a time when products and markets are better established.

The instant and overwhelming customer acceptance of PointCare's product all over the world led to the Company's current business plan which capitalizes on proven strengths of PointCare's founders and employees.

## PLANS FOR FUTURE PRODUCTS

**PointCare will continue to invent, develop, manufacture and sell medical diagnostic products to take a dominant share in global high growth market segments.**

To do so PointCare will follow its track record of success by first performing extensive global market research for new products as well as product improvements
- to remain a **dominant** player in the current target market of AIDS patient care and
- to identify new market segments where the Company can become a **dominant** force.

Market research will focus on high growth market segments globally. PointCare will continue to invent and license novel and proprietary technology to respond to such carefully researched customer needs.

3

## High Throughput CD4 Analyzer PointCare*COMPLETE*

In 2007 PointCare will round out its instrumentation offering and add a **High Throughput CD4 analyzer** which will be used in larger and more centralized laboratories. This instrument will offer an expanded test menu compared to AuRICA, which is a full 22 parameter blood count plus a CD4 count and CD4%. Certain parameters from the white call part of the full blood count will be used as indicators for an ongoing infection and the activation of tuberculosis to aid in the care for HIV patients. Hemoglobin will aid in the management of anemia. This high throughput instrument will have the capacity to process 150 patient samples per day in a fully automated fashion. It will be the first time in the industry that high throughput CD4 testing can be performed in a fully automated walk away system. This product is designed to replace today's manual flow cytometers that are used to test for CD4 in laboratory settings. PointCare has signed a co-development and manufacturing agreement with Drew Scientific www.drew-scientific.com , an experienced hematology instrumentation company. This new product was introduced at the international AIDS meeting in Toronto in August 2006. PointCare is currently finishing validation of production systems and will be ready to ship this new product in July/August 2007.

## New and Improved Near Patient CD4 Analyzer PointCare*NOW*

Throughout 2006 and early 2007 PointCare in partnership with C2 Diagnostics, www.c2diagnostics.com, have developed a **next generation near patient CD4 analyzer** to replace the current AuRICA product. This development targeted the currently very high cost of manufacture of instrumentation and reagents. The new and improved instrumentation design has all current user interface features that are so well received in the marketplace but has increased throughput from currently 4 patients per hour to a minimum of 10 patients per hour. I addition the large number of disposable tubes and bottles required in the current AuRICA design are reduced significantly to ultimately reduce the standard cost of the assay by 50 to 60%. In addition, as a response to customers requests a basic hematology test menu was added to the CD4 and CD4% analysis capability of the system, again a first in the industry. This product also was introduced at the international AIDS meeting in Toronto in August 2006. PointCare began taking purchase orders in the 1st quarter of 2007 and expects to ship

4

product in July of 2007. This relatively long time between purchase order and delivery is acceptable for PointCare's initial customer base which are large non-government organizations with long range planning and budget cycles. To date the company has received purchase orders for 30 of the new PointCare *NOW* systems.

In addition to the above described products, the Company embarked on the formidable task of developing **HIV virus tests** to further serve its target market of AIDS patient care. Feasibility projects for two separate products are underway, the first to screen patients who are HIV antibody negative but are actually infected by the virus and the second to monitor the virus during the course of therapy and drastically reduce the number of very expensive PCR tests.

## Rapid Viral Load Test to Close the Diagnostic Gap

Virus testing during HIV screening of healthy individuals is unavailable worldwide. Rapid antibody tests for HIV (test strips) are readily available on a global basis and used routinely to identify individuals who have been infected with HIV.  These tests are not sensitive and show positive results only 4 to 6 weeks after the actual infection took place.  During this time of early infection, the individual actually carries the highest load of virus in the bloodstream that will ever occur during the course of the disease, and therefore is the most infectious. A study in Uganda showed that the transmission rate of HIV is 8 times higher during the early and currently undiagnosed period of the infection compared to the later stages when antibody is present (SCIENCE NEWS Vol. 167, page 260, April 23, 2005)..  It is estimated that more than 70% of all HIV infections are caused by individuals in this short initial period of infection.  Current thinking is that such people could be quarantined for a few weeks and possibly be given early therapy, such as is now done as "prophylaxis" for hospital workers that contact infected blood. **A diagnostic gap needs to be closed with a test product that is as convenient to use as the currently established rapid screening test strips for HIV antibody but gives information about infectivity, especially during the time when the antibody strip tests are not sensitive.** PointCare plans to round out its AIDS care product line with such a test system.

PointCare Supp 04137

PointCare Technologies Business Plan    CONFIDENTIAL    June 2007

## Viral Load Test to Monitor AIDS Therapy Long Term

The same technology in a different product configuration will be useful in the market of **AIDS therapy monitoring**: Virus testing during AIDS patient care is routinely performed in industrialized countries, but nearly unavailable in the developing world. The situation is exactly the same as in CD4 testing before AuRICA. HIV virus tests are complex and difficult to perform even by highly trained technologists. They can only be performed in sophisticated central laboratories and are very costly in addition. Moreover, they were developed for the protection of the blood supply in industrialized nations and therefore emphasize sensitivity but lack resolution critical for therapeutic decision making. PointCare plans to emphasize resolution in the therapeutic decision making range in the development of its HIV virus testing product. If successful, this new test system will dominate the market of HIV virus testing outside the blood bank, everywhere in the world.

## Long Term Plans for Future Products

Longer term and **outside its current focus on products for AIDS patient care**, PointCare plans to repeat the success of moving CD4 counting from the highly specialized clinical laboratory and the need for technicians with Masters Degree level training to any laboratory setting and even the doctors office. PointCare will develop a line of clinical flow cytometers, based on its proprietary core technology currently employed in the CD4 testing product. PointCare will capitalize on the inherent strengths of the technology which results in products that far exceed industry standards with regard to robustness and ease of use and maintenance. The capability of these flow cytometers to perform direct volumetric counting of cells and cell fragments will be applied from the classic flow cytometry field of immune status testing to new research fields in cell based discovery and diagnostics. PointCare plans to engage in a significant market research effort to identify novel cellular parameters which have not been employed appropriately due to a lack of an instrumentation platform that can be easily used by a clinical researcher. Target markets will be worldwide, providing major cost advantages in the industrialized world and allowing first time ever diagnoses and therapy control in the developing nations. Again, PointCare will use new and proprietary technology to overhaul a technologically stagnant market niche with good growth and high profit margins.

6

## INTELLECTUAL PROPERTY

PointCare has filed two patent applications to date. One application covers the fundamentals of the CD4 assay principle. This will be a broadly enabling patent, applicable to any cellular assay, not just CD4. PointCare will pursue licensing opportunities for its technology outside the company's immediate interest in HIV/AIDS care.

Another patent application covers a method for fully automated quality control on every patient sample tested. This patent application is specific to the CD4 test and will open a market opportunity for the doctor's office in the US and Europe.

PointCare is in the process of filing one or more patent applications around its viral load testing products.

## POINTCARE, A MANUFACTURING COMPANY

PointCare has successfully built a manufacturing organization which produces instruments and reagents to FDA/GMP standards and is ISO 13485 certified. PointCare's quality system which oversees product development, manufacturing and product performance at customer sites fully complies with FDA requirements. The Company put its quality system in place in the record time of four months. In October 2005 PointCare has successfully completed the company's first FDA compliance audit and received a clean bill of health.

Currently PointCare utilizes industry established suppliers to procure instrument subsystems and reagent kit components. PointCare's own organization is responsible for quality control of its suppliers and final assembly, testing and quality control of the products. This type of manufacturing organization made it possible to produce high quality products with minimal start-up time and with very little capital investment. As manufacturing volumes rise and more products come on line the Company will explore the expansion of PointCare owned production to drive costs down while maximizing returns.

7

PointCare Supp 04139

# MARKETS FOR POINTCARE PRODUCTS

## Markets for CD4 tests

According to current estimates more than 50 million people are HIV infected worldwide. The WHO recommends CD4 testing for every HIV infected patient four times per year, before, during and after therapy. If testing was performed according to WHO recommendations there would be need for about 200 million CD4 tests every year which represents a market potential in the billion dollar range.

At this point in time widespread CD4 testing on a worldwide basis is not feasible for lack of suitable technology. The availability of the PointCare **AuRICA and CD4** *SURE* products is changing this situation. Many opinion leaders in the field and most recently the WHO have named PointCare's product the best product design for worldwide deployment of HIV/AIDS care. Therefore PointCare expects to capture a very significant market share of the worldwide CD4 testing needs. It is too early to project the speed with which this new market will develop, suitable technology now being available.

The following is a number of examples of market developments PointCare is actively tracking and participating in:

- A government tender in Nigeria for 150 installations within 2 years the first 40 units to be installed this calendar year
- A government tender in Tanzania for 6 instruments in 2007 and a potential for 30 more in 2008
- The Institute of Human Virology (IHV) of the NIH is developing a total of 160 HIV care sites throughout East Africa over the next 24 months. IHV currently is PointCare's largest customer and always willing to give glowing references about PointCare's product. Pointcare already has received requests for quotes for a total of 9 new instruments from IHV and believes that it is well positions to place instruments in most if not all of the 160 sites.
- PointCare has been approached to participate in a program led by the French government rolling out HIV treatment in West Africa. 39 to 69 instruments are currently planned for this program.
- PointCare is currently negotiating with two significant distributors in India. One potential distributor is willing to make a minimum

8



PointCare Technologies Business Plan      CONFIDENTIAL               June 2007

commitment for 30 instruments for the first 6 month post licensing in India.

- Pointcare has opened discussions with one of the largest medical equipment distributors in Russia and was informed that the Russian military is in the process of decentralizing its HIV treatment program. The distributor has requested to perform a study of the suitability of the PointCare system for that purpose at the military reference hospital in Moscow as soon as possible. The total number of sites are said to be between 60 and 100.

- PointCare's only significant competitor is Becton and Dickinson (BD) who offers a similarly priced instrument to the global decentralized market (FACScount). This instrument was developed approximately 15 years ago. It is a manual instrument with no automation and requires a highly trained laboratory technician to operate. Reagents are very heat and light sensitive and therefore costly in shipping and storage. The instrument is difficult to service not the least for its outdated parts. However, until Pointcare came out with its product the FACScount was the only choice available for the decentralized market. BD placed approximately 17,000 units worldwide. These will need to be replaced on an emergency basis within the next 5 to 7 years. BD has approached PointCare about the distribution of the PointCare products.

- Lastly, but perhaps most importantly, approximately 25 to 30% of people in the emerging economies are currently privately insured with a continuously rising tendency.   This population is highly HIV infected and is beginning to receive treatment on a rapid basis spurred by the need of their employers (who insure them) to retain their workforce cost effectively. Pointcare has made its first sale into this market recently to Shell Oil in Nigeria. Pointcare distributors are poised to target this market for its long term sustainability and greatest stability.

## Markets for Virus Tests

Closing the gap between actual HIV infection and a positive HIV test (4 to 6 weeks) promises to have an even larger impact not only in developing countries but also in the US and Europe.

