UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No. 08 CV 1490-AKH

|  |  |
|---|---|
| DREW SCIENTIFIC, INC., <br>              Plaintiff <br> vs. <br><br> POINTCARE TECHNOLOGIES, INC,. <br>              Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## AFFIDAVIT OF MICHAEL P. TWOHIG IN OPPOSITION TO DREW'S MOTION FOR PRELIMINARY INJUNCTION

I, Michael P. Twohig, declare:

1.  I am an associate attorney at the law firm Burns & Levinson LLP and I represent PointCare Technologies, Inc. ("PointCare") in the above-captioned action. I make this affidavit in opposition to Drew Scientific, Inc. ("Drew")'s motion for preliminary injunction seeking to force PointCare to continue performing a contract it has rightfully terminated due to Drew's material breach.

2.  The purpose of this affidavit is to place before the Court documents (not attached to the other affidavits submitted by PointCare in opposition to Drew's motion) evidencing why Drew's allegations are false and misleading and why Drew's motion should be denied.

3.  A true and correct copy of excerpts from the deposition transcript of George Chappell are attached hereto as Exhibit A.

4.  A true and correct copy of excerpts from the deposition transcript of Herbert Chow, Ph. D. along with a true and accurate copy of tab 8 to Exhibit 1 from the Chow deposition are attached hereto as Exhibit B.

5.      A true and correct copy of excerpts from the deposition transcript of Richard J. DePiano are attached hereto as Exhibit C.

6.      A true and correct copy of excerpts from the deposition transcript of Francis Matuszak along with a true and accurate copy of Exhibit 5 from the Matuszak deposition are attached hereto as Exhibit D.

7.      A true and correct copy of excerpts from the deposition transcript of Linsey Rockingham are attached hereto as Exhibit E.

8.      A true and correct copy of excerpts from the deposition transcript of (James) Gary Young along with true and accurate copies of Exhibits 7, 12, 13, and 18 from the Young deposition are attached hereto as Exhibit F.

9.      A true and correct copy of "Drew Scientific Marketing Plan" (DR 31619-40), produced by Drew in discovery, is attached hereto as Exhibit G.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 28th day of April, 2008, in Boston, Massachusetts.

Michael P. Twohig

01240730

# Exhibit A

1                    IN THE UNITED STATES DISTRICT COURT

                     FOR THE SOUTHERN DISTRICT OF NEW YORK

2

      DREW SCIENTIFIC, INC.,        )

3                                   )

           Plaintiff,               )

4                                   )

      vs.                           ) CASE NO. 08 CV 1490-AKH

5                                   )

      POINTCARE TECHNOLOGIES,       )

6     INC.,                         )

                                    )

7          Defendant.               )

8

9

10

11                    ORAL DEPOSITION OF GEORGE CHAPPELL

12                           APRIL 1, 2008

13

14

15

16          ORAL DEPOSITION OF GEORGE CHAPPELL, produced as a

17     witness at the instance of the Defendant and duly sworn,

18     was taken in the above-styled and numbered cause on the

19     1st day of April, 2008, from 9:50 a.m. to 6:02 p.m.,

20     before Jamie Prince, Certified Shorthand Reporter in and

21     for the State of Texas, reported by computerized stenotype

22     machine at HQ Global Workplaces, 2911 Turtle Creek

23     Boulevard, Suite 300, Dallas, Texas, pursuant to the

24     Federal Rules of Civil Procedure and the provisions stated

25     on the record or attached hereto.

## Page 2

```
1            A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        MR. JOHN DELLAPORTAS (VIA VIDEOCONFERENCE)
         DUANE MORRIS, LLP
5        1540 BROADWAY
         NEW YORK, NEW YORK  10036
6        212.692.1000
7    FOR THE DEFENDANT:
8        MR. MICHAEL P. TWOHIG (VIA VIDEOCONFERENCE)
         BURNS & LEVINSON, LLP
9        125 SUMMER STREET
         BOSTON, MASSACHUSETTS  02110
10       617.345.3000
11   ALSO PRESENT:
12       MS. PETRA KRAULEDAT (VIA VIDEOCONFERENCE)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1                   I N D E X
2
3                              PAGE
4    Appearances               2
5    Index                     3
6    WITNESS - GEORGE CHAPPELL
7        Examination by Mr. Twohig         6
         Examination by Mr. Dellaportas    190
8        Further Examination by Mr. Twohig 193
9    Witness Signature Page/Corrections    195
10   Reporter's Certificate                197
11
12               E X H I B I T S
13
14   NUMBER   DESCRIPTION               IDENTIFIED
15
     Exhibit 1  Attachment 1 to Annex 1         28
16   Exhibit 2  Untitled document with 46 line items  29
     Exhibit 3  Attachment 2 to Annex 1         31
17   Exhibit 4  5/17/06 Email to Gary Young, Karl Gu, Jerry
                West, George Chappell, Rodger [sic] Bourree,
18              Lee Carter, Rodger Bourree and Lee Carter
                from Andrew Kenney                64
19   Exhibit 5  5/22/06 Email to Jerry West, George Chappell,
                Gary Young, Karl Gu and Rodger Bourree from
20              Andrew Kenney                    71
     Exhibit 6  5/22/06 Email to Harry Rimmer, Doug Nickols,
21              Rodger Bourree and Frank Matuszak from Andrew
                Kenney with Project Initiation & Approvals  75
22   Exhibit 7  Synopsis of PointCare Technologies Assay for
                the Identification of CD4 Positive Lymphocytes 91
23   Exhibit 8  Email chain starting 5/24/06 between Andrew
                Kenney, George Chappell and Doug Nickols   95
24   Exhibit 9  Email chain starting 5/25/06 between Roger
                Bourree, Don Barry and Jerry West          97
25
```

## Page 4

```
1            EXHIBITS CONTINUED
2    NUMBER   DESCRIPTION           IDENTIFIED
3    Exhibit 10  11/22/07 Email to Don Barry and Peter
                Hansen from George Chappell      100
4    Exhibit 11  6/21/06 Email chain between Harry Rimmer,
                Andrew Kenney and Doug Nickols   106
5    Exhibit 12  7/28/06 Email to Don Barry from Gary Young  111
     Exhibit 13  8/4/06 Email to Gary Young and George
6               Chappell from Don Barry          115
     Exhibit 14  8/9/06 Email to Don Barry from George
7               Chappell with attached Repairs to
                BAR-8202-001 PCB                 116
8    Exhibit 15  Email chain starting 8/9/06 between Don
                Barry, Gary Young and Eric Newman  121
9    Exhibit 16  8/31/06 Email chain between Gary Young,
                George Chappell, Andrew Kenney, Jerry West,
10              Karl Gu, Don Barry and Peter Hansen  123
     Exhibit 17  Email chain starting on 9/29/006 between Gary
11              Young, George Chappell, Karl Gu, Andrew
                Kenney and Doug Nickols          123
12   Exhibit 18  Email chain starting 4/9/07 between Don
                Barry, Amy Coughlin and Gary Young  129
13   Exhibit 19  4/10/07 Email to Don Barry from Gary Young  131
     Exhibit 20  6/12/07 Email to Gary Young, Doug Nickols,
14              Jerry West, Karl Gu, George Chappell and
                William Ross from Peter Hansen   134
15   Exhibit 21  Email chain starting 6/21/07 between Don
                Barry, Peter Hansen, Doug Nickols, Gary
16              Young and Frank Matuszak         137
     Exhibit 22  Email chain starting 6/21/07 between Don
17              Barry, Peter Hansen, Doug Nickols, Gary
                Young and Frank Matuszak         143
18   Exhibit 23  8/2/07 Email to Richard DePiano, Doug
                Nickols and Frank Matuszak from Peter Hansen  150
19   Exhibit 24  9/13/07 Email chain between Gary Young and
                Peter Hansen                     153
20   Exhibit 25  CD4 Project Status 11/5/07      155
     Exhibit 26  11/6/07 Email to Doug Nickols from George
21              Chappell                         162
     Exhibit 27  11/7/07 Email to Doug Nickols from George
22              Chappell                         167
     Exhibit 28  11/15/07 Email chain between Doug Nickols,
23              George Chappell and Gary Young with attached
                CD4 Project Status               170
24   Exhibit 29  11/19/07 Email to Peter Hansen from George
                Chappell                         174
25
```

