UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

DREW SCIENTIFIC, INC.,

    Plaintiff,

    -v-

POINTCARE TECHNOLOGIES, INC.,

    Defendant.
-------------------------------------------------------x

DECLARATION OF
FRANCIS MATUSZAK
IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

1. This is the second sworn statement that I have filed on this Motion and its purpose is to address some of the statements with respect to marketing made by Petra Krauledat in ¶¶ 43-54 of her Affidavit dated April 25, 2008. My first is dated April 15, 2008, and I have also given testimony, so I will try to restrict this Declaration to the new issues being injected by Ms. Krauledat.

2. Ms. Krauledat makes the statement (¶ 43) that Drew never provided PointCare with a marketing plan for territories in which Drew is the "Market Leader." I have answered this assertion in the past, and I am surprised she is still making it since it is provably untrue. I have given PointCare our marketing information on at least five separate occasions:

  (i)  On April 28, 2006 during contract negotiations (Exhibit 1 hereto);

  (ii)  during sales meetings in January 2007, I discussed our sales plans in each territory with my counterpart, Dan O'Connor;

  (iii)  via e-mail to Petra on March 18, 2007 (Exhibit 2 hereto);

  (iv)  during merger negotiations on April 24, 2007, I discussed our sales plans in each territory with Petra; and

  (v)  via e-mail to Hansen on May 14, 2007 (Exhibit 3 hereto), which we followed with a purchase order for 7 NP machines on July 2, 2007.

Ms. Krauledat's interpretation of Mr. DePiano's statements in his letter of October 3, 2007 as some kind of confirmation of her unjustified assertion is unbelievable. Mr. DePiano only promised her another comprehensive plan after she advised us of the manufacturing schedule for the NP. She never did, and she never even honored our Purchase Orders which had been previously accepted. At no time did DePiano agree that we had not furnished sales plans; indeed, he acknowledged that the information given us in connection with the merger negotiations, which is the same as I gave them, was the equivalent of a sales plan.

3.     Dr. Krauledat did not furnish us with significant information about tenders in Russia and Malaysia as she says she did in ¶ 44. I heard nothing from her in August 2006, December 2006, January 2007 or the Spring of 2007 when she claims she told me, at various times, about various tenders. What I do know is that I asked Dr. Krauledat for any information on potential tenders during merger negotiations in April 2007 and Dr. Krauledat again in June 2007, after Dan O'Connor left PointCare. On both occasions, her response was in the negative. She did tell us about a Russian tender in October 2007, but did not give us any further details that would help our distributor find it despite several requests I made to her. On the basis of the discovery I have reviewed, I believe she was in possession of information which would have been helpful that she chose not to share with us, even though she was contractually bound to do so.

4.     I did speak to Andrew Buck, Drew's Sales Manager in Southeast Asia, who is mentioned in ¶ 46. He recalls Dr. Krauledat visiting our Indian distributor's booth at an Indian trade show in December 2006, but denies that she mentioned a Malaysian tender to him. Nor did he talk to her about the Drew Malaysian distributors.

5.    In response to ¶ 51, it is nonsense. Dr. Krauledat was always aware of our view that she had no right to contact distributors in our territories, including Russia, and she repeatedly assured us, as late as November 2007, that she would not do so.

6.    We did receive several leads from Dan O'Connor's replacement, Linsey Rockingham, in August 2007 (¶ 52), and we did follow up on them to the extent we could. However, there was no product available at the time. Now that there is, PointCare refuses to honor our purchase orders. The suggestion that my e-mail could be interpreted as our putting on a show of support without actually intending to make a sale is offensive. Were it not for PointCare's opposition, we would have made many sales of the NP.

7.    The statements made by Dr. Krauledat in ¶ 53 do not accord with my understanding of the Agreement. We could both sell to NGOs wherever they were located, but installation, service and supply contracts need to be referred to the Market Leader in the territory where the NGO was located.

8.    I was not asked about my exchange of e-mails with Sam Hill, which is the subject of ¶ 54 of the Krauledat Affidavit. Suffice it to say that we were talking about Puerto Rico, which is a Drew territory.

9.    I spoke to Simon Rowe, another one of Drew's salesmen, about the statements made by Dr. Krauledat in ¶ 58. He assures me that he never spoke to Dr. Krauledat on this subject, but received the information from Block Scientific as I recounted at my deposition.

10.    I have absolutely no idea what Dr. Krauledat is saying in ¶¶ 59 and 60. I never talked to Dan O'Connor about replacing our Russian distributor or traveling to Russia with him. Further, Dr. Krauledat never asked me about this supposed agreement when I contacted her after Mr. O'Connor left.

11.    Since Dr. Krauledat makes much of my communications with a PointCare shareholder, Mr. O'Connor, most of which Mr. O'Connor initiated, after he left PointCare, I want to make clear that much of the information he provided to me I already knew, was publicly available, or was otherwise non-confidential. At my deposition, I recalled only one instance where he may have shared confidential PointCare financial information to me and I related that information to Drew's internal counsel. There was no "stealing of customers" or "illicit attempts" to obtain confidential information and the suggestion otherwise is not at all consistent with my testimony. I find the reference to the collapse of the Abbotts Lab transaction particularly curious since Mr. O'Connor related it to me before his departure from Pointcare and this fact was well known.

12.    Dr. Krauledat also makes much of the fact that after PointCare took its intractable stance, I considered alternatives to HT development. As I testified, there are other sources of gold reagents on the market and the CD4 assay does not appear to be proprietary, at least according to the U.S. Patent Office. Given PointCare's non-disclosures about the rejection of the CD4 assay by the Patent Office, I thought it prudent to check its other proprietary claims as well.

Middletown, New Jersey
Dated:  April 30, 2008


FRANCIS MATUSZAK

DM1\1328157.1

# EXHIBIT 1

Redacted

From: Harry Rimmer
Sent: Wednesday, April 26, 2006 9:43 PM
To: 'Petra Krauledat'
Cc: Richard J. DePiano; 'Frank Matuszak'; 'Roger Bourree'
Subject: Draft Agreement and reagent pricing

Petra, here is the first draft of the agreement. It has been reviewed by Rich and myself. We obviously need to insert the product definitions and timescales etc. There is also some confusion about the sourcing of the NP instrument - so we were unsure how to include it in all aspects of the agreement. Let me have your comments when it is convenient.
I have also attached an explanation of the reagent pricing which Drew needs to meet the margin target.
I'll phone you tomorrow to understand your co-marketing ideas
Regards,
Harry

Attachment: PointCare02 (4).DOC
Attachment: PCTI reagent price.doc

HIGHLY CONFIDENTIAL

DRAFT—April 26, 2006—FOR PURPOSES OF DISCUSSION ONLY

## Distribution and Co-Marketing Agreement

This Agreement, together with **Annexes 1 to 6** attached hereto and incorporated by reference ("**Agreement**") is made this _ **day of May, 2006** by and between PointCare Technologies, Inc., a company organized and existing under the laws of ------, with offices at ----------------------------------- ("**POINTCARE**"), and **DREW SCIENTIFIC INC.**, a company organized and existing under the laws of Texas, with offices at 4230 Shilling Way, Dallas, Texas, USA ("**DREW**"). POINTCARE and DREW are sometimes hereinafter collectively referred to as the "Parties".

### RECITALS

**WHEREAS,** POINTCARE develops, manufactures, and sells medical diagnostics that enable near care patient testing to be effectively performed, including POINTCARE'S proprietary CD4 Lymphocyte enumeration assay, CD4sure™.

**WHEREAS,** DREW, among other things, develops, manufactures, and sells *in vitro* diagnostic instrumentation platforms, including the Excell 22™, and associated consumables.