There are approximately 12 million HIV tests performed every year outside the blood bank in the US and Europe. As of recently new infection rates are rising again and the discussion of an earlier detection of HIV infection has become an important topic (SCIENCE NEWS Vol. 167, page 260, April 23, 2005). More than 40,000 new infections were confirmed in the US in 2004,

9

the actual number is estimated to be higher. Government grants from the NIH and from the military encourage research to close the diagnostic gap. The **virus test** PointCare is developing will be a perfect answer to this need. It is designed to be performed as easily as the current HIV antibody rapid tests and will be offered as a combination of virus and antibody test to have a complete diagnosis during a single clinic visit from day one and at any time during the course of the infection. Virus testing by way of Polymer Chain Reaction (PCR), or Branch DNA (bDNA) detection, the only technologies currently available and not suitable for the above outlined need, are premium priced everywhere in the world. Prices range from $50 to $100 for a single test which provides a very attractive basis for new competition. Even at half of the currently achieved prices the US and European market potential alone is about $450 million (based on the assumption of 12 million tests performed per year). It is likely that the number of tests performed will increase if early diagnosis and potential immediate therapeutic intervention becomes available.

On a worldwide basis the new infection rate is staggeringly high compared to the US and Europe and almost everywhere on the rise. Current estimates believe that 5 to 6 million new infections occur every year with infection rates being the highest in Eastern Europe, India and Asia (2004 World AIDS conference in Bangkok). A firm number of HIV diagnostic tests performed worldwide is unavailable but can be estimated to be at least 5 times the number of new infections diagnosed. On that basis a market potential of 30 million or more virus tests per year could result in a $500 million growing market outside the US and Europe.

The worldwide market potential for a simple, high resolution virus test for therapy monitoring is very hard to estimate at this point in time. Such a test will be applied only when patients are in therapy in order to evaluate their response to therapy and make therapy adjustments. Therefore the market potential will be highly linked to the speed of therapy roll-out worldwide. The WHO had targeted 3 million patients to be under therapy by 2005. These goals turned out to be ambitious and were not achieved but will probably be achieved very shortly. Once this initial infrastructure is in place a faster increase of enrollment into therapy can be expected. Best estimates today would suggest that by the time the PointCare virus test will be commercially available 6 to 10 million patients will receive therapy outside the US and Europe which results in a market potential of 24 to 40 million

10

tests per year, significantly rising over time (The WHO recommends at least 4 virus tests per year for a patient under therapy).

## MARKETING AND SALES

PointCare Technologies currently sells its AuRICA instrument and CD4*SURE* assay directly to US and European based organizations such as PEPFAR (the President's Emergency Program For AIDS Relief), APHL (Association Of Public Health Laboratories) or the European Community AIDS relief effort. These organizations are active worldwide with specific emphasis on territories with a very high HIV/AIDS prevalence. Through these organizations AuRICA systems were placed in many different countries which gave PointCare good recognition in a broad territory without the immediate need to develop a large sales network. Payments for the instruments are being received from reputable US or European sources and reagent supply will be secured for up to 5 years through these organizations. Customer service communications are streamlined through the organization which again relieves Pointcare from an immediate need for a large customer service workforce. To date instruments are operating in South Africa, Zambia, Kenya, Uganda, Nigeria, Malawi, Tanzania, Haiti, and Barbados. All shipments have been paid for promptly.

In addition, distributors have been signed up in Africa, India, and Central America. PointCare has developed certain criteria for the acceptance of a distributor. Those include that distributors will have to place their orders with a letter of credit from an internationally recognized bank. Payments have to be made before shipment of the instrumentation. The distributor has to be able to show a well referenced customer support system in their organization. The distributor needs to accept PointCare's published list prices. Three major distributors, one in Southern Africa, one in East Africa, and one in Central America fulfill all of these criteria. The current distribution network covers a total of more than 40 countries worldwide. Other negotiations are underway.

PointCare has chosen the direct sales route as the Company has experienced significant difficulties with the established large company distribution channels when it came to rapidly responding to customer inquiries and

11

customer feedback. When launching a new product into a new market place a close relationship to customers is essential. Product adjustments need to be made quickly and a close and personal relationship to the first ground breaking customers is critical for the long term success of an innovative product line. PointCare staff has already proven that it is capable of satisfying the special needs of such first customers. PointCare will expand this capability and with that firmly pave the ground for the long term success of its products when sold via larger corporate distribution networks.

## FINANCIAL SUMMARY

PointCare funded its first 20 months of operation with a $2 million equity investment from private individuals.

At that stage a partnership was formed with Beckman Coulter and operations were funded from $517,000 in product sales, $1.625 million advances on future royalties and $1.625 million in license fees. The relationship with Beckman Coulter was terminated by mutual agreement. Beckman Coulter did wave any claims to a repayment of advances on future royalties.

A bridge loan of $630,000 was obtained from the original shareholders in the fall of 2005 and an additional bridge loan of $830,000 from new private individuals was closed in March 2006. This bridge loan, including the accrued interest, was converted into equity in December 2006 with an additional equity investment of $2.33M as part of a Series B round.

Revenue was just over $700,000 in 2004 and rose to $1.28 million in 2005, and $1.76 million in 2006. Future projections through 2009 are based on the CD4 testing product line only. The new virus testing product also has not been included in the projections. Revenues are projected to increase to $3.5 million in 2007, $16.9 million in 2008, and $31.9 million in 2009. Profitability is expected to occur in early 2008.

Detailed historic and forward looking financials are available upon request.

12

## MANAGEMENT TEAM

### Petra B. Krauledat, Ph.D
President and CEO

Dr. Krauledat has a long career in running successful startups and managing the development, manufacture, and launch of breakthrough products for international diagnostics companies. An expert in viral diagnostics, Dr. Krauledat introduced the first commercial HIV test while employed with Behringwerke in Germany. She also managed the development of the first Hepatitis C assay for the Ortho Diagnostics/Chiron joint venture. Together with Dr. Hansen, she holds two patents for optically resonant colloidal metal labels in biochemical assays.

Dr. Krauledat has served as president of three successful start-up companies: Sienna Biotech, Inc., Union Biometrica Technologies, and Union Biometrica, Inc. Sienna Biotech was responsible for the earliest FDA-approved multiplexed immunoassay system. Among its other achievements, Union Biometrica Technologies (UBT) developed the prototype platform and assays, which are the basis for the PointCARE™ system -- PointCare Technologies' flagship product. Union Biometrica Inc., a UBT spin-off, introduced the COPAS™ product line, the world's first model organism research flow cytometers. Union Biometrica built an international market and operated from two locations, one in the United States and the other in Belgium. The company was sold in 2001 for $17.5 million.

### W. Peter Hansen, Ph.D
Chief Science Officer

Dr. Hansen's work at PointCare has been vital in making flow cytometry available for point of treatment applications. Mr. Hansen is a prolific commercial inventor in the field of biomedical analysis. His inventions are widely incorporated in significant products for flow cytometry, immunoassay, and nucleic acid detection. He co-invented the fundamental flow cytometry methods for T-lymphocyte subset analysis (Johnson and Johnson), the first commercial multiplexed immunoassay system in flow

13

PointCare Technologies Business Plan        CONFIDENTIAL              June 2007

cytometry (Sienna Biotech, now DiaSorin), the first homogeneous nucleic acid detection system (Johnson and Johnson), and the first flow sorter for multicellular organisms (Union Biometrica, now part of Harvard Biosciences).

Drs. Krauledat and Hansen have been married for 17 years and have successfully launched four companies together during that time.

14

# EXHIBIT 21

REDACTED

```
------Original Message------
To: Linsey Rockingham
Cc: Bobby Feigler
Cc: Kassey Kalutkiewicz
Cc: Moe Doire
Sent: Feb 23, 2008 11:28 AM
Subject: Marketing
```

Dear Linsey,
As you know, our company is currently in litigation with Drew regarding the Agreement we terminated last year November. In the face of this litigation, please suspend your activities to try to identify a distributor in Russia and in Malaysia. I will let you know when the matter is resolved and you can resume your activities. Please do not begin any new activities in any of the territories where Drew was the "market leader" in the terminated agreement.
I will call you on Monday in case you have any questions.
Thank you
Petra

Sent wirelessly via BlackBerry from T-Mobile.

CONFIDENTIAL

1

EXHIBIT 22

| | |
|---|---|
| From: | Tomasz Tuora [tomasz.tuora@cormay.pl] |
| Sent: | Monday, March 10, 2008 10:14 AM |
| To: | Linsey Rockingham |
| Cc: | 'Tadeusz Tuora' |
| Subject: | RE: Business plan for PointCare |

Dear Linsey,

Regarding our cooperation we are organizing a special meeting about POINTCARE in Moscow tomorrow on Tuesday, on this meeting we will decide where should be organized the training here in Poland or in Moscow.

Regarding Poland the market is maximum 2 - units per year.

Regarding Romania the market has been granted a national program for testing every men so we expect to place 5 units per year.

Ukraine we haven't received the answer from our partner yet, we will push harder after confirmation from Your end

As for EU countries like Poland the registration requires CE marked , declaration of conformity , registration document on European Union territory. You should have these docs so far if You have CE. Then to import the unit You don't need any more docs.

Regarding Your questions we will need the instrument to work in Russian , it is clear.

Regarding the document of confirming the indentity of the product, we just need the statement from POINTCARE stating which of instruments are similar , signed by authorized person at POINTCARE.

Please inform is it possible to organize the training in Russia. Please also confirm that You take the cost of registration in Russia.

Awaiting Your reply

Tomasz T


^^^^^^^^^^^^^^^^^^^^^^^^^^^^

1

Attorneys' Eyes Only

PointCare Supp 09242



Tomasz Tuora

General Manager

PZ CORMAY S.A.

M: +48 602 313 630

T: +48 22 751 79 10

F: +48 22 751 79 11

web: www.pzcormay.pl
<file:///C:\Documents%20and%20Settings\Tomasz%20Tuora\Dane%20aplikacji\M
icrosoft\Signatures\www.pzcormay.pl>

---

From: Linsey Rockingham [mailto:lrockingham@pointcare.net]
Sent: Tuesday, February 19, 2008 2:59 PM
To: Tomasz Tuora
Cc: Maurice Doize; Kassey Kalutkiewicz
Subject: Business plan for PointCare

Dear Tomasz,

Thank you for the business plan.

We have reviewed the plan and we do have some questions regarding your business plan.

The business plan covers Russia only . I know in our recent phone conversation you
mentioned that you knew there was no market for our CD4 instrument in Belarus at the
moment,  as there are no government tenders coming out and all the HIV centers are
government controlled. Is this the same for Poland, Ukraine and Romania as there was no
business plan for those countries?

The expenses that you quote in the business plan, we presume these are the  costs that PZ
Cormay will be funding?

The project schedule is good.  If the training is going to be at your offices in Poland
and PointCare ships the instruments and reagents to you in Poland as our distributor, does
PointCare have to get our product registered in Poland as well? Please can you let us know
what documents we  will need to ship an instrument to you in Poland.

We have reviewed all the documents that are required for registering medical products in
Russian and we can supply them all to you.

2

Attorneys' Eyes Only

PointCare Supp 09243

We do have a questions on number 10 and 11.