## Page 5

```
1            EXHIBITS CONTINUED
2    NUMBER   DESCRIPTION           IDENTIFIED
3    Exhibit 30  12/11/07 Email chain between Gary Young,
                Peter Hansen, Jerry West, George Chappell,
4               Karl Gu and William Ross         179
     Exhibit 31  Email chain starting 12/13/07 between Doug
5               Nickols, Frank Matuszak, Gary Young and
                William Ross                     186
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1    MR. TWOHIG: Mr. Chappell, just before we
2    get started with the deposition, just want you to know
3    that if you need a break at any time, you let us know and
4    we're more than happy to oblige you. Okay?
5    THE WITNESS: Thank you.
6    MR. TWOHIG: The only thing I would ask --
7    and I'm sure your counsel will agree -- is that if there's
8    a question pending, let's get the answer to the question
9    first, then you can just let us know you need a break and
10   we'll break for you.
11   THE WITNESS: That's fine.
12   GEORGE CHAPPELL,
13   having been first duly sworn, testified as follows:
14   EXAMINATION
15   BY MR. TWOHIG:
16   Q.  Could you state your full name for the record,
17   please.
18   A.  George Dennis Chappell, Sr.
19   Q.  And what's your residential address, sir?
20   A.  115 Settlers Creek Drive, DeSoto, Texas.
21   Q.  And how about your business address?
22   A.  4230 Shilling Way, Dallas, Texas.
23   Q.  And are you employed by Drew Scientific?
24   A.  That is correct.
25   Q.  Now, Mr. Chappell, I'd just like you, if you

Page 7

1    would, to give us a brief educational background, starting
2    with college.
3    A.  I received a bachelor's degree in electrical
4    engineering from the University of Texas at Arlington.
5    Q.  Did you do any studies after that?
6    A.  No, sir.
7    Q.  Do you have any additional education; for
8    example, professional seminars or training in your field?
9    A.  I suppose I would.  I don't know that I could
10   recall all of them.
11   Q.  What types of seminars or professional training
12   have you had, then, over the years since college?
13   A.  I've had training in certain
14   application-specific software that I use in my job.
15   Q.  Which ones?
16   A.  In the schematic capture and PC board layout,
17   circuit simulation.  Those are all I can recall at the
18   moment.
19   Q.  Okay.  And where did you have those -- what were
20   they?  Were they training seminars or courses, or how
21   would you characterize them?
22   A.  They were training seminars.
23   Q.  And who provided those to you?
24   A.  The supplier of the software.
25   Q.  And is it one software supplier we're talking

Page 8

1    about?
2    A.  No.  There were several.
3    Q.  And who were the different software suppliers
4    that we're talking about?  If you can't recall, you can
5    just answer that way.
6    A.  One was a company called Viewlogic.
7    Q.  Okay.  Do you remember any of the others?
8    A.  Another was a company called Dataflow.
9    Q.  Okay.  Any others?
10   A.  One was Texas Instruments.
11   Q.  Okay.  Any others?
12   A.  Not that I can recall.
13   Q.  All right.  Now, I might have missed it, but did
14   you tell me the year of your graduation when you got your
15   bachelor's degree in electrical engineering?
16   A.  I don't believe I did.
17   Q.  Will you tell me now?
18   A.  I believe that was 1980.
19   Q.  So other than those seminars or training courses
20   that you mentioned in connection with software that you
21   use, any other training in your field that you recall at
22   this time?
23   A.  Just 30 years' on-the-job experience.
24   Q.  On-the-job training?
25   A.  Yes, sir.

Page 9

1    Q.  Okay.  Now, where did you start working after
2    you graduated from college?
3    A.  Could you be more specific?
4    Q.  Well, let me ask you this:  When did you start
5    working in the engineering field?
6    A.  I'm not sure.  Probably about 1977.
7    Q.  Okay.  So was that during the time that you were
8    attending college?
9    A.  Yes.
10   Q.  Let me ask you this:  When did you start working
11   for Drew?
12   A.  Well, of course, we were acquired by Drew.
13   Q.  Okay.  Who were you working for when Drew
14   acquired your company?
15   A.  I was working for MWI, Incorporated.
16   Q.  MWI, Incorporated?
17   A.  Yes, sir.
18   MR. DELLAPORTAS: Objection.  Asked and
19   answered.
20   MR. TWOHIG: Okay, John.
21   Q.  (By Mr. Twohig) What was MWI, Incorporated's
22   business?
23   A.  Electronic manufacturing.
24   Q.  What type of electronics?
25   A.  Various.  Some medical instrumentation, some

Page 10

1   well logging instrumentation. Just various types of
2   instrumentation.
3       Q.  How long were you in the employ of MWI,
4   Incorporated?
5       A.  Since its beginning, in 1985.
6       Q.  And let me ask you this:  You said that MWI,
7   Incorporated was acquired by Drew?
8       A.  That's correct.
9       Q.  When did that acquisition take place?
10      A.  I don't remember the exact date.
11      Q.  Can you give me a year?
12      A.  It would be a guess.
13      Q.  Can you give me an educated guess and a ballpark
14  figure?
15      A.  I believe it was about 2000.
16      Q.  Approximately 2000?
17      A.  I believe.  It may have been --
18          MR. DELLAPORTAS:  Objection.  Asked and
19  answered.
20      A.  -- April of 2001.  I don't remember.
21      Q.  (By Mr. Twohig)  So you're placing it somewhere
22  in the 2000-2001 time frame?
23          MR. DELLAPORTAS:  Objection.  Asked and
24  answered.  Let's move on, please.
25      Q.  (By Mr. Twohig)  You can answer the question,

Page 11

1   Mr. Chappell.
2       A.  Yes.
3       Q.  Thank you, sir.
4           Now, prior to starting with MWI, Inc. in about
5   1985, did you work in the engineering field prior to that?
6       A.  Yes.
7       Q.  Who did you work for?
8       A.  Simplec Manufacturing.
9       Q.  And where were they located?
10      A.  4230 Shilling Way, Dallas, Texas.
11      Q.  Now, where was MWI, Inc. located?
12      A.  They weren't.  Well, excuse me.  At what time?
13      Q.  When you were working for them.
14      A.  4230 Shilling Way, Dallas, Texas.
15      Q.  Was -- I'm not sure if I'm going to get the name
16  right, but was Simplec Manufacturing acquired by MWI?
17      A.  I really don't know all the details.  I don't
18  know if you would call it an acquisition or...
19      Q.  Okay.  In any event, it seems like you were
20  working in the same location when you were at Simplec and
21  when you were at MWI and also when you were at Drew.  Is
22  that fair to say?
23      A.  That's correct.
24      Q.  What about your positions with these three
25  companies.  Why don't you tell me what you started off as

Page 12

1   with Simplec.
2       A.  I started as a test technician.
3       Q.  Okay.  And did you progress to any other
4   position with Simplec?
5       A.  Engineering manager.
6       Q.  Okay.  Did you progress to any other position
7   with them?
8       A.  No.
9       Q.  All right.  What about when you were working
10  with MWI, Inc., what position did you start out with them?
11      A.  Engineering manager.
12      Q.  Did you progress to any other position with MWI,
13  Inc.?
14      A.  No.  Well, I changed positions.
15      Q.  What position did you change to?
16      A.  Chief engineer.
17      Q.  And what about when you were working with Drew.
18  What position did you start out with Drew?
19      A.  Chief engineer.
20      Q.  Did you progress to any other position with
21  Drew?
22      A.  No, sir.
23      Q.  Are you still a chief engineer today for Drew?
24      A.  That's correct.
25      Q.  When did you make that progression to chief

Page 13

1   engineer with Drew?
2       A.  I think I've already answered that question.
3           MR. DELLAPORTAS:  Objection.
4       Q.  (By Mr. Twohig)  I'm not sure if you did, but if
5   you'd just answer it for me now, I'd appreciate it.
6           MR. DELLAPORTAS:  Objection.  Asked and
7   answered.
8           George, before you answer questions, if I'm
9   stating an objection, I would ask you to hold off until
10  I've completed my objection.
11      Q.  (By Mr. Twohig)  You can go ahead now.
12      A.  I said I was the chief engineer at MWI, Inc. and
13  I was the chief engineer at Drew Scientific.
14      Q.  Okay.  And I believe you placed -- that would
15  place us in 2000, then, when Drew -- or 2000 or 2001 time
16  period when Drew took over MWI, right?
17      A.  That's correct.
18      Q.  Why don't you tell me what your duties and
19  responsibilities are as chief engineer at Drew.
20          MR. DELLAPORTAS:  Objection.  Compound.
21      Q.  (By Mr. Twohig)  Go ahead, Mr. Chappell.
22      A.  I do most of the circuit design, printed circuit
23  board design, firmware design for the various projects
24  that we work on.
25      Q.  Any other duties and responsibilities?

Page 26

1  him about it anyway. So one last time, are you
2  instructing him not to answer?
3       MR. DELLAPORTAS: I stated my position and
4  it's a standing instruction and a standing objection as it
5  goes to the whole case.
6       THE REPORTER: I'm not hearing in New York
7  real well. Can you pull the microphone closer to you?
8       MR. DELLAPORTAS: The microphones here,
9  annoyingly, are kind of built into the table, so I'll try
10 to speak a little closer.
11      THE REPORTER: That's better. Thank you.
12      Q.  (By Mr. Twohig) Mr. Chappell, are you going to
13 answer my question?
14      A.  My attorney just advised me not to, I thought.
15      Q.  Are you going to answer my question, yes or no?
16      MR. DELLAPORTAS: I think he said no, but
17 to the extent --
18      MR. TWOHIG: I just want to get that on the
19 record.
20      A.  No.
21      Q.  (By Mr. Twobig) So you're refusing to answer
22 the question?
23      MR. DELLAPORTAS: Objection. Asked and
24 answered. Move on. You got your no.
25      Q.  (By Mr. Twohig) Did you work on a project with

Page 27

1  PointCare Technologies?
2       A.  Yes, sir.
3       Q.  And what was that project about? Did it have a
4  name?
5       A.  It was called the CD4 project.
6       Q.  Okay. And were you working on developing an
7  instrument?
8       A.  We were working on modifying an instrument that
9  we had previously developed to add the CD4 parameter to
10 it.
11      Q.  Okay. And the instrument that you had
12 previously developed, you're referring to Drew's XL22?
13      A.  No, sir.
14      Q.  Which instrument are you referring to?
15      A.  The Drew 2280.
16      Q.  The Drew 2280?
17      A.  Yes, sir.
18      Q.  When was the Drew 2280 designed and development
19 completed?
20      A.  Just before we started the CD4 project.
21      Q.  When do you recall starting the CD4 project?
22      A.  I believe it was July of 2006.
23      Q.  Now, the CD4 project, the instrument that was
24 being developed, was that also known as the HT?
25      A.  I believe that's what other people called it,

Page 28

1  yes, sir.
2       Q.  Okay. And did you or do you understand that HT
3  stands for High Throughput?
4       A.  Yes, sir.
5       Q.  Let me ask you this: Why don't we take a look
6  now at --
7       MR. TWOHIG: Jamie, if you could take out
8  Exhibit -- well, it's not Exhibit 2, but Document No. 2
9  and if you could mark that as Exhibit 1.
10      THE REPORTER: Okay.
11      (Exhibit 1 marked.)
12      Q.  (By Mr. Twohig) Just to make sure we're looking
13 at the same document, Mr. Chappell, this should be a
14 one-page document and it says Attachment 1 to Annex 1 at
15 the top. Do you see that?
16      A.  Yes, sir.
17      Q.  And do you see that there are line items, 46
18 line items?
19      A.  Yes, sir.
20      Q.  And do you see the date down in the bottom
21 left-hand side? It says 6/2/2006.
22      A.  Yes, sir.
23      Q.  Okay. Have you ever seen this document before?
24      A.  I don't recall.
25      Q.  Have you ever seen a document like this with

Page 29

1  respect to the CD4 project?
2       MR. DELLAPORTAS: Object to form.
3       A.  Yes, sir.
4       Q.  (By Mr. Twohig) Okay. And the document that
5  you're thinking of that is like this and it was referring
6  to the CD4 project, do you recall when you first saw that
7  document?
8       A.  No, sir.
9       Q.  Do you know who created the document that you're
10 thinking of?
11      A.  There were several people making schedules then.
12 I'm not really sure, no.
13      MR. TWOHIG: Jamie, if you could, mark
14 Document No. 6 as Exhibit 2 and hand it to the witness.
15      (Exhibit 2 marked.)
16      THE REPORTER: Okay.
17      Q.  (By Mr. Twohig) Mr. Chappell, do you have that
18 Exhibit 2 in front of you now?
19      A.  Yes, sir.
20      Q.  And just to make sure we're talking about the
21 same thing, this is another document with 46 line items
22 and it has a date down in the lower left corner of
23 10/2/2007. Do you see that?
24      A.  Yes, sir.
25      Q.  Is that the document that you're thinking of?

**Page 34**

1  you see that?
2      A. Yes, sir.
3      Q. And then if you look over on the right side, do
4  you see where there are, again, those horizontal blocks,
5  some of them followed by initials. Do you see those?
6      A. Yes, sir.
7      Q. I notice, for example, if you look over at
8  Line 17 and you look across, you see Line 17 where it says
9  "fluid routing"?
10     A. Yes, sir.
11     Q. And then if you look over it says -- where the
12  horizontal block is, the initials are DME?
13     A. Yes, sir.
14     Q. What do you understand DME to be referring to?
15     A. I don't know.
16     Q. Let me ask you this: Do you sometimes have
17  timelines and product development lines for projects that
18  you're working on at Drew?
19     A. Yes, sir.
20     Q. And do you ever use DME to stand for Drew
21  Mechanical Engineers?
22     A. I've never seen it before.
23     Q. Do you ever use DM to stand for Drew
24  Manufacturing?
25     A. No, sir.

**Page 35**

1      Q. Okay. So just one final question on this. Is
2  it fair to say that you're still not sure if you've ever
3  seen this particular timeline before?
4          MR. DELLAPORTAS: Objection. Asked and
5  answered.
6      A. Yes, sir.
7      Q. (By Mr. Twohig) Okay. Thank you, Mr. Chappell.
8      Mr. Chappell, what is your understanding of the
9  business relationship between Drew and PointCare? Do you
10  understand -- let me ask you a better question.
11     Do you understand that the business relationship
12  with Drew and PointCare is specifically the development of
13  this CD4 project?
14     A. Yes, sir. I understand it was a joint effort.
15     Q. Go ahead. I can't hear you.
16     A. I understood that it was a joint effort between
17  Drew and PointCare.
18     Q. To develop the CD4 instrument?
19     A. That's correct.
20     Q. Also known as the HT?
21     A. Yes, sir.
22     Q. Okay. Did you work on that effort?
23     A. Yes, sir.
24     Q. Did you work on it from its inception?
25     A. From the inception of the formal project, yes,

**Page 36**

1  sir.
2      Q. Okay. Now, is it your understanding that what
3  was supposed to take place in this CD4 project was that
4  Drew was supposed to modify its XL22 platform to
5  accommodate PointCare's CD4 assay?
6          MR. DELLAPORTAS: Object to form.
7      A. It was my understanding we were going to modify
8  the 2280 platform.
9      Q. (By Mr. Twohig) Okay. And was it your
10  understanding that Drew would be responsible for the
11  engineering tasks involved in that effort?
12     A. Not all of the engineering tasks, no, sir.
13     Q. Okay. Why don't you tell me which engineering
14  tasks you believe Drew was going to be responsible for.
15         MR. DELLAPORTAS: I'm going to object to
16  form there.
17     A. I believe we were to be responsible for the
18  hardware modification, the addition of any electronics
19  that were necessary for those hardware modifications, and,
20  of course, the firmware to go with the additional
21  electronics, and I understood that we had a joint
22  responsibility on the software.
23     Q. (By Mr. Twohig) Okay. Any other engineering
24  tasks that you believe Drew was responsible for on the CD4
25  project?

**Page 37**

1      A. I think that was it, mainly. Well, Drew was --
2  I think we were also assigned the responsibility of some
3  of the regulatory testing and environmental testing. And
4  again, I don't think any responsibility was cast in stone
5  as far as Drew was concerned. It was done with the advice
6  and consent of the PointCare personnel as well.
7      Q. Well, just so that I understand you here, do you
8  mean to say that there was some sort of agreement between
9  Drew and PointCare as to what Drew was responsible for,
10  what PointCare was responsible for, and what things were
11  joint responsibility?
12         MR. DELLAPORTAS: Object to form.
13     A. There may have been something like that.
14     Q. (By Mr. Twohig) Okay. I have your list of
15  things, and you mentioned some things that Drew is
16  responsible for. You mentioned at least one thing that
17  was joint responsibility. At the tail end of your list
18  you mentioned regulatory testing and environmental
19  testing.
20     A. Yes, sir.
21     Q. Did you understand that -- I'm sorry.
22     Did you understand that Drew was going to be
23  responsible for the regulatory testing and environmental
24  testing or only parts of those?
25         MR. DELLAPORTAS: Object to form.

Page 38

1    A. It was my understanding that we would be
2 responsible for the environmental testing and for part of
3 the regulatory testing that involved the low-voltage
4 safety and the CE mark. Those are normally the only parts
5 that I'm involved with.
6    Q. (By Mr. Twohig) I didn't fully understand the
7 phrase. You said something about safety.
8    A. Low-voltage safety.
9    Q. Low-voltage, okay. Thank you.
10    I want to go back and focus on the first three
11 things that you had mentioned.
12    You mentioned that Drew would be responsible for
13 hardware modification. Can you tell me what hardware
14 modification was entailed in this project?
15    A. It mostly centered around the mixing cuvette,
16 which was the device that was added to mix the new
17 reagents and the patient sample to prepare it for the CD4
18 measurement.
19    Q. Okay. And what were the other hardware
20 modifications?
21    A. We also had to add an additional sensor to the
22 optics head for detecting the CD4 particles.
23    Q. Okay. What other hardware modifications?
24    A. We also modified the -- what we call the slide
25 valve in order to eliminate other devices that we might

Page 39

1 have used to direct the fluids and conserve space so we
2 could get everything to fit in the package.
3    Q. So the modification of the slide valve, did that
4 pertain to the fluidics part of the device?
5    A. Yes, sir.
6    Q. Any other hardware modifications on the CD4
7 project?
8    A. There were some modifications made to the
9 fluidics, some valves added, minor things, but those --
10 the mixing cuvettes and there were some pumps to support
11 the mixing cuvette. We also added a dual syringe pump to
12 deliver the lyse and quenching reagents, and we also had
13 to modify the reagent detector board to add inputs for the
14 four new reagents, or three, however many new reagents
15 there were.
16    Q. Okay. The last two that you just mentioned, you
17 mentioned modify the reagent detector board, and just
18 prior to that you also -- I didn't catch that whole one.
19 I think you said you added some pumps.
20    A. Two peristaltic pumps for metering the new
21 reagents.
22    Q. Mini pumps or micro pumps?
23    A. Peristaltic pumps.
24    Q. Okay. Let's -- anything else that you want to
25 add to this list of hardware modifications? Let me

Page 40

1 rephrase the question.
2    Are there any other hardware modifications that
3 you would list?
4    A. We also designed a reservoir to hold the gold
5 reagent.
6    Q. Okay. Mr. Chappell, were you involved in all of
7 these hardware modification tasks?
8    A. I was in all except the reagent detection board.
9 I didn't have too much involvement in it.
10    Q. Who was the main person involved in that?
11    A. It was Jerry West and Karl Gu.
12    Q. But in all of the other hardware modification
13 tasks that you mentioned previously, were you very
14 involved?
15    A. Yes, sir.
16    Q. Now, I believe you said that you believe you
17 became involved in the project and that the project
18 started formally in approximately July of 2006. Is that
19 accurate?
20    A. Best of my knowledge, yes, sir.
21    Q. And were you involved, then, undertaking these
22 hardware modification tasks from that point in time
23 onwards?
24    A. Yes, sir.
25    Q. And are you still involved in that today?

Page 41

1    A. Until, oh, about three or four weeks ago.
2    Q. Okay. And what were you still working on three
3 or four weeks ago when you stopped being involved?
4    A. What we call the shipping decks.
5    Q. The shipping decks?
6    A. Yes, sir.
7    Q. What were you doing with the shipping decks?
8    A. Trying to streamline their operation so that we
9 could prepare an instrument for shipping without removing
10 the cover.
11    Q. Who were you going to be shipping the instrument
12 to?
13    A. Customers, I suppose.
14    Q. Do you not know?
15    A. I really don't understand your question. Which
16 instrument are you talking about?
17    Q. I'm talking about the HT instrument, the CD4
18 instrument.
19    A. Well, of course.
20    Q. Is that the same one you're talking about?
21    A. Yes, sir.
22    Q. Okay. So are you just not sure who you were
23 preparing -- let me rephrase the question.
24    Are you saying you were doing this generally in
25 preparation for shipping?

Page 42

1    A.  That's correct.  It's part of every instrument
2  project, so it was not for any one specific instrument.
3    Q.  Okay.  And let me back up for one second.
4        So the shipping decks that you were referring
5  to, can you just describe them, tell me what they are?
6    A.  They are pieces of software that control the
7  pumps and motors and hardware in the analyzer.  In this
8  case, the object was to control these devices in such a
9  manner that we could rinse and then dry -- rinse,
10  sanitize, and dry all of the fluidics inside the
11  instrument in preparation to ship it.
12    Q.  Now, what stage of product development, design
13  and development, would that be in?
14    A.  Could you be more specific?
15    Q.  Well, this CD4 project was a project that you
16  were designing and developing an instrument, correct?
17    A.  Yes, sir.
18    Q.  And I take it that the end point of that design
19  and development is to get to an instrument that is going
20  to be manufacturable and reliable and that you're going to
21  be able to sell to customers, right?
22    A.  That's correct.
23    Q.  And I take it that this work that you were doing
24  three or four weeks ago with respect to the shipping decks
25  was something that you had to do prior to getting to that

Page 43

1  end point.  Is that also correct?
2        MR. DELLAPORTAS:  Object to form.
3    A.  Yes, sir.
4    Q.  (By Mr. Twohig)  So what I'm trying to learn
5  here is how much prior to that end point was this task.
6        MR. DELLAPORTAS:  Objection.  Vague and...
7        THE REPORTER:  I got the objection, vague.
8  Was that it or was there more to that objection?
9        MR. DELLAPORTAS:  I'm sorry.  Vague and
10  confusing.
11    A.  I am confused.  Are you talking about end point
12  of a project in general or -- I mean, the shipping decks
13  can be prepared at any time.
14    Q.  (By Mr. Twohig)  Okay.  They can be prepared at
15  any time.  That actually helps me out.
16        Let me ask you this:  Did you finish that task,
17  trying to straighten out the shipping decks?
18    A.  No, sir.
19    Q.  So I take it -- and correct me if I'm wrong --
20  you were instructed at that point to just stop that task.
21    A.  I was never instructed directly to stop it.
22    Q.  But you did stop?
23    A.  Yes, sir.
24    Q.  Okay.  If you were going to continue on with
25  your engineering effort on the CD4 project, you would have

Page 44

1  to pick up and continue that task, right?
2    A.  Yes, sir.
3    Q.  What other tasks would be remaining in the
4  engineering effort if you pick the project back up?
5    A.  We would still need to do the environmental
6  testing.  We would still need to do the regulatory
7  testing, and I would think that we would have to also have
8  input from PointCare on finalizing the measurement cycle,
9  preparation of the sample and the measurement.
10    Q.  What about reliability testing.  Would you need
11  to do that?
12    A.  Yes, sir.  We would need to complete it.
13    Q.  Did you already start that task?
14    A.  Yes, sir.  We've done some of it.
15    Q.  Were you involved in that?
16    A.  Yes, sir.
17    Q.  What did that consist of?
18    A.  So far, I think we've done what would be the
19  equivalent of a three-year life test on the slide valve.
20    Q.  Is that the only reliability testing that you've
21  undertaken?
22    A.  To the best of my recollection, yes, sir.
23    Q.  And what other reliability testing do you
24  believe would be necessary for this instrument, the CD4
25  instrument?

Page 45

1        MR. DELLAPORTAS:  Objection.  Object to
2  form.  Necessary for what purpose?
3    Q.  (By Mr. Twohig)  Go ahead, Mr. Chappell.
4    A.  I don't know that I could give you an
5  all-inclusive list.  I could tell you some of the other
6  things that come to mind would be --
7    Q.  Why don't -- go ahead.  Why don't you go ahead
8  and answer to the best of your ability.
9        MR. DELLAPORTAS:  Same objection.
10    A.  We would need to do some life testing on the
11  syringe pump that we designed for moving the lyse and
12  quench reagents; probably some testing on the peristaltic
13  pumps that we added.
14    Q.  (By Mr. Twohig)  Any other reliability testing
15  that you would undertake on the CD4 machine?
16        MR. DELLAPORTAS:  Object to form.
17    Q.  (By Mr. Twohig)  Let me see if I can help you
18  out.  How about with the optics head?
19    A.  Yes.  We did have some new parts there, so yeah,
20  we would probably do some testing on it.
21    Q.  What about the ultrasonic sensor?
22    A.  Yes, sir.
23    Q.  So we have the syringe pump, the peristaltic
24  pump, the optics head, and the ultrasonic sensor.  Any
25  other items that you can think of that you would do

Page 46

1  reliability testing on on the CD4 project?
2      A.  Well, we also added some stepping motors for
3  mixing the reagents.  They would probably test it in
4  conjunction with the peristaltic pumps.
5      Q.  Any other items that you would do reliability
6  testing to?
7      A.  Not that come to mind, no, sir.
8      Q.  What about the whole integrated system?
9      A.  I'm not sure how you would do a reliability test
10  on the whole integrated system.
11      Q.  Okay.  Even though you're not sure how it would
12  be done, do you think it would be some reliability testing
13  that should be done?
14      A.  There's testing that's done but what's not
15  normally termed as reliability testing.
16      Q.  Okay.  What type of testing is done with the
17  integrated system?
18      A.  Usually verification and validation.
19      Q.  What does that consist of?  And feel free to
20  split those up and address them one at a time.
21      A.  Verification involves applying certain inputs
22  and see if you get the predicted outputs by using
23  measuring instruments such as volt meters, oscilloscopes,
24  et cetera.
25          Validation usually involves operating the system

Page 47

1  for its intended use and see if you get the expected
2  results and consistency that were demanded by the
3  specifications.
4      Q.  Let me ask you this:  Has any verification
5  testing been done for the CD4 instrument?
6      A.  I think we have some verification data, yes,
7  sir.
8      Q.  I take it that you haven't completed that
9  verification testing, though, for the HT.
10      A.  No, sir.  That's an ongoing process.  It occurs
11  throughout the life of the project, essentially.
12      Q.  And just to be clear here, I'm using CD4
13  instrument and HT interchangeably.  Do you understand that
14  to be the case?
15      A.  Yes, sir.
16      Q.  What about validation.  Has any validation work
17  been done yet for the HT?
18      A.  No, sir.  We can't.
19      Q.  Why is that?
20      A.  The software was never completed.
21      Q.  Now, I take it that you would need completed
22  hardware and completed software to be able to do
23  validation.
24      A.  That is correct.
25      Q.  And is the reason the software was never

Page 48

1  completed because you can't complete the software until
2  the hardware is completed?
3      A.  I wouldn't think so, no.
4      Q.  So your understanding is that you can complete
5  the software for the HT instrument prior to the completion
6  of the hardware?
7          MR. DELLAPORTAS:  Objection.  Asked and
8  answered.
9      A.  I think it has to be before we can complete the
10  hardware.  Hardware and software design is always a joint
11  effort and there's always fine-tuning back and forth.  If
12  we can't get at least a first cut of the completion of the
13  software, we cannot finish the hardware test.
14      Q.  (By Mr. Twohig)  So is it your testimony that
15  you don't believe you got a first cut at the software for
16  the HT instrument?
17      A.  Not that was complete enough for us to finish
18  the project, no.
19      Q.  Now, can you be more specific?  Which part of
20  the software do you believe you did not get a complete
21  enough version of?
22      A.  It's called the DLL.
23      Q.  The DLL?
24      A.  That's correct.
25      Q.  And what does that DLL do?

Page 49

1      A.  It takes the data that is generated during the
2  measurement cycle and massages that data and analyzes it
3  and prints it in such a manner that the operator can
4  determine how well the instrument is working, and it also
5  calculates the final results of the various parameters
6  that the instrument is supposed to report.
7      Q.  Mr. Chappell, I just want to go back and go down
8  the list of the hardware that you had testified about that
9  you would do the reliability testing on.
10          So just going back to the top of the list, I
11  think the first thing you mentioned was the syringe pump
12  and that you would do life testing on the syringe pump.
13  Do you recall that?
14      A.  Yes, sir.
15      Q.  Can you tell me what -- what would that testing
16  comprise?
17      A.  Mainly would determine how many times that pump
18  would be exercised during the -- while you're measuring
19  one CD4 sample, then multiply that number of times by an
20  estimated number of samples per week that a lab might run
21  and then multiply that by the number of samples that you
22  might expect it to be measured in a three-year time
23  period.  Then we would usually modify the deck to exercise
24  that pump that number of cycles and then disassemble the
25  pump afterwards, take measurements, look for wear, so

Page 50

1  forth.
2      Q.  How long would you expect that all that would
3  take?
4      A.  Maybe two or three weeks.
5      Q.  And who would undertake that testing?
6      A.  I would.
7      Q.  Alone?
8      A.  No.  I would probably supervise William Ross.
9      Q.  And the two of you working on it would take two
10 to three weeks?
11     A.  Yes, sir.
12     Q.  Why don't we go down to the second item on the
13 list that you testified to, and that was the peristaltic
14 pump.
15     A.  Yes, sir.
16     Q.  And what would you do with respect to the
17 peristaltic pump for reliability testing?
18     A.  It would be similar.  We would determine how
19 long that pump is operated during each measurement cycle,
20 extend that to a three-year time period and then operate
21 the pumps and, again -- probably we wouldn't look so much
22 for wear in those.  What we would look at is whether or
23 not they still -- probably look at the accuracy of the
24 fluids that were delivered, accuracy of the volumes of the
25 fluids.

Page 51

1      Q.  And who would do that testing?
2      A.  Again, probably myself.  I would probably
3  supervise William.
4      Q.  And how long would that take or how long would
5  you anticipate that that would take?
6      A.  Well, without actually running the numbers,
7  again, maybe two or three weeks.
8      Q.  The next item that you had mentioned was the
9  optics head.
10     A.  Yes, sir.
11     Q.  And I'd ask you the same question.  What type of
12 reliability testing would you do for the optics head?
13     A.  I'm not really sure, to tell the truth.  I'm
14 actually not --
15     Q.  Why is that?
16     A.  I'm actually not the resident expert on the
17 optics head.  I didn't design it originally and the man
18 that did design it is gone.  I would probably consult with
19 some of the other people in the company and we would have
20 to come to a consensus as to just what we would test
21 there.
22     Q.  Who is the person who did design the optics
23 head?
24     A.  Well, Gary Young worked on it in conjunction
25 with Jerry West, and the engineer that's gone now is John

Page 52

1  Charles Pina.
2      Q.  Can you spell that last name, please?
3      A.  P-I-N-A.
4      Q.  Do you know when that -- by the way, before I
5  ask this, am I saying that correctly?  Is it optics head
6  or is it optic head?
7      A.  Your choice.
8      Q.  All right.  Both work for you?
9      A.  Yes, sir.
10     Q.  Okay.  When was that optic head developed?
11     A.  It was in the '90s.  I don't remember exactly
12 when.
13     Q.  Do you know if it was developed for the original
14 XL22?
15     A.  Yes, sir, it was.
16     Q.  Okay.  And was it modified for the XL2280?
17     A.  Slightly.
18     Q.  What was the slight modification?
19     A.  We added a resistive heater to it.
20     Q.  Why did you do that?
21     A.  Because there was no longer enough heat
22 generated inside the instrument to bring the optics head
23 up to the required operating range if the ambient
24 temperature were very low, at the low end of the operating
25 specs.

Page 53

1      Q.  Okay.  What modifications were made for the CD4
2  or HT instrument?
3      A.  Modifications to what?
4      Q.  To the optic head.  Sorry.
5      A.  We added a second photomultiplier tube at
6  90 degrees to the flow cell.
7      Q.  Is a photomultiplier -- do you abbreviate that
8  as PMT?
9      A.  Yes, sir.
10     Q.  So you added a second PMT?
11     A.  Yes, sir.
12     Q.  Just going back for a second, did you
13 participate in the modification to the 2280?  And I'm
14 referring to what you testified about adding the resistive
15 heater.
16     A.  Yes, sir.
17     Q.  And did you participate in the modification for
18 the HT project to the optic head?  And that was adding the
19 second PMT.
20     A.  Yes, sir.
21     Q.  Okay.  And just to make sure that I understood
22 this correctly, you testified that you feel that you're
23 unable to give an estimate as to how long it would take to
24 do the reliability testing for the optic head?
25         MR. DELLAPORTAS:  Objection.  Asked and

Page 54

1  answered.
2     A.  No, sir, because I'm not sure exactly what we
3  would be testing.
4     Q.  (By Mr. Twohig)  Okay.  Fair enough.
5        Let me move on to the next item that you
6  testified about, the ultrasonic sensor.  Can you please
7  tell me what you would do for reliability testing for the
8  ultrasonic sensor?
9     A.  It would probably be tested in conjunction with
10 the peristaltic pumps since that's the reason it's in the
11 circuit.  So it would probably -- reliability testing for
12 it will be done in parallel with the peristaltic pumps.
13    Q.  So that would be done over the same time period?
14    A.  Yes, sir.
15    Q.  And the same people would be involved?
16    A.  Yes, sir.
17    Q.  Okay.  What about the stepping motors.  I
18 believe that was the next item that you had referenced.
19 What type of reliability testing would you do on those?
20    A.  Did I mention stepping motors?
21    Q.  I believe you did.  I think for the mixer.
22    A.  Oh, I'm sorry.
23    Q.  That's okay.
24    A.  Essentially the same thing.  We would just
25 determine how long each motor is operated during a

Page 55

1  measurement cycle and at what speeds, project that over a
2  three-year life and then exercise them.  Those we could
3  run without having to move any reagents, probably, so
4  that's something that we would probably run 24 hours a day
5  and maybe finish that within a week or two.
6     Q.  And who would do that testing?
7     A.  Myself and William Ross.
8     Q.  Let me ask you this:  Do you usually work on
9  more than one project at a time, Mr. Chappell?
10    A.  Depends upon what the project is.
11    Q.  Let me ask you, over the course of 2006 and
12 2007, from the point when you started working on the HT
13 CD4 project, were you working on multiple projects during
14 that time period?
15        MR. DELLAPORTAS:  Object to form.
16    A.  I did work on some other projects when there
17 were gaps in the schedule in the CD4 project when I --
18 when it was not possible for me to do anything else.
19    Q.  (By Mr. Twohig)  Is it your testimony that there
20 were points in time during the CD4 project when you were
21 unable to do anything to -- excuse me -- unable to do any
22 work on the project?
23    A.  That's correct.
24    Q.  And why was that?
25    A.  PointCare had all our hardware.

Page 56

1     Q.  So there --
2     A.  They had the prototype.
3     Q.  I'm sorry.  I didn't hear.
4     A.  They had the prototype hardware.  I had nothing
5  to work on.
6     Q.  How many prototypes did you have?
7     A.  I think there were just two.
8     Q.  So you never built a third?
9     A.  There were some production prototypes that were
10 being built, but I don't think they were ever completed.
11    Q.  So then to just clarify here, you had two
12 prototypes that were completed; is that correct?
13    A.  Yes, sir.
14    Q.  And can you tell me when they were both
15 completed?
16    A.  Sometime in the spring of 2007.  I couldn't tell
17 you exactly when, no, sir.
18    Q.  Do you believe they were both completed around
19 the same time?
20    A.  Within a few weeks of one another.  We sent
21 PointCare one prototype, got some feedback from them, and
22 then got the second one up to the same level as the first
23 and then shipped to them.
24    Q.  So is it your testimony that you sent both
25 prototypes to PointCare at some point in time?

Page 57

1     A.  Pretty sure that's correct, yes.
2     Q.  And did they send one back to you, or is it your
3  testimony that both prototypes remained at PointCare for
4  some period?
5         MR. DELLAPORTAS:  Objection.  Compound,
6  vague, and confusing.
7     A.  Sometimes they had both of them.  Sometimes they
8  would send one back to us and then we would ship it back
9  to them.  Sometimes we had one; sometimes we didn't.
10    Q.  (By Mr. Twohig)  What was the longest period of
11 time, as you recall it, that you were without a prototype?
12    A.  Probably two or three weeks.  I couldn't tell
13 you exactly.
14    Q.  Let me ask you this:  I thought there was a plan
15 to make a third prototype.  Are you aware of any plan to
16 make a third prototype instrument?
17    A.  I don't remember if there was or not.
18    Q.  Okay.  Mr. Chappell, it's been a little bit of a
19 length here.  Why don't we take another five-minute break
20 and give you a chance to stretch out.  Does that sound
21 good?
22        MR. DELLAPORTAS:  Michael, why don't we
23 take a lunch break?
24        MR. TWOHIG:  I'm wondering about that.  I
25 know for Mr. Chappell it's not quite noon.  John, I guess

Page 62

1    A. No, sir.
2    Q. -- that was sent -- excuse me?
3    A. No, sir.
4       Sorry. I thought you were finished.
5    Q. I wasn't.
6       You mentioned a few moments ago that a modified
7    XL22 instrument was sent to PointCare during this
8    feasibility analysis period. Do you recall that?
9    A. Yes, sir.
10   Q. Did you participate in making the modifications
11   to that instrument?
12   A. No, sir, I did not.
13   Q. Do you know who did?
14   A. I believe that was Roger Bourree and Gary Young.
15   Q. And you mentioned some of the modifications that
16   you believe were made. Are you also aware that optics
17   were modified?
18   A. Yes, sir. I'd forgotten that.
19   Q. Okay. And would you agree that that was a
20   pre-prototype HT?
21   A. Not in the least.
22   Q. You don't believe that was a pre-prototype HT?
23   A. No.
24   Q. How would you characterize it?
25   A. It was just a modified instrument. I mean, the

Page 63

1    HT, its main purpose in life was to perform the automatic
2    preparation of the sample for the CD4 measurement where
3    it's -- XL22, the sample had to be prepared manually and
4    then dumped into the instrument.
5    Q. I'm sorry. Were you finished?
6    A. You know, it's kind of comparing apples to
7    oranges.
8    Q. Because that modified instrument that was sent
9    during the feasibility period lacked the automated
10   capacity to prepare the samples?
11   A. That's correct.
12   Q. Were you aware of the -- back up for a second.
13      This modified instrument that you were just
14   testifying about that was sent to PointCare during the
15   feasibility period, are you aware of the results that were
16   obtained at PointCare during that testing period?
17   A. Not during the period. I didn't become aware of
18   the results until sometime later.
19   Q. When was it that you first became aware of
20   testing results obtained with the modified instrument?
21   A. It's probably sometime in the spring of 2006,
22   and I was never given any formal data. Just it worked, or
23   appeared to work.
24   Q. So you previously testified that you formally
25   became involved in the project in about July of '06. Is

Page 64

1    it fair to say based on what you've just testified to that
2    you were intermittently involved in the project prior to
3    that time?
4       MR. DELLAPORTAS: Object to form.
5    A. I don't think so.
6    Q. (By Mr. Twohig) How would you characterize your
7    involvement then? I'm speaking about the late '05, early
8    2006 period.
9    A. I was not involved at all. It was -- everything
10   was being kept very confidential, and apparently I was not
11   allowed to know what was going on.
12   Q. Okay. I understand. So other than the little
13   bit of information that you've just provided in your
14   testimony, you were not involved?
15   A. No, sir.
16      MR. TWOHIG: Jamie, if you could take out
17   Document No. 7 and mark that as the next exhibit.
18      THE REPORTER: Okay.
19      (Exhibit 4 marked.)
20   Q. (By Mr. Twohig) Just so we're all on the same
21   page here, do you see the Bates number down in the lower
22   right-hand corner? It's a Drew document. It's marked
23   DR6707. Do you see that?
24   A. Yes, sir.
25      MR. TWOHIG: John, you got that?

Page 65

1       MR. DELLAPORTAS: Yup.
2    Q. (By Mr. Twohig) So, Mr. Chappell, you can see
3    that this is an email from Andrew Kenney to several people
4    at Drew and it's dated May 17 of 2006. Do you see that?
5    A. Yes, sir.
6    Q. And the subject reference is CD4 project
7    meeting. Do you see that?
8    A. Yes, sir.
9    Q. If you can, look at the text of the email. It
10   reads, It seems as if this project is going to start with
11   a vengeance. Do you see that first line there?
12   A. Yes, sir.
13   Q. Now, do you recall receiving this email at the
14   time?
15   A. I believe so, yes, sir.
16   Q. And do you recall that at that time when the CD4
17   project was getting underway that there was a sense of
18   urgency at Drew to get the project moving along?
19   A. Yes, sir.
20   Q. And why was there a sense of urgency to move the
21   project along?
22   A. I don't know.
23   Q. Do you see the next line there Mr. Kenney
24   states, We need an urgent and probably lengthy meeting to
25   get things started. Do you see that?

Page 74

1 urgency at that point in time with the project?
2     MR. DELLAPORTAS: Objection. Asked and
3 answered.
4     A. Yes, sir.
5     Q. (By Mr. Twohig) And do you recall why there was
6 a sense of urgency at that point in time?
7     MR. DELLAPORTAS: Objection. Calls for
8 speculation.
9     A. The way it was explained to me, as I recall now,
10 after thinking about it, was that PointCare was also
11 working with another vendor on a similar instrument and we
12 wanted to try to get ours working first.
13     Q. (By Mr. Twohig) Do you recall if that similar
14 instrument was the NP, also known as the Near Patient?
15     A. No, I don't.
16     Q. Do you recall if that instrument was also a CD4
17 instrument?
18     A. Yes, sir.
19     Q. Okay. And to your knowledge, was it similar in
20 some respects to the HT?
21     A. Yes, sir.
22     Q. Is it your understanding that it was a smaller
23 version of the HT in some respects?
24     MR. DELLAPORTAS: Object to form.
25     A. It was my understanding it was smaller and

Page 75

1 slower.
2     Q. (By Mr. Twohig) Okay. Portable?
3     A. I don't recall that word ever being used, no,
4 sir.
5     Q. Now, was there any other reason why there was a
6 sense of urgency in developing the HT at this point in
7 time?
8     A. I'm rarely given such information. No.
9     Q. Were you aware of any deadlines on the project
10 at that point in time?
11     A. I was aware of some goals.
12     Q. But as far as you know, there were no deadlines
13 in place for that project?
14     A. As I said, I knew that there were some projected
15 goals, but I was never informed of any hard and fast
16 deadlines, no, sir.
17     Q. So you weren't aware of any contractual
18 deadlines for the project?
19     A. No, sir.
20     MR. TWOHIG: Jamie, if you could take out
21 Document No. 9 and mark that as the next exhibit.
22     THE REPORTER: Okay. No. 6.
23     (Exhibit 6 marked.)
24     Q. (By Mr. Twohig) Just to make sure we're on the
25 same page here, Mr. Chappell, do you have a document with

Page 76

1 a Bates No. DR15340?
2     A. Yes, sir.
3     MR. TWOHIG: And that's been marked as
4 exhibit number what, Jamie?
5     THE REPORTER: That's 6.
6     Q. (By Mr. Twohig) So looking at this document
7 that's been marked Exhibit No. 6 -- and we don't need to
8 discuss the email. I see that you're not part of that
9 email, but if you would, turn over -- first I'll just
10 point out for the record, you see on the email it mentions
11 an attachment, product initiation and approvals? Do you
12 see that?
13     A. Yes, sir.
14     Q. Actually, stay with the email for a second. I
15 want to ask you a question about that.
16     It references in the text of the email, it says
17 a project initiation document.
18     A. Yes, sir.
19     Q. Is that a specific form?
20     A. Yes, sir.
21     Q. Are you familiar with that form?
22     A. Yes, sir.
23     Q. When are those required?
24     A. Before the start of the project.
25     Q. And what's supposed to be included in that form?

Page 77

1     A. Well, I'm familiar with the concept of the
2 document. I've never initiated one, so I don't know all
3 the details, but it's basically a document to get approval
4 from upper management to do a project.
5     Q. And as far as you're aware, those are prepared
6 at the start of any project?
7     A. I believe, according to our quality system, yes,
8 it must be prepared before you can start the project.
9     Q. And I see in that email there -- you see the
10 reference the QS?
11     A. Yes, sir.
12     Q. Do you understand that to be referring to
13 Quality System?
14     A. Yes, sir.
15     Q. Why don't we turn over and take a look at the
16 attachment. Does this appear to be what you would
17 recognize as a project initiation document?
18     A. Well, these documents change from time to time.
19 That may be what we were using at the time.
20     Q. And, in fact, if you look at the document title,
21 it does say "project initiation" in it?
22     A. Yes, sir.
23     Q. And specifically it's for the CD4 analyzer,
24 right?
25     A. Yes, sir.

Page 78

1    Q.  Now, do you notice the date on the document?
2    A.  Yes, sir.
3    Q.  And what do you see that date to be?
4    A.  May 19th, 2006.
5    Q.  And if you flip over to the -- it says Page 2
6  out of 3.  You see right up at the top it says Inaugural
7  Project Meeting held May 19, 2006?
8    A.  Uh-huh.
9    Q.  Could you just give a verbal answer?
10    A.  Yes, sir.  I'm sorry.
11    Q.  That's okay.  We just need to do that for the
12  court reporter.
13    A.  I'm sorry.
14    Q.  That's all right.
15       Do you see there the list of attendees?
16    A.  Yes, sir.
17    Q.  Do you see your name on that list?
18    A.  Yes, sir.
19    Q.  Do you recall attending that meeting?
20    A.  As I stated before, the meeting I recall that
21  started the project was the one in which the PointCare
22  representatives were there, and I don't see them listed
23  here, so my memory must be faulty.  It says I was there,
24  so I must have been there.
25    Q.  So just so I understand, you don't recall

Page 79

1  attending the meeting referenced here?
2    A.  If it's the one where Peter Hansen and Don Barry
3  were present, yes, I do.  That's what I recall as being
4  the start.
5    Q.  But assuming that the list of attendees here is
6  correct, you don't remember attending an inaugural meeting
7  where Peter Hansen and Don Barry were not present, right?
8    A.  To the best of my recollection, that's correct.
9    Q.  It does say -- below the list of attendees it
10  says Gary Young will be the Dallas-based project
11  coordinator responsible for the project.
12    A.  Yes, sir.
13    Q.  Was Mr. Young, in fact, made the project leader
14  for Drew on the HT project?
15    A.  I don't know that he was the project leader.  He
16  was mainly the liaison between Drew and PointCare, is my
17  recollection.
18    Q.  Did the project ever have a project leader for
19  Drew?
20    A.  Not that I recall.
21    Q.  Now, you notice --
22    A.  Excuse me.  Excuse me, please.  I forgot.
23  Andrew Kenney was involved in the beginning, and I believe
24  he was the project leader at the beginning, I believe.
25    Q.  Okay.  But you believe that at some point he was

Page 80

1  no longer serving as the project leader?
2    A.  Yes.
3    Q.  Do you know when that point in time was?
4    A.  When he was no longer the engineering manager.
5    Q.  Now, if you -- we're working our way down that
6  Page 2 there.  You see where it says the customer
7  specification was reviewed?
8    A.  Yes, sir.
9    Q.  Do you remember reviewing the customer
10  specification?
11    A.  Yes, sir, I do.  You jogged my memory.
12    Q.  Now, you just said "you jogged my memory."  Do
13  you remember doing it in the presence of the other team
14  members?
15    A.  Yes.  I think I recall this meeting now, and we
16  did discuss -- we did see the specifications for the first
17  time, that's correct.
18    Q.  And if we can just take a look back, I believe
19  it might be Exhibit 2.  It was document No. 3.  You see
20  the product specifications for the HT instrument?
21    A.  Yes, sir.
22    Q.  Are those the specifications that you recall
23  reviewing at that meeting?
24    A.  Well, I would have to have some time to go over
25  it to see if these were the exact ones at that point in

Page 81

1  time, but we did review something very similar to this.
2    Q.  Okay.  That's actually sufficient.  I'm not
3  going to make you try and figure it out.
4       Now, are you aware, Mr. Chappell, that a final
5  set of specifications for the HT were agreed upon between
6  Drew and PointCare and that they were made part of the
7  contract?
8       MR. DELLAPORTAS:  Objection.  Compound.
9    A.  Could you maybe separate those two questions?
10    Q.  (By Mr. Twohig)  Let's see.  I'll try it again.
11       Are you aware that a final set of specifications
12  for the HT was agreed upon between Drew and PointCare and
13  made a part of the contract?
14       MR. DELLAPORTAS:  Same objection.
15    A.  All I can say is we reviewed these
16  specifications, some changes were agreed upon, and whether
17  or not they were made part of the contract, I have no
18  idea.  I was never privy to that information.
19    Q.  (By Mr. Twohig)  Fair enough.
20       Do you remember any discussion about the
21  specifications you looked at with the other team members
22  for Drew?
23    A.  Vaguely.  I don't remember many --
24    Q.  Do you remember -- I'm sorry.  Go ahead.
25    A.  I don't remember many of the details.

Page 130

1  optics head at that point in time?
2      A.  Yes, sir.
3      Q.  And what was the problem, as you recall it?  And
4  if you flip over to Page 2, there's an email there from
5  Gary Young to Don and it's cc'd to you and it refers to a
6  conversation between you and Gary.  Do you see that?
7      A.  Uh-huh.  Yes, sir.
8      Q.  Does that help you to respond to my question?
9      A.  Yes, sir.
10     Q.  So what was the problem with the optics head?
11     A.  I think we finally determined that it was
12  contamination on the injector or in the injection path.
13     Q.  And what was the cause of that?  Did you
14  determine the cause?
15     A.  At that point in time, no, sir.  We just -- I
16  believe we did take the head apart and inspect the parts
17  under a microscope and found some contamination.
18     Q.  Now, it says here, I just spoke to George about
19  it.  It appears the optic head is out of alignment.
20     So apparently Gary Young believed that that was
21  the problem at the time, right?
22     A.  Yes, but he's not an optics expert.
23     Q.  So was it later determined that the head was not
24  out of alignment but it was actually contamination, as you
25  just testified?

Page 131

1      A.  Yes, sir.  I believe so.
2      Q.  Okay.  But apparently at that point in time --
3  well, let me ask you this:  Gary suggested to Don that Don
4  try realigning the flow cell mount.  Do you see that?
5      A.  Yes, sir.
6      Q.  And that was to try and realign the optic head,
7  right?
8      A.  Yes, sir.
9      Q.  Okay.  So, obviously, at that point in time it
10  appears that Gary and you and Don were under the
11  impression that it was a misalignment of the optic head,
12  right?
13     A.  I don't think we knew what it was.  That was
14  just one of the troubleshooting steps we were going
15  through.
16     MR. TWOHIG:  Let's take a look at the next
17  document, Document 22, if you'd mark that, Jamie.
18     THE REPORTER:  Okay.  No. 19.
19     (Exhibit 19 marked.)
20     MR. TWOHIG:  So is this Exhibit 18, Jamie?
21     THE REPORTER:  It's No. 19.
22     MR. TWOHIG:  I'm sorry.  Exhibit 19.
23     Q.  (By Mr. Twohig)  And just to confirm, it's
24  DR23777, Mr. Chappell?
25     A.  Yes, sir.

Page 132

1      Q.  That's an April 10, 2007 email.  Do you see
2  that?
3      A.  Yes, sir.
4      Q.  Okay.  Again, this is an email from Gary Young
5  to Don Barry, right?
6      A.  Yes, sir.
7      Q.  And you're cc'd on it?
8      A.  Yes, sir.
9      Q.  And in the first paragraph there, he says, After
10  several hours of attempting to align the optic head, we've
11  concluded the problem's with the quartz flow cell glued to
12  the PEEK mount.  Do you see that?
13     A.  Yes, sir.
14     Q.  So at this point in time is that what you came
15  to believe was the problem with the optic head?
16     A.  Not really.  I think we still thought it was
17  contamination.  There were several theories, and we didn't
18  know really what to believe.  This was some new behavior.
19  We'd been building these heads for many years and had
20  never seen the problems that we had here.
21     Q.  Okay.  In the next line it says, The spare we
22  had for just this problem have the same problem also.  You
23  see that?
24     A.  Yes.
25     Q.  Now, that spare was in your possession in

Page 133

1  Dallas, right?
2      A.  I assume that's what he's talking about.  Again,
3  I didn't initiate this email.
4      MR. DELLAPORTAS:  I would --
5      Q.  (By Mr. Twohig)  Okay.  Well --
6      THE REPORTER:  Will you repeat that one
7  more time?
8      MR. DELLAPORTAS:  I would caution the
9  witness not to speculate.
10     THE REPORTER:  Thank you.
11     Q.  (By Mr. Twohig)  Did you ever resolve the issue
12  of what the problem with the optic head was?
13     A.  Yes, sir.
14     Q.  And what was that resolution?
15     A.  It was an error in the software.
16     Q.  An error in the software?
17     A.  Yes, sir.
18     Q.  Which software?
19     A.  It was the rinse deck, post-sample deck.
20     Q.  Was that part of the firmware?
21     A.  No, but it was my responsibility.
22     Q.  Okay.  You want to take a break?
23     A.  Yes, please.
24     Q.  Is five minutes good?
25     A.  More or less.

# Exhibit B

Page 1

1

2                 UNITED STATES DISTRICT COURT

3               SOUTHERN DISTRICT OF NEW YORK

4    --------------------------------X

5    DREW SCIENTIFIC, INC.,

6               Plaintiff,    Case No. 08 CV 1490-AKH

          -vs-

7    POINTCARE TECHNOLOGIES, INC.,

8               Defendants.

9    --------------------------------X

10

11          DEPOSITION OF HERBERT CHOW, Ph.D.

12                 New York, New York

13                  March 25, 2008

14

15

16

17

18

19

20

21    Reported by:

      Bonnie Pruszynski, RMR

22    JOB NO. 15871

23

24

25

| Page 2 | Page 3 |
|---|---|

**Page 2**

1
2     March 25, 2008
3     8:55 a.m.
4
5
6     Deposition of HERBERT CHOW, Ph.D.
7     held at DUANE MORRIS, LLP, 1540 Broadway,
8     New York, New York, before Bonnie
9     Pruszynski, Registered Professional
10    Reporter, Registered Merit Reporter,
11    Certified LiveNote Reporter, and a Notary
12    Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1
2     A P P E A R A N C E S:
3     DUANE MORRIS, LLP
4     Attorneys for Plaintiff
5         1540 Broadway
6         New York, New York 10036
7     BY:    ANTHONY J. COSTANTINI, ESQ.
8         -and-
9     DUANE MORRIS, LLP
10    Attorneys for Plaintiff
11        470 Atlantic Avenue, Suite 500
12        Boston, MA  02110
13    BY:    BEN KURUVILLA, ESQ.
14
15    BURNS & LEVINSON, LLP
16    Attorneys for Defendants
17        125 Summer Street
18        Boston, MA 02110
19    BY:    ANDREW F. CAPLAN, ESQ.
20
21    ALSO PRESENT:  PETRA KRAULEDAT, Ph.D.
22                   PETER HANSEN, Ph.D.
23
24
25

| Page 4 | Page 5 |
|---|---|

**Page 4**

1          H. Chow, Ph.D.
2          (Witness sworn.)
3     HERBERT CHOW, Ph.D.,
4          called as a witness, having been first
5          duly sworn, was examined and testified
6          as follows:
7     EXAMINATION
8     BY MR. CAPLAN:
9     Q     Good morning, Dr. Chow.
10    A     Good morning.
11    Q     I have introduced myself off the
12    record. On the record, I am Andrew Caplan and I
13    represent PointCare.
14          You know my clients, Petra Krauledat
15    and Peter Hansen?
16    A     Yes.
17    Q     Just to go over a few ground rules.
18          You can see we have a court reporter
19    taking down everything we say. If you could do
20    your best to please let me finish my questions
21    before you answer, that will save her from having
22    to type two people talking at once; and I will
23    likewise try to do my best to wait until your
24    answer is finished before I start to my question.
25          Fair enough?

**Page 5**

1          H. Chow, Ph.D.
2     A     Sure.
3     Q     If you don't understand my question
4     or it doesn't make sense, let me know, and I will
5     try to ask a better question; otherwise, if you
6     answer the question, we will have to assume you
7     understood it and it make sense to you.
8     A     Okay.
9     Q     Have you ever been deposed before?
10    A     No.
11    Q     Have you ever served as an expert
12    witness, have you ever been retained as an expert
13    witness for a lawsuit?
14    A     No.
15    Q     Have you been retained as an expert
16    witness for this lawsuit?
17    A     No.
18    Q     Have you had any discussions with
19    Drew about the possibility of serving as an expert
20    witness?
21    A     No.
22    Q     Did you do anything to prepare for
23    this deposition?
24    A     Have I done anything to prepare in
25    terms of reading documents? Do extra laboratory

Page 18

1         H. Chow, Ph.D.
2    Q    Did anyone participate by phone?
3    A    No.
4         Well, I guess Brian Damiano did show
5    up in the beginning of the meeting, and then --
6    for about ten minutes and then he left, and then
7    Mr. Costantini shows up.
8    Q    Okay.  For at least part of the
9    meeting, you reviewed the documents we have
10   here --
11   A    Correct.
12   Q    -- in this three-ring binder?
13   A    Correct.
14   Q    Did you review any other documents
15   yesterday?
16   A    That's all the documents in front of
17   you in the binder.
18   Q    Okay.  When you reviewed these
19   exhibits, did they remind you of anything you had
20   forgotten about?
21   A    I don't think so.  Mostly, mostly all
22   of those are still in my recollection.
23   Q    Fair enough.
24        Did any folks from Drew participate
25   either in person or on the telephone in

Page 19

1         H. Chow, Ph.D.
2    yesterday's meeting?
3    A    No.  At the end of the day, Mr. Frank
4    Matuszak and I were to have a drink, and because
5    he was -- he was close by.  So, we had a drink,
6    that was after the meeting.
7    Q    Okay.  Did you talk with him about
8    the case at all?
9    A    No.  We talked about all the other
10   business that I was involved with Drew at this
11   time, but we didn't talk about the case at all.
12   Q    Do you have ongoing business with
13   Drew?
14   A    Yes, yes.  I have two other projects
15   ongoing with Drew, and we mostly talk about that.
16   Q    Okay.  What are those on other two
17   projects?
18   A    One project has to do with the HPA1C,
19   which I think the instrument, it's called DS 360.
20   It's a -- it's A1C detection systems for diabetes
21   monitoring, so that's business number one.
22        Project number two has to do with
23   some of the due diligence works I was requested
24   by, by Drew on some other investment.
25        Do you want me to be specific on

Page 20

1         H. Chow, Ph.D.
2    that?
3    Q    I will follow-up, thanks.
4         When were you -- strike that.
5         The first matter, can we refer to
6    that as DS 360?
7    A    Sure.
8    Q    When did you receive that engagement
9    from Drew?
10   A    Around August.
11   Q    Of what year?
12   A    August 2007.  In fact, I started, I
13   believe, the first week of September 2007 on that
14   project.  The discussion was in July, the actual
15   work started in late August to early September.
16   Q    Had you ever previously done any work
17   for Drew?
18   A    Yes.  Previously, it was that second
19   product that I was talking about.  It was a due
20   diligence project with immunodiagnostic product
21   that Drew was interested in.  I believe the
22   company was in, was in Europe.
23        So I, I was engaged to work on the
24   due diligence of the company, marketing research.
25   Q    And when did you receive that

Page 21

1         H. Chow, Ph.D.
2    engagement?
3    A    That must be about the same time,
4    July time frame.
5    Q    July 2007?
6    A    July 2007.
7    Q    Had you done any prior work for Drew?
8    A    No, I don't believe so.
9    Q    How did you first come in contact
10   with Drew?
11   A    In fact, I believe it was through
12   conversation with Mr. Hansen, and through also one
13   of our mutual friends, Dan O'Connor, who is one of
14   my colleagues at Abbott.
15        And I believe in the beginning of
16   2007, in one of the conversation, because he knew
17   that I was in -- I was independent consultant, and
18   he -- he was telling me that Drew --
19   Q    Which he now?  I'm sorry.
20   A    Mr. O'Connor.
21   Q    Thank you.
22   A    And he was suggesting that maybe I
23   should contact Drew to get them interested to hire
24   me as a consultant for different projects, and
25   that was the start of the -- of my contact.

Page 86

1        H. Chow, Ph.D.
2    Q    And in your experience, if an FDA
3 auditor feels that the company is not in control
4 of the design because of a lack of certain design
5 history documents in the file, what are the
6 consequences?
7    A    Then you either have to go back and
8 redo it, or you are not -- well, the short answer
9 is you are not allowed to sell the product,
10 because at that phase, when they come in to
11 inspect, you are telling the FDA I am ready to
12 launch the product, and I have been through all
13 these design control steps and measures.  And if
14 they come in and find that you are, you are very
15 relaxed in the design controls and you don't have
16 a lot of the key elements to show that you are in
17 control of design, then -- then you won't be able
18 to pass.
19    Q    So, if an FDA auditor is unsatisfied
20 with a document in a company's design history
21 file, the company will not be able to take their
22 product to market; correct?
23    A    Sometimes they will stop it,
24 sometimes they will say, continue to market it,
25 but correct these defects and I will inspect you

Page 87

1        H. Chow, Ph.D.
2 again.  And it really depends to severity of the
3 lax.  If it's minor, they will come back in six
4 months, they will come back in one year, and if
5 you show the documents, then you correct the
6 problem, you are okay.  But if the problem is
7 severe, they may ask you to stop.  So, it really
8 depends on what problems you have.
9    Q    If the FDA auditors is unsatisfied
10 with the design history file, they have the
11 authority to tell the company they can't take
12 their product to market; correct?
13    A    There are incidents just like that.
14    Q    Have you ever experienced one?
15    A    Not personally.
16    Q    Are you aware of any at Drew?
17    A    I don't know of any incidents.  I am
18 not following it, nor I have information.  The
19 only the only familiar information I have is with
20 Abbott and Johnson & Johnson.  So, I never
21 investigate this part of the Drew business.
22    Q    It's important to a company
23 developing a medical instrument to have a complete
24 design history file that will be satisfactory to
25 the FDA; correct?

Page 88

1        H. Chow, Ph.D.
2    A    I think it is in FDA guidelines that
3 each company should have -- it's actually a law,
4 it's not a guideline, that you have to have a
5 design control history file.
6        You are not looking to go into a
7 company and look at a binder that is called
8 "design history file."  Design history file is a
9 collection of documents that you use to satisfy
10 the inspector that you are in control of the
11 entire design process.  So, it's a set of binders.
12    Q    And those documents are required by
13 law?
14    A    Those documents, yes.
15    Q    And that is an important law to
16 medical device companies who need the FDA approval
17 to sell their products; correct?
18    A    Correct.
19    Q    And FDA auditors, do they call before
20 they show up for an audit?
21    A    Some do and some don't.  The last two
22 times I was involved with it, actually they call.
23 We actually have appointment with them six months
24 ahead of time.  And but, of course, they didn't
25 tell us exactly six months later on Tuesday or

Page 89

1        H. Chow, Ph.D.
2 Thursday day, but, yeah, they give you short
3 notice when they are ready to come in.
4    Q    Do FDA auditors sometime show up
5 unannounced?
6    A    I heard that before, yeah.
7    Q    When the FDA auditors show up, they
8 expect the design file to be readily accessible to
9 them; is that correct?
10    A    Yes, they expect that.
11    Q    It's important for an FDA regulated
12 company to have an organized design history file;
13 correct?
14    A    I would say any products that have an
15 FDA approved, certified FDA approved FDA product,
16 I would be very surprised that that company
17 doesn't have a design history file for that
18 particular product.  It's almost suicidal, I would
19 say.
20    Q    It will be suicidal not to have a
21 readily accessible design history file collection
22 of documents for an FDA regulated company;
23 correct?
24    A    Yes.
25    Q    The notion is if an FDA regulator --

Page 114

H. Chow, Ph.D.

1    talking about.
2        Q    I should have asked you what you
3    would say if you call me about it.
4        A    That would be another two hours.
5        Q    Are you familiar with the Becton
6    Dickinson instrument or instruments that count
7    CD4?
8        A    I believe there is one, I believe
9    there is a smaller piece of equipment. It's
10   called FACS scan. I believe that it can do CD4
11   count.
12       Q    And are you familiar with the bigger
13   Becton Dickinson instrument that does CD4 and
14   other testing?
15       A    I am more familiar with the large
16   piece of equipment than the smaller one that is
17   dedicated to CD4.
18       Q    You are more familiar with the larger
19   piece?
20       A    Yes.
21       Q    So, you know that, you know that
22   Becton Dickinson's larger FDA-approved instrument
23   tests CD4?
24       A    Yes.

Page 115

H. Chow, Ph.D.

1        Q    And other stuff?
2        A    Yes.
3        Q    And Drew's HT was designed to test
4    CD4?
5        A    Only.
6        Q    Only. And --
7        A    Well, I shouldn't say that. Based on
8    the spec, test CD4 and other parameters.
9        Q    As well as hematology?
10       A    Yes.
11       Q    So, to serve as a predicate device,
12   it's okay if an existing FDA-approved instrument
13   tests the same things as your instrument as well
14   as some more, stuff; right?
15       MR. COSTANTINI: Is that a question?
16   It was sounding more like a statement.
17       MR. CAPLAN: Did you understand my
18   question, sir?
19       A    Can you repeat?
20       (Record read.)
21       MR. COSTANTINI: The question is: Do
22   you understand the question as stated or do
23   you want him to restate it?
24       A    I think you need to restate it.

Page 116

H. Chow, Ph.D.

1        Q    What is a predicate device?
2        A    A predicate device in this instance
3    ought to be another instrument that counts CD4
4    with the intended use, with the same intended use.
5        So, if I would give an example of the
6    Becton Dickinson instruments, there are large
7    pieces of equipment, likely those large pieces of
8    equipment are not FDA approved. They are only
9    approved for research use only. That piece of
10   equipment cannot be used as a predicate device.
11       The smaller instrument, if the
12   intended use is to count CD4 for the management of
13   AIDS patient, if that is the intended use cleared
14   by FDA, then, yes, it will be, it can be used in
15   this case to serve as predicate device.
16       Q    Do you know whether Becton
17   Dickinson's smaller CD4 counting device was FDA
18   approved in mid November of '07?
19       A    I never investigate, but I would
20   probably, 80 percent certain that, yes.
21       Q    So, you are 80 percent certain that
22   Becton Dickinson had a small CD4 counting device
23   that was FDA approved in November of '07?
24       A    Correct.

Page 117

H. Chow, Ph.D.

1        Q    Are you 80 percent sure that Becton
2    Dickinson's CD4 counting device was a reference
3    instrument or could serve as a reference
4    instrument for the Drew HT --
5        A    Correct.
6        Q    -- in mid-November of '07; correct?
7        A    Yes. Correct.
8        Q    Let me back up.
9        In mid-November of '07, when Matuszak
10   and Nickols first raised with you a request for
11   you to do some work regarding the Drew HT, what
12   did they tell you about that?
13       MR. COSTANTINI: You said Matuszak or
14   Nickols. Do you mean Matuszak and Nickols?
15       Q    What he said.
16       A    I only spoke with one of them one at
17   a time. I never have any instance in which I
18   spoke with both of them at the same time.
19       Q    Let me start again. Who at Drew
20   first --
21       A    Frank Matuszak.
22       Q    What did he say to you about the HT?
23       A    He told me that -- he never told me
24   that there was -- there was a collaboration

Page 122

H. Chow, Ph.D.

1     A    No. I assumed that when someone told
2  me that, you know, there is a collaboration going
3  on with another party, and the piece of equipment
4  is about to ship to that party, I assume that it's
5  a regular collaboration process for development
6  purpose. So, for whatever purpose, I never follow
7  up with that.
8     Q    So, at least during the Matuszak
9  conversation, you didn't know what point or what
10 the partner was expected to do once it received
11 the equipment?
12    A    Correct.
13    Q    What else did Mr. Matuszak tell you
14 during that conversation?
15    A    That was the extent. Nothing else.
16    Q    And was anyone else part of that
17 conversation?
18    A    Not at the time, but when I -- when I
19 start planning for the testing activity, I
20 obviously have to talk to the engineers who is
21 involved, and there was more information given to
22 me afterwards, once I accepted the assignment.
23    Q    Okay. Did Mr. Matuszak, what did Mr.
24 Matuszak ask you to do?

Page 123

H. Chow, Ph.D.

1     A    Asked me to independently verify the
2  performance of the instrument based on, based on
3  the system requirement specification.
4         And he did provide, I don't remember
5  whether he send me -- I believe so, he send me the
6  system specifications of the HT and he -- and he
7  asked me specifically to design a set of tests
8  that allow me to judge whether the HT instruments
9  meet a subset of that specification.
10    Q    Which specifications -- strike that.
11        So, Mr. Matuszak asked you to test
12 some but not all of the specifications?
13    A    No. He gave me the entire
14 specification, I believe the specification, well
15 -- I just happened to flip it over here.
16        It's the annex one, it's --
17    Q    So, you are in Exhibit 1, and just --
18 you are in Exhibit 1, tab 11; is that correct?
19        MR. COSTANTINI:  Tab 11.
20    Q    He gave you that document?
21    A    I believe that is the set of
22 requirements that was given to me, and I have to
23 decide which requirements are important, which are
24 not important, based on -- based on my judgment.

Page 124

H. Chow, Ph.D.

1     Q    Did he give you any further guidance
2  about which specifications to test beyond that?
3     A    No. I will have to come up with that
4  decision.
5     Q    So, Drew left that to your sole
6  discretion?
7     A    Right.
8     Q    Without any guidance?
9     A    No guidance at all.
10    Q    Do you something to add, sir?
11    A    All I was told was the purpose of
12 this piece of equipment. The intention of it is
13 to count CD4, and being an expert in the field,
14 the burden is on me to come up with the design
15 elements to test whether this piece equipment will
16 issue enough information for the software to
17 calculate CD4 count or percentage.
18        So, based on that clue, I would then
19 have to search through the specifications which
20 items are important, which items are not
21 important. And knowing that the stage of the
22 prototype, where is it in. And, again, so we went
23 through some of that in the morning.
24        I already know, by assumption, that

Page 125

H. Chow, Ph.D.

1  the final software is not there, some of the
2  algorithms may not be completely on board in the
3  instrument.
4         So, based on those assumptions, you
5  know, I have to pick and choose what is important.
6     Q    So, those are all things you learned
7  from talking to Mr. Matuszak at that meeting?
8     A    Yes.
9     Q    How long was your discussion with
10 from Mr. Matuszak at that meeting about the HT?
11    A    Most of the conversation I have with
12 Mr. Matuszak is no more than ten minutes, no
13 longer than 10 minutes.
14    Q    So, his entire explanation of your
15 mission on this project was no more than ten
16 minutes?
17    A    Actually, the entire conversation was
18 this piece of instrument, the intended use is to
19 count CD4 cells; that was it.
20        So, I, on my own, will have to come
21 up with the key element, what needs to be tested,
22 what is the design of the test plan, and it's all
23 left with me.
24    Q    I'm sorry, because I thought you said

Page 130

1          H. Chow, Ph.D.
2   to count the CD4 and the percent beyond saying it
3   was not quite finished?
4      A    No.
5      Q    What else did he tell you?
6      A    That's it.  And I -- and from that --
7   and then I asked him at what stage the instrument
8   was.
9          And he -- and he did at the time,
10  because I already signed on as a -- as a
11  consultant for the project, he did tell me that
12  the piece of equipment were to send to the
13  partners for further development of the CD4
14  algorithm.
15     Q    Did you tell you anything else about
16  why Drew was shipping this equipment to its
17  partner?
18     A    For development of the, for further
19  development of the CD4 algorithm.
20     Q    That's it?
21     A    Yes.  I don't want to put words in
22  his mouth.  It's kind of sounds to me like it's
23  ready for system integration, you know.  I know
24  Drew handles the engineering portion at that time.
25  And from the conversation, I would extract that

Page 131

1          H. Chow, Ph.D.
2   PointCare, or the partners, was to complete the
3   CD4 algorithm in the machine, and sending it to
4   the partners means to complete that portion of the
5   work.
6          And also to debug the entire system,
7   make sure that -- well, it's a normal course of
8   system integration and system debug, that type of
9   activities.
10     Q    What else did Mr. Nickols tell you?
11     A    That's the extent of what I remember
12  from the conversation.
13     Q    Did he ask, what did he ask you to
14  do, if anything?
15     A    He asked me to come up with a plan
16  what to do.
17     Q    When was your -- when were these
18  conversations with Mr. Nickols?
19     A    Must be towards the latter part of
20  November, I believe.
21     Q    If I can back up for a second, when
22  you had your initial conversation with Mr.
23  Matuszak in mid-November, did he give you a time
24  frame for this assignment?
25     A    The sooner the better.

Page 132

1          H. Chow, Ph.D.
2      Q    That's what he said?
3      A    Yes.
4      Q    Can you explain why?
5      A    No.  In fact, most of the
6   conversation beyond the initial conversation, most
7   of the things we trading e-mail.  And I believe
8   all the -- a lot of these e-mails are documented
9   in the book.
10         There weren't much elaboration
11  beyond, beyond what I told you on the instrument.
12  There were no explanation to me.
13         I assume that when my client --
14  virtually all my clients, when they come to me,
15  it's the sooner the better.  So, I stopped asking
16  that question anymore.
17     Q    I am familiar with that phenomenon.
18     A    I assume everybody's contracts due
19  and want work done at the last minute, so it's a
20  given.
21     Q    You understood that there was some
22  urgency to complete your project; correct?
23     A    Yes.  When they say "yesterday," it
24  means there is urgency to get it done.
25     Q    At the time, were you still working

Page 133

1          H. Chow, Ph.D.
2   on the other Drew instrument project, the DS360?
3      A    Yes, yes.
4      Q    And did you have any other work on
5   your plate?
6          MR. COSTANTINI:  From Drew or
7      otherwise?
8          MR. CAPLAN:  Anyplace.
9          MR. COSTANTINI:  I just want to be
10     sure.
11  BY MR. CAPLAN:
12     Q    Why don't we take it one at a time.
13         When Drew gave you the HT assignment,
14  did you have any other work from Drew beside the
15  360?
16     A    Not besides the 360.
17     Q    And did you have any work from any
18  other sources on your plate in mid-November of
19  '07?
20     A    Yes, I did.  I have about, at the
21  time, I had three other projects I was working on,
22  not from the same company.  I believe it was two
23  or three companies.
24     Q    Were those the typical type of
25  clients who all wanted their projects done the

Page 150

H. Chow, Ph.D.

1        H. Chow, Ph.D.
2      I did ask them what is the predicate
3  device? And they told me they don't have one
4  on-site.
5      And I believe we talked about do we
6  need to go out and get a laboratory to work with
7  us so that we have at least some reference whether
8  when we have a CD4 count, do we know whether the
9  CD4 count is good or bad or lymphocyte counts.
10    Q    Who were you having these discussions
11  with or communications with?
12    A    I believe at a time the e-mail was
13  sent to a Steve -- William Ross and Gary Young.
14    Q    So, if I can back up, you were
15  looking for a reference -- strike that.
16      You were looking for a predicate
17  device to use in your testing; correct?
18    A    Yes.
19    Q    And did you want a reference device,
20  predicate device?
21    A    How would you know that your results
22  is hitting the target without, without a
23  reference?
24    Q    You can't know that without a
25  reference device?

Page 151

1        H. Chow, Ph.D.
2    A    No, you can't.
3    Q    That's why you wanted one to do your
4  testing?
5    A    Yes.
6    Q    Drew didn't have one?
7    A    Drew did not have, did not have a
8  predicate device that -- that can count CD4 with
9  the intended use for AIDS patient management.
10    Q    And, so, then there was, you had
11  communications or discussions with the folks at
12  Drew about whether to avail yourselves of a
13  predicate device from a lab; correct?
14    A    That was discussed, that was one of
15  the options.
16    Q    Who said what about that?
17    A    Who said what about what?
18    Q    That is a lawyer way to ask what was
19  the discussion?
20      MR. COSTANTINI: What was the
21  discussion about that particular option?
22    Q    So, the question on the table is:
23  Drew doesn't have this predicate device that I
24  would like here --
25    A    What is the second best option?

Page 152

1        H. Chow, Ph.D.
2    Q    Yes.
3    A    Going out to a lab. Usually, the
4  labs are using the large piece of equipment, the
5  cell sorters, that sort of thing, that may, may be
6  able to give out a CD4 count, but not with the
7  intended use similar to the kind of equipment the
8  HT is designed for.
9      So, even though they all give out the
10  CD4 count, but the intent, the use -- intent is
11  different.
12      I could, I could -- I could give an
13  example.
14    Q    Please.
15    A    A predicate device, it's a red apple
16  compare towed a red apple. If I were to compare
17  the red apple in this case, the HT with a
18  laboratory flow cytometry equipment, which is not
19  designed to the same intended use, I will be
20  comparing the red apple to a green apple or maybe
21  a tomato. So, it's different.
22      At this stage, what matters is you
23  compare with the predicate device for intended
24  use, and so you make sure that you are comparing
25  apple to apple and red apple to red apple.

Page 153

1        H. Chow, Ph.D.
2      And the key issue here is the HT is
3  using a set of chemistry that is very unique to
4  the partner, and at that time I think -- I know
5  PointCare is the partner. So, at that point I
6  know the set of reagents is very unique to
7  PointCare.
8      In the requirements, I have on two
9  unknowns here. Having multiple unknowns is not a
10  very good thing in scientific terms. If I want to
11  prove that the instrument is correct, I want the
12  instrument to be the single unknown. In this case
13  I have two unknowns: The instrument is an unknown
14  and the reagent is an unknown.
15      So, when the test results come out
16  not so good, is the reagent at fault or the
17  instrument at fault?
18      So, the first thing, if I have to
19  design a test plan, someone skilled in the arts
20  will say, "Let me eliminate one of these two."
21      Being, being the hardware is in
22  question here, the only thing I can eliminate is
23  the chemistry set produced by PointCare, and the
24  only instruments in the world that I know of that
25  use the PointCare particle to count CD4 is the

Page 154

H. Chow, Ph.D.

1    H. Chow, Ph.D.
2    PointCare FDA approved equipment.
3        So, logically, my assumption is, my
4    first question to ask is: Do you have a predicate
5    device; i.e., if I want to be more specific, do
6    you have a PointCare class of instruments with the
7    same intended use that can count CD4?
8        I didn't know the exact brand name at
9    the time. Now I know it's, what, NP? I just
10   learned that yesterday.
11       But at a time I didn't know. I
12   asked. So what is the apple to, red apple to red
13   apple comparison.
14       They told me they don't have one
15   on-site. They used to have one, but they sent it
16   back to the partner, and they didn't have one.
17   So, that is why the conversation drifted to, well,
18   maybe we should get a -- get a reference lab or
19   get an outside laboratory to do are comparisons.
20   But the decision was it's a red apple to green
21   apple comparison. They are not using the same
22   PointCare reagents.
23       So, at the end, if there is a
24   mismatch in the data, I don't know whether it's
25   the reagent is different or whether it is the

Page 155

H. Chow, Ph.D.

1        H. Chow, Ph.D.
2    instrument is different, so, I cannot achieve my
3    objective.
4        So, we decided -- we decided we are
5    going to stay with what we have.
6    **Q    So, at the time your expert**
7    **conclusion was that there is not, there is no**
8    **reference device in the world for the HT, other**
9    **than the NP?**
10   A    No. There was no equipment available
11   at Drew. I knew, I knew at the time that there
12   was equipment based on, based on the flier that I
13   got from Mr. O'Connor, that the instrument exists,
14   but I didn't know the name of the instrument, but
15   that instrument or the equivalent instrument is
16   not available at Drew.
17   **Q    When you were doing your HT testing**
18   **for Drew, you wanted to have a predicate device;**
19   **right?**
20   A    It would be best if I have, if I have
21   a reference.
22   **Q    Because you can't do accuracy testing**
23   **without a reference device; right?**
24   A    I cannot do accuracy testing without
25   the predicate device.

Page 156

1        H. Chow, Ph.D.
2    **Q    Right. Let's start again.**
3        **When you did your testing at Drew,**
4    did you want to -- strike that.
5        **When you did your HT testing for**
6    **Drew, did you want to have a predicate device?**
7    A    Do you have something you want to
8    say? No.
9        I'm sorry was distracted by his --
10       MR. COSTANTINI: I was going to ask
11   for an interruption while we figured out
12   what the noise was, because it was afraid it
13   was going to interfere with the question or
14   answer. Apparently, it's given up by
15   itself, it was a musical introduction to
16   your question, which do you want him to
17   repeat it?
18       THE WITNESS: Please.
19   BY MR. CAPLAN:
20   **Q    To make sure we are on the same page,**
21   **when you were doing, when you were testing Drew's**
22   **HT, you wanted to have a predicate device to use**
23   **in your testing; correct?**
24   A    Correct.
25   **Q    And you wanted a predicate device in**

Page 157

1        **H. Chow, Ph.D.**
2    **order to do precision testing; correct?**
3    A    I want a predicate device to do
4    precision the testing and the equipment will be
5    best if it used the same particles or the same
6    beads that is produced by PointCare.
7    **Q    We will do better if we take just one**
8    **question at a time.**
9    A    Okay.
10   **Q    You wanted a predicate device in**
11   **order to do precision testing of the HT**
12   **instrument; correct?**
13   A    Correct.
14   **Q    Without a predicate device, you could**
15   **not do precision testing of the HT device;**
16   **correct?**
17   A    I can do precision testing, but I
18   cannot do accuracy testing.
19   **Q    So, you wanted a predicate device in**
20   **order to do accuracy testing of the HT?**
21   A    Correct.
22   **Q    Without a predicate device, you could**
23   **not do accuracy testing of the HT; correct?**
24   A    Correct.
25   **Q    First you asked Drew if they had a**

Page 162

H. Chow, Ph.D.

1      for your testing?
2          A    I told them it's important to have a
3      reference instrument that used the same PointCare
4      reagent.
5          Q    Does the Becton Dickinson instrument
6      use the same PointCare reagent?
7          A    No.
8          Q    So, in your view, that is not a
9      reference instrument; right?
10         A    It's not a reference -- well, you
11     could, by FDA guidelines, you could use it as an
12     FDA predicate device, but at this stage of the
13     development, it's a red apple to green apple
14     comparison.
15         Q    So, at that time, you could have used
16     as a reference instrument, an instrument that did
17     not use PointCare's reagent; correct?
18         A    I couldn't.
19         Q    You could not?
20         A    I won't, because I will have two
21     variables. My job is to eliminate -- I don't want
22     to have two variables, because if the data doesn't
23     come out right, is the instrument ready or is the
24     reagent not ready or is the software?

Page 163

H. Chow, Ph.D.

1          I don't want to have all these
2      variables. I want to have an instrument as a
3      comparison that use common PointCare reagent, so
4      that is my only option.
5          Q    Okay. Did you do anything to
6      investigate whether PointCare had a commercially
7      available --
8          A    No.
9          Q    -- commercially available FDA product
10     on the market that ran its reagent that you could
11     have used as a reference instrument?
12         A    No, I didn't. I left it with Drew
13     because if any -- because they are developing this
14     kind of equipment. If they know someone, some
15     competitors has it elsewhere, using other
16     predicate device, they would come up with the
17     suggestion, so --
18         Q    Did you even ask the folks at Drew
19     whether they were aware of any predicate device
20     that ran --
21         A    In general --
22         Q    If I could finish my question.
23         A    Sorry.
24         Q    Did you ask anyone at Drew whether

Page 164

H. Chow, Ph.D.

1      they were aware of any company selling a predicate
2      device for CD4 testing that used PointCare's assay
3      that you could use a predicate device in your work
4      for Drew?
5          A    I didn't ask specifically the
6      predicate device, but I did ask in general, are
7      there other reference instruments that we can use?
8      So, in that case, I am giving an even more general
9      term. Do we have available in this class of CD4
10     count instruments. I don't care whether it's a
11     flow cytometry, for laboratory research use or for
12     clinically approved product, do we have anything
13     in the Dallas area that we can use. So, I would
14     assume that it implies, whether it's predicate
15     device or not predicate device, do we have
16     anything available.
17         Q    And what, what was the answer you got
18     to that question from Drew?
19         A    There are laboratories around in the
20     Dallas laboratory area that can, if they can
21     participate, we can send the flood blood to, and
22     they can give us a CD4 count or whatever
23     information we ask for. There are laboratories
24     that can provide you with that.

Page 165

H. Chow, Ph.D.

1          Q    Why were those laboratories not used
2      for your work?
3          A    Because, again, unless they are using
4      the PointCare particles in the CD4 count, then it
5      is not a good comparison for what I have to
6      accomplish.
7          Q    Who made that decision?
8          A    Me.
9          Q    Have you ever heard of PointCare's
10     AuRICA instrument?
11         A    Yes. I believe that was in the flier
12     that Mr. O'Connor sent me.
13         Q    Do you know whether, in fact, the
14     AuRICA was an FDA-approved instrument for CD4
15     testing that used PointCare's reagent?
16         A    I think now I know that it is FDA
17     approved, but at the time I did not.
18         Q    Did you investigate that at the time?
19         A    No.
20         Q    So, what instrument would Drew use as
21     a predicate device to gain FDA approval for the
22     HT?
23         A    We didn't have a predicate device.
24         Q    There was none?

Page 254

1          H. Chow, Ph.D.
2     with some questions.
3     Q     Tab 37, is that an e-mail you
4  received from Ken Pina on December 12?
5     A     It has my name on it.
6     Q     Did you receive it?
7     A     Yes.
8     Q     Here is a draft letter.  Please note
9  the highlighted section?
10    A     Yes.
11    Q     Tab 38, is that the attachment you
12 received with the e-mail on tab 37.
13    A     It looks like it is.
14          MR. COSTANTINI:  I will say that it
15 is our supposition that it is when we put
16 this together for Mr. Chow.  He is the only
17 one that can tell you for sure.
18    A     Without the attachment directly
19 attached to the e-mails, I cannot be sure whether
20 this is word for word the exact document, but I
21 have seen the highlighted sections on this page.
22    Q     Did someone ask you to comment on --
23    A     No.  Didn't ask me to comment, just
24 make sure that I have no objection to it.
25    Q     What did you say about that?

Page 255

1          H. Chow, Ph.D.
2     A     I don't see anything that is
3  incorrect.
4     Q     So, this highlighted paragraph that
5  says, "Drew has now progressed the project to the
6  point where it's now necessary for PointCare to
7  carry out its responsibility and make certain that
8  it's CD4Sure leukocyte enumeration assay will be
9  compatible with and operate with Drew's HTC and
10 HTW diagnostic instrument platforms."
11          Did you know what PointCare's
12 responsibilities were in that regard?
13    A     From the previous communications with
14 annex one, there were timelines and there were
15 division of labors between the two companies, who
16 is doing what.  In that regard, I have a glimpse
17 of what PointCare ought to do and what Drew signed
18 up to do.
19    Q     Do you consider yourself, do you
20 understand -- have you made a study of the
21 parties' respective obligations under their
22 agreement?
23    A     I received it and I look at it, and
24 whether I need to know -- do I -- I don't -- I
25 don't expect that I need to know, because my

Page 256

1          H. Chow, Ph.D.
2  assignment is to make sure whether the instrument
3  is in a state that you can ship it back to the
4  partner; that was my assignment.
5          So, to what extent the business
6  agreement between two parties really has nothing
7  to do with my -- what I set out to do.
8     Q     So, it was not your task to
9  familiarize yourself with the parties' various
10 obligations --
11    A     No.
12    Q     -- under the agreement; right?
13    A     No.
14    Q     Did you ever receive a full copy of
15 the contract?
16    A     Beyond, beyond the initial e-mail,
17 whatever attached e-mails, no, I did not have the
18 final copy.
19    Q     I may not have been clear.
20          The contract between Drew and
21 PointCare, we have seen certain annexes.  Did you
22 ever get the whole enchilada?
23    A     No.
24    Q     So, when this sentence that we are
25 looking at in tab 38, says PointCare -- I'm sorry.

Page 257

1          H. Chow, Ph.D.
2          Start again.
3          Tab 238 says Drew has now progressed
4  the project to point where it is now necessary for
5  PointCare to carry out its responsibilities, so
6  forth and so on.
7          What point in the project did Drew
8  have to get to where PointCare's responsibilities
9  described here kicked in?
10    A     If we go back to the CD4 count,
11 apparently that is the objective of instruments,
12 if Drew is signed up to do the hardware to make
13 sure that the white cell count is correct, the
14 lymphocyte count is correct, and PointCare is
15 working on the CD4 software, then as long as the
16 total white count and lymphocyte counts, they are
17 okay, then that is the point that can go back to
18 PointCare for further development.
19    Q     And do you say that based upon an
20 understanding of what the contract between parties
21 require?
22    A     No.  It's based upon what the initial
23 goal that is set out for me to test instruments
24 and where I have to take the -- take my report to.
25 Those are the two key elements that I derive from

Page 258