**NOW THEREFORE,** in consideration of the mutual promises and conditions herein contained, the Parties agree as follows:

### Art. 1. Diagnostic Platform Development

**1.1** DREW will agree to modify its current Excell 22™ hematology platform to accomodate POINTCARE'S proprietary CD4 Lymphocyte enumeration assay, CD4sure™. For purposes of this Agreement, this platform will be referenced as the 'high throughput' (HT) platform. A second platform, which will be jointly developed, collaborating with a mutually agreed upon third party consultant, will be referenced as the 'near patient ' (NP) platform. Among other things, a description of the two (2) diagnostic instrumentation platforms ('platforms'), as well as : (a) platform and assay

1

specifications ; (b)  development responsibilities ; (c)  allocation of development

costs ; (d) development timetables ; (e) performance parameters of the present

CD4sure™assay and a newly developed CD4 lymphocyte enumeration assay, as

well as other assay-related performance standards ; (f) performance parameters of

the instrumentation platforms, as well as other platform-related performance

standards ; (g) responsibility for transfer of the developed platforms, the present

CD4sure™ assay, and the newly developed CD4 lymphocyte enumeration assay into

manufacturing ; and (h) responsibility for incurred costs, as well as future costs, are

set forth in *Annex 1* ("Specifications and Development Timelines for the DREW HT

Platform and the POINTCARE CD4sure™ Lymphocyte Enumeration Assay Kit ") and

*Annex 2* ("Specifications and Development Timelines for the DREW NP Platform and

the reformulated CD4 Lymphocyte Enumeration Assay Kit "), which are hereby

included in this Agreement by reference.

**1.2**    **Diagnostic Instrumentation Platform & CD4 Lymphocyte Enumeration**
           **Assay Kit Modifications.**

   **1.2.1**  Except as otherwise provided in this Agreement, no instrumentation

platform delivered by DREW hereunder shall be modified or deviate from the

agreed upon specifications noted in *Annex 1* and/or *Annex 2*, except as may

be jointly agreed upon by the Parties in writing.  If an instrumentation platform

is modified, the cost of developing the modified platform shall be allocated as

stated in *Annex 1* and/or *Annex 2*, as applicable.  Any instrumentation

platform unit price adjustment resulting from an agreed upon modification shall

be negotiated in good faith by the Parties and shall be no more than DREW's

actual development and manufacturing costs.  Any modification of the

Platforms under this Article 1 shall be properly documented in writing and the

corresponding *Annex*  shall be modified accordingly.

2

HIGHLY CONFIDENTIAL

**1.2.2** Except as otherwise provided in this Agreement, no CD4 Lymphocyte Enumeration Assay Kit delivered by POINTCARE hereunder shall be modified or deviate from the agreed upon specifications noted in ***Annex 1*** and/or ***Annex 2***, except as may be jointly agreed upon by the Parties in writing. If a CD4 Lymphocyte Enumeration Assay Kit is modified, the cost of developing the modified platform shall be allocated as stated in ***Annex 1*** and/or ***Annex 2***, as applicable. Any CD4 Lymphocyte Enumeration Assay Kit unit price adjustment resulting from an agreed upon modification shall be negotiated in good faith by the Parties and shall be no more than POINTCARE'S actual development and manufacturing costs. Any modification of the CD4 Lymphocyte Enumeration Assay Kit under this Article 1 shall be properly documented in writing and the corresponding ***Annex*** shall be modified accordingly.

**1.3    Conformity and Compliance Standards.**

**1.3.1** POINTCARE represents and warrants that its CD4sure™ assay, as well as the modified CD4 assay to be developed, will be manufactured, sold and distributed to DREW pursuant to the terms of this Agreement, will fully conform to all agreed upon specifications, and will fully conform to and comply with all applicable laws, rules and regulations of the United States, including but not limited to relevant provisions of the U.S. Food, Drug and Cosmetic (FD&C) Act and rules, regulations, guidelines and advisories issued pursuant to the FD&C Act. POINTCARE shall be solely responsible for all costs associated with securing any necessary U.S. FDA approvals to market and sell the CD4 Lymphocyte Enumeration assays that will be used and/or developed for use with DREW's diagnostic instrumentation platforms unless otherwise agreed upon in writing by the Parties.

**1.3.2** DREW represents and warrants that any diagnostic instrumentation platform that is developed under this Agreement and/or which will be manufactured, sold and distributed to POINTCARE pursuant to the terms of

3

this Agreement, will fully conform to agreed upon specifications, and will conform to and comply with all applicable laws, rules and regulations of the United States, including but not limited to relevant provisions of the U.S. Food, Drug and Cosmetic (FD&C) Act and rules, regulations, guidelines and advisories issued pursuant to the FD&C Act.    DREW shall be solely responsible for all costs associated with securing U.S. FDA approval to market and sell the diagnostic instrumentation platforms developed under this Agreement unless otherwise agreed upon in writing by the Parties.

**1.3.3** POINTCARE and DREW, at their respective option, may seek regulatory approvals or effect registrations necessary to sell and distribute the assays and the platforms in certain countries that are encompassed in their respective marketing and sales Territories, as defined in **Annex 3**. POINTCARE and Drew agree to act in good faith to support the other Partie's efforts to obtain such approvals or effect such registrations by supplying information in their possession that is necessary for the preparation of submissions to relevant regulatory agencies and by providing consultations through knowledgeable technical representatives upon written request in accordance with the terms set forth in **Annex 3**.

**1.3.4** Within their respective Territories, both Parties to this Agreement shall have the right to appoint any of their respective subsidiaries, affiliates, distributors and/or sub-distributors, to resell or market the products encompassed within this Agreement, consistent with the terms and conditions of this Agreement.

**1.3.5** DREW represents and warrants that it has secured or will secure the necessary International Standards Organization ("ISO") certification for medical devices for the instrumentation platforms developed pursuant to this Agreement.    During the Term of this Agreement, DREW will comply with applicable ISO requirements with respect to the diagnostic instrumentation platforms sold to POINTCARE. DREW shall maintain a device history record for each diagnostic instrumentation platform that it manufactures and sells to

4

POINTCARE and agrees to make such records available to POINTCARE during normal business hours for review upon request.

**1.3.6** POINTCARE and DREW shall cooperate in meeting applicable requirements and the guidelines published by the FDA, ISO and other relevant governmental regulatory agencies.  POINTCARE and DREW shall use their best efforts and work cooperatively to answer specific questions relating to quality assurance that are received from any government or regulatory agency.  In the event that either POINTCARE or DREW receives notice of non-compliance with any applicable government or quasi-government law or regulation, the notified Party shall immediately provide the other Party with written notice of such purported non-compliance.   Each Party shall notify the other Party promptly in writing if it becomes aware of any defect or condition which may render any assay or platform that is a part of this Agreement pursuant to **Annex 1** and/or **2** to be in violation of any applicable law or regulation.

**1.3.7** The Parties agree to label the products manufactured pursuant to this Agreement in compliance with applicable laws and regulations, as well as the terms and conditions contained in **Annex 4** of this Agreement.

## Art. 2. Terms of Purchase and Supply.

**2.1** During the Term of this Agreement and subject to the terms and conditions included in this Agreement, DREW shall purchase the quantities of CD4 test kits for use with the HT and NP instrumentation platforms exclusively from POINTCARE as set forth in **Annex 5**.

**2.2** During the period that this Agreement remains effective and subject to the terms and conditions included in this Agreement, POINTCARE shall purchase the HT [and NP??] instrumentation platforms, as well as any replacement or spare parts for the HT [and NP??] instrumentation platforms, exclusively from DREW for use with POINTCARE's CD4 Lymphocyte Enumeration assay kits as set forth in **Annex 5**.

5

DR00000300

**2.3**    POINTCARE agrees to fill with reasonable promptness, all orders from DREW for its CD4 Lymphocyte Enumeration assay kits that are approved and accepted by POINTCARE.   Upon receipt of an order from DREW, POINTCARE will acknowledge receipt and provide an estimated date of shipment.  At no time during the term of this Agreement shall the period between acceptance of a DREW purchase order and the shipment by POINTCARE of its CD4 Lymphocyte Enumeration assay kits to DREW exceed eight (8) weeks, unless mutually agreed upon by the Parties.  Discuss—what happens in instances of limited inventory—how to prioritize needs of parties.