Manuals in Russian language, containing sufficient data for effective and safe usage of registering products. We can translate manuals if you provide them in English.

Thank you for your kind offering to translate the manuals.  We presume we would also have to ensure that our instrument can be operated in Russian for the registration?  Please advise.

Documents, confirming identity of the product to already registered in Russia. — 1 copy with "Apostille" (if applicable).

Does this mean that they want us to confirm comparable products that are already registered in Russia such as our competitors products ? If so, you will have to advise us as to what comparable instruments are available in Russia. Our main competitors in the CD4 marketplace are the BD FACSCount, Guava Technologies and Partec.  Partec have two sales locations in Russia,  and BD are part of the evaluation so would have to be registered.

Please can you send us  at least two, but no more than four current or past customers that PointCare may contact.

If you have any questions, please contact me.

Best Regards,

Linsey

3

EXHIBIT 23

Page 1

1

2      UNITED STATES DISTRICT COURT

       SOUTHERN DISTRICT OF NEW YORK

3      ----------------------------X

4      DREW SCIENTIFIC, INC.,

5              Plaintiff,

6          vs.                    Case No.

                                  08 CV 1490-AKH

7      POINTCARE TECHNOLOGIES,

       INC.,

8

                   Defendant.

9

       ----------------------------X

10

11

12        DEPOSITION OF LINSEY ROCKINGHAM

13            New York, New York

14          Thursday, April 3, 2008

15   Contains Confidential - Attorneys' Eyes Only Portions

16

17

18

19

20

21

22

23     Reported by:

24     JOAN WARNOCK

25     JOB NO. 15878

Page 162

```
1   Attorneys' Eyes Only - L. Rockingham
2       and what you remember, please.
3           THE WITNESS:  Okay.
4       A.  I don't remember the exact date.
5       Q.  How long ago was it?  And today is
6   April 3rd, if that helps.
7       A.  It was sometime this year.
8       Q.  Well, we could go through lots and
9   lots of emails between you and potential
10  Russian distributors that occurred this year,
11  so I'm assuming that you did not continue to
12  have such emails after Dr. Krauledat gave --
13      A.  Correct.
14      Q.  -- such an instruction.  But is
15  your recollection any better of how recent
16  the instruction was other than sometime in
17  2008?
18      A.  March 2008.
19      Q.  And did you respond to Mr. Tuora's
20  email of March 10th in any form?
21      A.  No.  Oh, yes, I did.  Sorry.  I
22  did.
23      Q.  In what form did you respond?
24      A.  I spoke to him on the phone.
25      Q.  And can you recount that
```

TSG Reporting - Worldwide     877-702-9580

Page 163

```
1   Attorneys' Eyes Only - L. Rockingham
2   conversation as best you can recall?
3       A.  I told him that we were putting our
4   plans for Russia on hold.
5       Q.  And how long after this March 10th
6   email did that conversation occur?
7       A.  Very soon afterwards.
8       Q.  In addition to the three Russian
9   distributors we covered, or potential Russian
10  distributors, I think you told me about
11  Block, I think you've told me about DRG, and
12  you've told me about Cormay.  Did you have
13  discussions with any other potential Russian
14  distributors?  Let me broaden it to say
15  communications, because I realize a lot of
16  things are done by the internet these days.
17      A.  I don't remember.
18      Q.  And you told me as to the
19  conversation you had with Dr. Krauledat about
20  her meeting with DRG at Medica and her
21  reasons for not going forward with them.  Did
22  she report to you about her meeting with the
23  Cormay representatives at Medica?
24      A.  Yes.
25      Q.  What did she say?
```

TSG Reporting - Worldwide     877-702-9580

Page 164

```
1   Attorneys' Eyes Only - L. Rockingham
2       A.  She said that she had met them at
3   Medica and they were also a distributor for a
4   company called Orphea.
5       Q.  And who had she met with?
6       A.  She had met with the senior
7   Mr. Tuora.
8       Q.  And did she convey to you any
9   impressions of that meeting?
10      A.  Yes.
11      Q.  And what were those impressions
12  that she conveyed?
13      A.  That she thought that they were a
14  good company because they already were a
15  distributor for Orphea.
16      Q.  And who is Orphea?
17      A.  Orphea is another medical device
18  distributor.
19      Q.  What types of medical devices do
20  they distribute?
21      A.  I only know of one.
22      Q.  And what is that one that you know
23  of?
24      A.  It's one that is manufactured by
25  C2.
```

TSG Reporting - Worldwide     877-702-9580

Page 165

```
1   Attorneys' Eyes Only - L. Rockingham
2       Q.  And C2 was also the manufacturer of
3   the NP machines; is that correct?
4       A.  Correct.
5       Q.  And this C2-manufactured device,
6   what does it do?  Orphea's device, not yours,
7   what does it do?
8           MR. CAPLAN:  Objection.
9       A.  I'm not sure.
10      Q.  You just know it's some kind of
11  medical device that Orphea makes -- or that
12  C2 makes for Orphea?
13      A.  Correct.
14      Q.  And subsequent to the time that you
15  had the conversation -- or let me ask you,
16  first of all, the conversation that you had
17  with Dr. Krauledat in terms of her
18  impressions of Cormay, how long after the
19  Medica conference did that conversation
20  occur?
21      A.  I didn't have a conversation.
22      Q.  Was it an email communication?
23      A.  Yes.
24      Q.  How long after the conference did
25  that email communication take place?
```

TSG Reporting - Worldwide     877-702-9580

# EXHIBIT 24

**From:** Peter Hansen
**Sent:** 7/2/2007 7:54:19 PM
**To:** Richard J. DePiano
**CC:** Frank Matuszak; Doug Nickols; Sam Hill; Petra Krauledat; Don Barry; Linsey Rockingham
**Subject:**

Dear Richard;

I am concerned about the lack of engineering progress on the 2280/CD4 (PointCare Complete) during 2007. At this time we have no working instruments from Texas despite having demonstrated that the assay worked satisfactorily in a preliminary trial (Barbados) in late in 2006.

The schedule called for Texas engineering to automate the assay over the winter and spring months of 2007. When they had failed to get a system working by March and we found there were no microscopes or other biological troubleshooting tools available at the Texas site to diagnose the situation (very unusual for a hematology company), we moved two instruments to Massachusetts to help locate and identify the problem(s). This was not a welcome undertaking at PointCare because, with the Drew schedule slippage, the 2280/CD4 project was on a direct collision with the PointCare NOW project schedule.

By June, PointCare had located the main problem responsible for blocking all progress. It turned out to be malfunctioning optics. This was a major surprise since the optics Drew supplied for the 2006 Barbados trial had worked well. Once on this trail we found that of the several optical heads Drew had built, the majority were malfunctioning. Once a Drew test technician "fixed" the optics at PointCare we were able three weeks ago to identify the rest of the engineering areas that needed work in Texas. The main item that needed to be fixed was the gold optical sensor material which became coated with gold and rendered useless. We have experience in this area and sent two materials suggestions to Texas. Additionally, the Luer assembly for injecting gold into the reservoir exhibited backpressure and did not work. We sent a design modification to Texas. We asked for an improved motor speed control on a mixer motor, and this has been constructed but not tested.

I am losing confidence in the Drew aspects of this project because:



1. Drew engineering has not delivered working instruments.

2. Problem discovery and resolution has been driven from PointCare. There is no engineering management in place in Texas. I get temporary action when I talk to Jerry West or Frank Matuszak, but their roles are clearly unofficial and focused on the specific problem that I identify. While helpful, they are not substitute managers.

3. PointCare pinpointed the optics as the problem, but we have no information as to what the problem really was. The majority of optical heads that we have tested did not work and I am not comfortable that because the Drew test technician could fix the heads, we should be confident that there is an engineering solution in place.

4. Because of the delay caused by optics, the serious work on the fluidics is still in an early stage.

5. We have no response when we asked for a formal timeline revision estimate from Texas engineering. The responses from Gary Young are a piecemeal overlay of "fixes". He sends parts for us to install and try out at PointCare, but I am looking for complete and tested systems.

6. The engineering phase of the project is months off schedule, has no corrective action plan, and needs Drew management review.


As a consequence of the above, PointCare will not commit to a date or proceed with the clinical studies of the system until three identical units are constructed by Drew, tested for engineering reliability by Drew, shipped to Massachusetts, installed by Drew, and satisfactorily validated by PointCare on patient samples. I am putting the clinical phase of the project on hold at PointCare until I see that all performance specifications in our contract are met consistently by three units. Right now, I do not have confidence that Drew can actually manufacture the system reliably.


Please let me know the plans for timeline revision and delivery of working systems.


Sincerely,


Peter Hansen


Chief Scientific Officer

HIGHLY CONFIDENTIAL

PointCare Technologies, Inc

W. Peter Hansen, PhD
Chief Scientific Officer
PointCare Technologies, Inc.

HIGHLY CONFIDENTIAL

DR00001488

# EXHIBIT 25

**From:** Richard J. DePiano Jr.
**Sent:** 7/13/2007 9:19:14 PM
**To:** phansen@pointcare.net
**CC:** Richard J. DePiano
**Subject:** Drew - PointCare

Dear Peter:

Your correspondence of July 2 was referred to me for follow-up investigation and reply.

Needless to say, we at Drew value the relationship that we have with you, Petra and PointCare. To this end, we have promptly and critically evaluated the concerns that you noted in your correspondence.

While I do not believe that it would prove productive to respond point-by-point to all of your assertions, I will attempt below to provide you with our overall assessment, as well as more detailed feedback on some of the more material assertions.

It is my impression that your concerns center primarily upon the ability of Drew's AuRica HT instrument to properly perform in a commercial setting. You have expressed reservations that the two instruments that you have worked with did not perform satisfactorily, that Drew's engineering capabilities are limited, and that communications from Drew relative to project timelines and status have not been satisfactory from your perspective.

As you know, Drew was reluctant to ship the two AuRica HT machines to PointCare and had requested that PointCare have its expert work on the assay mixing component at Drew's Dallas facility so that Drew's engineers would be readily available to assist. As you also know, you personally demanded that the instruments be shipped to PointCare. It remains the position of Drew that the two AuRica HT instruments, including the optics components, were fully operational (less the PointCare assay mixing) and in good working condition when shipped.

Unfortunately and without consulting Drew, PointCare unilaterally decided to have its personnel disassemble both instruments once they arrived at PointCare so that PointCare's team could work

HIGHLY CONFIDENTIAL

on Assay Mixture Component development. This occurred without a Drew engineer present and despite our specific guidance to the contrary. During the process, PointCare personnel damaged and misaligned key components of the AuRica HT equipment.

While you are correct that PointCare's assay appeared to work in a preliminary trial, you fail to mention that the automated mixing method was built per specifications provided by PointCare. While you complain that the optics provided by Drew malfunctioned when automated mixing was undertaken, you fail to note that the problems encountered as we moved to the automated mixing method were primarily related to PointCare's gold attaching to the surface of the optics (which was of a base material specified precisely by PointCare). As you may recall, Drew had specifically recommended against the use of this surface composite and had proposed an alternative material, which was rejected by PointCare. Further, despite PointCare's assertions that the optic problems being encountered during the automated mixing phase were not related to its choice of surface composite or its gold optical sensor material, this proved to be exactly the case. Drew's engineer confirmed that this was the true root cause and then was able to effectuate an appropriate modification. PointCare's delay in acknowledging this fact (as you may remember, PointCare initially dismissed the possibility that its gold was attaching to the surface of the optical sensor) resulted in further project delay.