```
 1              H. Chow, Ph.D.
 2   all the information that I have.
 3       Q    So, your opinion that the HT
 4   instrument was ready to deliver to Drew was based
 5   upon your analysis of criteria and information
 6   that Drew gave you and not the requirements of the
 7   contract?
 8       A    No, no.
 9       Q    That is a wrong statement.
10       A    No. It's not based on, it's based on
11   my understanding of the specifications and what's
12   required to give a CD4 count, and the train of
13   events that has to go into it, and that's purely,
14   that is my -- my thought process.
15       Q    That is purely the basis of your
16   opinion that the HT was ready to deliver to
17   PointCare?
18       A    Right.
19       Q    And your opinion that the HT was
20   ready for delivery to PointCare is not based upon
21   the contract between the parties; right?
22       A    No. No.
23       Q    Do you know whether or not prior to
24   your test it had already been determined that
25   PointCare's assay was compatible with and operated
```

Page 259

```
 1              H. Chow, Ph.D.
 2   with Drew's HT platforms?
 3       A    I would assume if it was in effect,
 4   then why would both companies work on the project?
 5   I would assume by working together, it's already,
 6   it's already pre-determined that the PointCare
 7   assay could and would work on HT platform.
 8   Someone must have determined that before, before
 9   they jointly embarked on this project.
10       Q    So, you assume that before they even
11   started the project, it was already determined
12   that PointCare's assay would work on the HT
13   platform?
14       A    Someone must have done some work on
15   it, yeah.
16       Q    So, if it was already known that
17   PointCare's assay worked with -- worked on the HT
18   platform, then what remained for PointCare to do
19   in terms of carrying out its responsibility to
20   make sure that its assay was compatible with the
21   platform if that was already established?
22       MR. COSTANTINI:  Is this a trick
23   question?
24       MR. CAPLAN:  No.
25       MR. COSTANTINI:  Just because you
```

Page 260

```
 1              H. Chow, Ph.D.
 2   could do it, doesn't mean that it's done.
 3       A    First of all, I have never seen any
 4   data prior to my involvement on the project, and
 5   never looked at the prior data to see whether, at
 6   what state the PointCare assays work on the
 7   instrument. So, I have no knowledge on any prior
 8   attempt.
 9       And I guess at this point, if you --
10   just purely based on my data, that the CD4 count
11   as we went through it at length, it was okay. The
12   software built into the HT instruments, it looks
13   okay, except on the critical point at the low end
14   of the CD4 count, they need some work.
15       Q    The software needed some work, you
16   say?
17       A    Right.
18       Q    Not the assay necessarily?
19       A    That is the assay.
20       Q    The software is the assay?
21       A    No. I assume it's not the chemistry
22   at fault. I assume that it's the software is not
23   quite ready. Now, it could be there is more work
24   to be done with the PointCare particles assay, I
25   don't know, and not until I compare with other
```

Page 261