**2.4**    DREW agrees to fill with reasonable promptness, all orders from POINTCARE for its instrumentation platforms that are approved and accepted by DREW.   Upon receipt of an order from POINTCARE, DREW will acknowledge receipt and provide an estimated date of shipment.  At no time during the term of this Agreement shall the period between acceptance of a POINTCARE purchase order and the shipment by DREW of its instrumentation platforms to POINTCARE exceed eight (8) weeks, unless mutually agreed upon by the Parties.  Delivery terms for spare/replacement parts and other consumables shall be confirmed by DREW upon receipt of a written purchase order from POINTCARE.  DREW will use its best efforts to deliver instrumentation platforms or spare parts purchased hereunder within the delivery terms requested by POINTCARE, subject to the Warranty (Article 3) and other applicable provisions of this Agreement.

**2.5**    The prices that POINTCARE shall pay to DREW for the purchase of DREW's HT [and NP???] instrumentation platforms, as well any spare/replacement parts that are requested, and the price that DREW shall pay to POINTCARE for the purchase of its CD4 Lymphocyte Enumeration assay kits are set forth in ***Annex 5***.  Said costs shall include the cost of proper packaging for shipment per the specifications included in ***Annex 1*** and ***2***.   The Party that orders the product shall be fully responsible for the actual cost of shipping and insurance.  Title to the purchased product(s) and the risk of loss or damage shall shift to the purchaser upon delivery to the purchaser, the purchaser's agent, the purchaser's representative, or a mutually acceptable transport company.

6

**2.6**    Any price adjustments sought by either Party relative to a product or service that is included in this Agreement must be in accordance with the terms and conditions set forth in *Annex 5*.

**2.7**    The payment terms that are applicable to any product or service that is included in this Agreement are included in *Annex 5*.

**2.8**    During the Term of this Agreement, POINTCARE shall not manufacture, market, sell or distribute any instrumentation platform that is competitive with the DREW HT [and NP??] diagnostic instrumentation platforms without DREW'S prior express written agreement.  Further, POINTCARE shall not distribute, market or sell or distribute any HT [or NP??] diagnostic instrumentation platform under any trade name, trademark or logo that is the legal property of DREW without first obtaining DREW's prior written consent.

### Art. 3 Warranty:

**3.1**    POINTCARE hereby represents and warrants to DREW that the CD4 Lymphocyte Enumeration assay kits that it sells or otherwise provides to DREW hereunder will conform to the Product Specifications set forth in *Annexes 1* and *2.* Further, POINTCARE hereby represents and warrants to DREW that any modifications thereto, will be in compliance with all applicable laws and regulations and will be free from defects in material, workmanship and design.  If any POINTCARE CD4 Lymphocyte Enumeration assay kit sold to DREW is recalled by POINTCARE or is otherwise not capable of being legally sold or used with DREW's HT or NP instrumentation platforms through no fault or error on the part of DREW, POINTCARE agrees to promptly replace said CD4 testing kit(s), at its expense (including the cost of shipping and insurance).  DREW agrees to return any CD4 testing kits that it cannot sell for the above noted reasons directly to POINTCARE or its designated agent, at POINTCARE's cost.

**3.2**    DREW hereby represents and warrants to POINTCARE that any DREW HT or NP instrumentation platform and spare/replacement parts sold or otherwise provided

7

to POINTCARE hereunder will conform to the Product Specifications set forth in **Annexes 1** and **2**, as applicable. Further, DREW hereby represents and warrants to POINTCARE that any instrumentation platform or parts modifications will be in compliance with all applicable laws and regulations and will be free from defects in material, workmanship and design. DREW instrumentation platform and parts that are sold or otherwise provided to POINTCARE under this Agreement shall be warranted for a period of fifteen (15) months from the date of shipment from DREW to POINTCARE or for a period of twelve (12) months from the date that the instrumentation platform or part was provided to POINTCARE's customer or end-user, whichever expires first. POINTCARE agrees to secure, maintain and provide to DREW upon request, a certification, signed by a representative of the customer and/or end-user that confirms the date of customer and/or end user receipt.

**3.3**    Neither POINTCARE nor DREW provide the other Party with any other warranties, whether expressed or implied. In no event will DREW be liable to POINTCARE or any other person for direct or indirect, remote or consequential damages related to the incorrect use of its instrumentation platforms, including but not limited to commercial losses and tort claims of any kind.

**3.4**    Notwithstanding any contrary terms in this Agreement, POINTCARE agrees to indemnify, defend and hold DREW harmless from and against any and all losses, claims, actions, costs, expenses and damages, including attorney's fees and expenses, that arise out of a breach of any warranty contained in this Agreement or out of any product liability claim or action that relates to any POINTCARE product sold or otherwise provided pursuant to this Agreement, except to the extent that such loss, claim, action, cost, expense, or damage arises from acts or omissions that are negligent, recklessness or deemed to represent willful misconduct on the part of DREW or its subsidiaries or any of their agents or distributors, or from representations made by DREW or its subsidiaries or any of their agents or distributors beyond those made by POINTCARE. In connection with such indemnifications, DREW agrees to notify POINTCARE of any such claim, pursuant to the Notice provisions of this Agreement, within five (5) business days of receipt of notice by DREW's legal counsel and to cooperate with POINTCARE, at POINTCARE'S expense, in the defense of any such claim.

8

**Art. 4.    Installation, maintenance and repairs of DREW HT [and NP??] Instrumentation Platforms.**

**4.1**    POINTCARE and/or its agents, representatives and/or affiliates, shall be responsible for the installation, set-up, and repair of all DREW HT [and NP??] instrumentation platforms purchased pursuant to this Agreement at all POINTCARE customer or end-user facilities.  POINTCARE also assumes responsibility to provide any needed maintenance service and to provide requested technical support to its customers and end-users relative to the operation, use, care and maintenance of the DREW HT [and NP??] instrumentation platforms.  Unless specifically set forth in **Annex 6** of this Agreement, DREW shall not be responsible for installing or repairing DREW HT [and NP??] instrumentation platforms provided to POINTCARE under this Agreement.  Further, unless specifically noted in **Annex 6**, DREW shall bear no responsibility to provide technical support or training to POINTCARE'S employees, agents, representatives, customers or end-users.

**4.2**    POINTCARE agrees that it shall only use spare/replacement parts purchased from DREW to repair or service any DREW instrumentation platform procured pursuant to this Agreement.  In the event that POINTCARE or its employees, agents, representatives, customers or end-users use parts purchased from a person or entity not related to DREW, without the specific written approval of DREW, any and all warranties, including but not limited to the warranty against material defects and manufacturing flaws, shall be deemed null and void.

**4.3**    DREW does maintain a competent team of technical specialists that are knowledgable concerning its instrumentation platforms. DREW agrees to reasonably consider a request for technical assistance by POINTCARE that is not agreed upon in **Annex 6** and to make a reasonable effort to provide an application/service specialist to support POINTCARE and its customer or end-user pursuant to the relevant reimbursement and support terms contained in **Annex 6**.

10

**3.5**    Notwithstanding any contrary terms in this Agreement, DREW agrees to indemnify, defend and hold harmless POINTCARE from and against any and all losses, claims, actions, costs, expenses and damages, including attorney's fees and expenses, that arise out of a breach of any warranty contained in this Agreement or out of any product liability claim or action that relates to any DREW instrumentation platform sold or otherwise provided pursuant to this Agreement, except to the extent that such loss, claim, action, cost, expense, or damage arises from acts or omissions that are negligent, recklessness or deemed to represent willful misconduct on the part of POINTCARE or its subsidiaries or any of their agents or distributors, or from representations made by POINTCARE or its subsidiaries or any of their agents or distributors beyond those made by DREW relating to the HT [or NP??] instrumentation platforms. In connection with such indemnifications, POINTCARE agrees to notify DREW of any such claim pursuant to the Notice provisions of this Agreement within five (5) business days of receipt of notice by POINTCARE'S legal counsel and to cooperate with DREW, at DREW's expense, in the defense of any such claim.

**3.6**    POINTCARE agrees to procure and maintain product liability and general liability insurances naming DREW as an additional insured, with minimum limits in each case as noted in **Annex 5**. POINTCARE shall, on or before delivery of its CD4 Lymphocyte Enumeration assay kits, furnish DREW with certificates of insurance evidencing the foregoing coverages and limits. Such insurance policies shall not be cancelled or changed without adequate replacement and without providing DREW with thirty (30) day's advance written notice of such replacement.