Of equal concern to Drew from a "time lost" perspective is the fact that when PointCare did return one of the instruments to Drew's Dallas facility, it experienced material damage that Drew had to repair because PointCare had failed to properly drain the assay fluids from the equipment prior to shipping.

Peter, the above is not meant to be a rebuttal nor to be accusatory/"finger-pointing". My feedback, however, is intended to underscore that the problems you identify are not necessarily wholly of Drew's making. Drew has and will continue to work diligently to meet its contractual obligations to PointCare. In the same spirit, Drew expects PointCare to do the same. I firmly believe that what is needed at this juncture is an open dialogue, a continued spirit of cooperation, and an agreed upon strategic plan that takes into consideration our current status so that we expeditiously move forward to achieve our mutual goals.

As I understand, Drew agreed to deliver two (2) operational AuRica HT instruments to PointCare. Drew did in fact meet its obligation. PointCare subsequently provided Drew with change orders that requested material specification modifications to the AuRica HT. Drew has completed most of PointCare's requested changes and is presently working through the remaining change order modifications requested by PointCare. Just as Drew has previously and continues to

DR00000015

meet its obligations, it expects that PointCare will honor its obligation and promptly proceed with clinical studies.

If you desire a further discussion of the above, please give me a call.  Otherwise, please confirm that PointCare will proceed with its obligations as defined by our Agreement.

Thank you and regards,

Rich, Jr.

ESCALON MEDICAL CORP

By: Richard J. DePiano, Jr., Esquire

Chief Operating Officer & General Counsel

565 East Swedesford Road

Suite 200

Wayne, PA  19087

610 254-8930 Direct Telephone

610 688-5278 Direct Fax

610 688-6830, Extension 103

THIS COMMUNICATION MAY CONTAIN CONFIDENTIAL AND/OR OTHERWISE PROPRIETARY MATERIAL and is thus for use by the intended recipient. If you received this e-mail in error, please contact the sender and delete the e-mail and its attachments from all computers.

HIGHLY CONFIDENTIAL

# EXHIBIT 26

**From:** Karl Gu
**Sent:** 6/8/2007 3:49:09 PM
**To:** Gary Young; Doug Nickols
**CC:**
**Subject:** FW: CD4 Update

Pointcare delivered the software and we will start tesing ASAP.

Karl

———

From: Jennifer Waite [mailto:jwaite@pointcaretechnologies.com]
Sent: Friday, June 08, 2007 10:20 AM
To: Karl Gu; Williamross7@tx.rr.com
Cc: Andrea Desrosiers; Dorothy Branco
Subject: CD4 Update

Hi Karl and William,


The attached zip file contains a new CD4 DLL file, a new UI executable file, and the CD4 DLL
integration document. Dorothy has completed the DLL changes that we discussed in TX and is
described in the document. The UI executable has changed to support the new
RecoverCD4Results() function call.


Karl, I finally figured out why I was having LIS communication problems a couple of weeks ago.
The reason is that I didn't know I needed a "null modem" cable. I finally found one and tested
your DLL. I tested transferring a CD4 control result file and everything is working correctly as far
as I can tell.


Also, Karl, could you make a small change to Hematology24.dll for us? We noticed that when
you are creating the CD4 .fcs file, you are writing junk (left over) data into the part of the file that
holds classification data. Could you make it a point to pack zeros into this part of the file? The
reason is that we don't want to have false classification values in the file at any time… in case the
software crashes or is terminated for some unknown reason before the CD4 dll has a chance to
touch the file and reset that data. Let me know if you need clarification.

HIGHLY CONFIDENTIAL

Thanks…and have a great weekend!

-Jen


Jennifer Waite

Software Engineer

PointCare Technologies, Inc.

tel: (508) 281-6926 x15

fax: (508) 281-6930

jwaite@pointcare.net


Attachment: CD4 DLL & DLL Update 8Jun07.zip

HIGHLY CONFIDENTIAL

DR00027757

# EXHIBIT 27

**From:** Peter Hansen
**Sent:** 9/13/2007 3:25:14 PM
**To:** Gary Young
**CC:** Don Barry; Doug Nickols
**Subject:** Progress?

Gary,


I haven't heard anything from you since the first of August when you thought that you would have ultrasonic gold sensors to test in two to three weeks.  As I said in my email to you a couple of weeks ago, there was a lot of interest in the machine at the Barbados conference.  Did you get the email, because I still didn't hear anything back?  Anyway, I am genuinely interested in what's happening and what we can do to help.  I am not a marketing guy, but I think from what I see in the field, the system has a future.


Peter

HIGHLY CONFIDENTIAL

DR00044148

# EXHIBIT 28

**From:**      Petra Krauledat [pkrauledat@pointcaretechnologies.com]

**Sent:**      Thursday, September 13, 2007 11:23 AM

**To:**        Richard J. DePiano

**Cc:**        Peter Hansen; Linsey Rockingham

**Subject:** Status update

Dear Rich,

It was good meeting you recently at the AACC. I hope very much that we will be able to move forward with the HT project even though at this point we have no indication of the timeline that the Drew engineering group is moving towards.

I do understand from our conversation that you instructed your staff to look back through all written records to ascertain who was responsible for the delay we are experiencing in completing this project. We did receive an account from Rich Jr. in response to Peter's complaint that we are not managing the timeline toward product introduction. I will not go through Rich's account line by line to rebut it and just summarize that his entire account was not factual. Among other things he asserted that Drew had sent working optics to PointCare and PointCare's "fiddling" with the optics had in fact caused the problems. As you can see from more recent e-mails from Drew's engineering group, the non-working optics was entirely due to a faulty assembly of a temperature controller which was to keep the optics aligned and failed to do so. The problem was corrected at Drew and we are told that this will not happen again. There are other examples which, in the interest of moving forward, I will not list. I am writing to summarize where, I believe, we are to date and to communicate PointCare's plans for moving forward.

PointCare has completed all work on CD4 assay development and shown that satisfactory clinical results can be achieved with manual sample preparation and properly aligned optics. Those data were communicated late last year. PointCare has moved forward from there and completed the package design of the test kit, manufactured three validation lots and has undertaken stability studies for all fully manufactured test components. Today PointCare can show stability of all components to 7 months at 42° C. In addition to that Pointcare has shown that the CD4 test can be run successfully in a fully automated fashion on the instrument one to maximally two times in a row, but not on a consistent basis. Several reasons for the failure of consistent performance were identified by PointCare and communicated to Drew together with the return of the instruments to Drew for the purpose of correcting the identified problems (mistakenly Rich did call these communications "engineering change orders"). PointCare has also communicated that the problems identified were not necessarily all problems and others could be found in the future. PointCare did train Drew employees in performing the CD4 assay so that the engineering development of the fluidics could be completed more efficiently in Texas. This is ongoing at this point and PointCare had received communications about the progress from time to time but nothing for the part month. Peter's e-mails to Garry Young remain unanswered.

Unfortunately there is no communication from Drew about an expected project completion date. As a result of this I need to inform you that I have to withdraw the forecast for the PointCare COMPLETE and PointCare has decided to stop all its activities in promoting this product for the time being. We do not expect to resume marketing activities for this product until 2008. We have assigned sales and marketing resources that had been committed to the COMPLETE to other programs and do not have the capacity to resume sales activities this year. I very much regret that I had to take this step especially as we are seeing considerable interest in the field. Should the development be completed before PointCare can resume sales activities I would be willing to turn over any sales leads from the PointCare territories to Drew.

In the meantime PointCare will continue to work on reagent stability testing until stability failure or up to two years total stability, whichever is earlier. PointCare will continue to wait for working instruments and within maximally two months of receiving two working units, will resume work on clinical evaluations for FDA 510K filing and subsequently submit to the FDA. If no further problems are found we expect to complete clinical evaluations within 2 months and the 510K filing within an additional 6 weeks.

Regarding the timeline for the PointCare NOW (Drew D4) near patient system I would like to inform you that the first system was shipped this week. We have received a purchase order for 7 instruments from Drew for Q3 of 2007 and a forecast for another 8 units for the remainder of 2007. We will be able to deliver CE marked instruments now and expect to be able to

ship FDA approved systems in late November.

We have not received a "Sales Plan" for each of the territories as our Agreement calls for. As you may remember, PointCare provided a detailed sales plan (we call it commercialization plan) to Drew in May. I do understand that it is difficult to develop a sales plan and a forecast for an entirely new market but I have not even seen a draft sales plan from Drew. In the meantime PointCare has been approached by several distributors from the Drew assigned territories with projections that far exceed the Drew forecasts. We need to discuss this issue in the near future to find a mutually acceptable solution on how to move forward in those territories. I would appreciate you letting me know who the appropriate people for this discussion are.

Best regards
Petra

Petra B. Krauledat Ph.D.
President and CEO
phone 518-253-8642
fax 508-281-6930

# EXHIBIT 29

-----Original Message-----
From: Petra Krauledat [mailto:petra.krauledat@tmo.blackberry.net]
Sent: Friday, October 26, 2007 11:22 AM
To: Petra Krauledat; Richard J. DePiano
Cc: Peter Hansen
Subject: Future business relationship


Dear Rich,

In reference to your most recent letter, I very much appreciate your reaching out and suggesting to move forward in our business relationship rather than dwelling upon the past.

Even though I completely agree with that approach I find it useful to learn from the past so that mistakes are not repeated.

For example, during several recent long airplane rides I had the peace and quiet to go over our Agreement and identify areas where I believe we have learned important lessons and, therefore, may want to revise the Agreement for better success in the future.

1. Technical disagreements.

In several written exchanges at the management level we have had significant disagreement over the development status of the high throughput instrument (HT). This culminated quite recently in the Drew president taking the position that PointCare owed Drew money for the delivery of two non-working HT instruments. In review of our Agreement there was never any requirement for either party to pay for non-working instrumentation that was still under development. We do not expect Drew to pay for non-working NP systems and we do not plan to pay for non-working HT systems.

The development status of the NP is that systems have been released for full manufacture and delivery to paying customers very close to the planned timeline. We will install the final released software revision in the Drew NP demo system next week as planned with Frank Matuszak, which will bring that unit up to the final released manufacturing status.

The development status of the HT is that a working engineered prototype has not been delivered to PointCare and the project is now 10 months past the original timeline and still not near manufacturing release. From your recent letter, it seems that Drew is taking the position that the HT instruments in question were shipped to PointCare in full working condition and later on "damaged" by PointCare, hence the demand for payment. The fact is that these instruments never worked, due to "roadblock" design flaws in the optics assembly and the immunogold dispenser module that were identified jointly with no technical disagreements.