```
 1              H. Chow, Ph.D.
 2   instruments I won't come to that conclusion.
 3       Q    An assay is another word for a
 4   chemical reagent, right?
 5       A    Correct.
 6       Q    That is something totally different
 7   than software?
 8       A    Correct.
 9       Q    So, when you did your work, you had
10   no information one way or the other whether or not
11   it had already been determined that PointCare's
12   assay worked on the HT platform; right?
13       A    No, not prior to my testing exercise
14   at Drew. In fact, the testing result pointed
15   towards that the PointCare assay is probably
16   working, because I use the same particles all
17   throughout the test.
18       And apparently, the precision,
19   precision seems to be okay. It's the -- well,
20   precision seems to be okay for the hematology
21   portions and so that doesn't interfere. If I
22   would have guessed, I would probably say the
23   chemistry, it's -- it's not a place where I would
24   want to see improvement. I would first tackle the
25   software.
```

Page 266

1      H. Chow, Ph.D.
2  is responsible for system integration.  I was
3  under the impression that the software would be
4  responsible by PointCare and someone will be
5  taking the entire system and go run these clinical
6  or laboratory tests.
7      Q      And your — you have a lot of
8  experience in system integration in your career;
9  right?
10     A      Yes.
11     Q      You are an expert in that?
12     A      I have done many system integration
13 in many systems.
14     Q      Do you consider yourselves to be very
15 familiar with the HT instrument based on your
16 testing?
17     A      Yes.
18     Q      So, in your expert opinion, how much
19 time would you have expected it to take in order
20 to do system integration on this instrument?
21     A      Based on the data we have seen today,
22 the CT4 counts, it's very close to the target and
23 they need refinement.  So, the thing that you need
24 to do is collect N equal to 80 from a real clinic,
25 from real patient, and refine that algorithm, and

Page 267

1      H. Chow, Ph.D.
2  maybe refine the chemistry, and if there is
3  anything to correct on the instruments, correct
4  it.
5      So, the system integration, if I
6  didn't have chance that day to run the instrument
7  myself, and understand that now I can put the
8  blood in, and the banana comes out and banana
9  looked yellow and the peel is okay, I won't make
10 that statement.  It seems like now it comes out a
11 banana, but it is squashed a little bit.  So we
12 can make it a little bit pretty.  The only way to
13 do it is to go out to a real laboratory and run
14 more data and refine it.  It's not really have to
15 start from scratch to do it.
16     Q      My question is how long?
17     A      Not until the system integrations
18 continue.  Unless you have, you don't have --
19 assuming that you have no more hiccup, all this is
20 refinement of software, you may get lucky in a few
21 months that you can get to where you are, that you
22 can go start the clinical.
23     Q      So, if you got lucky, you didn't have
24 hiccups, you didn't have software problems, best
25 case scenario a few months more to go to clinical

Page 268

1      H. Chow, Ph.D.
2  trials?
3      A      Yes.
4      Q      In your experience, what happens, is
5  it unusual to have hiccups in this phase?
6      A      You know, there are two ways to look
7  at it.  If the data comes out wishy washy, I have
8  some numbers come out high, some low, I would say,
9  you are not quite there.  It seems like it is
10 giving me some random number.
11     Even though the end number is small,
12 but the trend is pretty clear.  You are giving
13 some genuine CD4 numbers, even though it's off
14 peak a little bit.  It's just fine adjustment.  It
15 wasn't for that two days we ran, I don't know how
16 many runs, many runs, continuously without human
17 intervention, and it was running very smooth.
18 There was no hiccup.  So, to me the hardware, it's
19 running okay.  The software, the firmware that is
20 driving the hardware, the motors and all that, is
21 not running jaggedly, it's running pretty smooth.
22 So, to me you are at the end stage of system
23 integration rather than the beginning stage of the
24 system integration; nevertheless, there is system
25 integration, refinement of the software or maybe

Page 269

1      H. Chow, Ph.D.
2  chemistry, it's the task.
3      MR. COSTANTINI:  Let me just tell you
4  that Mr. Chow's car is here to take him to
5  the airport.  So, if you could do some wind
6  up questions --
7      MR. CAPLAN:  I'm on the home stretch
8  here.
9      MR. COSTANTINI:  I would hope.
10 BY MR. CAPLAN:
11     Q      So, you say best case scenario with
12 no hiccup, system integration was two to three
13 more months of work; right?
14     A      Yes.
15     Q      What, if we don't have best case
16 scenario, what amount of time would we be looking
17 for system integration on this project?
18     A      I can't give you a guess.
19     Q      Do you have a best estimate?
20     A      No.
21     Q      If Drew asked you to form a judgment
22 as a consultant and said, you know, Dr. Chow, how
23 much longer are we looking at here.
24     A      To me, the system is running pretty
25 smooth.  I mean, I -- if you look at the error

Page 270

1             H. Chow, Ph.D.
2 coming out of the report, there are not that many
3 errors. So, to me the system the, you are at the
4 tail end of the system integration.
5     Q    Two to three months more?
6     A    Yeah.
7     Q    What come after system integration?
8     A    Then you are ready to do clinical
9 study, to collect FDA study, which means you go
10 to --
11    Q    I don't need what remains, just what
12 comes next?
13    A    Clinical.
14    Q    In your experience, how long would
15 you have expected clinical studies to take on this
16 instrument?
17    A    Clinicals, if go to sites that have
18 high traffic AIDS patients, three sites are not
19 that hard to find in the United States or
20 elsewhere, I would say one-and-a-half, two months
21 you can collect all the data, and take another
22 half a month to reduce the data and put in the
23 report and submit it to FDA.
24    Q    So that's, is there anything else to
25 clinical studies?

Page 271

1             H. Chow, Ph.D.
2     A    Sign a contract with the sites to
3 make sure that they agree on the payments. That
4 will probably take more time than actually running
5 the clinical. They laughing, so they agree with
6 me.
7     Q    When you include the agony of the
8 signing the contract, and then the one-and-a-half
9 to two months?
10    A    Yeah.
11    Q    And then a half month, how long would
12 you have expected clinical to take on this
13 project?
14    A    I would say two months if you are
15 really pushing it. So, if you go a high
16 traffic --
17    Q    Well, I'm asking for the rapid, best
18 case scenario, I'm asking for your expert opinion
19 about the likely amount of time this project would
20 have taken.
21    A    Given that you have to test in high
22 traffic laboratories, it should go very rapid. If
23 you go to 150 per laboratory would probably, times
24 three sites, you can do it in parallel, so, 150
25 samples, in high traffic laboratory, you can do it

Page 272

1             H. Chow, Ph.D.
2 in a month-and-a-half to two months.
3     Q    Plus then you said another half a
4 month to reduce it?
5     A    Right.
6     Q    And then sometime to dicker about a
7 contract.
8     A    No, I said dicker about a contract
9 now.
10    Q    That was up front?
11    A    Up front. You can do it now.
12    Q    How long is the contract haggling?
13    A    It depends on the site. To do
14 investigational review board, they only meet once
15 a week for these universities, give it two months.
16 If you start now, knowing that one-and-a-half
17 months or two months later the software will be
18 done, and then you can go, go ahead and run the
19 clinical.
20    Q    So, that's clinical studies, two
21 months on the contract and about two months for
22 actual work, about four months total for clinical
23 studies?
24    A    Yes.
25    Q    What is the next step?

Page 273

1             H. Chow, Ph.D.
2     A    Reduce that whole body of data, write
3 it up, submit to FDA.
4     Q    How long does that take in your
5 expert experience?
6     A    Usually, with the 510(k) studies, I
7 think the ongoing cycle is 45 to 90 days, depends
8 if FDA has a question.
9     Q    After you submit to FDA?
10    A    After you submit it to FDA.
11    Q    I thought there was a step about
12 pulling your materials together and making a
13 submission.
14    A    Those are efforts based. So, if you
15 put two or three clinical coordinators together,
16 you can generate a report fast.
17    Q    Can you do that before the clinical
18 studies are over?
19    A    You can have all the forms done,
20 write up done, have pre-conclusions and then pluck
21 in the data to support whatever the preconceived
22 idea you have, you can do that.
23    Q    You have to do some work on your
24 510(k) submission after your clinical studies are
25 done?

Page 274

H. Chow, Ph.D.

1       H. Chow, Ph.D.
2      A    You can start writing the package now
3   and pluck in the data when you have the data.
4      Q    You have to spend on clinical studies
5   are done working on your 510 submission?
6      A    Right.
7      Q    In your expert experience, how would
8   that take?
9      A    Writing or submitting.
10     Q    Putting the materials together, FDA,
11  here it is.
12     A    Two, three weeks at the most.
13     Q    Then you submit to it the FDA, how
14  long does that normally take until the FDA gives a
15  blessing?
16     A    If there is no question, I think it's
17  45 days. 45 days? Ninety days.
18          If they have questions, they will
19  come back and then the clock starts again, the
20  90-day clock starts again.
21     Q    Is it rare in your experience for the
22  FDA to have questions about a 510(k) submission?
23     A    If it's a PMA, yes. 510(k) these
24  days the FDA is very accommodative. Especially,
25  this kind of program is needed in the world, they

Page 275

1       H. Chow, Ph.D.
2   would probably expedite it.
3      Q    Assuming you get lucky and no
4   questions from the FDA and FDA gives its approval,
5   what happens next?
6      A    When they give you the approval, you
7   can go right ahead and sell it. In fact, you
8   don't have to wait until FDA approval. You can
9   market this as a research use only as a presale
10  strategy and many companies doing the same thing.
11     Q    So, to wrap up, from the point at
12  which you concluded the HT was ready to be sent to
13  PointCare, until the instrument would have been
14  ready for FDA approval, in your expert opinion you
15  would have expected there to be approximately two
16  to three months of system integration work, a
17  further four months for clinical studies,
18  including the studies and the contract haggling?
19     A    Two to four months.
20     Q    Two to four months, and then two to
21  three more weeks to put together your 510(k)?
22     A    I think that is already included at
23  two to four months. I thought I said collecting
24  the data would probably take two months, and then
25  let's say you take another month to reduce the

Page 276

1       H. Chow, Ph.D.
2   data packet. So, the total duration from the time
3   you start clinical to finish the package, ready to
4   send, it will be three months to four months.
5      Q    But there was, you said you would
6   expect about two months to haggle out to contracts
7   with the labs, right.
8      A    You can do it if you start early,
9   that is in parallel with the software development.
10     Q    So, in your experience, you would
11  expect that to be completely over with, contract
12  signed --
13     A    By the time the software is done.
14     Q    So, in your expert opinion, you would
15  expect two to three months for system integration
16  and then another two months or so for clinical
17  studies before a 510(k) could be submitted?
18
19     (Continued on next page to include jurat)
20
21
22
23
24
25

Page 277

1       H. Chow, Ph.D.
2      A    Correct.
3
4      (Deposition concluded.)
5
6      I, HERBERT CHOW, Ph.D., the witness
7   herein, do hereby certify that the foregoing
8   testimony of the pages of this deposition to be a
9   true and correct transcript, subject to the
10  corrections, if any, shown on the attached page.
11                                          _____
12          H. Chow, Ph.D.
13  Subscribed and sworn to before me this
14  _____ day of _____, _____.
15                                          _____
16      NOTARY PUBLIC
17
18
19
20
21
22
23
24
25

**Rubicon Consulting**

CONFIDENTIAL

July 20, 2007

Via electronic mail to Mr. Richard J. DePiano at rdepiano@escalonmed.com

Richard J. Depiano
Escalon Medical Corp.
Chairman and CEO
565 East Swedesford Road, Suite 200
Wayne, PA 19087

RE:    Letter of Engagement

Dear Mr. Depiano:

Good business practice requires my firm, Rubicon Consulting, to inform clients in writing of my services, billing practices, and fees. This letter is to furnish you with a written memorandum of the basis upon which you have engaged our service.

By way of introduction, Rubicon Consulting is a business and technology consulting firm specializing in medical devices, biotechnology, and therapeutic products. Specialties include: strategic planning, technical due diligence, technology assessment, business and product development, technology transfer from pilot plant to manufacturing, Quality and Regulatory issues related to Design Control.

It is somewhat difficult to predict, with any reasonable degree of accuracy, the nature and full extent of services to be performed on your behalf. Once we have agreed on certain project(s), we would amend this document and attach a Work Statement executed by both parties.

You agree to pay for all authorized services at the rates then in effect. Our current rate is charged at $125 per hour (General Manager). We find that certain tasks can be economically performed by my associates (writing of documentations, specifications, protocols etc.) at a reduced rate of $100 per hour. If a task may be more cost effective by delegating it to other members, I will seek your approval prior to such delegation. All authorized travel expenses will be reimbursed with in transit travel time charged at $40 per hour. Client will receive our invoicing for services via email once by month, on the fifteenth. Payment for invoices is due 30 days after the date of the invoice.

P. 1 of 1.

HIGHLY CONFIDENTIAL

## Rubicon Consulting

You may discharge us at any time, with or without any reason. Additionally, we may withdraw for reasons which include breach of the Agreement by your firm, your refusal to follow our advice in a material matter, or the occurrence of any fact or circumstance that would render our continuing representation of you unlawful, unethical, or otherwise inappropriate in our judgment. We both agree to sign documents reasonably necessary to effect or complete our discharge or withdrawal.

Please note that we already have a signed Mutual Nondisclosure Agreement in place.

Lastly, it is our understanding that you or your designated alternate, are the Administrative Representative with the authority to administer the matters of this letter in all its aspects. In this capacity, you are authorized to receive and approve invoices, and to sign and receive all correspondence.

Thank you. We look forward to working with you and representing your interests.

Yours truly,

Herbert Chow, Ph.D.
General Manager
Rubicon Consulting
PO Box 503915
San Diego,
CA 92150-3915
858-229-7407
email: herbchow@msn.com or chow.herb@sbcglobal.net
Skype: Herbert.chow

P. 2 of 2

HIGHLY CONFIDENTIAL

# Exhibit C

Page 1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    ---------------------------------------X

     DREW SCIENTIFIC, INC.,

4

                         Plaintiff,

5

                 -against-        Case No. 08 CV 1490-AKH

6

     POINTCARE TECHNOLOGIES, INC.,

7

                         Defendants.

8    ---------------------------------------X

9

10

11             DEPOSITION OF RICHARD J. DePIANO

12                   New York, New York

13               Wednesday, April 2, 2008

14

15

16       *CONFIDENTIAL PORTIONS - ATTORNEYS' EYES ONLY*

17                    PAGES 89-91

18

19   Reported by:

20   Angela M. Shaw-Crockett, CSR, RPR

21   Job No. 15877

22

23

24

25

Page 2

1
2
3
4
5
6
7
8                    April 2, 2008
9                    9:36 a.m.
10
11
12    DEPOSITION of RICHARD J. DePIANO, taken by
13    the Defendants, held at the offices of
14    Duane Morris, LLP, 1540 Broadway,
15    New York, New York, before Angela M.
16    Shaw-Crockett, a Certified Shorthand Reporter,
17    Registered Professional Reporter and Notary Public
18    of the State of New York and New Jersey.
19
20
21
22
23
24
25

Page 3

1
2            A P P E A R A N C E S :
3
      DUANE MORRIS, LLP
4         Attorneys for the Plaintiff
          1540 Broadway
5         New York, New York  10036
6    BY:   ANTHONY J. COSTANTINI, ESQ.
            BRIAN J. DAMIANO, ESQ.
7
8
9    BURNS & LEVINSON LLP
          Attorneys for the Defendants
10        125 Summer street
          Boston, Massachusetts 02110
11
12   BY:   ANDREW F. CAPLAN, ESQ.
13
14
15
16
17   ALSO PRESENT:  Petra Krauledat
18                  Frank Matuszak, Drew Scientific
19        **        **        **
20
21
22
23
24
25

Page 4

1
2        S T I P U L A T I O N S
3        IT IS HEREBY STIPULATED AND AGREED
4    by and between counsel for the respective parties
5    hereto that all rights provided by the C.P.L.R.,
6    including the right to object to any question,
7    except as to form, or to move to strike any
8    testimony at this examination, are reserved; and, in
9    addition, the failure to object to any question or
10   to move to strike any testimony at this examination
11   shall not be a bar or waiver to make such motion at,
12   and is reserved for, the trial of this action;
13       IT IS FURTHER STIPULATED AND
14   AGREED that this examination may be signed and sworn
15   to, by the witness being examined, before a notary
16   public other than the notary public before whom the
17   examination was begun, but the failure to do so, or
18   to return the original of this examination to
19   counsel, shall not be deemed a waiver of the rights
20   provided by Rules 3116 and 3117 of the C.P.L.R., and
21   shall be controlled thereby.
22       IT IS FURTHER STIPULATED and
23   agreed that the filing of the original of this
24   examination shall be and the same hereby waived.
25

Page 5

1
2    R I C H A R D   J.   D e P I A N O ,
3    called as a witness, having been first duly sworn,
4    was examined and testified as follows:
5        Business address:  565 East Swedesford Road,
6        Wayne, Pennsylvania 19087.
7    EXAMINATION BY
8    MR. CAPLAN:
9        Q.   Good morning, sir.
10       A.   Good morning.
11       Q.   If you could just state your name for the
12   record, please, and spell your last name.
13       A.   Richard J. DePiano, spelled D-E capital
14   P-I-A-N-O.
15       Q.   What do you do for a living?
16       A.   Sometimes I run Escalon Medical Corp.  I'm
17   the chairman and CEO of that company.
18       Q.   Have you been deposed before?
19       A.   Yes.
20       Q.   How many times?
21       A.   I don't know the exact number, but more
22   than ten.
23       Q.   What's your best estimate of how many
24   times you've been deposed?
25       A.   20, 30 times over my career.

Page 62

R. DePIANO - 4/2/08

1
2    Q.   And that was Escalon's concern about the
3    fact that all of Drew's products except the 2280
4    weren't dated?
5    A.   Yes. We knew that when we went in there
6    that we would have to -- it was very similar to
7    another company we acquired, and we were successful
8    in doing that, so we thought we could be successful
9    doing this.
10   Q.   And the fact that all but the 2280 were
11   dated, was that also a concern to Escalon in terms
12   of the ability to find customers interested in
13   buying the dated products?
14   A.   The marketing of those products becomes
15   difficult versus new brand new products and more
16   bells and whistles were -- you know, more features.
17   Q.   It probably doesn't take a lifetime in
18   sales to say that if one is selling a dated product
19   and one's competitors are selling current products,
20   one is at a competitor disadvantage. Fair enough?
21   A.   Fair enough.
22   Q.   And that was the situation that Escalon
23   found itself in relative to the Drew product
24   portfolio, with the exception of the 2280?
25   A.   I think when we acquired the company, that

Page 63

R. DePIANO - 4/2/08

1
2    was the situation.
3    Q.   In the medical diagnostic device field,
4    approximately what time frame would you consider a
5    product to be dated?  How long would a product be
6    out there before it could be considered dated, given
7    the pace of change in the medical diagnostic field?
8         MR. COSTANTINI:  You mean is there a
9         general rule for such things?
10   BY MR. CAPLAN:
11   Q.   To your understanding.
12   A.   I don't know the specific time frame that
13   one would be considered dated.  I can say more from
14   manufacturing the product rather than selling the
15   product.
16        Manufacturing becomes difficult after --
17   especially if electronic components are involved.
18   After three years you have to really look at what
19   other offerings are out there for replacements.
20   Q.   And do you have an understanding as the
21   CEO of Escalon of the approximate time at which a
22   medical diagnostic product would be considered dated
23   from a sales or a competitive point of view?
24   A.   No, I don't.
25   Q.   Just to back up, when we started on this

Page 64

R. DePIANO - 4/2/08

1
2    portion of our Q and A, I asked you to explain to me
3    Escalon's plan to update Drew's product offerings
4    and to expand them.  And you've described to me that
5    there was an obsolescence or a dating challenge.
6         Was there more to -- what was the plan --
7    what was Escalon's plan to deal with that issue?
8    A.   Well, I was made aware of the fact that we
9    were solely a hematology company at the time we made
10   the acquisition.  Then subsequent to the
11   acquisition, and bringing on new personnel, we
12   wanted to expand to be a one-stop shopping, to the
13   extent we could be, so we looked to add lines which
14   we didn't carry, such as a chemistry line.
15   Q.   When you say "we," are you referring to
16   Drew at this point?
17   A.   Drew.
18   Q.   I'm sorry.  What did you mean when you
19   said that there was expanding into the chemistry
20   area?  What did that refer to?
21   A.   We did hematology, not general
22   chemistries.  We didn't have a machine nor did we
23   make one or ever sell one as Drew.  So we were now
24   looking at expanding our product offering to a new
25   line of products called chemistry machine, and

Page 65

R. DePIANO - 4/2/08

1
2    offering the consumables which go along with that
3    product.
4    Q.   If I could just back up for a sec.
5         When Escalon bought Drew, prior to that
6    time had Drew developed any medical devices?
7    A.   I believe everything that Drew owned was
8    developed by them, except for one OEM arrangement.
9    I believe that OEM arrangement was a design provided
10   by the ultimate customer that we made the machine
11   for them.
12   Q.   And when Escalon bought Drew, did Escalon
13   intend that Drew would continue to develop medical
14   devices?
15   A.   Yes.
16   Q.   That was part of the business plan for
17   Drew?
18   A.   Yes.
19   Q.   And did Escalon investigate Drew's skills
20   or competence in the product development area as
21   part of the acquisition?
22   A.   Before or after?
23   Q.   In the process of acquiring Drew.
24        So whatever due diligence or
25   information-gathering led to buying Drew, did

17

Page 114

R. DePIANO - 4/2/08

1       was the possibility that was under discussion?
2           A.   They were going to bring a consumable
3       which would be available for us to market in the US
4       and other places.
5           Q.   Were there other parts of the deal under
6       discussion when you learned about it?
7           A.   Yes.  That we would modify, with their
8       help, our 2280 existing platform machine.
9           Q.   When you learned about this possible
10      collaboration, were there any other parts of the
11      transaction, to your knowledge?
12          A.   Other parts?
13          Q.   Yes.
14          A.   Yes.
15          Q.   Okay.  I'm sort of saying early on when
16      you first learned that there's a discussion between
17      Drew and PointCare, you've described a couple
18      components of the discussion.
19          Are there other components of the
20      discussion early on, to your memory?
21          A.   Most of the discussions between PointCare
22      and Drew were handled directly by Harry Rimmer, and
23      he would apprise me of what was going on.
24          Q.   Was there anyone else on behalf of Drew or

Page 115

R. DePIANO - 4/2/08

1       Escalon who was part of a negotiation team for
2       this -- relative to PointCare along with Mr. Rimmer?
3           A.   Well, at one point I was introduced to the
4       process.  The negotiations -- I'm not sure who else
5       participated with Harry in negotiations, but there
6       was a Ken Pina, an attorney, who was working for us
7       who assisted Harry in the actual creation of the
8       documents.
9           Q.   Do you recall that an agreement was signed
10      in approximately June of 2006?
11          A.   Oh, yes.
12          Q.   And prior to that signing of the contract,
13      what was your personal involvement either with the
14      negotiations or behind the scenes or in any other
15      respect?
16          A.   I was very critical of the prospect on the
17      basis that the focus at the time of our business
18      plan was to continue along the path of improving the
19      existing products.  And this would have created a
20      reallocation of resources, and I wanted to explore
21      more of what the impact would be on our business.
22          Q.   That was your position prior to an
23      agreement being entered?
24          A.   Yes.  During this five, six, whatever

Page 116

R. DePIANO - 4/2/08

1       number of months it took to negotiate the contract.
2           Q.   And Mr. Rimmer was Drew's primary contact
3       with PointCare for contract negotiations?
4           A.   Yes.
5           Q.   And Mr. Rimmer kept you apprised of the
6       discussions?
7           A.   Yes.
8           Q.   And you gave him feedback along the lines
9       of what you've just told us?
10          A.   Uh-huh.  Yes.
11          MR. COSTANTINI:  She can't do "uh-huh."
12      BY MR. CAPLAN:
13          Q.   So you expressed the view to Mr. Rimmer
14      that you were very critical of the prospect of a new
15      arrangement with PointCare because the focus of
16      Drew's business plan at the time was to continue on
17      the path of improving existing products.
18          What did you say to him about that?
19          A.   Well, I was -- first of all, we were
20      approached by PointCare, who indicated -- and I was
21      part of that discussion after it was started; I
22      don't remember the exact dates -- that our machine
23      was indicative of a platform that could be modified
24      to take their specific reagent, and they were very

Page 117

R. DePIANO - 4/2/08

1       much interested in getting a machine to actually
2       provide the platform for the reagent or the
3       proprietary -- quote, proprietary technology that
4       they had developed.
5           And I was extremely skeptical, because I
6       had asked our people whether we had knowledge --
7       enough knowledge to actually handle the project
8       ourselves and was made aware of the fact we had
9       never worked with gold or did anything like the CD4
10      type of reagent.
11          So my concern was, you know, how would we
12      be able to get this accomplished.
13          And I was reassured that -- after the due
14      diligence was done on the fact that our platform was
15      capable of being adapted or appeared to be capable
16      of being adapted, that the expertise lied at
17      PointCare to assist in that development.
18          Q.   You understood that the business
19      proposition under discussion was a possible
20      arrangement between PointCare and Drew where
21      PointCare brought to the table its proprietary
22      reagent, and the notion was that a preexisting Drew
23      platform could be modified to work with the reagent?
24          A.   Correct.

Page 122

1          **R. DePIANO - 4/2/08**
2          MR. COSTANTINI:  You mean before Peter
3   opened his mouth, what he thought.
4   BY MR. CAPLAN:
5      **Q.  Did you understand my question, sir?**
6      A.  Yes.
7          My impression was that they were capable
8   of doing the work that they had been doing up to
9   that point in time, which was on hematology
10  equipment that was in our basic product line.
11         This was moving us into another product
12  line, as I was told, doing something we had never
13  done before.  So the skillsets that existed in my
14  opinion were very good for what they were doing.
15  This is something new.  I had no way of evaluating
16  whether or not their skillsets were adequate to take
17  on a new project.
18     **Q.  And you understood that the opportunity on**
19  **the table was for Drew to modify its existing 2280**
20  **platform to accommodate PointCare's proprietary**
21  **assay?**
22     A.  Yes.
23     **Q.  And when you describe it as a proprietary**
24  **assay, what do you mean by that?**
25     A.  I was led to believe that the CD4 assay,

Page 123

1          R. DePIANO - 4/2/08
2   which was their -- or Peter's and Petra's; I'm not
3   sure which one developed it -- but it was -- Peter
4   was, you know, an intellectual property, capably
5   patented and would not be available to the rest of
6   the market -- competitive marketplace.
7          So when I was first introduced to the
8   concept, we have an opportunity to be one of the
9   only other people besides PointCare that has this
10  particular assay and would give us a competitive
11  position in the marketplace, because other than
12  PointCare, nobody else would have access to that
13  product; and we would have a competitive advantage
14  in the marketplace against competitors that we
15  viewed in hematology.
16     **Q.  And you had that understanding that**
17  **PointCare's assay was proprietary when Drew entered**
18  **its agreement with PointCare, correct?**
19     A.  Yes.  I thought it was patentable at that
20  point in time and was unique, relying again on the
21  expertise of Peter and his credentials that this was
22  the case.  Otherwise, for a me-too product, if
23  anybody else can make the same thing, it would have
24  definitely been totally unattractive and I would
25  never have went forward with the project if I

Page 124

1          R. DePIANO - 4/2/08
2   thought that was the case.
3      **Q.  Was it important and valuable to you that**
4   **PointCare's assay was proprietary?**
5      A.  Absolutely.  That was the one of the key
6   factors for us going into this transaction.
7      **Q.  And did you or your people do any due**
8   **diligence on that fact prior to entering this**
9   **agreement?**
10     A.  I did not.  I believe Harry did talk --
11  and I think there was a patent pending or filed or
12  something like that, but I don't think it was issued
13  at the time.
14     **Q.  And did Mr. Rimmer report back to you the**
15  **results of his due diligence regarding the**
16  **proprietary nature of PointCare's assay?**
17     A.  Yes.  He believed that based on people he
18  spoke to, and Peter -- I don't know who else he
19  spoke to -- that, yes, this was, you know, actually
20  going to be out of the general public's domain and
21  very limited.
22     **Q.  And did you understand once Drew entered**
23  **this agreement with PointCare that the assay**
24  **remained PointCare's proprietary property?**
25     A.  Yes.

Page 125

1          R. DePIANO - 4/2/08
2      **Q.  The time frame of my next question starts**
3   **from when PointCare entered its contract with Drew,**
4   **June of 2006, until the time that Drew filed this**
5   **lawsuit.**
6          **So from the time that the contract was**
7   **signed until this lawsuit got started, was it your**
8   **understanding throughout that time period that**
9   **PointCare's assay was proprietary to it?**
10     A.  Yes.
11     **Q.  Has that understanding changed since then?**
12     A.  Yes.
13     **Q.  How so?**
14     A.  Through the process of this discovery, if
15  that's the right term, or litigation, I was advised
16  that the patent, which we didn't know, was denied.
17     **Q.  Who told you that?**
18     A.  The host of people that have been reading
19  the documents.  It could have been one of four
20  people.  I'm not sure exactly which comment was
21  made.  It could have been Frank Matuszak and/or one
22  of my attorneys that said in the documents supplied
23  there was an indication that the technology was that
24  prior art existed and therefore it was questionable;
25  and that ultimately it did get rejected.

Page 126

R. DePIANO - 4/2/08

1
2     Q.  Do you have expertise in the patent law
3  area, sir?
4     A.  I don't have expertise in anything.
5     Q.  Do you have an understanding whether the
6  alleged denial of PointCare's patent application on
7  its assay — whether that's final or subject to
8  further review?
9     A.  I don't know.
10     Q.  So at least for the entire time of the
11  business relationship between Drew and PointCare, at
12  least until the filing of the lawsuit, you
13  understood as CEO of Escalon that Drew's — strike
14  that — that PointCare's assay was proprietary to
15  it, correct?
16     A.  Yes.  That was my understanding.
17     Q.  And, as such, it would have violated
18  PointCare's proprietary rights in its assay for
19  someone to try to copy it, for example, or reverse
20  engineering.
21        Do you agree with that?
22     A.  Yes.
23     Q.  Prior to the contract being signed, do you
24  recall personally attending any meetings with any
25  representatives of PointCare?

Page 127

R. DePIANO - 4/2/08

1
2     A.  The dates escape me, but I know we had
3  dinner in Marlboro.  I don't know if it was before
4  the signing or — it was early on, but I don't
5  remember the exact timing.  In Marlboro we had
6  dinner.  I was not in attendance when — I think it
7  was just Peter and one of his co-workers
8  went to Dallas to look at the machine, and that was
9  before the contract was signed.
10        I'm sure there was a meeting or two.  I
11  just don't remember the dates.
12     Q.  Just more broadly, do you remember having
13  any direct communications, either in person or on
14  the phone or e-mail, or however, with Peter, Petra
15  or any of the folks from PointCare before signing a
16  contract?
17     A.  I remember telephone conversations with
18  Harry and Petra where I was in the room and we were
19  going — they were negotiating different aspects.
20     Q.  Do you remember any substance of that
21  conversation?
22     A.  It was around pricing.  Mostly around
23  pricing, as I recall.  There was a lot of issues
24  around the reagent pricing and structure of the
25  deal.

Page 128

R. DePIANO - 4/2/08

1
2     Q.  Do you remember anything else from that
3  conversation?
4     A.  From that particular conversation, no.
5  That's that sticks out mostly in my mind.
6     Q.  And, again, prior to the contract between
7  the parties being signed, do you remember any other
8  direct communications between yourself, Peter, Petra
9  or anyone else from PointCare in person, on the
10  phone, however?
11     A.  There probably was discussions.  I don't
12  know if they were all in person or by phone.
13     Q.  As we sit here today, do you remember the
14  substance of any communications between yourself and
15  any folks at PointCare prior to signing this
16  contract?
17     A.  Only the one discussion that's centered on
18  the fact that — and I think it was with Peter and
19  Petra together that we talked about their ability to
20  fix any problems we would have in getting our
21  machine converted.
22     Q.  And what was said about that?
23     A.  That Peter could solve those problems;
24  that's what Peter did; and Peter was very good at
25  that.

Page 129

R. DePIANO - 4/2/08

1
2     Q.  To your understanding, whose
3  responsibility was it under this contract to modify
4  Drew's existing platform to accommodate PointCare's
5  assay?
6     A.  Under the contract, as it was written,
7  Drew bore the expense and the responsibility for
8  modifying the 2280.
9     Q.  To accommodate PointCare's assay?
10     A.  Yes.
11     Q.  And going into the contract, you knew that
12  Peter Hansen and perhaps other colleagues at
13  PointCare had the skills to help Drew in that
14  regard, correct?
15     A.  Yes.
16     Q.  But ultimately you understood under the
17  contract that the responsibility fell on Drew to
18  modify its platform to work with PointCare's assay,
19  correct?
20     A.  Yes.  And at the time, the responsibility
21  was fixed because of the costs associated with it.
22  We should bear that.
23     Q.  So Drew bore responsibility for the costs
24  of accommodating its platform to PointCare's assay,
25  correct?

Page 134

1          R. DePIANO - 4/2/08
2    do that.
3        Q.  So you expected a lot of help from
4    PointCare?
5        A.  Absolutely.  We never would have went into
6    this, because it was totally out of -- foreign to
7    anything we had ever done before.
8        Q.  And understanding that you expected a lot
9    of help from PointCare, isn't it a fact that you
10   understood that ultimately Drew was responsible for
11   the successful modification of the platform to
12   accommodate the assay?
13       A.  I'd have to answer that no.
14       Q.  Why not?
15       A.  Because we couldn't do it.  I knew we
16   couldn't do it the day when I went in there.  And I
17   told you my objection for not getting involved is we
18   didn't have the expertise.  So the responsibility
19   for having the knowledge was because it was
20   represented by PointCare that they had that
21   knowledge and could do it.
22       Q.  So it's your position that the day that
23   Drew signed this manufacturing, distribution and
24   co-marketing agreement with PointCare, Drew did not
25   have the technical skills on its own to modify its

Page 135

1          R. DePIANO - 4/2/08
2    platform to accommodate PointCare's assay, correct?
3        A.  Correct.  That was my understanding.
4        Q.  I know we've covered a lot of ground, but
5    let me just try to ask you a general question.
6            You've described to us PointCare's
7    representations about its capabilities to assist
8    PointCare.
9            My question to you is, who specifically at
10   PointCare made those representations to you?
11       A.  To assist PointCare?  I don't --
12           MR. COSTANTINI:  I think you got tangled
13   up in your question.  If you want it read back.
14           MR. CAPLAN:  It took me until 2:30 to get
15   tangled up.  I'm having a good day.
16           (A discussion was held off the record.)
17           MR. COSTANTINI:  You want her to read it
18   back?
19           MR. CAPLAN:  No.  Being told my question
20   was bad is bad enough.  I don't need to hear it
21   again.
22   BY MR. CAPLAN:
23       Q.  Who at PointCare represented to Drew or
24   Escalon that PointCare had these various
25   capabilities to assist Drew in adopting the

Page 136

1          R. DePIANO - 4/2/08
2    platform?
3        A.  Peter Hansen.
4        Q.  Did he say that to you personally?
5        A.  Yes.
6        Q.  Where and when?
7        A.  I don't remember where it was.  It was
8    either -- one of the conversations we had during
9    this period of time.
10           You got to remember that PointCare
11   solicited us, and we had a basic machine that they
12   wanted modified.  They had the reagent that was
13   supposedly their business premise.  They wanted to
14   sell this reagent, and they needed another platform
15   other than the one they had, so they solicited us.
16           We didn't have any knowledge of CD4 in
17   terms of applying it in our business prior to
18   meeting PointCare.  So everything we did to get
19   enticed into this arrangement was based on the
20   knowledge that they represented to us that they
21   possessed.
22       Q.  What exactly did Peter Hansen say to you,
23   as best as you can remember?
24       A.  Our platform was a well-constructed
25   machine.  And it is very capable with modifications

Page 137

1          R. DePIANO - 4/2/08
2    to handle what they wanted in a fast throughput or a
3    more speedy throughput of their product versus a
4    slower one.
5            I don't know exactly what that means,
6    but ...
7            And I remember the conversation dealt with
8    a mixer.  I didn't even know we had a mixer in
9    there.  I had no idea what the mixing was all about;
10   but mixing something, and it needed to be more
11   robust.
12           And they talked about the idea of a --
13   replacing some parts that would be more beneficial,
14   more efficient, or do things better.  It had to do
15   with an optinet (phonetic) or a camera or something
16   like that.
17           And that was the conversation where they
18   assured me, yes, you guys know how to build them,
19   and you can build them after you got a platform that
20   we could start from, these modifications can be
21   done, and they were going to do all the assistance
22   needed to get that to work, and we needed their
23   chemistries and their software.
24           But, literally, Peter was going to have a
25   hands-on responsibility for doing that.  Otherwise,

Page 138

R. DePIANO - 4/2/08

1     I had no intention at that stage in the company to
2     divert the resources which we did have away from
3     projects that they were working on. Because this
4     was totally new. It was nothing we were -- on our
5     drawing board or that I even knew about was
6     something we wanted in the future. It was an
7     opportunity brought to us by PointCare. And based
8     on that, we decided to move forward.
9         Q.   When did Peter Hansen say that to you?
10        A.   I don't remember.
11        Q.   Before or after June of '06?
12        A.   I think it was before.
13            I wasn't willing to do this project unless
14    we had some comfort regarding our ability to
15    perform.
16        Q.   Do you have a clear memory that Peter
17    Hansen made these representations to you before
18    Mr. Rimmer signed the contract for Drew?
19        A.   I'm pretty sure he did.
20        Q.   Is that on the phone or in person?
21        A.   I don't remember.
22        Q.   Do you remember anything about the
23    conversation, the circumstances of the conversation?
24        A.   I just remember the mixer, because I

(Note: line numbers 1-25 on left; above transcription condensed.)

Page 139

R. DePIANO - 4/2/08

1     didn't know we had a mixer.
2         It's the only word I understood in the
3     whole conversation.
4         Q.   I've had those conversations myself.
5         So it's your testimony that Peter Hansen
6     gave you a comfort that he and his people would
7     assist Drew to adopt their platform to accommodate
8     PointCare's assay, right?
9         A.   Yes.
10        Q.   Did Peter Hansen ever represent to you
11    that PointCare would be ultimately responsible to
12    modify Drew's platform to accommodate PointCare's
13    assay?
14        A.   Not to modify.
15        Q.   That was Drew's responsibility?
16        A.   To modify. He represented that he would
17    be able to guide our people through the process and
18    show them how to get it done. He had the knowledge.
19        Q.   So in a nutshell, you understood from
20    talking to Mr. Hansen that he and his people would
21    help Drew to modify the platform to accommodate the
22    assay and that Drew would be responsible to do that
23    work?
24        A.   To pay for it.

Page 140

R. DePIANO - 4/2/08

1         MR. COSTANTINI: I think the word is
2     "guide." I think the wording in his testimony
3     was "guide," not "help."
4         MR. CAPLAN: Could I have the question
5     back, please.
6         (The last question was read back by the
7     Reporter.)
8         A.   To actually physically do the work under
9     his guidance, and we would be responsible for paying
10    for it.
11        Q.   Did Peter Hansen or anyone else at
12    PointCare ever represent to you that PointCare would
13    be responsible to modify the platform to accommodate
14    the assay?
15        A.   No. PointCare never took that
16    responsibility to modify it. They took
17    responsibility for providing knowledge to modify it.
18        MR. COSTANTINI: Is this a logical break
19    time?
20        MR. CAPLAN: Read my body language.
21        (Recess at 2:31 p.m.)
22        (Deposition resumes at 2:51 p.m.)
23    BY MR. CAPLAN:
24        Q.   Prior to Drew signing the contract with

Page 141

R. DePIANO - 4/2/08

1     PointCare, aside from speaking with Peter Hansen,
2     did you do anything to satisfy yourself that Drew
3     had the capabilities to monitor its platform to
4     accommodate PointCare's assay?
5         MR. COSTANTINI: You mean "modify"? I
6     think you said "monitor."
7         THE WITNESS: Monitor the platform?
8     BY MR. CAPLAN:
9         Q.   I meant to say "modify."
10        A.   Modify the platform?
11        Q.   Why don't I start again, because we
12    probably lost the question.
13        Prior to signing the contract, did you do
14    anything other than talking to Peter Hansen to
15    satisfy yourself as the Escalon CEO that Drew had
16    the capabilities to modify its existing 2280
17    platform to accommodate PointCare's assay?
18        A.   I personally did not do anything.
19        Q.   Did you ask any of your subordinates to do
20    anything to satisfy yourself of Drew's capabilities
21    to modify its platform to accommodate PointCare's
22    assay?
23        A.   I was given assurances by Harry that --
24    Harry Rimmer, who was then president of Drew, that

Page 158

R. DePIANO - 4/2/08

1    from PointCare?
2        A.  There were other people at PointCare, but
3    my only interaction was very limited to -- I met
4    several people, but they weren't really -- I met a
5    KC.  I forget his last name.  And I met Eric, who is
6    the controller.
7        Q.  Eric Newman?
8        A.  Eric Newman was the controller who didn't
9    get really into any of the technical things.
10       And then I met the vice president of
11   sales.
12       Q.  Dan O'Connor?
13       A.  Yeah.  First time I met him at dinner.  We
14   were up at dinner before the -- before the agreement
15   was signed in Marlboro.  It was an experience.
16       Q.  Yeah.  What do you mean when you say that?
17       A.  It was a great dinner.
18       Q.  And you understood prior to signing this
19   agreement that PointCare had previously had a deal
20   with a distributor to manufacture a different
21   platform that worked with its assay, right?
22       A.  I don't know if it was a distributor, but
23   I know that they had a vendor who manufactured
24   equipment which they sold.  I think they were the

Page 159

R. DePIANO - 4/2/08

1    distributor.  PointCare was the distributor of
2    equipment that utilized -- or had the ability to
3    utilize the CD4 assay that they stated was
4    proprietary to them.  And I said earlier they had
5    some number of machines out there; that they had
6    sold 60 machines or something.
7        Q.  And when PointCare came to Drew about
8    expressing interest in Drew modifying its platform
9    to work with the PointCare assay, you understood
10   from the folks at PointCare that their prior
11   relationship with the vendor who manufactured the
12   instruments that work with the CD4, that
13   relationship had come to an end for some reason or
14   another, right?
15       MR. COSTANTINI:  I'm sorry.  Could I hear
16   that one again.
17       (The last question was read back by the
18   Reporter.)
19       A.  There were two aspects to that -- the
20   answer.  One is yes, I understand that it was ended.
21   I don't know all the reasoning behind it, but it was
22   no longer, you know, the case that they were going
23   to get the equipment.
24       And I know that they were looking for

Page 160

R. DePIANO - 4/2/08

1    spare parts, and there was a machine that had
2    already been in the market or something that could
3    be cannibalized in spare parts from that machine.
4    And even I believe I heard a conversation about the
5    fact that if we get trade-ins of that particular
6    model, whatever it was, I don't know the name of it,
7    they would be interested in taking those machines.
8        Q.  So --
9        A.  Poor cannibalization of parts.
10       Q.  So when PointCare came to Drew about a
11   possible business relationship, you understood that
12   PointCare's supply of the CD4 instrument had been
13   ended for one reason or another?
14       A.  Yes.
15       Q.  And PointCare was coming to Drew hoping to
16   find a supply of platforms that work with the CD4
17   assay, right?
18       A.  I believe we were one of several companies
19   they explored the possibility with.
20       Q.  And did you understand from your
21   discussions with Petra Krauledat or Peter Hansen or
22   others that there was some urgency on PointCare's
23   part to obtain a new platform that they could sell
24   with their assay?

Page 161

R. DePIANO - 4/2/08

1        A.  Yes.
2        Q.  Why do you say that?
3        A.  Well, because up front when Harry -- it
4    was either Harry or in one of the discussions, they
5    wanted to get this done quickly.
6        Q.  So --
7        A.  Very quickly.
8        Q.  -- Harry Rimmer made that clear to you?
9        A.  Yes.
10       But then I kind of raised an issue about
11   if we wanted to do this so quickly, why is it taking
12   over six months to get a contract done.
13       Q.  Who did you raise that to?
14       A.  Harry.
15       Q.  What did he say?
16       A.  Just it's taking that long to get all the
17   details worked out in the contract.
18       Q.  Did you ever do an investigation to
19   determine how much of the delay was attributed to
20   Mr. Rimmer's ability to move a contract forward?
21       A.  No.  But in my past experience, everybody
22   goes this way, which is the hand sign that says it's
23   not my fault; it's everybody else's fault.  So who
24   shot who, I don't know.

41

1        R. DePIANO - 4/2/08
2  project from Drew's side?
3        MR. COSTANTINI: From that point forward.
4     A. Harry Rimmer.
5     Q. Back up for a second.
6        We've talked about PointCare's NP
7  instrument and we've talked about that under this
8  agreement it was contemplated that Drew would have
9  certain rights to distribute and market the NP
10  instrument.
11        My question is, when this contract was
12  signed, did you have an understanding of whether
13  there were any preconditions for Drew to have the
14  right to distribute and market the NP instrument?
15     A. No.
16     Q. To avoid having to mark another copy of
17  the agreement, I'm going to try a question just
18  reading you a sentence or two, and if I need to mark
19  it, I will, but I'm trying to save a tree or two
20  here.
21        Just reading you from Article 1.1 of the
22  contract where -- I'll just read you two sentences.
23  "PointCare shall grant Drew nonexclusive worldwide
24  distribution rights for such NP platform. Such
25  distribution rights will be conditional upon the

1        R. DePIANO - 4/2/08
2  successful development and marketing of the HT
3  platform."
4        Do you have an understanding of what those
5  sentences mean, sir?
6     A. I do.
7     Q. And what's your understanding?
8     A. That you don't get the right to market the
9  NP unless you develop the HT.
10     Q. "Yes" or "no," has the development of the
11  HT been accomplished?
12     A. Yes.
13     Q. What do you mean when you say that?
14     A. It was ready as far as we can go months
15  ago.
16     Q. Ready for what purpose?
17     A. To have PointCare fulfill its part of the
18  obligation.
19     Q. What state of completion was the HT at
20  that time?
21     A. What time are you talking about?
22     Q. The time you're talking about when you say
23  that it was ready.
24     A. It was ready to be shipped to PointCare
25  for their part of the contract to complete.

1        R. DePIANO - 4/2/08
2     Q. And I understand you're not a technical
3  person. Neither am I. But from your understanding,
4  what state of preparedness was the HT?
5     A. It was complete and able to be used by
6  PointCare to do the part of the contract that they
7  were supposed to do.
8     Q. And which part was that?
9     A. Get the reagent and the software, whatever
10  was done, to work together with our machine.
11     Q. At that time did the instrument meet the
12  contract specifications?
13     A. I was told it did.
14     Q. By whom?
15     A. By our people in Dallas. And by a
16  consultant.
17     Q. Herbert Chow?
18     A. Yes.
19     Q. Did you have a personal conversation with
20  Herbert Chow about that?
21     A. No.
22     Q. So who were the folks in Dallas that told
23  you the HT met specifications at that time?
24     A. Doug Nickols I believe was the one who
25  stated that.

1        R. DePIANO - 4/2/08
2     Q. As best as you can recall, what did
3  Mr. Nickols tell you about that?
4     A. Machine is ready to be shipped.
5     Q. Did he say anything else beyond the
6  statement the machine is ready to be shipped?
7     A. Relevant to this, no.
8     Q. Did Mr. Nickols actually tell you the
9  machine met specifications under the contract?
10     A. They had fulfilled everything that they
11  needed to under the contract, and it was also the
12  opinion of Herb Chow, and we had to report to that
13  end is what I was told.
14     Q. And you relied on Mr. Nickols in that
15  regard?
16     A. Of course.
17     Q. Did anyone tell you that Herb Chow had
18  determined that the HT met all of the contract
19  specifications?
20     A. Yes.
21     Q. That's what Mr. Nickols told you?
22     A. Yes. I didn't speak directly to Herb
23  Chow.
24     Q. Did you read his report?
25     A. No.

Page 194

```
 1          R. DePIANO - 4/2/08
 2   have?
 3       A.  I believe he would have, yes.
 4       Q.  What type of skills or what did Peter
 5   bring to the table that Drew lacked at the time?
 6       A.  They didn't have anybody with Peter's
 7   background and/or in my opinion knowledge and
 8   vision.
 9       Q.  Technical knowledge?
10       A.  Technical knowledge.
11       Q.  And I think you said there were two things
12   of interest to you about a possible combination
13   between PointCare and Drew.  Hansen was one.  What
14   was the other one?
15       A.  To have a proprietary -- I thought was a
16   proprietary consumable.
17       Q.  So where did the possibility go from that
18   initial conversation?
19       A.  Well, we were -- I thought we were pretty
20   serious in pursuing it.  And, obviously, if you know
21   what a public company's requirements are, they must
22   have fairness opinions on any transaction that would
23   involve stock.
24          And we got to the point where due
25   diligence proceeded.  And Petra was very dogmatic
```

Page 195

```
 1          R. DePIANO - 4/2/08
 2   about staying on a definitive timetable to get the
 3   due diligence done.  And then we got to valuation.
 4   We hired an independent firm that we've used before
 5   to valuate PointCare.
 6       Q.  What happened from there?
 7       A.  They started to do the valuation and
 8   basically gave us some preliminary valuations.  And
 9   I, as soon as I got them, called Petra and said
10   they're not coming out anywhere near where you're
11   going to be happy, and gave her the numbers.
12          And she had interacted with Steve Sherf,
13   who was the person responsible for the valuation.
14   So --
15       Q.  Sherf did Drew's evaluation [sic] of
16   PointCare?
17       A.  Yes.
18          And the report, in draft, indicated a much
19   lower valuation than what was expected.  Passed it
20   on to Petra.
21          And she basically wrote back and said
22   we've reached an impasse valuation just isn't ...
23       Q.  In this context, did Drew have Sherf do a
24   valuation of Drew?
25       A.  No.
```

Page 196

```
 1          R. DePIANO - 4/2/08
 2          He had performed a valuation of our
 3   goodwill in Drew for purposes of, you know, the
 4   independent accountant's report for impairment.
 5       Q.  And at the time did PointCare give Drew a
 6   valuation -- its own valuation of PointCare?
 7       A.  Supplied me with a valuation done by I
 8   believe a third party.  It wasn't done by -- it was
 9   done by a third party.
10       Q.  Fair enough.
11          And in sum and substance, that was the end
12   of the merger talks?
13       A.  When I got the memo that said we were at
14   an impasse and the numbers aren't going to work,
15   that was it.
16       Q.  To your observation, did that have any
17   effect on the working relationship between PointCare
18   and Drew?
19          MR. COSTANTINI:  Observation at the time
20   now?
21          MR. CAPLAN:  Right.
22       A.  At the time I didn't think it would; but
23   with hindsight after this investigation, it clearly
24   did.
25       Q.  At any time prior to the filing of the
```

Page 197