**3.7**    DREW agrees to procure and maintain product liability and general liability insurances naming POINTCARE as an additional insured, with minimum limits in each case as noted in **Annex 5**. DREW shall, on or before delivery of its HT or NP instrumentation platforms, furnish POINTCARE with certificates of insurance evidencing the foregoing coverages and limits. Such insurance policies shall not be cancelled or changed without adequate replacement and without providing POINTCARE with thirty (30) day's advance written notice of such replacement.

9

HIGHLY CONFIDENTIAL

## Art. 5.    Intellectual property.

**5.1**    All patents, trademarks, trade names, labels and copyrights currently proprietary to POINTCARE ("POINTCARE Intellectual Property") shall remain the exclusive property of POINTCARE.   POINTCARE shall have the exclusive right to all future modifications and additions to POINTCARE'S Intellectual Property, as well as intellectual property developed in the future by POINTCARE provided such modifications, additions, and/or developments are not the result of the direct or indirect involvement or financial assistance of DREW.  DREW shall not have the right to and shall not apply for any patent(s) relating to POINTCARE Intellectual Property that is solely developed by POINTCARE, at its own cost, during the term of this Agreement and thereafter.

**5.2**    All patents, trademarks, trade names, labels and copyrights currently proprietary to DREW ("DREW Intellectual Property") shall remain the exclusive property of DREW. DREW shall have the exclusive right to all future modifications and additions to DREW'S Intellectual Property as well as intellectual property developed by DREW provided such modifications, additions, and/or developments are not the result of the direct or indirect involvement or financial assistance of POINTCARE. POINTCARE shall not have the right to and shall not apply for any patent(s) relating to DREW Intellectual Property which is solely developed by DREW, at its own cost, during the term of this Agreement and thereafter.

**5.3**    All intellectual property that is jointly developed by the Parties, pursuant to the terms and conditions of this Agreement, with the express exception of additional intellectual property developed with respect to DREW's Excell 22™, shall be deemed to be jointly owned by the Parties.  With respect to intellectual property developed relative to DREW'S Excell 22™, it shall be the property of DREW.  Each Party shall have the sole right to use and/or license its rights to said intellectual property within its Territories as defined in this Agreement.  If a Party should desire to sell its rights to any intellectual property that was jointly developed pursuant to this Agreement, the Parties will act in a commercially reasonable manner to achieve a valuation of the property rights of the Party that seeks to divest its rights and the other Party shall

11

    DR00000306

have the right of first refusal with respect to said property. If, after best efforts, an agreement cannot be reached between the Parties regarding a commercially appropriate valuation, the Parties agree that they will select a mutually acceptable arbitrator to establish a valuation that will be deemed binding upon the Parties. The costs of the arbitrator, as well as the arbitration proceeding, will be equally divided between the Parties. The arbitrator will have the authority to set forth guidelines for the submission of evidence, expert reports and testimony. However, it is agreed that no oral testimony will be included in the proceedings and that the Federal Rules of Civil Procedure and Evidence will otherwise govern such proceedings. Each Party will be responsible for its own costs associated with resolving such a disagreement.

**5.4**    Notwithstanding the other provisions of this Article 5, POINTCARE shall supply to DREW, in electronic, editable format (such as Microsoft Word), information, manuals and documentation sufficient for DREW'S development of its own product manuals, promotional materials and related documentation for distribution to its agents, distributors and current or prospective end-users. DREW shall have the exclusive right to copyright the manuals, promotional materials and other documentation it so develops. All of the documents developed and distributed under this Article 5.4 shall bear DREW's logo and/or trade dress unless the Parties agree otherwise in writing.

**5.5**    Notwithstanding the other provisions of this Article 5, DREW shall supply to POINTCARE, in electronic, editable format (such as Microsoft Word), information, manuals and documentation sufficient for POINTCARE'S development of its own product manuals, promotional materials and related documentation for distribution to its agents, distributors and current or prospective end-users. POINTCARE shall have the exclusive right to copyright the manuals, promotional materials and other documentation it so develops. All of the documents developed and distributed under this Article 5.5 shall bear POINTCARE'S logo and/or trade dress unless the Parties agree otherwise in writing.

HIGHLY CONFIDENTIAL                                                                            DR00000307

## Art. 6.    <u>Term and Termination</u>

**6.1**    With respect to combined use of DREW'S HT instrumentation platform and POINTCARE'S CD4sure™ assay, this Agreement shall be effective for a term of five (5) years commencing on the date that DREW receives U.S. FDA approval to sell the HT platform, as modified to accomodate POINTCARE's CD4sure™ assay, or POINTCARE receives U.S. FDA approval to sell its modified CD4sure™ assay, whichever approval is later received, and end on the fifth anniversary of DREW'S or POINTCARE's receipt of such FDA approval.  Unless the Agreement is lawfully terminated in accordance with the provisions of this Agreement, the Agreement shall be automatically renewed at the option of DREW for a successive five (5) year period unless DREW provides POINTCARE with written notice of its desire not to renew the Agreement no less than ninety (90) days prior to anniversary date of DREW's receipt of FDA approval as noted above.  DREW shall have the right to renew this Agreement for a total of three (3) successive five (5) year periods following the initial term.

**6.2**    With respect to combined use of the NP instrumentation platform and CD4 Lymphocyte Enumeration assay kit that the Parties will collaborate to develop, this Agreement shall be effective for a period of five (5) years commencing on the date that DREW receives U.S. FDA approval to sell the NP platform or the date that POINTCARE receives FDA approval to sell its modified CD4 Lymphocyte Enumeration assay kits in the United States, whichever approval is later received and ending on the fifth anniversary of DREW'S or POINTCARE's receipt of such FDA approval.  Unless the Agreement is lawfully terminated in accordance with the provisions of this Agreement, the Agreement shall be automatically renewed at the option of DREW for a successive five (5) year period unless DREW provides POINTCARE with written notice of its desire not to renew the Agreement no less than ninety (90) days prior to anniversary date of receipt of FDA approval as noted above. DREW shall have the right to renew the term of this Agreement for a total of three (3) successive periods following the above initial term.

HIGHLY CONFIDENTIAL                                    DR00000308

**6.3**    Neither Party shall be liable to the other for damages resulting from the expiration or termination of this Agreement pursuant to this Article 6.

**6.4**    POINTCARE shall be obligated to manufacture and supply to DREW all CD4 Lymphocyte Enumeration assay kits ordered by DREW pursuant to Article 2 prior to the expiration or termination of this Agreement, provided that such order was received and accepted by POINTCARE prior to such expiration or termination.

**6.5**    DREW shall be obligated to manufacture and supply to POINTCARE all instrumentation platforms and parts ordered by POINTCARE pursuant to Article 2 prior to the expiration or termination of this Agreement, provided that such order was received and accepted by DREW prior to such expiration or termination.

**6.6**    If a Party fails to submit any payment due hereunder more than five (5) days after the due date, a written non-payment notice of such non-payment may be issued to the delinquent Party. If a Party has issued three (3) successive notices of non-payment to the other Party, it may terminate this agreement five (5) days after receipt of the third notice, pursuant to Section 8.4 unless the deficiency is fully satisfied prior to receipt of the wriiten termination notice.

**6.7**    Notwithstanding any provision in this Agreement to the contrary, upon expiration or termination of this Agreement for any reason, each Party shall continue to supply requested product, to the extent that they have inventory, if legally necessary to comply with any applicable laws and regulations of countries in which a Party sells the CD4 Lymphocite Enumeration assays kits, the HT instrumentation platform and/or the NP instrumentation platform.