2. Moving forward

In the spirit of moving forward, I believe that it is important to recognize that Drew development staff works in a completely different culture than PointCare development staff when it comes to the adherence to time lines. PointCare is ready to accept that difference and is willing to waive adherence to the timeline in the Agreement provided that Drew will become the sole marketer of the HT system under the Drew label for both, instrument and reagents. PointCare, of course, will adhere to its obligation and obtain 510K approval for the CD4 test and remain the manufacturer of the CD4 reagents for the HT instrument.

I believe that with such a modification of our current Agreement tensions will be relieved and a successful HT product can be introduced on a timeline solely determined by Drew.

3. Sales and Marketing in a modified relationship.

In our current Agreement our respective companies are co-marketing both products, the HT and the NP instrument, whereby each company is the market "leader" in certain non-overlapping territories (with the exception of India). We have agreed to provide each other with sales plans and forecasts for the above products. At the current stage the NP product is shipping to customers in PointCare territories as we speak. PointCare has shared its sales plan and forecast for the NP product with Drew last summer and is actively working on the implementation of its plan.

Compared to PointCare's sales plan, Drew's forecast for the NP product has been very modest (50 instruments during the first operating year). This low forecast is at variance with Drew having, by its own claim, a well established distributor network in very significant territories. PointCare has given Drew leads in certain Drew territories but has never received a forecast that reflected such leads. By way of example: in one instance PointCare has informed Drew about a tender for 41 instruments in Russia. Unfortunately, after more than 6 months Drew's Russian distributor has not been able to identify any details about the tender. In another instance, you yourself returned from a trip to China and informed me that your distributors see no market for CD4 testing in China even though our sources and well-publicized, open literature accounts report otherwise.

In analyzing this difference in perception of the market opportunity for the NP product PointCare had to come to the following conclusion: Drew's distributors appear to serve the more traditional and established laboratory market segment where there would be little or no interest in a point of care CD4 product.

Recognizing Drew's strength in the laboratory market segment I propose the following modification to our co-marketing agreement. Drew will become the sole worldwide marketer for the HT instrument and reagents that were designed for the laboratory market. This would be done under the Drew label. PointCare will become the sole worldwide marketer of the NP instrument and reagents and this would be done under the PointCare label. This division will not only cater to the strengths of our companies but also avoid customer confusion and confusion among distributors. Both companies should provide leads to

PointCare: Future business relationship                                    Page 3 of 3

one another for the other party's product and pay an appropriate commission to one another when one of those leads results in a sale.

4.  Summary

In summary, I believe that the above outline and suggestions focus on Drew's and PointCare's strength in product development as well as marketing and sales and will result in a more profitable outcome for either company by avoiding duplication of efforts.


Please let me know your thoughts about my proposed changes to our relationship as soon as you can so that we can move forward smoothly in the original spirit of our Agreement.


Best regards
Petra
Sent wirelessly via BlackBerry from T-Mobile.

# EXHIBIT 30

# MANUFACTURING, DISTRIBUTION and CO-MARKETING AGREEMENT

PointCare Technologies, Inc. offered on November 8, 2007 to Drew Scientific, Inc. (and Richard J. DePiano, CEO of Escalon Medical Corp. (Parent corporation of Drew Scientific, Inc.)) the following addendum to this agreement:

1) The length of the agreement will be amended in Section 6.1 from: "this Agreement shall be effective for a term of five (5) years commencing on the date that DREW receives U.S. FDA approval to sell the HT platform, as modified to accommodate POINTCARE's CD4sure assay, or POINTCARE receives U.S. FDA approval to sell its modified CD4sure assay, whichever approval is later received ("Anniversary Date"), and end on the fifth anniversary of the Anniversary Date to 2 years from the date of this addendum.

2) The length of the agreement will be amended in Section 6.2 from: "this Agreement shall be effective for a period of five (5) years ("NP Term") commencing on the date that U.S. FDA approval is received to sell the NP platform or the date that POINTCARE receives FDA approval to sell its modified CD4 Lymphocyte Enumeration Assay Kits for the NP instrumentation platform in the United States, whichever approval is later received ("NP Anniversary Date") and ending on the fifth anniversary of the NP Anniversary Date to 2 years from the date of this addendum.

3) Under Annex 3 – Sales & Marketing Territories - DREW will now have the exclusive worldwide rights to sell and market the HT platform and also non-exclusive worldwide rights to market and sell the NP platform and the respective CD4 lymphocyte enumeration test kits under the DREW label. POINTCARE will have non-exclusive worldwide rights to market and sell the NP platform and the corresponding CD4 lymphocyte enumeration kit under the POINTCARE label as well as other labels.

4) Under Annex 3 – Sales & Marketing Territories - There will be no designated "Market Leader" or "Supporter" in any territory as both DREW and POINTCARE will have the ability to sell and market the NP platform and the respective CD4 lymphocyte enumeration test kit under their own labels in any territory without restriction.

5) POINTCARE has the right to audit all service call logs and field service records of DREW each quarter to determine that all pertinent service information is being provided to POINTCARE in a timely fashion. POINTCARE has the right to terminate this agreement after the first year if DREW is found not to be providing pertinent service information regarding the NP platform.

Petra B. Krauledat, CEO                          Eric J. Newman, Controller

# EXHIBIT 31

**From:** Daniel O'Connor
**Sent:** 7/14/2007 7:15:38 PM
**To:** Frank Matuszak
**CC:**
**Subject:** RE: AACC

Hi Frank;

I am about to do the same with the lawn on this end.  I will be around all evening, so feel free to call if you still have the time and energy.

Dan

---

**From:** Frank Matuszak [mailto:fmatuszak@escalonmed.com]
**Sent:** Saturday, July 14, 2007 10:52 AM
**To:** Daniel O'Connor
**Subject:** RE: AACC

Dan,

I would have no problem telling Rich this was my idea to approach you. Perhaps you are not aware of the fact that I technically do not work for drew but was hired and am still paid by Escalon so I will do what is in the best interest of Escalon and that means turning around Drew so that it can make a profit to be either sold, merged or any other form of the above. This point I believe was lost on Petra and she did not know to what extent I am involved.

I realize that you experience is around hematology but I can tell you that the Trilogy and the diabetes products  fill Drew out nicely and it will parley the hematology piece and make us attractive to distributors  as a one stop supplier. FDA approval for the Trilogy will be within the next 2 weeks and COAG is due before the end of the year. This unit will be a winner.

Reading from your email below I would propose that you take over the Pointcare piece and also consult on any direction we take on the human hematology side. I currently do this with Bob on the research side and he has full autonomy to do as he sees fit and draws the resources he needs from the former group at CDC.

Let me know your thoughts and perhaps we can talk over the weekend and then see about a trip to Dallas. I am cutting the lawn and getting things done around the house this weekend so you can reach me at 732-706-5414



DEPOSITION
EXHIBIT
MATUSZAK 3
3.28.08

HIGHLY CONFIDENTIAL

DR00050495

Regards,

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

PS : Also meeting with Herb Chow at AACC to see how he can help us on the R&D side.

———

From: Daniel O'Connor [mailto:djo3349@new.rr.com]
Sent: Saturday, July 14, 2007 10:42 AM
To: Frank Matuszak
Subject: RE: AACC

Frank;

Please make sure that Rich realizes that this was something you asked me about and that I did not ask for this to happen on my own. I believe that there are a lot of things that we could do to turn the PCT & Drew hematology effort around if he were willing to commit to the time and effort. As I have told you before I really have negligible experience in chemistry and at this late date I don't envision remaking myself. What I would like to see is a strategic review of those instruments that Drew clearly has advantages in (Vet, low cost small hem instruments & HIV etc.) and see if we can build a specialty company out of it. I have built large hematology sales and service operations and I know where we can cut and where we will have no choice to invest.

I have never visited your facility in Dallas and I propose that you bring me down there for a walk through and we sit down and see if any of this makes sense for all concerned. At that time I will outline what the issues are with PCT and how to address the board and make a play for what is left and the intellectual property etc.

I need to know that if I would get involved and ask all my contacts to work with us that Rich won't tire of the effort and sell it out from underneath us. Petra insisted that she was his savior and they both were on the same page about everything (like getting rid of you and making Sam the VP of sales & marketing?). So don't short change yourself on Susan's introduction etc.

HIGHLY CONFIDENTIAL

Dan

From: Frank Matuszak [mailto:fmatuszak@escalonmed.com]
Sent: Friday, July 13, 2007 9:02 PM
To: Daniel O'Connor
Subject: RE: AACC

Dan,

I think Rich would be open to talking to you about a take over. The key piece will be to make
sure we get the product done before Peter takes his bat and ball and goes home. We are working
on something that I am sure you will have an interest so let me run your proposal by Rich and see
what comes of it. I can tell you that he would be more than happy to give you free rein on the
Pointcare piece if it can make money and  during the due dilegence Petra could not prove how she
would make money. I'll be with Rich on Sunday and will let you know how it turns out.

Give me an idea of what your looking for if we were to move forward.

Thanks

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

From: Daniel O'Connor [mailto:djo3349@new.rr.com]
Sent: Friday, July 13, 2007 8:28 PM
To: Frank Matuszak
Subject: RE: AACC

Hi Frank;

I won't be attending the AACC, but I think you will enjoy meeting Susan.  She is a very
professional person and is well regarded among the the diagnostics companies that she has

HIGHLY CONFIDENTIAL

worked with over the years. I believe that she can give you a lot of insight about Alpha-Wasserman and that it will be sound advice.

The Abbott boys are in a real turmoil and I think that this is not the last chapter in the sale of the diagnostics division. Right up to the last minute Beckman was trying to purchase it and maybe they will reopen that chapter? Let me have a few weeks to resource input from them on that subject. A little bird has told he that PCT has laid off as many as possible and that the money will run out shortly. I am so very sad that this will result in them failing to provide the support for Catholic Relief Services etc.

If Rich really wants to pull off a deal he should hire me to negotiate a deal with the PointCare board and we should purchase it from the stockholders. I think that is could be purchased cheaply and if I can get rid of Petra and get a consultanting contract from Peter I can renegotiate a deal with C2 and all of the other serious players. I don't know if Rich is really up for a turn around, but I do know how to make money and run a company - take a look at the Abbott hematology division for proof. What I don't know is how far one can trust Rich and I do not want to find myself being sued by a crazy German nut job.

Take care of yourself!

Dan

From: Frank Matuszak [mailto:fmatuszak@escalonmed.com]
Sent: Friday, July 13, 2007 1:13 PM
To: Daniel O'Connor
Subject: AACC

Dan,

I was just wondering if you will be at AACC this year. I am planning on meeting with Susan so thanks for the intro.

What do you think about the abbott deal falling thru GE must have gotten wise. I know that your deal fell thru on the Pharma side and it would sure be good to pick that up again so if you want to work on this for Drew we would be happy to pay you for the deal since it is a pretty slim chance that Pointcare will payout or if you want to stay out perhaps you could drop me the contact info and we could work something along those lines.