```
 1          R. DePIANO - 4/2/08
 2   lawsuit, did you believe that the merger discussions
 3   had hurt the working relationship between the
 4   parties in any way?
 5       A.  Hurt, no.  I didn't believe -- personally
 6   I didn't believe.  I thought Petra understood -- she
 7   was the point person -- understood the fact that I
 8   alone do not make the decision.  I have a board of
 9   directors.  We're a public company, and they do
10   follow the rules, especially given today's
11   environment.  As such, that report would have -- I
12   knew that that report was not going to be
13   acceptable, and my board would not go against an
14   independent third party.
15       Q.  Did the failed merger discussions cause
16   any friction between the parties?
17       A.  At the time?
18       Q.  Yes.
19       A.  At the time, I didn't believe it did.
20       Q.  Prior to the filing of the lawsuit, did
21   you think that the failed merger talks had caused
22   any friction between the parties?
23       A.  Clearly started to have my suspicions
24   about everything that was going wrong was always
25   Drew's fault.  PointCare was holier than thou during
```

Page 202

R. DePIANO - 4/2/08

1     R. DePIANO - 4/2/08
2 Drew ended in approximately June of 2007; is that
3 right?
4     A. Yes.
5     Q. After that time, did you ever give any
6 further consideration to trying to acquire
7 PointCare?
8     A. Did I give? No. Escalon was not
9 interested after that.
10     Q. After merger discussions between the
11 parties ended, did you ever consider the possibility
12 of Escalon or Drew merging with or somehow combining
13 with PointCare?
14     A. Well, by "consider," you mean did I ever
15 think about it? Did I act upon it? Did I convey it
16 to my board? What specifically do you mean by
17 "consider"?
18     Q. Did it ever cross -- any of those --
19     A. Crossed my mind. Crossed my mind.
20     Q. After the merger discussions ended, did
21 you ever speak with any colleagues from Drew or
22 Escalon about a possible combination transaction
23 with PointCare?
24     A. Yes.
25     Q. Who did you discuss that with?

Page 203

1     R. DePIANO - 4/2/08
2     A. Frank Matuszak.
3     Q. When?
4     A. After the merger was not consummated.
5 Sometime after that. I don't know when.
6     Q. 2007?
7     A. I'm not sure if it was late 2007 or '8,
8 but it was a conversation, not an action step.
9     Q. Who initiated the conversation between you
10 and Mr. Matuszak?
11     A. Frank mentioned it to me.
12     Q. What did he mention to you?
13     A. That will we have any interest in going
14 after PointCare -- talking to their board about a
15 potential merger.
16     Q. Talking to what board?
17     A. PointCare's board.
18     Q. What else did Mr. Matuszak say you to
19 about that?
20     A. Did I have any interest in talking to
21 their board.
22     Q. What else did he say?
23     MR. COSTANTINI: Why do you think he said
24 something else?
25     A. With regard to us acquiring them?

Page 204

1     R. DePIANO - 4/2/08
2     Q. Did Mr. Matuszak say anything else?
3     A. Not about the acquisition, no.
4     Q. That's it. That's all he said.
5     In substance he said to you would Escalon
6 be interested in communicating with the PointCare
7 board about a possible combination?
8     A. Regarding that item, yes, that's all he
9 said about that item.
10     Q. Did he mention that he was speaking to
11 anyone outside of Drew or Escalon about that topic?
12     A. He said that he was only speaking to one
13 person, a former employee, Dan O'Connor.
14     Q. And you understood that Dan O'Connor was a
15 former employee of PointCare?
16     A. At that time. He had left back in June,
17 July, something like that.
18     Q. And so Mr. Matuszak came to you and he
19 told you that he was having discussions with former
20 PointCare employee Dan O'Connor about whether
21 Escalon would be interested in a possible
22 combination with PointCare, right?
23     Strike that. Let me ask it more
24 generally.
25     Mr. Matuszak told you that he had been

Page 205

1     R. DePIANO - 4/2/08
2 having some conversations with Mr. O'Connor, right?
3     A. That they were communicating. Whether it
4 was verbal, e-mail, I don't know.
5     Q. And did he tell you what he and
6 Mr. O'Connor were communicating about at that time?
7     A. They were talking mostly business, from
8 what I understand.
9     Q. What were they discussing relative to the
10 issue that we're talking about here?
11     A. The merger?
12     Q. Yes.
13     A. Just the fact that Dan O'Connor indicated
14 that would I be interested in talking to their board
15 about acquiring PointCare.
16     Q. Did Mr. Matuszak tell you anything else
17 about his discussions with Mr. O'Connor?
18     A. Yeah. He mentioned that they had several
19 discussions or communications about many issues.
20     Q. What other issues?
21     A. All related to business matters. I think
22 there was one -- they had some talk about an
23 individual that was a friend of Dan's and maybe
24 looking for a job and things of that nature. And I
25 think he even talked about Dan being a consultant or

52

Page 206

R. DePIANO - 4/2/08

1       R. DePIANO - 4/2/08
2   employee of Escalon -- or of Drew.
3       Q.  So Mr. Matuszak told you that he had been
4   communicating with former PointCare employee
5   O'Connor about various business issues, right?
6       A.  Yes.
7       Q.  Did he tell you that he'd been speaking to
8   Mr. O'Connor about former business issues related to
9   PointCare?
10      A.  Yes.
11      Q.  And what were those issues that he told
12  you he'd been discussing with Mr. O'Connor relative
13  to PointCare?
14      A.  Issues with management, issues with the
15  business.  I don't remember all the specifics.
16      Q.  What other issues do you remember that
17  Mr. Matuszak told you he was discussing with
18  Mr. O'Connor about PointCare business?
19      A.  Other than those -- there's probably
20  several more, but I don't remember exactly what they
21  were.
22      You have to realize that I didn't put a
23  lot of stock and faith in Mr. O'Connor.  I was not
24  one of his fans.  As a matter of fact, I even went
25  as far to mention to Petra before the merger I would

Page 207

R. DePIANO - 4/2/08

1       R. DePIANO - 4/2/08
2   have a very difficult time working with that guy.
3       I met him the first time at a dinner in
4   Marlboro with Petra, Peter, Harry, and I forget who
5   else was there, but -- and I just really didn't feel
6   very comfortable with him, and I --
7       Q.  Why not?
8       A.  I thought he was -- blew a lot of smoke.
9   It was all smoke and mirrors.  I didn't know if he
10  had any substance.  But Petra assured me that he was
11  -- a lot of experience in the industry and all these
12  other accolades about his credentials.  So I said,
13  well ...
14      So when somebody mentions what he might or
15  might not say to me, I don't really focus very well
16  on that.
17      Q.  Let's just explore what you do remember.
18  Let me ask you this question.
19      Is it fair to say Mr. O'Connor made a poor
20  first impression on you?
21      A.  Yes.
22      Q.  Right from the beginning, you didn't think
23  much of him?
24      A.  I only met him via the first meetings
25  before the contract was signed.  I think I was there

Page 208

R. DePIANO - 4/2/08

1       R. DePIANO - 4/2/08
2   in Marlboro, and we went to dinner.
3       Q.  And based on a single meeting with him, he
4   wasn't the type of guy you particularly cared to do
5   business with, was he?
6       A.  I would not want to be that very dependent
7   on a guy like him, yes, that's right.
8       Q.  Did he strike you as untrustworthy?
9       A.  I didn't say untrustworthy.  No, he wasn't
10  untrustworthy.  I just think he was -- lacked a lot
11  of substance.  And he fell in love every morning
12  when he woke up and looked in the mirror.  So, I
13  mean ...
14      Q.  So at some point in late '07 or early '08,
15  your director of sales, Mr. Matuszak, tells you that
16  he's been having some ongoing communications with
17  Mr. O'Connor about PointCare business, right?
18      A.  Yes.
19      Q.  And you mentioned one of those issues
20  related to management.
21      What were you told about that?
22      A.  That basically he didn't have a lot of
23  confidence in the current management's leadership
24  and that there may be an opportunity to deal
25  directly with the board on this -- on a merger

Page 209

R. DePIANO - 4/2/08

1       R. DePIANO - 4/2/08
2   opportunity.
3       Q.  You used some "he's" in there.
4       Is it that --
5       A.  Mr. O'Connor -- Frank told me Mr. O'Connor
6   didn't have a lot of confidence and did feel that
7   approaching the board would be a good idea.
8       Q.  And Frank told you that O'Connor said that
9   O'Connor did not have a lot of confidence in
10  PointCare's management, right?
11      A.  Yes.  He didn't have any confidence in me
12  either.  He didn't trust me.  He also told me that.
13      Q.  Did Mr. Matuszak tell you that
14  Mr. O'Connor was advocating that Escalon do
15  something about a possible merger?
16      A.  Yeah.  What I said.  He said that we
17  should go directly to the board.
18      Q.  Beyond passing along O'Connor's view on
19  that, did Mr. Matuszak express his opinion to you
20  about that possibility?
21      A.  He just asked me what I thought.
22      Q.  Did he express an opinion one way or the
23  other?
24      A.  No, he didn't express an opinion saying it
25  was good, bad or different.  To me, anyway.

Page 214

R. DePIANO - 4/2/08

1
2  their board with regard to a merger, why doesn't he
3  do it.
4      Q.  Did you give Mr. Matuszak any guidance at
5  all about whether or not you thought it would be
6  appropriate for him to continue discussions with
7  Mr. O'Connor about the possibility of Escalon
8  contacting the PointCare board about a transaction?
9      A.  I'm sorry.  Can you just repeat that
10 again.
11     Q.  She can.
12         (The last question was read back by the
13 Reporter.)
14     A.  My guidance was if they want to talk to
15 us, they can contact us.  That was my guidance.
16     Q.  Just to be clear, did you give him any
17 guidance that he should not contact the PointCare
18 board?
19     A.  Yes.
20     Q.  What was your guidance to him on that?
21     A.  He can't contact the PointCare board.
22     Q.  Why not?
23     A.  Frank Matuszak contact?
24     Q.  Right.
25     A.  Because, you know, it would be against

Page 215

R. DePIANO - 4/2/08

1
2  what I wanted in the company.  It's going against my
3  policy.
4      Q.  Is there any other reason why it would be
5  inappropriate for Mr. Matuszak to contact the
6  PointCare board?
7      A.  Inappropriate?  I didn't think it would be
8  his place to do that.
9      Q.  Now, did Mr. Matuszak tell you of any
10 other information that Mr. O'Connor had passed along
11 concerning PointCare other than what you've told us
12 about?
13     A.  As I said, there may have been some other
14 subjects, none of which I was paying much attention
15 to, unfortunately.  If I had known you were going to
16 ask me a question, I would have paid attention.
17     Q.  Do you recall Mr. Matuszak mentioning that
18 Mr. O'Connor had passed along some financial
19 information about PointCare that Mr. O'Connor had
20 obtained from PointCare?
21     A.  Financial information?  What type of
22 financial information?
23     Q.  Any kind.
24     A.  I remember him mentioning that Dan was
25 talking to somebody in the company, and I think he

Page 216

R. DePIANO - 4/2/08

1
2  said he was talking to the financial person in the
3  company.
4      Q.  So Mr. Matuszak told you that Dan O'Connor
5  was talking to the PointCare comptroller, Eric
6  Newman, right?
7      A.  Yeah, I believe that was the name, yeah.
8      Q.  And Mr. Matuszak told you that
9  Mr. Matuszak was passing along to Mr. Matuszak
10 financial information that Mr. O'Connor was
11 obtaining from the comptroller, Newman, correct?
12     A.  In substance, yes.
13     Q.  Did Mr. Matuszak pass along any of that
14 financial information he had obtained from O'Connor?
15     A.  There's some e-mails he sent me, but I
16 don't remember a lot of what was in them other than
17 that merger thing.
18     Q.  So Mr. Matuszak forwarded you e-mails that
19 had PointCare financial information that O'Connor
20 had obtained from the comptroller, Newman; is that
21 right?
22     A.  There may have been statements regarding
23 financial information.  No financial statements were
24 sent to me.
25     Q.  I don't mean the financial statements in

Page 217

R. DePIANO - 4/2/08

1
2  the formal sense, but you have a memory that
3  Mr. Matuszak sent you e-mails providing you with
4  financial information that Mr. O'Connor had obtained
5  from PointCare's comptroller, Eric Newman, right?
6      A.  I don't know if an e-mail would have
7  specified this data was obtained by Dan O'Connor
8  from Eric Newman.  It may have been Dan O'Connor
9  said something or Dan O'Connor indicated this.  Now,
10 the innuendo was where did he get it from.
11     Q.  And your understanding was that O'Connor
12 was obtaining PointCare financial information from
13 its comptroller, Eric Newman?
14     A.  Yes.
15     Q.  And did you give Mr. Matuszak any guidance
16 as to whether or not he should be talking to
17 Mr. O'Connor and accepting financial information
18 that O'Connor claimed to have obtained from
19 PointCare's comptroller?
20     A.  Did I give him any guidance with
21 continuing?
22     Q.  Yes.
23     A.  No.
24     Q.  Did you have any problem with your head of
25 sales speaking with a terminated PointCare employee

Page 218

1    R. DePIANO - 4/2/08
2  in obtaining PointCare financial information from
3  its comptroller?
4        MR. COSTANTINI: So far he hasn't said
5    "communicate." He said he sent e-mails.
6        MR. CAPLAN: I said "communicated"?
7        MR. COSTANTINI: You said "speaking." "Do
8    you have any problem with speaking." He hasn't
9    testified to speaking.
10 BY MR. CAPLAN:
11    Q.  Did you have any problem with
12 Mr. Matuszak, Drew's director of sales,
13 communicating with a former PointCare employee,
14 Mr. O'Connor, in obtaining financial information
15 that Mr. O'Connor had obtained from PointCare's
16 comptroller, Eric Newman?
17    A.  Basically, no, for the following reason.
18 In the contract there's a confidentiality clause
19 which states that we can speak with employees and
20 affiliates. Mr. O'Connor is a shareholder. And I
21 spoke to Frank about the fact that any information
22 Mr. O'Connor as an affiliate shares with him cannot
23 be communicated outside of our company. And that
24 was rigidly adhered to, that any information which
25 came into our company from a qualified source, we

Page 219

1    R. DePIANO - 4/2/08
2  had to maintain under the terms of this agreement as
3  confidential and could not talk to third parties.
4    Q.  And that's what you said to Mr. Matuszak?
5    A.  Yes.
6    Q.  So you gave him your approval for him to
7  obtain PointCare financial information that
8  Mr. O'Connor was obtaining from the comptroller,
9  Eric Newman?
10    A.  I didn't say I gave my approval. I
11 explained to him under the conditions under which
12 this contract functioned. The confidentiality
13 agreement allowed an affiliate to speak to us.
14    Q.  That's not my question.
15        My question is:  Did you express to
16 Mr. Matuszak approval or disapproval of his
17 obtaining PointCare financial information that
18 Mr. O'Connor was obtaining from PointCare's
19 comptroller, Eric Newman?
20    A.  Neither approval nor disapproval.
21    Q.  When Mr. Matuszak made you aware that
22 O'Connor was passing along PointCare financial
23 information obtained from PointCare's comptroller,
24 did you tell Mr. Matuszak to stop it?
25    A.  No. He wasn't getting the information

Page 220

1        R. DePIANO - 4/2/08
2  from the comptroller. Mr. O'Connor was. So he was
3  the recipient. I never told him to stop. Just told
4  him it can't be shared anywhere.
5    Q.  Did you ever say to Mr. Matuszak in the
6  context of his conversations that O'Connor did not
7  strike you as the type of businessperson that he
8  should be affiliating himself with?
9    A.  No.
10    Q.  Did you think that to yourself?
11    A.  No. I had very little interest in
12 Mr. O'Connor. And I didn't believe that Frank was
13 affiliating with him by communicating with him.
14 It's a little different. My definition of
15 "affiliation" is little different than just
16 receiving correspondence periodically.
17    Q.  At the time, Drew had an ongoing contract
18 with PointCare, correct?
19    A.  Yes. Yes. Still.
20    Q.  And in the context of Drew's ongoing
21 business relationship with PointCare, did you have
22 any problem with Mr. Matuszak having ongoing
23 communications with a former PointCare employee
24 about various PointCare business and financial
25 matters?

Page 221

1        R. DePIANO - 4/2/08
2    A.  Former employees, I would have. But with
3  regard to Dan O'Connor, he was a shareholder; and as
4  such, I didn't have any problem with him talking
5  with a shareholder.
6    Q.  Did you know that Mr. O'Connor had been
7  the head of sales at PointCare?
8    A.  Yes. He was the person I met at dinner.
9  Yes.
10    Q.  And you understood that as the head of
11 sales, he would, through the course of his
12 employment, have become privy to confidential
13 PointCare business information?
14    A.  I don't personally know whether he did,
15 but I assumed he would have.
16    Q.  Fair to assume that the person who's in
17 charge of sales at PointCare would have knowledge of
18 confidential business information of the company?
19    A.  Good assumption, yes.
20    Q.  And did you ever give Mr. Matuszak
21 guidance to be careful not to obtain from
22 Mr. O'Connor any confidential PointCare information
23 that Mr. O'Connor may have obtained in the course of
24 his employment at PointCare?
25    A.  No. All I cautioned Mr. Matuszak is to

R. DePIANO - 4/2/08

1
2  make sure he doesn't give any confidential
3  information out about Drew to Mr. O'Connor.
4      Q.  Why was that a concern to you?
5      A.  Because Frank was under the control of
6  Drew via Escalon, we're a public company, and
7  literally our rules applied to our employees.  And
8  that was it.
9      Q.  When Mr. Matuszak -- if he were to leave
10 Drew's employment, would you have a problem with him
11 divulging company confidential information after he
12 leaves?
13     A.  I would probably have a problem with him
14 doing that.
15     Q.  And another hypothetical.
16         If he were to leave the company and Petra
17 Krauledat, for example, were to call him and ask him
18 for Drew confidential information, and he were to
19 pass that along, would you have a problem with their
20 doing that?
21     A.  Would I have a problem?
22     Q.  Let me -- yeah.
23     A.  Of course I would have a problem if he did
24 that, knowing full well that our rules and
25 regulations of employment with him and the contract

R. DePIANO - 4/2/08

1
2  he had prohibited that, yes.
3      Q.  And you understand, based on your
4  experience as a businessman, that companies like
5  PointCare typically have similar confidentiality
6  agreements with their employees?
7      A.  I can only assume, rather than have full
8  knowledge, but wouldn't that be under the -- her
9  auspices or the management of PointCare to control
10 the people that, you know, they have.  Just like
11 if -- in your example if Frank told PointCare's
12 management anything that was confidential, my
13 problem would be with Frank, not with PointCare.
14     Q.  So you'd have no problem if Frank Matuszak
15 were to leave the company and he'd called up Petra
16 to spill some company secrets, you'd have no problem
17 with her listening and taking in that information?
18     A.  How can I control her?  I can't control
19 her.  I mean, it's way beyond my ability to say to
20 Petra stop listening if Frank calls her.
21     Q.  And if Petra kept up the dialogue and kept
22 in touch with Frank and obtained information, would
23 you have any problem with her doing that in this
24 hypothetical?
25     A.  I would have a problem with Frank.  I

R. DePIANO - 4/2/08

1
2  wouldn't have a problem with Petra.  Not that Petra
3  would do that, but that's besides the point.
4      Q.  I didn't mean to pick on Petra in my
5  hypothetical.
6         Did Mr. Matuszak ever mention whether he
7  had any discussions with Mr. O'Connor about the
8  possibility of Mr. O'Connor being compensated for
9  any of these -- in connection with the possible
10 transaction with PointCare?
11     A.  Compensated for a potential transaction
12 with PointCare.
13     Q.  Compensated in connection with the
14 transaction.
15         So did he ever say if a deal goes through,
16 O'Connor is looking to get paid such-and-such,
17 anything to that effect?
18     A.  By "deal," what do you mean specifically?
19     MR. COSTANTINI:  Are you talking about the
20 merger possibility?
21     MR. CAPLAN:  Yes.
22     A.  Merger?  No, I had no knowledge that Dan
23 would ever be compensated for a merger.
24     Q.  Did you ever have any discussions with
25 Mr. Matuszak about the possibility of Mr. O'Connor

R. DePIANO - 4/2/08

1
2  being compensated in connection with any of the
3  matters he was discussing with Mr. Matuszak?
4      A.  Yes.
5      Q.  What were you told about that?
6      A.  If O'Connor was free to come to work with
7  us, he would naturally be compensated for any
8  services he provided.
9      Q.  Did Mr. Matuszak tell you that he had
10 discussions with Mr. O'Connor about the possibility
11 of Mr. O'Connor coming on board at Drew or Escalon?
12     A.  I think it was in one of the e-mails, but
13 I don't believe Mr. O'Connor accepted any such
14 arrangement.  The possibility was in the e-mail of
15 him, if he was able to, but I don't think he was
16 interested.
17     Q.  So did someone on behalf of Drew or
18 Escalon tell Mr. O'Connor about a possible position
19 for him at the company?
20     A.  Other than Frank's e-mail?
21     Q.  That's what I'm asking.
22         So you're telling me that Frank sent an
23 e-mail to O'Connor about a possible position for
24 O'Connor at the company?
25     A.  I don't remember the exact words, but it

Page 258

R. DePIANO - 4/2/08

1
2     Q.  Do you accept that Drew has responsibility
3     for any of the problems that the HT project
4     experienced after May of 2007?
5        A.  No, I don't.
6        Q.  Do you recall in the early December of
7     2007 time frame that Drew informed PointCare that
8     the HT instrument was ready to be delivered for
9     PointCare?
10       A.  Right.
11       Q.  And do you recall PointCare's response?
12       A.  I think they indicated they weren't going
13    to be available.  Their lawyer wrote back or
14    somebody wrote back saying that they weren't
15    available to do anything with it for several weeks.
16       Q.  Do you recall that PointCare asked Drew to
17    provide PointCare with Drew's underlying test data
18    that showed that the instrument was complete?
19       A.  Yes.
20       Q.  And did you talk about that request with
21    your people?
22       A.  I believe our people had brought in an
23    expert to support whether or not they were ready or
24    not.
25       Q.  Did Drew provide PointCare with the

Page 259

R. DePIANO - 4/2/08

1
2     underlying test data that PointCare requested in
3     connection with Drew's request to send the
4     instrument along to PointCare?
5        A.  I think they submitted a report from the
6     consultant.  I don't know if they submitted the
7     other information.
8        Q.  Do you recall that PointCare asked for the
9     underlying test data beyond Dr. Chow's report?
10       A.  We believed that was just another stalling
11    tactic on the part of PointCare.
12          MR. COSTANTINI:  Could I have the question
13       back, please.
14          (The last question was read back by the
15       Reporter.)
16       A.  Yes.
17       Q.  Did Drew have documentation of underlying
18    test data supporting Drew's position that Drew's
19    work on the HT instrument was finished?
20       A.  I personally did not see that data.
21       Q.  Do you know if it existed?
22       A.  No, I don't know if it existed.
23       Q.  You understand that Drew is an
24    FDA-regulated company?
25       A.  Yes.

Page 260

R. DePIANO - 4/2/08

1
2     Q.  And you understand that PointCare is an
3     FDA-regulated company, correct?
4        A.  I assume they are.
5        Q.  And you understand that the HT was an
6     FDA-regulated product?
7        A.  Yes.
8        Q.  And do you understand, at least in general
9     terms, that it is an FDA requirement for companies
10    to keep detailed records of their development
11    process of an instrument in order to get FDA
12    approval for it?
13       A.  Yes.
14       Q.  And it's an FDA requirement for companies
15    like Drew to keep formal records of its testing in
16    order to submit that for FDA approval, correct?
17       A.  Yes.
18       Q.  And did you understand that those were the
19    type of records that Dr. Hansen wanted to see before
20    moving forward with further steps on the HT?
21       A.  I understand that Dr. Hansen was using
22    whatever excuse he could -- because we couldn't test
23    the machine without the software and without their
24    basic help to do it.  And --
25       Q.  You can keep going, but you're not

Page 261

R. DePIANO - 4/2/08

1
2     answering my question, sir.
3        A.  Okay.  Repeat your question.
4          MR. COSTANTINI:  It's only fair.  Your
5       partner didn't answer my questions three times
6       when I asked "What is the basis in the contract
7       for that request?"
8          THE WITNESS:  Repeat the question.
9          (The last question was read back by the
10      Reporter.)
11       A.  I was told that's what he wanted.
12       Q.  Did Drew have those records?
13       A.  I have no idea.  If it was an FDA
14    requirement, we probably have them, because we're
15    compliant.
16       Q.  Do you have any personal knowledge whether
17    or not Drew had those FDA-required records for the
18    HT development process?
19       A.  I said no, I don't.
20       Q.  Was there any reason why Drew would not
21    provide such FDA-required records to Dr. Hansen in
22    response to his request?
23       A.  Do I know of why we wouldn't?
24       Q.  Well, let me ask you this.
25          Were you involved in Drew's decision not

Page 270

R. DePIANO - 4/2/08
1
2    ready for delivery by the week of December 10."
3        A.  Yes.
4        Q.  Who told you that the HT's platform met
5    specifications at that time?
6        A.  Doug and Gary.
7        Q.  And were they basing that on Dr. Chow's
8    testing?
9        A.  I don't know.
10       Q.  As we sit here today, do you know whether
11   this is an accurate statement to say that the HT met
12   specifications?
13       A.  I believed it was an accurate statement.
14       Q.  Aside from belief, do you know whether it
15   was accurate at the time?
16       A.  Did I personally go down and measure the
17   instrument?  I don't know how to do that and come up
18   with the specifications.  As I said, I'm not
19   technical.  So I run a company, I have people report
20   to me, and those individuals informed me that it met
21   specifications.  Period.
22       Q.  Who told you that?
23       A.  Same people I mentioned before.  Doug and
24   Gary and their team.
25       Q.  If you could, if you don't mind flipping

Page 271

R. DePIANO - 4/2/08
1
2    to tab B of your affidavit.
3        Actually, before I get there, one other
4    question.
5        Did Drew ever stop work on the HT?
6        A.  No idea.
7        Q.  Okay.
8        MR. COSTANTINI:  You mean Exhibit B?
9    BY MR. CAPLAN:
10       Q.  Exhibit B in your affidavit.
11       Is that a letter that you sent to Petra
12   Krauledat on October 3, 2007?
13       A.  Tell you in a minute.
14       Yes.  Yes, it is.
15       Q.  If I can ask you to please turn to the
16   third page of the document.
17       A.  (Witness complies.)
18       Q.  I apologize.  Let's back up.  On the
19   second page.  Put it in reverse.
20       Do you see in the middle of the page
21   there's an issue 3?
22       A.  Yes.
23       Q.  And you wrote to Dr. Krauledat that you
24   were gratified to hear that PointCare has achieved
25   satisfactory clinical results with manual sample

Page 272

R. DePIANO - 4/2/08
1
2    preparation, and you asked her, quote, "Could you
3    please forward the supporting data to Frank,"
4    question mark, end quote.
5        Why did you ask Petra Krauledat to provide
6    Frank with the supporting data showing satisfactory
7    clinical results on the assay?
8        A.  Because I think Frank had indicated to me
9    in the past that we were still waiting for -- we
10   thought that those -- the information that was
11   submitted from the manual, clinical, the first
12   results were preliminary, and we were asking for the
13   final data.
14       Q.  And why did Drew or Escalon want PointCare
15   to provide it with the final testing data showing
16   that its assay had passed testing?
17       A.  I believe at the time I was told that the
18   reason we wanted it was for FDA reasons.
19       Q.  And did you think that it was reasonable
20   to ask PointCare for that documentation?
21       A.  I didn't think it was unreasonable.
22       Q.  And in the context of developing an
23   FDA-compliant instrument, it's reasonable to ask a
24   business partner to provide underlying written test
25   data documentation that supports its assertion that

Page 273

R. DePIANO - 4/2/08
1
2    tests have been passed.
3        Would you agree with that?
4        A.  It's reasonable to assume that.
5        Q.  And you understood when you asked
6    PointCare to supply the underlying test data showing
7    that the tests had proven satisfactory, Drew had a
8    legitimate business purpose for asking for that
9    information?
10       A.  I believe they did.
11       Q.  Moving right along to page 4 of the same
12   letter.
13       MR. COSTANTINI:  What issue are you on?
14       MR. CAPLAN:  I'm on the carryover
15   paragraph from page 3.
16       I'll just read into the record to try to
17   move it along a bit.
18   BY MR. CAPLAN:
19       Q.  The last sentence of that paragraph --
20   I'll wait until you have the page in front of you.
21       Do you see there's a carryover paragraph
22   on page 4 that ends with the words "up its
23   manufacturing issues"?
24       A.  Uh-huh.
25       Q.  Okay.  And then a couple sentences down,

Page 282

R. DePIANO - 4/2/08

1
2      Q.  How much time did you spend reviewing
3   documents to satisfy yourself about the accuracy of
4   your affidavit before you submitted it?
5      A.  I didn't spend a continuous amount of
6   time, so -- I get interrupted quite a bit during my
7   day, so I don't -- I didn't keep -- ever since I
8   left public accounting, I don't keep time records
9   anymore.
10      Q.  I'm jealous.
11      A.  I don't bill, either, by the hour, so ...
12      Q.  Fair to say that for most part you relied
13   on information provided to you by subordinates in
14   presenting this affidavit to the Court?
15      A.  A lot of what I did was communicate with
16   subordinates and rely on information contained in
17   the supporting documentation and conversations with
18   people.
19      Q.  Now, do you contend that PointCare has
20   violated any confidentiality obligations under the
21   parties' agreement?
22      A.  We believe that -- we have -- or I have
23   suspicions that the information gained as part of
24   working with us to solve some of the problems in our
25   situation by PointCare may have been shared with

Page 283

R. DePIANO - 4/2/08

1
2   other parties.
3      Q.  You suspect it may have been shared.
4      Do you have any anything more solid than
5   suspecting it may have been shared?
6      A.  No.  Just ...
7      MR. COSTANTINI:  Do you recall this is the
8   C2 testimony we spent some time on before?  I'm
9   not sure --
10   BY MR. CAPLAN:
11      Q.  Other than that, do you claim that
12   PointCare has breached its contractual
13   confidentiality obligations in any other respects?
14      A.  After being made aware of certain
15   discovery information, I believe they talked to
16   another company without our permission, and I don't
17   know what was disclosed to that company about us,
18   but I did see there were projections, and that
19   information would have been confidential, so I think
20   they breached it in terms of sharing it with another
21   party.
22      Q.  With whom?
23      A.  Some kind of "sure."  I forget the name of
24   the company.
25      Q.  The company with the word "sure" in the

Page 284

R. DePIANO - 4/2/08

1
2   title.
3      A   Yeah.  S-U-R-E.  Or "Optisure" or
4   something like that.
5      Q.  What information did you see PointCare
6   sharing with that company?
7      A.  The documents I've seen were financial
8   projections with Drew, without Drew, things of that
9   nature.
10      Q.  Now, do you understand in the context of
11   the business relationship between Drew and PointCare
12   that each side's testing data and FDA documentation
13   are subject to confidentiality under the parties'
14   confidentiality agreement?
15      A.  The testing data?
16      Q.  Yes.
17      A.  No.  Because I think we have to share it
18   with the FDA, so it can't be that confidential.
19      Q.  Fair enough.
20      Well, when those documents are submitted
21   to the FDA, is it your understanding that they are
22   part of the public record?
23      A.  I really don't know the answer to that.
24   My assumption is any government agency, once you
25   give them something, is, as -- you know, public can

Page 285

R. DePIANO - 4/2/08

1
2   access unless there's some rule that says they
3   can't.  I don't know.
4      Q.  Fair to say that your opinion or your
5   evaluation of PointCare has been changed since
6   you've seen documents that have been generated in
7   discovery in this lawsuit?
8      A.  Absolutely.
9      Q.  And what have you seen that changed your
10   view?
11      A.  Many, many documents.  A lot read,
12   e-mails, correspondence.
13      Q.  In substance, what have you learned that's
14   led you to form your view of PointCare?  Could you
15   describe to us.
16      A.  That in my belief that there was an
17   intentional -- it was -- PointCare intentionally
18   decided to sabotage this project to make sure that
19   the machine would never work so that they can get
20   out of our contract and move on with what they
21   needed to do for them to survive.
22      Q.  And why do you think PointCare wanted to
23   get out of this contract?
24      A.  I think because it would have inhibited
25   the value that they needed to create for themselves

# Exhibit D

Page 1

1

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4     -------------------------------X

5     DREW SCIENTIFIC, INC.,

6              Plaintiff,    Case No. 08 CV 1490-AKH

          -vs-

7     POINTCARE TECHNOLOGIES, INC.,

8              Defendants.

9     -------------------------------X

10

11          DEPOSITION OF FRANCIS MATUSZAK

12              New York, New York

13              March 28, 2008

14

15

16

17

18

19

20

21    Reported by:

      Bonnie Pruszynski, RMR

22    JOB NO. 15874

23

24

25

## Page 2

1
2    March 28, 2008
3    8:30 a.m.
4
5
6    Deposition of FRANCIS MATUSZAK, held
7    at DUANE MORRIS, LLP, 1540 Broadway, New
8    York, New York, before Bonnie Pruszynski,
9    Registered Professional Reporter, Registered
10   Merit Reporter, Certified LiveNote Reporter,
11   and a Notary Public of the State of New
12   York.
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

## Page 3

1
2    A P P E A R A N C E S :
3    DUANE MORRIS, LLP
4    Attorneys for Plaintiff
5        1540 Broadway
6        New York, New York 10017
7    BY:    ANTHONY J. COSTANTINI, ESQ.
8        -and-
9    DUANE MORRIS, LLP
10   Attorneys for Plaintiff
11       470 Atlantic Avenue, Suite 500
12       Boston, MA  02110
13   BY:    BEN KURUVILLA, ESQ.
14
15   BURNS & LEVINSON, LLP
16   Attorneys for Defendants
17       125 Summer Street
18       Boston, MA 02110 10017
19   BY:    ANDREW F. CAPLAN, ESQ.
20
21   ALSO PRESENT: PETRA KRAULEDAT, Ph.D.
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

## Page 4

1        (Witness sworn.)
2    FRANCIS MATUSZAK,
3        called as a witness, having been first
4        duly sworn, was examined and testified
5        as follows:
6    EXAMINATION
7    BY MR. CAPLAN:
8    Q    Good morning.
9    A    Good morning.
10       How are you?
11   Q    Good, thanks.
12       We spent the last several days
13   together.
14   A    Yes, we have.
15   Q    All right.  For the record, I am
16   Andrew Caplan.  I represent PointCare in this
17   lawsuit brought by Drew Scientific.
18       Could you please state your name and
19   spell it for the record, please?
20   A    Francis, F-R-A-N-C-I-S, Matuszak,
21   M-A-T-U-S-Z-A-K.
22   Q    I share with you the same ground
23   rules you have heard day after day for
24   depositions.

TSG Reporting - Worldwide    877-702-9580

## Page 5

1        F. Matuszak
2        You can see that the court reporter
3    is typing down everything we are saying.  If you
4    could please do your best to let me finish my
5    questions before you answer, I will do my best to
6    let you finish your answers before I start my next
7    question.
8        Fair enough?
9    A    Yes, it is.
10   Q    If my questions are confusing or
11   don't make sense, let me know and I will try
12   better.
13   A    Okay.
14   Q    Otherwise, if you answer the
15   questions, we will have to assume you understood
16   the questions.  If you need a break, let me know,
17   except if a question is pending, I would
18   appreciate an answer, then we can take a break.
19   A    Sure.
20   Q    What did you do to prepare for your
21   deposition today, sir?
22   A    I reviewed e-mails that I sent, that
23   I received, a binder prepared by Duane Morris.  I
24   reviewed some of my files on my computer; so,
25   basically, expense reports.

TSG Reporting - Worldwide    877-702-9580

Page 110

1          F. Matuszak
2    PointCare?
3        A    We met with Dan O'Connor, and we
4    meaning, the first meeting was with Roger Borray
5    and Dan O'Connor. I was not involved in it.
6        I think subsequent, during that week,
7    we came to meet Petra Krauledat and Peter Hansen,
8    and I believe our meeting was Roger Borray from
9    Drew, Harry Rimmer and myself.
10        MR. COSTANTINI:  Off the record.
11        (Discussion held off the record.)
12    BY MR. CAPLAN:
13        Q    At the time of the Medica conference,
14    what was Roger Borray's position at Drew?
15        A    I don't know his exact title.
16        Q    What was his area?
17        MR. COSTANTINI:  You mean what
18    function did he perform?
19        Q    Sure.
20        A    I would say the best wording would be
21    business development.
22        Q    So, you permanently met with Peter,
23    Petra and Harry Rimmer and yourself at Medica?
24        A    Yes.
25        Q    Anyone else at the meeting?

Page 111

1          F. Matuszak
2        A    Can you repeat the names?
3        Q    Krauledat, Hansen, Rimmer, Matuszak.
4        A    And Roger Borray. I can't be certain
5    whether or not Dan O'Connor was there. I believe
6    he was not.
7        Q    What was the purpose of this meeting?
8        A    Dan O'Connor had said the purpose of
9    the meeting to be that this company, PointCare,
10    was looking for a quick -- an instrument to bring
11    in quickly to the market to do CD4, CD4 percent
12    measurement.
13        Q    And who was Mr. O'Connor at the time?
14        A    He worked at PointCare. Yes, he did.
15        Q    What was his title or function?
16        A    I think it was business development.
17        Q    Did he explain to you or was it
18    explained at this meeting why PointCare was
19    looking to quickly bring an instrument to the
20    market?
21        A    I don't know if that was expressed in
22    the first sets of meetings.
23        Q    Well, when he said that PointCare was
24    looking to quickly bring an instrument to the
25    market, did you understand what the urgency was?

Page 112

1          F. Matuszak
2        A    The urgency as it pertains to what?
3        Q    To why it was urgent for them.
4        MR. COSTANTINI:  He didn't say it was
5    urgent. He said they wanted to do it
6    quickly, that is different from urgently.
7        Q    Did you understand why they wanted to
8    get a product to the market quickly?
9        A    I don't think at the initial meetings
10    that that was expressed to us.
11        Q    Was it explained to you at some
12    point?
13        A    Yes.
14        Q    What was the explanation given?
15        A    The explanation was that PointCare
16    had a handshake agreement with Idexx Laboratories,
17    and that Idexx Laboratories was significantly
18    increasing their price to PointCare.
19        Q    Connect the dots. So why did that --
20        A    The price increase, as we were told
21    from PointCare, was unacceptable in their point of
22    view and, therefore, they needed to look for
23    alternate suppliers.
24        Q    And they needed an alternate supplier
25    quickly?

Page 113

1          F. Matuszak
2        A    Yes.
3        Q    Who explained that to you?
4        A    I think all three, Dan O'Connor,
5    Petra Krauledat and Peter Hansen at various times.
6        Q    At various times prior to the parties
7    signing their written agreement?
8        A    Yes.
9        Q    So, prior to signing the agreement,
10    at various times O'Connor, Krauledat and Hansen
11    explained to you that PointCare needed to find a
12    new supplier, who could help them quickly get an
13    instrument to market; correct?
14        A    Yes.
15        Q    They did express that it was of some
16    urgency to PointCare to enter a relationship with
17    a supplier who could get an instrument to market
18    quickly; correct?
19        A    Yes.
20        Q    And before signing the contract with
21    PointCare, you understood that getting a new
22    instrument to market quickly was important to
23    PointCare?
24        A    Yes.
25        Q    That was one of the reasons that they

Page 114

```
1              F. Matuszak
2   were signing the contract with Drew?
3       A    That was not evident when the
4   contract was signed, given the time frame that it
5   took to execute the agreement.
6       Q    You understood, from your discussions
7   leading to the signing of a contract, that
8   PointCare's objective was to contract with a
9   supplier who would help them quickly get a product
10  to market; correct?
11      A    Can you repeat the question?
12      Q    No.
13           (Record read.)
14      A    Can you rephrase that?
15      Q    I will try.  Fair enough.
16           You understood -- strike that.
17           Prior to signing a written agreement
18  with PointCare, you understood from discussions
19  with Dan O'Connor, Peter Hansen and Petra
20  Krauledat that PointCare's objective in reaching
21  an agreement with a new supplier was to quickly
22  get a new instrument to market; correct?
23      A    Yes.  However, as I mentioned, given
24  the time that it took to negotiate the agreement,
25  that did not become -- that time frame became less
    TSG Reporting - Worldwide    877-702-9580
```

Page 115

```
1              F. Matuszak
2   evident to us or that need.
3       Q    So, let's take it one step at a time.
4           They told you that getting to market
5   quickly was their objective in signing the
6   contract; correct?
7       A    Yes.
8       Q    And you concluded in your mind, based
9   upon the time of negotiations, that it may not
10  have been as urgent as they were telling you?
11           Actually, I withdraw the question.
12           So, they told you during contract
13  negotiations -- strike that.
14           When O'Connor, Hansen and Krauledat
15  told you and your colleagues during contract
16  negotiations that they wanted to sign an agreement
17  with a supplier who could help them quickly get a
18  product to market, did you and your counterpart
19  tell PointCare that Drew could deliver that?
20      A    I have no direct knowledge of express
21  time frame as to, you know, how long is quickly.
22  Could be one week, two months, three months.
23      Q    Well, you have testified that each of
24  O'Connor, Hansen and Krauledat told you on various
25  occasions that PointCare needed a supplier who
    TSG Reporting - Worldwide    877-702-9580
```

Page 116