**6.8**    Either Party may terminate this Agreement:

> (a)    in the event of a material breach by the other Party of any of the terms and conditions of the Agreement, excepting breach resulting from non-payment of any disputed amounts due hereunder (<u>See</u> Section 6.5 of this Article), by giving the other

14

Party notice of such breach, and provided that such breach shall not have been cured within sixty (60) days of such notice; or

(b)   immediately, by written notice thereof, if any of the following events or an event analogous thereto occurs:

  (i)   an adjudication has been made that the other Party is bankrupt or insolvent;

  (ii)   the other Party has filed bankruptcy proceedings or has had such proceedings filed against it, except as part of a bona fide scheme for reorganization;

  (iii)   a receiver has been appointed for all or substantially all of the property of the other Party;

  (iv)   the other Party has assigned or attempted to assign this Agreement for the benefit of its creditors; or

  (v)   the other Party has begun any proceeding for the liquidation or winding up of its business affairs.

**6.9**    In the event that DREW is unable to deliver to POINTCARE its requirements of DREW diagnostic intrumentation platforms as required under the terms of this Agreement, including but not limited to the product specifications included in *Annexes 1* and **2** and to the extent that DREW's inability to perform under this Agreement is not excused by this Agreement or a subsequent written agreement of the Parties,  POINTCARE shall have the right, until such time that DREW can meet its obligations under this Agreement, to directly manufacture the diagnostic instrumentation platforms or to have the platforms manufactured by a mutually acceptable third Party.  DREW will fully cooperate with POINTCARE  and execute an appropriate license agreement for the transfer by DREW of know-how and technologies that are necessary to manufacture the diagnostic instrumentation platforms provided that POINTCARE and its third party manufacturer recognize in the

15

HIGHLY CONFIDENTIAL

DR00000310

license agreement the legal rights which DREW possesses with respect to any know-how or technology provided in the license agreement and further agree that the term of the license is limited in scope until said time that DREW is able to reasonably demonstrate that it is capable of satisfying its supply obligations under this Agreement. The Parties will negotiate an appropriate licensing fee in good faith. If, after best efforts, the Parties cannot agree to a mutually acceptable licensing fee and agreement, the Parties shall select a mutually acceptable arbitrator and proceed in accordance with the arbitration process that is noted in Section 5.3 of this Agreement.

Moreover, should DREW close down or otherwise divest its manufacturing facility or facilities that are necessary for the manufacture of the DREW diagnostic instrumentation platforms, POINTCARE shall have the right of first refusal to purchase said facility/facilities at fair market value, which shall be set by a mutually agreed upon third Party appraiser. If DREW is unable to meet its obligations to POINTCARE as a result of the sale of its manufacturing facility/facilities and POINTCARE would choose not to purchase the facility/facilities but still desires to secure its requirements of the DREW diagnostic instrumentation platforms, DREW will agree to provide POINTCARE with a license under which DREW shall transfer the know-how and technologies that are necessary to manufacture the diagnostic instrumentation platforms. The Parties will negotiate an appropriate licensing fee in good faith. If, after best efforts, the Parties cannot agree to a mutually acceptable licensing fee and agreement, the Parties shall select a mutually acceptable arbitrator and proceed in accordance with the arbitration process that is noted in Section 5.3 of this Agreement.

**6.10**  In the event that POINTCARE is unable to deliver to DREW its requirements of POINTCARE CD4 Lymphocyte Enumeration assay kits, as required under the terms of this Agreement, including but not limited to the product specifications included in *Annexes 1* and *2*, and to the extent that POINTCARE's inability to perform under this Agreement is not excused by this Agreement or a subsequent written agreement of the Parties,  DREW shall have the right, until such time that POINTCARE can meet its obligations under this Agreement, to directly manufacture the CD4 Lymphocyte Enumeration assay kits or to have the CD4 Lymphocyte Enumeration assay kits

16

HIGHLY CONFIDENTIAL

manufactured by a mutually acceptable third Party.  POINTCARE will fully cooperate
with DREW  and execute an appropriate license agreement for the transfer by
POINTCARE of know-how and technologies that are necessary to manufacture the
CD4 Lymphocyte Enumeration assay kits provided that DREW and its third party
manufacturer recognize in the license agreement the legal rights which POINTCARE
possesses with respect to any know-how or technology provided in the license
agreement and further agrees that the term of the license is limited in scope until said
time that POINTCARE is able to reasonably demonstrate that it is capable of
satisfying its supply obligations under this Agreement.  The Parties will negotiate an
appropriate licensing fee in good faith.  If, after best efforts, the Parties cannot agree
to a mutually acceptable licensing fee and agreement, the Parties shall select a
mutually acceptable arbitrator and proceed in accordance with the arbitration process
that is noted in Section 5.3 of this Agreement.


Moreover, should POINTCARE close down or otherwise divest its manufacturing
facility or facilities that are necessary for the manufacture of the CD4 Lymphocyte
Enumeration assay kit, DREW shall have the right of first refusal to purchase said
facility/facilities at fair market value, which shall be set by a mutually agreed upon
third Party appraiser.  Should POINTCARE receive a credible offer to buy all of its
operations or a portion of its operations that would affect its ability to supply DREW'S
requirements for CD4 Lymphocyte Enumaration assay kits, POINTCARE agrees that
DREW shall have the right to make an offer that exceeds the other credible offer and
that POINTCARE shall be obligated to accept such offer from DREW.  If
POINTCARE is unable to meet its obligations to DREW as a result of the sale of its
manufacturing facility/facilities and DREW would choose not to purchase the
facility/facilities but still desires to secure its requirements of the CD4 Lymphocyte
Enumeration assay kits, POINTCARE will agree to provide DREW with a license
under which POINTCARE shall transfer the know-how and technologies that are
necessary to manufacture the CD4 Lymphocyte Enumeration assay kits.  The Parties
will negotiate an appropriate licensing fee in good faith.  If, after best efforts, the
Parties cannot agree to a mutually acceptable licensing fee and agreement,  the
Parties shall select a mutually acceptable arbitrator and proceed in accordance with
the arbitration process that is noted in Section 5.3 of this Agreement.

17

HIGHLY CONFIDENTIAL

supersedes any and all prior or contemporaneous negotiations, agreements, representations, understandings and commitments concerning the subject matter hereof.  This Agreement shall take precedence over all conflicting or inconsistent terms, conditions or provisions on any invoice or purchase order.   Any alteration, amendment or modification to any term or provision of this Agreement shall be in writing and signed by duly authorized officers of POINTCARE and DREW.

**8.3    Force Majeure.**  If the full or partial performance of this Agreement or any obligation hereunder is prevented, restricted or interfered with by reason of any cause beyond the control of the affected Party, including, but not limited to fire, strikes, or any law, regulation or policy of any government, or any subdivision, authority or agency thereof that is enacted subsequent to the execution of this Agreement, the Party so affected, upon written notice to the other Party, shall be excused from such performance to the extent of such prevention, restriction or interference, provided that the Party so affected shall use all reasonable efforts to avoid or remove such cause or causes of nonperformance, and shall continue performance hereunder with all reasonable dispatch when such cause or causes are removed.  Failure to adhere to or comply with existing laws, rules and regulations, such as but not limited to the U.S. FD&C Act and its good manufacturing practice (GMP) regulations will not be considered a Force Majeure event and will not relieve a Party of its performance obligations pursuant to this Agreement.

**8.4    Methods of Notice.**  Any notice, or other communications which are required or permitted hereunder shall be in the English language, shall be written and shall be deemed given on the date received by the receiving Party, if and when : (i) delivered personally with a signed receipt of such delivery, or (ii) sent by registered mail or certified mail, postage prepaid, return receipt requested, or (iii) sent by overnight courier with an internationally recognized courier, or (iv) sent via facsimile or electronic (e-mail) transmission, the receipt of which has been confirmed in a separate writing by the receiving Party.

**8.5    Addresses for Notices.**  Unless and until such addresses may be changed by written notice to the other Party, complying with the terms of this Section 8.5, all notices to DREW shall be addressed to:

HIGHLY CONFIDENTIAL                                                                                    DR00000315

**6.11**  Following the termination of this Agreement (whether upon non-renewal or termination pursuant to Article 6), each Party to this Agreement shall have the right to continue distributing the diagnostic instrumentation platforms and/or the CD4 Lymphocyte Enumeration assay kits that remain in their stock at the end of the Agreement.

**6.12**  Termination or non-renewal of this Agreement shall not in any way operate so as to impair or destroy any of the rights or remedies of POINTCARE or DREW, whether at law or in equity, nor shall it relieve the Parties of their obligations pursuant to Articles 3, 5, and 7 and Sections 8.1, 8.4, and 8.5 of this Agreement.