Regards,

Frank Matuszak

HIGHLY CONFIDENTIAL

DR00050498

VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

HIGHLY CONFIDENTIAL

# EXHIBIT 32

**From:** Daniel O'Connor
**Sent:** 7/18/2007 4:10:14 PM
**To:** Frank Matuszak
**CC:**
**Subject:** RE: conversation with Rich

Hi Frank;

Here is David Singh's telephone number 905-947-9013, email: dsingh@destiny financial.ca

The next person to contact about this sort of discussion would be Fred Morris of Federal Street Capital, 781-295-4000, ext. 202, morris@brookventure.com

I personally think that Fred is a waste of time, but they did make a significant investment and have flogged PCT to anyone who would listen etc. If you want I can send you their latest solicitation for investors - I was quite surprised that they would even consider that I would invest.

I have a call in to find out about the valuation being presented to the board, and I also have someone checking on the status of the instrument and reagent platform. It is my understanding that they are re-writing some software code to maximize the ability of the software to identify the pertinent populations. The latest release date being reported to the customers is September. Lastly, I will try to determine if and when it can truly be released and the actual limitations of the new platform.

I am off to Michigan for the Port Huron to Mackinaw sail boat race this weekend and will return early next week.

Dan

---

From: Frank Matuszak [mailto:fmatuszak@escalonmed.com]
Sent: Wednesday, July 18, 2007 8:37 AM
To: Daniel O'Connor
Subject: conversation with Rich

Dan,

I spoke with Rich and here is where we stand:

We need to find out fairly quickly if the product will ever work and the only way to do that is by getting in touch with the development people other than Peter and Petra since we know that they will always say it can be done. The main reason behind finding this out is to see if the current group of people can do this without Peter's help.

DEPOSITION
EXHIBIT
Matuszak 4
3-28-08

HIGHLY CONFIDENTIAL

Secondly if we seem fairly certain that we can get this to work we need to come up with an estimate of how much it will cost to get us there and lastly it is not possible for Rich to contact the board directly but it would not be a problem if they contacted him. So we need to know if Petra ever presented the Escalon valuation to the board and if not we need for them to request the info surrounding the proposed deal.

On a positive note I know Rich would be in for the long haul if we could move on some of the items above. I think the main person who has to be asking questions is the guy in Canada.

Let me know you thoughts on what can be done on your side.

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email; fmatuszak@escalonmed.com
SKYPE frankmatuszak

PS. Petra is claiming the orders are flowing in not sure how she is going to install them since she has no field service.

HIGHLY CONFIDENTIAL

# EXHIBIT 33

**From:** Daniel O'Connor
**Sent:** 7/24/2007 1:46:07 PM
**To:** Frank Matuszak
**CC:**
**Subject:** Fyi

Here is some information about their current progress with the AuRICA NOW

"She indicates that it is running good and doing what it is supposed to do. Deeper prying indicates that the statement comes from a flow script perspective. As far as data, the jury is still out. I'd like to see the proof data! She indicates though it cranks out a CD4, WBC & HGB with no problem. I'll continue to dig on that."

Please keep this between you and Rich. I still don't know about the reagents or the actual performance. I also got an interesting response from the guy who wants to purchase 150 for Nigeria over the next 3 years. He told me that he and his associates might be willing to take an equity position in a newly formed company.

I am off to go fishing for a week this coming Monday and won't be back until the 6th.

Dan O'Connor

920-380-9886

djo3349@new.rr.com
SKYPE: djo3349dan.oconnor

HIGHLY CONFIDENTIAL

# EXHIBIT 34

Page 1

1

2                   UNITED STATES DISTRICT COURT

3                   SOUTHERN DISTRICT OF NEW YORK

4      --------------------------------X

5      DREW SCIENTIFIC, INC.,

6                Plaintiff,      Case No. 08 CV 1490-AKH

            -vs-

7      POINTCARE TECHNOLOGIES, INC.,

8                Defendants.

9      --------------------------------X

10

11              DEPOSITION OF FRANCIS MATUSZAK

12                    New York, New York

13                     March 28, 2008

14

15

16

17

18

19

20

21     Reported by:

       Bonnie Pruszynski, RMR

22     JOB NO. 15874

23

24

25

Page 290

```
 1            F. Matuszak
 2   O'Connor had called someone to try to find out
 3   whether -- strike that.
 4            Did you understand he was referring
 5   to valuations that had been performed during the
 6   merger discussions?
 7      A    My understanding around that was that
 8   he was a stockholder and that a stockholder would
 9   be able to ask those questions.
10      Q    All right.  But would a stockholder
11   be able to give information from a board of
12   directors meeting to someone outside the company
13   like yourself?
14      A    As it pertains to valuation?
15      Q    Oh, you have already agreed with me
16   that information discussed at a company's board of
17   directs is confidential; right.
18      A    Yes.
19      Q    Would you agree with me if valuations
20   of a company in the context of merger discussions
21   are discussed at a board, that that would be
22   highly confidential?
23      A    Yes, but I cannot control someone
24   sending me information.
25      Q    You couldn't say to him, "no, thank
```

TSG Reporting - Worldwide    877-702-9580

Page 291

```
 1            F. Matuszak
 2   you.  Don't sent it to me.  That would be
 3   inappropriate," you couldn't do that?
 4      A    I don't think you can do that with an
 5   e-mail.
 6      Q    Really?
 7      A    When an e-mail is sent out.
 8      Q    Did it even occur to you to write
 9   back and to just say, "no, Dan.  Don't send that
10   to me.  That is confidential board information.
11   It would inappropriate for me to have it."
12            Did you consider writing back to him
13   that way?
14      A    I think the fact that I didn't follow
15   up with any of this indicates that we moved no
16   further with it.
17      Q    So, it's your testimony that you did,
18   you did nothing in furtherance of this matter
19   beyond this e-mail?
20      A    To the best of my knowledge.
21      Q    But my question for me to you is:  Did you
22   either write or call him and say, "Dan, don't do
23   anything further here.  This is just wrong"?
24      A    No.
25      Q    And at the time that you received
```

TSG Reporting - Worldwide    877-702-9580

Page 292

```
 1            F. Matuszak
 2   this e-mail, did you recognize it would be wrong
 3   for him to tell you, someone outside of PointCare,
 4   whether valuations from a merger discussion had
 5   been presented to PointCare's board?
 6      A    In terms of valuation, being that he
 7   was a stockholder, I didn't -- I thought he was
 8   able to have access to that information.
 9      Q    The question isn't access.  The
10   question is whether it's appropriate for him to
11   tell you, someone outside the company,
12   confidential information that was discussed at
13   PointCare's board.
14            At the time, did you think that that
15   was appropriate for you to receive such
16   information?
17      A    No, I did not consider it.
18      Q    Okay.  And are you clear in your mind
19   that this is the last that you and Mr. O'Connor
20   spoke about going around the CEO and potentially
21   taking over PointCare?
22      A    Not entirely clear, no.
23      Q    So, it could have happened further?
24      A    Other than talk, but there was
25   absolutely no, nothing moved towards it.
```

TSG Reporting - Worldwide    877-702-9580

Page 293

```
 1            F. Matuszak
 2      Q    Why not?
 3      A    Because Dan likes to talk a big game
 4   and, in the end run, he is unable of doing what
 5   needs to be done, so...
 6      Q    At any point did you ever say to him,
 7   "we just can't do this.  This is inappropriate"?
 8      A    I think I did.  We did say that we
 9   can't move forward on this.
10      Q    Really, where was that?  Can you read
11   me what you are referring to, please?
12      A    We said it's not possible for Rich to
13   contact the board, so that was the end of it.
14      Q    But it wasn't the end of it, was it?
15   You continued to talk to Mr. O'Connor about the
16   possibility of PointCare's comptroller, Eric
17   Newman, going to the board about this.  Do you
18   recall that?
19      A    I don't remember the exact details
20   around it.
21      Q    Do you remember, in substance, that
22   what I just said was true?
23      A    I think Dan O'Connor did have
24   conversations with Eric Newman.
25      Q    So, despite the fact that Mr. DePiano
```

TSG Reporting - Worldwide    877-702-9580

Page 294

```
 1          F. Matuszak
 2  declared that he couldn't go to the board, the
 3  discussions continued between you and
 4  Mr. O'Connor; correct?
 5          MR. COSTANTINI:  Object to the form
 6  of the question.
 7      A   Can you repeat the question?
 8          (Record read.)
 9      A   I think Dan did still continue to
10  contact me, yes.
11      Q   And you continued to discuss this
12  with him; right?
13      A   I believe so.
14      Q   And at the time, did you know who
15  Eric Newman was?
16      A   Yes.
17      Q   And who was he?
18      A   I think he was the controller.
19      Q   And you understood that the
20  controller handles the finances for PointCare?
21      A   Yes.
22      Q   And you understand that the
23  controller handles confidential financial
24  information for PointCare?
25      A   Yes.
```
TSG Reporting - Worldwide      877-702-9580

Page 295

```
 1          F. Matuszak
 2      Q   And you understand that confidential
 3  financial information is sensitive to a company
 4  like PointCare?
 5      A   Yes.
 6      Q   And you understood that PointCare
 7  would expect its financial information to be kept
 8  confidential to it; correct?
 9      A   Yes.
10      Q   And you understood that it would be
11  inappropriate for someone to contact PointCare's
12  controller to ask him financial information about
13  PointCare; right?
14      A   It depends on the person asking the
15  question.
16      Q   Someone who is, someone who is
17  outside of PointCare.
18          Let me ask you this:  So, are you
19  suggesting that Mr. O'Connor, as a shareholder,
20  had a certain right to obtain certain financial
21  information from PointCare?
22      A   Yes.  And needed to hold or could
23  hold his -- basically, his investment, ask for
24  accountability.
25      Q   So, Mr. O'Connor, in your mind, had
```
TSG Reporting - Worldwide      877-702-9580

Page 296

```
 1          F. Matuszak
 2  certain rights to contact Eric Newman, controller,
 3  to get confidential information because O'Connor
 4  was a shareholder; right?
 5      A   Yes.
 6      Q   But, certainly, O'Connor did not have
 7  the right to disclose any PointCare confidential
 8  information from the controller to you at Drew;
 9  right?
10      A   Yes.
11      Q   That would be wrong, wouldn't it?
12      A   Yes.
13      Q   And that happened; right?
14      A   I believe Dan did send me some
15  information.
16      Q   What did he send you?
17      A   I don't recall exactly what it was.
18      Q   But you recall that he sent you some
19  confidential financial information he had obtained
20  from Eric Newman, the controller of PointCare;
21  right?
22      A   Yes.
23      Q   What did you do with that
24  information.
25      A   Privilege?
```
TSG Reporting - Worldwide      877-702-9580

Page 297

```
 1          F. Matuszak
 2          MR. COSTANTINI:  He's raising with me
 3  a question about a possible privilege
 4  assertion.  So, let me go outside with him
 5  for a second to see what this is about.
 6          MR. CAPLAN:  Okay, if you need to
 7  confer about a privilege.
 8          (Witness and his counsel conferring
 9  outside the deposition room.)
10          MR. COSTANTINI:  The problem is the
11  answer is going to be he advised counsel of
12  it and that is perfectly permissible for you
13  to learn.
14          What the discussion was subsequent to
15  that, is, you know, I think would be within
16  the privilege, but I will let him answer as
17  he was going to answer that he advised
18  counsel of it.
19  BY MR. CAPLAN:
20      Q   Who is the counsel?
21      A   To the best of my knowledge, it would
22  be Duane Morris.
23      Q   Did you tell anyone at Drew the
24  confidential financial information that
25  Mr. O'Connor passed along to you from controller,
```
TSG Reporting - Worldwide      877-702-9580