```
1              F. Matuszak
2   could quickly get a new product to market.  When
3   they told you that, what did you say Drew could do
4   for them in that regard?
5           MR. COSTANTINI:  If I might suggest
6       you broaden your question.  He might not
7       necessarily have been, the speaker,
8       Mr. Rimmer might have been within his
9       hearing.  If you want what he said, fine; if
10      you want what anyone from the Drew side
11      said, which I suspect is your real
12      objectives.  I would suggest broadening it a
13      little.
14      Q    I will broaden it as Tony suggests.
15  So, on the various occasions that O'Connor, Hansen
16  and Krauledat told you and your colleagues that
17  PointCare's objective in signing a new agreement
18  was to quickly get a product to market, what did
19  you or your colleagues say in response?
20      A    I think basically what we said is we
21  would be happy to work with you towards that end.
22      Q    Did you or your colleagues tell
23  PointCare that Drew was capable of working with
24  them to quickly get a new instrument to market?
25      A    I don't think we made any claims as
    TSG Reporting - Worldwide    877-702-9580
```

Page 117

```
1              F. Matuszak
2   to quickly or a time frame that I can recall.
3       Q    So, you were present on -- you were
4   present when O'Connor, Hansen and Krauledat said
5   that they needed to get a product quickly to
6   market and no one told them Drew was capable of
7   doing that to your knowledge?
8       A    I think that was a determination made
9   by PointCare whether or not we could do it.
10      Q    My question is -- strike that.
11           During these discussions with
12  PointCare, did you reach a conclusion in your mind
13  that this was a relationship that was worth
14  pursuing?
15      A    Yes, I believe by the fact that we
16  executed the agreement.
17      Q    And, so, your future business
18  collaborator, for lack of a better word, its three
19  senior executives are stating in your presence
20  that they needed Drew to help them to quickly get
21  a product to market, and it's your testimony that
22  no one at Drew told them that Drew had the
23  capability to do that?
24      A    Again, I think, during the time from
25  Medica to when the agreement was signed, Dr.
    TSG Reporting - Worldwide    877-702-9580
```

Page 118

F. Matuszak

1   Hansen did some of the feasibility studies to see
2   whether or not the system would be capable of
3   working with -- with the technology that PointCare
4   had.
5       Q    You are not answering my question,
6   sir. I asked you about Drew's response when these
7   three PointCare senior executives are stating that
8   they need someone who can help them quickly get a
9   product to market.
10      A    And I said that our answer was yes,
11  we would be willing to work with you.
12      Q    Just to close the loop and we can
13  move on. So, in your presence, when O'Connor,
14  Krauledat and Hansen told you and your counterpart
15  that they needed a business partner who could
16  assist them to get a product quickly to market,
17  the substance of Drew's response was, "we are
18  willing to work with you"?
19      A    Yes.
20      Q    If we could back up, you started to
21  tell me about the meeting with you and some
22  colleagues from PointCare at
23  Medica; and, according to my notes, the PointCare
24  folks told you PointCare was looking for an

Page 119

F. Matuszak

1   instrument to get quickly to market.
2       Q    What are you and the folks from Drew
3   telling to the folks from PointCare at this
4   meeting?
5       A    As I recall, it was probably a little
6   bit about Drew's direction, Escalon's investment
7   in Drew and the technical specifications
8   surrounding the Excel 22.
9           I am fairly certain that Roger Borray
10  spent sometime with Peter Hansen discussing the
11  22.
12      Q    And what is the short answer of what
13  the Excel 22 was at the time?
14      A    It was a hematology analyzer.
15      Q    Is it fair to say that a general
16  subject of discussion in Medica was the
17  possibility of PointCare and Drew getting together
18  so that -- to combine PointCare's assay with
19  Drew's Excel 22 platform?
20      A    Yes.
21      Q    Part of the question on the table was
22  will that combination work or can it be made to
23  work?
24      A    Yes.

Page 120

F. Matuszak

1       Q    And that technical issue is not your
2   area, fair to say?
3       A    Yeah. There is no way I could answer
4   that, especially at the trade show.
5       Q    But it is fair to say that your area
6   is sales?
7       A    Yes.
8       Q    So, was it of some interest to you if
9   the technical folks could make this marriage work
10  to have a new product to sell?
11      A    Yes.
12      Q    And just backing up, what products
13  were you and your people selling at the time that
14  PointCare came on your radar screen?
15      A    We were selling, at that time, the
16  22, the hemoglobin A1C analyzer, the Hemovet.
17      Q    I am going to guess that is a
18  veterinary product.
19      A    Yes.
20          MR. COSTANTINI:  How did you guess
21  that?
22      A    The Evolution, which is another
23  hematology analyzer, and the Excel 16 and 18,
24  which were also hematology analyzers.

Page 121

F. Matuszak

1       Q    Just to try to move it along, I'm
2   going to ask you a grossly oversimplified
3   question, see if it works.
4           Can you tell me which of these were
5   the bigger sellers and if any of them were more
6   marginal?
7       A    It terms of total dollar sales, the
8   22 was probably the highest from a sales
9   standpoint. The higher margin was the Hemovet.
10      Q    Were any of the other three products
11  significant financially to Drew at that time?
12      A    Yeah, the A1C.
13      Q    How about the Evolution or the Excel
14  16 or 18, were those significant financially to
15  Drew at the time?
16      A    No.
17      Q    And the Excel 22, what was its
18  market?
19      A    To small hospitals, physician office
20  labs.
21      Q    Anything else?
22      A    That's it.
23      Q    For the Hemovet instrument the market
24  was in the veterinary sphere?

Page 126

F. Matuszak

1
2    Q    What was your involvement from that
3    point going forward?
4    A    I would say very limited.
5    Q    So, other technical folks were
6    figuring out the technical issues?
7    A    Yes.
8    Q    That was Peter Hansen on our side?
9    A    Yes.
10    Q    And who on Drew's side?
11    A    Roger Borray.
12    Q    Based on what you heard at Medica,
13    were you interested, did you see PointCare as
14    providing an opportunity for your sales
15    department?
16    A    I followed up after Medica to look at
17    the opportunities.
18    Q    And what did you find out?
19    A    I generally thought that it would
20    give us a sales advantage.
21    Q    What do you mean by "sales
22    advantage"?
23    A    That we would be able to sell more
24    hematology analyzers than our competitor.
25    Q    What was it about the potential

TSG Reporting - Worldwide    877-702-9580

Page 127

F. Matuszak

1
2    relationship with PointCare that led you to
3    conclude that this would give you or give Drew a
4    sales advantage?
5    Let me ask it cleaner.
6    What did PointCare bring to the table
7    that you thought would help give Drew a sales
8    advantage?
9    A    A test that could not normally be
10    performed on a hematology analyzer easily.
11    Q    What was the test?
12    A    CD4, CD4 percent.
13    Q    Recognizing you are not a technical
14    guy, what was your understanding of -- strike
15    that.
16    While you are not a technical guy,
17    you understood that PointCare had a CD4 test?
18    A    Yes.
19    Q    Did you understand that was something
20    that Peter Hansen had invented?
21    A    That's what we were told.
22    Q    Did you ever learn anything to the
23    contrary?
24    A    I believe I have during the course of
25    this legal process, but I can't confirm it for

TSG Reporting - Worldwide    877-702-9580

Page 128

F. Matuszak

1
2    sure.
3    Q    What have you learned in that regard?
4    A    I saw a document, through one of the
5    many ones that have been shown, that PointCare
6    applied for a patent and that it was rejected on
7    prior art.
8    Q    The patent on what was rejected for
9    prior art?
10    A    I believe it was around the CD4, but
11    I don't -- that is the information I don't have.
12    Q    And this is a document you have seen
13    that someone produced in the lawsuit?
14    A    Yes.
15    Q    At least at the time that PointCare
16    and Drew were exploring a relationship, and you
17    saw that PointCare's CD4 test could bring a sales
18    advantage to Drew, at that time did you understand
19    that PointCare's CD4 test was proprietary to them?
20    A    That's what we were told.
21    Q    And that was your understanding?
22    A    Well, if I have no other information
23    to contradict that, yes, then that would be my
24    understanding.
25    Q    My question is: Did you have any

TSG Reporting - Worldwide    877-702-9580

Page 129

F. Matuszak

1
2    information to contradict that.
3    A    No.
4    MR. COSTANTINI:  Off the record.
5    (Discussion held off the record.)
6    BY MR. CAPLAN:
7    Q    When you Drew and PointCare were
8    considering entering a business relationship, did
9    you think that the PointCare CD4 test involved
10    some proprietary IP rights?
11    A    That's what PointCare expressed to
12    us, yes.
13    Q    And that was always your
14    understanding at all times, at least through the
15    time this lawsuit was commenced?
16    A    Yes.
17    Q    So, throughout Drew's -- strike that.
18    From the beginning of discussions --
19    strike that.
20    From at least early on in discussions
21    between PointCare and Drew, and throughout the
22    entire time of the parties' business relationship,
23    you understood that PointCare owned the IP and its
24    CD4 test; correct?
25    A    Yes.

TSG Reporting - Worldwide    877-702-9580

Page 170

F. Matuszak

1  assumed.
2
3      Q    So, can you explain --
4      A    And we would have expected, and we
5  reminded Petra Krauledat several times that we
6  expected PointCare to abide by the distribution
7  agreement.
8      Q    But have you no specific memory of
9  replying to this alleged e-mail and telling her
10 you can't do that?
11     A    There were several replies, not maybe
12 specific to that e-mail, but there were several
13 replies, I think one in May, and then one around
14 that time frame, where we said we expect PointCare
15 to honor the terms of the co-marketing agreement.
16     Q    Are you aware of, yourself or any
17 colleague at Drew, responding to this alleged
18 e-mail from Dr. Krauledat and telling her you
19 can't do that, if you -- in substance, if you try
20 to line up distributors in Russia, you are
21 violating the contract?
22     A    There were several e-mails reminding,
23 again, Petra Krauledat.
24     Q    That is a question and answer, sir.
25 My question is:  Are there any e-mails responding
TSG Reporting - Worldwide    877-702-9580

Page 171

F. Matuszak

1
2  to her e-mail telling her you can't do that?
3      MR. COSTANTINI:  And he's telling you
4  yes.
5      MR. CAPLAN:  No, he isn't.
6      Q    You are telling me there were general
7  e-mails.  Were any of these a response to this
8  e-mail of hers?  That is my question.
9      A    I can't be sure.  I don't know.
10     Q    Did you have any discussions with
11 colleagues at Drew about this e-mail from Dr.
12 Krauledat?
13     A    Yes.
14     Q    With whom did you discuss it?
15     MR. COSTANTINI:  You can talk about
16 with whom you discussed it, if lawyers are
17 amongst them --
18     A    I believe it was Ken Pina, Doug
19 Nickols, possibly Richard DePiano, Jr.
20     Q    So, Pina, Nickols and maybe DePiano,
21 Jr., and yourself discussed this issue.
22     A    We discussed the general issue of the
23 fact that PointCare may not be agreeing or
24 complying with the terms of the agreement.  And I
25 don't exactly know, when, what date that was.
TSG Reporting - Worldwide    877-702-9580

Page 172

F. Matuszak

1
2      Q    Was this a meeting?
3      A    It would have been done by
4  teleconference.
5      Q    What -- do you recall the substance
6  of the conversation?
7      MR. COSTANTINI:  He isn't asking you
8  what the substance is.  He's asking you if
9  you recall the substance.
10     A    I can't recall, but it would have
11 been regarding the fact that we believe that
12 PointCare was not honoring the co-marketing
13 agreement.
14     Q    Is Mr. Pina an attorney?
15     A    Yes.
16     MR. COSTANTINI:  And Mr. DePiano, Jr.
17 is an attorney as well.
18     Q    Is Mr. Pina an attorney employed by
19 Drew, like does he work at Drew, or is he an
20 outside attorney?
21     A    He's in Escalon.  He's retained by
22 Escalon.
23     Q    Let me ask this:  Do you know what
24 Mr. Pina's job is at Escalon?
25     A    He helped construct this agreement.
TSG Reporting - Worldwide    877-702-9580

Page 173

F. Matuszak

1
2  So, he's -- I don't know.  I don't know exactly
3  his title, but he's counsel, and Rich DePiano, Jr.
4  is general counsel.
5      Q    So, the DePiano in this discussion
6  was Junior?
7      A    Yes.
8      Q    So, you had a discussion with two
9  in-house counsels at Drew, and Mr. Nickols -- was
10 he the president of Drew at that time?
11     A    Yes.
12     Q    And yourself?
13     A    Um-hum.
14     Q    And you have no memory, one way or
15 the other, whether anyone responded to Dr.
16 Krauledat's e-mail and told her she was not
17 allowed to try to line up distributors in Russia;
18 is that right?
19     A    At that time, there were quite a few
20 e-mails going back between Petra Krauledat and
21 Rich DePiano, Sr. So there may very well have been
22 a response to that, but I don't recall it.
23     Q    Fair enough.
24     A    It's a timing -- there were so many
25 at that time.
TSG Reporting - Worldwide    877-702-9580

Page 226

1            F. Matuszak
2   goal in this project was to beat the NP to the
3   market?
4      A    With any instrument that comes to the
5   market, timing is critical. The sooner you can
6   bring a product to market, the more profits you
7   are going to make; that was my whole goal
8   surrounding that.
9      Q    So, it was critical to Drew to get
10  the HT to market as fast as possible; right?
11     A    Yes.
12     Q    And it was likewise critical to
13  PointCare for the HT to get to market as soon as
14  possible; right?
15     A    That's what they expressed to us,
16  yes.
17     Q    In that regard, the timeline, it was
18  critical to adhere as closely as possible to the
19  timeline in the contract; correct?
20     A    Yes.
21     Q    That's why timelines are put in
22  contracts; right?
23     A    Well, I have never seen a timeline
24  developed that way.
25     Q    That's why this timeline was put in

Page 227

1            F. Matuszak
2   the contract, reflecting both sides' intent that
3   it was critical to get this product to market in a
4   timely fashion; correct?
5          MR. COSTANTINI:  He's already told
6      you he didn't have anything to do with
7      making up the timeline, so he is he going to
8      know why it was put in in the manner it was
9      put in?
10     A    Can you repeat the question?
11         (Record read.)
12     A    Let me put the timeline in front of
13  me.
14     Q    Please take whatever time you need to
15  continue reviewing the timeline.  Whenever you are
16  done, you can just look up.
17     A    Okay.  I will.
18         Could you re-read the question again?
19         (Record read.)
20     A    I don't know that I can answer that
21  one way or another, because timelines are
22  relative, as I mentioned.
23       I think I mentioned earlier, to one
24  person quick is, you know, two weeks, three weeks.
25  This is, you know, a longer period of time.

Page 228

1            F. Matuszak
2       Is this relative, based on when this
3   agreement was signed and when this timeline was
4   developed, no one had an understanding as to how
5   long each one of these would actually take.  So,
6   how could we make a determination of whether it
7   was going to be fast or slow?
8      Q    Did you have an understanding that
9   this timeline was intended to reflect the time
10  that the project was supposed to take?
11     A    My understanding of this agreement,
12  or of this timeline, and based on the dates that I
13  see, is that there was, indeed, some feasibility
14  studies done early on and there was some time
15  expected times placed into the timeline, but there
16  was not enough initial information to guarantee
17  that these timelines would have been met.
18     Q    Did you understand, when this
19  contract was signed, that these deadlines in the
20  timeline were requirements of the contract?
21     A    That doesn't appear -- that is not my
22  understanding.
23     Q    Can we go back to the e-mail, Exhibit
24  2?
25       The first page of your e-mail to

Page 229

1            F. Matuszak
2   Mr. DePiano, Sr., do you see the second to the
3   last paragraph, where you start off, "our unit is
4   a few months away from shipping"?
5      A    Yes.
6      Q    What was your basis for saying that
7   on March 20th of '07?
8      A    Based on information that I received
9   during the sales meeting.
10     Q    From whom?
11     A    From, I believe, Petra Krauledat and
12  Peter Hansen, and the fact that we were going to
13  be shipping an instrument up to PointCare.
14     Q    When you wrote that Drew's unit --
15  strike that.  "Our unit is a few months away from
16  shipping," were you relying on any information
17  from Drew?
18     A    Yes.  That they were prepared to ship
19  an instrument up for testing.
20     Q    When you said "a few months away from
21  testing," were you referring to the shipping of a
22  single prototype instrument to PointCare, is that
23  what you are referring to?
24     A    Can you repeat the question?
25         (Record read.)

Page 262

1          F. Matuszak
2  Rockingham.
3      Q    To your knowledge, did Drew want to
4  get back an NP for any reason other than the sales
5  and marketing reasons you have described to me?
6      A    For me, personally, because -- I
7  wanted it for the sales.
8      Q    And, to your knowledge, did anyone
9  else at Drew want it for any other purposes?
10     A    I can't recall.
11     Q    You kept in touch with Dan O'Connor
12  after he left PointCare?
13     A    Yes.
14     Q    For what purpose?
15     A    Dan has a wealth of information
16  around the industry and likes to talk, and anybody
17  that likes to talk is valuable in terms of
18  information for sales.
19     Q    Dan had loose lips?
20     A    Yes.
21     Q    And that was of interest to you in
22  terms of keeping in touch with him?
23     A    Yes.
24     Q    And you also said he had a wealth of
25  information.  He had a wealth of information that

TSG Reporting - Worldwide     877-702-9580

Page 263

1          F. Matuszak
2  he gained as head of sales at PointCare; right?
3      A    And prior.  He has industry
4  experience.
5      Q    And it was of interest to you if
6  Mr. O'Connor and his loose lips would share
7  PointCare internal information with you, wasn't
8  it?
9          MR. COSTANTINI:  Object to the
10     question.
11     A    If that happened to be delivered,
12  yes.  He was a shareholder, so, I would assume
13  that he had -- he could discuss certain things.
14         (Telephone interruption.)
15         MR. COSTANTINI:  Let's go off the
16     record for just a moment.
17         (Discussion held off the record.)
18  BY MR. CAPLAN:
19     Q    Is it your understanding that a
20  shareholder of a company has free reign to
21  disclose any information about the company without
22  restriction?
23     A    I am not sure I have any knowledge
24  one way or the other regarding that.
25     Q    You are not suggesting simply because

TSG Reporting - Worldwide     877-702-9580

Page 264

1          F. Matuszak
2  Mr. O'Connor was a shareholder it was fine for him
3  to tell you anything and everything that he
4  learned at PointCare, are you?
5      A    As it pertains to what?
6      Q    PointCare and confidential
7  information he gained when he was head of sales at
8  PointCare.
9      A    I don't think I could determine what
10  was confidential and what was not.
11     Q    Well, you understood, when
12  Mr. O'Connor left PointCare, that he had a duty to
13  maintain the confidentiality of the PointCare
14  information, didn't you?
15     A    I don't know what his agreement was
16  with PointCare.
17     Q    You have already testified that,
18  regardless of an agreement, you understand that
19  employees and senior management of companies have
20  an inherent duty to maintain the confidentiality
21  of their company's business information; right?
22     A    Yes, of certain information.
23     Q    You understood that Mr. O'Connor,
24  when he left PointCare, had a duty of
25  confidentiality to PointCare; right?

TSG Reporting - Worldwide     877-702-9580

Page 265

1          F. Matuszak
2      A    Yes, but as I mentioned before, I
3  didn't know what was confidential and what was
4  not.  So, therefore, I couldn't make a decision
5  for Dan to say -- he told me what he told me.
6      Q    Did you ever ask Mr. O'Connor to
7  describe to you the terms of his confidentiality
8  agreement at PointCare?
9      A    No.
10     Q    Did you ever ask Mr. O'Connor what he
11  was allowed and not allowed to tell you in regard
12  to PointCare confidential information?
13     A    No.
14     Q    So, you knew that he had duties of
15  confidentiality.  Did you make any inquiry to know
16  what it was appropriate or not appropriate for him
17  to share with you?
18     A    No.
19     Q    Did you ever say to Mr. O'Connor,
20  "jeez, I don't think you should tell me that.
21  That one sounds confidential"?
22     A    No.
23     Q    Whatever Mr. O'Connor was willing to
24  tell you about PointCare information, you were
25  willing to listen; right?

TSG Reporting - Worldwide     877-702-9580

Page 270

1        F. Matuszak
2    Q    And some of the PointCare information
3  that Mr. O'Connor disclosed to you after he left
4  PointCare, you passed that along to Rich DePiano,
5  Sr., right?
6    A    I can't recall whether or not it was
7  privileged or not at the time we did that.
8    Q    You mean you spoke to him, but the
9  lawyers may have been there?
10   A    Yes.
11   Q    Do you recall Mr. O'Connor feeding
12  you — do you recall, after Mr. O'Connor left
13  PointCare, his feeding you information about
14  business deals that PointCare had had that might
15  be falling through that Drew might be able to
16  obtain for itself?
17       Do you remember receiving any of that
18  kind of information from Mr. O'Connor?
19   A    As I mentioned earlier, that was my
20  intention, to not let business go away because
21  PointCare and O'Connor separated. Ultimately, it
22  would help both companies.
23   Q    Maybe I wasn't clear.
24       My question was: Do you recall his
25  telling you about any deals that PointCare might

TSG Reporting - Worldwide    877-702-9580

Page 271

1        F. Matuszak
2  be losing, that he claimed PointCare was losing
3  that Drew could get for itself?
4       Do you recall him feeding you any of
5  those inside scoops?
6    A    Yes, I think so.
7    Q    Tell me about it.
8    A    I think the one major one was
9  around -- he had been working on a very large deal
10  for Abbott that had issues and that deal fell
11  through.
12   Q    He had been working on that Abbott
13  deal on behalf of PointCare?
14   A    Yes. And clearly the information
15  that he had was not going to be shared with
16  PointCare because they had no information around
17  it. And, again, my objective was to collect the
18  business for both companies, both would share in
19  the wealth.
20       If there was a poor relationship between
21  Dan and PointCare, there was no reason why we
22  still couldn't get the information.
23   Q    So, you admit that Mr. O'Connor
24  tipped you off about PointCare allegedly losing a
25  deal with Abbott; right?

TSG Reporting - Worldwide    877-702-9580

Page 272

1        F. Matuszak
2       MR. COSTANTINI: Object to the form
3  of the question.
4       MR. CAPLAN: I will unload the
5  question.
6       MR. COSTANTINI: "Admit to," come on.
7    A    Well, no. We knew for a fact, before
8  Dan leaving, that the Abbott deal was lost. In
9  fact, I believe I also learned that information
10  prior to Dan leaving from Petra Krauledat. It was
11  based around the fact that there was in issue with
12  Abbott.
13   Q    You are clear that it had completely
14  fallen through, not just that it was facing some
15  issues and that PointCare had a chance to
16  resurrect it?
17   A    There was nothing indicated to me
18  that that was going to be resurrected.
19   Q    Did you pursue that Abbott
20  opportunity on behalf of Drew?
21   A    No, I have not.
22   Q    And it's your testimony that if --
23  well, are you saying that you took in that
24  information with the intent of resurrecting it and
25  sharing some of it back with PointCare?

TSG Reporting - Worldwide    877-702-9580

Page 273

1        F. Matuszak
2    A    Well, yes. If we had gotten the
3  information that it was worthwhile, I would have.
4  Clearly, there was no real information that Dan
5  had. Dan, as I mentioned earlier, likes to talk,
6  so, half of the stuff that he tells you needs to
7  be weighted.
8    Q    Do you recall having some discussions
9  with Mr. O'Connor about the possibility of getting
10  a direct line of communication to the PointCare
11  board in order to do some type of transaction
12  directly with PointCare?
13   A    Yes.
14   Q    And do recall talking with him about
15  trying to get a direct line of communication with
16  if board bypassing, the CEO, Petra Krauledat?
17   A    Yes.
18   Q    Tell me about that, those
19  discussions?
20   A    Basically, he felt that the company
21  could make money. We talked a little about how
22  that might happen and then it went nothing further
23  than that.
24   Q    He told you that he thought which
25  company could make money?

TSG Reporting - Worldwide    877-702-9580

Page 274

F. Matuszak

1
2    A    PointCare, or the technology around
3  PointCare.
4    Q    And what possible transaction did you
5  and he discuss? Strike that.
6        What did you and he -- he told you he
7  thought PointCare could make money. Did you and
8  he discuss doing something about that?
9    A    Nothing more than just a few, you
10  know, this could be done if you wanted to do it
11  and we went no further than that.
12    Q    What is the "this" that you
13  considered could be done?
14    A    Contacting the board directly.
15    Q    For purposes of what?
16    A    An acquisition.
17    Q    And why were you discussing with him
18  going directly to the board of directors and not
19  going through the CEO, Petra Krauledat?
20    A    Because, clearly, in the past we
21  couldn't come to an agreement on the first
22  valuation, so there was no reason to believe that
23  we would be able to come to an agreement only a
24  few months after.
25    Q    Were there any other reasons that you

Page 275

F. Matuszak

1
2  thought it was beneficial to bypass the CEO and go
3  directly to the board to discuss a possible
4  acquisition?
5    A    I can't recall. If you have
6  something to refresh my memory, I would be more
7  than happy to review it.
8    Q    And you talked about the possibility,
9  you spoke with Richard DePiano, Sr. about the
10  possibility of bypassing Dr. Krauledat and going
11  directly to the PointCare board; right?
12    A    I don't recall.
13    Q    Do you recall Mr. O'Connor asking you
14  to tell Rich DePiano, Sr. that you had first
15  approached Mr. O'Connor about these matters?
16    A    I don't recall.
17    Q    Do recall telling Mr. O'Connor that
18  you would have no problem telling Rich it was your
19  idea to approach Mr. O'Connor?
20    A    Can you read that back?
21        (Record read.)
22    A    I don't recall speaking to Dan
23  O'Connor one way or the other as to whether I
24  would talk to Rich about it or not.
25    Q    Which of you came up with the idea of

Page 276

F. Matuszak

1
2  bypassing the CEO and going directly to
3  PointCare's board about the possibility of
4  acquiring them?
5    A    I'm not sure. I don't recall.
6    Q    Now, at the time of your discussions
7  with O'Connor, former PointCare sales manager,
8  Drew and PointCare were still operating under
9  their distribution, marketing and so forth
10  agreement regarding the HT and NP; right?
11    A    Yes.
12    Q    To your understanding, did Drew and
13  PointCare have a duty of good faith to each other
14  under that contract?
15    A    I don't know the legal implications
16  around that.
17    Q    From a layperson's perspective, did
18  you feel duty bound to act in good faith towards
19  PointCare during the parties' business dealings?
20    A    Yes. Which, in any of the
21  discussions that I believe that I had with Dan
22  regarding the Abbott deal, was in good faith as I
23  mentioned earlier.
24    Q    And do you, from your layperson's
25  prospective, think that you were acting in good

Page 277

F. Matuszak

1
2  faith when you spoke to him about the possibility
3  of bypassing PointCare's CEO and going directly to
4  the board of directs about acquiring the company?
5    A    If it was ultimately, yes, in
6  PointCare's benefit to -- to have a merger.
7    Q    So, in your view, were you acting in
8  good faith in talking to Mr. O'Connor about
9  bypassing their CEO on and entering direct merger
10  discussions with the board of directors?
11    A    I guess that would depend on whether
12  not it was acted upon.
13    Q    Well, my question to you -- was it
14  ever acted upon?
15    A    No.
16    Q    So, my question to you is: Did you
17  think you were acting in good faith just to
18  strategize and to talk about the possibility of
19  bypassing PointCare's CEO to directly approach
20  their board of directors about a transaction in
21  the context of the parties ongoing business
22  relationship?
23    A    Can you read that back.
24        (Record read.)
25    A    I think strategizing about it had no

Page 282

1    F. Matuszak
2  reasoning, I believe, behind it.
3    **Q    Did he ever tell you why he**
4  **distrusted him?**
5    A    I think it was a personal thing.  It
6  wasn't anything specific.
7    **Q    Skipping along to the first page of**
8  **this, that is a reply e-mail that you sent to Dan**
9  **O'Connor later that morning, Saturday, July 14th?**
10   A    Yes.
11   **Q    And you told him, "I would have no**
12 **problem telling Rich this was my idea to approach**
13 **you."**
14   **That is DePiano, Sr.?**
15   A    Yes.
16   **Q    So, you agreed to tell DePiano, Sr.**
17 **it was your idea to approach O'Connor; right?**
18   A    Yes.  However, I'm not positive that
19 I did to speak to Rich about this.
20   **Q    When you agreed to tell Mr. DePiano**
21 **that this was your idea to approach O'Connor, was**
22 **that how it happened?  Did you, in fact, approach**
23 **O'Connor about this?**
24   MR. COSTANTINI:  You mean approach
25    DePiano about?
TSG Reporting - Worldwide    877-702-9580

Page 283

1    F. Matuszak
2    MR. CAPLAN: No.  This one I actually
3  got right.
4    MR. COSTANTINI:  Okay.  I lost it
5  someplace along the way.
6    A    I don't recall who mentioned it.  I
7  don't remember whether it was myself or Dan.
8    (Matuszak Exhibit 4 marked for
9    identification as of this date.)
10   **Q    Mr. Matuszak, a couple of quick**
11 **questions.**
12   **Do you recognize that as an e-mail**
13 **that you and Mr. O'Connor exchanged on July 18th,**
14 **2007?**
15   A    Yes.
16   **Q    And do you see on the bottom you**
17 **wrote to Mr. O'Connor, "Subject: Conversation**
18 **with Rich.  I spoke with Rich, and here is with**
19 **where we stand"?**
20   **Let me know when you finish reading**
21 **it.**
22   A    Yes, that's my e-mail.
23   **Q    And does this e-mail refresh your**
24 **recollection that you spoke with Rich DePiano, Sr.**
25 **about these discussions between you and**
TSG Reporting - Worldwide    877-702-9580

Page 284

1    F. Matuszak
2  Mr. O'Connor?
3    A    I don't recall actually having the
4  conversation, but, obviously, I must have.
5    **Q    And in your e-mail, when you wrote to**
6  **O'Connor, "I spoke to Rich and here is where we**
7  **stand," Rich is Rich DePiano, Sr., right?**
8    A    Yes.
9    **Q    What did you discuss with Rich**
10 **DePiano, Sr. about this?**
11   A    I don't remember the exact contents
12 of the call.
13   **Q    Do you remember the substance of it?**
14   A    No.
15   **Q    Did -- strike this.**
16   **Was this the first time you had**
17 **spoken to Mr. DePiano and passed along information**
18 **that Mr. O'Connor gave you after he had left**
19 **PointCare?**
20   MR. COSTANTINI:  Did we establish
21    when he left PointCare?  That might help hip
22    answer.
23   A    I don't recall, given the timeline,
24 because it was, again, very close.
25   **Q    What is your best recollection of**
TSG Reporting - Worldwide    877-702-9580

Page 285

1    F. Matuszak
2  **when Mr. O'Connor left PointCare?**
3    A    I believe around June.
4    **Q    You have a good memory.**
5    **Why don't we work off of a working**
6  **assumption that Mr. O'Connor left PointCare on or**
7  **ought about June 5th of 2007?**
8    A    Okay.
9    MR. COSTANTINI:  With that date in
10   mind, are you going to reask your question?
11 BY MR. CAPLAN:
12   **Q    With that date in mind, we just**
13 **looked at an e-mail on July 18th reflecting that**
14 **you spoke with Richard DePiano, Sr. about your**
15 **conversation with Mr. O'Connor concerning possibly**
16 **going around the CEO and talking to the board of**
17 **directors.**
18   **So, my follow-up question is:  Is**
19 **that the first time you spoke with Mr. O'Connor**
20 **and passed along -- I'm sorry.**
21   **Is that the first time you spoke with**
22 **Mr. DePiano, Sr. about information that**
23 **Mr. O'Connor provided to you after he left**
24 **PointCare?**
25   A    To the best of my knowledge, I don't
TSG Reporting - Worldwide    877-702-9580

Page 294:

F. Matuszak
declared that he couldn't go to the board, the
discussions continued between you and
Mr. O'Connor; correct?
MR. COSTANTINI: Object to the form
of the question.
A Can you repeat the question?
(Record read.)
A I think Dan did still continue to
contact me, yes.
Q And you continued to discuss this
with him; right?
A I believe so.
Q And at the time, did you know who
Eric Newman was?
A Yes.
Q And who was he?
A I think he was the controller.
Q And you understood that the
controller handles the finances for PointCare?
A Yes.
Q And you understand that the
controller handles confidential financial
information for PointCare?
A Yes.

Page 295:

F. Matuszak
Q And you understand that confidential
financial information is sensitive to a company
like PointCare?
A Yes.
Q And you understood that PointCare
would expect its financial information to be kept
confidential to it; correct?
A Yes.
Q And you understood that it would be
inappropriate for someone to contact PointCare's
controller to ask him financial information about
PointCare; right?
A It depends on the person asking the
question.
Q Someone who is, someone who is
outside of PointCare.
Let me ask you this: So, are you
suggesting that Mr. O'Connor, as a shareholder,
had a certain right to obtain certain financial
information from PointCare?
A Yes. And needed to hold or could
hold his -- basically, his investment, ask for
accountability.
Q So, Mr. O'Connor, in your mind, had

Page 296:

F. Matuszak
certain rights to contact Eric Newman, controller,
to get confidential information because O'Connor
was a shareholder; right?
A Yes.
Q But, certainly, O'Connor did not have
the right to disclose any PointCare confidential
information from the controller to you at Drew;
right?
A Yes.
Q That would be wrong, wouldn't it?
A Yes.
Q And that happened; right?
A I believe Dan did send me some
information.
Q What did he send you?
A I don't recall exactly what it was.
Q But you recall that he sent you some
confidential financial information he had obtained
from Eric Newman, the controller of PointCare;
right?
A Yes.
Q What did you do with that
information.
A Privilege?

Page 297:

F. Matuszak
MR. COSTANTINI: He's raising with me
a question about a possible privilege
assertion. So, let me go outside with him
for a second to see what this is about.
MR. CAPLAN: Okay, if you need to
confer about a privilege.
(Witness and his counsel conferring
outside the deposition room.)
MR. COSTANTINI: The problem is the
answer is going to be he advised counsel of
it and that is perfectly permissible for you
to learn.
What the discussion was subsequent to
that, is, you know, I think would be within
the privilege, but I will let him answer as
he was going to answer that he advised
counsel of it.
BY MR. CAPLAN:
Q Who is the counsel?
A To the best of my knowledge, it would
be Duane Morris.
Q Did you tell anyone at Drew the
confidential financial information that
Mr. O'Connor passed along to you from controller,

 TSG Reporting - Worldwide 877-702-9580

## Page 294

F. Matuszak

declared that he couldn't go to the board, the discussions continued between you and Mr. O'Connor; correct?

MR. COSTANTINI: Object to the form of the question.

A Can you repeat the question?

(Record read.)

A I think Dan did still continue to contact me, yes.

Q And you continued to discuss this with him; right?

A I believe so.

Q And at the time, did you know who Eric Newman was?

A Yes.

Q And who was he?

A I think he was the controller.

Q And you understood that the controller handles the finances for PointCare?

A Yes.

Q And you understand that the controller handles confidential financial information for PointCare?

A Yes.

## Page 295

F. Matuszak

Q And you understand that confidential financial information is sensitive to a company like PointCare?

A Yes.

Q And you understood that PointCare would expect its financial information to be kept confidential to it; correct?

A Yes.

Q And you understood that it would be inappropriate for someone to contact PointCare's controller to ask him financial information about PointCare; right?

A It depends on the person asking the question.

Q Someone who is, someone who is outside of PointCare.

Let me ask you this: So, are you suggesting that Mr. O'Connor, as a shareholder, had a certain right to obtain certain financial information from PointCare?

A Yes. And needed to hold or could hold his -- basically, his investment, ask for accountability.

Q So, Mr. O'Connor, in your mind, had

## Page 296

F. Matuszak

certain rights to contact Eric Newman, controller, to get confidential information because O'Connor was a shareholder; right?

A Yes.

Q But, certainly, O'Connor did not have the right to disclose any PointCare confidential information from the controller to you at Drew; right?

A Yes.

Q That would be wrong, wouldn't it?

A Yes.

Q And that happened; right?

A I believe Dan did send me some information.

Q What did he send you?

A I don't recall exactly what it was.

Q But you recall that he sent you some confidential financial information he had obtained from Eric Newman, the controller of PointCare; right?

A Yes.

Q What did you do with that information.

A Privilege?

## Page 297

F. Matuszak

MR. COSTANTINI: He's raising with me a question about a possible privilege assertion. So, let me go outside with him for a second to see what this is about.

MR. CAPLAN: Okay, if you need to confer about a privilege.

(Witness and his counsel conferring outside the deposition room.)

MR. COSTANTINI: The problem is the answer is going to be he advised counsel of it and that is perfectly permissible for you to learn.

What the discussion was subsequent to that, is, you know, I think would be within the privilege, but I will let him answer as he was going to answer that he advised counsel of it.

BY MR. CAPLAN:

Q Who is the counsel?

A To the best of my knowledge, it would be Duane Morris.

Q Did you tell anyone at Drew the confidential financial information that Mr. O'Connor passed along to you from controller,

Page 298

```
 1           F. Matuszak
 2  Eric Newman?
 3      A    It would have been as one group.
 4      Q    Who was the group to whom you
 5  reported the information?
 6      A    Well, it would be everyone that was
 7  in the conference call regarding the --
 8      Q    Okay.
 9      A    -- the PointCare matter.  So it
10  was -- everyone was in.
11      Q    Who is the cast of characters?  Who
12  is on this call?
13      A    I can't say for sure, but it would
14  be, more than likely, Doug Nickols, Rich DePiano,
15  possibly Ken Pina and Tony Costantini, and maybe
16  some others from Duane Morris.
17      Q    And not looking for exact dates, but
18  when in relation to -- strike that.
19           When you received, what is your best
20  memory of when Mr. O'Connor passed along this
21  confidential financial PointCare information to
22  you?
23      A    I don't know what it is, so it would
24  be hard to say when.
25      Q    Well, in the couple of years you have
```
TSG Reporting - Worldwide    877-702-9580

Page 299