## Art. 7    Confidentiality:

**7.1**    Each Party shall maintain in confidence both the terms of this Agreement and any information received from the other Party in writing during the term of this Agreement and shall neither publish, disseminate nor disclose such information to any third Party nor use such information except for the furtherance of the purposes of this Agreement, without the prior express written permission of such other Party. This obligation shall not apply to any information which: (i) now or hereafter comes into the public domain, except by breach of this Agreement, or (ii) is already in the possession of the receiving Party other than as a result of having received it from the disclosing Party as evidenced by written records, or (iii) is independently developed by the receiving Party without use of or access to the information of the disclosing Party, or (iv) which is required to be provided to a governmental regulatory agency in order to secure the necessary regulatory approvals to manufacture or market the products, or (v) is required to be disclosed by a Subpoena issued from a court of competent jurisdiction, a Court Order or a civil investigative demand; provided that the receiving Party, subject to such requirement of this subparagraph (v): (a) promptly notifies the other Party and co-operates with efforts to make such disclosure in confidence or subject to a suitable Protective Order; and (b) the receiving Party discloses only so much of the confidential information as its counsel advises is required to comply with such requirement; or (vi) is intended to be used by an agent,

18

HIGHLY CONFIDENTIAL

affiliate and/or end-user of DREW or POINTCARE. The obligations of this Article 7 shall extend to any agent, employee, affiliate, and/or end-user that is provided, in whole or in part, with this Agreement.  Moreover, the obligations of Article 7 shall continue for five (5) years after the expiration or termination of this Agreement. Upon expiration or termination of this Agreement, each Party shall, at the other's request, destroy or return to the other Party all copies of any information provided pursuant to this Agreement, including all information provided to any agent, employee, affiliate, and/or end-user . However, counsel for each Party to this Agreement may retain one (1) copy of such information solely for the purpose of monitoring compliance with the obligation of confidentiality under this Agreement.

**7.2**    Each Party agrees not to recruit any member of staff or employee of the other Party for a possible employment or independent assignment within their organization or any affiliated organizations, either as an employee or independent consultant or in any other capacity, without the previous agreement of the other Party. These obligations shall remain in force during the term of this Agreement and for a period of one (1) year after expiration or termination of this Agreement.

### Art. 8.    MISCELLANEOUS

**8.1    Binding Effect and Assignment**.  This Agreement shall inure to the benefit of and be binding upon each of the Parties hereto and their respective successors and assigns.  Nevertheless, neither this Agreement, nor any right or obligation of a Party arising from this Agreement, may be assigned by such Party without the prior written approval of the other Party, such approval not to be unreasonably withheld, except that DREW may assign this Agreement and such rights and obligations to a purchaser or other transferee of its entire business, without such written approval from POINTCARE.  The benefits to DREW under this Agreement are also available to DREW'S subsidiaries and affiliate companies, and DREW shall be responsible for any such subsidiary or affiliate to POINTCARE hereunder, if same are not met.

**8.2    Entire Agreement and Modifications**.  This Agreement (including the Annexes hereto), together with the Confidentiality Agreement between the Parties dated _____, sets forth the entire Agreement between the Parties and

19

DR00000314

Drew Scientific, Inc.

4230 Shilling Way

Dallas, TX  75237-1093

USA


Attention: _____


Fax:  214-210-4949


Copy to:  General Counsel

Escalon Medical Corp.

565 E. Swedesford Road

Suite 200

Wayne, PA  19087

Fax:  610-688-6830


and all notices to POINTCARE shall be addressed to:



Attention:

Fax:


**8.6**    **Governing Law:  Arbitration**.  This Agreement shall be construed, interpreted
and enforced in accordance with the substantive laws of the state of New York.  Any
legal action filed pursuant to and/or related to this Agreement or its interpretation
shall be filed in the U.S. District Court for the Southern District of New York.  The
Parties shall make a good faith effort to attempt to amicably resolve any
disagreements, involving their respective Presidents, before any legal action is filed
by a Party to this Agreement.


21

HIGHLY CONFIDENTIAL

DR00000316

**8.7    Severability.**  If any provision of this Agreement becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction, (a) this Agreement and the remaining provisions hereof shall continue in full force and effect and (b) the Parties shall negotiate in good faith such amendments to the provisions found to be invalid, illegal or unenforceable as are necessary to eliminate such invalidity, illegality or unenforceability.

**8.8    No Waiver of Subsequent Breach.**  No waiver of any breach of this Agreement or any obligation arising under this Agreement by either Party shall constitute a waiver of any subsequent breach or breaches, whether such breaches are of a similar or dissimilar nature.

**8.9    Nature of Relationship.**  Unless otherwise expressly agreed upon in writing, neither Party to this Agreement shall be in any way the agent or representative of the other Party for any purpose whatsoever, and shall have no right to create or assume any obligation or responsibility of any kind, whether express or implied, in the name of or on behalf of the other Party or to bind the other Party in any manner whatsoever.

**8.10    Reading and Understanding.**  Each party warrants that, prior to executing this Agreement, it carefully read the Agreement in its entirety, had the opportunity to seek legal advice, and that it understood all of the terms contained herein.

**8.11    Counterparts.**  This Agreement may be signed in counterparts, each of which shall be an original, but all of which shall be deemed to be one and the same instrument, and shall be valid and binding when so signed.

HIGHLY CONFIDENTIAL

DR00000317

IN WITNESS WHEREOF, this Agreement has been executed by the duly authorized officers of POINTCARE and DREW effective as of the date and year first above written.

**DREW SCIENTIFIC, INC**          **PointCare Technologies, Inc.**

By: _____          By: _____


Name:                               Name:

Title:                              Title:


Date: _____        Date: _____

23

HIGHLY CONFIDENTIAL

<u>**Annex 2**</u>

**Specifications and Development Timelines**

**for the NP Instrumentation Platform &  the reformulated**

<u>**POINTCARE Lymphocyte Enumeration Assay Kit**</u>

**Drew NP Diagnostic Instrumentation Platform:**

- Drew and PointCare will decide how costs associated with and related to the development and approval for sale of the NP diagnostic instrumentation platform that will be compatible with PointCare's CD4sure™ Lymphocyte Enumeration assay will be allocated.
- ***Need development timetable***
- ***Need product specifications***
- ***Need to define joint distribution rights***

**POINTCARE CD4sure™ Assay Test Kit**

- Pointcare and Drew will decide how costs associated with and related to the development and approval for sale of a reformularted Lymphocyte Enumeration assay that will be compatible with NP diagnostic instrumentation platform will be allocated.
- ***Need development timetable***
- ***Need product specifications***
- ***Need to define joint distribution rights***

26

HIGHLY CONFIDENTIAL

DR00000321

## Annex 3
## Sales & Marketing Territories

The Parties agree as follows;

- Market Rights – For discussion

- With respect to Trade Shows and other exhibit and sales presentation venues, it is acknowledged that each Party shall attend certain Trade Shows and public events ("Shows") where it will seek to merchantise the products covered under this Agreement. To provide efficient coverage of such Shows and minimize redundancies and sales presentation overlap, it is agreed that DREW will attend those Shows that are related to clinical diagnostics, as well as regional distributor Shows within its Territories. POINTCARE shall be responsible for attending Shows that are specifically related to HIV treatment. While each company shall bear its own costs associated with attending and/or participating in a Show, the Parties also agree that they will provide reasonable support to each other, as requested during such Shows, including but not limited to the provision of appropriate personnel, instrumentation, assay/reagent kits, and scientific and marketing literature. The Parties further agree that by the fifth (5th) day of the fourth calendar quarter of every year, they will submit to each other a list of the Shows which they propose to attend in the coming year. The Parties will then discuss these proposals and work cooperatively to allocate needed personnel and resources to support the proposed programs. It is recognized that additional Shows may be added to the schedule of a Party during the course of the calendar year. Each Party will make a best effort to provide at least sixty (60) days notice of the scheduling of an additional Show. The notified Party will make a best effort to provide any needed support should such timely notice be received. If less than sixty (60) days of notice is provided, the receiving Party is under no obligation to assist but should make as reasonable an effort as possible to assist.