Page 298

```
1              F. Matuszak
2  Eric Newman?
3       A    It would have been as one group.
4       Q    Who was the group to whom you
5  reported the information?
6       A    Well, it would be everyone that was
7  in the conference call regarding the --
8       Q    Okay.
9       A    -- the PointCare matter.  So it
10 was -- everyone was in.
11      Q    Who is the cast of characters?  Who
12 is on this call?
13      A    I can't say for sure, but it would
14 be, more than likely, Doug Nickols, Rich DePiano,
15 possibly Ken Pina and Tony Costantini, and maybe
16 some others from Duane Morris.
17      Q    And not looking for exact dates, but
18 when in relation to -- strike that.
19           When you received, what is your best
20 memory of when Mr. O'Connor passed along this
21 confidential financial PointCare information to
22 you?
23      A    I don't know what it is, so it would
24 be hard to say when.
25      Q    Well, in the couple of years you have
```

Page 299

```
1              F. Matuszak
2  worked at Drew, have you often had occasion to
3  convene a group of senior management and someone
4  as august as Mr. Costantini to get advice of
5  counsel?
6       A    It would be around the time of the
7  lawsuit.
8       Q    I guess that's what I was getting at.
9           Did you pass along this information
10 in or around the time you received it from
11 Mr. O'Connor or was it not until the lawsuit that
12 you passed it along?
13      A    I have -- I can't comment, because I
14 don't know when it was.  I don't recall the time
15 frame.
16      Q    What, if anything, did you do with
17 it, aside from passing it along to this august
18 group, what, if anything, did you do with
19 PointCare's financial information?
20      A    I don't recall.
21      Q    When Mr. O'Connor passed that
22 information along to you, did you tell him, "it's
23 not right for you to give this to me"?
24      A    No.
25           (Matuszak Exhibit 5 marked for
```

Page 300

```
1              F. Matuszak
2       identification as of this date.)
3       Q    Showing you Exhibit 5, do you
4  recognize that as an e-mail that Doug Nickols sent
5  to you on December 14, '07 --
6       A    Yes.
7       Q    -- and a string of prior e-mails.
8           Could you please turn to the second
9  to last page.  And, first, would you just agree
10 with me that that is the earliest in a string of
11 the e-mails; that is an e-mail that you sent to
12 Doug Nickols, December 13th, 2007?
13      A    Yes.
14      Q    The third line down, you say, "we
15 think the hardware is set."
16           Do you see that?
17      A    Which?
18      Q    We think the hardware is set, given
19 that we think the hardware is set.
20      A    Yes.
21      Q    The hardware you are referring to,
22 the HT?
23      A    Yes.
24      Q    And what did you mean when you said,
25 "we think the hardware is set"?
```

Page 301

```
1              F. Matuszak
2       A    That all of the problems resulting
3  around the gold particle deposits, that we were
4  able to come to solutions and fix those problems.
5       Q    Were any and all problems with the HT
6  hardware fixed at this point to your knowledge?
7       A    Yes, I believe it -- well, as best as we
8  can determine.
9       Q    And since are you not the technical
10 guy, did you figure that out or did someone tell
11 you that?
12      A    Somebody else basically conveyed to
13 me.
14      Q    Who is the technical person that told
15 you that?
16      A    Well, I think at this time we
17 probably would have gotten some data on -- from
18 Herb Chow, but I am not sure of the dates.  But I
19 would have probably seen that and concluded that
20 things started looking, were starting to look
21 good.
22      Q    Do you consider within your expertise
23 to read Herb Chow's report and to interpret what
24 it's telling you?
25      A    I mean, from some of my field
```

# EXHIBIT 35

**From:** Daniel O'Connor
**Sent:** 8/8/2007 5:15:24 PM
**To:** Frank Matuszak
**CC:**
**Subject:** RE: Employment at Drew Scientific

Frank;

I am afraid that Eric probably wouldn't do this, as he keeps a very low profile etc.

Dan

_____

From: Frank Matuszak [mailto:fmatuszak@escalonmed.com]
Sent: Wednesday, August 08, 2007 11:28 AM
To: Daniel O'Connor
Subject: RE: Employment at Drew Scientific

Dan,

Thanks well hopefully Eric will not wait any longer and make this known to the board as well as the fact that Rich was willing to put in several million to get this done and it was not that Drew backed out as Petra would have everyone believe.

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

_____

From: Daniel O'Connor [mailto:djo3349@new.rr.com]
Sent: Wednesday, August 08, 2007 12:09 PM
To: Frank Matuszak
Subject: RE: Employment at Drew Scientific

HIGHLY CONFIDENTIAL

Hi Frank;

I am in contact with the controller and he tells me that even if they raise a very small amount (under $500,000.00) they can't make it until the product release. My friends at Abbot have dumped the project to work with them once they knew I was no longer involved and that was for 100 systems at $12,000.00 per. You add that back to that the Nigerian deal for 40, the 60 for Catholic Relief Services and about another 20 or so and they could of sold 220 this year if they had just told the truth (this makes no allowance for what you might have sold). I also had a deal in the work with TRANSASIA to represent them in India and do depot service repairs and warehouse reagents. I think that Rich should send a note to the board indicating his interest in exercising his option to acquire the company in the event of bankruptcy. It should at least get him a chance to address the board so that he can express his interests. Don't forget that the average user will spend in excess of $20,000.00 per on reagents and controls, with a net to the company of about $15,000.00. This is a significant sum and the only thing that stands in the way is Petra..

I think that you should realize that Andrea (the software gal) and her two associates are the key people. They wrote all the algorithms and know how to deal with the impact of the reagents on the system. They also could upgrade all of your software for any existing units and any new ones to come in the future. They seem to get along well with Henri's software guy.

Dan

---

From: Frank Matuszak [mailto:fmatuszak@escalonmed.com]
Sent: Wednesday, August 08, 2007 9:05 AM
To: Daniel O'Connor
Subject: RE: Employment at Drew Scientific

Dan thanks we may give him a try on a temp basis when I met him at AACC he was currently out of Abbott.

I know Rich is still interested it looks like that until the board does something though his hands are tied but I think he will jump in when the time comes.

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

HIGHLY CONFIDENTIAL

From: Daniel O'Connor [mailto:djo3349@new.rr.com]
Sent: Tuesday, August 07, 2007 11:01 AM
To: Frank Matuszak
Subject: RE: Employment at Drew Scientific

Hi Frank;

Well the weather was quite unsettled and as a result the fishing was slow. I went with a softball buddy of 30 years and this marked our 8th trip to Canada for fishing, so it was worth the time to catch up etc.

I am not sure that I know the guy, but I could find out if you were really interested in him. I obviously would not want to inquire to potentially embarrass him etc. As I read his resume I find that he is really a software guy and I would wonder what if any reagent or mechanical help he would be to you.

I keep hearing from the guy in Ireland who wants to purchase 150 units over 3 years and potentially would consider an investment if I was willing to lead an effort to turn it around. He has told them that until there is a 510k and real performance data he will not proceed. Petra has offered him a 2 year warranty and as I told him what good is that if they are no longer in business. Jeff Pritchard and Zip have been let go and they now really have only in house staff to send out and that supposes that they could afford to do it in any case.

What I now understand is that they will be lucky to submit a 510K by September and that would mean no product release until November. They are still trying to work out the final analysis software and work out the kinks in the instrument itself. I do not think that they have finalized the manual etc., so they are still some time from shipping instruments. They will easily run out of money by September unless Petra can tell another lie to a potential investor.

Dan

_____

From: Frank Matuszak [mailto:fmatuszak@escalonmed.com]
Sent: Tuesday, August 07, 2007 9:37 AM
To: Daniel O'Connor
Subject: FW: Employment at Drew Scientific

Dan,

HIGHLY CONFIDENTIAL

I hope you landed a few nice size fish. We caught an 18 inch bass at scout camp along with a really old and nasty snapping turtle.

As you know we are always looking at increasing our R&D capabilities and I was wondering if you new of this guy and if so what are your thoughts. Also Herb is coming to Dallas next week to review our projects.

Lastly any update on the person in Africa who was looking for a possible equity position and have there been any new updates on your end.

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

_____

From: Richard Bordenkircher [mailto:borderb@verizon.net]
Sent: Tuesday, July 31, 2007 2:31 PM
To: Sam Hill
Subject: Employment at Drew Scientific

Dear Mr. Hill:

When we met two weeks ago at the AACC convention, I inquired about potential employment opportunities and we discussed the company's plans to expand R&D. I gave you my résumé and you passed it on to Frank.

To reiterate my background, I was a Systems Engineer for 12 years in the Hematology Business Unit of Abbott Diagnostics. This position allowed me to work all phases of various projects (many concurrently) from concept and development through validation testing, as well as supporting on-market products, and serve as a technical resource for Marketing, Scientific/Medical Affairs, QA, and Customer Service. In addition, I specialized in data analysis and algorithm development.

HIGHLY CONFIDENTIAL

I have attached my résumé along with summaries of two projects – a reticulocyte assay and WBC counting with an extended differential – that I led through development. With my skills and knowledge of the technology and the diagnostics business, I am eager to contribute to Drew's continued success. I would appreciate you forwarding my résumé to the appropriate managers. Thank you very much.


Regards,

Richard Bordenkircher

HIGHLY CONFIDENTIAL

# EXHIBIT 36

**From:** Daniel O'Connor
**Sent:** 1/18/2008 5:59:37 PM
**To:** Frank Matuszak
**CC:**
**Subject:** RE: Evaluation of New version of Point Care (PointCare NOW)

Frank,

They will continue to lose their butts on these accounts, as most don't do 10 tests per day.  This coupled with poor power (almost all of the use generators), the need to train them how to use them, the difficulty in getting the reagents to them, and on and on.

Dan

_____

From: Frank Matuszak [mailto:fmatuszak@escalonmed.com]
Sent: Friday, January 18, 2008 10:39 AM
To: Daniel O'Connor
Subject: RE: Evaluation of New version of Point Care (PointCare NOW)

Thanks not sure how the CDC got involved with Catholic Relief Service a bit confusing so these are the 30 units they agreed to swap out for the 750k but costs them 900k to do it. Good business guess they make it up on volume.

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

_____

From: Daniel O'Connor [mailto:djo3349@new.rr.com]
Sent: Friday, January 18, 2008 11:36 AM
To: Frank Matuszak
Subject: RE: Evaluation of New version of Point Care (PointCare NOW)

HIGHLY CONFIDENTIAL

Frank,

They had that account prior to your deal and these are a trade out of existing systems as part of the warranty program, so I think you would be on shaky ground on that one. Also those sales are through Catholic Relief Services and not sales are bound for overseas shipment and I believe that they are allowed under the contract. Give her shit anyway!