```
 1           F. Matuszak
 2  worked at Drew, have you often had occasion to
 3  convene a group of senior management and someone
 4  as august as Mr. Costantini to get advice of
 5  counsel?
 6      A    It would be around the time of the
 7  lawsuit.
 8      Q    I guess that's what I was getting at.
 9           Did you pass along this information
10  in or around the time you received it from
11  Mr. O'Connor or was it not until the lawsuit that
12  you passed it along?
13      A    I have -- I can't comment, because I
14  don't know when it was.  I don't recall the time
15  frame.
16      Q    What, if anything, did you do with
17  it, aside from passing it along to this august
18  group, what, if anything, did you do with
19  PointCare's financial information?
20      A    I don't recall.
21      Q    When Mr. O'Connor passed that
22  information along to you, did you tell him, "it's
23  not right for you to give this to me"?
24      A    No.
25           (Matuszak Exhibit 5 marked for
```
TSG Reporting - Worldwide    877-702-9580

Page 300

```
 1           F. Matuszak
 2  identification as of this date.)
 3      Q    Showing you Exhibit 5, do you
 4  recognize that as an e-mail that Doug Nickols sent
 5  to you on December 14, '07?
 6      A    Yes.
 7      Q    -- and a string of prior e-mails.
 8           Could you please turn to the second
 9  to last page.  And, first, would you just agree
10  with me that that is the earliest in a string of
11  the e-mails; that is an e-mail that you sent to
12  Doug Nickols, December 13th, 2007?
13      A    Yes.
14      Q    The third line down, you say, "we
15  think the hardware is set."
16           Do you see that?
17      A    Which?
18      Q    We think the hardware is set, given
19  that we think the hardware is set.
20      A    Yes.
21      Q    The hardware you are referring to,
22  the HT?
23      A    Yes.
24      Q    And what did you mean when you said,
25  "we think the hardware is set"?
```
TSG Reporting - Worldwide    877-702-9580

Page 301

```
 1           F. Matuszak
 2      A    That all of the problems resulting
 3  around the gold particle deposits, that we were
 4  able to come to solutions and fix those problems.
 5      Q    Were any and all problems with the HT
 6  hardware fixed at this point to your knowledge?
 7      A    Yes, I believe -- well, as best as we
 8  can determine.
 9      Q    And since are you not the technical
10  guy, did you figure that out or did someone tell
11  you that?
12      A    Somebody else basically conveyed to
13  me.
14      Q    Who is the technical person that told
15  you that?
16      A    Well, I think at this time we
17  probably would have gotten some data on -- from
18  Herb Chow, but I am not sure of the dates.  But I
19  would have probably seen that and concluded that
20  things started looking, were starting to look
21  good.
22      Q    Do you consider within your expertise
23  to read Herb Chow's report and to interpret what
24  it's telling you?
25      A    I mean, from some of my field
```
TSG Reporting - Worldwide    877-702-9580

Page 302

```
 1            F. Matuszak
 2  engineering experience, I could read some of it
 3  and say, okay.  There are some conclusions that he
 4  reached that, obviously, I could understand and
 5  say, yeah, that looks good.  The whole, the whole
 6  piece of it; probably not.
 7      Q     The last paragraph of that e-mail
 8  that you wrote to Doug Nickols, you told him "just
 9  keeping you up-to-date and, hopefully, PointCare
10  backs down."
11      What did that refer to?
12      A     Well, by this time things had really
13  just blown up totally.
14      Q     I was there.
15      A     And, really, all we wanted to do was
16  get things moving, get things selling and,
17  hopefully, we could come to a mutual agreement,
18  and the relationship probably wouldn't be the way
19  it was, but at least we could start selling and
20  moving things along.
21      Q     To your understanding, was Drew open
22  to the possibility of reaching a new, mutually
23  agreeable agreement at that time?
24      A     At some point in that era, yes.
25      Q     And then continuing on that sentence,
```
TSG Reporting - Worldwide       877-702-9580

Page 303

```
 1            F. Matuszak
 2  you say, "hopefully PointCare backs down, but we
 3  should, in the meantime, also find another
 4  manufacturer of gold antibodies for CD4."
 5      What did you mean there?
 6      A     We invested a lot of time in our
 7  development of the HT, and if we weren't going to
 8  be able -- it seemed like it was going to the
 9  point where we weren't even going to be able to
10  get gold reagent; that we should at least be able
11  to run an assay using gold reagent.
12      Q     And at that time, you understood that
13  the gold reagent for CD4 was proprietary to
14  PointCare; right?
15      A     No.  When we were at Medica, we found
16  multiple vendors of gold reagent.  So, gold
17  reagent is a known commodity.
18      Q     From -- by whom?
19      A     I don't know.  I don't have any
20  direct knowledge of who.
21      Q     I thought you said at Medica you
22  found a bunch of folks who could sell it to you.
23      A     Yeah.  Roger Borray had met with some
24  and told me, yeah, we could probably do this.
25      Q     So, it's your understanding that here
```
TSG Reporting - Worldwide       877-702-9580

Page 304

```
 1            F. Matuszak
 2  you were referring to the availability of gold
 3  antibodies for CD4, other than PointCare's
 4  proprietary assay?
 5      A     But our understanding was that we
 6  wouldn't be infringing on any proprietary
 7  information that PointCare had.
 8      Q     That is not quite my question.  I'm
 9  asking for you to explain what you meant here when
10  you wrote that "Drew should find another
11  manufacturer of gold antibodies for CD4."
12      Is it your testimony that you meant
13  that someone at Drew had told you that there were
14  other gold antibodies for CD4 that other folks
15  were manufacturing and you could go buy from them?
16      A     Yes.
17      Q     And who told you that?
18      A     I believe Roger Borray had mentioned
19  it to us.
20      Q     When did he tell you that?
21      A     Probably sometime after Medica in
22  '07.
23      Q     And then at the end of the sentence
24  you say, "that Drew should also find out if we can
25  get the accelerant analyzed to see what is in it."
```
TSG Reporting - Worldwide       877-702-9580

Page 305

```
 1            F. Matuszak
 2  What did you mean by that.
 3      A     To do an analysis.
 4      Q     What accelerant?
 5      A     I'm not technical.
 6      Q     I didn't mean that technically.
 7      A PointCare accelerant.
 8      A     I'm not entirely sure if it was a
 9  PointCare accelerant or if there were other
10  accelerants out in the market.
11      Q     The accelerant that Drew had
12  anticipated using for the HT was a PointCare
13  accelerant; right?
14      MR. COSTANTINI:  If he knows.
15      Q     Please don't tell me anything you
16  don't know, sir.
17      A     It may have been a PointCare
18  accelerant.
19      Q     And you understood at the time that
20  PointCare's accelerant was proprietary to it;
21  right?
22      A     Yes.
23      Q     And you were suggesting to
24  Mr. Nickols that Drew should find out if it could
25  analyze the accelerant and see what's in it so
```
TSG Reporting - Worldwide       877-702-9580

Page 306

```
1          F. Matuszak
2  Drew could manufacture its own accelerant; right.
3      A    No.
4      Q    Why is that not true?
5      A    To see if we could find an alternate
6  source.
7      Q    Why would you need to analyze what
8  was in PointCare's accelerant in order to find an
9  alternative source for it?
10     A    To determine if, indeed, it was
11 proprietary.
12     Q    How would analyzing it determine if
13 it was proprietary?
14     A    The components would enable you to
15 then do a patent search and see if it was
16 proprietary, and then, given the documents that I
17 have subsequently seen, there was no guarantee
18 that this was a proprietary reagent.
19     Q    You wouldn't have to know the
20 ingredients of the accelerant to do a patent
21 search to see if it was patented, would you?
22     A    Yes. I believe, I'm not technical,
23 again, but in my opinion you would need to know
24 what was in something before you really would do a
25 patent search, but I am not the technical person.
```
TSG Reporting - Worldwide    877-702-9580

Page 307

```
1          F. Matuszak
2      Q    My standard caveat, you are not the
3  technical guy here. But at the time Herb Chow did
4  his testing, and do recall subsequent to Herb
5  Chow's testing that Drew sent a letter to
6  PointCare declaring that the HT was ready for
7  PointCare to taking it and to do some further work
8  on it?
9      A    Yes.
10     Q    At that point in time, as the head of
11 sales at Drew, did you have an expectation of how
12 much time all the rest of the work would take
13 before you would have a product you could sell to
14 your customers?
15     A    I would have no knowledge until the
16 final testing or the final work that needed to be
17 done with PointCare was completed, because that
18 was a variable that we had no information on.
19     Q    Did you talk to any of your
20 colleagues on the technical side, R&D,
21 manufacturing, whatever, to get their opinion on
22 how long you might be waiting before you had a
23 product to sell?
24     A    I don't recall I had a conversation.
25     Q    Do you recall having any information
```
TSG Reporting - Worldwide    877-702-9580

Page 308

```
1          F. Matuszak
2  at Drew, at the time Drew was asking PointCare to
3  take the HT and do some more work, how long it
4  would be before you would have an instrument for
5  sale?
6      A    I don't recall.
7      Q    Was that important to you, in
8  December of '07, to know how long or short it
9  would be before you had instruments to sell to
10 your customers?
11     A    Well, there was far too many
12 variables to even consider where we would be at.
13     Q    So, at that time you had no idea how
14 close Drew and PointCare's effort was towards
15 having an HT to sell?
16     A    Effort as well as the agreement.
17 There are were too many variables to assign a --
18     Q    Fair enough.
19         Did you have an opinion if, if, as
20 you say, if PointCare had "backed off" and the
21 parties had continued to work with the remaining
22 tasks, did you have any understanding of how long
23 you were looking at before you would have an HT
24 product to sell?
25     A    Without the PointCare piece, without
```
TSG Reporting - Worldwide    877-702-9580

Page 309

```
1          F. Matuszak
2  knowing what that timeline is, I think it would
3  probably be whether, you are technical or not
4  technical, it would be a guess.
5      Q    Would you agree with me, in a
6  non-technical sense, there was still a lot of work
7  left to be done?
8      A    Again, I can't guess, because I had
9  no idea of how long the PointCare piece would be.
10     Q    You understood that Drew was shipping
11 a prototype to PointCare; right?
12     A    I did not have any knowledge. I
13 didn't have that understanding.
14     Q    Did you have any understanding of
15 what state of completion the HT was when Drew
16 wanted to ship it to PointCare, how far along it
17 was in layman's terms?
18     A    No.
19         MR. COSTANTINI: I don't know how far
20 you are from the end. We would like to take
21 a break if are you a long time from the end;
22 if you are near the end --
23         MR. CAPLAN: How about if we take a
24 break, and I will still promise to be close
25 to the end.
```
TSG Reporting - Worldwide    877-702-9580

**From:** Doug Nickols
**Sent:** 12/14/2007 11:40:24 PM
**To:** Frank Matuszak
**CC:**
**Subject:** FW: 2280 cd4

It's too premature to over-commit to something as soon as first of February in India, especially since we just left PA with the objective to get our current efforts on XL2280 in line. CD4 can't be trusted until the basic XL2280 is defect free. I wish you would have discussed with me first, since we're a ways off from productionization of the CD4 to send an instrument that far away that soon. Would suggest our first field instrument be a little closer to home and we get the Pointcare portion ironed out.

When we started seeing problems with the machines at Pointcare back in May, 2007, we stopped work on the preproduction instruments. They were near completion in assembly, but we pulled and modified some components for experimental parts to resolve the technical issues. Additionally, these instruments were Aurica instruments and they now will be modified to Drew instruments. Lastly, unlike the XL2280, we WILL go thru Test and QC before submitting them for all the validation. If you recall, that validation will take us at a minimum 1 month, that's if we run 24 hours a day. All of these preproduction instruments will be consumed in validation with one instrument coming out the end in a condition suitable for external evaluation. I caution anyone in taking it to the other side of the world as our maiden voyage. As soon as we clear the 3 thru QC, we will begin another set of instruments as originally planned thru the production process as long as we have all the documentation ready to do so. This production run will validate the instructions and documentation necessary to build instruments consistently.

With that said, I'm encouraged by Gary pulling together a "to-be-finished" list (attached) today. I think a little of it is me being on site and stressing the sense of urgency, but more of it is knowing we now have a working prototype to leverage off of.

We can talk more about the CD4 project when we're together in State College, PA next week. Hope you make is home safely.

Regards,

Doug Nickols
214-210-4923 (direct)
214-210-4900 (main line)
214-210-4949 (fax)
dnickols@drew-scientific.com
Confidentiality Notice: This electronic transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.



HIGHLY CONFIDENTIAL

DR00051480

From: Gary Young
Sent: Friday, December 14, 2007 3:58 PM
To: Doug Nickols
Cc: Tim Barker; Alta Hill; Phil West; George Chappell; William Ross
Subject: RE: 2280 cd4

The attached listing contains the major tasks and parts shortage for completing the five CD4 units currently in stock at Drew.

Three are in Assembly and two are in the Engineering Lab

The only Purchase part we appear to be short on is the ultrasonic sensor. It is on order and due in on Dec. 20th.

We are short several Manufactured parts which need the documentation updated prior to manufacturing.

Please review the attachment and provide me with dates you can respond to these requirements

If you have any questions, please call me.

Regards,

Gary

From: Doug Nickols
Sent: Friday, December 14, 2007 7:24 AM
To: Gary Young
Cc: Tim Barker; Alta Hill; Phil West; George Chappell
Subject: FW: 2280 cd4

I expect by now all the parts required for the 3 Drew CD4 instruments are in either in Alta's or Tim's hands for procurement. Please confirm. Reference my email attached dated 11/30/07.

HIGHLY CONFIDENTIAL

Please put together a shortage list of all the components necessary to complete these instrument(s) and the remaining prototype due to Pointcare by end of business today. Phil should be able to assist. Lising should include what, when, who and status. This status needs to be updated at least twice weekly and distrubuted to each of the stakeholders (Phil, Tim, Alta, Ed, George, myself and whoever else you think is key to there successful completion).

Keep in mind, these 3 instruments will be going thru Test and QC.

Thanks,

Doug Nickols
214-210-4923 (direct)
214-210-4900 (main line)
214-210-4949 (fax)
dnickols@drew-scientific.com
Confidentiality Notice: This electronic transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

From: Frank Matuszak
Sent: Thursday, December 13, 2007 10:16 PM
To: Doug Nickols
Subject: 2280 cd4

Doug,

We have the opportunity to have some good sales in India based on the cd4, I told one of the labs we could be possible prepared to get an evaluation system to India in the beginning of Feb.. Given that we think the hardware is set should we not start sending the unit out for emc and electrical safety testing. Also how many could we build based on parts availability, I know that the sheer valve in use is prototype material and if that is a long lead time items we would need to start moving on ordering some.

Just keeping you up to date and hopefully Pointcare backs down but we should in the meantime also find out another manufacturer of gold antibodies for cd4 as well as find out if we can get the accelerant analyzed to see what is in it.

Regards,

DR00051482

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

Attachment: CD4 Shortage List and Pending Tasks.doc

HIGHLY CONFIDENTIAL

# Exhibit E

Page 1

1

2      UNITED STATES DISTRICT COURT

       SOUTHERN DISTRICT OF NEW YORK

3      ---------------------------X

4      DREW SCIENTIFIC, INC.,

5                  Plaintiff,

6            vs.                    Case No.

                                    08 CV 1490-AKH

7      POINTCARE TECHNOLOGIES,

       INC.,

8

                   Defendant.

9

       ---------------------------X

10

11

12          DEPOSITION OF LINSEY ROCKINGHAM

13              New York, New York

14           Thursday, April 3, 2008

15     Contains Confidential - Attorneys' Eyes Only Portions

16

17

18

19

20

21

22

23     Reported by:

24     JOAN WARNOCK

25     JOB NO. 15878

Page 2

```
1
2                                          April 3, 2008
3                                          9:50 a.m.
4
5
6          Deposition of LINSEY ROCKINGHAM,
7    held at the offices of Duane Morris,
8    LLP, 1540 Broadway, New York, New York,
9    before Joan Warnock, a Notary Public of
10   the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
1
2    A P P E A R A N C E S :
3
4          DUANE MORRIS, LLP
5          Attorneys for Plaintiff
6            1540 Broadway
7            New York, New York  10036
8          BY:  ANTHONY J. COSTANTINI, ESQ.
9               -and-
10         DUANE MORRIS, LLP
11         Attorneys for Plaintiff
12           470 Atlantic Avenue
13           Suite 500
14           Boston, Massachusetts  02210
15         BY:  BEN KURUVILLA, ESQ.
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
1
2    A P P E A R A N C E S (Cont'd.)
3
4          BURNS & LEVINSON, LLP
5          Attorneys for Defendant
6            125 Summer Street
7            Boston Massachusetts  02110
8          BY:  ANDREW F. CAPLAN, ESQ.
9
10   ALSO PRESENT:
11     FRANCIS MATUSZAK, DREW SCIENTIFIC
12     RICHARD DePIANO, DREW SCIENTIFIC
13     PETRA B. KRAULEDAT, POINTCARE
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
1          L. Rockingham
2    LINSEY ROCKINGHAM,
3    called as a witness, having been
4    duly sworn by a Notary Public, was
5    examined and testified as follows:
6          COURT REPORTER:  Please state your
7    name and address for the record.
8          THE WITNESS:  Linsey Elizabeth
9    Rockingham, 4 Worcester Street, Belmont
10   Massachusetts  02468.
11   EXAMINATION BY
12   MR. COSTANTINI:
13       Q.  Good morning, Ms. Rockingham.  How
14   are you?
15       A.  Good morning.
16       Q.  I've introduced myself to you
17   already and to the other people in the room,
18   but I'm going on the record now.  My name is
19   Tony Costantini with the Duane Morris law
20   firm, and I'm representing Drew and Escalon
21   in this matter, and I'll be asking you
22   various questions.
23          Have you ever given sworn testimony
24   before?
25       A.  No.
```

TSG Reporting - Worldwide    877-702-9580

Page 162

1    Attorneys' Eyes Only - L. Rockingham
2        and what you remember, please.
3        THE WITNESS: Okay.
4        A. I don't remember the exact date.
5        Q. How long ago was it? And today is
6    April 3rd, if that helps.
7        A. It was sometime this year.
8        Q. Well, we could go through lots and
9    lots of emails between you and potential
10   Russian distributors that occurred this year,
11   so I'm assuming that you did not continue to
12   have such emails after Dr. Krauledat gave --
13       A. Correct.
14       Q. -- such an instruction. But is
15   your recollection any better of how recent
16   the instruction was other than sometime in
17   2008?
18       A. March 2008.
19       Q. And did you respond to Mr. Tuora's
20   email of March 10th in any form?
21       A. No. Oh, yes, I did. Sorry. I
22   did.
23       Q. In what form did you respond?
24       A. I spoke to him on the phone.
25       Q. And can you recount that

Page 163

1    Attorneys' Eyes Only - L. Rockingham
2    conversation as best you can recall?
3        A. I told him that we were putting our
4    plans for Russia on hold.
5        Q. And how long after this March 10th
6    email did that conversation occur?
7        A. Very soon afterwards.
8        Q. In addition to the three Russian
9    distributors we covered, or potential Russian
10   distributors, I think you told me about
11   Block, I think you've told me about DRG, and
12   you've told me about Cormay. Did you have
13   discussions with any other potential Russian
14   distributors? Let me broaden it to say
15   communications, because I realize a lot of
16   things are done by the internet these days.
17       A. I don't remember.
18       Q. And you told me as to the
19   conversation you had with Dr. Krauledat about
20   her meeting with DRG at Medica and her
21   reasons for not going forward with them. Did
22   she report to you about her meeting with the
23   Cormay representatives at Medica?
24       A. Yes.
25       Q. What did she say?

Page 164

1    Attorneys' Eyes Only - L. Rockingham
2        A. She said that she had met them at
3    Medica and they were also a distributor for a
4    company called Orphea.
5        Q. And who had she met with?
6        A. She had met with the senior
7    Mr. Tuora.
8        Q. And did she convey to you any
9    impressions of that meeting?
10       A. Yes.
11       Q. And what were those impressions
12   that she conveyed?
13       A. That she thought that they were a
14   good company because they already were a
15   distributor for Orphea.
16       Q. And who is Orphea?
17       A. Orphea is another medical device
18   distributor.
19       Q. What types of medical devices do
20   they distribute?
21       A. I only know of one.
22       Q. And what is that one that you know
23   of?
24       A. It's one that is manufactured by
25   C2.

Page 165

1    Attorneys' Eyes Only - L. Rockingham
2        Q. And C2 was also the manufacturer of
3    the NP machines; is that correct?
4        A. Correct.
5        Q. And this C2-manufactured device,
6    what does it do? Orphea's device, not yours,
7    what does it do?
8        MR. CAPLAN: Objection.
9        A. I'm not sure.
10       Q. You just know it's some kind of
11   medical device that Orphea makes -- or that
12   C2 makes for Orphea?
13       A. Correct.
14       Q. And subsequent to the time that you
15   had the conversation -- or let me ask you,
16   first of all, the conversation that you had
17   with Dr. Krauledat in terms of her
18   impressions of Cormay, how long after the
19   Medica conference did that conversation
20   occur?
21       A. I didn't have a conversation.
22       Q. Was it an email communication?
23       A. Yes.
24       Q. How long after the conference did
25   that email communication take place?

# Exhibit F

Page 1

1

2                  UNITED STATES DISTRICT COURT

3                 SOUTHERN DISTRICT OF NEW YORK

4

5    DREW SCIENTIFIC, INC.,          )
                                     ) Case No.
6                   Plaintiff,       ) 08 CV 1490-AKH
                                     )
7                   vs.              )
                                     )
8    POINTCARE TECHNOLOGIES, INC.,)
                                     )
9                   Defendant.       )
     ----------------------------)

10

11

12

13

14             DEPOSITION OF JAMES GARY YOUNG

15                  New York, New York

16               Wednesday, April 9, 2008

17

18

19

20

21

22

23   Reported by:

24   KRISTIN KOCH, RPR, RMR, CRR, CLR

25   JOB NO. 16196

## Page 2

```
1
2
3
4
5              April 9, 2008
6              9:24 a.m.
7
8
9       Deposition of JAMES GARY YOUNG, held
10   at the offices of Duane Morris, LLP, 1540
11   Broadway, New York, New York, before
12   Kristin Koch, a Registered Professional
13   Reporter, Registered Merit Reporter,
14   Certified Realtime Reporter, Certified
15   Livenote Reporter and Notary Public of the
16   State of New York.
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

## Page 3

```
1
2   APPEARANCES:
3
4
5       DUANE MORRIS, LLP
6       Attorneys for Plaintiff
7          1540 Broadway
8          New York, New York 10036
9       BY:  JOHN DELLAPORTAS, ESQ.
10          ANTHONY J. COSTANTINI, ESQ.
11
12
13       BURNS & LEVINSON LLP
14       Attorneys for Defendant
15          125 Summer Street
16          Boston, Massachusetts 02110
17       BY:  MICHAEL P. TWOHIG, ESQ.
18
19
20   ALSO PRESENT:
21
22          PETRA KRAULEDAT
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

## Page 4

```
1
2       IT IS HEREBY STIPULATED AND AGREED
3   by and between the attorneys for the
4   respective parties herein, that filing and
5   sealing be and the same are hereby waived.
6       IT IS FURTHER STIPULATED AND AGREED
7   that all objections, except as to the form
8   of the question, shall be reserved to the
9   time of the trial.
10       IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized
13   to administer an oath, with the same
14   force and effect as if signed and sworn
15   to before the Court.
16
17
18
19           - oOo -
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

## Page 5

```
1
2   J A M E S   G A R Y   Y O U N G,
3       called as a witness, having been duly sworn
4       by a Notary Public, was examined and
5       testified as follows:
6   EXAMINATION BY
7   MR. TWOHIG:
8       Q.  Good morning, sir.  Could you just
9   state your full name for the record, please.
10       A.  James Gary Young.
11       Q.  And could you give us your
12   residential address.
13       A.  2441 McAlpin Road.
14       Q.  How about your business address?
15       A.  4230 Shilling Way.
16       Q.  Who do you work for?
17       A.  Drew Scientific, Incorporated.
18       Q.  What's your position there?
19       A.  I am a mechanical engineer.
20       Q.  Do you have any other title?
21       A.  I have many titles, but mechanical
22   engineer, manufacturing support engineer, those
23   are my chief titles.
24       Q.  Do you sometimes have another title
25   associated with projects that you are involved
```

TSG Reporting - Worldwide    877-702-9580

Page 22

```
1              Young
2      Q.   Has your title or position changed
3  over time with Drew Scientific?
4      A.   Yes, sir.
5      Q.   Can you tell me what the change was?
6      A.   I moved away from doing chiefly
7  design work and I moved more into project
8  management, being a project liaison, supporting
9  the engineering staff and assisting them in
10  achieving their goals, offloading some of the
11  work, the more mundane work, such as ordering
12  parts and doing research and things like that.
13      Q.   Did you step into that role because
14  somebody else had left?
15      A.   Yes, sir.
16      Q.   And who was the person who left?
17      A.   Andrew Kenney.
18      Q.   Was Andrew Kenney based out of the
19  U.K.?
20      A.   Yes, sir.
21      Q.   So when Andrew Kenney was still
22  employed by Drew Scientific, correct me if I am
23  wrong -- he was employed by Drew Scientific;
24  right?
25      A.   Yes, sir.
```
TSG Reporting - Worldwide    877-702-9580

Page 23

```
1              Young
2      Q.   So during the time when he was
3  working for Drew Scientific he occupied that
4  project management role?
5      A.   He was the VP, vice president, in
6  charge of engineering and R&D.  He oversaw a
7  lot of the project.
8      Q.   What project are you talking about?
9      A.   I am talking about the project with
10  PointCare for the HT instrument.
11      Q.   What was your first foray into
12  project management with Drew Scientific?
13      A.   The HT project.
14      Q.   And were you the project manager, or
15  what title did you have when you were working
16  on the project?
17      A.   We are not big on titles at Drew
18  Scientific.  My title was either engineering
19  manager -- not engineering manager, excuse me.
20  That's wrong.  Was project manager or project
21  liaison.
22      Q.   Did you ever see project coordinator
23  used also?
24      A.   It may have been.
25      Q.   Now, did you have that role as
```
TSG Reporting - Worldwide    877-702-9580

Page 24

```
1              Young
2  project manager or project liaison from the
3  outset of the project with PointCare?
4      A.   Yes, sir.
5      Q.   And so how was Andrew Kenney
6  functioning at the outset then?
7      A.   Andrew Kenney would oversee, to a
8  large extent, what I did.
9      Q.   He was in the U.K. doing that,
10  though?
11      A.   No, sir, he was not.  He divided his
12  time between the U.K. facility and the Dallas
13  facility.
14      Q.   And based on your observations at
15  the time, what was the division in terms of
16  percentage of time at Dallas versus percentage
17  of time in the U.K.?
18      A.   I don't recall.  It's roughly 60/40.
19      Q.   Which way?
20      A.   U.K. 60 percent, Dallas 40 percent,
21  roughly.
22      Q.   Now, just real quickly since we are
23  on the topic, Karl Gu is another employee of
24  Drew Scientific; right?
25      A.   Yes, sir.
```
TSG Reporting - Worldwide    877-702-9580

Page 25

```
1              Young
2      Q.   And he worked with you on the HT
3  project with PointCare?
4      A.   Yes, sir.
5      Q.   Did he have the role of software
6  project manager?
7      A.   Yes, sir.
8      Q.   And was that role under you as
9  project manager?
10      A.   No, sir.
11      Q.   So if we were doing an
12  organizational chart, would you have put him
13  kind of horizontally next to you?
14      A.   It would be difficult to say where
15  he fit exactly in the project in a tree.
16      Q.   But I take it that you bore overall
17  project management responsibility from the Drew
18  perspective?
19      A.   I was the project liaison between
20  Drew and PointCare and in that respect I did
21  have much of the responsibility.
22      Q.   Okay.  Was it your understanding
23  that you needed to keep track of what Mr. Gu
24  was doing?
25      A.   I needed to know what Mr. Gu was
```
TSG Reporting - Worldwide    877-702-9580

Page 38

```
1              Young
2  PointCare HT project?
3      A.   There were two engineers, Vincent
4  Phan and Lee Carter, that were not directly
5  involved.
6      Q.   And why were they not involved in
7  the project?
8      A.   They were senior production support
9  engineers.  Their function was to support the
10 existing product lines that we were currently
11 building.
12     Q.   So were they slated to become
13 involved in the PointCare HT project at some
14 point?
15     A.   No, sir.  My understanding of their
16 function was to offload part of the
17 responsibility of supporting the manufacturing
18 line on to them to allow the regular
19 engineering staff to work more on the R&D
20 project or work more on R&D projects.
21     Q.   Right, but at some point the HT was
22 supposed to get to a state of
23 manufacturability; right?
24     A.   That is correct.
25     Q.   So was there a plan to then involve
   TSG Reporting - Worldwide     877-702-9580
```

Page 39

```
1              Young
2  them in the process?
3      A.   Yes, sir.
4      Q.   It never got to that point; right?
5      A.   No, sir.
6      Q.   Now, who in management did you send
7  these timelines that you updated?
8      A.   Doug Nickols and Andrew Kenney.
9      Q.   Anybody else?
10     A.   That's the management team that I
11 would report to.
12     Q.   And Andrew Kenney you also
13 mentioned, I believe, he is vice president,
14 you said?
15     A.   His title with Drew, I believe, was
16 vice president in charge of research and
17 development.
18     Q.   What about Doug Nickols, what was
19 his title?
20     A.   Doug has had several titles since he
21 has come on board with Drew.  He was the
22 general manager, then he was president and
23 general manager, and then assumed the working
24 responsibility of being the engineering manager
25 at the same time, and then later on became just
   TSG Reporting - Worldwide     877-702-9580
```

Page 40

```
1              Young
2  the engineering manager.
3      Q.   Now, during the time period of the
4  PointCare HT project, what positions did
5  Mr. Nickols occupy?
6      A.   Mr. Nickols became the acting
7  engineering manager in the fall of 2006.
8      Q.   And at that point in time the HT
9  project was already under way?
10     A.   Yes, sir.
11     Q.   And was that about the time when
12 Mr. Kenney left?
13     A.   Yes, sir.  Actually, Mr. Kenney did
14 not leave the company.  He was moved back to
15 the -- our facility that's in the U.K. in
16 Barrow-in-Furness.
17     Q.   Is he still there?
18     A.   Yes, he is still there.
19     Q.   And prior to that, what was
20 Mr. Nickols doing prior to stepping into that
21 position?
22     A.   He was the president, general
23 manager of the company.
24     Q.   So that seems like a little bit of a
25 step down.
   TSG Reporting - Worldwide     877-702-9580
```

Page 41

```
1              Young
2      MR. DELLAPORTAS:  Object to form.
3      A.   When Mr. Nickols took over the
4  engineering management, he still retained his
5  title as president and general manager, and
6  it's only been in the last month that his title
7  has actually changed to just engineering
8  manager.  He is no longer the president and
9  general manager of the company.
10     Q.   And do you know why that decision
11 was made to take his title away?
12     A.   No, sir.  That's a top management
13 decision made at Escalon I am not privileged
14 to.
15     Q.   Did somebody step in and occupy that
16 position?
17     A.   Yes, sir.
18     Q.   Who was that?
19     A.   The gentleman's name is Mark
20 Wallace.
21     Q.   Did he ever work on the HT project?
22     A.   No, sir.
23     Q.   Okay.  Why don't we take a look at
24 the document that we marked as Exhibit 1.  I
25 will let you flip through it.
   TSG Reporting - Worldwide     877-702-9580
```

Page 42

```
1              Young
2         (Document review.)
3      Q.  If you could just familiarize
4  yourself with it and then I will just ask you
5  some basic questions and you can determine
6  whether you need to read it in more depth.
7         (Document review.)
8      Q.  Let me just ask you a basic
9  question, Mr. Young.  Do you recognize this
10  document?
11      A.  No, sir, I don't.
12      Q.  So I take it that you don't recall
13  that anyone at Drew ever circulated this
14  document to you?
15      MR. DELLAPORTAS:  Object to form.
16      A.  I don't recall seeing this document.
17      Q.  Okay.  Do you recall ever discussing
18  this document?
19      MR. DELLAPORTAS:  Object to form.
20  I'm sorry.  Objection.  Asked and answered.
21      A.  Segments of this document may have
22  been discussed in our meeting with PointCare
23  that would have been in May of 2006.  However,
24  I don't recall seeing this exact document.
25      Q.  Okay.  So you do recall being in a
```

Page 43

```
1              Young
2  meeting with PointCare in May of 2006?
3      A.  Yes, sir.
4      Q.  And who do you recall being at the
5  meeting from the Drew side?
6      A.  Myself, George Chappell, Jerry West.
7  I don't recall if Andrew Kenney was there.  I'm
8  not sure about Andrew.
9      Q.  Roger Bourree?
10      A.  I don't recall Roger being there,
11  but that's not to say he wasn't.  I just don't
12  remember him.  He is not part of our normal
13  design team.
14      Q.  Okay.  Did you ever get a briefing
15  from Roger Bourree or anyone else at Drew
16  regarding the proposed HT project before the
17  contract was entered into and it started?
18      A.  No, sir.
19      Q.  You never did?
20      A.  No, sir.  I worked with Roger on
21  several occasions to get parts made, designed
22  and made, and sent to PointCare for them to
23  utilize on the Excell 22 that they were doing
24  some of their preliminary study work on.
25      Q.  And is your recollection that that
```

Page 44

```
1              Young
2  work that you just testified about took place
3  prior to the contract between PointCare and
4  Drew being entered into?
5      A.  Yes, sir.
6      Q.  Other than what you just testified
7  to, did you have any other participation in
8  let's call it pre-project work on this HT
9  project?
10      A.  I don't recall any pre-project work.
11      Q.  Other than what you just testified
12  to?
13      A.  Other than what I testified to
14  assisting Roger Bourree.
15      Q.  Did you have any discussion with
16  Roger with respect to the work that he asked
17  you to do?
18      A.  Minimal.  He had been in discussion
19  with people at PointCare.  They had a good
20  understanding what they wanted.  He just
21  conveyed that information on to me.  I took it,
22  designed the parts, had them made, had them
23  delivered.
24      Q.  So what information did he convey to
25  you about what PointCare wanted?
```

Page 45

```
1              Young
2      A.  One thing that comes to mind was a
3  small, low-volume cuvette that they needed
4  because the sample volumes that we were working
5  with -- they were working with, I mean to say,
6  were small and our existing design, the sample
7  was just swallowed up inside the huge volume of
8  the existing design.
9      Q.  Okay.  And when we are talking about
10  a low-volume cuvette, what was going to be
11  going into that low-volume cuvette?
12      A.  Roger never explained that to me.
13      Q.  Did you know at that point
14  pre project or I should say pre contract that a
15  medical device was contemplated that would be
16  performing an assay?
17      A.  I can't say with certainty that it
18  was presented to me the way that you said it.
19  However, since it was an analyzer, it was
20  reasonable deduction to assume that it would be
21  something along that line.
22      Q.  Did you make that assumption?
23      A.  Yes, sir.
24      Q.  Did anybody actually explicitly tell
25  you what was being contemplated?
```

Page 66

```
                    Young
1
2    that needed to be done to build each of these
3    subsystems.
4        Q.   Okay.  Just continuing on looking at
5    this, talking about the timeline here, do you
6    have an understanding about the -- let's call
7    them horizontal bars and initials over on the
8    right side of the document.
9        A.   I see those.
10       Q.   Do you have an understanding of what
11   those signified?
12       A.   That would normally signify a start
13   date and a completion date and the bar would
14   represent the period of time between them.
15       Q.   Okay.  And that's the way you read
16   this document?
17       A.   That's the way I would interpret
18   that, yes, sir.
19       Q.   Okay.  And what about the initials
20   next to those bars?
21       A.   Those initials would be the person
22   who was responsible for that task or that
23   operation.
24       Q.   Or group of people?
25       A.   Yes, sir.
```

Page 67

```
                    Young
1
2        Q.   And is that the way you understand
3    this document?
4        A.   That's the way I would understand
5    it, yes, sir.
6        Q.   Is it, in fact, the way you
7    understand it?
8            MR. DELLAPORTAS:  Object to form.
9    Asked and answered.
10           MR. TWOHIG:  Go ahead.
11       A.   That is the way that I understand
12   the document.
13       Q.   Okay.  And is that based on your
14   experience in the industry?
15       A.   It's based on my understanding of
16   the way Gantt charts work.
17       Q.   Okay.  And are Gantt charts commonly
18   used with projects that you work on?
19       A.   Not commonly, but I have used them
20   in the past.
21       Q.   And have you used them in the
22   context like this of a project timeline?
23       A.   Yes, sir.
24       Q.   Okay.  Taking a look at some
25   specific line items, now, if we look down --
```

Page 68

```
                    Young
1
2    why don't we start with number 13.  You see
3    that there the title is Development of Selected
4    Modules?
5        A.   Yes, sir.
6        Q.   Do you understand or do you have an
7    understanding of what is meant by development
8    of selected modules in the context of this
9    timeline?
10       A.   The term "development of selected
11   modules" would be encompassing the items that
12   are listed below it.  The items listed below
13   Development of Selected Modules would be
14   subsystems, as I refer to them, that are
15   required for the completion of the task titled
16   Development of Selected Modules.
17       Q.   Okay.  So, for example, let's take a
18   look at line 14, Mixing.  Do you understand
19   that to be referring to the task of creating a
20   mixing module for the HT device?
21       A.   In this particular case mixing is a
22   very generic term.  Mixing takes place on
23   several levels.  It could be interpreted in
24   several different ways.  There was a cuvette
25   system that did have mixing associated with it.
```

Page 69

```
                    Young
1
2    There is also mixing that takes place on the
3    CBC side, the blood count side, as well.
4    That's not typically associated with this, but
5    mixing is a generic term.
6        Q.   Well, let me ask you this:  In your
7    understanding of the project and the
8    modifications that were contemplated to the
9    Drew instrument, were there modifications
10   contemplated for both of those aspects of
11   mixing that you just testified about?
12       A.   There were changes that had to be
13   made to both sides, if you want to refer to it
14   as the CBC side as well as the CD4 side, in
15   order to get the two systems integrated
16   together.
17       Q.   And did you understand that the task
18   of doing both of those, the changes on both
19   sides, fell to Drew?
20       A.   The hardware development would have
21   been largely, not completely, but largely
22   responsible for Drew.  However, the --
23       Q.   Do you mean largely a responsibility
24   of Drew?
25       A.   Of Drew.  However --
```

Page 70

```
                    Young
 1
 2      Q.   Is that a yes?
 3      A.   No, that's a condition.
 4      Q.   Okay.
 5      A.   The system was ultimately to be
 6   proven by PointCare and so they would have the
 7   final say as to whether or not the subsystem or
 8   this aspect was working properly.  Since they
 9   were the specialists in this technique and had
10   developed the methods and methodology for doing
11   this, we would be dependent upon them for
12   making the final say as to whether or not it
13   was acceptable or not.
14      Q.   Okay.  And is it your understanding
15   that essentially what PointCare would do is
16   take the hardware that you had modified and see
17   what the outcome was when you ran that
18   hardware?
19           MR. DELLAPORTAS:  Object to form.
20      A.   Ultimately we felt like PointCare
21   was responsible for proving that what we had
22   designed was working properly.
23      Q.   And did you have an understanding of
24   how PointCare was going to go about proving it?
25      A.   We would develop a prototype system.
```

Page 71

```
                    Young
 1
 2   We would deliver that system to them.  They, in
 3   turn, would operate the system and would
 4   critique it and give us a summary of what they
 5   felt like the shortcomings were and we would,
 6   in turn, go back, revise or redesign those
 7   subsystems to bring them up to meet the
 8   specifications they felt like we were short on.
 9      Q.   Okay.  And so to just kind of follow
10   up on your testimony there, did you understand
11   that that is what PointCare was going to be
12   trying to prove, whether the hardware that you
13   had modified met the specifications?
14           MR. DELLAPORTAS:  Object to form.
15      A.   Again, the responsibility was for
16   PointCare to test the prototype unit and then
17   determine whether or not it met the
18   specifications.
19      Q.   Just looking across that line 14,
20   the mixing line where the initials DME are, do
21   you see that?
22      A.   Yes, sir.
23      Q.   What does that stand for?
24      A.   I do not recognize the initials DME.
25      Q.   If I suggested that it was Drew
```

Page 72

```
                    Young
 1
 2   mechanical engineering, would that be something
 3   that you would recognize?
 4      A.   No, sir.
 5           MR. DELLAPORTAS:  Objection.  Calls
 6   for speculation.
 7      Q.   Do you have initials that you refer
 8   to different divisions at Drew by, for example,
 9   the engineering group?
10      A.   No, sir.
11      Q.   So you don't know what DME refers to
12   in that line then?
13      A.   No, sir.
14           MR. DELLAPORTAS:  Objection.
15           Mr. Young, if you could give me a
16     minute to formulate my objections.
17           Objection.  Asked and answered.
18      Q.   So let me ask you this:  Going down
19   to the next line item where it says Immunogold
20   Delivery Module, is this another item that Drew
21   was responsible for creating?
22      A.   Yes, sir.
23      Q.   Is it similar to the item in line 14
24   where Drew would create this item in line 15
25   and then PointCare would prove or try to prove
```

Page 73

```
                    Young
 1
 2   whether it met specifications?
 3      A.   Yes, sir.  But I would like to say,
 4   though, that it would not be proven on a
 5   subsystem by subsystem basis, if that's what
 6   you are implying, because all of the subsystems
 7   are integrated.  None of them or few of them
 8   are capable of standing alone by themselves in
 9   doing anything or meaning anything.
10      Q.   Okay.  Would you test them, though,
11   standing alone initially?
12      A.   We would verify that they met the
13   specification for that segment that they were
14   designed for.
15      Q.   Okay.  Now, just to jump ahead a
16   little bit, if you go down to line 23 where it
17   says "hardware integration," so would you agree
18   that it is contemplated in this timeline that
19   the various modules, line 14, for example, line
20   15, another example, are then going to be
21   integrated?
22      A.   I think that's a safe assumption.
23      Q.   Okay.  And with respect to the
24   integration, if you look at line 24, CD4 mixing
25   module, was that a task that fell to Drew?
```

8

**From:** Andrew Kenney
**Sent:** 5/22/2006 2:57:20 PM
**To:** Jerry West; George Chappell; Gary Young; Karl Gu; Rodger Bourree
**CC:**
**Subject:** CD4 Meeting

Can we have a meeting tomorrow, Tuesday, 9am your time to start the ball
rolling. A key decision is to identify what extra help we are going to
need to get the job done asap. Pls call me on skype.