- The Parties agree to work cooperatively to develop a brochure and CD presentation that can be used to communicate the benefits of using the HT and NP diagnostic instrumentation platforms and CD4 Lymphocyte Enumeration assay kits developed under this Agreement. The Parties shall jointly agree upon and equally share all costs associated with such a

HIGHLY CONFIDENTIAL

DR00000322

**List of Annexes**

***Annex 1***:   Specifications and Development Timelines for the DREW HT Instrumentation Platform & the POINTCARE CD4sure™ Lymphocyte Enumeration Assay Kit

***Annex 2***:   Specifications and Development Timelines for the NP Instrumentation Platform & the reformulated POINTCARE Lymphocyte Enumeration Assay Kit

***Annex 3***:   Sales and Marketing Territories

***Annex 4***:   CD4 Lymphocyte Enumeration Assay Kit
and Diagnostic Instrumentation Platform Labeling Terms & Conditions

***Annex 5***:   Pricing Terms and Conditions; Requirements Forecasts; Terms and Conditions of Technical Support by DREW & POINTCARE

***Annex 6***:   Warranty Period Support & Training

24

HIGHLY CONFIDENTIAL

DR00000319

**ANNEX 1**

**Specifications and Development Timelines for the DREW HT Instrumentation Platform & the POINTCARE CD4sure™ Lymphocyte Enumeration Assay Kit**

1. **DREW HT Instrumentation Platform:**

    Points to be included:
    - Drew is responsible for and will bear the costs associated with and related to the development and approval for sale in the United States of the HT diagnostic instrumentation platform that will be compatible with PointCare's CD4sure™ Lymphocyte Enumeration assay.
    - Drew is responsible for and will bear all costs associated with and related to the transfer of a HT diagnostic instrumentation platform that is compatible with PointCare's CD4sure™ Lymphocyte Enumeration assay into DREW's manufacturing organization.
    - Any software problems that are detected with respect to the HT instrumentation platform shall be jointly investigated. Both Parties will work cooperatively and in good faith to achieve concensus towards a satisfactory solution to any potential software issues and will establish a written process for ascertaining the equitable division of costs associated with the resolution of any software issue that is confirmed by both Parties.
    - ***Need development timetable***
    - ***Need product specifications – include EU specs?***

2. **POINTCARE CD4sure™ Assay Test Kit**

    Points to be included:
    - Pointcare is responsible for and will bear the costs associated with and related to the development and approval for sale in the United States of a e PointCare's CD4sure™ Lymphocyte Enumeration assay that will be compatible with Drew's HT diagnostic instrumentation platform.
    - PointCare is responsible for and will bear all costs associated with and related to the development and transfer of a reformulated Lymphocyte Enumeration assay that shall be compatible with and operate with Drew's HT diagnostic instrumentation platform into Pointcare's manufacturing organization.
    - ***Need development timetable***
    - ***Need product specifications – include EU specs?***

25

HIGHLY CONFIDENTIAL

DR00000320

development effort. The Parties will work cooperatively to develop a budget, as well as a concept that can be jointly utilized by the Parties in their respective Territories.

28

## Annex 4
## Product Labelling Terms & Conditions

The Parties agree as follows:

- Each Party to this Agreement shall have the right to market and sell the HT and NP diagnostic instrumentation platforms and the CD4 Lymphocyte Enumeration assay kits under their own labelling within their respective Territories. Each Party agrees to assist the other Party and to cooperate as reasonably necessary, granting any licenses that are required, in order that each Party can, if it chooses, market and sell the above noted products under its own brand and with its own labelling. However, it is acknowledged that if DREW deviates from any labeling recommendations made by POINTCARE with respect to its CD4 Lymphocyte Enumeration assay kits and/or if POINTCARE would deviate from the labeling recommendations of DREW relative to DREW'S HT [and NP??] diagnostic instrumentation platforms, the Party that chooses to modify the labelling assumes the full risk and responsibility for any damages, injuries, regulatory and/or any other actions that may result and hereby agrees to fully defend and indemnify the other Party against any and all resulting claims or legal actions, threatened or actual.

- Subject to the liability disclaimers included in this Agreement, including but not limited to this *Annex 4*, POINTCARE shall package its CD4 Lymphocyte Assay kits which are ordered for purchase by DREW in accordance with the labelling specifications provided to POINTCARE by DREW.

- Subject to the liability disclaimers included in this Agreement, including but not limited to this *Annex 4*, DREW shall package its HT [and NP??] diagnostic instrumentation platforms which are ordered for purchase by POINTCARE in accordance with the labelling specifications provided to DREW by POINTCARE.

- DREW agrees to provide reasonable cooperation to POINTCARE should POINTCARE request that labeling requirements of a POINTCARE customer be included on any NP diagnostic instrumentation platform that DREW manufacturers for sale to POINTCARE. POINTCARE agrees to accept and

29

pay any and all reasonable and documented costs for such modifications and to provide DREW with full defense and indemnity for any and all resulting claims or legal actions, threatened or actual, that may result from the labeling change(s) requested by POINTCARE.

HIGHLY CONFIDENTIAL                                                       DR00000325

## Annex 6
## Warranty Period Support & Training Requirements

In addition to the terms and conditions included in Article 3 of this Agrement, it is agreed that:

- If a DREW platform that is under warranty cannot be repaired by POINTCARE, POINTCARE may send such platform to DREW's manufacturing facility for diagnosis and possible repair. POINTCARE will assume full responsibility for all costs associated with the transport of the platform to and from DREW'S manufacturing facility, including but not limited to shipping and insurance charges.
- In the event that DREW HT platforms sold to POINTCARE incur a material manufacturing defect that is epidemic in nature, DREW agrees to bear the commercially reasonable and documented incremental costs of service incurred by POINTCARE to correct the malfunction.
- If POINTCARE experiences an "out of the box" malfunction of a DREW HT [or NB??] platform, DREW and POINTCARE's field maintence personnel shall work cooperatively to ascertain the nature of the problem and the best course of action to promptly resolve the problem.
- Drew agrees to provide complementary initial training to a mutually agreed upon number of POINTCARE's designated technicians and distributors relative to the repair and maintenance of the HT diagnostic instrumentation platforms. The training will take place at a DREW manufacturing facility. POINTCARE shall bear responsibility for the travel, meals, lodging and other costs incurred by its personnel and agents. Said training will be conducted at as mutually agreed upon during the duration of this Agreement.
- POINTCARE agrees to provide complementary initial training to a mutually agreed upon number of DREW's designated technicians and distributors relative to the use of POINTCARE'S CD4 Lymphocyte Enumeration Assay kits at a location to be determined. DREW shall bear responsibility for the travel, meals, lodging and other costs incurred by its personnel and agents.

HIGHLY CONFIDENTIAL

DR00000328

## Annex 5
### Pricing Terms & Conditions; Requirements Forecasts; Terms and Conditions of Technical Support by DREW & POINTCARE

- DREW agrees to sell HT [and NP???] diagnostic instrumentation platforms to POINTCARE that are labeled in accordance with POINTCARE'S specifications at a price that shall not exceed USD $7,750 more than the standard cost to DREW to manufacture the relevant instrumentation platform. Further, DREW agrees to sell spare/replacement parts and accessories to POINTCARE, in quantities that are sufficent to meet its requirements , at a discount of forty-five (45) % off of the current published list price.

- DREW shall provide POINTCARE with its experience and assistance in ascertainng the type and quanity of spare/replacement parts and accessories that POINTCARE should consider maintaining in its inventory.  Further, in order that POINTCARE is able to develop a system of "loaner" diagnostic platforms that it can provide to its customers and end-users to temporarity replace platforms that are under replair, DREW will also allow POINTCARE to purchase one HT or NP diagnostic instrumentation platform at DREW'S standard cost for every fifteen (15) HT and/or NP diagnostic instrumentation platforms purchased by POINTCARE at the agreed upon price set forth per above.