Dan

-------

From: Frank Matuszak [mailto:fmatuszak@escalonmed.com]
Sent: Friday, January 18, 2008 10:04 AM
To: Daniel O'Connor
Subject: RE: Evaluation of New version of Point Care (PointCare NOW)

Dan,

So it looks like they have shipped 30 of the new units to Haiti of which 23 where ordered by CDC seems to me that the CDC is located in the US. Therefore can I only guess that this should have been handed over to Drew based on the agreement? Just thinking out loud.

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

-------

From: Daniel O'Connor [mailto:djo3349@new.rr.com]
Sent: Friday, January 18, 2008 10:48 AM
To: Frank Matuszak
Subject: FW: Evaluation of New version of Point Care (PointCare NOW)

Frank,

Read this for your information, but please don't forward it.

HIGHLY CONFIDENTIAL

DR00051554

Dan

_____

From: Cynthia Warner [mailto:cynthiakwarner@mac.com]
Sent: Friday, January 18, 2008 4:14 AM
To: Daniel O'Connor
Subject: Fwd: Evaluation of New version of Point Care (PointCare NOW)


This is just fyi. I am fuzzy on the dates involved in this event - but I am sure you remember (and may have been involved?) in some (much?) of it.

Before Rachanee "dismissed" UMD from HT, Dave initiated an "evaluation" of PC vs manual CD4 testing. Dave asked for my comments on the process itself and on an early copy of the report. As I remember the evaluation lasted only a few weeks and data collection was complete by June or perhaps even earlier.

I saw a second draft of the report in August or September. I have not had any direct contact with Dave or Rachanee on the report since then. On September 5th, I was "reorganized" at CDC. Tom Spira is no longer my boss. Larry Westerman arrived on 29 October to "replace Tom" as lead on the clinical monitoring activity in our unit. Larry was most recently in Zambia at CIDRZ.


He sent me the message below. He does not know my history with this process. As I said - just fyi....

cynthiakwarner@mac.com

Begin forwarded message:


From: "Warner, Cynthia (CDC/CCID/NCHHSTP)"
Date: January 17, 2008 12:16:54 PM EST
To: cynthiakwarner@mac.com
Subject: FW: Evaluation of New version of Point Care (PointCare NOW)

-----Original Message-----
From: Westerman, Larry (CDC/CCID/NCHHSTP)
Sent: Friday, January 11, 2008 12:33 PM
To: 'Rachanee Cheingsong (CDC Haiti)'
Cc: Warner, Cynthia (CDC/CCID/NCHHSTP); Cecil, Virginia M. (CDC/CCID/NCHHSTP)
(CTR); Diallo, Karidia (CDC/CCID/NCHHSTP) (CTR)
Subject: RE: Evaluation of New version of Point Care (PointCare NOW)

HIGHLY CONFIDENTIAL

Rachanee,

After a quick review of the report I have a few comments:

1. Even though the r value are good but not great, the y-intercept a systemically higher value for PointCare
2. It would be good to replot this data with only CD4 counts <350 or 400. Repeat also with more samples.
3. Was an internal preformance validation of the PointCare instrument done? (Repeats of same samples, carryover, etc.)

4. I see that one level of control was run on each instrument. How do the L-J plots look? What are CV%? Can you run two levels? Can you run the same control (same lot also) on both instrument?

Let me know the outcome of your meeting.

Larry

PS I am looking forward to meeting you in Maputo.


-----Original Message-----
From: Rachanee Cheingsong (CDC Haiti) [mailto:cheingsongr@HT.CDC.GOV]
Sent: Friday, January 11, 2008 10:32 AM
To: Westerman, Larry (CDC/CCID/NCHHSTP)
Subject: RE: Evaluation of New version of Point Care (PointCare NOW)

Thank you. I look forward to hearing from you soon. I heard from Karidia you will be in Maputo. I will be there too, may be we could meet there. But I would appreciate your precious comments before I leave so that I could share them to the parties concerned. Thanks.

Rachanee

-----Original Message-----
From: Westerman, Larry (CDC/CCID/NCHHSTP) [mailto:LEW2@CDC.GOV]
Sent: Friday, January 11, 2008 9:21 AM
To: Rachanee Cheingsong (CDC Haiti); Diallo, Karidia (CDC/CCID/NCHHSTP) (CTR)
Subject: RE: Evaluation of New version of Point Care (PointCare NOW)

Rachanee,

I will take a quick look at it this morning an give you a brief evaluation.

HIGHLY CONFIDENTIAL

larry

-----Original Message-----
From: Rachanee Cheingsong (CDC Haiti) [mailto:cheingsongr@HT.CDC.GOV]
Sent: Friday, January 11, 2008 8:07 AM
To: Diallo, Karidia (CDC/CCID/NCHHSTP) (CTR); Westerman, Larry
(CDC/CCID/NCHHSTP)
Subject: RE: Evaluation of New version of Point Care (PointCare NOW)

Hello Larry and Karidia,

Our work rhythm in Haiti moves a little bit faster than I thought. Yesterday I found out that there
was a meeting between Dr Boncy, the national lab director and Dave Doherty (IHV) at 1 pm to
discuss about the study. So I did join the meeting before getting your comments back.

Dr Boncy and I shared the same thoughts that the correlation of CD4 results between the
Pointcare Now and facscount and the manual methods although there are some relation but they
are not that so close in all cases. These could be due to different technology used to identify the
CD4 cells. The variations appeared to be greater or more evident among samples with low (<200)
and medium CD4 counts (200-500).

We thought since these two groups of samples are critical for clinicians to make decision to start
ARV treatment, it would be better if we could continue to evaluate the technology focusing on
these two types of samples, i.e. increase the sample size to at least 50 per group. We feel that
without concrete data, we could not make any recommendations to clinicians or make them trust
results generated from all of these techniques. So, we will continue looking at this aspect.

As for the implementation of the new version of PointCare, there is a limited timeline for Dave
Doherty. He will be working under this project until the end of March, a few more weeks.
Because of this, Dr Boncy has decided that we should start installing the new PointCare in Haiti
within this timeline while continue the above study. His staff will work closely with Dave Doherty
in order to master the technique of trouble shooting, installation as well as providing technical
assistance to the ARV lab. There are 30 Pointcares in Haiti. Seven were bought by AIDS Relief
for CRS Network and 23 by CDC/IHV to support MSPP, GHESKIO and MSH network. Of the
23, 2 were installed at the national lab, 2 will be stored at the national lab for spare equipment.
Then the rest of 19 will be installed among those ARV lab networks that are currently using the
old version of PointCare.

Although we have moved forward on this subject yesterday, however, I would appreciate your
comments. Once receive, I will forward or share with Dr Boncy and the group in order to better
improve our CD4 clinical lab services.

Thanks.

Rachanee

HIGHLY CONFIDENTIAL

DR00051557

-----Original Message-----
From: Diallo, Karidia (CDC/CCID/NCHHSTP) (CTR) [mailto:edu9@CDC.GOV]
Sent: Thursday, January 10, 2008 12:58 PM
To: Westerman, Larry (CDC/CCID/NCHHSTP)
Cc: Rachanee Cheingsong (CDC Haiti)
Subject: FW: Evaluation of New version of Point Care (PointCare NOW)
Importance: High

Hi Larry,

I'm sending you these data on behalf of the Haiti lab director. Can you please have a look at your early convenience and give her your comments/input/suggestions so she can go ahead and have the meeting with the other people on the Point Care issues in the country? You can scroll down and see what help she's seeking and also her own comments. Thanks for your anticipated help.

Karidia

-----Original Message-----
From: Rachanee Cheingsong (CDC Haiti) [mailto:cheingsongr@HT.CDC.GOV]
Sent: Thursday, January 10, 2008 7:50 AM
To: Nkengasong, John (CDC/CCID/NCHHSTP)
Cc: Diallo, Karidia (CDC/CCID/NCHHSTP) (CTR)
Subject: Evaluation of New version of Point Care (PointCare NOW)
Importance: High

Hi Karidia and John,

Attached please find an evaluation report of Pointcare NOW done by David Doherty (IHV) in collaboration with the National Lab, GHESKIO and CDC. There might be some changes regarding the title and also names of institutions participated in this study which got to be more prominent instead of getting acknowledgement at the end of the report.

I would like some help from our branch to look at the technical contents, the results of this study, and the interpretations, in particular the portion of comparison of Pointcare NOW, Facscount, and the manual CD4 methods. Are the reported interpretations technically sound?

When I look at the results, from CD4 (PC NOW, Facscount and manual) and hematology (between PC NOW and Sysmex), there were better tighter correlation among the hematology results generated by PC NOW and Sysmex. My interpretation for the hematology part is both instruments gave very consistent results.

However, the scatter plots for CD4, although correlated, the plots were more scattered. The r values were less too. My questions are:

HIGHLY CONFIDENTIAL

1. Could we say that the new PointCare (PC NOW) give relatively comparable CD4 counts as compared to the Facscount and the manual method?

2. Field test at 3 sites still showed some problems of needing to repeat the test (15% of the total samples). This is I think the similar type of problem seen with the first version which were the general cause of complaints. I would like to see more results coming from these sites instead of start to replace the instruments with the new version. Or should we go ahead install all new instruments for the whole country. There are advantages and disadvantages for both directions. What would be your recommendation?

I will ask Dave Doherty to prepare an abstract to be submitted to the next HIV implementers meeting in Kampala. I think the study has some merits and could be shared with other PEPFAR countries.

I appreciate your thoughts and would be grateful if I could get your response at your earliest convenience. The director of the national lab wants to discuss with me about this study. I would like to be assured that my interpretations are in the right track.

Many Thanks and best regards.

Rachanee

-----Original Message-----
From: David Doherty [mailto:dpdoherty46@gmail.com]
Sent: Thursday, December 27, 2007 9:30 PM
To: jacques boncy; Rachanee Cheingsong (CDC Haiti); Clément Ndongmo (CDC Haïti); Anna Likos (CDC Haïti); Joyelle Dominique; Peter Hansen; Peter Hansen; Kassey Kalutkiewicz; Don Barry; Gertrude Rolin; ULYSSE Marie Lourna
Subject: Point Care Now Report

Good evening all,
I managed to get this thing out the door a little earlier than expected.
I hope you are as surprised by that fact as am I.
Please review the report at your leisure and comment as you think necessary. There is a lot of information but I believe that I have organized it sufficiently well to permit the reader to separate wheat from chaff with relative ease.
Best wishes for a Happy New Year.
Dave

HIGHLY CONFIDENTIAL

# EXHIBIT 37

**From:** Doug Nickols
**Sent:** 7/5/2007 12:31:35 PM
**To:** Rob O'Connor
**CC:**
**Subject:** RE: Recruiting Clause

Holding my breath, since it won't be long. Doug.

-----Original Message-----
From: Rob O'Connor
Sent: Thursday, July 05, 2007 7:28 AM
To: Doug Nickols
Subject: RE: Recruiting Clause

Not once they go belly up

-----Original Message-----
From: "Doug Nickols"
To: "Rob O'Connor" ; "Frank Matuszak"
Sent: 7/5/2007 8:29 AM
Subject: Recruiting Clause

Found the non-recruit clause in the PCT agreement, so I won't go any further than just a "hair-brained" idea I had.

Doug.

HIGHLY CONFIDENTIAL