Andrew

**HIGHLY CONFIDENTIAL**



DR00006709

20

**From:** Doug Nickols
**Sent:** 10/2/2006 1:01:03 PM
**To:** Gary Young; George Chappell; Karl Gu
**CC:** Tim Barker; Lee Carter
**Subject:** RE: Survival

I appoligize for being out this week in CT. I feel like I'm laying it on the line, then leaving for the week. Sea Gull effect if you will.

With that said, I consider it necessary to comment further on Andrew's email below. Although he appologizes for bluntness, the situation is more serious than he thinks. Sales are deteriorating because we can't sell the same old stuff.

1. Besides the 2 strategies below (cut & deliver), we can't spend a whole lot of money doing it. We've used it up, so our key resource is every Drew employee. My intention is to spread your load so you can focus on development.

2. XL2280 wasn't a disaster. It's not over and that's my point!! We're doing much better than our product introduction last year and that was the first in many years. Somewhere in the project we thought our jobs were done and they're not. The toughest part is the last 2% and we have to have the intestines to get thru that part. Something will go wrong, but it's the immediate resolution that will make it only a distraction and not a problem. In the coming months, when there's an XL2280 issue, get help and keep the problem resolution active to rapidly complete the task. Drew employees are proud of our XL22 and we can be just as proud of the XL2280.

3. "Urgency and responsibility" are the basics. We need ownership. If you go into a medical lab with a Drew product, I want you to proudly state that you designed that instrument and hear someone tell you how much they love it. If we don't do our jobs with urgency, our competitor's instrument will be in that lab. Think of Drew as your own business, and let's use those "business owner" traits to succeed.

Enough of my preaching. Hope you get the point.

ADDITIONAL COMMENTS:

Don't spend any time discussing it this week, because IMMEDIATE DEVELOPMENT work is the top issue, but in the back of your mind consider the current way we are doing business and what we need to do to accelerate change. Time to completion is killing us, both for little tasks and for big. William has been added to the staff and from what I see is making an impact. Want your opinions, but my top two possibilities are:

1. Bring in a green Production Engineer with an electrical engineering background to complement Lee's work. First 2 months would be with Tuan testing instruments. First big project would be to complete outsourcing of pcb assemblies, including conversion to surface mount. Biggest problem is your time George to train him, but want your thoughts on how much

HIGHLY CONFIDENTIAL



production support that could actually lighten you of. The time Lee has available could then be spent on finishing up the Evolution productionization, then DS360 productionization.

2. Commission a Documentation Control person to handle the design and systems side of Engineering. (in the old days, before Lee was born, they called this person a Drafter). Gary, that would free up some time for you to lead the CD4 effort. My observation at the last CD4 meeting was that others ran it and releasing some of the distractions, Gary, should give more attention to overcome the control issues.(comments are not to offend, but to try and help progress).

Both these ideas require additional funding, but that's my problem to find.

All for now, Doug.

————

From: Andrew Kenney [mailto:andrewk@drew-scientific.com]
Sent: Friday, September 29, 2006 9:20 AM
To: Gary Young; George Chappell; Karl Gu
Cc: Jerry West (remote); Doug Nickols
Subject: Survival

By now you will all have had a chance to read the Escalon press release regarding fiscal 2006. The $2 million loss is unsustainable and many changes are being made to rectify this situation. The strategy is twofold - cut costs and deliver more products.

The DS360 project is crucial and I need to spend the bulk of my time in the UK to make this happen on time. With my continued unavoidable absence, I have asked Doug and Lee to be available for resolving priority conflicts and resource allocation issues on a day to day basis.

The 2280 release for sale was a disaster and we must not let this happen again for CD4. We must develop a sense of urgency immediately and begin to take responsibility for our own futures and that of the company.
If you see a job that needs doing it's yours - don't wait for someone else to come along. Without releasing new products we will not survive. All of our jobs are at risk.

First priority is 2280 - nothing else must go wrong.

Second priority is CD4. We must catch up with the time line. If more help is needed either with subcontractors, equipment, parts, tools, whatever then say so immediately either to me or to Doug. Nothing must get in the way of a timely, high quality delivery.

An updated task list is attached. The other issues must be addressed but not so that they interfere with the 2280 or CD4 projects.

HIGHLY CONFIDENTIAL

Sorry to be so blunt but this really is the last chance to save ourselves. We can make a big difference to the success of the company and we must.

Andrew

HIGHLY CONFIDENTIAL

DR00028391

**From:** Doug Nickols
**Sent:** 10/31/2007 3:19:29 AM
**To:** Gary Young
**CC:**
**Subject:** RE: CD4 update

You'll have to explain your scheduling verbally.

I don't understand why item 1 is dependent on items 2 & 3 to complete it's testing.

Additionally, we don't have 2 to 3 weeks, since 2 to 3 weeks turns into 4 to 6 or longer for this project. If only "moderate improvement" is the resultant of item 2, can we drop this effort and follow up with a design improvement after we deliver the 2 working instruments to Pointcare? We've proven the hypothesis and measured the results, which is sufficient for now.

What items must be ordered for item 3 to work, or is all of it off-the-shelf or machine shop proto's? How can we shorten 1 week into days?

We discussed last week disproving Pointcare's assumption that the lysing of red cells wasn't taking place correctly. Have we disproved that assumption? Do we have documented data showing our findings?

Let's discuss as soon as you get in. We've got to show results and quickly.

Regards,

Doug Nickols
214-210-4923 (direct)
214-210-4900 (main line)
214-210-4949 (fax)
dnickols@drew-scientific.com
Confidentiality Notice: This electronic transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

-----Original Message-----
From: Gary Young
Sent: Tuesday, October 30, 2007 5:28 PM
To: Doug Nickols
Subject: RE: CD4 update

Item 1:



HIGHLY CONFIDENTIAL

DR00051241

George had two cuvettes made. One with the port from the side and one with the port from the bottom. The only one he has tested is the side port design. Testing of the bottom port design should only take two or three days. When the testing takes place will depend on items 2 and 3.

Item 2:

George cannot give me a date on this. It's too early in the testing. If we implement it, it will require a major change to a PCB. To me, this would imply two or three weeks including redesign, fabrication, firmware, and testing.

Item 3:

This will require adding one or two General valves, plumbing changes, and deck mods. I estimate one week to fab and test.

One other item I failed to mention earlier is a problem George thinks is a reflected light issue inside the flowcell area. He's had William remove the optichead and add a mask to he flowcell on the CD4 PMT side. William has completed this task and realigned it. George is working on it again. The results from test have yet to be determined due to a drift now being seen in several channels. Cause of the drift is unknown at this time.

Gary

-----Original Message-----
From: Doug Nickols
Sent: Tuesday, October 30, 2007 3:58 PM
To: Gary Young
Subject: RE: CD4 update

When will testing be conclusive and changes firm. Got to have a realistic date. We're on the line now and must have results very quickly.
Doug

-----Original Message-----
From: "Gary Young"
To: "Doug Nickols"
Sent: 10/30/2007 3:50 PM
Subject: CD4 update

10-30-2007

1. George has completed the installation and modifications to the new CD4 lower cuvette. Modifications had to be made to get the Ultrasonic sensor to work.
The air gaps are now consistent and don't break or close down as in the old design.

HIGHLY CONFIDENTIAL

DR00051242

2. George has temporarily patched in a micro-stepping driver board for driving the injector. He has gone from half stepping the motor to eight stepping it. This should reduce the flow pulsations. This modification shows a moderate improvement in the CD4 super wide channel.

3. George has experimented with changing the fluid from sheath to diluent during the CD4 measurement. This test has demonstarted a marked improvement in the channel width and signal profiles (single sharp peak) on the extinction signal and reduction in the width of the signal from the super wide angle detection. This indicates there is an index of refraction issue between the two fluids.

As I know more, I'll send it to you.

Gary Young

HIGHLY CONFIDENTIAL

33

**From:** George Chappell
**Sent:** 11/19/2007 6:33:34 PM
**To:** Peter Hansen (phansen@pointcare.net); Peter Hansen (ter.hansen@tmo.blackberry.net)
**CC:**
**Subject:** CD4

Hello Peter,
Please examine these data and tell me if I am on the right track. I have been using the times, speeds and volumes that Amy gave me and have been working on the mechanics and flow characteristics of the system to give me reliability and repeatability. I have incorporated the ultrasonic sensor into the mixing block and rearranged the plumbing such that the optic sensor for the accelerent and the ultrasonic sensor for the gold reagent are reliable. I also found that matching the sheath reagent to the reagent used to dilute the sample eliminates the signals that we thought were unlysed red cells. I was still having problems getting good separation between the CD4 negative and CD4 positive lymphs. That is why I started looking at the incubation time and temperature. I spent some time trying to eliminate stray light paths and reflections in the optical head, but found that once they were eliminated the CD4 positive signal was also gone. After you look at the data, we need to get together and decide how to proceed. I think that we are very close to having a system that will work.

GDC

Attachment: FCS_Study.ZIP
Attachment: Incubation_Study.pdf
Attachment: Time_And_Temp_Study.pdf

HIGHLY CONFIDENTIAL


Young
Exhibit
18
KdK 4908

DR00044803

# Exhibit G

# Drew Scientific
# Marketing Plan
# July 05
# Updated July06 Rev1
# Updated March 07 Rev2

HIGHLY CONFIDENTIAL

# *1.0 Summary*

The following report will detail our initial business plan at the start of the July 05-June 06 business plan for Drew Scientific. The plan will be updated yearly at this time or as needed based on business conditions.

**All information in this report is confidential and should not be copied or reproduced.**

HIGHLY CONFIDENTIAL

# *2.0 The Enterprise*

Drew Scientific is a wholly owned subsidiary of Escalon Medical. The company is currently based in three separate offices in Dallas TX, Oxford CT and Barrow UK the core business is in the manufacturer and sale of In Vitro Diagnostic (IVD) equipment and supplies in both the Veterinary and Human sectors. The company objective is to become a quality manufacturer of IVD products that will function in both fields.

At the end of the fiscal year June 2005 there were 108 employees who generated $10.7 million dollars. This equates to approximately $97,000 per employee which is below industry average.

**Update -001 July 06**

At the end of fiscal year June 2006 Drew reach sales of $14.468 million with total employee number at 106. Total sales per employee were $136,000 a $40,000 increase over 2005. Total margin at standard for the same period was $7.1 million equating to a 49% margin. This the first full year of data tracking these items and is drawn from the monthly sales report.

**Update- 002 March 07**

Sales to date have been $8,031 this includes an instrument credit of nearly $330k in reversed Trilogy sales. Total Margin dollars for the same period $4.2 million equating to a total margin of 52% at standard. Total employee head count is not certain at this time but is estimated to be around 90.

## 2.1 Image Objectives

Drew Scientific has suffered over the last few years due mainly in part to a lack of operating cash. This resulted in poor product quality and little to no investment in new product development or marketing. We have made initial investments in expanding the sales force and we look to develop our distributor relationships. In addition we will actively market the Drew brand and look to expand our product offering and mix.

Update-001 July 06

Some improvement has been made towards product quality and we are slowly converting distributors back into the mix. We have had a difficult time in securing qualified vet distributors and the business as whole needs to be reevaluated.

Update- 002 March 07

Continued improvement in distributor relationships despite lack of new product releases.

HIGHLY CONFIDENTIAL

US and ROW are primed and ready for new products to improve our product offering and increase sales. Some instability experienced in vet and research customers as we made the transition from CT to Dallas these issues are slowly being worked on and additional training of the Customer Service staff will continue.

## 2.2 SWOT

Drew has a number of strengths that should help us to achieve significant growth. These include;

Patented technology with respect to 5-part diff measurement principles in both the Vet and Human market.

A new and motivated sales force with a broad array of industry knowledge.

Fairly widespread distributor network worldwide.

Good reputation for A1C testing which is highly profitable.

Our limitations include;

Poor quality of produced systems.

Small organization compared to other players in the market.

Older product line which needs to be revamped.

Update 001 July 06

These SWOT items still remain in place today with little change.

## 2.3 The Future

There are a number of actions we would like to take to improve our competitive position in the future.

We intend to expand our distributor networks in the US.

In addition to our current products we look to augment our product offering by adding chemistry and immuno diagnostics to both the human and vet market.

HIGHLY CONFIDENTIAL

We are looking to add new OEM products for the 3-part hematology market.

We expect to launch a new replacement for the HB gold system by Medica this year.

We are looking to improve our marketing and branding of Drew Scientific.

Update 001 July 06

We have begun to add key distributors on the US medical side however we have not been able to make any significant inroads on the vet side.

3 part OEM will be released within the next few months for ROW sales

DS360 project has no end in sight

We have released new marketing material for our Hearted line including a new brochure and CD.

HIGHLY CONFIDENTIAL

# 3.0 Market Description

We will promote our products in two distinct markets. The veterinary field and the human market.

The veterinary field will be broken into two groups:

**The research market**- in this market we will continue our strong presence and continue selling via our referral network

**The veterinary office lab**- we will look to sell via direct sales where applicable and thru distribution in order to improve coverage.

**The POL and Small Hospital Labs**. The human field will concentrate in the POL and small rural hospital settings. We will sell via small regional distributors and with larger distributors on a nationwide basis. The two main products we will focus on in this market are our hematology products and our A1C testing products.

Update July 06

We continue to sell into the above mentioned markets

## 3.1 Environment

Technology is having a significant impact on the construction of medical equipment. Time to market for new equipment is being reduced along with the manufacturing costs to produce them. As a result, system improvements are being completed quickly causing major investments in R&D.

We will need to explore ways in which we can lower costs along with improving our development cycle time.

## 3.2 Target Market(s)

We will focus on three primary market segments with a minor focus on two others:

The first market is the veterinarian and research market. This market is attractive because there are relatively few players in the market and we are one of only three companies who have 5-part unit that the vets can afford. We will look to build our product offering in this market to attract a wider selection of distributors. In the research market we will

HIGHLY CONFIDENTIAL

continue selling our unique system qualities as the dominant system for mouse testing worldwide.

The second market is the human hematology field. We have one of the few 5-part units available that is not with a major competitor. We provide an alternative to the smaller distributors who cannot or will not work with the big suppliers. We need to push the Excell-22 abroad and the Excell-16 in the US. This market will also benefit from obtaining a low cost 3-part unit that we can sell in the international market.

The third market is for A1C testing. This is a market that we have a good solid base of business. We expect that the new project X will provide us with some good potential next year but until then we need to lower our production costs on the DS5 and provide our distributors with an upgrade option from the HB gold to project X.

The OEM business is the smallest portion of our business with the smallest margins as well. We expect that the Bayer contract will not be extended which will result in a loss of 33K per month in instruments sales. An effort should be made to take on the existing Bayer business and if this is not feasible we should look to work with the regional Bayer branches to maintain our business. Primus is a competitor of ours in the A1C market and the project has never had wide acceptance at Drew. Financial problems within Primus make it difficult to predict what will happen in the future. We should look to decrease our dependency on these OEM agreements and augment our own target markets. Short term this will have a negative affect on the budget but long term we will be able to focus our R&D resources on our key markets.

Update July 06

Vet and Research testing market we have continued our strong growth in research testing. However, since no significant growth has occurred in the vet office testing market we will retrench around that market and look to protect our base business and target only high volume vet labs that can benefit from our unique technology.

Human Hematology- we are continuing to place the entire product line throughout the world and have plans to launch the new D3 within the next 3 months. We are also looking at pursuing OEM agreements for 22. Reduced cost version of the 22 will not be released for sale until Sept 06.

A1c Testing despite significant delays in new product offerings we have been able to sustain our level of A1C Testing worldwide. New product offerings must arrive in order to prevent consumable erosion from both a margin and volume standpoint.

OEM business continues to decline as expected on the Bayer side while Primus although doing well remains unstable as orders are quarter to quarter and the system is approaching obsolescence.

HIGHLY CONFIDENTIAL

Chemistry business we have entered into a new market for Drew with some limited success. The unit appears to be well received but delays in 510k submission have resulted in delayed launch of the product in the US.

## 3.3 Prospect Description

Our products are sold worldwide and require an extensive use of distributors in order to reach our target markets. We have in place a good number of distributors in the international market but we need to develop distributors in the US. The development of key distributors in both the vet and human markets within the US are key to our continued success. The distributors will require a good deal of handholding in the near future in order for them to be comfortable with selling the benefits of our systems.

Update July 06

Building and improving our distribution network continues to be one of our key goals as this will improve both the image of Drew as well as increase and improve sales volume and margin.

## 3.3.1 Size

Boston Biomedical Consultants estimate that the entire global market for human IVD testing stands around 21 billion dollars. While the veterinary market stands about 1 billion dollars.

We compete on the human side in the hematology and diabetes testing portion of this market.
Hematology accounts for $1.7 billion while diabetes testing accounts for $2.6 billion of the global IVD testing. Other industry estimates have this figure at twice this number around $5 Billion. In hematology the growth will be in the area of 7% while diabetic testing is expected to grow at a rate of 12%.

In the vet market we are selling in the hematology market and to a much lesser extent in the chemistry market. Hematology accounts for about $158 million of the total market while chemistry accounts for $193 million.

Update July 06

The chemistry Immuno-chemistry and coag markets are the largest segment of all the markets in diagnostics and will be targeting the smaller users of this market with the Trilogy test system.

HIGHLY CONFIDENTIAL

## 3.3.2 Alternatives

Our customers have a wide range of suppliers who are capable of solving their problems. Drew must show to the customer that we are technically superior to our competitors or that our products provide more value from a total product offering. This will be a challenge in the near future as many of the products we offer are using much older technology that our competitors.

# 3.4 The Competition

In the human hematology market there are four key players in the market. They are Abbott, Beckman Coulter, Sysmex and Bayer. These four players account for the lion's share of the market with smaller players such as Drew accounting for the last 25% of the market. On a yearly basis we account for less than 1% of the total market. We have seen evidence of some new players within this field who could threaten our small market share.

The diabetic market is composed of several different markets but we are specifically involved in the A1C testing. We have several players in this market with the major players being Bayer, Tosoh, and Primus. Here again we have a very small share of the market and we see new players such as Metrika trying gain market share by simplifying the test so it can be run in the Dr's offices.

With the veterinary field we have several competitors. The three major players are Abaxis, Heska and Idexx. We have seen no less than 3-4 new competitors trying to enter into this field over the last 6 months. We currently have 2-3% market share in this field mostly from the results of Bob Canada.

All of these markets are coming under pricing and technology threats that need to be addressed quickly.

Update July 06

Clearly the addition of the Trilogy chemistry system has given Drew an added breath of product in the US and once cleared will open up and improve our sales in the hematology line by offering bundled product offering

DR00031627

# *4.0 Strategy*

## 4.1 Products/Services

We currently offer both a 3-part and 5-part hematology unit to the human market. The 3-part unit is currently much older than the competitors' instrumentation. We plan on developing a lower cost unit with new features to introduce in the first part of 2006. We estimate that the new unit would have a life of 5 years and that we could sell approximately 1200 unit during the 5 years. With the current system we expect to sell less than 15 units internationally. We expect to have positive growth from the Evolution in the US only and expect to sell 50 units in the first year.

The 5-part system will have a price reduction towards the beginning of 2006 and we expect that this will enable us to retain our margins even with the declining price of 5-part units worldwide. Total units for the year are expected to be at 144.

In the diabetes business we expect that the HBGold business will collapse in the next 12 months. We are developing plans to lock up our customer bases so that they are not lost prior to the launch of project X. The DS5 business will have about 15 months of continued strong sales but we cannot expect that the business will last much beyond that. We will explore ways of increasing market share so that the installed base will carry us until a new system is developed.

In the vet market we will look to expand our superior 5-part system. The system is currently a stable product and we will look to educate the end user as to the benefits of using the Hemavet for their practice.

Update July 06

**Human Hematology total instrument sales for 2006 where as follows:**

**ROW**

Excell 18 total unit 06  37 units
Excell 22 total units 06 57 units

**US**
Excel 16 total units 06 11 units
Evolution total units 06 10 units
Excell 22 total unit 06   11 units

We exceed our number of units forecasted in Excell 18 and 16's but missed our numbers

DR00031628

on the 22's and Evolutions. The 22's had been a major portion of our budgeted sales in 06 which it had been expected to improve with the launch of the 2280 this however was delayed over 8 months and no units have been delivered to date.

Evolution lagged as well due to delay in product development. First Evolutions did not ship until Feb 06.

**A1C**

Total HBGold instruments sold 20 units 06
Total DS5
Row 157 units
US 11 units

Gold units continue on the decline. However we had a resurge in the DS5 that was not expected by marketing into markets that do not have issues with labor costs. This has enabled us to sell this product despite the manual nature of the unit. This does, however, impact our US customers who are expecting user friendly systems.

**Hemavet**

Total instrument sales

Total units including ROW, Vet and Research- 81 units
Total 1700 system $30K sales very high end research 7 units

Hemavet sales while strong in the research and ROW did not exceed our expected forecast in the vet field. we are taking corrective action in this area of the sales force.

**Trilogy**

Total sales for 06 9 units as a product launch.

Update March 07

Hematology

Sales to date

ROW
Excell 18  dropped off as expected 4 units total although an order is expected for 20 in April
Excell 22/2280  25 units
D3 has begun to be sold in the ROW and to date we have sales of 25 units with orders for 25 in April and several tenders which would exceed 100 units in the first partial year of sales.

HIGHLY CONFIDENTIAL

US
Evolution 27 units shipped to date with commitments from Mckesseon and Immulab
driving the business

Excell22/2280 4 units to date

A1C

Sales are continued strong on the DS5 total unit sales of 76 units, sales have dropped off
from last year and is to be expected since the unit has been on the market since 1993.

HbGold sales are non-existent.

**Trilogy**

Due to fda issues the majority of the units sold in 06 needed to be returned creating a
huge credit and inventory adjustment, although we did have 3 sales to research customers
in 07.

## 4.1.1 Brand Names

Drew's image is disjointed, and not classy. Customers (End users and Distributors)
don't have a "desire" to acquire a Drew Scientific unit. Prior Corporate acquisitions
were never fully incorporated. Customers and Distributors are confused. Escalon
acquisition needs to be well explained and the opportunity to build the Drew brand
must be taken.

We will continue to fully incorporate the image of Drew as an Escalon subsidiary.
Our focus will be on the Drew brand and we will look to eliminate all of the former
trappings of MWI and CDC. These names are synonymous with poorly run
companies at best and out right fraud in some of the worst cases.

Our image must be restored and will accomplish this by presenting a professional
business appearance in all our business dealings. We also we look to standardize our
marketing communication plan across all of the three former companies. In order to
achieve this we will need to link and tie together the companies with integrated phone
and email services.

Update July 06

This process continues; all business units have been switched the Escalon server and
all calls for Drew are either answered in Dallas for US and South America customers

and the UK for the ROW.

## 4.1.2 Packaging

Currently our packaging does not contribute to our marketing effort. It is to say the least plain and does not reinforce our branding of the Drew name. We should during the year examine new alternatives to our current packaging methods. We believe that how a product is package is an outward sign of the interior quality.

Update july 06

No progress has been made in this effort as of yet.

## 4.2 Pricing

Market pricing

**Veterinary Market**

Hematology

The Hemavet is currently competitively priced compared to the other 5-part units in the field within the US. We have had heard recently that the Melot unit is currently being sold for less and they are attempting to enter into the US market. This may have a negative effect on our pricing in the US but it will require that we monitor it for a period of time before an answer can be given. The international community is experiencing severe price erosion due to low cost 3-part units. Any new low cost 3-part unit for the human market should also have a potential in the international vet market. This will enable us to test the unit for vet applications prior to launch in the US.

Chemistry
The current price of the Pro-Chem is very competitive however the ease of use offsets this price advantage. Our main liability in this field is the high cost to manufacture our reagents and cuvettes. This prevents us from decreasing our price so that we can make aggressive moves to capture market share. In order to continue in this market we need to develop a new platform which can reduce reagent preparation costs so that we can place pricing pressure on the industry leaders.

**Human Market**

Hematology

HIGHLY CONFIDENTIAL

The hematology line pricing appears to be holding well in the US but is under extreme price pressure in the rest of the world. A low cost 3-part is essential if we are to remain in this market. The 5-part market is also seeing a lowering of prices and we expect so lower cost units to hit the market within the next 6 months. Developments are being made to lower our production costs so that margins can be retained. Short term plan is to continue to base our deals on the entire margin of the deal and capture the reagent stream in order to improve our gross margins.

Diabetes

The DS5 capital investment is a barrier to increased sales. We need to provide our instruments to the field at a lower price so we can recognize the reagent stream.

Our instruments (pumps) are not being placed due to high capital investments. This places in jeopardy our continued profitable expansion of our reagent base. The value of a consistent reagent business can not be ignored as it is a residual revenue stream for a minimum of 5 years. We must look to increase our instrument market share in the next 12 months so that we can capitalize on that installed base when our new products come on board. It takes far less effort to upgrade an existing customer than it does to close a new one.

Update July 06

We are still experience price pressures in our capital equipment this is generally attributable to the fact that our material costs continue to remain high we have had minimal cost reductions in the 2280 instrument. The goal of the 2280 was to reduce costs on the system by $1200 total cost reductions was only half that at $600.
The Ds5 standard cost has nearly increased by $1,000 in the last 2 years causing our margins to shrink even further and forcing us pull out of lower volume end users.
The Trilogy appears to be well priced at $38k to distributors and the reagents will provide us with 60% plus margin to distributors and appears to be competitive as well.

## 4.3 Distribution

Our products will be sold through distribution.

In the US our distribution channels need to be developed. We expect to add no less than 15 new distributors in the human market this year. It is expected that each one of these distributors will have a sales organization of at least 5 sales reps. As you can see if these goals are realized we will have a significantly greater sales force in the US over the prior year. Much of our growth for the upcoming year will be tried to these new distributors. We expect that each one of our reps will spend a great deal of time with each distributor

educating them and supporting them in the sales cycle. By working with the distributors on a regular basis we will insure that our products are being talked about on a regular basis.

In the international market we will look to continue our relationship with existing distributors and look to expand into new territories. Each distributor will be visited at least twice a year to review the business and will allow us to communicate our expectations.

Update July 06

US Distribution has increased but not to our expected levels by the above goals. We have been able to sign on McKesseon corp in the following states Arkansas, Texas, Oklahoma and Mississippi. In these states they have 17 reps along with 3 instrument specialists. This was a tremendous achievement as McKesseon has signed agreement with Beckman and the area manager has instructed his reps to ignore the BC contract and work with us. In addition we added Immulab as mentioned earlier and this agreement is for 36 Evolutions in 06-07. We have also added Kreisers in the northwest but this has not amounted to any sales as of yet. Lastly we have received an order from MSB for 12 Trilogy systems over the next 12 months.

Update March 07

In the last quarter we have made significant strides in adding a large number of distributors in the US. Jan 07 marked the signing of IMCO along with the over 100 distributors that they have as part of the cooperative. We will be attending their yearly meeting in May 07 and they are ready to move with our chemistry and hematology product lines. We will be the sole provider of this equipment to IMCO.

HIGHLY CONFIDENTIAL

## 4.4 Promotion

In order to maximize our sales this year we will look to promote our products with both a push and pull strategy.

The push strategy will be employed on our distributors. We will get them excited about selling the Drew product by incentivizing their reps. In the US we will look to spiff the distributor reps so that they lead with our product.

We will employ the pull strategy by starting an integrated marketing communications plan. We will look to publish reference articles on our products. Trade journal ads will be placed to raise the awareness of Drew as a company and supplier of diagnostic equipment.

## 4.4.1 Product/Service Image

We wish to improve Drew's image from its current state as a poorly run company to a company that is making rapid changes. We want to be perceived as a small company that can make new and novel ideas happen in a short period of time. It is imperative that we get customers to feel that exciting things are on the horizon with Drew. In this way we can get them to invest in our future and theirs.

Update July 07

In the last year we have made significant inroads in bringing new ideas into the company. In summary we have added 3 new products that will be ready for sale in the upcoming year.

D3
2280 CD4
Trilogy

Summer of 2007
DS360

## 4.4.2 Publicity

In order to promote our products we will look to establish a marketing

DR00031634

communications budget. This in the past has been limited and we need to be addressed in order to improve Drew's image. We will look to sponsor industry leaders so that they may speak about our products at regional trade shows. Print ads will also be used to communicate new product offerings. We will also look to develop CD mailers that provide interactive demos of our equipment.

## 4.4.3 Advertising

Our advertising plan is currently in development and we have a proposal from Lepoidevin group. This proposal will be reviewed and recommendations will be incorporated into this plan.

Update July 06

The Lepoidevin group was hired in 06 to form a marketing plan for the Hemavet product line it was anticipated that we would be able to have 3 territory managers that along with an integrated marketing plan that we could generate an extra $2million in sales on the vet line. The marketing proposal included a new brochure and cd along with corresponding trade journal advertisements. The total budget for the year was $100k which was on target. We however did not achieve the increased sales and the marketing plan was cancelled.

Update March 07
We have released a new brochure for the 2280 and D3 with minimal cost using Bluepole in the UK. The brochures look ok but lack the polish of having a high power marketing firm they do however provide the needed inflammation.

## 4.5 Customer Support

Our support structure needs to be reviewed and a service plan must be developed. We currently offer 1 year warranty on our products with service being performed on a direct and also thru our distributors.

Our international customers are almost exclusively serviced by our distributors. As such we need to provide our distributors with timely support in order for them to properly support our customer base. Currently we have one service engineer covering the entire world exclusive of the US. in anticipation of increased workflow we are currently recruiting an additional engineer. This additional engineer should be able to cover all of our needs for the next year. Our distributors as a result should expect to see greater support from us by the middle of this year. Replacement parts is an area of concern. We need to have a proper supply of spare parts in Barrow so that replacement parts can be sent out same day if needed.

HIGHLY CONFIDENTIAL

The US service group is larger and will be called upon to do great deal of work in the next 12 months. We have many distributors being added that do not service our equipment. As a result we will be called upon to provide the service. In the short term we should look to employ third party service groups to fill the gaps we have. In the long term we will need to develop our service group so that we can control our costs and provide better customer service.

Update July 06

We have a need to place a leader who can pull the entire service group together. We have reviewed external candidates but will offer the WW sales manager position to Jay Robinson. He will relocate to Dallas in Dec 06.

Update March 07

The move to have Jay in the US has begun to payoff dividends. We have removed 2 service reps in Dallas who did not have the necessary skills. To replace these reps we have added Steve Siedel who is a 20-year veteran with Abbott hematology systems. We have also added a Med tech to answer calls in Dallas. The next 3 months will be spent training this group on all of our products.

HIGHLY CONFIDENTIAL

# *5.0 Organization*

## 5.1 Objectives

Near Term (next 12 months)

Introduce the Evolution
Increase our distributors in the US by adding 15-20 new distributors
Introduce a new low cost 3-part unit
Increase market awareness by implementing a marketing communications plan
Test market a new chemistry analyzer
Grow sales from 10.7 million to 15.5 million a 49% increase

Long Term
Establish Drew as a key player in the diagnostic industry
Increase our product range and offering
Triple Drew's current market share
Grow Drew into a 45-50 million dollar a year company

Update July 06

As mentioned we drove top line sales to $14 million in 06 which was short of our desired goals. Evolution has been released but we still have several products that need to launched. Long term goals remain the same.

## 5.2 Organization Factors

Our sales structure is flat and is comprised of the following:

| | |
|---|---|
| Jeff Appleyard | European research and Marketing Manager |
| Roger Bourree | Central & South America distributors and product development |
| Andrew Buck | Sales Far East |
| Robert Canada | USA Research (Hemavet) |
| Tom Drew | East Coast Vet products |
| Chrinstina Lampton | Central Coast Vet products |
| Weldon Eberhart | West Coast Vet products |
| Sam Hill | West Coast Hematology |

HIGHLY CONFIDENTIAL

David McCormick  M. East, Africa and India Sales
Simon Rowe   Eastern Europe
Open Position   East Coast US Hematology
Frank Matuszak   VP of Sales and Marketing

Updated July 06

During the year we reduced our vet force and removed Weldon Eberhart and Tom Drew due to poor performance. Additionally we lost Jeff Appleyard to Bayer which was a big loss for the sales team. We have elected not to find a replacement until we have enough products to warrant the investment in a full time marketing person. Additionally we have added 3 people to our technical staff to support and develop Trilogy.

Update March 07

In January we further reduced our sales force and removed Dave Mac for poor performance. Continued investment in the service department will take priority over sales force increases for if we cannot service our product we will be unable to increase sales due to poor customer service.

## 5.2.1 Marketing

Currently our total marketing group is comprised of Jeff Appleyard who is the marketing manager. In addition to Jeff we have a tradeshow coordinator Tammy who is part time. Tammy is responsible for coordinating all of the logistics with the tradeshow. Additional resources are needed in this area. The LePoidevin group may be a potential source for creative help in this area. We will also look to use some of the resources at Escalon. Jeneen Cunnigham has had some marketing experience and we will look to use her skills in this area.

Update July 06

All of the above marketing support has left the company and have not been replaced until new products are available. Tradeshows are being coordinated by myself and Bob Canada. Major shows for the human market this year will be AACC and Medica. We will also attend local shows as needed that each sales rep will schedule as needed. The vet group will attend NAVC, Western Vet, ACVIM and ALAS as well as attend other shows by having our equipment in the booth and supporting the distributor with an instrument and a representative. Most other shows will be attended with Dan Scott as they attend all of the major and minor vet shows.

## 5.2.2 Sales

HIGHLY CONFIDENTIAL                 DR00031638

The range of experiences of the sales team is very varied. Training needs for each individual need to be assessed. Robert Canada is probably the most developed and experienced sales person. We have recently added a few sales people in the US. They have a good range of skills and they will be able to adapt easily into the organization.

Continued training will be a key to our success. The Vet sales team will have a meeting in August which will give the technical skills they need to sell with our distributors. We expect to have a full sales meeting in October which will cover product training as well as sales training.

All of our sales people have and are aware of the commission plan. The plans in the past were not a source of motivation since many times payments could not be made due to financial constraints.

Update July 06

With the current staff changes we now have an experienced group and no novices. Sam, Simon and Andrew are all running and moving their territories to new growth levels. Christina is being used to hold on to our base business in the vet side and doing a good job as well. Bob as usually continues to surpass past sales years.

Update March 07

The entire group attended a WW sales and service meeting in Dallas the meeting went well and we will strive to have a meeting once a year. Suggestions for the next meeting were noted and will be put in place for the next meeting. We talked about many new products on the way and it is believed that the new products are imperative to our growth.

HIGHLY CONFIDENTIAL

# *6.0 Key Issues*

# *7.0 Financial Projections*

# *8.0 Charts*

Projections to be included from budget templates

HIGHLY CONFIDENTIAL

DR00031640