- POINTCARE agrees to sell CD4 Lymphocyte Enumeration assay kits to DREW that are labeled in accordance with DREW'S specifications according to the following price schedule: TO BE ADDED

- POINTCARE agrees to pay DREW USD $ 0.30 per CD4 Lymphocyte Enumeration test that POINTCARE sells for use on a DREW manufactured HT or NP diagnostic instrumentation platform.

- The Parties will provide each other with rolling twelve (12) month forecasts of their purchase requirements.  The first month of the initial forecast shall be

31

DR00000326

considered a firm commitment to purchase. Seventy (70) % of the second month forecast that was included in the initial forecast shall also be considered a firm purchase commitment. The remaining ten (10) months of the initial forecast are considered to be for planning purposes only. However, each Party is required to provide their rolling forecast to the other Party by the fifteenth (15th) day of every month and one hundred (100) % of said forecast for the following month shall be considered a firm purchase commitment. No less than seventy (70) % of the following month's forecast shall also be considered a firm purchase commitment. [Example – On May, 14, 2007, POINTCARE issues an updated "rolling" 12 month forecast that includes an order for 10 HT units in June, 2007 and 10 HT units in July, 2007. Pointcare would be committed to purchase at least 10 units in June and at least 7 units in July.].

**Need other sale conditions and terms**

- The Parties agree that the payment terms for any purchases or sales made to each other under this Agreement shall be delevered to the other Party within no less than forty-five (45) days of receipt of the invoice.

- Insurance:  Both Parties agree to maintain the following insurance coverages:
  -    Products Liability Coverage:  Minimum amount of USD $1,000.000.00 per occurrence and USD $5,000,000.00 in the aggregate.
  -    General Liability Insurance:  Minimum amount of USD $1,000.000.00 per occurrence and USD $5,000,000.00 in the aggregate.

32

HIGHLY CONFIDENTIAL

- POINTCARE agrees that it bears sole responsibility for providing its customers, distributors and other end-users with installation, service and maintenance of the HT diagnostic instrumentation platforms and that it shall provide all "first" and "second" level support to its customers, distributors and other end-users (NEED TO DEFINE THESE TERMS - level 1, 2 and 3). During the time that this Agreement remains in effect, DREW shall agree to provide "third level" support to POINTCARE, assisting POINTCARE in those few situations where POINTCARE is unable to satisfactorily resolve an issue after utilizing its existing resources. Such support shall be provided by DREW to POINTCARE via telephone or electronic transmission at DREW'S reasonable and customary charge for such service. If a DREW support specialist is requested to provide field support, POINTCARE agrees to pay all costs associated with DREW'S effort to satisfy its request.

34

HIGHLY CONFIDENTIAL

Reagent Pricing

Until we are in the market there will continue to be uncertainty about the pricing we can achieve. The PCTI plan assumes $6/test (end user price), and PCTI are currently achieving approximately $10/test.

We will be using distributors so if we allow them 30%, we may realize $7/test.

So my projections assume approx. $6.35 net price per test.

To make 50% gross margin overall, I need to make more than 50% on the reagents.

I realize that your initial costs will be high, and so Drew is prepared to pay $4 in 2007.

From January 2008, I would need a cost of $3.50/test with a volume discount from that point.

I have considered what would be a reasonable volume projection.

For the HT instrument I am assuming the following sales per year

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| HT instruments | 20 | 30 | 50 |
| Tests/day | 35 | 35 | 35 |
| Total tests | 94,792 | 317,188 | 674,479 |

For the NP instrument I am assuming the following

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| NP instruments | 20 | 70 | 100 |
| Tests/day | 20 | 20 | 20 |
| Total tests | 54,167 | 289,583 | 720,833 |

I would need to be at $3/test by 2009

So I would propose:

$4/test until Dec31st, 2007

$3.50/test after Jan 1st, 2008

$3.00/test when volume exceeds ½ million tests per year

This pricing doesn't give me a 50% Gross Margin until 2009

HIGHLY CONFIDENTIAL

**EXHIBIT 2**



Redacted

From: Frank Matuszak
Sent: Sunday, March 18, 2007 8:39 AM
To: Petra Krauledat
Subject: Forecast for NP instruments and reagents along with HT reagents


Petra,

Based on our current assumptions we feel that in the first 12 months after release of the product we will sell:

50 NP units and expect them to be sold in the following quarterly quantities
Q1 July 07-Sept07  7 units
Q2 Oct 07-Dec07  8 units
Q3 Jan 08- Mar08  15 units
Q4 Apr 08- Jun08   20 units

We estimate that each unit will use 20  30 test kits per calendar year and that 50% of the kits for the year will be placed one month after instrument install.

As for the HT unit we expect to sell 17 units in the first fiscal year and that the estimated kit usage will be 80 kits per unit.

Please let me know if you have any questions.

HIGHLY CONFIDENTIAL

Regards,

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

HIGHLY CONFIDENTIAL

**EXHIBIT 3**

**From:** Frank Matuszak
**Sent:** 5/14/2007 11:24:57 AM
**To:** peter.hansen@tmo.blackberry.net; Doug Nickols
**CC:** Petra Krauledat; Richard J. DePiano; Don Barry
**Subject:** RE: HT

Peter,

Thanks for the update. I have sent 2 emails in the past confirming our forecast for 50 units along with our estimated tests per unit per year. I will send you a copy of the email sent on March 18th. We can issue a PO for these units if this is a requirement.

On two unrelated topics have you gotten confirmation back on your meeting the week of May 21st with the representative from WIPRO. We have been in discussions with them and it would be good to have both companies meet WIPRO at the same time. Secondly I would like to setup a meeting to visit Marty Fleischer at Sloan and Petra indicated that you would like to attend this meeting since you know him well. Please let me know some dates that might work into your schedule.


Regards,


Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

-----Original Message-----
From: Peter Hansen [mailto:peter.hansen@tmo.blackberry.net]
Sent: Monday, May 14, 2007 4:30 AM
To: Doug Nickols; Frank Matuszak
Cc: Petra Krauledat; Richard J. DePiano; Don Barry
Subject: HT

Dear Doug and Frank,

We had recently discussed having Jay Robinson accompany the HT to Barbados for the upcoming clinicals. It's still a good idea, but he shouild not pack his bags quite yet.

HIGHLY CONFIDENTIAL

Here's an update. Last December we took a prototype to Barbados to test the assay and new optics. It did not require any automation from the machine. The samples were prepared manually and the pre-prototype machine pushed the prepared sample through the optics. The test was a success over a broad range of HIV, non HIV, difficult to lyse and easy to lyse patients.

Since then it has been a struggle to get beyond the pre-prototype level to the next stage by having full engineering prototypes at Drew to work. By that I mean have all the automation work in concert. The first prototype was having a hard time at Drew so I asked to have it shipped to PCT where our familiarity with the assay and our trouble shooting tools with the microscope might help. That machine has had a number of component failures and incorrect setup issues that have taken too many repeat tries to fix (wrong parts sent and other similarly annoying issues). The second prototype arrived last week and was a very serious out of box failure ( see Don's email to Gary).

I am flying in to Boston today and will have an emergency meeting with Don to asess the extent of the problems and where our clinical trial schedule is today. I really can't see why these problems are happening. All the components seem to work and the assay has worked on tough patients. It seems to be a case of lost focus and lack of attention to detail. These compunding small errors are costing a lot of time (see out of box problem with number 2 and exchanges between Don and Gary still trying to get the first protoype working). I still think the basic engineering is sound and the guys were quite good in their approach. How can we now translate this to a systems level? I'll hook up by phone with you by Wednesday.

On a related topic. We will receive the first 15 manufactured C2 instruments over the month of June. The next manufacturing delivery round will be in September. Once again I must remind you, Frank, that our Agreement calls for a written forecast which we have not to my knowledge received. I recall a verbal estimate by you for 55 starting with 5 in July. Obviously I can't use a verbal to order production. Please help me out here as soon as possible. In the case of the C2 project we have the refreshing situation of Development moving along on time, but the discouraging situation where Sales is not pushing. Please, let's change that.

Peter
Sent wirelessly via BlackBerry from T-Mobile.

HIGHLY CONFIDENTIAL