Anthony J. Costantini
John Dellaportas
Brian Damiano
Duane Morris LLP
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Plaintiff Drew Scientific, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

DREW SCIENTIFIC, INC.,                        :        08 CV 1490 (AKH)
                                              :
                            Plaintiff,        :
                                              :        **REPLY DECLARATION OF**
                                              :        **ANTHONY J. COSTANTINI**
              -v-                             :        **IN FURTHER SUPPORT OF**
                                              :        **PLAINTIFF'S MOTION FOR**
                                              :        **A PRELIMINARY INJUNCTION**
                                              :
POINTCARE TECHNOLOGIES, INC.,                 :
                                              :
                            Defendant.        :
-------------------------------------------------------x

ANTHONY J. COSTANTINI declares:

1.      I am a member of the law firm of Duane Morris LLP, attorneys for plaintiff Drew

Scientific, Inc. ("Drew") in the above-captioned action.  I submit this Reply Declaration in

further support of Drew's motion for this Court to issue a preliminary injunction pursuant to

Federal Rule of Civil Procedure 65, directing defendant PointCare Technologies, Inc.

("PointCare") to comply with the terms of the parties' Agreement and requiring PointCare to

cease all related misconduct.

2.      The purpose of this Reply Declaration is to put before the Court the documents

which establish that Drew's motion for a preliminary injunction should be granted in its entirety,

as referenced in Drew's Reply Memorandum of Law dated May 2, 2008.

3.     True and correct copies of relevant excerpts from the March 27, 2008 deposition of Donald E. Barry, Jr. are collectively annexed hereto as Exhibit 1, together with selected exhibits thereto.

4.     True and correct copies of relevant excerpts from the April 1, 2008 deposition of George Chappell are collectively annexed hereto as Exhibit 2, together with selected exhibits thereto.

5.     A true and correct copy of relevant excerpts from the errata sheet to the March 25, 2008 deposition of Herbert Chow is annexed hereto as Exhibit 3.

6.     True and correct copies of relevant excerpts from the April 11, 2008 deposition of Amy Coughlin are collectively annexed hereto as Exhibit 4, together with selected exhibits thereto.

7.     True and correct copies of relevant excerpts from the April 2, 2008 deposition of Richard DePiano are collectively annexed hereto as Exhibit 5, together with selected exhibits thereto.

8.     True and correct copies of relevant excerpts from the March 27, 2008 deposition of Andrea Desrosiers are collectively annexed hereto as Exhibit 6, together with selected exhibits thereto.

9.     True and correct copies of relevant excerpts from the March 26, 2008 deposition of Peter Hansen are collectively annexed hereto as Exhibit 7, together with selected exhibits thereto.

10.     True and correct copies of relevant excerpts from the April 4, 2008 deposition of Petra Krauledat are collectively annexed hereto as Exhibit 8, together with selected exhibits thereto.

2

11.    True and correct copies of relevant excerpts from the March 28, 2008 deposition of Francis Matuszak are collectively annexed hereto as Exhibit 9, together with selected exhibits thereto.

12.    True and correct copies of relevant excerpts from the April 3, 2008 deposition of Linsey Rockingham are collectively annexed hereto as Exhibit 10, together with selected exhibits thereto.

13.    True and correct copies of relevant excerpts from the April 9, 2008 deposition of James Gary Young are collectively annexed hereto as Exhibit 11, together with selected exhibits thereto.

14.    A true and correct copy of an e-mail from Peter Hansen to Richard J. DePiano dated November 9, 2006 and bearing bates number DR00000752 is annexed hereto as Exhibit 12.

15.    A true and correct copy of an e-mail from Linsey Rockingham to Jeremy Linder dated September 23, 2007 with attachments and bearing bates numbers PointCare Supp 09192 to 09206 is annexed hereto as Exhibit 13.

16.    A true and correct copy of e-mail correspondence I had with Michael Twohig, Esq., counsel for PointCare, dated April 22, 2008, is annexed attached hereto as Exhibit 14.


Pursuant to 28 U.S.C. § 1746, I declare under the penalties of perjury that the foregoing is true and correct.

Dated: New York, New York
       May 2, 2008

                                            _____/s/ Anthony J. Costantini_____
                                                    Anthony J. Costantini

3

Don Barry

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    --------------------------------X

5    DREW SCIENTIFIC, INC.,

6             Plaintiff,    Case No. 08 CV 1490-AKH

7        -vs-

8    POINTCARE TECHNOLOGIES, INC.,

9             Defendants.

10   --------------------------------X

11

12          DEPOSITION OF DONALD E. BARRY, JR.

13             New York, New York

14                March 27, 2008

15

16

17

18

19

20

21

22   Reported by:

     Bonnie Pruszynski, RMR

23   JOB NO. 15873

24

25

Unsigned

Don Barry

1                    D. Barry, Jr.

2        Q     Do additional PointCare employees or

3    different PointCare employees report to you today?

4              MR. CAPLAN:  Objection.  You can

5        answer.

6        A     Okay.  We are currently going through

7    a transition period right now.  Nothing is

8    official on paper as far as reporting duties.

9        Q     You mean a restructuring?

10       A     A restructuring.

11       Q     As of January 2008, were there

12   people, different people reporting to you than

13   Ms. Coughlin and Mr. Zeygerman?

14       A    No.

15       Q     Okay.  Whether or not they directly

16   report to you, are there other employees whose

17   work product you are responsible for?

18       A     Can you please define that?

19       Q     Sure.

20             Do you supervise other employees at

21   PointCare?

22       A     Can you tell me what you mean by

23   "supervise"?

24       Q     Are there employees, other than

25   either Ms. Coughlin or Mr. Zeygerman, whose work

Don Barry

1                    D. Barry, Jr.

2      product and quality you monitor and review

3      periodically?

4           MR. CAPLAN:  Objection.  When does

5           the question relate to?

6      Q      Since you have been appointed

7      Director of Systems.

8           MR. CAPLAN:  Objection.

9      A      Yes.

10     Q      Who are those employees?

11     A      Amanda Restell.

12     Q      What does she do?  What is her title,

13     if you know?

14     A      I'm not sure.

15     Q      Okay.  What kind of work does she do?

16     A      Reagent and assay development.

17     Q      Okay.  Which other employees?

18     A      Rashan Hardeway.

19     Q      It's a man or a woman?

20     A      Man.

21     Q      Do you know his title?

22     A      No.

23     Q      Do you know what kind of work he

24     does?

25     A      Reagent and assay development.

Don Barry

1                    D. Barry, Jr.

2        Q    Okay.  Any others?

3        A    Tracie Fredet.

4        Q    Do you know her title?

5        A    I'm not sure.

6        Q    Do you know what kind of work she

7    does?

8        A    Reagent and assay development.

9        Q    Any others?

10       A    Can you repeat the wording of the

11   question, please?

12       Q    Sure.

13            Are there, in addition to those

14   employees you have previously identified as

15   directly reporting to you, are there other

16   employees whom you supervise in the course of your

17   responsibilities as Director of Systems?

18       A    Yes.  Dorothy Branco.

19       Q    Do you know her title?

20       A    No.

21       Q    Okay.  What does she do?

22       A    Software development.

23       Q    Okay.  Any others?

24       A    Andrea Desrosiers.

25       Q    What, do you know her title?

Unsigned

Don Barry

1                    D. Barry, Jr.

2      A    Software manager.

3      Q    Any others?

4      A    Jennifer Waite.

5      Q    Do you know her title?

6      A    No.

7      Q    What does she do?

8      A    Software development.

9      Q    Okay.  Any others?

10     A    That's all.

11     Q    Okay.  Now, who do you report to at

12   PointCare?

13     A    Dr. Hansen.

14     Q    Okay.  You report directly to him?

15     A    Yes.

16     Q    Do you report to anyone else --

17   withdraw that.

18          Do you report to any other either

19   superiors or higher-ranked individuals at

20   PointCare, supervisors?

21     A    No.

22     Q    Do you every report to the board of

23   directors?

24     A    I'm not sure I understand that

25   question.

Unsigned

Don Barry

1              D. Barry, Jr.

2      Q    Have you ever attended a board of

3  directors meeting of PointCare?

4      A    Yes.

5      Q    How many times?

6      A    Just once.

7      Q    Okay.  Do you recall when that was?

8      A    No.

9      Q    Who asked you to attend?

10      A    I cannot remember.

11      Q    Okay.  Do you recall why you were

12  asked to attend or -- withdraw that.

13          Do you recall anyone telling you why

14  they wanted you to attend the board meeting?

15      A    Yes.

16      Q    What do you recall?

17      A    Whoever it was that asked me to

18  attend the meeting wanted to introduce me to the

19  board as a project manager.

20      Q    Did that introduction take place?

21      A    Yes.

22      Q    Okay.  Other than introducing

23  yourself to the board members as a product

24  manager, did you have any manner of presentation

25  to the board of directors at that meeting?

1              D. Barry, Jr.

2         MR. CAPLAN:  That is just a yes or no

3    question.

4    A    I can't remember.

5    Q    What do you recall of that meeting?

6         MR. CAPLAN:  We are going to stop

7    here if we are talking to talk about what

8    happens at the board.  That is attorneys'

9    eyes only.

10        MR. DELLAPORTAS:  Let me -- let me

11   ask a different question and see if he still

12   wants you to go.

13   Q    Do you recall anything of a -- this

14   is a yes or no question.

15        Do you recall anything of what you

16   told the board at that meeting?

17   A    No.

18   Q    Okay.

19        MR. CAPLAN:  Saved.

20   Q    Now, back when you were Project

21   Manager, New Systems Development, whom did you

22   report to at that time?

23   A    Dr. Hansen.

24   Q    Okay.  When you became Director of

25   Systems, did you replace anyone?

Don Barry

1              D. Barry, Jr.

2      A    No.

3      Q    Was there a person who held the title

4  of Director of Systems before you did?

5      A    Not at PointCare.

6      Q    What is your educational background?

7  Do you have a bachelor's?

8      A    Yes.

9      Q    Where did you get that?

10     A    Colby College.

11     Q    What year?

12     A    2003.

13     Q    Okay.  What is that in?

14     A    I hold dual degrees in physics and

15  mathematical sciences.

16     Q    Where is Colby College located?

17     A    Waterville, Maine.

18     Q    And you got that degree in the

19  spring?

20     A    Of '03, yes.

21     Q    Did you have a job between graduation

22  and when you joined PointCare in the fall of '03?

23     A    Yes.

24     Q    What was that job?

25     A    MediCept.

Don Barry

1               D. Barry, Jr.

2    Q    How do you spell that?

3    A    M-E-D-I capital C-E-P-T.

4    Q    Okay.  That is a company name?

5    A    Yes.

6    Q    Where are they located?

7    A    Ashland, Massachusetts.

8    Q    Is that near Boston?

9    A    Define "near."

10   Q    Is it a suburb of Boston?

11   A    Not necessarily.

12   Q    Okay.  What did you do for MediCept?

13   A    I was an engineer.

14   Q    How long did you hold that position?

15   A    Until fall of 2003.

16   Q    Four or five months?

17   A    Four to six months, approximately.

18   Q    Why did you decide to join PointCare?

19   A    To join a new company that would

20   provide new health care products throughout world.

21   Q    What business was MediCept in?

22   A    Engineering consulting.

23   Q    Any focus on that?

24   A    Yes.

25   Q    What was that company's focus?

Don Barry

1            D. Barry, Jr.

2      A    Consulting.

3      Q    Okay.  Did they consult any

4    particular kinds of businesses?

5      A    Many different kinds.

6      Q    I notice the word Medi, M-E-D-I is in

7    their name.

8            Did they focus on medical businesses?

9      A    Yes.

10     Q    Okay.  Did they actually -- did they

11   manufacture or design any medical devices?

12           MR. CRAMER:  Objection.

13     A    Yes.

14     Q    What kinds of devices did they do?

15   Did they manufacture or design?

16           MR. CRAMER:  Objection.

17     A    Which one?

18     Q    MediCept.

19     A    No, manufacture and design -- can I

20   have the question?

21     Q    Let me break it down into two.

22     A    Thanks.

23     Q    Did they manufacture any medical

24   devices?

25     A    Yes.

Don Barry

1              D. Barry, Jr.

2      Q    What medical devices did they

3    manufacture while you were there?

4      A    Disposables.

5      Q    What are disposables?

6      A    Things you throw away.

7      Q    Disposable what?

8      A    Medical devices.

9      Q    Okay.  What kind of medical devices

10    are disposable?

11      A    Ones that are thrown away after use.

12      Q    Sorry.  I should try to be a little

13    more clear.

14          What different kinds of medical

15    devices will be examples of disposable medical

16    devices?

17      A    An example would be a syringe.

18      Q    Okay.  You definitely wouldn't want

19    to reuse that.

20          Can you give me some other examples?

21      A    Needles.

22      Q    Now, other than disposables, did they

23    manufacture other kinds of medical devices, again,

24    while you were there?

25      A    Yes.

Unsigned

Don Barry

1                    D. Barry, Jr.

2        Q    What other kinds?

3        A    Instruments.

4        Q    What kinds of instruments?

5        A    Analysis instruments.

6        Q    Have you heard of the term "flow

7    cytometer"?

8        A    Yes.

9        Q    Did they do flow cytometers?  Did

10    they manufacture flow cytometers?

11        A    Not while I was there.

12        Q    Did they design flow cytometers?

13        A    Not while I was there.

14        Q    Did they manufacture parts for flow

15    cytometers?

16        A    Not while I was there.

17        Q    Did they design parts for flow

18    cytometers?

19        A    Not while I was there.

20        Q    Did they design medical instruments

21    in general?

22        A    Yes.

23        Q    What medical instruments -- withdraw

24    that.

25                What medical instruments or devices

Don Barry

1                D. Barry, Jr.

2    did MediCept design while you were there?

3        A    Can you define "design," please?

4        Q    Sure.

5            Have you heard the word "design" used

6    in the context of the medical device industry?

7        A    Yes.

8        Q    Okay.  When you heard, when you hear

9    someone use the word "design," what do you

10   understand it to mean?

11       A    When it's used as just the term

12   "design"?

13       Q    Um-hum.

14       A    It implies all phases of design.

15       Q    Okay.  So, using that same definition

16   here, to the best of your knowledge while you were

17   at MediCept, what kinds of instruments did they --

18   medical devices or instruments did they design?

19       A    I can't remember.

20       Q    Do you have any other, since getting

21   your bachelor's, do you have any other

22   postgraduate degrees or education?

23           MR. CRAMER:  Objection.

24       A    Yes.

25       Q    What do you have?

Don Barry

1                    D. Barry, Jr.

2       A    Education.

3       Q    Okay.  Do you have any other

4    postgraduate degrees?

5       A    No.

6       Q    Okay.  Have you taken any formal

7    classes since graduating from Colby College?

8       A    Yes.

9       Q    What classes have you taken?

10      A    Physics classes.

11      Q    Okay.  Where have you taken those?

12      A    Wooster Polytechnic Institute.

13      Q    Okay.  Anything else, any other

14   classes?

15      A    Yes.

16      Q    Okay.  What other classes have you

17   taken?

18      A    I took an electrical and computer

19   engineering class.

20      Q    The same place, Wooster Polytechnic?

21      A    Yes.

22      Q    Any other classes?

23      A    No.

24      Q    Okay.  Are these classes working

25   towards a degree?

Don Barry

1                    D. Barry, Jr.

2        A    Yes.

3        Q    What is that degree?

4        A    Masters of science.

5        Q    Okay.  Do you expect to get that from

6    Wooster Polytechnic?

7        A    Yes.

8        Q    Do you have a projected date on which

9    you will get that degree?

10       A    No.

11       Q    Okay.  Now, you told me earlier, when

12   you first joined PointCare as an assistant

13   scientist, back in the fall of 2003, you were

14   assigned, either principally or exclusively, to

15   research and development for something called the

16   AuRICA.  Do you recall that?

17       A    Yes.

18       Q    Okay.  What is the AuRICA?

19       A    A flow cytometer.

20       Q    And what stage of development was the

21   AuRICA in when you joined PointCare?

22       A    Design.

23       Q    How far along in the design process

24   was it when you joined PointCare in the fall of

25   2003?

Unsigned

Don Barry

1              D. Barry, Jr.

2       A    I am not sure I understand that

3    question.

4       Q    Sure.

5              Was there an actual prototype at that

6    stage?

7       A    Yes.

8       Q    Okay.  And was it referred to as the

9    AuRICA at that stage or was that a name that was

10   placed on it at a later date?

11      A    That was the name that was placed on

12   it at a later date.

13      Q    What was it called at that stage, if

14   anything?

15      A    When I joined the company, I'm not

16   sure that it had an official name.

17      Q    Okay.  And you said you assisted in

18   research and development with respect to the

19   AuRICA.  What, specifically, did you do as a

20   assistant scientist with respect to the AuRICA or

21   what subsequently became known as the AuRICA?

22             MR. CRAMER:  Objection.

23      A    I ran the instrument.

24      Q    And what does that entail?

25             I apologize.  What did that entail?

Don Barry

1              D. Barry, Jr.

2      A    Using a software menu that was

3    associated with the instrument and following the

4    instructions.

5      Q    Was the instrument attached to a

6    computer?

7      A    Yes.

8      Q    Okay.  What kind of computer?

9      A    Can you clarify that?

10      Q    Sure.  Was it a regular PC or some

11    specialized kind of computer, the hardware I am

12    talking about now?

13      A    It's a PC.

14      Q    And you said using a software menu,

15    was this software particular for the AuRICA?

16      A    No.

17      Q    Does the software program have a

18    name, the one that you worked with back when you

19    were an assistant scientist?

20      A    Yes.

21      Q    What was the name?

22      A    Sandbox.

23      Q    Is that PointCare software or does a

24    third-party vendor make that?

25      A    It's a third-party.

Don Barry

1                      D. Barry, Jr.

2        A    Yes.

3        Q    Okay.  If you could take us through

4    and show us, show us those parts.

5        A    Is this still under the objection?

6             Attachment one to annex one.

7        Q    Yes, okay.

8        A    Attachment two to annex one.

9        Q    And those are product specifications

10   for the HT instrument?

11       A    Yes.

12       Q    Okay.  Any other parts?

13       A    Attachment three to annex one.

14       Q    Synopsis of PointCare Technologies

15   Assay for the Identification of CD4 Positive

16   Lymphocytes.

17       A    Yes.

18       Q    Any other parts?

19       A    Attachment one to annex two.

20       Q    Okay.

21       A    That's all I can remember.

22       Q    Okay.  Let's go to attachment one to

23   annex one.

24       A    Okay.

25       Q    What was your role with respect to

Unsigned

Don Barry

1                    D. Barry, Jr.

2     this attachment?

3       A    To provide input.

4       Q    And that would have been to Dr.

5     Hansen?

6       A    Yes.

7       Q    Did you draft this?

8       A    I can't remember.

9       Q    You might have.

10      A    Yes.

11      Q    Okay.  What about attachment two to

12    annex one, what was your role there?

13      A    I drafted this.

14      Q    This has four columns.  The first --

15    five columns.

16           The first column says CR/BR number.

17    Do you see that?

18      A    Yes.

19      Q    What does that refer to?

20      A    Customer requirement/business

21    requirement.

22      Q    And those are numbers you assigned to

23    each of these?

24      A    Yes.

25      Q    And when you use the term customer or

Unsigned

Don Barry

1               D. Barry, Jr.

2    business requirement, what were you referring to?

3               MR. CRAMER:  Objection.

4        A     The definitions are defined in the

5    guideline document that describes how to draft

6    this particular type of document in our quality

7    system.

8        Q     That is a PointCare corporate

9    guideline document.

10       A     Yes.

11       Q     Okay.  And who is the customer being

12   referred to here?

13       A     Anyone who would purchase or use the

14   instrument.

15       Q     Okay.  And how did you come to the

16   determination of what customers would require of

17   this product specification?

18       A     I'm sorry.

19             Can you rephrase that, please?

20       Q     Sure.

21             How did you come -- you drafted this;

22   correct?

23       A     I drafted it, yes.

24       Q     Okay.  So, in drafting column two,

25   how did you come to decide what would become

Unsigned

Don Barry

1                D. Barry, Jr.

2        A    Yes.

3        Q    Who, what do you understand his role

4    to be with respect to the HT project?

5        A    He would be the project manager from

6    Drew's side.

7        Q    Essentially, your counterpart?

8        A    Yes.

9            MR. DELLAPORTAS:  Okay.  I'm going to

10       ask the reporter to mark as Barry Exhibit

11       4 --

12       Q    Before I do that, one further

13   question on the FDA issues.

14           In performing your, your FDA

15   regulatory obligations that you have just

16   testified to, would you have needed anything from

17   Drew, other than a validated instrument?

18           MR. CRAMER:  Objection.

19       A    Yes.

20       Q    What else would you have needed from

21   Drew?

22       A    I am not qualified to define

23   everything that we would need.

24       Q    Fair enough.

25           What other things can you

Don Barry

1                    D. Barry, Jr.

2      specifically identify that you would need from

3      Drew --

4            MR. CRAMER:  Objection.

5      Q      -- on top of the validated instrument

6      as you have testified?

7      A      Labeling.

8      Q      Okay.  Anything else?

9      A      That's all I can think of right now.

10           MR. DELLAPORTAS:  Okay.  Now, I am

11      going to mark as Barry Exhibit 4, a document

12      bearing Bates labels DR60272 through

13      DR60274.

14           (Barry Exhibit 4 marked for

15      identification as of this date.)

16      Q      Mr. Barry, do you recall sending this

17      e-mail to Mr. Young on or around March 16, 2007?

18      A      I don't recall sending the e-mail.

19      Q      Do you have any reason to believe

20      this isn't your e-mail?

21      A      No.

22      Q      Okay.  "I feel bad and somewhat

23      responsible that we are having trouble with that

24      optical sensor.  I know that you sent me some

25      Lexan to test with and I had said that it would be

                    Unsigned

1                D. Barry, Jr.

2      okay.  This reagent is very difficult to deal with

3      and we have been stumped and have had three or

4      four engineering groups stumped at finding

5      materials that can be machined and are compatible,

6      I know that the small channels of the gold channel

7      are virtually impossible to polish and this is may

8      be the cause of the buildup.  It may be possible

9      to switch to Delrin, which seems to work well with

10     the gold reservoir, if an infrared sensor can read

11     through it."

12            Do you see that?

13     A     Yes.

14     Q     What is Lexan?

15     A     The type of plastic.

16            MR. CRAMER:  For completeness of the

17     record, I will point out in line three the

18     word "other" also appears in the page.

19     Other than that, the reading was

20     magnificent.

21     BY MR. DELLAPORTAS:

22     Q     Now, on the penultimate line of that

23     paragraph you refer to something called "the

24     buildup."

25            Do you see that, the second to the

Don Barry

1                    D. Barry, Jr.

2      last line of that paragraph?

3          A    Yes, I see that.

4          Q    What were you referring to there?

5          A    At this time I had believed that

6      there was some kind of buildup that was

7      interfering with the optical sensors.

8          Q    Okay.  And how did the Lexan relate

9      to that concern?

10         A    The described buildup was in a piece

11     of Lexan.

12         Q    I see.  Now, what about the reference

13     to something called Delrin.  What is Delrin?

14         A    It's another type of plastic.

15         Q    Okay.  Did the parties ever study the

16     feasibility of switching to Delrin?

17         A    I'm sorry.  Can you be more clear on

18     that?

19         Q    Sure.

20              Did the parties ever investigate your

21     suggestion of possibly switching to Delrin?

22         A    I'm not sure.

23         Q    Okay.  And whether it be Lexan or

24     Delrin or something else, what specific part of

25     the device would these substances have been used

Unsigned

Don Barry

1                    D. Barry, Jr.

2      for?

3         A      Parts of the device where the gold

4      reagent would be in contact with.

5         Q      Would that include the internal

6      surfaces of the device?

7         A      I'm not sure what you mean by

8      "internal surface."

9         Q      What parts of the device would the

10     gold have been building up in?

11        A      The only area that we were able to

12     detect was the area of the interrogation zone of

13     the optical sensor.

14        Q      And is it fair to say that this gold

15     buildup issue was one of the principle causes of

16     the delays of the HT development?

17              MR. CRAMER:  Objection.

18        A     Yes.

19        Q      Okay.  Now, the next paragraph reads,

20     in relevant part, "the rest of the design of the

21     instrument is quite impressive.  Before our issue

22     yesterday, I saw some of the best CD4 clusters

23     ever on any instrument that we have worked at

24     PointCare, including our current platform.  It was

25     difficult for me to get any work done for the

                            Unsigned

Don Barry

1                    D. Barry, Jr.

2      first day that we had the instrument installed

3      because everyone kept bothering me to show them

4      the dot plots.  The lysing step was almost at a

5      point where the cycle is complete.  I was actually

6      surprised to see that you guys got that far.  It

7      is such a difficult reagent system to work with

8      that I spent nearly four months to get it to work

9      on our current platform, which included a week of

10     work with the guy who led the team that developed

11     the reagents."

12                    Do you see that?

13     A     Yes.

14     Q     Who is the guy who led the team that

15     developed the reagents that you are referring to

16     there?

17     A     I can't remember his name.

18     Q     Okay.  Is he a PointCare person?

19     A     No.

20     Q     Where did the reagents come from?

21                    MR. CRAMER:  Objection.

22     Q     Let me, actually, rephrase it.

23                    Who developed the reagents?

24     A     Can you please clarify?

25     Q     Yes.  Let me be a little more

Don Barry

1          D. Barry, Jr.

2          MR. DELLAPORTAS:  This as good a

3     place as any.

4          (Recess taken.)

5          MR. CRAMER:  Go on the record.

6          During the break, Mr. Barry pointed

7     out to me that he was in the middle of an

8     answer when the next question inadvertently

9     jumped in, and he wanted to finish his

10    answer.

11   BY MR. DELLAPORTAS:

12    Q    Please go ahead and do so.

13    A    I have to find the question, but it

14   was --

15    Q    Can you give me kind of the --

16    A    The gist is you were asking me who

17   were the reagent, the manufacturers of the

18   different reagents for the system and I had

19   indicated PointCare, and I had indicated that I am

20   not sure who develops reagents that came from

21   Drew.

22    Q    Okay.

23    A    And then there is also Beckman

24   Coulter is another reagent manufacturer.

25    Q    Okay.  Thank you for that.

Don Barry

```
 1                  D. Barry, Jr.

 2             I'm sorry for cutting you off.

 3      A     That's fine.

 4      Q     Before we finish up with Barry

 5   Exhibit 8, on the Glen Ford thing on the bottom of

 6   the first page of that document, there is a follow

 7   up e-mail from you to Dr. Hansen in which you

 8   state, "I took care of it I think.  No big deal.

 9   Petra can tell you the whole story.  I did put out

10   a warning for Glen."  Signed Don.

11             What is the warning for Glen that you

12   were referring to there?

13      A     It was a reminder that he has an NDA

14   agreement with us and cannot disclose any trade

15   secrets with respect to the gold to any other

16   company.

17      Q     And the Petra, there is a reference

18   to Dr. Krauledat, the president or the then

19   president of PointCare?

20      A     Yes.

21      Q     At a certain point shortly after that

22   e-mail, did Drew put the HT project on hold?

23      A     I don't know.

24      Q     You don't remember that term being

25   used, "put the HT project on hold"?
```

Unsigned

Don Barry

1                D. Barry, Jr.

2       A    I can't remember.

3            MR. DELLAPORTAS:  Okay.  Let's mark

4       as Barry Exhibit 9, document bearing Bates

5       numbers PointCare Supp 6305 through 6306.

6            (Barry Exhibit 9 marked for

7       identification as of this date.)

8       Q    If I could direct your attention to

9   the second page and, specifically, the e-mail at

10  the top of the page, which appears to be an e-mail

11  from Linsey Rockingham to you on July 10th, 2007.

12           Do you see that?

13      A    Yes.

14      Q    Do you recall receiving that e-mail?

15      A    I don't recall.

16      Q    Any reason to believe you didn't

17  receive it?

18      A    No.

19      Q    Who is Linsey Rockingham?

20      A    PointCare employee.

21      Q    What is her position or what was her

22  position at the time?

23      A    I don't remember her exact title.

24      Q    What was -- what responsibilities --

25  withdraw that.

Unsigned

From: Peter Hansen
To: Roger Bourree; rbourree@MWI-DANAM.COM
Subject: Don's Report
Date: 4/5/2006 6:27:51 PM

Attachment N1: HT-0001 System Mod Feasibility.doc

Title of Project:    High Throughput System for Developing World Market

Date:    March 27, 2006

Author:    Don Barry

Approvals:

| APPROVALS | | | | |
|---|---|---|---|---|
| name | Signature | date | Title | Document Approval Function |
| Don Barry | | | Scientist/Engineer | Originator/Project Manager |
| Romiya Glover | | | Scientist | Technical Review |
| Maurice Doire | | | Director, QA/QC | QA/QC |

Confidential

PointCare Supp 05489





## Abstract

The Excell 22 (Drew Scientific) has been identified as an instrument that can be adapted to accommodate a CD4 immunogold assay. This system has the potential for becoming a high throughput analyzer for approximately 100-150 hematology plus CD4 samples per day.

The PointCare lysing system (Erythrolyse/Stabilyse) has proven to be more effective in CD4 cluster presentation than the Drew lyse. The Drew lyse will remain onboard for the gold-free 5-part leukocyte differential. The Drew paddle mixers can be used to lyse samples for CD4 analysis with the Erythrolyse. Further optimization is to be done in the Excell 22 mixing chamber.

The Excell 22 optics has been modified to accommodate the CD4 immunogold assay. A new "Right-Angle Scatter" (RAS) detector has been added to the optical assembly for improved CD4 analysis over the Excell 22 "Super-Wide Angle" (SWA) Detector. A black matte finish has been applied to the interior of the optical assembly to reduce stray light. The Excell 22 does not currently have any integration on the detectors, but this may have to be implemented for enhanced CD4 cluster presentation.

Fluid delivery modules will have to be added to the Excell 22 to accommodate the addition reagents required for the CD4 immunogold assay. A gold reagent and accelerant delivery module as well as delivery for the Erythrolyse and Stabilyse will have to be implemented. There is an auto-sampler that PointCare would like to use for all systems being sold for CD4 analysis. This would allow the system to be operated for 30 samples without interruption.

Modifications to the Excell 22 analytical software will have to be made for CD4 cluster recognition as well as flagging criteria. The Excell 22 user interface will also have to be modified for CD4 analysis of patients and controls.

Some of the components of the Excell 22 are open and susceptible to dust and particulate collection. These components will have to be examined for the environment that PointCare plans to place these instruments. Internal control points for temperature, humidity, and door and cover sensors will also have to be addressed.

Confidential

PointCare Supp 05490



1.  Purpose

    a.  Drew Scientific currently sells an instrument by the name "Excell 22" that has the potential to utilize a CD4 gold assay. The purpose of this investigation is to examine the possibility of adapting the Excell 22 to analyze a CD4 gold assay and determine the necessary hardware modification to do so.

2.  References and Attachments

    b.  PointCare Lab Notebook PCT-1035, pages 1-2, 20-32

    c.  PointCare Lab Notebook PCT-1040, pages 16-19

    d.  Drew Scientific Visit Report 010506

    e.  Drew Scientific Visit Report 021006

    f.  Bikoue, A., et al. *Quantitative Analysis of Leukocyte Membrane Antigen Expression: Normal Adult Values.* Cytometry. Vol. 26: pages 137-147. 1996.

3.  Test Results

    g.  Description and Status of Testing:

| Task # | Test Task | Critical Element | Schedule | Responsibility |
|---|---|---|---|---|
| 1. | Decide between Drew RBC lysing reagent and PointCare RBC lysing reagent | Lysability and CD4 cluster separation | 2/10/06 | D. Barry |
| 2. | Evaluate Excell 22 paddle mixers | Lysability and CD4 cluster separation | 3/31/06 | D. Barry |
| 3. | Evaluate Excell 22 optics as platform for PointCare immunogold assay | CD4 cluster separation | 3/31/06 | D. Barry/ P. Hansen |
| 4. | Evaluate Excell 22 data handling electronics and sample handling electronics | Flexibility necessary for CD4 assay | 2/10/06 | D. Barry |
| 5. | Determine design options for immunogold dispensing | Small volume (~10 uL) fluid delivery | 3/31/06 | D. Barry |
| 6. | Determine gates and regions for analytical software development | New gates for CD4 lymphocytes | 3/31/06 | D. Barry |
| 7. | Evaluate Excell 22 user interface | CD4 analysis capability | 3/31/06 | D. Barry |

Confidential

PointCare Supp 05491

| 8. | Determine dust-sensitive components of Excell 22 | Particulate interference | 2/10/06 | D. Barry |
| 9. | Determine compatibility of auto-sampler | Throughput expected, number of samples held, and sample volume delivered | 2/10/06 | D. Barry |
| 10. | Evaluate internal control points in Excell 22 | Complete hardware and assay control points | 3/31/06 | D. Barry |

h.  **Significant Test Results**

    i. Both the Drew five-part differential lysing reagent and the PointCare lysing reagent (Erythrolyse II) are acceptable for red cell lysis. The PointCare lysing reagent did however produce greater CD4 cluster separation than the Drew lyse (figure 1). Please see below a legend for Excell 22 parameter numbers:

| Parameter Number | Description | Angle |
| --- | --- | --- |
| 1 | Low Angle Scatter (LAS) | ~3° |
| 2 | Extinction (EXT) | 0° |
| 3 | Wide Angle Scatter (WAS) | ~8° |
| 4 | Super Wide Angle Scatter (SWA)/ Right Angle Scatter (RAS) | ~30° - 45° for SWA, 65° – 115° for RAS |

Confidential

PointCare Supp 05492



*Figure 1:* The plots above demonstrate that both the Drew lyse (left) and the PointCare lyse (right) can produce clean RBC lysis, but only the PointCare lyse presents a clear CD4 cluster.

    ii.       The paddle mixer and mixing sequence that exists in the Excell 22 did not provide sufficient mixing to completely lyse the red cells and present CD4 cluster separation similar to off line vortex mixing. A breadboard of the paddle mixer with a stepper motor to control mix speeds and times was developed to evaluate if the paddle mixer could be used with a different sequence.

The vortex sequence of 3 seconds mix with blood, gold, and diluent, then add lyse and vortex for 8 seconds, then add quench and vortex for 10 seconds is considered to be the standard to compare to [PCT-1035: 1-2]. All vortexing is done at 1700 rpm. The standard volumes are 50 μL whole blood, 50 μL diluent (PBS with 0.1% polybrene), 20 μL gold, 300 μL Erythrolyse II, and 133 μL Stabilyse [PCT-1035: 1-2]. An example of this sequence using an AuRICA for the analysis portion can be seen in figure 2.

Confidential

PointCare Supp 05493



*Figure 2:* The plot above shows the Erythrolyse when vortexing is used to lyse the sample.

When the same sequence is used with the paddle mixer, a clean leukocyte differential can be seen when no gold or diluent are used (figure 3). When gold is added, the CD4 cluster is present, but there are some unlysed RBCs present (figure 3).

Confidential

PointCare Supp 05494





Confidential

PointCare Supp 05495







*Figure 3:* The left plot shows that when the paddle mixer is used with no gold or diluent, a clean WBC differential can be seen. The right plots shows that with the same sequence but with gold added, the CD4 cluster is present, but unlysed RBCs are present as well.

It is still possible to use the paddle mixer to obtain both an easily discernable CD4 cluster and a clean leukocyte differential. Some options for modification of the lyse sequence include lyse and quench volume adjustment, lysing time adjustment, and lyse mixing speed. Complete results from testing using these sequences can be found in notebook PCT1035: 20-32.

Confidential

PointCare Supp 05496





Confidential

PointCare Supp 05497





Confidential

PointCare Supp 05498





*Figure 4:* The left plot shows that when the lyse volume is increased from 300 to 400 μL, the RBCs are decreased. The center plot shows that when the mix speed is increased from 1700 to 3400 RPM, the RBCs disappear, but it looks like there may be some platelet aggregates or possibly agglutination of leukocyte fragments or protein. The right plot shows that when the lyse mix time is extended to 12 seconds, but the mix speed and volumes are the same, the RBCs tend to disappear.

Optimization of the paddle mixer should be done using the Drew Excell 22 mixing chamber. The geometry and material of the chamber is different than that of a 12mm polypropylene culture tube and the mixing may be slightly different. It may be necessary to modify the Excell 22 mixing chamber so that no reagent is lost through the bottom of the cuvette.

iii.     The existing optics in the Excell 22 had to be modified to accommodate the CD4 assay. The Excell 22 optics currently has a "super-wide angle" detector that has a mask to detect eosinophils at 30° to 45°

Confidential

PointCare Supp 05499

(figure 5). To be able to see the CD4+ cells separate from the CD4-, the mask had to be removed to allow an angle of 30° to ~90°.



*Figure 5:* The plot above shows PointCare lyse with Excell 22 optics as manufactured today with a mask on the super-wide angle detector.

In order to see an improved CD4 cluster presentation, the gain for the super-wide scatter detector was nearly doubled. This did improve the visibility of the CD4 cluster, but also added noise. The scatter gain was then brought down to about 1.5 times the original gain and similar results were seen with slightly less signal (figure 6).

Confidential

PointCare Supp 05500



*Figure 6:* The left plot shows the mask removed and the gain doubled on the super-wide angle detector. The right plot shows a gain of 1.5 times the original. In both cases, an increased noise is seen.

The Excell 22 laser normally runs at about 2 mW. When the laser power was increased from approximately 3 mW to 4 mW (1.9V), cluster definition was improved without a significant increase in noise (figure 7). It may be necessary to use a higher powered laser to easily define a CD4 cluster. PointCare currently uses a laser running at 8 mW to visualize a CD4 cluster. The Drew system does have a PMT that may prevent the need for a higher powered laser. The beam profile in the Excell 22 optics is 200 μm wide by 20-25 μm tall. This appears to be acceptable for sizing the cells as well as producing enough signal for all detectors.

Confidential

PointCare Supp 05501



*Figure 7:* The above plot shows an increased CD4 separation by increasing the laser power without increasing the gains.

The PMT for the super-wide angle has a light collection lens. We removed this lens to see if we could eliminate an extra alignment step in manufacturing, as well as the need for an extra part (figure 8). It does appear that even with the lens removed, a CD4 cluster can be seen. Just to note, a different gold lot was used that may account for differences in CD4 separation from previous analysis.

Confidential

PointCare Supp 05502





*Figure 8:* The above plot shows the CD4 cluster without a light collection lens.

There was a modified optical assembly at Drew with the internal walls of the optics covered with a matte black finish to reduce stray light. This increased the signal of the clusters and should help us in locating the CD4 clusters (figure 9).

Confidential

PointCare Supp 05503





| Region # | # of Events | % of Gated Cells |
|---|---|---|
| None | 1410 | 100.0 |
| 1 | 1410 | 100.0 |
| 2 | 745 | 52.84 |
| 3 | 0 | 0.0 |

*Figure 9:* The above plot shows the CD4 cluster with a blackened interior and without a light collection lens.

In order to analyze both eosinophils (by use of the mask) and the CD4 cluster, an additional detector (PMT) was added to the other side of the Excell 22 optics. It is possible to identify eosinophils without the mask (figure 10), but the mask is an enhancement. The interior of the optical assembly does have a black finish to reduce stray light. The additional detector does have a light collection lens but there is no mask. The lens may not be necessary for the RAS detector, but more testing paying close attention to noise will have to be done. This detector is repositioned to be centered at 90° with a range at approximately 65° to 115°. A CD4 cluster could be easily seen using this optical assembly (figure 11) when the laser is

Confidential

PointCare Supp 05504

run at 1.5 mW. Although it is difficult to determine if increasing the laser power improved cluster definition in the case, previous testing has shown that this may be an improvement. It may be necessary to further increase the laser power for larger CD4 cluster separation.





*Figure 10:* The plot above shows that when the Drew 5-part differential lyse is used with a sample without gold, the eosinophils are easily distinguished, even without the mask.

Confidential

PointCare Supp 05505





*Figure 11:* The left plot shows that when using the additional right-angle scatter (RAS) detector without a mask, a CD4 cluster can be seen. The right plot shows an increased laser power from 1.5 to 2 mW.

The current PointCare electro-optics design on the AuRICA System uses a higher power (8mW) laser and has analog integration on the RAS preamp. A slight improvement to the CD4 cluster presentation can be seen with higher laser power, but the majority of the enhancement is done by the integration (figure 12). For this reason, it may be necessary to add integration to the Drew optics for optimal cluster presentation.

Confidential

PointCare Supp 05506



Confidential

PointCare Supp 05507



Confidential

PointCare Supp 05508



*Figure 12:* The three plots above are examples of a manual preparation of the Erythrolyse/Stabilyse system. The left and center plot is a sample analyzed with the PointCare optics and the right is using the Drew optics. The center plot demonstrates the increased cluster presentation when using integration. For this reason, it may be necessary to add integration or increase laser power on the Drew system for increased signal.

Additional information including testing procedures and results can be found in *Drew Scientific Visit Report 010506*, *Drew Scientific Visit Report 021006*, and *PCT 1040, pages 16-19*.

iv.     The Excell 22 is currently going through a revision to replace obsolete electronics that may have been a concern to PointCare for future manufacturability.

The need to add the PointCare lyse reagents and gold delivery module present the need for I/O ports in the Excell 22. These ports are available for implementation of the CD4 assay fluid handling.

There is a new power supply design that will meet the PointCare business and marketing needs. A power budget of the Excell 22 is acceptable so that in case of a power failure, a sample may be completed and the system may

Confidential

PointCare Supp 05509



safely be shutdown with the presence of an Uninterruptible Power Supply (UPS). The possible use of an automobile battery pair for daily operation is still to be determined.

The data collection electronics only have peak detection (no integral channel). There is a benefit to adding integration due to increased CD4 cluster presentation. This will have to be explored further.

An onboard processor and touch screen monitor would be desirable for a future revision, but an external touch screen should be acceptable at this time.

v.        The immunogold dispensing does not have to be done at a high precision (only ~10%). Syringes for immunogold and accelerant will have to be added to the Excell 22 for CD4 analysis. Because of the small volumes used, it may be necessary to add a pipetting system for the gold and accelerant reagents. The pipetting mechanism would also be necessary for the dried gold reconstitution. Attention to fluid line lengths and internal diameters are needed to ensure minimal loss of gold reagent to waste. In-line mixing may be needed for the blood, gold, and accelerant mixture.

A temperature control module for the bulk gold reagent will need to be added to the Excell 22. The bulk reagent temperature specifications have not yet been determined, but it is expected to be 2-25° C.

vi.        The gates and regions for analytical software have been established for CD4 analysis. The lymphocyte gate can be placed in the low angle vs. wide angle scatter parameters. After gating on lymphocytes, the CD4 cluster can be seen using extinction vs. a modified super-wide angle (right-angle scatter). Because analysis will be dual platform, a conservative (small CV) gate can be chosen for purity of lymphocytes to obtain a CD4%. This can then be applied to the lymph count obtained by either the impedance channel or the gold-free lymph count from the cytometer.

vii.        The Excell 22 user interface (UI) will have to be modified to accommodate a CD4 testing option, as well as a hematology only test. The UI will also need to be modified for CD4 and external controls.

viii.        Currently, the Excell 22 has open cuvettes that may allow dust to enter the mixing chamber. A cover will have to be developed to prevent contamination to mixing chambers.

ix.        The auto-sampler in existence for the Excell 22 can operate uninterruptible for 30 samples at a time. This is an expected time of 90 minutes of automated operation for a CD4 test. There is a barcode reader for positive sample identification. No testing has been done, but modification for a CD4 assay appears favorable.

x.        Internal control points may have to be implemented. Currently, door

Confidential                                                    PointCare Supp 05510

and cover sensors, reagent level sensing, database verification, and volume check (auto-sampler only) exist, but some anticipated hardware controls for temperature and humidity are to be introduced later. There are existing flags for hematology parameters but new flagging criteria and control points for CD4 analysis will have to be included as well.

i.  Other Test Results

n/a

4.  Discussion

j.  The integration may be necessary to overcome differences in CD4 cluster presentation. Patient to patient variability can be as much as 30% due to number of CD4 antigen sites. A study done on normal patients by Bikoue et al. found that the average number of CD4 antigen sites on a T-Lymphocyte is $47,000 \pm 14,000$ ($\pm 30\%$). The difference in number of CD4 antigen sites could present differences in CD4 cluster presentation. A patient with a low number of antigen sites could have large overlap between CD4- and CD4+ which would be difficult to resolve.

The integration also would decrease noise on the RAS channel. The CD4 absolute count is less than 50 counts/$\mu$L in many patients who are in late stage AIDS. This is in the range of noise on the RAS detector when using peak detection only. By adding integration, the low CD4 counts should be easier to detect.

5.  Conclusions

k.  The Excell 22 system can be modified to accommodate a CD4 immunogold assay. The Excell 22 can be adapted to meet the needs of a developing world market for high volume CD4 analysis.

Confidential

PointCare Supp 05511



6. Recommendations

    l. The Erythrolyse II/Stabilyse lysing system should be used to obtain a CD4 cluster on the Excell 22. The Erythrolyse II produced a larger separation between the CD4- and CD4+ clusters than the Drew lyse.

    m. The mixing sequence with the Drew Excell 22 paddle mixer needs to be optimized for the mixing chamber to be used. This can be developed using the mixer breadboard and an AuRICA instrument and compared to vortexing as a standard.

    n. The Excell 22 optics can be used for the CD4 immunogold assay with the following modifications:

        i. An additional PMT now should be placed on the opposite side of the " super-wide angle" detector to act as a "right-angle scatter" detector. There should be no mask on this side and testing will need to be done to determine the need for a light collection lens.

        ii.     The interior of the optical assembly should have a black finish.

        iii.     A power increase or change to the current Excell 22 laser may be necessary. This should be pursued as part of assay and system optimization when rapid sample delivery is available. Options for integration on the RAS detector will also have to be examined. The beam size appears to be appropriate for CD4 analysis.

    o. Create new module for handling PointCare lyse reagents and gold delivery module. Data handling for the additional detector must be addressed as well.

    p. A bulk gold reagent must be developed for this system. Number of uses, reagent drying method, reconstitution method, and temperature control must be developed at PointCare.

    q. Gating strategies for the CD4 cluster need to be developed for the Excell 22. Only a CD4% will be necessary for this part of the analysis. There currently is no integration for scatter parameters in the Excell 22. This will create more globular cell clusters (CD4- and CD4+) and may be more easily analyzable by histogram analysis methods.

    r. Modifications to the Drew UI must be done to accommodate CD4 whole bloods and controls.

    s. Dust covers for open cuvettes should be designed to prevent particulate interference.

    t. The auto-sampler sequence will have to be modified to allow sampling for CD4 analysis.

    u. Internal control points for hardware and flagging criteria for CD4 analysis must be

Confidential

PointCare Supp 05512

implemented.

Dear Roger,

Our meetings here with Rich, Harry, and Frank really moved right along, and I think everyone is on the same page.

I have attached Don Barry's report regarding the system work that you, Romiya, and he did in Dallas. I think that there is one very important new conclusion which you can read on Page 14 and 16. I can summarize it here:

Make no change in laser power from the current Excell 22 configuration. The advantage is of course that no current hematology analysis will need to be changed in the new system. However, even though with the current laser power there are two clusters, there really is insufficient CD4 cluster separation. If, however one was to add an integrator to the new PMT electronics, the cluster separation should be fine.

Here is why we say the cluster separation is "insufficient". The problem with CD4 analysis is that there is a 30% CV in the mean number of CD4 receptors on lymphocytes from patient to patient. It has nothing to do with HIV or the stage of the diasease. This means that the CD4 positive cluster position on the right angle scatter axis moves plus and minus about 50% if you take into account extreme cases. For this reason, you need a pretty big valley between populations when you are looking at the "average" patient in order to deal with the extreme low antigen density patients.

If you look at Don's dot plots on page 14, you will see the following illustration: The left-hand plot is the PointCare optics and peak detection for the signals. The right-hand plot is the Drew (new) optics and also peak detection for the signals. The plots are similar inasmuch as there is not a wide valley between the two clusters. The middle plot is the same sample and same run as the left-hand plot with PointCare optics, but analyzed through an integrator (we get both peak and integral outputs on PointCare). You can see the dramatic improvement in the size of the valley with the integrator.

Don and I propose that we include an integrator on the new PMT output. We have had a lot of experience with flow cytometry integrators, and in fact we have an excellent contractor near here that builds them for us. I am sure that he could design and build the appropriate board for you very quickly.

Let either Don or me know if there are any changes or additions that you would like to make to the report.

Thanks, and we are looking forward to seeing you in Boston.

Confidential

PointCare Supp 05513

Peter

Confidential

PointCare Supp 05514

COPY

## Manufacturing, Distribution and Co-Marketing Agreement

This Agreement, together with *Annexes 1 to 6* attached hereto and incorporated by reference ("**Agreement**") is made this _____ day of **June, 2006** by and between PointCare Technologies, Inc., a company organized and existing under the laws of the Commonwealth of Massachusetts, with offices at 121 Cedar Hill Street, Marlborough, Massachusetts, USA ("**POINTCARE**"), and **DREW SCIENTIFIC INC.**, a company organized and existing under the laws of Texas, with offices at 4230 Shilling Way, Dallas, Texas, USA ("**DREW**"). POINTCARE and DREW are sometimes hereinafter collectively referred to as the "Parties".

### RECITALS

**WHEREAS**, POINTCARE develops, manufactures, and sells medical diagnostics that enable near patient care testing to be performed effectively, including POINTCARE'S proprietary CD4 Lymphocyte Enumeration Assay, CD4sure™.

**WHEREAS**, DREW, among other things, develops, manufactures, and sells *in vitro* diagnostic instrumentation platforms, including the Excell 22™, and associated consumables.

**NOW THEREFORE**, in consideration of the mutual promises and conditions herein contained, the Parties agree as follows:

### Art. 1. Diagnostic Platform Development

**1.1** DREW agrees to modify its current Excell 22™ hematology platform to accommodate POINTCARE'S proprietary CD4 Lymphocyte Enumeration Assay, CD4sure™. DREW will manufacture one modified version, called the 'HTc', which will be a full five part system that will be marketed and sold by DREW, and a second version, called the 'HTw', which be marketed and sold by POINTCARE for use in the treatment of patients with HIV infection. For purposes of this Agreement, these platforms will be referenced collectively as the 'high throughput' (HT) platform or individually as noted above. Among other things, a description of the two (2) diagnostic instrumentation platforms ('platforms'), as well as : (a) platform and assay specifications ; (b) development responsibilities ; (c) allocation of development costs ; (d) development timetables ; (e) performance parameters of the present CD4sure™ Assay and a

DEPOSITION
EXHIBIT
Barry 2
3.31.08
PENGAD 800-631-6989

newly developed CD4 Lymphocyte Enumeration Assay, as well as other assay-related performance standards ; (f) performance parameters of the instrumentation platforms, as well as other platform-related performance standards ; (g) responsibility for transfer of the developed platforms, the present CD4sure™ Assay, and the newly developed CD4 Lymphocyte Enumeration Assay into manufacturing ; and (h) responsibility for incurred costs, as well as future costs, are set forth in *Annex 1* ("Specifications and Development Timelines for the DREW HT Platform and the POINTCARE CD4sure™ Lymphocyte Enumeration Assay Kit ")  which is hereby included in this Agreement by reference.

POINTCARE hereby agrees to enter into a Development and Manufacturing agreement with a third party medical device manufacturer to jointly develop and manufacture the Near Patient (NP) instrumentation platform.  Once developed, POINTCARE agrees that it will purchase, private label, and sell the NP instrumentation platform to DREW at prices, terms and conditions as noted in *Annex 2*.  Further, POINTCARE shall grant DREW non-exclusive worldwide distribution rights for such NP platform. Such distribution rights will be conditional upon the successful development and marketing of the HT platform.  A description of the NP platform, as well as : (a)  platform and assay specifications ; (b)  development responsibilities ; (c)  allocation of development costs ; (d) development timetables ; (e) performance parameters of the CD4sure™ Assay, as well as other assay-related performance standards ; (f) performance parameters of the instrumentation platform, as well as other platform-related performance standards ; and (g) responsibility for transfer of the developed platform and the CD4sure™ assay into manufacturing are set forth in *Annex 2* ("Specifications and Development Timelines for the NP Instrumentation Platform and the POINTCARE reformulated Lymphocyte Enumeration Assay Kit ").

2

1.2    Diagnostic Instrumentation Platform & CD4 Lymphocyte Enumeration Assay Kit Modifications.

1.2.1   Except as otherwise provided in this Agreement, no instrumentation platform delivered by DREW, POINTCARE, or a third party manufacturer pursuant to this Agreement shall be modified or deviate from the agreed upon specifications noted in *Annex 1* and/or *Annex 2*, except as may be jointly agreed upon by the Parties in writing.  If an instrumentation platform is modified, the cost of developing the modified platform shall be allocated as stated in *Annex 1* and/or *Annex 2*, as applicable.  Any instrumentation platform unit price adjustment resulting from an agreed upon modification shall be negotiated in good faith by the Parties and shall be no more than the actual development and manufacturing costs.  Any modification of the Platforms under this Article 1 shall be properly documented in writing and the corresponding *Annex* shall be modified accordingly.

1.2.2   Except as otherwise provided in this Agreement, no CD4 Lymphocyte Enumeration Assay Kit delivered by POINTCARE hereunder shall be modified or deviate from the agreed upon specifications noted in *Annex 1* and/or *Annex 2*, except as may be jointly agreed upon by the Parties in writing.  If a CD4 Lymphocyte Enumeration Assay Kit is modified, the cost of developing the modified platform shall be allocated as stated in *Annex 1* and/or *Annex 2*, as applicable.  Any CD4 Lymphocyte Enumeration Assay Kit unit price adjustment resulting from an agreed upon modification shall be negotiated in good faith by the Parties and shall be no more than POINTCARE'S actual development and manufacturing costs.  Any modification of the CD4 Lymphocyte Enumeration Assay Kit under this Article 1 shall be properly documented in writing and the corresponding *Annex* shall be modified accordingly.

3

**1.3    Conformity and Compliance Standards.**

**1.3.1** POINTCARE represents and warrants that the CD4sure™ Assay, the reformulated CD4 Assay to be developed, and the NP instrumentation platform, will be manufactured, sold and distributed to DREW pursuant to the terms of this Agreement, will fully conform to all agreed upon specifications, and will fully conform to and comply with all applicable laws, rules and regulations of the United States, including but not limited to relevant provisions of the U.S. Food, Drug and Cosmetic (FD&C) Act and rules, regulations, guidelines and advisories issued pursuant to the FD&C Act. POINTCARE shall be solely responsible for all costs associated with securing any necessary U.S. FDA approvals to market and sell the CD4 Lymphocyte Enumeration Assays that will be used and/or developed for use with the HT and NP diagnostic instrumentation platforms unless otherwise agreed upon in writing by the Parties. Further, POINTCARE shall be responsible for all costs associated with securing .U.S. FDA approval to market and sell the NP diagnostic instrumentation platforms developed under this Agreement unless otherwise agreed upon in writing by the Parties.

**1.3.2** DREW represents and warrants that any HT diagnostic instrumentation platforms manufactured, sold and distributed to POINTCARE pursuant to the terms of this Agreement, will fully conform to agreed upon specifications, and will conform to and comply with all applicable laws, rules and regulations of the United States, including but not limited to relevant provisions of the U.S. Food, Drug and Cosmetic (FD&C) Act and rules, regulations, guidelines and advisories issued pursuant to the FD&C Act. DREW shall be solely responsible for all costs associated with securing U.S. FDA approval to market and sell the HT diagnostic instrumentation platforms developed under this Agreement unless otherwise agreed upon in writing by the Parties.

**1.3.3** POINTCARE and DREW, at their respective option, may seek regulatory approvals or effect registrations necessary to sell and distribute the assays and the platforms in certain countries that are encompassed within the marketing and sales territories, as defined in *Annex 3*. POINTCARE and DREW agree to act in good faith to support the other Party's efforts to obtain such approvals or effect such registrations by supplying information in their possession that is necessary for the preparation of



submissions to relevant regulatory agencies and by providing consultations through knowledgeable technical representatives upon written request in accordance with the terms set forth in *Annex 3*.

**1.3.4** Both Parties to this Agreement shall have the right to appoint any of their respective subsidiaries, affiliates, distributors and/or sub-distributors, to resell or market the products encompassed within this Agreement, consistent with the terms and conditions of this Agreement.

**1.3.5** DREW and POINTCARE represent and warrant that they have secured or will secure the necessary International Standards Organization ("ISO") certification for medical devices for the instrumentation platforms developed pursuant to this Agreement (DREW will secure for the HT platforms and POINTCARE will secure for the NP platform).. During the Term of this Agreement, DREW and POINTCARE will comply with applicable ISO requirements with respect to the diagnostic instrumentation platforms. DREW and POINTCARE shall require that a device history record be properly maintained and kept for each diagnostic instrumentation platform that is manufactured and sold to a Party pursuant to this Agreement and further agree that such records shall be made available to each Party for review upon reasonable request, during normal business hours..

**1.3.6** POINTCARE and DREW shall cooperate in meeting applicable requirements and the guidelines published by the FDA, ISO and other relevant governmental regulatory agencies. POINTCARE and DREW shall use their best efforts and work cooperatively to answer specific questions relating to quality assurance that are received from any government or regulatory agency. In the event that either POINTCARE or DREW receives notice of non-compliance with any applicable government or quasi-government law or regulation, the notified Party shall immediately provide the other Party with written notice of such purported non-compliance. Each Party shall notify the other Party promptly in writing if it becomes aware of any defect or condition which may render any CD4 assay or platform that is a part of this Agreement pursuant to *Annex 1* and/or *Annex 2* to be in violation of any applicable law or regulation.



**1.3.7** The Parties agree to label the products manufactured pursuant to this Agreement in compliance with applicable laws and regulations, as well as the terms and conditions contained in *Annex 4* of this Agreement.

## Art. 2.  Terms of Purchase and Supply.

**2.1** During the Term of this Agreement and subject to the terms and conditions included in this Agreement, DREW shall purchase all CD4 test kits for use with the HT and NP instrumentation platforms exclusively from POINTCARE as set forth in *Annex 5*.

**2.2** During the period that this Agreement remains effective and subject to the terms and conditions included in this Agreement, POINTCARE shall purchase the HTw instrumentation platform, as well as any replacement or spare parts for the HTw instrumentation platform, exclusively from DREW for use with POINTCARE's CD4 Lymphocyte Enumeration Assay Kits as set forth in *Annex 5*.

**2.3** POINTCARE agrees to fill with reasonable promptness, all orders from DREW for its CD4 Lymphocyte Enumeration Assay Kits and NP instrumentation platforms that are approved and accepted by POINTCARE. Upon receipt of an order from DREW, POINTCARE will acknowledge receipt and provide an estimated date of shipment. At no time during the term of this Agreement shall the period between acceptance of a DREW purchase order and the shipment by POINTCARE to DREW exceed eight (8) weeks, unless mutually agreed upon by the Parties. In the instance of a supply limitation, POINTCARE agrees to ship a pro rata percentage of its existing inventory and production capacity at the time of supply limitation to DREW on the basis of each Party's average monthly volume requirements during the past three (3) months (or less if such shortage should occur before a full three months of supply information is available).

**2.4** DREW agrees to fill, with reasonable promptness, all orders from POINTCARE for its HTw instrumentation platform that are approved and accepted by DREW. Upon receipt of an order from POINTCARE, DREW will acknowledge receipt and provide an estimated date of shipment. At no time during the term of this Agreement shall the period between acceptance of a POINTCARE purchase order and the shipment by DREW of its HTw instrumentation



platform to POINTCARE exceed eight (8) weeks, unless mutually agreed upon by the Parties. Delivery terms for spare/replacement parts and other consumables shall be confirmed by DREW upon receipt of a written purchase order from POINTCARE. DREW will use its best efforts to deliver HTw instrumentation platforms or spare parts purchased hereunder within the delivery terms requested by POINTCARE, subject to the Warranty (Article 3) and other applicable provisions of this Agreement.

POINTCARE agrees that any agreement that it enters with a third party developer/manufacturer relative to the development and manufacture of the NP instrumentation platform shall require said third party manufacturer to fill with reasonable promptness, all orders from POINTCARE for the NP instrumentation platform that are approved and accepted. Upon receipt of an order from POINTCARE, the third party manufacturer shall be required to acknowledge receipt and provide an estimated date of shipment.

**2.5** The prices that POINTCARE shall pay to DREW for the purchase of DREW's HTw instrumentation platform, as well any spare/replacement parts that are requested, and the price that DREW shall pay to POINTCARE for the purchase of POINTCARE's NP instrumentation platform, as well any spare/replacement parts that are requested, and its CD4 Lymphocyte Enumeration assay kits are set forth in *Annex 5*. Said costs shall include the cost of proper packaging for shipment per the specifications included in *Annex 1* and *Annex 2*. The Party that orders the product shall be fully responsible for the actual cost of shipping and insurance. Title to the purchased product(s) and the risk of loss or damage shall shift to the purchaser upon delivery to the purchaser, the purchaser's agent, the purchaser's representative, or a mutually acceptable transport company.

**2.6** Any price adjustments sought by either Party relative to a product or service that is included in this Agreement must be in accordance with the terms and conditions set forth in *Annex 5*.

**2.7** The payment terms that are applicable to any product or service that is included in this Agreement are included in *Annex 5*.



2.8  During the Term of this Agreement, POINTCARE shall not manufacture, market, sell or distribute any instrumentation platform that is substantially equivalent with the DREW HT diagnostic instrumentation platforms with regard to test menu and performance, without DREW'S prior express written agreement, which will not be unreasonably withheld.  Further, POINTCARE shall not distribute, market or sell any diagnostic instrumentation platform under any trade name, trademark or logo that is the legal property of DREW without first obtaining DREW's prior written consent.

2.9  In case of a change of control of POINTCARE, DREW shall have the option to manufacture, or have manufactured, all reagents necessary to perform the CD4 Lymphocyte Enumeration Assay. POINTCARE will fully cooperate with DREW and execute an appropriate license agreement for the transfer by POINTCARE of know-how and technologies that are necessary to manufacture the CD4 Lymphocyte Enumeration Assay Kits provided that DREW and its third party manufacturer recognize in the license agreement the legal rights which POINTCARE possesses with respect to any know-how or technology. Such license agreement shall include a provision that acknowledges DREW's obligation to pay POINTCARE a continuing licensing royalty equal to five (5) percent of the sales price of each CD4 Lymphocyte Enumeration Assay Kit which it sells for use with the HT or NP instrumentation platforms.

2.10  In case of a change of control of POINTCARE, DREW shall also have the right to directly enter into an agreement with the third party manufacturer of the NP instrumentation platform, C2D, at any time that it deems appropriate and to purchase the NP instrumentation platform directly from said manufacturer rather than POINTCARE.

## Art. 3. Warranty:

3.1  POINTCARE hereby represents and warrants to DREW that the NP instrumentation platforms and CD4 Lymphocyte Enumeration Assay Kits that it sells or otherwise provides to DREW hereunder will conform to the Product Specifications set forth in *Annex 2.* Further, POINTCARE hereby represents and warrants to DREW that any modifications thereto, will be in compliance with all applicable laws and regulations and will be free from defects in material,



8

workmanship and design. If any POINTCARE CD4 Lymphocyte Enumeration Assay Kit sold to DREW is recalled by POINTCARE or its third party manufacturer and otherwise is not capable of being legally sold or used with the HTc or NP instrumentation platforms through no fault or error on the part of DREW, POINTCARE agrees to promptly replace said CD4 testing kit(s); at its full expense (including the cost of shipping and insurance), provided such CD4 testing kit(s) are not beyond the expiration date noted on said CD4 testing kit(s) at the time when DREW places POINTCARE on notice of such product return. DREW agrees to return any CD4 testing kits that it cannot sell for the above noted reasons directly to POINTCARE or its designated agent, at POINTCARE's cost. Further, NP instrumentation platforms and parts that are sold or otherwise provided by POINTCARE to DREW under this Agreement shall be warranted for a period of fifteen (15) months from the date of shipment from POINTCARE to DREW or for a period of twelve (12) months from the date that the NP instrumentation platform or part was provided to DREW's customer or end-user, whichever expires first. DREW agrees to secure, maintain and provide to POINTCARE, upon request, a certification, signed by a representative of the customer and/or end-user that confirms the date of customer and/or end user receipt.

3.2    DREW hereby agrees that any HTw instrumentation platform and spare/replacement parts sold or otherwise provided hereunder shall conform to the Product Specifications set forth in *Annex 1*, as applicable. Further, DREW agrees that any HTw instrumentation platform or parts modifications shall be in compliance with all applicable laws and regulations and will be free from defects in material, workmanship and design. DREW instrumentation platforms and parts that are sold or otherwise provided to POINTCARE under this Agreement shall be warranted for a period of fifteen (15) months from the date of shipment from DREW to POINTCARE or for a period of twelve (12) months from the date that the instrumentation platform or part was provided to POINTCARE's customer or end-user, whichever expires first. POINTCARE agrees to secure, maintain and provide to DREW upon request, a certification, signed by a representative of the customer and/or end-user that confirms the date of customer and/or end user receipt.

3.3    Neither POINTCARE nor DREW provides the other Party with any other warranties, whether expressed or implied. In no event will DREW or POINTCARE be liable to each other or any other person for direct or indirect, remote or consequential damages related to the



9

incorrect use of their respective instrumentation platforms, including but not limited to commercial losses and tort claims of any kind.

3.4    Notwithstanding any contrary terms in this Agreement, POINTCARE agrees to indemnify, defend and hold DREW harmless from and against any and all losses, claims, actions, costs, expenses and damages, including reasonable attorney's fees and expenses, that arise out of a breach of any warranty contained in this Agreement or out of any product liability claim or action that relates to any POINTCARE product sold or otherwise provided pursuant to this Agreement, except to the extent that such loss, claim, action, cost, expense, or damage arises from: a) acts or omissions that are negligent, reckless or deemed to represent willful misconduct on the part of DREW or its subsidiaries or any of their agents or distributors; or, b) representations made by DREW or its subsidiaries or any of their agents or distributors beyond those made by POINTCARE. In connection with such indemnifications, DREW agrees to notify POINTCARE of any such claim, pursuant to the Notice provisions of this Agreement, within five (5) business days of receipt of notice by DREW's legal counsel and to cooperate with POINTCARE, at POINTCARE'S expense, in the defense of any such claim.

3.5    Notwithstanding any contrary terms in this Agreement, DREW agrees to indemnify, defend and hold POINTCARE harmless from and against any and all losses, claims, actions, costs, expenses and damages, including reasonable attorney's fees and expenses, that arise out of a breach of any warranty contained in this Agreement or out of any product liability claim or action that relates to any DREW product sold or otherwise provided pursuant to this Agreement, except to the extent that such loss, claim, action, cost, expense, or damage arises from a):    acts or omissions that are negligent, reckless or deemed to represent willful misconduct on the part of POINTCARE or its subsidiaries or any of their agents or distributors; or, b) representations made by POINTCARE or its subsidiaries or any of their agents or distributors beyond those made by DREW.    In connection with such indemnifications, POINTCARE agrees to notify DREW of any such claim, pursuant to the Notice provisions of this Agreement, within five (5) business days of receipt of notice by POINTCARE's legal counsel and to cooperate with DREW, at DREW's expense, in the defense of any such claim.

3.6    POINTCARE agrees to procure and maintain product liability and general liability insurances naming DREW as an additional insured, with minimum limits of coverage as noted



10

in *Annex 5.* POINTCARE shall, on or before delivery of NP instrumentation platforms and/or CD4 Lymphocyte Enumeration Assay Kits, furnish DREW with certificates of insurance evidencing the foregoing coverages and limits. Such insurance policies shall not be cancelled or changed without adequate replacement and without providing DREW with thirty (30) days advance written notice of such replacement.

3.7    DREW agrees to procure and maintain product liability and general liability insurances naming POINTCARE as an additional insured, with minimum limits of coverage as noted in *Annex 5.* DREW shall, on or before delivery of its HTw instrumentation platform, furnish POINTCARE with certificates of insurance evidencing the foregoing coverages and limits. Such insurance policies shall not be cancelled or changed without adequate replacement and without providing POINTCARE with thirty (30) days advance written notice of such replacement.

3.8    POINTCARE agrees to require the third party manufacturer of the NP instrumentation platform to procure and maintain product liability and general liability insurances.

## Art. 4.  Installation, maintenance and repairs of Instrumentation Platforms.

4.1    POINTCARE and/or its agents, representatives and/or affiliates, shall be responsible for the installation, set-up, and repair of all DREW HTw instrumentation platforms purchased pursuant to this Agreement at all POINTCARE customer or end-user facilities. POINTCARE also assumes responsibility to provide any needed maintenance service and to provide requested technical support to its customers and end-users relative to the operation, use, care and maintenance of DREW HTw instrumentation platforms. Unless specifically set forth in *Annex 6* of this Agreement, DREW shall not be responsible for installing or repairing DREW HTw instrumentation platforms provided to POINTCARE under this Agreement. Further, unless specifically noted in *Annex 6*, DREW shall bear no responsibility to provide technical support or training to POINTCARE'S employees, agents, representatives, customers or end-users.

DREW and/or its agents, representatives and/or affiliates, shall be responsible for the installation, set-up, and repair of all POINTCARE NP instrumentation platforms purchased



11

pursuant to this Agreement at all DREW customer or end-user facilities. DREW also assumes responsibility to provide any needed maintenance service and to provide requested technical support to its customers and end-users relative to the operation, use, care and maintenance of POINTCARE NP instrumentation platforms. Further, unless specifically noted in *Annex 6*, POINTCARE shall bear no responsibility to provide technical support or training to DREW's employees, agents, representatives, customers or end-users.

4.2    POINTCARE agrees that it shall only use spare/replacement parts purchased from DREW to repair or service any DREW instrumentation platform procured pursuant to this Agreement.    In the event that POINTCARE or its employees, agents, representatives, customers or end-users use parts purchased from a person or entity not related to DREW, without the specific written approval of DREW, any and all warranties, including but not limited to the warranty against material defects and manufacturing flaws, shall be deemed null and void.

DREW agrees that it shall only use spare/replacement parts purchased from POINTCARE to repair or service any POINTCARE instrumentation platform procured pursuant to this Agreement. In the event that DREW or its employees, agents, representatives, customers or end-users use parts purchased from a person or entity not related to POINTCARE, without the specific written approval of POINTCARE, any and all warranties, including but not limited to the warranty against material defects and manufacturing flaws, shall be deemed null and void.

4.3    DREW does maintain a competent team of technical specialists that are knowledgeable concerning its instrumentation platforms. DREW agrees to reasonably consider a request for technical assistance by POINTCARE that is not agreed upon in *Annex 6* and to make a reasonable effort to provide an application/service specialist to support POINTCARE and its customer or end-user pursuant to the relevant reimbursement and support terms contained in *Annex 6*.

## Art. 5.    <u>Intellectual property.</u>

5.1    All patents, trademarks, trade names, labels and copyrights currently proprietary to POINTCARE ("POINTCARE Intellectual Property") shall remain the exclusive property of



POINTCARE.  POINTCARE shall have the exclusive right to all future modifications and additions to POINTCARE'S Intellectual Property, as well as intellectual property developed in the future by POINTCARE provided such modifications, additions, and/or developments are not the result of the direct involvement or financial assistance of DREW.  DREW shall not have the right to and shall not apply for any patent(s) relating to POINTCARE Intellectual Property that is solely developed by POINTCARE, at its own cost, during the term of this Agreement and thereafter.

5.2    All patents, trademarks, trade names, labels and copyrights currently proprietary to DREW ("DREW Intellectual Property") shall remain the exclusive property of DREW. DREW shall have the exclusive right to all future modifications and additions to DREW'S Intellectual Property as well as intellectual property developed by DREW provided such modifications, additions, and/or developments are not the result of the direct involvement or financial assistance of POINTCARE. POINTCARE shall not have the right to and shall not apply for any patent(s) relating to DREW Intellectual Property which is solely developed by DREW, at its own cost, during the term of this Agreement and thereafter.

5.3    All intellectual property that is jointly developed by the Parties during the Term of the Agreement shall be deemed to be jointly owned by the Parties, provided that a brief summary of the invention is described in writing within 10 business days from the date of the invention and signed by both Parties.  Subsequently, both Parties shall agree to a percent ownership of the invention. If such an agreement can not be reached after reasonable discussions among the Parties, the ownership of the invention shall be finally determined by an arbitrator as provided below in this section.  The Parties shall be responsible for all costs incurred in the protection or defense of the intellectual property according to their percent ownership of the intellectual property. Both Parties shall be free to use the joint invention and develop, make and sell products based on the jointly owned intellectual property, without seeking the consent of the other Party. Each Party agrees to negotiate a reasonable royalty to be paid to the other Party based upon sales that it makes or that its licensee makes, of products and/or processes that use or incorporate the intellectual property. The percent ownership in the intellectual property, the cost of product development and other reasonable factors shall be considered in the determination of a reasonable royalty.  Should the Parties be unable to agree on a royalty rate, they will submit the issue to binding arbitration as described below in this Section.



13

If a Party should desire to sell its rights to any intellectual property that was jointly developed pursuant to this Agreement, the Parties will act in a commercially reasonable manner to achieve a valuation of the property rights of the Party that seeks to divest its rights and the other Party shall have the right of first refusal with respect to said property. If, after best efforts, an agreement cannot be reached between the Parties regarding a commercially appropriate valuation, the Parties agree that they will select a mutually acceptable arbitrator to establish a valuation that will be deemed binding upon the Parties. The costs of the arbitrator, as well as the arbitration proceeding, will be equally divided between the Parties. The arbitrator will have the authority to set forth guidelines for the submission of evidence, expert reports and testimony. However, it is agreed that no oral testimony will be included in the proceeding and that the Federal Rules of Civil Procedure and Evidence will otherwise govern such proceedings. Each Party will be responsible for its own costs associated with resolving such a disagreement.

5.4    Notwithstanding the other provisions of this Article 5, POINTCARE shall supply to DREW, in electronic, editable format (such as Microsoft Word), information, manuals and documentation sufficient for DREW'S development of its own product manuals, promotional materials and related documentation for distribution to its agents, distributors and current or prospective end-users. DREW shall have the exclusive right to copyright the manuals, promotional materials and other documentation that develops. All of the documents developed and distributed under this Article 5.4 shall bear DREW's logo and/or trade dress unless the Parties agree otherwise in writing.

5.5    Notwithstanding the other provisions of this Article 5, DREW shall supply to POINTCARE, in electronic, editable format (such as Microsoft Word), information, manuals and documentation sufficient for POINTCARE'S development of its own product manuals, promotional materials and related documentation for distribution to its agents, distributors and current or prospective end-users. POINTCARE shall have the exclusive right to copyright the manuals, promotional materials and other documentation that it develops. All of the documents developed and distributed under this Article 5.5 shall bear POINTCARE'S logo and/or trade dress unless the Parties agree otherwise in writing.

## Art. 6.    Term and Termination

6.1    With respect to combined use of DREW'S HT instrumentation platforms and POINTCARE'S CD4sure™ assays, this Agreement shall be effective for a term of five (5) years commencing on the date that DREW receives U.S. FDA approval to sell the HTc and HTw platforms, as modified to accommodate POINTCARE's CD4sure™ assay, or POINTCARE receives U.S. FDA approval to sell its modified CD4sure™ assay, whichever approval is later received ('Anniversary Date'), and end on the fifth anniversary of the Anniversary Date.  Unless lawfully terminated, the provisions of this Agreement pertaining specifically to the supply to DREW by POINTCARE of its CD4 Lymphocyte Enumeration Assay Kits for use with the HTc shall be automatically renewed at the option of DREW for a successive five (5) year period unless DREW provides POINTCARE with written notice of its desire not to renew the Agreement no less than ninety (90) days prior to Anniversary Date. DREW shall have the right to renew this Agreement with respect to the aforementioned CD4 Lymphocyte Enumeration Assay Kits for a total of three (3) successive five (5) year periods following the initial term with the proviso that if POINTCARE no longer desires to manufacture and sell  CD4 Lymphocyte Enumeration Assay Kits to DREW, it shall provide DREW, at no cost, with the licenses, know-how and technical support necessary to allow DREW or its designated third party manufacturer to manufacture and sell the CD4 Lymphocyte Enumeration Assay Kits and DREW shall agree to pay POINTCARE a royalty in the amount of five percent (5%) of the sales price per CD4 Lymphocyte Enumeration Assay Kit sold.

6.2    With respect to combined use of the NP instrumentation platform and CD4 Lymphocyte Enumeration Assay Kits that POINTCARE shall develop, this Agreement shall be effective for a period of five (5) years ("NP Term") commencing on the date that U.S. FDA approval is received to sell the NP platform or the date that POINTCARE receives FDA approval to sell its modified CD4 Lymphocyte Enumeration Assay Kits for the NP instrumentation platform in the United States, whichever approval is later received ('NP Anniversary Date') and ending on the fifth anniversary of the NP Anniversary Date.  Unless the Agreement is lawfully terminated in accordance with the provisions of this Agreement, the provisions of this Agreement pertaining to the supply to DREW by POINTCARE of the NP instrumentation platform shall be capable of renewal for successive five (5) year terms, at the option of DREW, provided that DREW provides notice no less than thirty (30) days prior to the expiration of an NP Term, that C2 will



15

continue to supply the NP instrumentation platform to POINTCARE, and the Parties, acting in good faith, reach consensus on renegotiated pricing terms. With respect to the modified CD4 Lymphocyte Enumeration Assay Kit for use with the NP platform, it is agreed that DREW has the right to renew this Agreement for successive five (5) year terms provided that DREW provides notice no less than thirty (30) days prior to the expiration of an NP Term and that POINTCARE desires to continue to manufacture and sell said CD4 Assay Kits to DREW. If, after the initial term of this Agreement, POINTCARE no longer desires to supply DREW with the CD4 Assay Kits for use with the NP platform, it shall provide DREW, at no cost, with the licenses, know-how and technical support necessary to allow DREW or its designated third party manufacturer to manufacture and sell the modified CD4 Lymphocyte Enumeration Assay Kits for use with the NP instrumentation platform and DREW shall agree to pay POINTCARE a royalty in the amount of five percent (5%) of the sales price per CD4 Lymphocyte Enumeration Assay Kit sold.

6.3    With respect to DREW HTw instrumentation platform purchases by POINTCARE and POINTCARE NP instrumentation platform purchases by DREW, it is agreed that if this Agreement is lawfully terminated or at the conclusion of its initial term, each Party shall respectively have an independent option to purchase said instrumentation platforms from any manufacturer that they choose or to continue in the relationship defined by this Agreement. Notice must be provided in accordance with the terms of this Agreement. Further, the Parties agree that DREW and POINTCARE shall, upon lawful termination or at the conclusion of the Agreement's initial term, have an independent option to negotiate an agreement upon substantially similar terms that will allow each Party to continue to distribute products provided by the other party in the Territories as agreed upon herein or as amended in writing. While no Party shall be required to enter into such an arrangement, the Parties acknowledge that consent to enter into such an arrangement shall not be unreasonably withheld.

6.4    Neither Party shall be liable to the other for damages resulting from the lawful expiration or termination of this Agreement pursuant to this Article 6.

6.5    POINTCARE shall be obligated to manufacture and supply to DREW all NP instrumentation platforms and spare/replacement parts, as well as CD4 Lymphocyte Enumeration Assay Kits, ordered by DREW pursuant to this Agreement prior to the expiration



or termination of this Agreement, provided that such order was received and accepted by POINTCARE prior to such expiration or termination.

6.6.    DREW shall be obligated to manufacture and supply to POINTCARE all HTw instrumentation platforms and spare/replacement parts ordered by POINTCARE pursuant to this Agreement prior to the expiration or termination of this Agreement, provided that such order was received and accepted by DREW prior to such expiration or termination.

6.7    If a Party fails to submit any payment due hereunder more than five (5) days after the due date, a written non-payment notice of such non-payment may be issued to the delinquent Party. If a Party has issued three (3) successive notices of non-payment to the other Party, it may terminate this agreement five (5) days after receipt of the third notice, pursuant to Sections 8.4 and 8.5, unless the deficiency is fully satisfied prior to receipt of the written termination notice.

6.8    Notwithstanding any provision in this Agreement to the contrary, upon expiration or termination of this Agreement for any reason, each Party shall continue to supply requested product for a period of up to seven years if legally necessary to comply with any applicable laws and regulations of countries in which a Party sells the CD4 Lymphocyte Enumeration Assays Kits, the DREW HT instrumentation platforms and/or the POINTCARE NP instrumentation platform.

6.9    Either Party may terminate this Agreement:

    (a)    in the event of a material breach by the other Party of any of the terms and conditions of the Agreement, excepting breach resulting from non-payment of any disputed amounts due hereunder, by giving the other Party written notice of such breach, and provided that such breach shall not have been cured within sixty (60) days of such notice; or

    (b)    Immediately, by written notice thereof, if any of the following events or an event analogous thereto occurs:

17

(i)     an adjudication has been made that the other Party is bankrupt or insolvent;

(ii)    the other Party has filed bankruptcy proceedings or has had such proceedings filed against it, except as part of a bona fide scheme for reorganization;

(iii)   a receiver has been appointed for all or substantially all of the property of the other Party;

(iv)    the other Party has assigned or attempted to assign this Agreement for the benefit of its creditors; or

(v)     the other Party has begun any proceeding for the liquidation or winding up of its business affairs.

6.10    In the event that DREW is unable to deliver to POINTCARE its requirements of DREW HTw diagnostic instrumentation platforms as required under the terms of this Agreement, including but not limited to the product specifications included in *Annex 1* and to the extent that DREW's inability to perform under this Agreement is not excused by this Agreement or a subsequent written agreement of the Parties, POINTCARE shall have the right to directly manufacture the diagnostic instrumentation platforms or to have the platforms manufactured by a mutually acceptable third party. DREW will fully cooperate with POINTCARE and execute an appropriate license agreement for the transfer by DREW of know-how and technologies that are necessary to manufacture the diagnostic instrumentation platforms provided that POINTCARE and its third party manufacturer recognize in the license agreement the legal rights which DREW possesses with respect to any know-how or technology. The Parties will negotiate an appropriate licensing fee in good faith. If, after best efforts, the Parties cannot agree to a mutually acceptable licensing fee and agreement, the Parties shall select a mutually acceptable arbitrator and proceed in accordance with the arbitration process that is included in Section 5.3 of this Agreement.



Moreover, should DREW close down or otherwise divest its manufacturing facility or facilities that are necessary for the manufacture of the DREW HTw diagnostic instrumentation platform, POINTCARE shall have the right of first refusal to purchase said facility/facilities at fair market value, which shall be set by a mutually agreed upon third party appraiser. If DREW is unable to meet its obligations to POINTCARE as a result of the sale of its manufacturing facility/facilities and POINTCARE would choose not to purchase the facility/facilities but still desires to secure its requirements of the DREW HTw diagnostic instrumentation platform, DREW will agree to provide POINTCARE with a license under which DREW shall transfer the know-how and technologies that are necessary to manufacture the HTw diagnostic instrumentation platform. The Parties will negotiate an appropriate licensing fee in good faith. If, after best efforts, the Parties cannot agree to a mutually acceptable licensing fee and agreement, the Parties shall select a mutually acceptable arbitrator and proceed in accordance with the binding arbitration process that is included in Section 5.3 of this Agreement.

6.11    In the event that POINTCARE is unable to deliver to DREW its requirements of POINTCARE CD4 Lymphocyte Enumeration Assay Kits, as required under the terms of this Agreement, including but not limited to the product specifications included in *Annex 1* and *Annex 2*, and to the extent that POINTCARE's inability to perform under this Agreement is not excused by this Agreement or a subsequent written agreement of the Parties, DREW shall have the right to directly manufacture the CD4 Lymphocyte Enumeration Assay Kits or to have the CD4 Lymphocyte Enumeration Assay Kits manufactured by a mutually acceptable third party. POINTCARE will fully cooperate with DREW and execute an appropriate license agreement for the transfer by POINTCARE of know-how and technologies that are necessary to manufacture the CD4 Lymphocyte Enumeration Assay Kits provided that DREW and its third party manufacturer recognize in the license agreement the legal rights which POINTCARE possesses with respect to any know-how or technology. The Parties will negotiate an appropriate licensing fee in good faith. If, after best efforts, the Parties cannot agree to a mutually acceptable licensing fee and agreement, the Parties shall select a mutually acceptable arbitrator and proceed in accordance with the binding arbitration process that is included in Section 5.3 of this Agreement.

Moreover, should POINTCARE close down or otherwise divest its manufacturing facility or facilities that are necessary for the manufacture of the CD4 Lymphocyte Enumeration Assay

19

Kits, DREW shall have the right of first refusal to purchase said facility/facilities at fair market value, which shall be set by a mutually agreed upon third party appraiser. Should POINTCARE receive a credible offer to buy all of its operations or a portion of its operations that would affect its ability to supply DREW'S requirements for CD4 Lymphocyte Enumeration Assay Kits, POINTCARE agrees that DREW shall have the right to make an offer that exceeds the other credible offer and that POINTCARE shall be obligated to accept such offer from DREW. If POINTCARE is unable to meet its obligations to DREW as a result of the sale of its manufacturing facility/facilities and DREW would choose not to purchase the facility/facilities but still desires to secure its requirements of the CD4 Lymphocyte Enumeration Assay Kits, POINTCARE will agree to provide DREW with a license under which POINTCARE shall transfer the know-how and technologies that are necessary to manufacture the CD4 Lymphocyte Enumeration Assay Kits. The Parties will negotiate an appropriate licensing fee in good faith. If, after best efforts, the Parties cannot agree to a mutually acceptable licensing fee and agreement, the Parties shall select a mutually acceptable arbitrator and proceed in accordance with the binding arbitration process that is included in Section 5.3 of this Agreement.

6.12    Following the termination of this Agreement (whether by non-renewal or termination pursuant to Article 6), each Party to this Agreement shall have the right to continue distributing the diagnostic instrumentation platforms and/or the CD4 Lymphocyte Enumeration Assay Kits as follows:

6.12.1    DREW agrees that it will sell to POINTCARE its requirements of accessories, supplies and spare parts for the HTw platform at all times during the Term and for seven (7) years after the termination of this Agreement at pricing and terms that are in accordance with this Agreement. Such sales shall be governed by the terms of this Agreement, even though this Agreement may have been terminated. Should the Agreement be terminated and DREW cannot deliver spare parts within the agreed time frame, POINTCARE may repair, or refurbish or source from third parties equivalent spare parts for the HTw platform. DREW shall furnish to POINTCARE all information necessary to enable POINTCARE to source such parts and, if necessary, actively support POINTCARE's effort to do so. In such cases, DREW shall bear no risk and shall not be subject to any liability for any such product that it does not directly sell to POINTCARE.

6.12.2    POINTCARE agrees to sell to DREW its requirements of accessories, supplies and spare parts for the NP instrumentation platform, as well as the CD4 Lymphocyte Enumeration Test Kits for the HTc platform and the NP platform at all times during the



20

Term, and for seven (7) years after the termination of this Agreement at the pricing and the terms provided herein. Such sales shall be governed by the terms of this Agreement, even though this Agreement may have been terminated. Should the Agreement be terminated and POINTCARE cannot deliver such NP instrumentation platforms and/or CD4 assay kits within the agreed time frame, DREW may source the undeliverable product from third parties. POINTCARE shall furnish to DREW all information necessary to enable DREW to source such instrumentation platform and/or CD4 assay kits and, if necessary, actively support DREW's effort to do so. In such cases, POINTCARE shall bear no risk and shall not be subject to any liability for any such NP instrumentation platforms and/or CD4 Assay Kits that it does not directly sell to DREW.

**6.13**    Termination or non-renewal of this Agreement shall not in any way operate so as to impair or destroy any of the rights or remedies of POINTCARE or DREW, whether at law or in equity, nor shall it relieve the Parties of their obligations pursuant to Articles 3, 5, and 7 and Sections 8.1, 8.4, and 8.5 of this Agreement.

## Art. 7    Confidentiality:

**7.1**    Each Party shall maintain in confidence both the terms of this Agreement and any information received from the other Party in writing during the term of this Agreement and shall neither publish, disseminate nor disclose such information to any third Party nor use such information except for the furtherance of the purposes of this Agreement, without the prior express written permission of such other Party.  This obligation shall not apply to any information which: (i) now or hereafter comes into the public domain, except by breach of this Agreement, or (ii) is already in the possession of the receiving Party other than as a result of having received it from the disclosing Party as evidenced by written records, or (iii) is independently developed by the receiving Party without use of or access to the information of the disclosing Party, or (iv) which is required to be provided to a governmental regulatory agency in order to secure the necessary regulatory approvals to manufacture or market the products, or (v) is required to be disclosed by a Subpoena issued from a court of competent jurisdiction, a Court Order or a civil investigative demand; provided that the receiving Party, subject to such requirement of this subparagraph (v): (a) promptly notifies the other Party and co-operates with efforts to make such disclosure in confidence or subject to a suitable Protective Order; and (b) the receiving Party discloses only so much of the confidential information as its counsel advises is required to comply with such requirement; or (vi) is



21

intended to be used by an agent, affiliate and/or end-user of DREW or POINTCARE. The obligations of this Article 7 shall extend to any agent, employee, affiliate, and/or end-user that is provided, in whole or in part, with this Agreement. Moreover, the obligations of Article 7 shall continue for five (5) years after the expiration or termination of this Agreement. Upon expiration or termination of this Agreement, each Party shall, at the other's request, destroy or return to the other Party all copies of any information provided pursuant to this Agreement, including all information provided to any agent, employee, affiliate, and/or end-user. However, counsel for each Party to this Agreement may retain one (1) copy of such information solely for the purpose of monitoring compliance with the obligation of confidentiality under this Agreement.

7.2    Each Party agrees not to recruit any member of staff or employee of the other Party for a possible employment or independent assignment within their organization or any affiliated organizations, either as an employee or independent consultant or in any other capacity, without the previous agreement of the other Party. These obligations shall remain in force during the term of this Agreement and for a period of one (1) year after expiration or termination of this Agreement.

## Art. 8.    MISCELLANEOUS

8.1    **Binding Effect and Assignment.** This Agreement shall inure to the benefit of and be binding upon each of the Parties hereto and their respective successors and assigns. Nevertheless, neither this Agreement, nor any right or obligation of a Party arising from this Agreement, may be assigned by such Party without the prior written approval of the other Party, such approval not to be unreasonably withheld, except that DREW may assign this Agreement and such rights and obligations to a purchaser or other transferee of its entire business, without such written approval from POINTCARE The benefits to DREW under this Agreement are also available to DREW'S subsidiaries and affiliate companies, and DREW shall be responsible for any such subsidiary or affiliate to POINTCARE hereunder, if same are not met.

8.2    **Entire Agreement and Modifications.** This Agreement (including the Annexes hereto), together with the Confidentiality Agreement between the Parties dated November 18, 2005, sets forth the entire Agreement between the Parties and supersedes any and all prior or



22

contemporaneous negotiations, agreements, representations, understandings and commitments concerning the subject matter hereof. This Agreement shall take precedence over all conflicting or inconsistent terms, conditions or provisions on any invoice or purchase order. Any alteration, amendment or modification to any term or provision of this Agreement shall be in writing and signed by duly authorized officers of POINTCARE and DREW.

8.3    **Force Majeure.** If the full or partial performance of this Agreement or any obligation hereunder is prevented, restricted or interfered with by reason of any cause beyond the control of the affected Party, including, but not limited to fire, strikes, or any law, regulation or policy of any government, or any subdivision, authority or agency thereof that is enacted subsequent to the execution of this Agreement, the Party so affected, upon written notice to the other Party, shall be excused from such performance to the extent of such prevention, restriction or interference, provided that the Party so affected shall use all reasonable efforts to avoid or remove such cause or causes of nonperformance, and shall continue performance hereunder with all reasonable dispatch when such cause or causes are removed. Failure to adhere to or comply with existing laws, rules and regulations, such as but not limited to the U.S. FD&C Act and its good manufacturing practice (GMP) regulations will not be considered a Force Majeure event and will not relieve a Party of its performance obligations pursuant to this Agreement.

8.4    **Methods of Notice.** Any notice, or other communications which are required or permitted hereunder shall be in the English language, shall be written and shall be deemed given on the date received by the receiving Party, if and when : (i) delivered personally with a signed receipt of such delivery, or (ii) sent by registered mail or certified mail, postage prepaid, return receipt requested, or (iii) sent by overnight courier with an internationally recognized courier, or (iv) sent via facsimile or electronic (e-mail) transmission, the receipt of which has been confirmed in a separate writing by the receiving Party.



8.5    **Addresses for Notices.**  Unless and until such addresses may be changed by written notice to the other Party, complying with the terms of this Section 8.5, all notices to DREW shall be addressed to:


Drew Scientific, Inc.
4230 Shilling Way
Dallas, TX  75237-1093
USA

Attention:  President

Fax:  214-210-4949

Copy to:  General Counsel
Escalon Medical Corp.
565 E. Swedesford Road
Suite 200
Wayne, PA  19087
Fax:  610-688-6830


and all notices to POINTCARE shall be addressed to:

PointCare Technologies, Inc.
181 Cedar Hill Street
Marlborough, MA  01752


Attention:    Petra Krauledat, Ph.D.
              President & Chief Executive Officer
Fax:  1-508-281-6390

24

8.6    **Governing Law: Arbitration.** This Agreement shall be construed, interpreted and enforced in accordance with the substantive laws of the state of New York. Any legal action filed pursuant to and/or related to this Agreement or its interpretation shall be filed in the U.S. District Court for the Southern District of New York. The Parties shall make a good faith effort to attempt to amicably resolve any disagreements, involving their respective Presidents, before any legal action is filed by a Party to this Agreement.

8.7    **Severability.** If any provision of this Agreement becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction, (a) this Agreement and the remaining provisions hereof shall continue in full force and effect and (b) the Parties shall negotiate in good faith such amendments to the provisions found to be invalid, illegal or unenforceable as are necessary to eliminate such invalidity, illegality or unenforceability.

8.8    **No Waiver of Subsequent Breach.** No waiver of any breach of this Agreement or any obligation arising under this Agreement by either Party shall constitute a waiver of any subsequent breach or breaches, whether such breaches are of a similar or dissimilar nature.

8.9    **Nature of Relationship.** Unless otherwise expressly agreed upon in writing, neither Party to this Agreement shall be in any way the agent or representative of the other Party for any purpose whatsoever, and shall have no right to create or assume any obligation or responsibility of any kind, whether express or implied, in the name of or on behalf of the other Party or to bind the other Party in any manner whatsoever.

8.10    **Reading and Understanding.** Each party warrants that, prior to executing this Agreement, it carefully read the Agreement in its entirety, had the opportunity to seek legal advice, and that it understood all of the terms contained herein.

8.11    **Counterparts.** This Agreement may be signed in counterparts, each of which shall be an original, but all of which shall be deemed to be one and the same instrument, and shall be valid and binding when so signed.

25

IN WITNESS WHEREOF, this Agreement has been executed by the duly authorized officers of POINTCARE and DREW effective as of the date and year first above written.

**DREW SCIENTIFIC, INC**

By: _____

Name: H.M. RIMMER

Title: PRESIDENT

Date: June 2nd, 2006

**POINTCARE TECHNOLOGIES, INC.**

By: _____

Name: Petra B. Krauledat

Title: CEO

Date: June 5th, 2006

©COPY

*List of Annexes*

<u>List of Annexes</u>

*Annex 1:*    Specifications and Development Timelines for the DREW HTc and HTw Instrumentation Platforms & the POINTCARE CD4sure™ Lymphocyte Enumeration Assay Kit

*Annex 2:*    Specifications and Development Timelines for the POINTCARE NP Instrumentation Platform & the reformulated POINTCARE Lymphocyte Enumeration Assay Kit

*Annex 3:*    Sales and Marketing Territories

*Annex 4:*    CD4 Lymphocyte Enumeration Assay Kit
and Diagnostic Instrumentation Platform Labelling Terms & Conditions

*Annex 5:*    Pricing Terms and Conditions; Requirements Forecasts
*Annex 6:*    Warranty, Technical Support & Training

*Annex 1*

<u>ANNEX 1</u>

## Specifications and Development Timelines for the DREW HTc and HTw Instrumentation Platforms & the POINTCARE CD4sure™ Lymphocyte Enumeration Assay Kit

**HTw Instrumentation Platform:**

- Drew is responsible for and will bear the costs associated with and related to the development and approval for sale in the United States of the HTc and HTw diagnostic instrumentation platforms that will be compatible with PointCare's CD4sure™ Lymphocyte Enumeration assay.
- Drew is responsible for and will bear all costs associated with and related to the transfer of a HT diagnostic instrumentation platforms that are compatible with PointCare's CD4sure™ Lymphocyte Enumeration Assay Kit into DREW's manufacturing organization.
- Any software problems that are detected with respect to the HTw instrumentation platform shall be jointly investigated. Both Parties will work cooperatively and in good faith to achieve consensus towards a satisfactory solution to any potential software issues and will establish a written process for ascertaining the equitable division of costs associated with the resolution of any software issue that is confirmed by both Parties.
- Development timetable – attached as *Attachment 1 to Annex 1*
- HTw Instrumentation Platform Specifications: See *Attachment 2 to Annex 1*


–POINTCARE CD4sure™ Assay Test Kit

- Pointcare is responsible for and will bear the costs associated with and related to the development and approval for sale in the United States of PointCare's CD4sure™ Lymphocyte Enumeration assay that will be compatible with Drew's HTc and HTw diagnostic instrumentation platforms.
- PointCare is responsible for and will bear all costs associated with and related to the development and transfer into Pointcare's manufacturing organization of a reformulated Lymphocyte Enumeration assay that shall be compatible with and operate with Drew's HTc and HTw diagnostic instrumentation platforms.
- *Development timetable and POINTCARE Lymphocyte Enumeration assay kit [CD4Sure™ and the reformulated versions] Specifications: <u>See</u> Attachment 3 to Annex 1*

*Attachment 1
to Annex F*

ATTACHMENT 1 TO ANNEX 1

| ID | Description | Start | End |
|----|-------------|-------|-----|
| 1 | ⊟Analysis and Planning | 2/02/2006 | 4/28/2006 |
| 2 | Compatibility Testing | 2/02/2006 | 2/15/2006 |
| 3 | Business Strategy | 2/16/2006 | 4/14/2006 |
| 4 | Staffing/scheduling | 3/16/2006 | 3/31/2006 |
| 5 | Product Requirements | 2/16/2006 | 3/31/2006 |
| 6 | Product Requirement Review | 4/04/2006 | 4/07/2006 |
| 7 | Quality marriage | 3/16/2006 | 4/28/2006 |
| 8 | ⊟Feasibility of select modules | 3/01/2006 | 4/06/2006 |
| 9 | Right angle scatter modification | 3/16/2006 | 3/31/2006 |
| 10 | Test right angle scatter modification. | 3/28/2006 | 3/29/2006 |
| 11 | Lysa mixing modification | 3/01/2006 | 3/31/2006 |
| 12 | Test lysa mixing modification | 4/03/2006 | 4/06/2006 |
| 13 | ⊟Development of selected modules | 3/20/2006 | 6/30/2006 |
| 14 | Mixing | 4/05/2006 | 5/26/2006 |
| 15 | Immunogold delivery module | 4/12/2006 | 6/16/2006 |
| 16 | CD4 controls | 4/12/2006 | 6/30/2006 |
| 17 | Fluid routing | 4/05/2006 | 5/31/2006 |
| 18 | Optical module | 4/12/2006 | 5/31/2006 |
| 19 | Sample age extension | 4/12/2006 | 6/30/2006 |
| 20 | Analytical software for CD4 | 3/20/2006 | 6/30/2006 |
| 21 | User Interface | 4/12/2006 | 6/16/2006 |
| 22 | ⊟Integration of system | 3/23/2006 | 10/31/2006 |
| 23 | ⊟Hardware Integration | 3/23/2006 | 6/29/2006 |
| 24 | CD4 mixing module | 3/23/2006 | 6/29/2006 |
| 25 | Immunogold delivery module | 3/23/2006 | 6/29/2006 |
| 26 | CD4 fluid routing | 3/23/2006 | 8/29/2006 |
| 27 | modified optics | 3/23/2006 | 6/29/2006 |
| 28 | ⊟Software Integration | 3/23/2006 | 7/20/2006 |
| 29 | analytical software for CD4 | 3/23/2006 | 6/29/2006 |
| 30 | software for sample age extension | 3/23/2006 | 6/29/2006 |
| 31 | user Interface | 8/01/2006 | 9/29/2006 |
| 32 | In-house Testing | 9/04/2006 | 9/29/2006 |
| 33 | Field Testing | 8/01/2006 | 10/31/2006 |
| 34 | Reworks | 9/01/2006 | 3/05/2007 |
| 35 | ⊟Manufacturing engineering | 10/02/2006 | 12/29/2006 |
| 36 | Instrument manufacturing engineering | 10/02/2006 | 12/29/2006 |
| 37 | Reagent manufacturing engineering | 9/01/2006 | 12/29/2006 |
| 38 | QA procedures, manuals, labelling | 12/29/2006 | 1/18/2007 |
| 39 | Transfer to manufacturing - aggressive | 1/01/2007 | 3/05/2007 |
| 40 | Transfer to manufacturing - conservative | 12/01/2006 | 7/27/2007 |
| 41 | ⊟Regulatory | 12/01/2006 | 1/26/2007 |
| 42 | 510k data and submission - aggressive | 5/01/2007 | 7/27/2007 |
| 43 | 510k data and submission - conservative | 1/05/2007 | 1/05/2007 |
| 44 | Release to Market (non-510k) | 3/09/2007 | 3/09/2007 |
| 45 | Release to Market (510k) - aggressive | 7/27/2007 | 7/27/2007 |
| 46 | Release to Market (510k) - conservative | | |

6/02/2005



*Attachment 2*
*to Annex 1*

ATTACHMENT 2 TO ANNEX 1

PRODUCT SPECIFICATIONS FOR HT INSTRUMENT

| CR/BR No. | Customer or Business Requirement | PR No. | Product Requirement | Requirement Importance |
|---|---|---|---|---|
| CR-008-001 | Parameters reported: WBC, Lym, Lym %, Mono, Mono %, Neut, Neut %, Eo, Eo %, Hgb, CD4, CD4%. | PR-008-001 | Instrument capable of producing 4-pt WBC differential, plus hemoglobin, plus CD4. | Mandatory φ1 |
| CR-008-002 | Additional parameters reported RBC, RDW, MCV, Hct, MCH, MCHC, Plt, MPV, PDW, Pct Baso, Baso %. | PR-008-002 | Instrument capable of producing 5-part differential, plus RBC and Plt histogram. 5-part differential obtained by flow cytometer, RBC and Plt parameters obtained by impedance. | Desirable φ1 Mandatory φ2 |
| CR-008-003 | CD4 lymphocyte reportable range from 50/μL to 6,000/μL | PR-008-003 | Large dynamic range of CD4 cell enumeration with precision at 200/μL ± 25/μL (where ±25/μL is max acceptable SD). | Mandatory φ1 |
| CR-008-004 | CD4% of total lymphocyte reportable range from 1% to 80% | PR-008-004 | Large dynamic range of CD4 cell enumeration with precision at lym > 1500/uL and 15% ± 2% (where ±2% is max acceptable SD). | Mandatory φ1 |
| CR-008-005 | Only CD4 lymphocytes reported | PR-008-005 | CD4 monocytes excluded from analysis | Mandatory φ1 |
| CR-008-006 | WBC reportable range from 500/uL to 150,000/uL | PR-008-006 | Large dynamic range for WBC. Precise WBC count obtained by impedance with precision at 8,000/uL <2% | Mandatory φ1 |
| CR-008-007 | Lym reportable range from 300/uL to 17,000/uL | PR-008-007 | Large dynamic range for lymphocytes with precision at 2,000/uL <3% | Mandatory φ1 |
| CR-008-008 | Mono reportable range from 0 to 80% | PR-008-008 | Large dynamic range for monocytes with CV% at 7% is <<7% for a total WBC count > 8,000/uL. | Mandatory φ1 |
| CR-008-009 | Neut reportable range from 1 to 95% | PR-008-009 | Large dynamic range for neutrophils with CV% at 60% is < 3% for a total WBC count > 8,000/uL | Mandatory φ1 |
| CR-008-010 | Eo reportable range from 0.1 to 90% | PR-008-010 | Large dynamic range for eosinophils with CV% at 7% is <7% for a total WBC count> 8,000/uL | Mandatory φ1 |
| CR-008-011 | Hgb reportable range from 4 g/dL to 24 g/dL | PR-008-011a | Large dynamic range for hemoglobin with precision at 7 g/dL <2% | Mandatory φ1 |
| | | PR-008-011b | Hgb reportable range from 3 g/dL to 24 g/dL | Desirable φ2 |
| CR-008-012 | RBC reportable range from 0.02 to 9.99 M/uL | PR-008-012 | Large dynamic range for RBC with CV% at 5M/uL <1% | Desirable φ1 Mandatory φ2 |
| CR-008-013 | MCV reportable range from 40-150 fl | PR-008-013 | Large dynamic range for MCV with CV% at 90 fl <1% | Desirable φ1 Mandatory φ2 |
| CR-008-014 | RDW reportable range from 10 to 25% | PR-008-014 | Large dynamic range for RDW with CV% at 15% <5% | Desirable φ1 Mandatory φ2 |

## PRODUCT SPECIFICATIONS FOR H1 INSTRUMENT

| ID | Description | PR | Priority |
|---|---|---|---|
| CR-008-015 | Plt reportable range from 10-2000 K/uL | PR-008-015 | Large dynamic range for Plt with CV% at 250K/uL <3% | Desirable φ1 / Mandatory φ2 |
| CR-008-016 | MPV reportable range from 2-25 fl | PR-008-016 | Large dynamic range for MPV with CV% at 10 fl <5% | Desirable φ1 / Mandatory φ2 |
| CR-008-017 | 32 hour sample age for CD4 and CD4%. 8 hours for all other parameters. | PR-008-017 | Sample age extension for CD4 and CD4% from 8 hour age requirement | Desirable φ1 / Mandatory φ2 |
| CR-008-018 | System warns user if results possibly compromised by aged sample. | PR-008-018 | Mitigation factors for sample age, such as data entry for draw time, flagging for scatter plots, and training | Mandatory φ1 |
| CR-008-019 | System does not report results if compromised by aged sample. | PR-008-019 | Absolute internal control for sample age | Desirable φ1 |
| CR-008-020 | Minimum of 100 samples (including controls) in 7.5 hours | PR-008-020 | 4.5 minutes per sample | Mandatory φ1 |
| CR-008-021 | Instrument may operate for minimum of 1 hour or 30 samples unattended | PR-008-021 | Cap piercing autoloader capable of processing up to 30 samples | Desirable φ1 |
| CR-008-022 | Autoloader capable of handling standard tube sizes | PR-008-022a | Currently standard 5mL size tubes can be used | Mandatory φ1 |
| | | PR-008-022b | Expand possibilities to other sizes for future development | Desirable φ2 |
| CR-008-023 | Choice of CBC/CD4 or CBC only | PR-008-023 | Choice of sequence from menu or separate worklist. Barcode could be design to determine which sequence to be used | Mandatory φ1 |
| CR-008-024 | Minimum 5-pt WBC differential with CD4 | PR-008-024 | Two passes through flow cytometer—WBC differential without immunogold and CD4% with immunogold. Lym count to be determined either by impedance or optical without gold. | Mandatory φ1 |
| CR-008-025 | Minimal sample volume used in assay | PR-008-025a | 180 uL for CBC and an additional 45 uL for CD4 | Mandatory φ1 |
| | | PR-008-025b | Minimum 1.5mL sample volume supplied | Mandatory φ1 |
| CR-008-026 | No handling of open blood tubes | PR-008-026 | Automated cap piercing blood sampling (with autoloader) | Mandatory φ1 |
| CR-008-027 | Touch screen computer operation | PR-008-027 | Touch screen computer specified | Mandatory φ1 |
| CR-008-028 | Mitigation of computer theft | PR-008-028 | Option for security cable for computer | Mandatory φ1 |
| CR-008-029 | Printable results in black and white | PR-008-029a | B&W printer specified | Mandatory φ1 |
| | | PR-008-029b | Color printer specified | Optional φ1 |
| CR-008-030 | Local languages available for each market | PR-008-030 | English, French, Portuguese, Spanish, Chinese, Thai, Vietnamese, and Russian screens | Desirable φ1 / Mandatory φ2 |

FROM: KATHY 2142104950 TO: HARRY RIMMER    DATE: 6/2/06 TIME: 10:02:06 AM    PAGE 5 OF 10

## PRODUCT SPECIFICATIONS FOR HT INSTRUMENT

| | | | |
|---|---|---|---|
| CR-008-031 | Protected software for simple operation without tampering | PR-008-031 | Three levels of operation—service mode (through separate software), supervisor mode, and limited operator mode with identity of who "logs on" | Mandatory φ1 |
| CR-008-032 | Limited data entry | PR-008-032 | Barcoded sample and control entry | Mandatory φ1 |
| CR-008-033 | Reagent use and expiration tracking | PR-008-033 | Barcoded reagent entry and low reagent alarms | Mandatory φ1 |
| CR-008-034 | Non-editable numerical data and clusters on screen and on printouts | PR-008-034 | Automated cluster gating | Mandatory φ1 |
| CR-008-035 | Automatic QC tracking of CBC and CD4 controls with control chart display | PR-008-035 | Levey-Jennings control plots generated and easily printable | Mandatory φ1 |
| CR-008-036 | Control material appropriate for all parameters in system | PR-008-036 | Control materials including CD4 and CD4% in capped tubes with barcodes. Possibility of multiple control materials. | Mandatory φ1 |
| CR-008-037 | Data storage > 100,000 patients | PR-008-037 | Appropriate data storage and hardware capability | Mandatory φ1 |
| CR-008-038 | Searchable patient history | PR-008-038 | User interface designed to facilitate easy patient management | Mandatory φ1 |
| CR-008-039 | Easy daily startup and shutdown | PR-008-039a | Fully automated startup/shutdown <5 minutes each with no customer intervention after thermal equilibrium | Mandatory φ1 |
| | | PR-008-039b | Thermal equilibrium achieved in <30 minutes | Desirable φ1 |
| CR-008-040 | Assurance of gold reagent activity for every sample | PR-008-040 | Software driven internal control for gold reagent activity | Mandatory φ1 |
| CR-008-041 | Indeterminate samples denoted by a general flag symbol | PR-008-041a | Strict flag criteria for automated software gating. | Mandatory φ1 |
| | | PR-008-041b | Specific flag types for φ2 | Mandatory φ2 |
| CR-008-042 | Steady sample flow profile for analysis | PR-008-042 | Flow irregularity alerts and instructions how to proceed | Desirable φ2 |
| | | | | Mandatory φ2 |
| CR-008-043 | Instrument operation appropriate for all lab settings. | PR-008-043 | External temperature operating range 16–32°C (61–90°F). Relative humidity operating range 10% - 90%, non-condensing. Bulk gold reagent bottle is expected to remain on the instrument for ≤ 5 days. Heater at may be needed for immunogold reaction. | Mandatory φ1 |
| CR-008-044 | Operation with all electrical sources | PR-008-044 | 90–250V, 47–63 Hz. | Mandatory φ1 |
| CR-008-045 | Battery backup available | PR-008-045 | UPS specified with the ability to finish cycle and shutdown completely. | Mandatory φ1 |
| CR-008-046 | All preventative maintenance driven by software and performed by customer | PR-008-046 | No field service or manipulation of components for preventative maintenance. | Desirable φ1 |

RB

MMR PBK

## PRODUCT SPECIFICATIONS FOR HT INSTRUMENT

| | | | | |
|---|---|---|---|---|
| BR-008-001 | Automatic and manual calibration options | PR-008-047 | Calibration by factory, field service, or customer. Calibration only for total WBC count. | Mandatory φ1 |
| BR-008-002 | CD4 reagents must have minimum 2 months room temperature (4-30ºC) stability upon arrival at end user | PR-008-048a | Minimum 4 months stability at room temperature for CD4 reagents | Mandatory φ1 |
| | | PR-008-048b | Minimum 1 year stability at room temperature for CD4 reagents | Desirable φ2 |
| BR-008-003 | Troubleshooting done with minimal service visits | PR-008-049a | File download and instrument control capability for remote troubleshooting. | Desirable φ1 |
| | | PR-008-049b | Bidirectional ASTM or equivalent acceptable with future planning for "peer to peer" file sharing. | Desirable φ2 |
| BR-008-004 | Software upgrades performed by customer | PR-008-050 | Automated downloadable software upgrades for UI and analytical software | Desirable φ1 |
| BR-008-005 | Installation performed without experienced operator | PR-008-051 | Field service installed | Mandatory φ1 |
| BR-008-006 | Gold reagent bottle capacity sufficient for average daily throughput | PR-008-052 | Lyophilized or desiccated bulk gold reagent bottle reconstituted by convenience package without any skilled steps by customer. | Mandatory φ1 |
| BR-008-007 | Instrument conforms to international regulatory standards | PR-008-053a | CE/UL mark for product launch | Mandatory φ1 |
| | | PR-008-053b | FDA 510(k) for market expansion | Mandatory φ2 |

END OF DOCUMENT

*Attachment 3*
*to Annex 1*

ATTACHMENT 3 TO ANNEX 1


## Synopsis of PointCare Technologies Assay for the Identification of CD4 Positive Lymphocytes:

## Expression as Percentage of Lymphocyte Count ("CD4%") and CD4 Lymphocyte Count ("CD4 Absolute")

(Two-Page Document)


### SAMPLE

1. Sample is 45µl of whole blood in EDTA.
2. Cells must be suspended according to standard hematology practice.
3. Proceed to sample immunolabeling

### SAMPLE IMMUNOLABELING

1. Add 45µl whole blood to 20µl PointCare CD4 Immunogold and 45µl of PointCare accelerant. The order in which these reagents are combined is not important.
2. Mix by "vortex" action at approximately 1700 rpm or by similar method for approximately 5 seconds.
3. Depending on efficiency of mixing method, incubation at 37C may be required up to 180 seconds.
4. Proceed to sample lysing.

### SAMPLE LYSING

1. Add 300µl Erythrolyse II (Beckman Coulter) to the blood/gold/accelerant mixture to initiate red cell lysis.
2. Mix by "vortex" action at 1700 rpm for 10 seconds. In contrast to Step 2 in "Sample Immunolabeling", these conditions are critical, and if alternative mixing is used, the effect must mimic the effect of "vortexing".
3. Immediately add 133µl of Stabilyse (Beckman Coulter) to stop red cell lysis.
4. Mix by "vortex" action at 1700 rpm for 10 seconds. Again, in contrast to Step 2 in "Sample Immunolabeling", these conditions are critical, and if alternative mixing or timing is used, the effect must mimic the effect of "immediate addition" and "vortexing".
5. Sample is now stable and isotonic diluent can be added if required for fluid handling by instrumentation system.
6. Proceed to Optical Cytometer Analysis.

### OPTICAL CYTOMETER ANALYSIS

1. Optical cytometer must clearly distinguish lymphocytes from monocytes as both cell types carry CD4 antigens.
2. CD4+ versus CD4- lymphocyte discrimination is performed using the parameter commonly termed "Side Scatter" in flow cytometry. Discrimination improves, as "Back Scatter" collection angles are included.

1

FROM: KATHY 2142164950 TO: HARRY RIMMER    DATE: 8/26/03 10:28AM    PAGE 12 OF 20

## COMPUTATION OF CD4 "Percent" AND CD4 "Count"

1. Make the <u>CD4 Percent</u> computation from the Optical Cytometer analysis by counting events in the CD4+ lymphocyte cluster and dividing by the total number of CD4+ and CD4- lymphocyte events in both optically determined clusters.

2. Make the <u>CD4 Count</u> computation by multiplying the CD4 Percent (expressed as a decimal fraction) from the Optical Cytometer by the lymphocyte count obtained by impedance, or other non-optical, counting of the same sample.

## FLUID VOLUME TOLERANCES

| Reagent | Optimal Volume (µl) | Volume Range Allowed |
|---|---|---|
| Whole blood | 45 | ±10% |
| Accelerant | 45 | ±30% |
| Immunogold | 20 | ±30% |
| Erythrolyse II | 300 | ±10% |
| Stabilyse | 133 | ±10% |

END

2

*Annex 2*

<u>Annex 2</u>

Specifications and Development Timelines

for the NP Instrumentation Platform & the reformulated

<u>POINTCARE Lymphocyte Enumeration Assay Kit</u>

**NP Diagnostic Instrumentation Platform:**

- Pointcare to negotiate a Development and Manufacturing Agreement with C2 or another third party manufacturer that incorporates the specifications and development timetables included in *Attachment 1* to *Annex 2* (Near Patient Instrument for Developing World Market, by D. Barry, May 4, 2006).

**POINTCARE CD4sure™ Assay Test Kit**

- Pointcare is responsible for and will bear the costs associated with and related to the development and approval for sale in the United States of PointCare's Reformulated CD4sure™ Lymphocyte Enumeration assay that will be compatible with the NP diagnostic instrumentation platform and, as appropriate, Drew's HTc and HTw diagnostic instrumentation platforms.
- PointCare is responsible for and will bear all costs associated with and related to the development and transfer into Pointcare's manufacturing organization of a reformulated Lymphocyte Enumeration assay that shall be compatible with and operate with the NP diagnostic instrumentation platform and, as appropriate, Drew's HTc and HTw diagnostic instrumentation platforms.
- Development timetable and Product Specifications are attached hereto as *Attachment 2* to *Annex 2* and incorporated by reference (*TO BE DELIVERED BY POINTCARE BY JUNE 30, 2006 AND AGREED UPON BY THE PARTIES BY JULY 30, 2006).*



*Attachment 1*
*to Annex 2*

| PointCare<br>Technologies Inc. | CUSTOMER, BUSINESS AND PRODUCT<br>REQUIREMENT SPECIFICATIONS | Document No.:<br>CBPR-007 | Rev. A |
|---|---|---|---|
| **Effective Date:**<br>DRAFT | TITLE: NEAR PATIENT SYSTEM FOR<br>DEVELOPING WORLD MARKET | Page: 1 of 6 | |

### Attachment 1 to Annex 2

Title of Program:   Near Patient Instrument for Developing World Market

Date:   May 4, 2006

Author:   Don Barry

1. **Purpose and Scope**

   This document describes the customer and business requirements for the Near Patient System and the translation into product requirements. This system is to be co-developed by PointCare Technologies and a third party. The design controls for this project will be maintained separately by PointCare Technologies and the third party per their respective design control system.

2. **Product Overview**

   The Near Patient System is a flow-based and impedance-based system that will allow for analysis of CD4, CD4%, and certain hematology parameters to economically manage monitoring of HIV Antiretroviral Therapy. Designed for smaller clinics and remote testing venues, the system will support small patient sample volumes. It is comprised of the Near Patient Instrument and its associated reagents.

3. **Customer, Business and Product Requirements**

   The following requirements will ensure development of the above described Near Patient System.



**PointCare**
Technologies Inc.

| CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS | Document No.: CBPR-007 | Rev. A |
| --- | --- | --- |
| TITLE: NEAR PATIENT SYSTEM FOR DEVELOPING WORLD MARKET | Page: 2 of 6 | |

Effective Date:

DRAFT

| CR/BR No. | Customer or Business Requirement | PR No. | Product Requirement | Requirement Importance |
| --- | --- | --- | --- | --- |
| CR-007-001 | Parameters reported: WBC, Lym, Lym %, Mono, Mono %, Neut, Neut %, Eo, Eo %, Hgb, CD4, CD4%. | PR-007-001 | Instrument capable of producing WBC and a 4-pt WBC differential, plus hemoglobin, plus CD4. | Mandatory |
| CR-007-002 | CD4 lymphocyte reportable range from 50/nL to 6,000/nL | PR-007-002 | Large dynamic range of CD4 cell enumeration with precision at 200/nL < 10% CV. | Mandatory |
| CR-007-003 | CD4% of total lymphocyte reportable range from 1% to 80%. | PR-007-003 | Large dynamic range of CD4 cell enumeration with precision at 15% < 10% CV | Mandatory |
| CR-007-004 | Only CD4 lymphocytes reported | PR-007-004 | CD4 monocytes excluded from analysis | Mandatory |
| CR-007-005 | WBC reportable range from 500/nL to 100,000/nL | PR-007-005 | Large dynamic range for WBC. Precise WBC count obtained by impedance at 6,000/nL < 2.5% CV | Mandatory |
| CR-007-006 | Lymphocyte reportable range from 1 to 95% | PR-007-006 | Large dynamic range for lymphocytes with precision at 15% < 5% CV | Mandatory |
| CR-007-007 | Monocyte reportable range from 0 to 80% | PR-007-007 | Large dynamic range for monocytes with precision at 7% < 10% CV | Mandatory |
| CR-007-008 | Neutrophil reportable range from 1 to 95% | PR-007-008 | Large dynamic range for neutrophils with precision at 50% < 4% CV | Mandatory |
| CR-007-009 | Eosinophil reportable range from 0.1 to 90% | PR-007-009 | Large dynamic range for eosinophils with precision at 5% < 10% CV | Mandatory |
| CR-007-010 | Hemoglobin reportable range from 0.5 g/dL to 24 g/dL | PR-007-010 | Large dynamic range for hemoglobin with precision at 12 g/dL < 1.5% CV | Mandatory |
| CR-007-011 | Minimum 32 hour sample age for CD4 and CD4%. Minimum 8 hours for all other parameters. | PR-007-011 | Sample age extension for CD4 and CD4% from 8 hour minimum age requirement. | Mandatory |
| CR-007-012 | System warns user if results possibly compromised by aged sample. | PR-007-012 | Mitigation factors for sample age, such as data entry for draw time, flagging for dot-plots, and training | Mandatory |
| CR-007-013 | System does not report results if compromised by aged sample. | PR-007-013 | Absolute internal control for sample age through dot plot flagging. Can be a post launch upgrade. | Desirable |





FROM: KATHY 2142104950 TO: HARRY RIMMER          DATE: 5/2/08 TIME: 10:02:05 AM          PAGE 10 OF 26

**PointCare**
Technologies Inc.

**CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS**

**TITLE: NEAR PATIENT SYSTEM FOR DEVELOPING WORLD MARKET**

Document No.: CBPR-007

Rev. A

Effective Date:
DRAFT

Page: 3 of 6

| | | | |
|---|---|---|---|
| CR-007-014 | Daily throughput appropriate for Near Patient market | PR-007-014 | Minimum of 50 samples plus controls in 7.5 hours | Mandatory |
| CR-007-015 | Minimal cycle time to allow for reruns when necessary | PR-007-015 | <5 minute cycle time | Mandatory |
| CR-007-016 | WBC differential not to be compromised by CD4 gold reagent | PR-007-016 | Two passes through optical analysis chamber — one pass to obtain WBC differential without immunogold, another pass to obtain CD4% with immunogold. | Mandatory |
| CR-007-017 | No handling of open blood tubes | PR-007-017 | Automated cap piercing blood sampling from manually introduced sample tubes (no autoloader) | Mandatory |
| CR-007-018 | Keypad with integrated computer operation | PR-007-018 | Keypad and integrated computer design | Mandatory |
| CR-007-019 | Use of instrument in outdoor setting | PR-007-019 | Screen readable in full sunlight | Desirable |
| CR-007-020 | Printable results | PR-007-020 | Printer to be specified by instrument manufacturer | Mandatory |
| CR-007-021 | Local languages available for each market | PR-007-021 | English, French, Portuguese, Spanish, Chinese, Thai, Vietnamese, and Russian screens. Can be post launch upgrade. | Desirable |
| CR-007-022 | Protected software for simple operation without tampering | PR-007-022 | Three levels of operation—service mode, supervisor mode, and limited operator mode | Mandatory |
| CR-007-023 | Limited data entry | PR-007-023 | RFID or barcode sample and control entry | Mandatory |
| CR-007-024 | Reagent use and expiration tracking | PR-007-024 | RFID or barcode for reagent use tracking | Mandatory |
| CR-007-025 | Minimal reagent waste | PR-007-025 | Attention to small fluid volume usage | Mandatory |
| CR-007-026 | Numerical data output with no visual interpretation | PR-007-026 | Automated cluster gating | Mandatory |
| CR-007-027 | Automatic QC tracking of controls with control chart display | PR-007-027 | Levey-Jennings control plots generated and easily printable. Can be post launch upgrade. | Desirable |
| CR-007-028 | Data storage > 100,000 patient results | PR-007-028 | 1000 patient results available on instrument. Expandable data storage by optional external USB key and external computer. Can be post launch upgrade. | Desirable |
| CR-007-029 | Searchable patient history | PR-007-029 | User interface on external computer designed to facilitate easy patient management. Can be post launch upgrade. | Desirable |

MMR PBK

**PointCare** Technologies Inc.

| CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS | Document No.: CBPR-007 | Rev. A |

TITLE: NEAR PATIENT SYSTEM FOR DEVELOPING WORLD MARKET

Page: 4 of 6

Effective Date:

DRAFT

| CR-007-030 | Easy daily startup and shutdown | PR-007-030 | Fully automated startup/shutdown <5 minutes each with no customer intervention | Mandatory |
| CR-007-031 | Assurance of gold reagent activity for every sample | PR-007-031 | Software driven internal control for gold reagent activity by monitoring monocytes. | Mandatory |
| CR-007-032 | Indeterminate samples denoted by a general flag symbol | PR-007-032 | Stride flag criteria for automated software gating. Flag explanation available in administration and service mode. | Mandatory |
| CR-007-033 | Instrument operation appropriate for all lab settings. | PR-007-033 | External temperature operating range 18-34°C (64-93°F). Relative humidity operating range 10% - 80% at 32°C, non-condensing. A thermoelectric cooler for gold reagent bottle may need to be added. | Mandatory |
| CR-007-034 | Ability to operate in arid regions with airborne dust | PR-007-034 | Protected mixing chambers, optical assembly, and electronics | Mandatory |
| CR-007-035 | Tamper proof operation of instrument | PR-007-035 | Door and cover sensors to prevent operation when open | Mandatory |
| CR-007-036 | Multiple use gold reagent bottle | PR-007-036 | Lyophilized or desiccated bulk gold reagent bottle reconstituted by instrument. Manual reconstitution in a convenience package is an alternative if instrument reconstitution is not feasible. | Mandatory |
| CR-007-037 | Container available for easy transport | PR-007-037 | Weight < 50 lbs in approved container | Desirable |
| CR-007-037 | Instrument can be moved by customer without service call. | PR-007-038 | Durable hardware capable of shock/vibration resistance. No optical/mechanical adjustment after transportation in approved container. | Mandatory |
| CR-007-039 | Small footprint | PR-007-039 | Size <35 cm x 25 cm x 34 cm | Desirable |
| CR-007-040 | Ability to participate in proficiency programs. | PR-007-040 | Can be post launch upgrade. Requires collaboration with proficiency program managers as they have to make proficiency samples compatible with light scatter based system. | Desirable |
| CR-007-041 | Operation with all electrical sources | PR-007-041 | 90-250V, 47-63 Hz, all commonly used connectors available | Mandatory |

FROM: KATHY 2142104950 TO: HARRY RIMMER          DATE: 6/2/06 TIME: 10:02:06 AM

**PointCare** Technologies Inc.

**CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS**

**TITLE: NEAR PATIENT SYSTEM FOR DEVELOPING WORLD MARKET**

Document No.: CBPR-007

Rev. A

Page: 5 of 6

Effective Date: DRAFT

| | | | | |
|---|---|---|---|---|
| CR-007-042 | Capability to operate from alternative energy sources (generator, solar power). | PR-007-042 | Line conditioning to be specified by instrument manufacturer. Can be post launch upgrade. | Desirable |
| CR-007-043 | Battery backup available | PR-007-043 | UPS specified with the ability to finish cycle and shutdown completely. | Mandatory |
| CR-007-044 | All preventative maintenance performed by customer. | PR-007-044 | Manipulation of components for preventative maintenance done by customer guided by on screen instructions. | Mandatory |
| BR-007-001 | No calibration done by customer | PR-007-045 | Calibration by factory with possible adjustment by installer. | Mandatory |
| BR-007-002 | Minimize lab space | PR-007-046 | Diluent, lyse, clean, gold, and accelerant reagents contained and handled on board of instrument. | Mandatory |
| BR-007-003 | All reagents must have minimum 2 months room temperature (4-30°C) stability upon arrival | PR-007-047 | Minimum 4 months stability at 30°C. | Mandatory |
| BR-007-004 | Allow only PointCare reagents to be used | PR-007-048 | RF ID or barcode encryption to prevent counterfeit reagents | Mandatory |
| BR-007-005 | Cyanide-free hemoglobin method | PR-007-049 | Hemoglobin determined by cyanide-free reagent | Mandatory |
| BR-007-006 | Troubleshooting done with minimal service visits | PR-007-050 | File download capability for remote troubleshooting. | Mandatory |
| BR-007-007 | Software upgrades performed by customer | PR-007-051 | Automated downloadable software upgrades | Mandatory |
| BR-007-008 | Installation performed by field service | PR-007-052 | Field service or distributor installed | Mandatory |
| BR-007-009 | Multiple use gold reagent bottle | PR-007-053 | Lyophilized or desiccated gold reagent bottle for multiple uses within open vial stability limits. Potentially several sizes will be necessary dependent on average customer usage. | Mandatory |
| BR-007-010 | Instrument conforms to international regulatory standards | PR-007-054 | CE/UL mark for product launch. FDA 510(k) for market expansion. | Mandatory |

| PointCare Technologies Inc. | CUSTOMER, BUSINESS AND PRODUCT REQUIREMENT SPECIFICATIONS | | Document No.: CBPR-007 | Rev. A |
| --- | --- | --- | --- | --- |
| Effective Date: DRAFT | TITLE: NEAR PATIENT SYSTEM FOR DEVELOPING WORLD MARKET | | Page: 6 of 6 | |

END OF DOCUMENT

MMR PBK

*Attachment 2*
*to Annex 2*

*Annex 3*

## Annex 3
## Sales & Marketing Territories

The Parties agree as follows;

- DREW will have non-exclusive worldwide rights to market and sell the HTc platform and the NP platform and the respective CD4 lymphocyte enumeration test kits under the DREW label. POINTCARE will have non-exclusive worldwide rights to market and sell the HTw platform and the corresponding CD4 lymphocyte enumeration kit under the POINTCARE label. POINTCARE will have non-exclusive worldwide rights to market and sell the NP platform and the corresponding CD4 lymphocyte enumeration kit under the POINTCARE label as well as other labels, one of which may be the Beckman Coulter label.

- Notwithstanding the above, the Parties agree that each company will lead the marketing and sales effort in certain territories (the "Market Leader") while the other company will support the Market Leader's efforts in such territory (the "Supporter").

- The Market Leader shall have the right and responsibility to develop a distribution and customer service capability in a defined territory. The Market Leader shall not only diligently promote the products offered under its own label but also offer the products under the Supporter's label whenever applicable and not competitive to the Market Leader's product. The Supporter shall promptly refer all sales leads from the Market Leader's territories to the Market Leader. The Market Leader shall diligently pursue such sales leads and report progress on a regular basis to the Supporter. The Market Leader agrees to sell and service the Supporter's products within its territories; to the extent it is reasonably able. The Supporter shall promptly provide, upon request from the Market Leader, product information, testimonials from opinion leaders, references from customers and any other supporting information that is requested. The Market Leader will bear all costs related to the marketing and sales effort in its respective territories, including the reimbursement of all reasonable expenses incurred by the Supporter. Only expenses that have been pre-approved by the Market Leader shall be reimbursable.

- The Market Leader shall propose a "Sales Plan" for each territory for which it is responsible which shall detail the distribution channels, customer support facilities, pricing, target sales volumes and any other relevant information. The Parties shall discuss the Sales Plan and the Market Leader shall incorporate any reasonable input and suggestions from the Supporter. Progress shall be reviewed against such Sales Plan.

- The Market Leader shall retain its rights and responsibilities in a territory for an initial 18 months from the date of product introduction in said territory. During this period the Parties will review progress against the Sales Plan every six months. After the initial 18 months, the Market Leader shall retain its position for additional 12 month periods if the Sales Plan was fulfilled or exceeded. Should the Supporter have an agreement with a distributor that commits to selling at least 50% more instruments during a twelve (12) month period than the commitment of the Market Leader, and the Supporter's distributor issues a non-cancellable purchase order for twenty-five (25) percent of the twelve month sales commitment, the Supporter shall have the right to initiate its own sales and service efforts in said territory.

- Should a Party to this Agreement or its authorized agent obtain a Purchase Order from a Non-Government Organization ('NGO'), or a similar organization that is located within a territory in which the other Party is the Market Leader, the Market Leader and/or its authorized agent(s) shall support the installation, servicing and reagent supply for the instruments sold to the NGO or similar organization within its territories. The Market Leader or its authorized agent(s), at the direction of the Market Leader, shall be compensated at its respective standard rates for such services. Such a Purchase Order will not entitle the Party securing such a Purchase Order to otherwise market in the territory of the Market Leader unless otherwise permitted by this Agreement.

- "Product Introduction" shall be defined as the point in time when the Market Leader formally offers the product for sale and is accepting purchase orders. The Market Leader must offer product for sale at least two (2) months before the product is available and can be legally sold or distributed within the territory. At all times and in all territories within its scope of responsibility, the Market Leader shall make best efforts to fulfil all necessary duties to prepare for product distribution and sale within its territories and as agreed upon as

quickly as is commercially reasonable, including but not limited to achieving compliance with applicable laws and regulations. If the Market Leader unreasonably delays the Product Introduction into a territory, the Supporter shall have the right to initiate its own sales and service efforts in that territory.

- DREW will be the Market Leader in the following territories at the time of initial Product Introduction: USA, Russia, China, The European Union, Philippines, Hong Kong, Taiwan, Thailand, Malaysia, Vietnam, Korea, Egypt, Pakistan, Bangladesh, and Turkey.

- POINTCARE will be the Market Leader in the following territories at the time of initial Product Introduction: Canada, Sub-Saharan Africa, Central America and the Caribbean Island Nations.

- Both Parties will independently sell and market products under their own label in India.

- From time to time, both Parties shall discuss territories not covered at the time of the Agreement. Both Parties shall make reasonable efforts to begin distribution in territories not covered at the time of the Agreement. At any time during the Agreement, either Party shall have the right to propose Market Leadership in a new territory. If a Sales Plan is proposed that can not be significantly exceeded by the other Party, the proposing Party shall have the right to assume the Market Leader position.

- With respect to Trade Shows and other exhibit and sales presentation venues, it is acknowledged that each Party shall attend certain Trade Shows and public events ("Shows") where it will seek to merchandise the products covered under this Agreement. To provide efficient coverage of such Shows and minimize redundancies and sales presentation overlap, it is agreed that DREW will attend those Shows that are related to clinical diagnostics, as well as regional distributor Shows within its Territories. POINTCARE shall be responsible for attending Shows that are specifically related to HIV treatment. While each company shall bear its own costs associated with attending and/or participating in a Show, the Parties also agree that they will provide reasonable support to each other, as requested during such Shows, including but not limited to the provision of appropriate personnel, instrumentation, assay/reagent kits, and scientific and marketing literature. The Parties further

agree that by the fifth (5th) day of the fourth calendar quarter of every year, they will submit to each other a list of the Shows which they propose to attend in the coming year. The Parties will then discuss these proposals and work cooperatively to allocate needed personnel and resources to support the proposed programs. It is recognized that additional Shows may be added to the schedule of a Party during the course of the calendar year. Each Party will make a best effort to provide at least sixty (60) days notice of the scheduling of an additional Show. The notified Party will make a best effort to provide any needed support should such timely notice be received. If less than sixty (60) days of notice is provided, the receiving Party is under no obligation to assist but should make as reasonable an effort as possible to assist.

- The Parties agree to work cooperatively to develop a brochure and CD presentation that can be used to communicate the benefits of using the HTc, HTw and NP diagnostic instrumentation platforms and CD4 Lymphocyte Enumeration assay kits developed under this Agreement. The Parties shall jointly agree upon and equally share all costs associated with such a brochure and CD presentation development effort. The Parties will work cooperatively to develop a budget, as well as a concept that can be jointly utilized by the Parties in their respective territories.

MMR PBK

*Annex 4*

## Annex 4
### Product Labelling Terms & Conditions

The Parties agree as follows:

- Drew shall have the right to market and sell the HTc and NP diagnostic instrumentation platforms and the CD4 Lymphocyte Enumeration assay kits under its own labelling.

- POINTCARE shall have the right to market and sell the HTw and NP diagnostic instrumentation platforms and the CD4 Lymphocyte Enumeration assay kits under its own labelling.

- Each Party agrees to assist the other Party and to cooperate as reasonably necessary, granting any licenses that are required, in order that each Party can, if it chooses, market and sell the above noted products under its own brand and with its own labelling. However, it is acknowledged that if DREW deviates from any labelling recommendations made by POINTCARE with respect to its NP diagnostic instrumentation platform or CD4 Lymphocyte Enumeration assay kits and/or if POINTCARE would deviate from the labelling recommendations of DREW relative to DREW'S HTw diagnostic instrumentation platforms, the Party that chooses to modify the labelling assumes the full risk and responsibility for any damages, injuries, regulatory and/or any other actions that may result and hereby agrees to fully defend and indemnify the other Party against any and all resulting claims or legal actions, threatened or actual.

- Subject to the liability disclaimers included in this Agreement, including but not limited to this *Annex 4*, POINTCARE shall package its NP instrumentation platform and CD4 Lymphocyte Assay kits which are ordered for purchase by DREW in accordance with the labelling specifications provided to POINTCARE by DREW.

- Subject to the liability disclaimers included in this Agreement, including but not limited to this *Annex 4*, DREW shall package its HTw diagnostic instrumentation platforms which are ordered for purchase by POINTCARE in



accordance with the labelling specifications provided to DREW by POINTCARE.

- DREW agrees to provide reasonable cooperation to POINTCARE should POINTCARE request that labelling requirements of a POINTCARE customer be included on any HTw diagnostic instrumentation platform that DREW manufacturers for sale to POINTCARE. POINTCARE agrees to accept and pay any and all reasonable and documented costs for such modifications and to provide DREW with full defense and indemnity for any and all resulting claims or legal actions, threatened or actual, that may result from the labelling change(s) requested by POINTCARE.

HMR PBK

*Annex 5*

## Annex 5

### Pricing Terms & Conditions; Requirements Forecasts

- DREW agrees to sell HTw diagnostic instrumentation platforms to POINTCARE that are labelled in accordance with POINTCARE'S specifications at a price that shall not exceed USD $23,700. Further, DREW agrees to sell HTw diagnostic instrumentation platform spare/replacement parts and accessories to POINTCARE, in quantities that are sufficient to meet its requirements, at a discount of forty-five (45) percent off of the current published list price. The spare parts list is attached hereto as *Attachment 1 to Annex 5*. DREW shall provide POINTCARE with its experience and assistance in ascertaining the type and quantity of spare/replacement parts and accessories that POINTCARE should consider maintaining in its inventory. Further, in order that POINTCARE is able to develop a system of "loaner" diagnostic platforms that it can provide to its customers and end-users to temporarily replace platforms that are under repair, DREW will also allow POINTCARE to purchase one HTw diagnostic instrumentation platform at DREW'S standard cost for every ten (10) HTw diagnostic instrumentation platforms purchased by POINTCARE.

- POINTCARE agrees to sell NP diagnostic instrumentation platforms to DREW that are labelled in accordance with DREW'S specifications at a price that shall not exceed USD $ 14,000 . Further, POINTCARE agrees to sell spare/replacement parts and accessories to DREW, in quantities that are sufficient to meet its requirements, at a discount of forty-five (45) percent off of the current published list price (price list will be supplied). POINTCARE shall provide DREW with its experience and assistance in ascertain the type and quantity of spare/replacement parts and accessories that DREW should consider maintaining in its inventory. Further, in order that DREW is able to develop a system of "loaner" diagnostic platforms that it can provide to its customers and end-users to temporarily replace platforms that are under repair, POINTCARE will also allow DREW to purchase one NP diagnostic instrumentation platform at POINTCARE'S standard cost for every ten (10) NP diagnostic instrumentation platforms purchased by DREW.

*[signature]* PBK

- POINTCARE also agrees to sell CD4 Lymphocyte Enumeration Assay Kits for use on the HTc platform to DREW that are labelled in accordance with DREW'S specifications according to the following price schedule:

  - Cost of $4.00 per test for total sales volumes of up to 500,000 CD4 tests per year, based upon the relevant Anniversary Date.
  - Cost of $3.50 per test for total sales volume between 500,001 and 1 million CD4 tests per year, based upon the relevant Anniversary Date
  - Cost of $3.00 per test for total sales volume above 1 million tests per year, based upon the relevant Anniversary Date

- POINTCARE agrees to sell CD4 Lymphocyte Enumeration Kits for use on the NP platform to DREW that are labelled in accordance with DREW's specifications according to the following pricing schedule. Should DREW experience price erosion averaging twenty-five percent (25%) or more within its Territories, on average, using average revenue per test as the measure during any twelve month period, as compared to the average revenue per test during the initial twelve month period of sales, the Parties agree to renegotiate the pricing terms for the assay tests (kits) on a good faith basis.
  - Cost of $4.00 per test for sales volumes of up to 1 million CD4 tests per year, based upon the relevant Anniversary Date.
  - Cost of $3.50 per test for sales volumes of up to 3 million CD4 tests per year based upon the relevant Anniversary Date.
  - Cost of $3.00 per test for sales volumes above 3 million CD4 tests per year based upon the relevant Anniversary Date.

- POINTCARE agrees to pay DREW USD $ 0.30 per CD4 Lymphocyte Enumeration test that POINTCARE sells for use on a DREW manufactured HTw diagnostic instrumentation platform.
- It is understood that each CD4 Lymphocyte Enumeration Assay Kit may contain more than one test per kit, and that the pricing noted in this *Annex* is per test, not per assay kit.

- The Parties will provide each other with rolling twelve (12) month forecasts of their purchase requirements. The first month of the initial forecast shall be considered a firm commitment to purchase. Seventy (70) % of the second month forecast that was included in the initial forecast shall also be considered a firm purchase commitment. The remaining ten (10) months of the initial forecast are considered to be for planning purposes only. However, each Party is required to provide their rolling forecast to the other Party by the fifteenth (15th) day of every month and one hundred (100) % of said forecast for the following month shall be considered a firm purchase commitment. No less than seventy (70) % of the following month's forecast shall also be considered a firm purchase commitment. [Example – On May, 14, 2007, POINTCARE issues an updated "rolling" 12 month forecast that includes an order for 10 HTw units in June, 2007 and 10 HTw units in July, 2007. Pointcare would be committed to purchase at least 10 units in June and at least 7 units in July.].

- The Parties agree that payment for any purchases made under this Agreement shall be delivered to the other Party within forty-five (45) days of receipt of the invoice. No invoices will be issued by either Party before delivery of goods. Notwithstanding the above, DREW will agree to allow POINTCARE to extend the payment term to sixty (60) days, rather than forty-five (45) days, for the initial six (6) month period commencing when POINTCARE receives the first invoice from DREW for the HTw platform.

- Insurance:   Both Parties agree to maintain the following insurance coverages:
  - Products Liability Coverage: Minimum amount of USD $1,000.000.00 per occurrence and USD $3,000,000.00 in the aggregate.
  - General Liability Insurance: Minimum amount of USD $1,000.000.00 per occurrence and USD $2,000,000.00 in the aggregate.

*HMR PBK*

*Attachment 1*
*to Annex 5*

ATTACHMENT 1 TO ANNEX 5

Excell22 Parts Price List May 2006

| PN | Description | | 06 list US$ | 45% discount price US$ |
|---|---|---|---|---|
| FRU-2705-019 | Low Vacuum Reservoir Assy. w/bracket | ea. | 392.65 | 215.95 |
| FRU-2705-020 | TUBING,TYGON,1/16ID,Red  50 ft roll | ft | 26.84 | 14.76 |
| FRU-2705-021 | TUBING,TYGON,1/8ID,1/16W    50 ft roll | ft | 100.27 | 55.15 |
| FRU-2705-022 | TUBING,TYGON,1/32ID,1/32W    50 ft roll | ft | 25.36 | 13.95 |
| FRU-2705-023 | TUBING,TYGON,1/16ID,1/8OD  50 ft roll | ft | 29.43 | 16.18 |
| FRU-2705-024 | TUBING SILASTIC .062  50 ft roll | ft | 197.51 | 108.63 |
| FRU-2705-026 | TUBING, TYGON, MICRO, .060 X 0.020  50 ft roll | in | 66.99 | 36.84 |
| FRU-2705-027 | TUBING, TYGON, 5/32 X 3/32 50 ft roll | ft | 64.68 | 35.57 |
| FRU-2705-028 | TUBING,TYGON 5/16 X 3/16     10 ft roll | ft | 46.86 | 25.77 |
| FRU-2705-029 | TUBING,TYGON 1/8 ID, Red      50 ft roll | ft | 98.18 | 54.00 |
| FRU-2705-031 | TUBING, TYGON .04ID X .13OD   100 ft roll | ft | 215.60 | 118.58 |
| FRU-8100-005 | WBC Aperture Assy. | ea. | 166.93 | 91:81 |
| FRU-8400-005 | Pressure Reservoir Assy. | ea. | 287.93 | 158.36 |
| FRU-8400-008 | Valve, 12V, 2W, 1/16 port | ea. | 233.67 | 128.52 |
| FRU-8400-009 | Valve, 12V, 3W, 1/8 port | ea. | 243.51 | 133.93 |
| FRU-8400-010 | Valve, 12V, 2W, 1/8 port, Membrane | ea. | 254.79 | 140.13 |
| FRU-8400-013 | Valve, 12V,  Pinch Valve Normally Open | ea. | 213.29 | 117.31 |
| FRU-8400-018 | Valve, 9V, 3W, 5/32 port, Red Leads | ea. | 404.16 | 222.29 |
| FRU-8400-024 | Valve, 12V, 3W, Manifold Mtd. | ea. | 296.67 | 163.17 |
| FRU-8400-025 | Valve, 12V, 2W, Manifold (round) | ea. | 365.42 | 200.98 |
| FRU-8400-026 | Valve, 12V, 3W, Manifold, Coil (square) | ea. | 288.20 | 158.51 |
| FRU-8400-034 | RED indicator Lamp, pkg of 2 | ea. | 34.87 | 19.18 |
| FRU-8400-035 | WHITE indicator Lamp, pkg of 2 | ea. | 34.87 | 19.18. |
| FRU-8400-038 | 3/32" x 2" O-Ring, 10" Reservoirs Pkg of 5 | ea. | 15.00 | 8.25 |
| FRU-8400-039 | 3/32 X 2.5" O-Ring-5PSI Reservoir, Waste Jar Pkg of 5 | ea. | 15.00 | 8.25 |
| FRU-8400-045 | Wave Spring Washer, HGB Systems  Pkg of 10 | ea. | 15.00 | 8.25 |
| FRU-8400-046 | FILTER, FLUID, 25MM DIA.     Pkg of 5 | ea. | 64.90 | 35.70 |
| FRU-8400-055 | 540 NM OPT BANDPASS FILTER | ea. | 105.57 | 58.06 |
| FRU-8400-059 | WESCOR Check Valve Pkg of 5 | ea. | 29.65 | 16.30 |
| FRU-8400-070 | Valve, 12V, 2 Way, 1/16 Port, Wet Sleeve, EPDM Seal (sheath) | ea. | 211.04 | 116.07 |
| FRU-8400-073 | Clamp, 1 Ear w /Liner, new Guard Block Pkg of 10 | ea. | 20.00 | 11.00 |
| FRU-8400-079 | Metering Tube, 3.5" Lg | ea. | 61.77 | 33.97 |
| FRU-8400-130 | Paint, Touch Up, Drew Ash Gray | ea. | 28.74 | 15.81 |
| FRU-8400-131 | Paint, Touch Up, Drew Green | ea. | 52.25 | 28.74 |
| FRU-8516-004 | Delay Line assy., (Silencer) | ea. | 640.15 | 352.08 |
| FRU-8516-005 | RBC Aperture Excell, AL 8X8, 3000 Excell 22 | ea. | 184.86 | 101.67 |
| FRU-8516-010 | WBC Transducer Excell Series | ea. | 305.64 | 168.10 |
| FRU-8516-025 | "O" ring Kit, Apertures Excell, AL 8X8, ATAC, 3000 | ea. | 69.58 | 38.27 |
| FRU-8516-030 | Needle Assy., W/Nut & O-ring (New Style) | ea. | 327.58 | 180.17 |
| FRU-8516-059 | Guard Block Assy Modification Kit | ea. | 84.87 | 46.68 |
| FRU-8516-073 | HGB LED REPLACEMENT KIT | ea. | 101.97 | 56.08 |
| FRU-8516-078 | Dual Metering Tube Board, Excell Series | ea. | 321.09 | 176.60 |
| FRU-8516-081 | O_RING 2mm X 4mm  Pkg of 10 | ea. | 20.00 | 11.00 |
| FRU-8516-084 | Battery, Lithium, 3V, Coin | ea. | 15.00 | 8.25 |
| FRU-8516-087 | Check Valve, 1/8" In Line, Hi Flow  Pkg of 5 | ea. | 30.25 | 16.64 |
| FRU-8516-089 | Electronic Potentiometer, Z-3  Pkg of 4 | ea. | 54.21 | 29.81 |
| FRU-8516-090 | Sensor, Pressure/Vacuum, Solid State | ea. | 175.45 | 96.50 |
| FRU-8516-097 | Guard Electrode Block Assy.,. | ea. | 146.25 | 80.43 |
| FRU-8516-115 | Nut, Retainer Needle, Excell Series Pkg of 5 | ea. | 59.90 | 32.94 |
| FRU-8516-218 | Z55 - Metering tubes/keyboard Ctrl XL seies & XL22 | ea. | 185.79 | 102.18 |
| FRU-8740-032 | Transfer Tube, EXSAM, XL22 (For Dual Core Needle) | ea. | 67.88 | 37.33 |
| FRU-8740-033 | Rinse Line (Red), EXSAM | ea. | 35.92 | 19.75 |
| FRU-8808-001 | WOC Acquisition Board | ea. | 2,099.96 | 1,154.98 |
| FRU-8808-003 | Lan-Ethernet, PC104, (Network Adapter Card) | ea. | 667.87 | 367.33 |
| FRU-8808-004 | Reagent Detector Board | ea. | 377.41 | 207.58 |
| FRU-8808-006 | Extension/PMT, Pre-AMP board | ea. | 496.38 | 273.01 |
| FRU-8808-007 | Detector Array, Pre-AMP Board | ea. | 1,037.52 | 570.64 |

| Part # | Description | | Price 1 | Price 2 |
|---|---|---|---|---|
| FRU-8808-008 | Sequencer/ Impedance Amp Board  (2.2.2 Firmware) | ea. | 2,808.74 | 1,544.81 |
| FRU-8808-009 | Sequencer Interface Board | ea. | 876.98 | 482.34 |
| FRU-8808-010 | Pump / Dilutor Cont. Board (2.2.2 Firmware) | ea. | 1,248.50 | 686.68 |
| FRU-8808-011 | Valve Driver Board #1, Front Panel | ea. | 337.10 | 185.40 |
| FRU-8808-012 | Wash Block / Slide Valve Controller Board | ea. | 839.60 | 461.78 |
| FRU-8808-014 | Laser Temp Sensor Board, Fan Assy, XL22 | ea. | 258.17 | 141.99 |
| FRU-8808-020 | EX-Flo Reservoir Assy Excell22 | ea. | 458.59 | 252.22 |
| FRU-8808-021 | Exzyme Reservoir Assy Excell22 | ea. | 459.91 | 252.95 |
| FRU-8808-022 | EX-Iso Reservoir Assy Excell22 | ea. | 330.77 | 181.92 |
| FRU-8808-023 | Slide Valve, Rear Pad  Excell22 | ea. | 1,888.15 | 1,038.48 |
| FRU-8808-024 | Slide Valve, Front Pad, Excell22 | ea. | 2,320.29 | 1,276.16 |
| FRU-8808-025 | Rinse Block  Excell22 | ea. | 159.06 | 87.48 |
| FRU-8808-026 | Slide Valve Bushing w / Drive Shaft and Gear | ea. | 466.62 | 256.64 |
| FRU-8808-027 | Slide Valve Motor w/ Gear, Excell22 | ea. | 839.30 | 461.62 |
| FRU-8808-028 | 0.2 Micron Filter Assy, Excell22 (Diluent) | ea. | 332.04 | 182.62 |
| FRU-8808-030 | Rinse Block Motor Assy | ea. | 907.28 | 499.00 |
| FRU-8808-032 | High Vac / Waste Reservoir | ea. | 183.65 | 101.00 |
| FRU-8808-033 | Low Vac Reservoir | ea. | 258.12 | 141.96 |
| FRU-8808-034 | WOC Mixing Motor Assy | ea. | 349.09 | 192.00 |
| FRU-8808-035 | RBC Mixing Motor Assy | ea. | 349.09 | 192.00 |
| FRU-8808-036 | WIC Cuvette Assy | ea. | 406.62 | 223.64 |
| FRU-8808-037 | WOC Cuvette Assy | ea. | 1,451.67 | 798.42 |
| FRU-8808-038 | Pre-Mix Cuvette Assy | ea. | 1,004.19 | 552.30 |
| FRU-8808-039 | RBC Cuvette Assy w / Silencer | ea. | 741.13 | 407.62 |
| FRU-8808-040 | Linear Actuator 12VDC WOC Injector | ea. | 317.74 | 174.75 |
| FRU-8808-041 | Linear Actuator 12VDC, 0.001 STP (Sample Aspirator) | ea. | 326.98 | 179.84 |
| FRU-8808-042 | Barrier Filter Assy, Excell22 | ea. | 81.40 | 44.77 |
| FRU-8808-043 | Dilutor O-ring Kit Excell22 | ea. | 65.78 | 36.18 |
| FRU-8808-044 | Dilutor Motor, Excell22 | ea. | 498.25 | 274.03 |
| FRU-8808-045 | Vacuum Pump, Excell22 | ea. | 821.92 | 452.06 |
| FRU-8808-046 | Pressure Pump,Excell22 | ea. | 1,148.35 | 631.59 |
| FRU-8808-047 | Laser Assy, Excell 22 | ea. | 1,365.08 | 750.80 |
| FRU-8808-049 | WOC Tubing Kit Upgrade | ea. | 65.23 | 35.88 |
| FRU-8808-051 | WOC Flow Cell Adjustment Tool | ea. | 49.50 | 27.23 |
| FRU-8808-053 | WIC Cuvette Assy | ea. | 1,709.29 | 940.11 |
| FRU-8808-055 | UPS 400 VA 230 VAC, International | ea. | 3,043.15 | 1,673.73 |
| FRU-8808-056 | UPS 400VA 110VAC, Domestic | ea. | 2,607.55 | 1,434.15 |
| FRU-8808-057 | PMT Assy | ea. | 3,242.31 | 1,783.27 |
| FRU-8808-058 | Power Supply Assy | ea. | 1,582.13 | 870.17 |
| FRU-8808-059 | Power Supply 5V / 50W | ea. | 323.51 | 177.93 |
| FRU-8808-060 | Power Supply 12V / 10W | ea. | 511.34 | 281.23 |
| FRU-8808-061 | Diluter/Aspirator/ Injector assy. W Diluter/pump controller | ea. | 7,246.03 | 3,985.32 |
| FRU-8808-062 | Coax Cable, Optics | ea. | 45.60 | 25.08 |
| FRU-8808-064 | I2C Network / Communication Board | ea. | 202.18 | 111.20 |
| FRU-8808-065 | Microcontroller, SV / WB, U-5 | ea. | 43.62 | 23.99 |
| FRU-8808-067 | Dilutor Block and Drive Assy | ea. | 3,059.93 | 1,682.96 |
| FRU-8808-068 | Filter Assy, .2 Micron (new - sheath) | ea. | 307.67 | 169.22 |
| FRU-8808-069 | Sheath Filter & Valve Upgrade | ea. | 549.84 | 302.41 |
| FRU-8808-070 | Cooling Fan Retrofit Kit Excell 22 | ea. | 745.25 | 409.89 |
| FRU-8808-072 | Flow Cell Assy w / Injector 2 ports | ea. | 2,254.84 | 1,240.16 |
| FRU-8808-073 | Optic Head Assy (Current rev.) | ea. | 10,945.28 | 6,019.90 |
| FRU-8808-074 | Flow Cell Injector 2 ports (not for old flow cell) | ea. | 179.74 | 98.86 |
| FRU-8808-075 | Start switch W leads & Microswitch with arm | ea. | 96.03 | 52.82 |
| FRU-8808-076 | Injector Barb fittings connectors(5 /pkg) | ea. | 71.94 | 39.57 |
| FRU-8808-078 | Optic head power cable | ea. | 106.98 | 58.84 |
| FRU-8808-079 | V37 adapter block | ea. | 197.89 | 108.84 |
| FRU-8808-080 | Tube clamps & hose clamps pkg of 10 ea | ea. | 456.67 | 251.17 |
| FRU-8808-081 | Fan with wiring | ea. | 95.92 | 52.76 |
| FRU-8808-082 | Float switch waste sensor | ea. | 454.96 | 250.23 |
| FRU-8808-083 | Excell 22 Cleaning line | ea. | 102.36 | 56.30 |

*HML PBR*

| | | | |
|---|---|---|---:|---:|
| FRU-8808-084 | Ethernet Cable, Shielded | ea. | 75.19 | 41.35 |
| FRU-8808-092 | V36 adapter block for SSD | ea. | 182.55 | 100.40 |
| FRU-8808-100 | Retrofit Kit, Ex-Sam XL 22 | ea. | 94.00 | 51.70 |
| FRU-8808-102 | Bar Code Reader ,XL 22 (Keyboard Wedge) | ea. | 722.92 | 397.61 |
| FRU-8808-104 | Opticon Barcode Reader, XL22 | ea. | 722.92 | 397.61 |
| FRU-8808-115 | Preventative Maintenance Kit, XL22 | ea. | 2,747.53 | 1,511.14 |
| FRU-8808-116 | Pump / Dilutor Cont. Board for UI before 2.2.2 | ea. | 1,303.28 | 716.80 |
| FRU-8808-117 | Sequencer/ Impedance Amp Board before 2.2.2 | ea. | 2,852.08 | 1,568.64 |
| FRU-8808-118 | Disk on Chip - 2.2.2 UI | ea. | 521.29 | 286.71 |
| FRU-8808-119 | Disk on Chip - prior 2.2.2 UI | ea. | 396.00 | 217.80 |
| FRU-8808-120 | 386SX CPU - PC 104 W disk on chip -rev 2.2.2 | ea. | 1,854.88 | 1,020.18 |
| FRU-8808-121 | Front Cover, XL22 | ea. | 813.51 | 447.43 |
| FRU-8808-122 | 386SX CPU - PC 104 W disk on chip - prior rev 2.2.2 | ea. | 1,673.87 | 920.63 |
| FRU-8808-123 | Programmed Flash, XL 22 - V 2.2.2 (Z53 & Z54) | ea. | 238.21 | 131.01 |
| FRU-8808-124 | Programmed Flash, XL 22 - V 3.0.0 (Z53 & Z54) | ea. | 174.90 | 96.20 |
| FRU-8808-125 | Sequencer/ Impedance Amp Board  V 3.0.0 | ea. | 2,979.24 | 1,638.58. |
| FRU-8808-126 | PC104 DISK-ON-A-CHIP  (rev 19) | ea. | 423.06 | 232.68 |
| FRU-8808-127 | .SX CPU, PC104, W OPTC20 | ea. | 1,772.27 | 974.75 |
| FRU-8808-128 | Switch, Microswitch w / Arm | ea. | 45.00 | 24.75 |
| FRU-8808-129 | Sensor, Pressure 14.5 PSI | ea. | 57.75 | 31.76 |
| FRU-8808-130 | Install Cables, RJ45 & Parallel Printer | ea. | 23.11 | 12.71 |
| FRU-8808-131 | Cable Assy, I2C, Shielded, 60" (XL 22  Post-date 4/01) | ea. | 39.33 | 21.63 |
| FRU-8808-132 | Programmed Eprom, WB/Slide Valve, XL22 (Z-1) | ea. | 144.38 | 79.41 |
| FRU-8808-133 | Programmed Eprom, Dilutor Controller, (Z-4) | ea. | 153.12 | 84.22 |
| FRU-8808-134 | Programmed EPLD, Excell22 Add Dec (U11) | ea. | 154.17 | 84.79 |
| FRU-8808-135 | Piston, Aspiration, XL22 | ea. | 72.30 | 39.76 |
| FRU-8808-136 | Piston, Diluent, XL22 | ea. | 40.41 | 22.23 |
| FRU-8808-137 | Piston, Injector, XL22 | ea. | 72.30 | 39.76 |
| FRU-8808-138 | Piston, Lyse, XL22 | ea. | 30.19 | 16.60 |
| FRU-8808-139 | Piston, Sheath, XL22 | ea. | 35.21 | 19.37 |
| FRU-8808-202 | User Interface V 2.2.2 upgrade kit  - XL22 with SP1 | ea. | 144.21 | 79.32 |
| FRU-8808-302 | Service CD Rev. Win 2000 service packs (V 2.2.2) | ea. | 49.78 | 27.38 |
| FRU-9000-001 | Vacuum/Press. Gauge | ea. | 1,769.63 | 973.29 |
| FRU-9000-002 | Nut Driver 1/4" | ea. | 37.81 | 20.80 |
| FRU-9000-003 | Nut Driver 11/32" | ea. | 40.84 | 22.46 |
| FRU-9000-004 | U.S. Standard Ball Allen Wrench Set | ea. | 37.81 | 20.80 |
| FRU-9000-005 | Digital Multi-Meter | ea. | 320.65 | 176.36 |
| FRU-9000-006 | Test Lead Black | ea. | 25.71 | 14.14 |
| FRU-9000-007 | Test Lead Red | ea. | 25.71 | 14.14 |
| FRU-9000-008 | Flat Blade and Phillips Screw Driver Set | ea. | 139.15 | 76.53 |
| FRU-9000-009 | Needle Nose Pliers | ea. | 72.60 | 39.93 |
| FRU-9000-010 | Diagonal Cutting Pliers | ea. | 63.53 | 34.94 |
| FRU-9000-011 | Precision Knife | ea. | 19.66 | 10.81 |
| FRU-9000-012 | E-Prom Extractor | ea. | 42.35 | 23.29 |
| FRU-9000-013 | Curved 6" Hemostats | ea. | 30.25 | 16.64 |
| FRU-9000-014 | Precision Knife Replacement Blades | ea. | 13.61 | 7.49 |
| FRU-9000-015 | 3/8" Open/Box End Wrench | ea. | 29.40 | 16.17 |
| FRU-9000-016 | Standard Hardware Kit | ea. | 214.17 | 117.79 |
| FRU-9000-017 | Hydraulic Fittings Kit | ea. | 330.99 | 182.04 |
| FRU-9000-018 | US Std Punch Set | ea. | 170.91 | 94.00 |
| 4205-A | Particles, 5.01 | ea. | 1,633.50 | 898.43 |
| 4207-A | Particles, 6.992 | ea. | 1,633.50 | 898.43 |
| DC-111 | Dow Corning 111 Compound | ea. | 48.58 | 26.72 |
| M-XL22 | Manual, Operator, Excell22 | ea. | 125.00 | 68.75 |
| M-XL22-S | Manual, Service , Excell 22 (printed copy) | ea. | 125.00 | 68.75 |
| MIXL22 | Manual, Operator, Excell22, Infolab | ea. | 250.00 | 137.50 |
| R-001L | Lubricant Slide | ea. | 63.69 | 35.03 |
| R-005C | Light Pipe Cleaner | ea. | 121.99 | 67.09 |
| R-005L | Lubriplate | ea. | 17.71 | 9.74 |
| S-0002 | Waste Container | ea. | 15.00 | 8.25 |



*Annex 6*

## Annex 6

### Warranty, Technical Support & Training

In addition to the terms and conditions included in Article 3 of this Agreement, it is agreed that:

- If a DREW platform that is under warranty cannot be repaired by POINTCARE, POINTCARE may send such platform to DREW's manufacturing facility for diagnosis and possible repair. POINTCARE will assume full responsibility for all costs associated with the transport of the platform to and from DREW'S manufacturing facility, including but not limited to shipping and insurance charges.

- In the event that DREW HTw platforms sold to POINTCARE incur a material manufacturing defect that is epidemic in nature, DREW agrees to bear the commercially reasonable and documented incremental costs of service incurred by POINTCARE to correct the malfunction.

- If POINTCARE experiences an "out of the box" malfunction of a DREW HTw platform, DREW and POINTCARE's field maintenance personnel shall work cooperatively to ascertain the nature of the problem and the best course of action to promptly resolve the problem.

- Drew agrees to provide complementary initial training to a mutually agreed upon number of POINTCARE's designated technicians and distributors relative to the repair and maintenance of the HTw diagnostic instrumentation platforms. The training will take place at a DREW manufacturing facility. POINTCARE shall bear responsibility for the travel, meals, lodging and other costs incurred by its personnel and agents. Said training will be conducted at as mutually agreed upon during the duration of this Agreement.

- POINTCARE agrees to provide complementary initial training to a mutually agreed upon number of DREW's designated technicians and distributors relative to the use of POINTCARE'S NP instrumentation platform and its CD4 Lymphocyte Enumeration Assay kits at a location to be determined. DREW

shall bear responsibility for the travel, meals, lodging and other costs incurred by its personnel and agents.

- POINTCARE agrees that it shall bear sole responsibility for providing its customers, distributors and other end-users with installation, service and maintenance of the HTw diagnostic instrumentation platforms and that it shall provide all "first" and "second" level support to its customers, distributors and other end-users. First level support is defined as hotline support by either a POINTCARE distributor or POINTCARE directly, during which assistance is provided to the customer in diagnosing the problem in order to troubleshoot large component failures. Second level support is defined as either direct field service repair or delivery of a loaner while the unit is taken back to base for repair. A trained technician would be required to troubleshoot and repair the system in second level support. During the time that this Agreement remains in effect, DREW shall agree to provide "third level" support to POINTCARE, assisting POINTCARE in those few situations where POINTCARE is unable to satisfactorily resolve an issue after utilizing its existing resources. Such support shall be provided by DREW to POINTCARE via telephone or electronic transmission at DREW'S reasonable and customary charge for such service. If a DREW support specialist is requested to provide field support, POINTCARE agrees to pay all costs associated with DREW'S effort to satisfy its request.

1           IN THE UNITED STATES DISTRICT COURT

            FOR THE SOUTHERN DISTRICT OF NEW YORK

2

    DREW SCIENTIFIC, INC.,   )

3                        )

      Plaintiff,          )

4                        )

    vs.              ) CASE NO. 08 CV 1490-AKH

5                        )

    POINTCARE TECHNOLOGIES,   )

6    INC.,                )

                         )

7      Defendant.        )

8

9

10

11          ORAL DEPOSITION OF GEORGE CHAPPELL

12              APRIL 1, 2008

13

14

15

16      ORAL DEPOSITION OF GEORGE CHAPPELL, produced as a

17   witness at the instance of the Defendant and duly sworn,

18   was taken in the above-styled and numbered cause on the

19   1st day of April, 2008, from 9:50 a.m. to 6:02 p.m.,

20   before Jamie Prince, Certified Shorthand Reporter in and

21   for the State of Texas, reported by computerized stenotype

22   machine at HQ Global Workplaces, 2911 Turtle Creek

23   Boulevard, Suite 300, Dallas, Texas, pursuant to the

24   Federal Rules of Civil Procedure and the provisions stated

25   on the record or attached hereto.

George Chappell

1    for the CD4 project?

2       A.   I don't know what revision this document is.  I

3    saw a document similar to this and then revisions were

4    made.  I don't know if this is the latest revision or not.

5       Q.   Okay.  If you see, there's a date on the

6    left-hand side of 6/2/06.  You see that date?

7       A.   Yes, sir.

8       Q.   Now, is it your understanding that the

9    contract -- is it your understanding that the contract

10   between PointCare and Drew for the CD4 project was entered

11   into at approximately that time?

12      A.   I always thought it was in July.

13      Q.   You thought it was July?

14      A.   Yes, sir.

15      Q.   Of 2006?

16      A.   Yes, sir.

17      Q.   Okay.  Let me just take you back for a moment to

18   Exhibit 2.  Do you have that there?

19      A.   Yes, sir.

20      Q.   So would you agree with me that this appears to

21   be a development timeline?

22          MR. DELLAPORTAS:  Object to form.

23      A.   Yes, sir.

24      Q.   (By Mr. Twohig)  And if you look at some of the

25   line items -- for example, Line Item 25 and 26 -- does it

George Chappell

1    appear to be a development timeline for the CD4 project?

2        A.  Yes, sir.

3        Q.  Now, if you look over to the right side of the

4    document, you see where it has those horizontal blocks and

5    then it has initials after the horizontal blocks?

6        A.  Yes, sir.

7        Q.  And if you scan that, you can see that there's

8    several instances where the initials are GDC?

9        A.  Yes, sir.

10       Q.  Do those correspond to your initials?

11       A.  Yes, sir.

12       Q.  Having studied the document a little bit, does

13   it refresh your recollection as to whether you've ever

14   seen this particular timeline?

15       A.  Again, there were many schedules made for this

16   project.  I don't know if I've seen this particular one or

17   not.

18       Q.  Okay.  Now if we could just go back to the other

19   timeline, which was Exhibit 1.

20       A.  Yes, sir.

21       Q.  Do you have that there in front of you?

22       A.  Yes, sir.

23       Q.  Again, just kind of looking at this in a little

24   bit more detail, you notice some of the line items here,

25   for example, Line 24 and Line 26, they reference CD4.  Do

George Chappell

1    you see that?

2        A.  Yes, sir.

3        Q.  And then if you look over on the right side, do

4    you see where there are, again, those horizontal blocks,

5    some of them followed by initials.  Do you see those?

6        A.  Yes, sir.

7        Q.  I notice, for example, if you look over at

8    Line 17 and you look across, you see Line 17 where it says

9    "fluid routing"?

10       A.  Yes, sir.

11       Q.  And then if you look over it says -- where the

12   horizontal block is, the initials are DME?

13       A.  Yes, sir.

14       Q.  What do you understand DME to be referring to?

15       A.  I don't know.

16       Q.  Let me ask you this:  Do you sometimes have

17   timelines and product development lines for projects that

18   you're working on at Drew?

19       A.  Yes, sir.

20       Q.  And do you ever use DME to stand for Drew

21   Mechanical Engineers?

22       A.  I've never seen it before.

23       Q.  Do you ever use DM to stand for Drew

24   Manufacturing?

25       A.  No, sir.

Unsigned

George Chappell

1    time, but we did review something very similar to this.

2        Q.  Okay.  That's actually sufficient.  I'm not

3    going to make you try and figure it out.

4            Now, are you aware, Mr. Chappell, that a final

5    set of specifications for the HT were agreed upon between

6    Drew and PointCare and that they were made part of the

7    contract?

8            MR. DELLAPORTAS:  Objection.  Compound.

9        A.  Could you maybe separate those two questions?

10       Q.  (By Mr. Twohig)  Let's see.  I'll try it again.

11           Are you aware that a final set of specifications

12   for the HT was agreed upon between Drew and PointCare and

13   made a part of the contract?

14           MR. DELLAPORTAS:  Same objection.

15       A.  All I can say is we reviewed these

16   specifications, some changes were agreed upon, and whether

17   or not they were made part of the contract, I have no

18   idea.  I was never privy to that information.

19       Q.  (By Mr. Twohig)  Fair enough.

20           Do you remember any discussion about the

21   specifications you looked at with the other team members

22   for Drew?

23       A.  Vaguely.  I don't remember many --

24       Q.  Do you remember -- I'm sorry.  Go ahead.

25       A.  I don't remember many of the details.

Unsigned

George Chappell                                                                                      82

1        Q.  Can you tell me whatever details you do

2    remember?

3        A.  I know there were two or three things that we

4    objected to.  There weren't very many, but I don't recall

5    exactly what they were.

6        Q.  Now, if we go down just a little bit further, do

7    you see there where it says, Customer's development plan

8    is attached?

9        A.  On which document are you referring to?

10       Q.  We're still on Page 2 of 3.  I'm sorry.  Going

11   back to the most recent exhibit we marked.  I believe it

12   was Exhibit 6.

13       A.  Yes, sir.

14       Q.  So if you can just go back to the -- it was

15   Page 2 of 3 of the project initiation document, and about

16   halfway down do you see it says, Customer's development

17   plan is attached?

18       A.  Yes, sir.

19       Q.  Do you know if that's referring to a timeline

20   for development?

21       A.  I would think that it would be, yes.

22       Q.  The terminology suggests that it would be?

23       A.  Yes, sir.

24       Q.  Do you recall looking at a timeline for

25   development at that meeting?

Unsigned

George Chappell

1      A.  Yes, sir.  I believe we did.

2      Q.  And do you recall any of the details of the

3   timeline?

4      A.  I remember our discussion that it was incomplete

5   and we need to take most of the tasks and expand them so

6   we could be able to better determine exactly what the

7   duration of these tasks would be.

8      Q.  Okay.  Did you have some follow-up discussion

9   about that?

10     A.  As I recall, Gary -- several suggestions were

11  made and Gary Young was supposed to implement those

12  suggestions, and then I believe there was supposed to be

13  another meeting with PointCare to get their approval.

14     Q.  So as far as you know, the suggestions that were

15  made at the meeting regarding the timeline were

16  implemented by Gary Young?

17        MR. DELLAPORTAS:  Objection.  Calls for

18  speculation.

19     A.  I only know he was -- I'm pretty sure he was

20  assigned the task.

21     Q.  (By Mr. Twohig)  And let me ask you -- going

22  back to something you said about the timeline.  You said

23  that there were some items that were incomplete.  Do you

24  recall that?

25     A.  Yes, sir.

Unsigned

George Chappell

1    Q.   Do you recall what those items were?

2    A.   Well, almost all of it.  We determined that

3    these items listed here were only the high points and each

4    of them -- almost every one of them needed to be broken

5    down into smaller steps to define other tasks that needed

6    to be accomplished to complete that main item.

7    Q.   Okay.  So that was discussed at the meeting?

8    A.   I believe that's true.  It was discussed that

9    they were necessary and I believe some of them were

10   discussed in detail.  I don't know that all of them were.

11   Q.   Do you recall voicing whatever concerns you had

12   at the time?

13        MR. DELLAPORTAS:  Objection.  Assumes facts

14   not in evidence.

15   A.   No.  I'm not aware that I had any objections.

16   Q.   (By Mr. Twohig)  Do you recall other people

17   voicing concerns?

18   A.   Yes, I do, but I don't remember exactly who.

19   Q.   Do you recall if anyone voiced concern that the

20   engineering timelines were deemed too short?

21   A.   Well, what I recall was that this schedule did

22   not contain sufficient data to really be able to tell

23   whether the project could be completed within any time

24   frame.  There was just not enough information to make an

25   intelligent decision.

1    Q.  Do you recall anybody voicing any concerns that

2    the manufacturing engineering timelines were too short for

3    Drew?

4    A.  I think I've answered that.

5    Q.  I'd ask you to answer that question I just

6    asked, because I did put another word in there.  I just

7    wanted to make sure.

8         MR. DELLAPORTAS:  Objection.  Asked and

9    answered.

10    Q.  (By Mr. Twohig)  To try to short circuit this,

11    Mr. Chappell, is your answer the same for the question I

12    just asked you as for the prior question?

13    A.  Yes.  There's just not enough information here

14    to make an intelligent decision.

15    Q.  Fair enough.

16         If we continue looking at the document, you see

17    now where it says seven subprojects were identified?

18    A.  Yes, sir.

19    Q.  Do you recall these seven subprojects being

20    identified at the meeting?

21    A.  Give me just a moment to read it.

22    Q.  Absolutely.

23    A.  Yes, sir.

24    Q.  So let's take a look at -- well, let me ask you:

25    You've had a chance to look at the seven subprojects

George Chappell

1    A.  Yes, sir.

2    Q.  And what was that?

3    A.  To use an ultrasonic sensor.

4    Q.  And have you ever used ultrasonic sensors

5    before?

6    A.  Not in this application.

7    Q.  But prior to this time period, the time period

8    of this email, were you aware of the existence of

9    ultrasonic sensors?

10    A.  I was aware of it, but I wasn't really sure what

11    the state of the art was.  I hadn't looked into it in

12    several years.

13    Q.  And correct me if I'm wrong, but what an

14    ultrasonic sensor does is it detects the actual mass of

15    the liquid.  Let me rephrase that.

16       What it does is it uses audio waves to detect

17    the liquid.  Is that accurate?

18    A.  Yes, sir.  It uses ultrasonic energy instead of

19    light energy.

20    Q.  And light energy is what's used by the optical

21    sensor, right?

22    A.  Yes, sir.

23    Q.  Now, had ultrasonic sensors been incorporated

24    into any other Drew devices?

25    A.  Not that I'm aware of, no.

Unsigned

1     Q.  Okay.  Now, do you recall Don Barry ever

2     suggesting that an ultrasonic sensor could be used to

3     resolve this issue with the clouding in the tube?

4     A.  No, sir.

5     Q.  You don't recall speaking to Don about that?

6         MR. DELLAPORTAS:  Objection.  Different

7     question.

8     A.  I don't recall Don Barry ever initiating a

9     conversation in which he made that suggestion.

10        MR. TWOHIG:  Let's take a look at the next

11    document, Document 25.

12        (Exhibit 22 marked.)

13        THE REPORTER:  It's Exhibit 22.

14    Q.  (By Mr. Twohig)  Just to make sure we're on the

15    same document here, it's Bates label DR27961.  Do you see

16    that, Mr. Chappell?

17    A.  Yes, sir.

18    Q.  And just focusing on that first email on the

19    first page there, this is an internal email at Drew,

20    right?

21    A.  That's what it looks like, yes, sir.

22    Q.  And it appears to be a progress report on the HT

23    project, right?

24    A.  It seems to be about the HT project.  I don't

25    know if you call it a progress report or not.

Unsigned

George Chappell

1    Q.  Well, if you look at the subject line there.

2    A.  Okay.  Yes.

3    Q.  So if you look in that second paragraph, it

4  says, They've run enough samples on it to cloud the glass

5  passage with gold residue.  Once this passage becomes

6  opaque, the optical sensor no longer functions properly

7  and the system becomes inoperable.  Do you see that there?

8    A.  Yes, sir.

9    Q.  Is that an accurate statement of what happened?

10   A.  Not entirely.

11   Q.  What's not accurate about it?

12   A.  I don't think there was a glass passage.

13   Q.  What do you think the passage was made of?

14   A.  Polycarbonate.

15   Q.  Okay.  Did you test other materials?

16   A.  Yes, sir.

17   Q.  Who did the testing of other materials?

18   A.  Testing was done by both PointCare and Drew, by

19  Don Barry and Gary Young and myself.

20   Q.  What other materials did you test?

21   A.  We tried polycarbonate, polypropylene, Teflon,

22  Delrin, Tefzel, and there may have been some others.  I

23  don't recall.

24   Q.  And did any work better than others?

25   A.  Well, it was difficult for us to tell.

Unsigned

George Chappell

1      Q.  Did you ever call any third party for advice?

2      A.  I never did.

3      Q.  Did anybody else at Drew?

4          MR. DELLAPORTAS:  Objection.  Calls for

5   speculation.

6      A.  I have heard that William Ross did.

7      Q.  (By Mr. Twohig)  Who told you that?

8      A.  Either he or Gary Young.

9      Q.  Did whoever it was who told you tell you who he

10  called?

11     A.  He probably did, but I don't recall who it was.

12     Q.  If you take a look at the next paragraph here.

13  One sentence, it says, We think we have a solution.  And

14  then in the paragraph after that, it says, For the interim

15  we're going to use a cleaning solution.

16         Do you see that?

17     A.  Yes, sir.

18     Q.  Then it says, It is only a temporary fix until

19  we can get the final solution to the problem fully tested.

20  See that?

21     A.  Yes, sir.

22     Q.  Was the final solution the ultrasonic sensor?

23     A.  Yes, sir.

24     Q.  So you were working on that in June of '07?

25     A.  I don't recall.

George Chappell

1    Q.   Okay.  When did that ultrasonic sensor finally

2    get implemented?

3    A.   I think it was later in the summer, around

4    August or so.

5         MR. TWOHIG:  Let's take a look at the next

6    document.  It's 26, if you would mark that, Jamie.

7         (Exhibit 23 marked.)

8         THE REPORTER:  It's 23.

9    Q.   (By Mr. Twohig)  Mr. Chappell, before we move on

10   to Exhibit 23, I just want to step back for a second and

11   ask you about the collaborative nature of the project.

12        Did you find that there was good collaboration

13   between the Drew team and the PointCare team during the

14   course of the project?

15   A.   Sometimes yes; sometimes no.

16   Q.   Now, was there good collaboration more towards

17   the beginning and not so good collaboration more towards

18   the end or was it just at different times throughout the

19   project?

20   A.   Seemed like there was less collaboration toward

21   the end of the project.

22   Q.   So what time period would you identify as there

23   being less collaboration?  Would you say the last few

24   weeks?  The last few months?

25   A.   Oh, probably around the beginning to the

George Chappell

1    midsummer of 2007.

2        Q.  And was there any particular incident that you

3    feel kind of changed that collaboration?

4        A.  I don't understand the question.

5        Q.  Well, was there any particular incident or

6    occurrence that caused there to be less collaboration at

7    that time?

8        A.  I don't know of anything on our end that would

9    cause us not to collaborate with PointCare, and I don't

10   know how I could answer for PointCare.

11       Q.  Well, let's just focus on yourself for a second.

12   Did you continue collaborating with PointCare?

13       A.  Yes, sir.

14       Q.  So did you notice -- let me ask you this:  Did

15   other people at Drew, as far as you know, continue to

16   collaborate?

17       A.  They continued to communicate.  I know that for

18   sure.

19       Q.  What about the folks at PointCare.  Did they

20   continue to collaborate?

21       A.  Not as well as they had during the beginning of

22   the project.

23       Q.  Can you give me some specific examples of that?

24       A.  Yes.  For one was the gold reagent situation.

25       Q.  What was that?

Unsigned

George Chappell

1     A.   One reason we could never really determine what

2     material was best for this optical sensor or just what the

3     lifetime of the optical sensor will be is because we

4     couldn't get enough gold reagent from PointCare to run

5     more than just a few samples, so there was no way we could

6     do any kind of extensive testing, and that didn't change

7     until -- oh, it was around August or September of 2007

8     when we finally got a supply of outdated reagent that we

9     could use for testing.

10        Many of the problems that they were having with

11    optic heads we couldn't see in Dallas because we simply

12    didn't have the gold reagent to test with.

13        There was also -- they were supposed to be

14    supplying us with user interface software, especially the

15    DLL.  It was promised back in -- well, it was promised

16    many times through the latter part of 2006.  It was

17    absolutely supposed to be delivered in January of 2007,

18    and we still don't have it.

19        You know, it got to the point where Gary would

20    send emails to Don or Peter and nobody would ever respond.

21    It was extremely difficult for us.

22        We would -- when we finally did get some gold,

23    we would run samples and send them our data, and instead

24    of coming back with suggestions on how we could improve

25    things, they would come back with some very short

George Chappell

1    answers -- yes, no, this is wrong -- but nothing that

2    suggested that they were trying to cooperate with us.

3        Q.   Just with respect to the gold reagent issue that

4    you just raised, did you ever call anybody at PointCare

5    and ask for gold reagent to be shipped?

6        MR. DELLAPORTAS:  You're asking did he

7    personally do it?

8        MR. TWOHIG:  Correct.

9        A.   I don't recall that I did.  I believe -- Gary

10   was our liaison and we tried to put those kinds of

11   communications through him.

12       Q.   (By Mr. Twohig)  So then with respect to any

13   lack of shipment of gold reagent from PointCare, your

14   knowledge is all secondhand, right?

15       MR. DELLAPORTAS:  Object to form.  Calls

16   for a legal conclusion.

17       A.   What I know is I requested reagents, was told

18   that they were going to be shipped, and we never got them.

19       Q.   (By Mr. Twohig)  Who did you request reagents

20   from?

21       A.   I asked Gary to request the reagents from

22   PointCare.  I do not know who he talked to.  Gary came

23   back and said, yes, they would be shipped on such-and-such

24   a date, and we never received them.

25       Q.   Okay.  Let's take a look at Exhibit 23, if you

Unsigned

George Chappell

1    would.  You okay, Mr. Chappell?

2        A.  So far.  It's been a long day.

3        Q.  All right.  If you need to stop, just let us

4    know.

5            So looking at Exhibit 23.

6        A.  Yes, sir.

7        Q.  This is an email from Peter Hansen, and you're

8    not copied on it but he refers to a telephone call with

9    George and Gary.  Do you see that in the first sentence?

10       A.  Yes, sir.

11       Q.  And this email is August 2, 2007.  You see that?

12       A.  Yes, sir.

13       Q.  He says that you and Gary reported on two

14   issues, and if you'll look down at the next paragraph, it

15   says, First, they have isolated the problem with the

16   optics.  And then he goes on.  He says, The heater in the

17   optical head that is there to maintain a constant

18   temperature was going out of control due to an electrical

19   short.  This sent the temperature very high and misaligned

20   the optics.  The misalignment took a set and did not

21   return to normal when the unit cooled.

22           Now, is that consist with what you believed at

23   the time?

24       A.  We believed --

25           MR. DELLAPORTAS:  Objection.

Unsigned

George Chappell

1    how you felt at the time?

2        A.  Yes, sir.

3            MR. DELLAPORTAS:  Objection.

4            MR. TWOHIG:  Let's take a look at the next

5    document, 28.

6            (Exhibit 25 marked.)

7            THE REPORTER:  Okay.

8            MR. TWOHIG:  Is that Exhibit 25?

9            THE REPORTER:  Yes, it is.

10        Q.  (By Mr. Twohig)  Just to confirm, Mr. Chappell,

11    this is a three-page document, Bates Nos. DR53934 through

12    936.  Do you see that?

13        A.  Yes, sir.

14        Q.  Did you write this document?

15        A.  Yes, sir.

16        Q.  Okay.  And to the best of your recollection, was

17    this an accurate statement of your understanding of the

18    status of the project on November 5, 2007?

19        A.  Yes, sir.

20        Q.  It says in the first paragraph there on the

21    first page that you have been working on stabilization of

22    the sample flow.

23        A.  Yes, sir.

24        Q.  Was that a problem?

25        A.  We learned that it was, and we learned that it

George Chappell

1    was caused because we were advised by PointCare that we

2    could dilute the patient sample with our standard duty one

3    and then inject that into our standard flow cell using our

4    standard sheath reagent, and as we learned here by the

5    experiments I ran and the results I got that we were given

6    false information or bad information, whether it was

7    intentional or whatever, but it was not correct.

8        Q.  Who gave you that false information?

9        A.  Peter Hansen and Don Barry.

10       Q.  I want to see if we can drill down here.  I'm

11   concentrating on individuals, so when I say "you," did you

12   actually receive false information from Peter Hansen or

13   Don Barry, or are you talking about anybody else at Drew?

14       A.  Just a minute.

15       Q.  Anything in particular you're looking for?

16       A.  Yes.  It was the -- here we go.

17           MR. DELLAPORTAS:  What's the exhibit

18   number, Mr. Chappell?

19           THE WITNESS:  Exhibit 7.  If you look on

20   the first page, under Sample Lysing, Line 5, sample is now

21   stable and isotonic diluent can be added if required for

22   fluid handling by instrumentation system.

23       Q.  (By Mr. Twohig)  Hold on for one second.  I want

24   to make sure I have the right document here.  Is this the

25   one that says Synopsis of PointCare Technologies Assay?

George Chappell

1    A.  Yes, sir.

2    Q.  So where are you again?

3    A.  The paragraph titled Sample Lysing, Line 5.

4    Q.  So what are you saying that this Item No. 5

5    under Sample Lysing says?

6    A.  It says you can dilute the now stable sample

7    with isotonic diluent.

8    Q.  Okay.  And you're saying that that turned out to

9    be false?

10    A.  I'm saying that it produced a solution that was

11    not compatible with our system.

12    Q.  How was it not compatible with your system?

13    A.  Well, I explained that in Exhibit 25.

14    Q.  Okay.  And, obviously, it's a lengthy

15    explanation, right?

16    A.  Yes, sir.

17    Q.  Okay.  Let me do this then.  Just to be clear,

18    when you said that Mr. Hansen and Mr. Barry informed you

19    that you could do that, you were actually referring to

20    this statement here in Line 5 of the sample lysing of

21    Exhibit 7?

22    A.  No.  I was referring to instructions, verbal

23    instructions, that they gave us in one of the design

24    meetings, but this bears it out, backs me up.

25    Q.  So this Line 5 of the sample lysing section of

George Chappell

1          (Exhibit 29 marked.)

2          THE REPORTER:  It's Exhibit 29.

3     Q.  (By Mr. Twohig)  Mr. Chappell, just verifying

4   the Bates number, it's DR44803?

5     A.  Yes, sir.

6     Q.  And this is an email from you to Mr. Hansen on

7   November 19 of 2007.  Do you see that?

8     A.  Yes, sir.

9     Q.  And it's about the CD4 HT project?

10    A.  Yes, sir.

11    Q.  Now, in that first sentence you say, Please

12  examine these data and tell me if I'm on the right track.

13       Do you see that?

14    A.  Yes, sir.

15    Q.  And what were you referring to?  The right track

16  for what?

17    A.  For producing an acceptable result for the CD4

18  positive lymphocytes.

19    Q.  And if you go down to the next sentence there,

20  you say that you've been working on the mechanics and flow

21  characteristics of the system.

22    A.  Yes.

23    Q.  Do you see that?

24    A.  Yes.

25    Q.  And to give me reliability and repeatability,

Unsigned

George Chappell

1     right?

2          A.  Yes, sir.

3          Q.  So are those hardware adjustments that you're

4     making to the mechanics and flow characteristics of the

5     system?

6          A.  Well, it's basically these elements I referred

7     to in previous documents, like in Exhibit 25.  That and

8     changes in the decks.

9          Q.  Okay.  And your goal is to get reliability and

10    repeatability of results?

11         A.  That's right, without changing any of the

12    parameters that they were responsible for, to prove that,

13    you know, we had solved our problems.

14         Q.  Okay.  And when you say "our problems," you're

15    talking about Drew's problems, right?

16         A.  That's correct.

17         Q.  Then the next thing you mention there, you say,

18    I've incorporated the ultrasonic sensor into the mixing

19    block.  You see that?

20         A.  Yes, sir.

21         Q.  So was that just done recently prior to this

22    date?

23         A.  Yes, sir.  When we first got the ultrasonic

24    sensor for evaluation, it was added in a makeshift manner

25    in order to determine whether or not it would be suitable

George Chappell

1    for our use and we were trying to -- it takes several

2    weeks to get a complete new cuvette made, so the first

3    step to evaluate it was to use it on a cuvette that we had

4    been using to evaluate different materials for the optic

5    sensor. We had modified a cuvette so we could easily

6    change that portion of it to evaluate materials.

7        So I had a small piece designed or made in our

8    shop that would accept the ultrasonic transducer so we

9    could determine whether or not it would work properly in

10   our environment, and here we're talking about a more

11   permanent arrangement in which we made the sensor an

12   integral part of the complete mixing block assembly.

13       Q.  Okay.  And then you also say that you've

14   rearranged the plumbing such that the optic sensor for the

15   accelerant and ultrasonic sensor for the gold reagent are

16   reliable.  You see that there?

17       A.  Yes, sir.  What I'd found, that there was one

18   port that was being used to clean the cuvette which would

19   pull any excess gold reagent past a port that was close to

20   the accelerant sensor, and I found that over a period of

21   time of many, many cycles you would ultimately wind up

22   with the gold reagent being deposited in the path for the

23   optical sensor used for the accelerant, and that would

24   cause you to have the same problem with the accelerant

25   sensor as we were having previously with the gold sensor,

George Chappell

1    so I made some changes where instead of applying a vacuum

2    to that external port, we just used it as a vent port to

3    make the flow go the other direction so that the gold

4    reagent was always being pulled away from the port where

5    the accelerant was.  That fixed the problem.  Minor

6    detail, but...

7        Q.  Now, at the end there you're basically -- you

8    want Mr. Hansen to look at the data you're sending him,

9    right?

10        A.  Exactly.

11        Q.  And to give you his input and see if it's headed

12    in the right direction?

13        A.  That's correct.

14        Q.  And what was his response?

15        A.  I don't recall.  I don't recall if I ever did

16    get a response.  I don't remember.

17        Q.  What about from Don Barry?

18        A.  I think the response from Don Barry -- I think

19    in the response from Don Barry he asked me if we had

20    compared our results against data that were obtained from

21    mixing manual samples, and then I replied to him yes,

22    you'll notice the first sample in the batch was marked as

23    a manual sample.

24            MR. TWOHIG:  Why don't you take a look at

25    the next document.  So this is --

George Chappell

1     is going to be different.

2          MR. DELLAPORTAS:  I've got

3     cross-examination, Michael, if you're done.

4          MR. TWOHIG:  I can't hear you.  Sorry.

5          MR. DELLAPORTAS:  I've got some

6     cross-examination if you're done.

7          MR. TWOHIG:  Can you hold off and let me

8     see if I can get them to stop?  Because I'm going to have

9     trouble hearing.

10          MR. DELLAPORTAS:  Yeah.  Go crack some

11    heads out there.

12          (Recess.)

13              EXAMINATION

14     BY MR. DELLAPORTAS:

15     Q.  Good evening, Mr. Chappell.  We've met on the

16    telephone but never face to face.  My name is John

17    Dellaportas, and I'm with the law firm of Duane Morris

18    here in New York City, and we represent the plaintiff in

19    this action.

20          How are you?

21     A.  Fine.  How are you doing?

22     Q.  Great.  I just have a few questions for you.  I

23    know you've had a long day.

24          Mr. Chappell, would it be fair to say that the

25    HT project took longer than originally anticipated?

Unsigned

George Chappell

1      A.  Yes, sir.

2      Q.  Is there any particular technical issue which

3   you would say was the main contributor to that fact?

4      A.  I think the biggest one was the optical sensor

5   for the gold reagent.

6      Q.  Can you explain a little bit more what the

7   nature of that technical problem was?

8      A.  The optical sensor depended upon the

9   transmission of infrared light from one side of the sensor

10   through the path where the fluid was flowing, or was

11   present, to the other side of the sensor to detect whether

12   fluid was present or air was present.  The gold reagent

13   had a charge on it so that as the gold reagent was pulled

14   through the sensing path, some of the gold particles would

15   be deposited on the inner surface of the passageway.  Over

16   a period of time, you would get enough particles attached

17   to the passageway so that it would block the infrared

18   light and essentially would no longer work.

19      Q.  Whose idea was it to use a gold reagent?  Was --

20      A.  PointCare.

21      Q.  -- it Drew or PointCare?

22      A.  That was from PointCare.

23      Q.  Had Drew ever used a gold reagent before the

24   agreement with PointCare?

25      A.  No, sir.

George Chappell

1      Q.  And who represented to you that the gold reagent

2      would work well with an optical sensor?

3              MR. TWOHIG:  Objection.  It's leading and

4      it assumes facts not in evidence.

5      A.  Well, I don't think we really knew how well it

6      would work.  The folks at PointCare thought that perhaps

7      if we could find the right material, it would work.

8      Q.  (By Mr. Dellaportas)  Okay.  Did you advise the

9      folks at PointCare that the gold reagent was having this

10     compatibility problem?

11             MR. TWOHIG:  Objection.

12     A.  Yes.

13     Q.  (By Mr. Dellaportas)  And did they have any

14     suggestions for you on how to solve it?

15     A.  Just that we try different materials.

16     Q.  Did they recommend specific materials?

17     A.  Early on we provided to them with several

18     samples of plastic, and Don Barry tested them, and his

19     reply was the polycarbonate material seemed to be the best

20     candidate.

21     Q.  Did you try Mr. Barry's suggestion?

22     A.  Yes, sir, we did.

23     Q.  Did it work?

24     A.  No, sir.

25     Q.  Did anything PointCare suggested to you resolve

Unsigned

George Chappell

1    this problem?

2        A.   No, sir.

3        Q.   Did Drew ultimately solve the problem?

4        A.   Yes, sir.

5        Q.   Can you explain how Drew ultimately solved the

6    problem?

7        A.   We went to a different type of sensor.  We went

8    to an ultrasonic sensor that operated much the same as the

9    optical sensor except it used ultrasonic energy instead of

10   infrared light, and the ultrasonic energy was not affected

11   by the accumulation of the gold particles on the

12   passageway.

13       Q.   Whose idea was it to do that?

14       A.   That was mine.

15       Q.   And do you believe you've now solved the problem

16   with the compatibility issues with the gold reagent?

17       A.   Yes, sir.

18           MR. DELLAPORTAS:  No further questions.

19               FURTHER EXAMINATION

20       BY MR. TWOHIG:

21       Q.   Just maybe one or two follow-up questions,

22   Mr. Chappell.  Let me step back into the camera spot here.

23   I think the drilling has stopped.

24           Now, was it Drew who initially chose to use an

25   optical sensor?

Unsigned

George Chappell

1      A.  Yes, sir.

2      Q.  And did Drew have experience using optical

3  sensors?

4      A.  Yes, sir.

5      Q.  And is that why Drew chose initially to use an

6  optical sensor?

7      A.  Yes, sir.

8         MR. TWOHIG:  I have no further questions at

9  this time.  And just to clarify what I was putting on the

10  record before when the drilling started, we had earlier on

11  in the deposition that one instance, I believe, where

12  Mr. Dellaportas instructed the witness not to answer, and

13  I'm just reserving my rights to have those questions

14  answered and that's why I'm suspending the deposition and

15  not terminating it.

16         MR. DELLAPORTAS:  That's fine.  And if the

17  court should rule that witnesses are required to answer

18  about other unrelated confidential projects, we'll be

19  happy to bring Dr. Hansen back and spend a day with him

20  hearing all about his secret projects as well.

21         MR. TWOHIG:  Okay.  Thank you very much,

22  Mr. Chappell.

23         (Deposition recessed at 6:02 p.m.)

24

25

**From:** Gary Young
**Sent:** 6/22/2007 4:19:28 PM
**To:** Frank Matuszak; Doug Nickols
**CC:** Andrew Kenney; George Chappell; William Ross; Jerry West (remote)
**Subject:** RE: Progress report

Frank,

The source I had inside PointCare has become very tight lipped. She no longer returns my calls.

The unit was working when Tuan left it last week. Since then, they've run enough samples on it to cloud the glass passage with gold residue. Once this passage becomes opaque, the optical sensor no longer functions properly and the system becomes inoperable. I shipped, on Thursday, (overnight) two additional lower cuvette halves to PointCare so they can get back up and running.

We are working on this problem and we think we have a solution.

For the interiem period, I have instructed them on the use of a cleaning solution we discovered cleans the gold residue from the passages. It is only a tempory fix until we can get the final solution to the problem fully tested.

This information was passed along to Don and Peter and was acknowledged by Peter. I've heard nothing from them since Peter's acknowledgement.

If our testing is successful, we should have the solution to the gold residue solved and the parts to fix the problem in their hands Tuesday 26th or Wednesday 27th, otherwise, it will be three to four more days before we can get our second option implemented.

Gary

-----Original Message-----
From: Frank Matuszak
Sent: Friday, June 22, 2007 10:32 AM
To: Gary Young; Doug Nickols
Cc: Andrew Kenney
Subject: RE: Progress report

Doug and Gary,

I spoke with Linsey at Pointcare and she indicated that they would be going to Barbados to test the C2 unit in the next week or 2 and that she did not think that the 2280 would go due to waiting on parts. I was under the assumption that things were working after Tuan's visit. Does anyone else have any info to the contrary. Also Gary could you fish for clues as to the who what where and when on the Barbados trip.



EXHIBIT
Chappell 1- 22
4/1/08

HIGHLY CONFIDENTIAL

DR00027961

Thanks

Frank Matuszak
VP of Sales
Drew Scientific a division of Escalon Medical
565 East Swedesford Rd, Suite 200
Wayne PA 19087
Phone: 732-768-9694
Fax:214-210-4949
Email: fmatuszak@escalonmed.com
SKYPE frankmatuszak

-----Original Message-----
From: Gary Young
Sent: Friday, June 22, 2007 11:16 AM
To: Doug Nickols
Cc: Andrew Kenney; Frank Matuszak
Subject: FW: Progress report

-----Original Message-----
From: Peter Hansen [mailto:peter.hansen@tmo.blackberry.net]
Sent: Friday, June 22, 2007 10:02 AM
To: Gary Young
Subject: Re: Progress report

Thank you for the report. I appreciate the detail. Peter Sent wirelessly via BlackBerry from T-Mobile.

-----Original Message-----
From: "Gary Young"

Date: Fri, 22 Jun 2007 10:50:46
To:"Don Barry" ,"Peter Hansen" ,
Cc:"Andrew Kenney" ,"Doug Nickols" ,"William Ross" ,"George Chappell"
Subject: RE: Progress report


Don,
The stepper motor mixer was incorporated last week and is working fine. Karl got the test software modified to control it.

We found a 0.1 molar sodiun hydroxide solution removed the gold from the passages inside the polycarbonate. This is not a long term solution but a stop gap to keep the testing in process. Sodium hydroxide over time will attack both the polycarbonate and the glass tube. It toook

HIGHLY CONFIDENTIAL

approx. 10-15 minutes of the solution setting in the passage to achieve this result.

We are scheduled to start the testing of the polyprorpylene and Teflon part in the machine, today.

I will e-mail you later today with our findings.

Gary


------------------
From: Don Barry [mailto:debarry@pointcare.net]
Sent: Friday, June 22, 2007 8:01 AM
To: Gary Young
Subject: RE: Progress report


Hi Gary

Thank you for the update.  How is your group doing on incorporating a stepper motor control for the gold reservoir?  Have you made any other advances with the gold reservoir?

thank you,
Don

-----Original Message-----
From: Gary Young [mailto:gyoung@mwi-danam.com ]
Sent: Thu 6/21/2007 5:45 PM
To: Don Barry; Peter Hansen; Doug Nickols
Cc: Amy Coughlin; George Chappell; William Ross
Subject: Progress report

We received both the Polypropylene and the PTFE part from the shop today and George evaluated them with the current optical sensors. Both materials worked well with the polypropylene being the better of the two.

We are modofying the corner of a lower cuvette and will evaluate the assembly, on the unit, Friday morning.

We have perform several experiments and found a .1 molar solution of sodium hydroxide will clean the gold from the surface of the plastic. It is not instantaneous, but, any higher concentration will start to attack the borosilicate glass and polycarbonate. We are continuing our research to optimize this. This may work as a temporary fix for now.


Gary

HIGHLY CONFIDENTIAL

DR00027963

HIGHLY CONFIDENTIAL

DR00027964

**From:** George Chappell
**Sent:** 11/19/2007 6:33:34 PM
**To:** Peter Hansen (phansen@pointcare.net); Peter Hansen (ter.hansen@tmo.blackberry.net)
**CC:**
**Subject:** CD4

Hello Peter,
Please examine these data and tell me if I am on the right track. I have been using the times, speeds and volumes that Amy gave me and have been working on the mechanics and flow characteristics of the system to give me reliability and repeatability. I have incorporated the ultrasonic sensor into the mixing block and rearranged the plumbing such that the optic sensor for the accelerent and the ultrasonic sensor for the gold reagent are reliable. I also found that matching the sheath reagent to the reagent used to dilute the sample eliminates the signals that we thought were unlysed red cells. I was still having problems getting good separation between the CD4 negative and CD4 positive lymphs. That is why I started looking at the incubation time and temperature. I spent some time trying to eliminate stray light paths and reflections in the optical head, but found that once they were eliminated the CD4 positive signal was also gone. After you look at the data, we need to get together and decide how to proceed. I think that we are very close to having a system that will work.

GDC

Attachment: FCS_Study.ZIP
Attachment: Incubation_Study.pdf
Attachment: Time_And_Temp_Study.pdf



EXHIBIT
Chappell - 29
4\1\08

DR00044803

Anthony J. Costantini
John Dellaportas
Brian Damiano
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Plaintiff Drew Scientific, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

DREW SCIENTIFIC, INC.,

            Plaintiff,

     -v-

POINTCARE TECHNOLOGIES, INC.,

            Defendant.

---------------------------------------------------x

08 CV 1490 (AKH)

The following changes should be made to the March 25, 2008 transcript of the deposition of Herbert Chow:

| Page | Line(s) | Change | Reason for Change |
|------|---------|--------|-------------------|
| 42 | 22-23 | ....[which] prototype are you ..... | Either I misspoke or transcript error |
| 44 | 15 | Ann [Bolten] | Transcript error |
| 45 | 13 | .....but the team [leader is] Lee Carter | Either I misspoke or transcript error |
| 55 | 19 | [simulating] instead of assimilating | Transcript error |
| 56 | 4 | Host [a design review meeting] | Incomplete thought |
| 56 | 16 | [Toying] instead of toiling | Transcript error |

| Page | Line(s) | Change | Reason for Change |
|------|---------|--------|-------------------|
| 119 | 7 | [It's not good for them] to [approve] it | I misspoke |
| 142 | 2 | [Precision] instead of revision | Transcript error |
| 169 | 22 | ....FDA [blessed] piece..... | Transcript error |
| 223 | 12 | XT should be [HT] | Transcript error |
| 234 | 20 | The [rest] of them...... | Transcript error |
| 237 | 6 | [do] instead of take | I misspoke |
| 268 | 11 | [N number] not end number | Transcript error |
| 277 | 4 | When I read the rough copy of the deposition, I noted Mr. Caplan's comment about "adding up the numbers in his head." This comment (which was dropped from the final version) suggests that he did not really understand my testimony, and I therefore wish to clarify. Many of the activities I testified about could be done in parallel and therefore simply adding my time estimates together would not yield an answer as to when Drew/PointCare would be ready for an FDA submission. My own total estimate would be a little over four months after delivery of the HT I tested although I note that the estimate reflected in Attachment 1 to Annex 1 is shorter. | |

The witness, affirms under the penalties of perjury, that he has read the transcript and, except for the changes set forth above, that it is accurate.

HERBERT CHOW

Amy Coughlin

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3     --------------------------------------X

4     DREW SCIENTIFIC, INC.,

5              Plaintiff,

6         -against-        Case No. 08 CV 1490-AKH

7     POINTCARE TECHNOLOGIES, INC.,

8              Defendant.

9     --------------------------------------X

10     PORTIONS CONFIDENTIAL  ATTORNEYS' EYES ONLY

11          DEPOSITION OF AMY COUGHLIN

12              Burns & Levinson LLP

13               125 Summer Street

14

15          Boston, Massachusetts

16

17          Friday, April 11, 2008

18

19               9:39 a.m.

20

21

22

23     Reported by:  Dana Welch, CSR, RPR, CRR, CBC

24

25     Job No. 16283

Amy Coughlin

1                   AMY COUGHLIN

2    BY MR. KURUVILLA:

3       Q. Do you have an understanding of what

4    PointCare's responsibilities were under this

5    contract?

6        MR. CAPLAN:  Objection.  Asked and

7·       answered.

8        THE WITNESS:  I think I already answered

9        that question as well as I could.

10   BY MR. KURUVILLA:

11      Q. Did you work on the -- we talked earlier

12   about the HT.  Did you work on the HT platform?

13      A. Yes, I did.

14      Q. Can you tell me when you worked --

15   approximately which dates you worked on the HT?

16      A. I believe starting in October of 2006 to

17   sometime I believe the summer of 2007.

18      Q. Can you tell me exactly what you did with

19   respect to the HT, what your role was?

20       MR. CAPLAN:  Objection.  There's two

21       questions in there.

22   BY MR. KURUVILLA:

23      Q. Can you tell me how you were involved in

24   developing the HT?

25       MR. CAPLAN:  Objection.

Amy Coughlin

1              AMY COUGHLIN

2          THE WITNESS:  I guess I -- I worked on the

3       instrument with our reagents, helping with, I

4       guess, ensuring that the automated CD4 cycle

5       was working the same as the manual samples.

6    BY MR. KURUVILLA:

7          Q.  Let's go to October.  You said you started

8    in October 2006 working on the HT.

9          A.  I believe so, yes.

10         Q.  Okay.  And where did you work on the HT

11   from, at that time in October 2006?

12         A.  At PointCare in Marlborough.

13         Q.  Okay.  And can you tell me while you were

14   at PointCare working on the HT, what exactly --

15   what exactly it was you did?

16         MR. CAPLAN:  Objection.

17         THE WITNESS:  Actually, at that time, we

18      didn't have an HT system, per se.  We had a

19      slightly modified Excell 22.

20   BY MR. KURUVILLA:

21         Q.  Okay.  Can you tell me what the Excell 22

22   is?

23         A.  It's a Drew instrument, hematology

24   analyzer.

25         Q.  And so what did you do with respect to the

                              Unsigned

Amy Coughlin

1                          AMY COUGHLIN

2     Excell 22?

3          A.  At that time?

4          Q.  At that time while you were at PointCare's

5     facility.

6          A.  Familiarizing myself with the instrument

7     and running it.

8          Q.  How did you familiarize yourself with the

9     instrument?

10         A.  Running samples.

11         Q.  And what type of samples?

12         A.  Hematology samples, blood samples.

13         Q.  Okay.  Did you perform any other functions

14    with the Excell 22?

15         MR. CAPLAN:  At that time?

16    BY MR. KURUVILLA:

17         Q.  At that time.

18         A.  Not that I recall.

19         Q.  And can you tell me approximately when

20    in 2006 you worked on the HT at PointCare's

21    facility, what months?

22         A.  October, and part of November and

23    December.

24         Q.  At some point did you -- did you travel to

25    Drew's facility in Dallas?

Amy Coughlin

1                    AMY COUGHLIN

2        A.  Yes.

3        Q.  Okay.  Can you tell me when you traveled

4    to Drew's facility in Dallas?

5        A.  I believe the first trip was towards the

6    end of November, early December.  I don't know

7    exact dates.

8        Q.  You said the first trip.  Did you make

9    multiple trips to Dallas?

10       A.  Yes.

11       Q.  Do you have an idea of when the first one

12   was?

13          MR. CAPLAN:  She just told you.

14          THE WITNESS:  I just told you.

15   BY MR. KURUVILLA:

16       Q.  Okay.  Could you remind me?

17       A.  End of November, early December.

18       Q.  Okay.  And how long did you stay at Drew's

19   facilities during the first trip?

20       A.  I don't know exactly.  I would estimate

21   maybe two weeks.

22       Q.  And whose decision was it to have you go

23   to Drew's facility?

24          MR. CAPLAN:  Objection.

25

Amy Coughlin

1          AMY COUGHLIN

2    from using it, they were instructing me.

3        Q.  Why were they instructing you on how to

4    use the HT device?

5          MR. CAPLAN:  Objection.

6    BY MR. KURUVILLA:

7        Q.  Do you know why they were instructing you?

8        A.  So I would know how to use the device, or

9    more in depth.

10       Q.  Well, why did you need to know how to use

11   the device?

12       A.  I was working on the instrument.  I mean,

13   I had to use the device.  I don't know how else to

14   put it.

15       Q.  When you went down to the facility in

16   Dallas, were you going down -- was part of the

17   reason you were going down was to learn how to use

18   the device?

19       A.  No.

20       Q.  But you were being instructed on how to

21   use it?

22       A.  I think you misunderstand using the

23   device.  I already knew how to use the device.  I

24   was just learning more in depth on how it worked.

25       Q.  But you did state earlier that George

Amy Coughlin

1                    AMY COUGHLIN

2    Chappell, Gary Young, William Ross were showing you

3    how to use the device.

4        MR. CAPLAN:  Objection.

5        THE WITNESS:  Well, I thought the wording

6        was about how it worked, too.  I may have

7        mixed it up, the wording.

8    BY MR. KURUVILLA:

9        Q.  How were they instructing you how to use

10   the device?  How was George Chappell instructing

11   you?

12       MR. CAPLAN:  Objection.  Asked and

13       answered.  Go ahead.

14       THE WITNESS:  Yeah.  I thought it was more

15       on how it worked than using it, or putting it

16       together, sort of.

17   BY MR. KURUVILLA:

18       Q.  Why was the device being shipped back to

19   -- why was the prototype being shipped back to

20   PointCare?

21       A.  You mean shipped back?

22       Q.  Shipped to PointCare.  Why was the HT

23   being shipped to PointCare?

24       MR. CAPLAN:  Objection.

25       THE WITNESS:  I believe so we would have a

Unsigned

1               AMY COUGHLIN

2        prototype at our facility that we could test.

3    BY MR. KURUVILLA:

4        Q.  That test couldn't be performed at Drew's

5    facility?

6        A.  Not properly, no.

7        Q.  Why could it not be properly performed at

8    Drew's facility?

9        A.  Because we were also running manual CD4

10   samples along with the automated CD4 samples to

11   make sure it was working the same, and they did not

12   have the proper equipment to run manually prepared

13   samples there.

14       Q.  Did you work on the -- on the HT device

15   after it was shipped back to -- shipped to

16   PointCare's facility?

17       A.  Yes.

18       MR. CAPLAN:  Launching a whole new topic

19   here, five past 1:00.

20       MR. KURUVILLA:  Okay.  Let's break for

21   lunch.

22       (Proceedings interrupted at 1:07 p.m. and

23   reconvened at 1:48 p.m.)

24   BY MR. KURUVILLA:

25       Q.  Just to go back -- I promise it'll be

Amy Coughlin

1                AMY COUGHLIN

2    quickly -- on Exhibit 4, with respect to the

3    software issues identified by Jennifer Waite, do

4    you have an understanding if those issues were ever

5    resolved?

6        A.  I don't know for sure.  I believe so.

7        Q.  You believe so.  Do you know how those

8    issues were resolved?

9        A.  No, I do not.

10       Q.  Do you know who resolved them?

11       A.  No.

12       Q.  But you believe they were resolved?

13       A.  Yes.

14       Q.  How do you know that they were resolved?

15       A.  I believe, because eventually we had

16    software, so the user interface was working.

17       Q.  So because you eventually had software,

18    that's how you're able to determine whether this

19    issue identified here, the issues identified by

20    this e-mail were resolved?

21       MR. CAPLAN:  You just mischaracterized

22       what she told you.  She said because she had

23       software that worked, she concludes they were

24       resolved.

25    BY MR. KURUVILLA:

Richard J. Depiano

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    --------------------------------------X

     DREW SCIENTIFIC, INC.,

4

               Plaintiff,

5

          -against-      Case No. 08 CV 1490-AKH

6

     POINTCARE TECHNOLOGIES, INC.,

7

               Defendants.

8    --------------------------------------X

9

10

11          DEPOSITION OF RICHARD J. DePIANO

12             New York, New York

13             Wednesday, April 2, 2008

14

15

16     *CONFIDENTIAL PORTIONS - ATTORNEYS' EYES ONLY*

17             PAGES 89-91

18

19   Reported by:

20   Angela M. Shaw-Crockett, CSR, RPR

21   Job No. 15877

22

23

24

25

Richard J. Depiano

1                    R. DePIANO - 4/2/08

2    offering the consumables which go along with that

3    product.

4        Q.  If I could just back up for a sec.

5            When Escalon bought Drew, prior to that

6    time had Drew developed any medical devices?

7        A.  I believe everything that Drew owned was

8    developed by them, except for one OEM arrangement.

9    I believe that OEM arrangement was a design provided

10   by the ultimate customer that we made the machine

11   for them.

12       Q.  And when Escalon bought Drew, did Escalon

13   intend that Drew would continue to develop medical

14   devices?

15       A.  Yes.

16       Q.  That was part of the business plan for

17   Drew?

18       A.  Yes.

19       Q.  And did Escalon investigate Drew's skills

20   or competence in the product development area as

21   part of the acquisition?

22       A.  Before or after?

23       Q.  In the process of acquiring Drew.

24           So whatever due diligence or

25   information-gathering led to buying Drew, did

Unsigned

Richard J. Depiano

1               R. DePIANO - 4/2/08

2       Escalon have any information about Drew's track

3       record or competence or skills at developing

4       products?

5          A.  Only what was in the public domain.

6          Q.  When Escalon bought Drew, what did Escalon

7       understand was Drew's track record or competence or

8       skills at developing products?

9          A.  One of the founders, Keith Drew, the

10      company was named after, was the so-called inventor

11      of the piece of equipment that they started the

12      company with.  And we met and discussed the

13      products, the company.  And that was before we made

14      the acquisition.  It was limited to discussions with

15      him and other senior managers.

16         Q.  And based on those discussions or whatever

17      other information Escalon gathered from Drew, what

18      was Escalon's understanding of Drew's competence,

19      skills, track record of developing products?

20         A.  That they obviously were able to create a

21      product, and through the acquisitions they made

22      subsequent to Keith Drew founding the company, other

23      individuals in those companies had skillsets that

24      led us to believe that they could, you know, make

25      new equipment within -- in their space.  Hematology.

Unsigned

Richard J. Depiano

1              R. DePIANO - 4/2/08

2       Q.  How successfully?  In other words, when

3    you say that Escalon believed Drew had the ability

4    to develop new products, at what competence level?

5    You know, successfully?  Poorly?  Barely?

6    Magnificently?

7       A.  I'm not sure I can put a barometer, as you

8    say, on the competence to develop new products,

9    because a lot of the focus was on creating the

10   improvements to the products they had and couldn't

11   in the past.

12          So there was an expectation it's going to

13   take a couple of years to get that product line to

14   the point where you're more efficient in

15   manufacturing and more stable with regard to, you

16   know, the reliability of the equipment in the field.

17          So priority wasn't so much a new equipment

18   for our existing engineering group.  The priority

19   was to really focus on the upgrades and changes that

20   were necessary to improve the existing product line.

21   And we felt that they were very capable of doing

22   that, and that we had a good group of engineers to

23   do that.

24          By actual plans, we outsourced the two

25   newest pieces of equipment we had, one to a company

Richard J. Depiano

1              R. DePIANO - 4/2/08

2       in Europe that actually modified and accepted design

3       changes to something they already had, and provided

4       us with another piece of equipment in hematology.

5              The second was an existing product that

6       was designed and manufactured by a company in Europe

7       that they gave us the rights to sell that piece of

8       equipment in the United States.

9              So we didn't really create any new

10      products ourselves.

11         Q.  When was the first time post-acquisition

12      that Drew undertook to develop a new product?

13         A.  There was a project when we bought the

14      company.  It was called the 360.  That project was

15      under way and it is continuing today.

16         Q.  What type of product is a 360?

17             MR. COSTANTINI:  You mean what does it do?

18             MR. CAPLAN:  What he said.

19         A.  Blood analyzer.

20         Q.  So when Escalon bought Drew, Drew was

21      under way with developing a new blood analyzer

22      called a 360?

23         A.  Yes.  My understanding, it was to replace

24      a piece of equipment.  I believe, and I'm not a

25      hundred percent sure of this, I think the Hb Gold

Unsigned

Richard J. Depiano

1                R. DePIANO - 4/2/08

2     product which had been around for 15 years -- 10

3     years.

4         Q.  And when Escalon bought Drew, was there a

5     projected completion date in place for Drew's

6     development of the 360?

7              When Escalon brought Drew, did Drew inform

8     Escalon when Drew expected to be done developing the

9     360?

10        A.  I don't remember if they gave a specific

11    date.  We didn't really emphasize that project day

12    one.  It was subsequent to that that -- we really

13    weren't that focused on the new 360.  We were much

14    more focused on several other operating problems

15    within the business.  So I don't really remember if

16    they give us a date then or later.  Later they did

17    give us dates.

18        Q.  And what did they tell you about that?

19        A.  I don't remember exactly when they

20    provided these time lines, but they did provide time

21    lines -- I think '06 they provided us a time line

22    when we really put the full-court press on research

23    and development to complete this project.  Somewhat

24    of a stepchild.

25        Q.  Referring to --

Richard J. Depiano

1              R. DePIANO - 4/2/08

2     in those regards?

3         A.  From my subordinates or Harry's

4     subordinates?

5         Q.  Well, everyone at the company is your

6     subordinate, right?

7         A.  True.

8         Q.  So did anyone else at the company tell you

9     that Kenny was falling short in various regards?

10          MR. COSTANTINI:  "The company," are we

11       saying Escalon or are we saying Drew or either?

12          MR. CAPLAN:  Both.

13        A.  Comments were made at various times by

14     people as to the interaction and his personality

15     quirks, yes.

16        Q.  He was responsible to manage the whole R&D

17     department, right?

18        A.  For Drew, correct.

19        Q.  Was he a good manager of the R&D

20     department for Drew?

21        A.  No.

22        Q.  How did that affect R&D at Drew?

23        A.  I don't believe it was very positive.  He

24     was not a charismatic leader, did not lead by

25     example.  I don't believe that he was a team player,

Richard J. Depiano

                    R. DePIANO - 4/2/08

2    as I said before.  And the major impact on moral, as

3    well as their level of participation, because they

4    were following the leader.

5        Q.  And what R&D projects did Mr. Kenny

6    oversee?

7        A.  All of them.

8        Q.  What were they?

9        A.  I don't know them in detail.  He overseen

10   everything that went through.  And, initially, if

11   you're referencing PointCare, it was the PointCare

12   project as well was under R&D.  Everything was under

13   R&D.

14       Q.  So Mr. Kenny oversaw Drew's research and

15   development regarding the PointCare project?

16       A.  He was in charge.

17       Q.  And his performance in that regard fell

18   short, in your eyes, correct?

19       MR. COSTANTINI:  On the PointCare project

20       specifically you're asking about?

21       MR. CAPLAN:  Yes.

22       A.  I didn't weigh heavily on the fact that he

23   did.  It was -- I was informed that having a person

24   who spends time in two locations that are

25   geographically miles apart does not make for a very

Richard J. Depiano

1                R. DePIANO - 4/2/08

2      efficient management and running -- Peter wrote a

3      memo to me saying every time a decision has to be

4      made on a project, it has to go through Mr. Kenny;

5      he would prefer to have the project managed directly

6      out of Dallas.  And we did make that change.  That

7      was only the first time I really -- Peter I think

8      called me, and I said give it to me in writing so I

9      have some basis for doing this.

10         Q.   We're talking about Peter Hansen?

11         A.   Yes.

12         Q.   The chief scientific officer of PointCare?

13         A.   I don't know if he's the chief, but he is

14     the scientific officer.  I thought there was only

15     one chief.

16         Q.   Did you ever meet any scientific officers

17     at PointCare that Peter reported to?

18         A.   Yes.

19            MR. CAPLAN:  Dr. Krauledat?

20            I'll leave that topic alone.

21     BY MR. CAPLAN:

22         Q.   You talked about there was an issue as to

23     the geographic distance between Mr. Kenny and the

24     research and development work that Drew was

25     executing on PointCare.

Richard J. Depiano

```
 1              R. DePIANO - 4/2/08

 2         Just to follow the geography, Mr. Kenny

 3    worked out of the UK; is that correct?

 4      A.  He lived in the UK.

 5      Q.  Is that where he worked?

 6      A.  Yes.

 7      Q.  And where was Drew performing its R&D

 8    functions relative to the PointCare project?

 9      A.  Dallas, Texas.

10         But Mr. Kenny did travel from the UK to

11    the US.  There was the house that the company rented

12    that he would stay at for periods of time.

13      Q.  Peter Hansen complained that Drew having

14    its R&D director, Andrew Kenny, on the other side of

15    the pond was hurting the R&D efforts of the Drew

16    engineers in Dallas, correct, in substance?

17      A.  I wouldn't categorize it as a complaint.

18    He pointed out the inefficiencies of having an R&D

19    director who was not physically present where the

20    work was and preferred to have the project managed

21    for efficiency reasons.  I didn't see the word

22    "complaint" in his e-mail, but it might be there.

23      Q.  Did you agree with Peter Hansen's view

24    that having Mr. Kenny in the UK created efficiency

25    problems for the Drew R&D efforts on the PointCare
```

Unsigned

Richard J. Depiano

1              R. DePIANO - 4/2/08

2    was the possibility that was under discussion?

3        A.  They were going to bring a consumable

4    which would be available for us to market in the US

5    and other places.

6        Q.  Were there other parts of the deal under

7    discussion when you learned about it?

8        A.  Yes.  That we would modify, with their

9    help, our 2280 existing platform machine.

10       Q.  When you learned about this possible

11   collaboration, were there any other parts of the

12   transaction, to your knowledge?

13       A.  Other parts?

14       Q.  Yes.

15       A.  Yes.

16       Q.  Okay.  I'm sort of saying early on when

17   you first learned that there's a discussion between

18   Drew and PointCare, you've described a couple

19   components of the discussion.

20           Are there other components of the

21   discussion early on, to your memory?

22       A.  Most of the discussions between PointCare

23   and Drew were handled directly by Harry Rimmer, and

24   he would apprise me of what was going on.

25       Q.  Was there anyone else on behalf of Drew or

Unsigned

1           R. DePIANO - 4/2/08

2   Escalon who was part of a negotiation team for

3   this -- relative to PointCare along with Mr. Rimmer?

4     A.  Well, at one point I was introduced to the

5   process.  The negotiations -- I'm not sure who else

6   participated with Harry in negotiations, but there

7   was a Ken Pina, an attorney, who was working for us

8   who assisted Harry in the actual creation of the

9   documents.

10     Q.  Do you recall that an agreement was signed

11   in approximately June of 2006?

12     A.  Oh, yes.

13     Q.  And prior to that signing of the contract,

14   what was your personal involvement either with the

15   negotiations or behind the scenes or in any other

16   respect?

17     A.  I was very critical of the prospect on the

18   basis that the focus at the time of our business

19   plan was to continue along the path of improving the

20   existing products.  And this would have created a

21   reallocation of resources, and I wanted to explore

22   more of what the impact would be on our business.

23     Q.  That was your position prior to an

24   agreement being entered?

25     A.  Yes.  During this five, six, whatever

Unsigned

Richard J. Depiano

1                   R. DePIANO - 4/2/08

2      number of months it took to negotiate the contract.

3          Q.   And Mr. Rimmer was Drew's primary contact

4      with PointCare for contract negotiations?

5          A.   Yes.

6          Q.   And Mr. Rimmer kept you apprised of the

7      discussions?

8          A.   Yes.

9          Q.   And you gave him feedback along the lines

10      of what you've just told us?

11          A.   Uh-huh.  Yes.

12          MR. COSTANTINI:  She can't do "uh-huh."

13      BY MR. CAPLAN:

14          Q.   So you expressed the view to Mr. Rimmer

15      that you were very critical of the prospect of a new

16      arrangement with PointCare because the focus of

17      Drew's business plan at the time was to continue on

18      the path of improving existing products.

19              What did you say to him about that?

20          A.   Well, I was -- first of all, we were

21      approached by PointCare, who indicated -- and I was

22      part of that discussion after it was started; I

23      don't remember the exact dates -- that our machine

24      was indicative of a platform that could be modified

25      to take their specific reagent, and they were very

Unsigned

Richard J. Depiano

1              R. DePIANO - 4/2/08

2      much interested in getting a machine to actually

3      provide the platform for the reagent or the

4      proprietary -- quote, proprietary technology that

5      they had developed.

6          And I was extremely skeptical, because I

7      had asked our people whether we had knowledge --

8      enough knowledge to actually handle the project

9      ourselves and was made aware of the fact we had

10     never worked with gold or did anything like the CD4

11     type of reagent.

12         So my concern was, you know, how would we

13     be able to get this accomplished.

14         And I was reassured that -- after the due

15     diligence was done on the fact that our platform was

16     capable of being adapted or appeared to be capable

17     of being adapted, that the expertise lied at

18     PointCare to assist in that development.

19     Q.   You understood that the business

20     proposition under discussion was a possible

21     arrangement between PointCare and Drew where

22     PointCare brought to the table its proprietary

23     reagent, and the notion was that a preexisting Drew

24     platform could be modified to work with the reagent?

25     A.   Correct.

Unsigned

Richard J. Depiano

1                R. DePIANO - 4/2/08

2        Q.   And when that business proposition was

3    brought to you, you were skeptical?

4        A.   I wanted to know what Drew's capability

5    was to get that project complete.  And then I was

6    told that since PointCare had already had one system

7    or machine in the marketplace, even though they

8    weren't happy with the machine, that they were able

9    to get a machine to work and do the reagent --

10   whatever the reagent was to do -- and therefore they

11   would be the ones helping us convert our platform

12   and, you know, change the machine sufficiently to be

13   able to do the CD4, which we wouldn't do now.  Our

14   current machine, you can't just take the reagent and

15   get a result.

16            And I only remember some conversations

17   very early on about the fact that a mixer -- and

18   don't ask me to get technical, but there was a

19   mixer, some kind of machine in the machine, and it

20   was not robust enough to handle the CD4 reagent, and

21   that that had to be modified, but wasn't a big deal,

22   and these other things had to be changed, and that

23   was not a big deal.  And I was led to believe, as

24   well as I think some of our people, that PointCare

25   had the expertise to assist us and guide us in those

                        Unsigned

Richard J. Depiano

1                R. DePIANO - 4/2/08

2      Q.  Do you remember anything else from that

3   conversation?

4      A.  From that particular conversation, no.

5   That's that sticks out mostly in my mind.

6      Q.  And, again, prior to the contract between

7   the parties being signed, do you remember any other

8   direct communications between yourself, Peter, Petra

9   or anyone else from PointCare in person, on the

10  phone, however?

11     A.  There probably was discussions.  I don't

12  know if they were all in person or by phone.

13     Q.  As we sit here today, do you remember the

14  substance of any communications between yourself and

15  any folks at PointCare prior to signing this

16  contract?

17     A.  Only the one discussion that's centered on

18  the fact that -- and I think it was with Peter and

19  Petra together that we talked about their ability to

20  fix any problems we would have in getting our

21  machine converted.

22     Q.  And what was said about that?

23     A.  That Peter could solve those problems;

24  that's what Peter did; and Peter was very good at

25  that.

Unsigned

Richard J. Depiano

```
 1              R. DePIANO - 4/2/08

 2         Q.  To your understanding, whose

 3    responsibility was it under this contract to modify

 4    Drew's existing platform to accommodate PointCare's

 5    assay?

 6         A.  Under the contract, as it was written,

 7    Drew bore the expense and the responsibility for

 8    modifying the 2280.

 9         Q.  To accommodate PointCare's assay?

10         A.  Yes.

11         Q.  And going into the contract, you knew that

12    Peter Hansen and perhaps other colleagues at

13    PointCare had the skills to help Drew in that

14    regard, correct?

15         A.  Yes.

16         Q.  But ultimately you understood under the

17    contract that the responsibility fell on Drew to

18    modify its platform to work with PointCare's assay,

19    correct?

20         A.  Yes.  And at the time, the responsibility

21    was fixed because of the costs associated with it.

22    We should bear that.

23         Q.  So Drew bore responsibility for the costs

24    of accommodating its platform to PointCare's assay,

25    correct?
```

Unsigned

Richard J. Depiano

1                R. DePIANO - 4/2/08

2       A.  Yes.

3       Q.  And you understood under the contract that

4    Drew also bore the technical and manufacturing and

5    R&D responsibilities to modify its platform to

6    accommodate PointCare's assay, correct?

7            MR. COSTANTINI:  I'm going to object.

8        We've gone several times, and he's told you

9        that it's unacting [sic] under PointCare's

10       direction.  How many times do you want to go

11       over the same --

12           MR. CAPLAN:  Tony, that's a talking

13       objection, coaching the witness, and I would

14       ask you to state --

15           MR. COSTANTINI:  That's the fourth time by

16       my count that you've gone down this same road.

17           MR. CAPLAN:  Tony, when you don't like the

18       answer your client is giving, you give

19       speeches, and I would appreciate it if you

20       would refrain from that you.  You know that

21       that's not permitted under the rules.  It's a

22       different question.  I'd like an answer,

23       please.

24           MR. COSTANTINI:  It's the same question.

25       And the next time you go down this road, I'll

Unsigned

Richard J. Depiano

1                    R. DePIANO - 4/2/08

2        prove it to you by shutting it off.  And then

3        you can complain to the judge about it.  Okay.

4        Do it one more time --

5                MR. CAPLAN:  Could I have that question

6        read back that was interrupted by

7        Mr. Costantini, please.

8                (The last question was read back by the

9        Reporter.)

10        A.   My understanding didn't go to that level.

11        My understanding, maybe overly simplified, was that

12        as the CEO of the company, I made a decision based

13        on certain facts.  The facts were that, A, I didn't

14        want initially to get involved in a transaction

15        which we didn't really have any experience or

16        know-how to deal with.  A.

17                B, I was assured that our equipment could

18        be easily modified.  That "easily modified" came

19        from due diligence done by Peter and his colleague.

20        I'm not sure who the person was.  And I was given

21        assurances that this could be done quickly, and they

22        had the knowledge and know-how to guide Drew through

23        these machinations that would require the changes.

24        They knew -- I don't know whether they're called

25        optical heads or whatever they're called in there,

1              R. DePIANO - 4/2/08

2     that system, plus the mixer, I remember that

3     discussion, they could all be changed out.  Some of

4     the stuff that they had the knowledge of, because

5     they already had a machine that worked in the

6     marketplace, but they weren't happy with either the

7     vendor or the machine at the time.

8              So I would have never gone down this path,

9     because we would have never gotten there on our own.

10    And, literally, we're dependent upon PointCare and

11    their expertise to guide the development process.

12    And that development process and cooperation did

13    exist in the beginning.  And there were many

14    problems encountered that, in our opinion, PointCare

15    should have known about before they occurred,

16    because we were not familiar with that reagent, and

17    they were.  And they were actually using it for a

18    while with install-based machines.  I believe over

19    60 machines were installed or more than that were

20    installed in the marketplace by PointCare, utilizing

21    that reagent.  And they had sufficient knowledge.

22    And to find out some of the issues that we found out

23    after the fact just leaves me very suspect as to

24    what level they did have.

25         Q.  Out of fairness, that was a long answer,

Richard J. Depiano

1            R. DePIANO - 4/2/08

2    but I just want to focus on a couple of parts of it.

3            You testified -- part of your answer was

4    that PointCare had the knowledge and know-how to

5    guide Drew regarding the modification of its

6    platform, but that wasn't quite my question.

7            Understanding your position that PointCare

8    had the know-how to guide Drew, my question is, who

9    ultimately was responsible to modi- --  and putting

10   aside cost, because we've already covered cost, but

11   who ultimately was responsible in all other respects

12   to modify Drew's platform in order to accommodate

13   PointCare's assay?

14       A.   In my mind, we had the responsibility for

15   paying for those modifications using our expertise

16   in the machinery, but it was solely dependent upon

17   PointCare's representation to me that they would

18   know how to make this thing work.  They knew how to

19   work that project.

20           Other than that, that whatever the

21   contract says, I'm telling you my -- you know, what

22   I'm representing to you right now is the fact that

23   my understanding was we could never get this machine

24   to work without their direct input, and we took all

25   the appropriate steps to give them the latitude to

Richard J. Depiano

1           R. DePIANO - 4/2/08

2     do that.

3        Q.  So you expected a lot of help from

4     PointCare?

5        A.  Absolutely.  We never would have went into

6     this, because it was totally out of -- foreign to

7     anything we had ever done before.

8        Q.  And understanding that you expected a lot

9     of help from PointCare, isn't it a fact that you

10    understood that ultimately Drew was responsible for

11    the successful modification of the platform to

12    accommodate the assay?

13       A.  I'd have to answer that no.

14       Q.  Why not?

15       A.  Because we couldn't do it.  I knew we

16    couldn't do it the day when I went in there.  And I

17    told you my objection for not getting involved is we

18    didn't have the expertise.  So the responsibility

19    for having the knowledge was because it was

20    represented by PointCare that they had that

21    knowledge and could do it.

22       Q.  So it's your position that the day that

23    Drew signed this manufacturing, distribution and

24    co-marketing agreement with PointCare, Drew did not

25    have the technical skills on its own to modify its

Unsigned

Richard J. Depiano

1                    R. DePIANO - 4/2/08

2    platform to accommodate PointCare's assay, correct?

3        A.  Correct.  That was my understanding.

4        Q.  I know we've covered a lot of ground, but

5    let me just try to ask you a general question.

6            You've described to us PointCare's

7    representations about its capabilities to assist

8    PointCare.

9            My question to you is, who specifically at

10    PointCare made those representations to you?

11        A.  To assist PointCare?  I don't --

12            MR. COSTANTINI:  I think you got tangled

13    up in your question.  If you want it read back.

14            MR. CAPLAN:  It took me until 2:30 to get

15    tangled up.  I'm having a good day.

16            (A discussion was held off the record.)

17            MR. COSTANTINI:  You want her to read it

18    back?

19            MR. CAPLAN:  No.  Being told my question

20    was bad is bad enough.  I don't need to hear it

21    again.

22    BY MR. CAPLAN:

23        Q.  Who at PointCare represented to Drew or

24    Escalon that PointCare had these various

25    capabilities to assist Drew in adopting the

Unsigned

Richard J. Depiano

1                    R. DePIANO - 4/2/08

2    platform?

3        A.  Peter Hansen.

4        Q.  Did he say that to you personally?

5        A.  Yes.

6        Q.  Where and when?

7        A.  I don't remember where it was.  It was

8    either -- one of the conversations we had during

9    this period of time.

10           You got to remember that PointCare

11   solicited us, and we had a basic machine that they

12   wanted modified.  They had the reagent that was

13   supposedly their business premise.  They wanted to

14   sell this reagent, and they needed another platform

15   other than the one they had, so they solicited us.

16           We didn't have any knowledge of CD4 in

17   terms of applying it in our business prior to

18   meeting PointCare.  So everything we did to get

19   enticed into this arrangement was based on the

20   knowledge that they represented to us that they

21   possessed.

22       Q.  What exactly did Peter Hansen say to you,

23   as best as you can remember?

24       A.  Our platform was a well-constructed

25   machine.  And it is very capable with modifications

Unsigned

Richard J. Depiano

1        R. DePIANO - 4/2/08

2    to handle what they wanted in a fast throughput or a

3    more speedy throughput of their product versus a

4    slower one.

5        I don't know exactly what that means,

6    but ...

7        And I remember the conversation dealt with

8    a mixer. I didn't even know we had a mixer in

9    there. I had no idea what the mixing was all about;

10    but mixing something, and it needed to be more

11    robust.

12        And they talked about the idea of a --

13    replacing some parts that would be more beneficial,

14    more efficient, or do things better. It had to do

15    with an optinet (phonetic) or a camera or something

16    like that.

17        And that was the conversation where they

18    assured me, yes, you guys know how to build them,

19    and you can build them after you got a platform that

20    we could start from, these modifications can be

21    done, and they were going to do all the assistance

22    needed to get that to work, and we needed their

23    chemistries and their software.

24        But, literally, Peter was going to have a

25    hands-on responsibility for doing that. Otherwise,

Unsigned

Richard J. Depiano

1                R. DePIANO - 4/2/08

2     I had no intention at that stage in the company to

3     divert the resources which we did have away from

4     projects that they were working on.  Because this

5     was totally new.  It was nothing we were -- on our

6     drawing board or that I even knew about was

7     something we wanted in the future.  It was an

8     opportunity brought to us by PointCare.  And based

9     on that, we decided to move forward.

10        Q.   When did Peter Hansen say that to you?

11        A.   I don't remember.

12        Q.   Before or after June of '06?

13        A.   I think it was before.

14            I wasn't willing to do this project unless

15     we had some comfort regarding our ability to

16     perform.

17        Q.   Do you have a clear memory that Peter

18     Hansen made these representations to you before

19     Mr. Rimmer signed the contract for Drew?

20        A.   I'm pretty sure he did.

21        Q.   Is that on the phone or in person?

22        A.   I don't remember.

23        Q.   Do you remember anything about the

24     conversation, the circumstances of the conversation?

25        A.   I just remember the mixer, because I

Richard J. Depiano

1                    R. DePIANO - 4/2/08

2      didn't know we had a mixer.

3            It's the only word I understood in the

4      whole conversation.

5        Q.  I've had those conversations myself.

6            So it's your testimony that Peter Hansen

7      gave you a comfort that he and his people would

8      assist Drew to adopt their platform to accommodate

9      PointCare's assay, right?

10       A.  Yes.

11       Q.  Did Peter Hansen ever represent to you

12     that PointCare would be ultimately responsible to

13     modify Drew's platform to accommodate PointCare's

14     assay?

15       A.  Not to modify.

16       Q.  That was Drew's responsibility?

17       A.  To modify.  He represented that he would

18     be able to guide our people through the process and

19     show them how to get it done.  He had the knowledge.

20       Q.  So in a nutshell, you understood from

21     talking to Mr. Hansen that he and his people would

22     help Drew to modify the platform to accommodate the

23     assay and that Drew would be responsible to do that

24     work?

25       A.  To pay for it.

Unsigned

Richard J. Depiano

1            R. DePIANO - 4/2/08

2            MR. COSTANTINI:  I think the word is

3        "guide."  I think the wording in his testimony

4        was "guide," not "help."

5            MR. CAPLAN:  Could I have the question

6        back, please.

7            (The last question was read back by the

8        Reporter.)

9        A.  To actually physically do the work under

10       his guidance, and we would be responsible for paying

11       for it.

12       Q.  Did Peter Hansen or anyone else at

13       PointCare ever represent to you that PointCare would

14       be responsible to modify the platform to accommodate

15       the assay?

16       A.  No.  PointCare never took that

17       responsibility to modify it.  They took

18       responsibility for providing knowledge to modify it.

19           MR. COSTANTINI:  Is this a logical break

20       time?

21           MR. CAPLAN:  Read my body language.

22           (Recess at 2:31 p.m.)

23           (Deposition resumes at 2:51 p.m.)

24       BY MR. CAPLAN:

25       Q.  Prior to Drew signing the contract with

Unsigned

Richard J. Depiano

1              R. DePIANO - 4/2/08

2      PointCare, aside from speaking with Peter Hansen,

3      did you do anything to satisfy yourself that Drew

4      had the capabilities to monitor its platform to

5      accommodate PointCare's assay?

6              MR. COSTANTINI:  You mean "modify"?  I

7          think you said "monitor."

8              THE WITNESS:  Monitor the platform?

9      BY MR. CAPLAN:

10     Q.   I meant to say "modify."

11     A.   Modify the platform?

12     Q.   Why don't I start again, because we

13     probably lost the question.

14             Prior to signing the contract, did you do

15     anything other than talking to Peter Hansen to

16     satisfy yourself as the Escalon CEO that Drew had

17     the capabilities to modify its existing 2280

18     platform to accommodate PointCare's assay?

19     A.   I personally did not do anything.

20     Q.   Did you ask any of your subordinates to do

21     anything to satisfy yourself of Drew's capabilities

22     to modify its platform to accommodate PointCare's

23     assay?

24     A.   I was given assurances by Harry that --

25     Harry Rimmer, who was then president of Drew, that

Richard J. Depiano

1              R. DePIANO - 4/2/08

2      spare parts, and there was a machine that had

3      already been in the market or something that could

4      be cannibalized in spare parts from that machine.

5      And even I believe I heard a conversation about the

6      fact that if we get trade-ins of that particular

7      model, whatever it was, I don't know the name of it,

8      they would be interested in taking those machines.

9          Q.   So --

10         A.   Poor cannibalization of parts.

11         Q.   So when PointCare came to Drew about a

12     possible business relationship, you understood that

13     PointCare's supply of the CD4 instrument had been

14     ended for one reason or another?

15         A.   Yes.

16         Q.   And PointCare was coming to Drew hoping to

17     find a supply of platforms that work with the CD4

18     assay, right?

19         A.   I believe we were one of several companies

20     they explored the possibility with.

21         Q.   And did you understand from your

22     discussions with Petra Krauledat or Peter Hansen or

23     others that there was some urgency on PointCare's

24     part to obtain a new platform that they could sell

25     with their assay?

                        Unsigned

Richard J. Depiano

1                    R. DePIANO - 4/2/08

2        A.  Yes.

3        Q.  Why do you say that?

4        A.  Well, because up front when Harry -- it

5    was either Harry or in one of the discussions, they

6    wanted to get this done quickly.

7        Q.  So --

8        A.  Very quickly.

9        Q.  -- Harry Rimmer made that clear to you?

10       A.  Yes.

11           But then I kind of raised an issue about

12   if we wanted to do this so quickly, why is it taking

13   over six months to get a contract done.

14       Q.  Who did you raise that to?

15       A.  Harry.

16       Q.  What did he say?

17       A.  Just it's taking that long to get all the

18   details worked out in the contract.

19       Q.  Did you ever do an investigation to

20   determine how much of the delay was attributed to

21   Mr. Rimmer's ability to move a contract forward?

22       A.  No.  But in my past experience, everybody

23   goes this way, which is the hand sign that says it's

24   not my fault; it's everybody else's fault.  So who

25   shot who, I don't know.

                    Unsigned

Richard J. Depiano

1           R. DePIANO - 4/2/08

2      Q.  Right.

3          Mr. Rimmer kind of passed the buck to

4   PointCare, but --

5      A.  I didn't say he passed the buck, but

6   usually it's the type of thing where he wouldn't

7   really tell me whether it was all his fault and

8   therefore he took total responsibility for not

9   getting it done.  There always seemed to be another

10  issue to go back and negotiate or another point that

11  had to be resolved, and it was back and forth, back

12  and forth.

13     Q.  Was moving projects forward amongst

14  Mr. Rimmer's talents?

15     A.  It was when he was COO of the company.

16     Q.  How about when he was president?

17     A.  He moved some projects forward.  Other

18  ones seemed to be taking longer than anybody

19  anticipated.  So he had a mixed bag.

20     Q.  So as to whether Rimmer or PointCare was

21  responsible for the pace of contract negotiations,

22  you don't know one way or the other, right?

23     A.  No, I can't point and say specifically it

24  was Petra's fault or Harry's fault.  I can say

25  specifically it wasn't Peter's fault.

Unsigned

1              R: DePIANO - 4/2/08

2      Q.  Now, you gave an affidavit in this case

3  stating that Drew spent more than a million dollars

4  on this project, right?

5      A.  Yes.

6      Q.  Do you have personal knowledge if that's

7  true?

8      A.  I have knowledge that my CFO represented

9  that to me and has records to substantiate it.

10      Q.  And do you know what records your CFO

11  looked at to come up with that number?

12      A.  Accounting records.

13      Q.  Can you be any more specific?

14      A.  No.

15      Q.  Do you have an understanding of what the

16  components of the million dollars worth of

17  categories -- we're not getting into nitty-gritty

18  numbers -- but where did the million dollars go?

19      A.  It basically got expended on various

20  items.  It would be components, it would be payroll,

21  machine shop related costs.  It's -- off the top of

22  my head I would say there are general categories and

23  then, you know, there would be details behind that.

24      Q.  Do you have any sense of what the major

25  elements of the million dollars were?

Unsigned

Richard J. Depiano

1              R. DePIANO - 4/2/08

2      A.  Probably labor would be a big component.

3      Q.  Let me switch gears.

4          At some point, Drew and PointCare had

5  merger discussions?

6      A.  Yes.

7      Q.  And what was the time frame of those

8  discussions?

9      A.  March to June I believe of '07.

10     Q.  How did that come about?

11     A.  Well, there had been discussions between

12  myself and Petra earlier on about the possibility of

13  having Drew perform specific functions in the

14  business.  One was that we could be responsible for

15  all sales of the products, the joint products.  It

16  was only a discussion.

17         The second discussion had to do with the

18  possibility of us manufacturing the reagent in the

19  UK, since we had a facility that made reagents;

20  wasn't even sure we could, but that possibility.

21  And they were only discussions.

22         And then sometime, I believe it was March,

23  Petra and I met and had a discussion in Dallas.

24  Petra brought up the concept of maybe we should

25  explore the possibility of doing more than just the

                    Unsigned

Richard J. Depiano

1                R. DePIANO - 4/2/08

2     limited task of selling and manufacturing, and maybe

3     we should combine both of these companies sooner

4     rather than later.

5         Q.  So Petra was the first one who suggested a

6     possible merger?

7         A.  Combining the companies.  She didn't say

8     "merger."

9         Q.  But it was Petra's suggestion to possibly

10    combine the companies?

11        A.  She brought up that subject of going

12    further than just what we had talked about.

13        Q.  And what was your reaction?

14        A.  I'm an M&A guy.  I'm always interested.

15        Q.  What was interesting to you about a

16    possible combination between Drew and PointCare?

17        A.  Two things.  One, I thought at that time

18    having someone like Peter would be an excellent

19    addition because of not only his knowledge but his

20    ability to create new and innovative products in

21    this IVD world.  I wouldn't want to manage him on a

22    day-to-day basis, but I thought he would be very

23    beneficial to our company.  We didn't have anybody

24    like a Peter or their credentials.

25        Q.  Did Peter fill a void at Drew, or would he

Richard J. Depiano

1                R. DePIANO - 4/2/08

2     have?

3        A.   I believe he would have, yes.

4        Q.   What type of skills or what did Peter

5     bring to the table that Drew lacked at the time?

6        A.   They didn't have anybody with Peter's

7     background and/or in my opinion knowledge and

8     vision.

9        Q.   Technical knowledge?

10       A.   Technical knowledge.

11       Q.   And I think you said there were two things

12    of interest to you about a possible combination

13    between PointCare and Drew.  Hansen was one.  What

14    was the other one?

15       A.   To have a proprietary -- I thought was a

16    proprietary consumable.

17       Q.   So where did the possibility go from that

18    initial conversation?

19       A.   Well, we were -- I thought we were pretty

20    serious in pursuing it.  And, obviously, if you know

21    what a public company's requirements are, they must

22    have fairness opinions on any transaction that would

23    involve stock.

24            And we got to the point where due

25    diligence proceeded.  And Petra was very dogmatic

Richard J. Depiano

```
1              R. DePIANO - 4/2/08

2    in Marlboro, and we went to dinner.

3        Q.  And based on a single meeting with him, he

4    wasn't the type of guy you particularly cared to do

5    business with, was he?

6        A.  I would not want to be that very dependent

7    on a guy like him, yes, that's right.

8        Q.  Did he strike you as untrustworthy?

9        A.  I didn't say untrustworthy.  No, he wasn't

10   untrustworthy.  I just think he was -- lacked a lot

11   of substance.  And he fell in love every morning

12   when he woke up and looked in the mirror.  So, I

13   mean ...

14       Q.  So at some point in late '07 or early '08,

15   your director of sales, Mr. Matuszak, tells you that

16   he's been having some ongoing communications with

17   Mr. O'Connor about PointCare business, right?

18       A.  Yes.

19       Q.  And you mentioned one of those issues

20   related to management.

21           What were you told about that?

22       A.  That basically he didn't have a lot of

23   confidence in the current management's leadership

24   and that there may be an opportunity to deal

25   directly with the board on this -- on a merger
```

Richard J. Depiano

1             R. DePIANO - 4/2/08

2      opportunity.

3        Q.  You used some "he's" in there.

4          Is it that --

5        A.  Mr. O'Connor -- Frank told me Mr. O'Connor

6      didn't have a lot of confidence and did feel that

7      approaching the board would be a good idea.

8        Q.  And Frank told you that O'Connor said that

9      O'Connor did not have a lot of confidence in

10     PointCare's management, right?

11       A.  Yes.  He didn't have any confidence in me

12     either.  He didn't trust me.  He also told me that.

13       Q.  Did Mr. Matuszak tell you that

14     Mr. O'Connor was advocating that Escalon do

15     something about a possible merger?

16       A.  Yeah.  What I said.  He said that we

17     should go directly to the board.

18       Q.  Beyond passing along O'Connor's view on

19     that, did Mr. Matuszak express his opinion to you

20     about that possibility?

21       A.  He just asked me what I thought.

22       Q.  Did he express an opinion one way or the

23     other?

24       A.  No, he didn't express an opinion saying it

25     was good, bad or different.  To me, anyway.

Richard J. Depiano

1                    R. DePIANO - 4/2/08

2        Q.   So, in essence, he passed along a

3    possibility raised by Mr. O'Connor that -- was it

4    that you personally might contact the board?  Was

5    that the suggestion on the table?

6        A.   Me or Escalon.  Somebody officially from

7    the company.

8        Q.   So what do you say in response to that to

9    Mr. Matuszak?

10       A.   I basically told him that if the board

11   wanted to contact me, they know where we were.

12       Q.   Did you tell him anything else?

13       A.   Yeah.  That I didn't really have a lot of

14   confidence in anything that Dan O'Connor said.

15       Q.   Did you tell him anything else?

16       A.   What else did I tell him?  Well, I don't

17   know if I said very much more than that.

18       Q.   Now, at the time you had this discussion

19   with Mr. Matuszak, you knew that Mr. O'Connor no

20   longer worked at PointCare, right?

21       A.   That's right.

22       Q.   And did you know he'd been fired?

23       A.   I know he was no longer with the company.

24   I didn't get any official notice that he was fired.

25       Q.   Just to be clear, when you spoke to

Richard J. Depiano

1             R. DePIANO - 4/2/08

2     Mr. Matuszak about this, were you at all interested

3     in pursuing a possible combination with PointCare?

4       A.  No, not at that time.

5       Q.  And did you tell that to Mr. Matuszak?

6       A.  I just told him I don't know how it would

7     be possible to do anything with PointCare after the

8     valuation came in.

9       Q.  Did you tell Mr. Matuszak that you were

10    interested in a possible combination with PointCare?

11      A.  I may have said that under the right

12    circumstances I would still be interested, because I

13    still thought we had a good business premise when we

14    started the merger talks.

15      Q.  Did you tell him that there was anything

16    wrong with you or anyone from senior management at

17    Escalon contacting the PointCare board directly

18    about a possible combination?

19      A.  Anything wrong?

20      Q.  Yes.  So, in other words, he comes to you

21    with an idea that originates from O'Connor that you

22    or one of your colleagues might directly contact the

23    PointCare board to discuss a possible combination,

24    right?  That's the scenario he put on the table to

25    you?

Unsigned

Richard J. Depiano

1              R. DePIANO - 4/2/08

2      A.  Right.

3      Q.  Do you tell him that that's something that

4  would be inappropriate for you or your people to

5  pursue?

6      A.  I would say there's no way I would do

7  that.  I mean, if I basically wanted to, you know,

8  do a merger, we had gone through what I thought was

9  the proper steps to do a merger.  It didn't work for

10  other reasons.  What would I gain by going to the

11  board that they wouldn't have already known.

12      Q.  At the time that was your thought, at

13  least, about this situation?

14      A.  Yeah.  If they had a change of heart,

15  yeah, I'd listen to what they had to say.

16      Q.  That thought that you had, did you convey

17  that to Mr. Matuszak?

18      A.  I told him I would be willing to listen if

19  the board approached us, but I wasn't willing to

20  approach their board.

21      Q.  Did you give him any guidance one way or

22  the other about whether it would be appropriate for

23  him or O'Connor to approach the PointCare board

24  about this possible transaction?

25      A.  I may have asked him why wouldn't O'Connor

Richard J. Depiano

1                R. DePIANO - 4/2/08

2    do it.

3        Q.  Did you ask him that?

4        A.  I may have, yeah.

5        Q.  You may have, you may not have, you don't

6    know?

7        A.  I don't know.  But I -- knowing me, I

8    would have said why didn't he do it, what's he need

9    us for.

10       Q.  Why would Mr. O'Connor, former PointCare

11   employee, want to contact the PointCare board about

12   possibly combining with Drew?

13           MR. COSTANTINI:  We're now going to

14           speculate into what's going on in O'Connor's

15           mind?

16           MR. CAPLAN:  No.

17   BY MR. CAPLAN:

18       Q.  I'm asking you why you thought O'Connor

19   might have wanted to do that.  You said you

20   suggested that to Mr. Matuszak.

21           So why would you suggest that to him?

22       A.  Because I was told that O'Connor was the

23   one who told Matuszak why doesn't Rich or Escalon

24   approach their board.  So I just came back and said,

25   well, if he's interested in somebody contacting

Unsigned

Richard J. Depiano

1                    R. DePIANO - 4/2/08

2        in obtaining PointCare financial information from

3        its comptroller?

4              MR. COSTANTINI:  So far he hasn't said

5        "communicate."  He said he sent e-mails.

6              MR. CAPLAN:  I said "communicated"?

7              MR. COSTANTINI:  You said "speaking."  "Do

8        you have any problem with speaking."  He hasn't

9        testified to speaking.

10      BY MR. CAPLAN:

11          Q.   Did you have any problem with

12      Mr. Matuszak, Drew's director of sales,

13      communicating with a former PointCare employee,

14      Mr. O'Connor, in obtaining financial information

15      that Mr. O'Connor had obtained from PointCare's

16      comptroller, Eric Newman?

17          A.   Basically, no, for the following reason.

18      In the contract there's a confidentiality clause

19      which states that we can speak with employees and

20      affiliates.  Mr. O'Connor is a shareholder.  And I

21      spoke to Frank about the fact that any information

22      Mr. O'Connor as an affiliate shares with him cannot

23      be communicated outside of our company.  And that

24      was rigidly adhered to, that any information which

25      came into our company from a qualified source, we

                        Unsigned

Richard J. Depiano

1                R. DePIANO - 4/2/08

2     had to maintain under the terms of this agreement as

3     confidential and could not talk to third parties.

4          Q.  And that's what you said to Mr. Matuszak?

5          A.  Yes.

6          Q.  So you gave him your approval for him to

7     obtain PointCare financial information that

8     Mr. O'Connor was obtaining from the comptroller,

9     Eric Newman?

10         A.  I didn't say I gave my approval.  I

11    explained to him under the conditions under which

12    this contract functioned.  The confidentiality

13    agreement allowed an affiliate to speak to us.

14         Q.  That's not my question.

15              My question is:  Did you express to

16    Mr. Matuszak approval or disapproval of his

17    obtaining PointCare financial information that

18    Mr. O'Connor was obtaining from PointCare's

19    comptroller, Eric Newman?

20         A.  Neither approval nor disapproval.

21         Q.  When Mr. Matuszak made you aware that

22    O'Connor was passing along PointCare financial

23    information obtained from PointCare's comptroller,

24    did you tell Mr. Matuszak to stop it?

25         A.  No.  He wasn't getting the information

                      Unsigned

Richard J. Depiano

1                    R. DePIANO - 4/2/08

2        from the comptroller.  Mr. O'Connor was.  So he was

3        the recipient. . I never told him to stop.  Just told

4        him it can't be shared anywhere.

5            Q.   Did you ever say to Mr. Matuszak in the

6        context of his conversations that O'Connor did not

7        strike you as the type of businessperson that he

8        should be affiliating himself with?

9            A.   No.

10           Q.   Did you think that to yourself?

11           A.   No.  I had very little interest in

12       Mr. O'Connor.  And I didn't believe that Frank was

13       affiliating with him by communicating with him.

14       It's a little different.  My definition of

15       "affiliation" is little different than just

16       receiving correspondence periodically.

17           Q.   At the time, Drew had an ongoing contract

18       with PointCare, correct?

19           A.   Yes.  Yes.  Still.

20           Q.   And in the context of Drew's ongoing

21       business relationship with PointCare, did you have

22       any problem with Mr. Matuszak having ongoing

23       communications with a former PointCare employee

24       about various PointCare business and financial

25       matters?

Unsigned

Richard J. Depiano

1                  R. DePIANO - 4/2/08

2        A.  Former employees, I would have.  But with

3    regard to Dan O'Connor, he was a shareholder; and as

4    such, I didn't have any problem with him talking

5    with a shareholder.

6        Q.  Did you know that Mr. O'Connor had been

7    the head of sales at PointCare?

8        A.  Yes.  He was the person I met at dinner.

9    Yes.

10       Q.  And you understood that as the head of

11   sales, he would, through the course of his

12   employment, have become privy to confidential

13   PointCare business information?

14       A.  I don't personally know whether he did,

15   but I assumed he would have.

16       Q.  Fair to assume that the person who's in

17   charge of sales at PointCare would have knowledge of

18   confidential business information of the company?

19       A.  Good assumption, yes.

20       Q.  And did you ever give Mr. Matuszak

21   guidance to be careful not to obtain from

22   Mr. O'Connor any confidential PointCare information

23   that Mr. O'Connor may have obtained in the course of

24   his employment at PointCare?

25       A.  No.  All I cautioned Mr. Matuszak is to

Unsigned

**From:** Richard J. DePiano Jr.
**Sent:** 7/13/2007 9:19:14 PM
**To:** phansen@pointcare.net
**CC:** Richard J. DePiano
**Subject:** Drew - PointCare

Dear Peter:

Your correspondence of July 2 was referred to me for follow-up investigation and reply.

Needless to say, we at Drew value the relationship that we have with you, Petra and PointCare. To this end, we have promptly and critically evaluated the concerns that you noted in your correspondence.

While I do not believe that it would prove productive to respond point-by-point to all of your assertions, I will attempt below to provide you with our overall assessment, as well as more detailed feedback on some of the more material assertions.

It is my impression that your concerns center primarily upon the ability of Drew's AuRica HT instrument to properly perform in a commercial setting. You have expressed reservations that the two instruments that you have worked with did not perform satisfactorily, that Drew's engineering capabilities are limited, and that communications from Drew relative to project timelines and status have not been satisfactory from your perspective.

As you know, Drew was reluctant to ship the two AuRica HT machines to PointCare and had requested that PointCare have its expert work on the assay mixing component at Drew's Dallas facility so that Drew's engineers would be readily available to assist. As you also know, you personally demanded that the instruments be shipped to PointCare. It remains the position of Drew that the two AuRica HT instruments, including the optics components, were fully operational (less the PointCare assay mixing) and in good working condition when shipped.

Unfortunately and without consulting Drew, PointCare unilaterally decided to have its personnel disassemble both instruments once they arrived at PointCare so that PointCare's team could work



DR00000014

on Assay Mixture Component development. This occurred without a Drew engineer present and despite our specific guidance to the contrary. During the process, PointCare personnel damaged and misaligned key components of the AuRica HT equipment.

While you are correct that PointCare's assay appeared to work in a preliminary trial, you fail to mention that the automated mixing method was built per specifications provided by PointCare. While you complain that the optics provided by Drew malfunctioned when automated mixing was undertaken, you fail to note that the problems encountered as we moved to the automated mixing method were primarily related to PointCare's gold attaching to the surface of the optics (which was of a base material specified precisely by PointCare). As you may recall, Drew had specifically recommended against the use of this surface composite and had proposed an alternative material, which was rejected by PointCare. Further, despite PointCare's assertions that the optic problems being encountered during the automated mixing phase were not related to its choice of surface composite or its gold optical sensor material, this proved to be exactly the case. Drew's engineer confirmed that this was the true root cause and then was able to effectuate an appropriate modification. PointCare's delay in acknowledging this fact (as you may remember, PointCare initially dismissed the possibility that its gold was attaching to the surface of the optical sensor) resulted in further project delay.

Of equal concern to Drew from a "time lost" perspective is the fact that when PointCare did return one of the instruments to Drew's Dallas facility, it experienced material damage that Drew had to repair because PointCare had failed to properly drain the assay fluids from the equipment prior to shipping.

Peter, the above is not meant to be a rebuttal nor to be accusatory/"finger-pointing". My feedback, however, is intended to underscore that the problems you identify are not necessarily wholly of Drew's making. Drew has and will continue to work diligently to meet its contractual obligations to PointCare. In the same spirit, Drew expects PointCare to do the same. I firmly believe that what is needed at this juncture is an open dialogue, a continued spirit of cooperation, and an agreed upon strategic plan that takes into consideration our current status so that we expeditiously move forward to achieve our mutual goals.

As I understand, Drew agreed to deliver two (2) operational AuRica HT instruments to PointCare. Drew did in fact meet its obligation. PointCare subsequently provided Drew with change orders that requested material specification modifications to the AuRica HT. Drew has completed most of PointCare's requested changes and is presently working through the remaining change order modifications requested by PointCare. Just as Drew has previously and continues to

HIGHLY CONFIDENTIAL

meet its obligations, it expects that PointCare will honor its obligation and promptly proceed with clinical studies.

If you desire a further discussion of the above, please give me a call. Otherwise, please confirm that PointCare will proceed with its obligations as defined by our Agreement.

Thank you and regards,

Rich, Jr.

ESCALON MEDICAL CORP

By: Richard J. DePiano, Jr., Esquire

Chief Operating Officer & General Counsel

565 East Swedesford Road

Suite 200

Wayne, PA 19087

610 254-8930 Direct Telephone

610 688-5278 Direct Fax

610 688-6830, Extension 103

THIS COMMUNICATION MAY CONTAIN CONFIDENTIAL AND/OR OTHERWISE PROPRIETARY MATERIAL and is thus for use by the intended recipient. If you received this e-mail in error, please contact the sender and delete the e-mail and its attachments from all computers.

IIGHLY CONFIDENTIAL

Andrea Desrosiers

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     --------------------------------X

5     DREW SCIENTIFIC, INC.,

6              Plaintiff,    Case No. 08 CV 1490-AKH

          -vs-

7     POINTCARE TECHNOLOGIES, INC.,

8              Defendants.

9     --------------------------------X

10

11          DEPOSITION OF ANDREA DESROSIERS

12              New York, New York

13                March 27, 2008

14

15

16

17

18

19

20

21    Reported by:

      Bonnie Pruszynski, RMR

22    JOB NO. 15873

23

24

25

Andrea Desrosiers

1                    A. DESROSIERS

2     the HT device?

3         A     The software to operate the

4     instrument.

5         Q     Are there specific software programs

6     as part of the HT?

7         A     What do you mean by "programs"?

8         Q     I don't know how to define it

9     otherwise.

10            Are there other categories, other

11    multiple categories of software within the HT?

12        A     I guess I don't understand exactly

13    what --

14        Q     What type of software is in the HT?

15        A     I don't know what all the software

16    is.

17        Q     Do you know what some of the software

18    is?

19        A     Yes.

20        Q     Okay.  What software in the HT?  What

21    software in the HT are you familiar with?

22        A     The -- the presentation of the

23    buttons to operate the instrument.

24        Q     Okay.  Is there, is there a term to

25    describe that?

Unsigned

Andrea Desrosiers

1                    A. DESROSIERS

2        A    Yes.

3        Q    What is that?

4        A    The graphical user interface.

5        Q    Okay.  Can you describe for me the

6    graphical user interface?

7        A    Do you want it in terms of what a

8    graphical user interface is?

9        Q    Specifically, within the HT, what is

10    the graphical user interface that you just

11    mentioned?

12        A    It is a series of controls to make

13    the instrument do what you want.

14        Q    Okay.  When was the graphical user

15    interface developed?

16        A    For --

17        Q    For the HT.  We are only focusing on

18    the graphical user interface for the HT.

19        A    When was it developed, is that your

20    question?

21        Q    Is it fully developed now?

22            MR. CAPLAN:  Objection.

23        A    I don't know.

24        Q    Do you know what stage of the

25    development the graphical user interface is in

Andrea Desrosiers

1              A. DESROSIERS

2    right now?

3        A    It was unfinished.

4        Q    Do you know why it was unfinished?

5        A    No, I don't know why.

6        Q    Do you know if PointCare had any role

7    in the graphical user interface being unfinished?

8        A    PointCare developed the graphical

9    user interface.

10       Q    Okay.  And you said it was

11   unfinished, but you are not aware of why it is

12   unfinished?

13       A    No.

14       Q    Who, at PointCare, would know why the

15   graphical user interface is unfinished?

16       A    Jennifer Waite.

17       Q    Anyone else?

18       A    No.

19       Q    Okay.  In addition to the graphical

20   user interface, we are looking at -- we are

21   talking about software within the HT.  Can you

22   name for me another category of software?

23       A    The embedded software.

24       Q    And what does the embedded software

25   do?

1                    A. DESROSIERS

2       A    It moves motors.

3       Q    Does it do anything else?  I'm sorry.

4       A    I don't know everything that the

5    imbedded software does.

6       Q    Do you know whether the imbedded

7    software is completed?

8       A    I don't know.

9       Q    Okay.  But you don't know that it is

10   completed?

11      A    I don't know.

12      Q    Okay.  Do you know if PointCare was

13   responsible for completing the imbedded software?

14           MR. CAPLAN:  Objection.

15      A    Do I?

16      Q    Do you know if PointCare was

17   responsible for completing the embedded software?

18      A    I do have that knowledge, yes.

19      Q    Was PointCare responsible for

20   completing the embedded software?

21      A    No.

22      Q    Setting aside graphical user

23   interface and the embedded software, can you

24   please name for me a third category of software

25   within the HT device?

Andrea Desrosiers

1          A. DESROSIERS

2      A    The database software.

3      Q    And what does the database software

4    do?

5      A    It contains patient's data.

6      Q    Was PointCare responsible for

7    completing the database software?

8          MR. CAPLAN:  Objection.

9      A    Are you -- can you be more specific

10    about --

11     Q    In any way, was it PointCare's

12    responsibility to oversee the completion of the

13    database software with respect to the HT?

14         MR. CAPLAN:  Objection.

15     A    So oversee --

16     Q    To oversee or insure.

17         MR. CAPLAN:  Which one?

18     Q    Was PointCare involved in any way in

19    the effort to insure that the database software

20    for the HT device was completed?

21         MR. CAPLAN:  Objection.

22     A    Yes.

23     Q    What was its involvement?

24         MR. CAPLAN:  Objection.

25     A    PointCare wrote part of the

Andrea Desrosiers

```
1                    A. DESROSIERS

2     functionality.

3         Q     Was that functionality completed?

4         A     No.

5         Q     Do you know why it was not completed?

6         A     No.

7         Q     Now, setting aside the graphical user

8     interface, the embedded software, and the database

9     software, there another type of software with

10    respect to the HT?

11        A     Yes.

12        Q     Okay.  What is that?

13        A     The method of analyzing.

14        Q     Was PointCare involved in any way in

15    assuring that the method of analyzing with respect

16    to the HT was completed?

17              MR. CAPLAN:  Objection.

18        A     Can you break that down?

19        Q     Did PointCare have any

20    responsibilities with respect to insuring that the

21    method of analyzing for the HT was completed?

22              MR. CAPLAN:  Objection.

23        A     Yes.

24        Q     What were those responsibilities?

25              MR. CAPLAN:  Objection.
```

Unsigned

Andrea Desrosiers

1                    A. DESROSIERS

2        A    What were the --

3        Q    What was PointCare's responsibility

4    with respect to insuring that the method of

5    analyzing for the HT was completed?

6             MR. CAPLAN:  Objection.

7        A    I'm sorry.  I am not -- I am really

8    not understanding the question.

9        Q    Okay.  Well, you testified that

10   methods of analyzing is a type of software

11   involved with the HT device; is that correct?

12       A    Yes.

13       Q    And you testified that PointCare was

14   involved in insuring that the method of analyzing

15   software would be completed.

16            MR. CAPLAN:  Objection.

17       A    I don't understand what you mean by

18   "completed."

19       Q    Is the method of analyzing software,

20   is that completed?

21       A    No.

22       Q    Is it functional?

23       A    It functions, yes.

24       Q    Does it function perfectly?

25            MR. CAPLAN:  Objection.  What in life

Andrea Desrosiers

1                    A. DESROSIERS

2       does?

3       Q    Fair enough.

4           PointCare was responsible in --

5       strike that.

6           Was PointCare responsible in any way

7       for overseeing the method of analyzing software?

8           MR. CAPLAN:  Objection.

9       A    Yes.

10      Q    Okay.  Now, you have named four types

11      of software, and those are the graphical user

12      interface, the embedded software, database

13      software and now the method of analyzing.

14          Are there any other types of software

15      for the HT?

16      A    I am not aware of any other parts of

17      software.

18      Q    Are you aware of any problems

19      encountered by PointCare in developing the NP?

20          MR. CAPLAN:  Objection.

21      A    Yes.

22      Q    What were those problems?

23          MR. CAPLAN:  I am designating this as

24          attorney's eyes only.

25      Thanks, Frank.

                          Unsigned

1

2             UNITED STATES DISTRICT COURT

3             SOUTHERN DISTRICT OF NEW YORK

4      -------------------------------X

5      DREW SCIENTIFIC, INC.,

6             Plaintiff,    Case No. 08 CV 1490-AKH

              -vs-

7      POINTCARE TECHNOLOGIES, INC.,

8             Defendants.

9      -------------------------------X

10

11          DEPOSITION OF W. PETER HANSEN, Ph.D.

12               New York, New York

13                 March 26, 2008

14

15

16     CONTAINS CONFIDENTIAL - ATTORNEYS EYES ONLY PORTIONS

17

18

19

20

21     Reported by:

       Bonnie Pruszynski, RMR

22     JOB NO. 15872

23

24

25

Peter Hansen

1              W. Peter Hansen, Ph.D.

2      Q    Yes.

3      A    Well, since I don't remember which

4    ones, exactly, were FDA cleared, I probably can't

5    answer the question for you.

6              Let me try to be fair about it.

7      Q    Sure.

8      A    I did consider other products that

9    used light scatter optics for cell enumeration,

10    yes.

11      Q    And was there a conscious decision

12    made to pursue Drew in favor of -- Drew's products

13    in favor of those other products?

14      A    At what time?

15      Q    Around the time of the Medica

16    conference.

17      A    I didn't make a decision then.

18      Q    What about around the time of the

19    signing of this agreement, in June 2006?

20      A    One of the problems I am having is

21    there doesn't seem to be a date on the agreement.

22      Q    I see a month.  I don't see a day.

23    Let's see if the signature page has a day.

24              If you go to the page 26, it appears

25    the agreement was executed by the parties between

Unsigned

1          W. Peter Hansen, Ph.D.

2      June 2nd and June 5th, 2006.

3      A     Okay.  I see that, yes.

4          It was a blank on the first page,

5      that is what confused me.

6      Q     Yes.

7      A     Excuse me.

8          Now the question, again, now that we

9      have straightened out the date --

10     Q     The attorneys forgot to fill that in.

11     A     Everybody makes mistakes.

12         MR. COSTANTINI:  Usually not

13     attorneys.

14     BY MR. DELLAPORTAS:

15     Q     Did you make a conscious decision

16     that the Drew Excel 22 was better suited for

17     PointCare's gold tag assay than the other -- than

18     other competing products that used a light scatter

19     for cell analysis?

20     A     Now you left out the when.

21     Q     At around the time or just prior to

22     the signing of this agreement.

23         MR. CAPLAN:  Can I just ask, when you

24     say "you," do you mean Peter Hansen,

25     personally?

Unsigned

1          W. Peter Hansen, Ph.D.

2     Q    Let's say Peter Hansen, personally.

3     A    Peter Hansen personally, yes.  There

4     was a time that I decided, personally, that I

5     thought that this was a good, this platform would

6     be a good candidate to work on, yes.

7     Q    What about relative to other

8     comparable platforms, meaning other platforms

9     which used the light scatter measurement for cell

10    analysis.

11    A    I had looked at other platforms and,

12    in my opinion, this one could be modified and

13    developed faster than anything else I had seen.

14    Q    Okay.  And why did you believe that?

15    A    The optics of the Drew Excel 22 were

16    very close in design to the optics of the AuRICA

17    in function, and prior to the date on this

18    agreement I went to Drew and performed experiments

19    on the Excel 22 or -- I shouldn't say it was,

20    exactly, an Excel 22.  It was something in the

21    shop that someone told me was pretty close.  And

22    but I did experiments down at Drew with our gold

23    tagging assay on what appeared to be an Excel 22

24    to me and the experiments were successful.  There

25    was some modification to the optics.  It was

Unsigned

Peter Hansen

1           W. Peter Hansen, Ph.D.

2    extremely minor.

3        Q    When you say "some modification,"

4    what are you referring to?

5        A    The -- there was a second

6    photomultipliers tube, so -- not a second.  There

7    was another photomultiplier tube that had to be

8    added to the optics, and the Drew engineers added

9    it very quickly, and I was able to do experiments

10   very quickly and they worked.

11       Q    Around when did these experiments

12   take place?

13       A    Let's see.  Medica was in November,

14   probably, actually the end of November, 1st of

15   December '05, and I believe I did the experiments

16   over a period of time from January to

17   February '06.  So, a couple months later.

18       Q    Okay.  And these were done in Drew's

19   offices in Texas?

20       A    No.

21       Q    Where were they?  Where were these

22   experiments performed?

23       A    In their laboratory.

24       Q    Which is where.

25       A    In Duncanville, Texas.

1          W. Peter Hansen, Ph.D.

2     Q     Did anyone from PointCare go with

3     you?

4     A     Yes.

5     Q     Who went with you?

6     A     On one trip, Don Barry, Jr.  And

7     Romiya Glover on another trip.

8     Q     Are these technical people?

9     A     Yes.

10    Q     And they assisted you in the

11    experiments?

12    A     Yes.

13    Q     Is it fair to say you are the head of

14    the technical team at PointCare?

15    A     Yeah.  That is fair to say.

16    Sometimes I wonder, but it's fair to say.

17    Q     We are asking you, we are not asking

18    them.

19    A     In my opinion.

20    Q     So I, from the point in time when you

21    ran those experiments in, I guess the end of

22    November 2005, through, really, today or recent

23    times, who were the principal members of the, of

24    your technical team at PointCare?  You can give me

25    the cast of characters.

Peter Hansen

1         W. Peter Hansen, Ph.D.

2         MR. CAPLAN:  Objection.

3    A    The principal members?

4    Q    Yes.

5    A    Would you help me with the word

6    "principal"?

7    Q    Sure.  To the extent someone is

8    clerical or secretarial or administrative, eve n

9    if they work with the technical people, I am not

10   interested.  I am more interested in people with

11   scientific or engineering backgrounds, such as

12   yourself, who report to you either directly or

13   through an intermediary.

14   A    So, you would like a complete list of

15   anybody that has ever worked there on the

16   technical team, from November 2005 until what are

17   we now, March 2008?

18   Q    Before I answer yes or no, can you

19   give me a ballpark of how many people that would

20   be?

21   A    I really have to do a tally.  Excuse

22   me.

23   Q    Sure.

24   A    I think steady state numbers are

25   probably, you know, up and down, including myself,

Unsigned

Peter Hansen

1           W. Peter Hansen, Ph.D.

2     Q     Yes.

3     A     I don't remember that one.

4           MR. DELLAPORTAS:  Can we take a short

5     break?

6           MR. CAPLAN:  Sure.

7           (Recess taken.)

8     BY MR. DELLAPORTAS:

9     Q     Let's go back on the record.

10          Okay.  Let's go back to annex one, if

11    you can, the front page.

12    A     Yes.

13    Q     And specifically the bottom half of

14    the section entitled PointCare CD4Sure Assay Test

15    Kit trademarked.

16    A     Yes.

17    Q     I know you don't recall seeing annex

18    one.  The first bullet point in that section says:

19    PointCare is responsible for and will bear the

20    cost associated with the related to the

21    development and approval for sale in the United

22    States of PointCare CD4 Sure Lymphocyte

23    Enumeration assay that will be compatible with

24    Drew's HTc and HTw diagnostic implementation

25    platforms."

Unsigned

Peter Hansen

1          W. Peter Hansen, Ph.D.

2          Do you see that?

3     A    I see that.

4     Q    Whether or not you saw this page,

5     were you generally aware that that was PointCare's

6     obligation under their agreement with Drew?

7     A    That seems like a tautology to me,

8     because I was aware of fact that Drew had an

9     obligation to develop an HTc or HTw platform that

10    was compatible with our assay.  Once that was

11    done, this would automatically be true, so --

12    Q    No one ever informed you that

13    PointCare had this obligation, as articulated in

14    this bullet point?

15    A    The obligation, as I understood it,

16    is what was in 1.1, that we were just looking at

17    on the first page, which says Drew agrees to not

18    modify it current Excel 22 hematology platform to

19    accommodate PointCare's proprietary CD4 Lymphocyte

20    enumeration Assay, CD4Sure.  Drew will manufacture

21    one modified version, called the HTc" and the

22    other called the HTw.

23          And I would take it to mean that, you

24    know, once that compatibility, as I just read it

25    was established, we would maintain it.

Unsigned

Peter Hansen

1              W. Peter Hansen, Ph.D.

2        Q     Okay.  So, did this bullet point

3   impose any affirmative obligations on PointCare?

4              MR. CAPLAN:  Objection.

5        A     You know, any affirmative -- the

6   affirmative that I see would be to maintain the

7   capability once it was achieved, as I just said.

8        Q     Your understanding is, though,

9   although it uses the words "development" and

10  "approval," PointCare's only obligation is to

11  maintain the capability --

12       A     I didn't say only.

13       Q     -- once Drew achieves the capability?

14       A     I didn't mean to interrupt you.

15       Q     Let me withdraw it because we were

16  all speaking over one another.

17       A     Excuse me.

18       Q     I just am trying to figure out what,

19  if any, obligations you believe the bullet point I

20  just read imposed on PointCare.

21             MR. CAPLAN:  Other than what he's

22       already testified to?

23       A     Other than the obligation to maintain

24  the compatibility achieved solely by Drew.

25             MR. CAPLAN:  I object.

Peter Hansen

1           W. Peter Hansen, Ph.D.

2      Q    If any.

3      A    The question got real complex.  I

4   gave a real simple answer to the first version of

5   the question.  I can listen to a read back if you

6   want.

7      Q    That's okay.

8           Is there anything you want to add to

9   your prior answer?

10     A    No, I think it was complete.

11     Q    Okay, good.

12          Let's go to the second bullet point,

13   which reads, "PointCare is responsible for and

14   will bear all costs associated with and related to

15   the development and transfer into PointCare's

16   manufacturing organization of a reformulated

17   Lymphocyte Enumeration assay that shall be

18   compatible with and operate with Drew's HTc and

19   HTw diagnostic instrumentation platforms."

20          Did you have an understanding as to

21   what, if any, obligations this bullet point

22   imposed on PointCare?

23          MR. CAPLAN:  Objection.  He's already

24          testified he has never seen this bullet

25          point before.

Peter Hansen

1             W. Peter Hansen, Ph.D.

2      A    Having not seen it before, I need

3   to --

4      Q    Sure.

5      A    -- try to understand it now.

6      Q    Sure.

7      A    If you are asking if I understood

8   anything about it in the past --

9      Q    Separate and apart from whether you

10   actually saw this agreement, did anyone at

11   PointCare ever tell you that PointCare had the

12   responsibility articulated in the second bullet

13   point?

14      A    This bullet point uses language that

15   is new to me --

16      Q    Okay.

17      A    -- as of today.  And -- and I don't

18   recall anybody giving me this bullet point to work

19   by.

20      Q    What about the first bullet point,

21   did anyone ever give you that?

22      A    I -- no one ever gave me that bullet

23   point.

24      Q    Okay.  Let's go.

25      A    By that I mean, literally, what's on

Unsigned

Peter Hansen

1          W. Peter Hansen, Ph.D.

2     this page.

3      Q     Fair enough.

4          Let's go to attachment one to annex

5     one.  I believe you said you did see this?

6      A     Yes, that looks familiar.

7      Q     When you told me you have seen it,

8     did you see it contemporaneously, or did you just

9     see it in preparing for your deposition?

10     A     Contemporaneously to what?

11     Q     With the work being performed by Drew

12     and PointCare with respect to the HT platform.

13     A     Yes, I think that's correct, yes.

14     Q     Okay.  Let's go through some of

15     these, these numbers.

16          Do you see how there is a description

17     in the first column, and then the second and the

18     third columns are start and end dates.

19          Do you see those?

20     A     Yes, I do.

21     Q     Do you see on the right-hand side,

22     there are some initials with respect to some of

23     those lines.  Do you see that?

24     A     Yes.

25     Q     Okay.  And do you see compatibility

Peter Hansen

1          W. Peter Hansen, Ph.D.

2    testing number two?

3        A    Yes, I do.

4        Q    Do you see PH, RB, DB, do you see

5    that?

6        A    That is right.  I do.

7        Q    Do you have any understanding as to

8    what those initials stand for?

9        A    Yes, I do.

10       Q    Who is PH?

11       A    That is me.

12       Q    RB?

13       A    Roger Borray.

14       Q    DB?

15       A    Don Barry.

16       Q    Okay.  Let's go to line three,

17   business strategy.  Do you see that?

18       A    Yes.

19       Q    Do you know who HR, PK and RD are?

20       A    Yes.

21       Q    Who is HR?

22       A    Harry Rimmer.

23       Q    PK?

24       A    Petra Krauledat.

25       Q    RD?

1          W. Peter Hansen, Ph.D.

2     A    Rich DePiano.

3     Q    Fourth line, staffing and scheduling,

4    the same PH and the same RB as before?

5     A    Yes.

6     Q    That is Peter Hansen and Roger

7    Borray?

8     A    That's right.

9     Q    Line five, PH, RB and DB, same ones

10   as before?

11    A    Peter Hansen, Roger Borray and Don

12   Barry for line five, yes.

13    Q    Quality marriage receipt, DB, FM, PK,

14   HR and RB?

15          MR. CAPLAN:  I think you missed a

16      line.

17    A    I'm confused there.  That doesn't

18   match up.

19    Q    I'm sorry.  That is line six, product

20   requirement review.

21    A    What was the question?

22    Q    I think we have seen all those people

23   except for FM.

24          Who is FM?

25    A    That is, in my recollection, Frank

Unsigned

1            W. Peter Hansen, Ph.D.

2     Matuszak.  There is also some dot dot dots there,

3     so it looks like there was a number of other

4     unnamed characters.

5        Q     Do you know who drafted this?

6        A     Yes.  I am quite sure it was Andrew

7     Kenny.

8        Q     And who is Mr. Kenny?

9        A     Andrew Kenny, at the time I knew him,

10    was what I would call my counterpart at Drew.

11       Q     And do you have an understanding as

12    to the significance of the ellipsis at the end of

13    line six?

14       A     No.

15       Q     Okay.  Seven, quality marriage, i.e,

16    MD and DQ.  Do you know who those are?

17       A     MD would Mo Doire from PointCare and

18    DQ is an individual from Drew whose name I don't

19    remember.

20       Q     Okay.  All I can.

21       A     If you wait a minute, I can think.

22    DQ.  Let me just think about that.

23            I remember there were some quality

24    meetings.

25            No, I -- I really don't remember who

Unsigned

Peter Hansen

1             W. Peter Hansen, Ph.D.

2    the DQ is, but it was a person from -- oh, Drew

3    Quality, how about that?

4        Q    Aptly named.

5        A    Unidentified person from Drew

6    quality.

7        Q    Okay.  So, some of these refer to

8    generic categories as opposed to human beings?

9        A    Or else someone had trouble

10    identifying who was in charge.

11        Q    Okay.

12        A    It happens.

13        Q    Let's go to number nine.

14        A    Um-hum.

15        Q    Right angle scatter modification.

16        A    Yes.

17        Q    RB, PH, RG and DM.

18            Have we seen all those names before?

19        A    I don't know about DM.

20        Q    Who would DM be?

21        A    Drew -- Drew machine shop, I think.

22        Q    Okay.

23        A    Some of these are not people.

24        Q    What about RG, I don't think we have

25    seen that one either.

Peter Hansen

1          W. Peter Hansen, Ph.D.

2      A    Romiya Glover.

3      Q    Okay.  And ten, test right angle

4    scatter modification.  I think we have seen all

5    those initials at this point.

6      A    Yes.

7      Q    Eleven, lyse mixing modification.  I

8    think we have seen DB.

9      A    Yes.

10      Q    Test lyse mixing modification, we

11    have seen those initials.

12      A    Yes.

13      Q    Let's go to 14, mixing.  We see DME

14    and DB.

15          Do you know who DME refers to?

16      A    That would be an unnamed,

17    unidentified Drew mechanical engineer.

18      Q    Okay.  Fifteen immunogold delivery

19    module.  I think we have seen those initials.

20      A    That's, again, another unidentified

21    engineer.  It may not be the same person from

22    Drew.

23          So, the engineers were not identified

24    who was going to participate.

25      Q    Sixteen is CD4 controls, TF.

1          W. Peter Hansen, Ph.D.

2     A    Tracy Fredet.

3     Q    Okay.  17, fluid routing, that is the

4     nameless engineer again.

5     A    No.  That is not the same engineer

6     necessarily here at all.

7     Q    It's a nameless engineer?

8     A    It's a nameless engineer from Drew.

9          Would you mind giving me a straight

10    edge, because at this point my thumbs and fingers

11    don't follow this thing across correctly.

12         MR. CAPLAN:  I got it.

13    A    Thank you.

14         Where were we?  17?

15    Q    Seventeen.

16    A    Yes.

17    Q    A nameless Drew mechanical engineer?

18    A    A nameless Drew Mechanical engineer

19    to be staffed, I believe.

20    Q    And 18, optical module?

21    A    That is, again, a Drew -- I think

22    that is Drew machine shop.  Yes, Drew machine

23    shop.

24         So, that probably refers to any

25    number of people in the machine hop.

Peter Hansen

1                W. Peter Hansen, Ph.D.

2        Q        Nineteen, sample age extension, PCTS.

3        A        PointCare Technology, but I don't

4     know what the S is.

5        Q        Could it be staff?

6        A        Your guess is as good as mine.

7        Q        Okay.  Do you think at the time you

8     had an understanding as to what that meant?

9        A        Just let me think for a moment,

10    because it could refer to a person.  You know, it

11    could be a misprint because the person that did

12    this work was Tracy Fredet, so it could be

13    PointCare and it should have been TF.

14       Q        Okay.  Analytical software for CD4,

15    AD.  I don't think we have seen that one yet

16    either.

17       A        That is Andrea Desrosiers.

18       Q        User interface, JW.

19       A        That is Jennifer Waite.

20       Q        I think then we are out of initials.

21                Do you know why the initials stop at

22    number 21?

23       A        No, I don't.

24       Q        Okay.  Well, let me start with the

25    first, 21.

1          W. Peter Hansen, Ph.D.

2          If you could go through these and

3    tell me which of these were ultimately

4    accomplished and which, if any, of these have

5    never been accomplished.

6      A     Let me just look at something that

7    may help you in your last question about why the

8    initials stop.

9          That's right, this is annex.

10          I don't know if this is coincidental,

11    but the initials all stop at about the same date

12    the agreement was signed, so --

13          MR. CAPLAN:  He's asking if you know,

14      Peter.

15      A    No, I don't know.

16      Q    So, for numbers one through 21, do

17    you know which of these were performed and which

18    of these were not performed?

19      A     Yes.  Sure.  Let's go through this.

20          Analysis and planning, yes, that was.

21    Analysis and planning, yes, there were a number of

22    meetings.

23          Compatibility testing, that was the

24    testing that I referred to earlier where I

25    traveled down to Drew and so on, that was

Peter Hansen

1              W. Peter Hansen, Ph.D.

2        A      I never saw one work.

3        Q      Do you have a belief as to whose

4    responsibility that was?

5        A      Drew Engineering.

6        Q      What is the basis for that?

7        A      The many meetings we had.

8        Q      Next line, CD4 fluid routing.  Start

9    date 3/23/06, end date 6/29/06.

10              Was that ever completed?

11        A      It was what I would call a very

12    advanced stage of the CD4 fluid routing.  If there

13    was anything left to do, it was I would call

14    minor.

15        Q      Do you have -- I'm sorry.  Withdraw

16    that.

17              Was that completed within the

18    specified time frame?

19        A      No.

20        Q      Do you recall when that was

21    completed?

22        A      Well, I said I saw something that was

23    reasonably complete in the May-June '07 time

24    frame --

25        Q      Okay.

Peter Hansen

1                W. Peter Hansen, Ph.D.

2        A    -- a year later.

3        Q    Modified optics, 3/23/06 to 6/29/06.

4    Was that ever completed?

5        A    I never saw one working.

6        Q    Do you have a belief as to whose

7    responsibility that was to complete?

8        A    Yes.

9        Q    What is your belief?

10       A    It was Drew engineering team.

11       Q    What is the basis for your belief?

12       A    The many meetings we had on the

13   subject.

14       Q    Okay.  Let's go to software

15   integration.

16            Would it be helpful to do these line

17   by line or would you prefer to speak generally?

18       A    Excuse me for speaking over you.

19   Yes.

20       Q    The first line is analytical software

21   for CD4, start date 3/23/06, end date 6/29/06.

22            Was that ever completed?

23       A    I haven't seen it completed.

24       Q    And do you have an understanding as

25   to whose responsibility that was?

1           W. Peter Hansen, Ph.D.

2       A     That was for the final integration of

3    analytical software for CD4, that is PointCare's

4    responsibility.

5       Q     Software for sample age extension,

6    3/23/06 through 6/29/06.

7           Was that ever completed?

8       A     I think your question is:  Was the

9    integration of the software completed and the

10   answer is no.

11      Q     Yes.  All these, when I speaking of

12   these four or five line items, they are all as

13   subcategories of software integration.  I will

14   call it the line number so we are clear.

15      A     Sure.

16      Q     And that was never completed?

17      A     I have never seen one, no.  It was

18   not completed.

19      Q     Do you have an understanding as to

20   whose responsibility that was?

21      A     That was PointCare's responsibility.

22      Q     Line 31, user interfaces, 3/23/06 to

23   7/20/06.

24           Was that ever completed?

25           MR. CAPLAN:  Which line item?

Peter Hansen

1           W. Peter Hansen, Ph.D.

2           MR. DELLAPORTAS:  Line 31?

3      A    I saw a user face.

4      Q    It's late in the day.

5      A    A user interface working to the point

6    where we could demonstrate it to some interested

7    customers, approximately June '07.  As to whether

8    or not it was absolutely complete, I can't tell

9    you.

10     Q    This was for the HT machine?

11     A    This was for the HT.  This was for an

12   HT prototype that we had at PointCare, yes.

13     Q    Who put that together?

14     A    The prototype?

15     Q    The user interface specifically.

16     A    The user interface was developed by

17   Jennifer Waite at PointCare, and incorporated into

18   the Drew software by Carl Gu of Drew -- sorry,

19   he's a Drew software engineer.

20     Q    Carl?

21     A    Gu, G-U.

22     Q    32, in-house testing, 8/1/06 to

23   8/31/06.

24          Was that ever completed?

25     A    Yes.

Peter Hansen

1                    W. Peter Hansen, Ph.D.

2        Q      When was that completed?

3        A      Oh, excuse me.  Excuse me.  I'm

4    looking under the wrong total heading.  I didn't

5    realize we hadn't moved on.

6        Q      Sorry.  Line 32.

7        A      In-house testing of an integrated

8    system, that would have to be, excuse me, in-house

9    testing of an integrated system.

10            No that has not been completed.

11        Q      Okay.  And whose responsibility was

12    that?  32, I am speaking of.

13        A      Line 32, I have to look at this whole

14    chart to -- yes, that would be a Drew

15    responsibility.

16        Q      What is the basis for your belief?

17        A      The meetings that we had on the --

18    with the team, the joint teams.

19        Q      Okay.  And on the, I think you have

20    given the PointCare members.  Who is on the joint

21    team on the Drew side?

22        A      From the technical team, the people

23    were Gary Young, who was the project leader at

24    Drew; George Chappell, who is an engineer at Drew;

25    Carl Gu, software engineer at Drew; and from time

Unsigned

1              W. Peter Hansen, Ph.D.

2      to time William Ross, a technician at Drew.  But

3      William Ross would not be in these meetings.

4          Q      When you have referenced from time to

5      time that Drew took responsibility for one thing

6      or another at the meetings, would there have been

7      a particular person from the Drew side who would

8      take responsibility or would it vary from task to

9      task?

10         A      I don't think I said that.

11         Q      You don't think you said what?

12         A      What you just said.

13         Q      At various times I have asked you

14     whose responsibility one task or another was.

15         A      Yes.

16         Q      I believe you have told me sometimes

17     PointCare, sometime Drew's, and on some of the

18     instances where you have asked Drew, I asked you

19     what was the basis for your belief, and you

20     referenced joint meetings of the teams.

21             Do I have that right or did I

22     misstate something?

23         A      I think you misstated it.

24         Q      Okay.  What part did I misstate?

25         A      Sometimes PointCare, sometimes

Unsigned

Petra Krauledat

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    ---------------------------------------X

     DREW SCIENTIFIC, INC.,

4

                    Plaintiff,

5

          -against-      Case No. 08 CV 1490-AKH

6

     POINTCARE TECHNOLOGIES, INC.,

7

                    Defendants.

8    ---------------------------------------X

9

10

11

12        DEPOSITION OF PETRA KRAULEDAT, Ph.D.

13            New York, New York

14            Friday, April 4, 2008

15

16

17    *CONFIDENTIAL PORTIONS - ATTORNEYS' EYES ONLY*

18

19

20    Reported by:

21    Angela M. Shaw-Crockett, CSR, RPR

22    Job No. 15879

23

24

25

                    Unsigned

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2      Q.  Had your husband been involved in the

3    design of the Idexx unit?

4      A.  Yes.

5      Q.  And when had he helped design that?

6      A.  I think in approximately 1997.  Maybe '96,

7    '97 time frame.

8      Q.  That was part of the Sienna period?

9      A.  No.

10      Q.  What period was that?

11      A.  Union Biometrica.

12      Q.  So would it be fair to say that he was

13    intimately familiar with the device that you were

14    acquiring from Idexx?

15           MR. CAPLAN:  Objection.

16      A.  No.

17      Q.  It would not be fair?

18      A.  That would not be fair.

19      Q.  If he helped design the unit, why wouldn't

20    it be fair to say that he was familiar with it?

21           MR. CAPLAN:  Objection.  She didn't say he

22    wasn't familiar with it.  She said he wasn't

23    intimately familiar.

24           MR. COSTANTINI:  Let me just take that

25    away from the equation and see if that changes

Unsigned

Petra Krauledat

1                P. KRAULEDAT - 4/4/08

2         the answer.

3            MR. CAPLAN:  Okay.

4         A.  It does change the answer.  He was

5      somewhat familiar.

6         Q.  Was PointCare able to offer the AuRICA for

7      sale?

8         A.  Yes.

9         Q.  And was it successful in its sales

10     efforts?

11        A.  Yes.

12        Q.  And approximately how many such devices

13     were sold?

14        A.  Somewhere between 60 and 70 devices.

15        Q.  And who were the customers?  I don't need

16     to know all 60 or 70, but if you could generally

17     tell me the categories of the customers for the

18     AuRICA device.

19        A.  Nongovernment organizations,

20     multi-national corporations.  That's it, those two.

21        Q.  For how long of a period did PointCare

22     sell the AuRICA device?

23        A.  Three months.

24        Q.  What months were those?

25           Let's settle for what year were those

1                    P. KRAULEDAT - 4/4/08

2      months.

3          A.  I think it was very early 2005.  Very

4      early 2006.  Sorry.

5          Q.  I believe you said that the FDA approvals

6      were at the end of 2004; is that correct?

7          A.  Yes.

8          Q.  Were no devices sold during 2005?

9          A.  No AuRICA devices.

10         Q.  No AuRICA devices.

11             But they were sold in the early part of

12     2006, and you have approximately 60 to 70 sales, and

13     then sales ceased; is that correct?

14         A.  That's correct.

15         Q.  What was the reason that sales ceased?

16         A.  We were out of inventory.

17         Q.  Why couldn't you get more inventory?

18         A.  We decided not to get any more inventory.

19         Q.  And why did you decide not to get any more

20     inventory?

21         A.  Because it was not economical.

22         Q.  Not economical in what sense?

23         A.  The inventory would have been too

24     expensive to sustain the business.

25         Q.  And had something changed from your

Unsigned

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2     original planning on putting together and selling

3     this machine?

4         A.  Yes.

5         Q.  What had changed?

6         A.  The cost for the instrumentation that was

7     delivered by Idexx Laboratories.

8         Q.  Did they raise the price?

9         A.  Yes.

10        Q.  You said previously that there had been an

11    agreement, a written agreement, between Idexx and

12    PointCare.

13             Was pricing addressed in that agreement?

14        A.  Yes.

15        Q.  And was their raise of prices consistent

16    with that agreement or was it in your view a

17    violation of the agreement?

18             MR. CAPLAN:  Objection.

19        A.  It was inconsistent with the agreement.

20        Q.  Inconsistent?

21        A.  Yes.

22        Q.  And did you bring this inconsistency to

23    Idexx's attention?

24        A.  Yes.

25        Q.  And what happened there?

Petra Krauledat

1                    P. KRAULEDAT - 4/4/08

2        A.  Idexx was not willing to adhere to the

3    agreement.

4        Q.  Did you consider suing Idexx?

5            MR. CAPLAN:  I'd just caution you in

6    answering this and any following questions not

7    to reveal any information that may be the

8    product of discussions with attorneys.

9        A.  No, I didn't.

10       Q.  Did you each decide to go your separate

11   ways?

12           MR. CAPLAN:  Objection.

13       Q.  Idexx and PointCare.

14       A.  I don't know.

15       Q.  Did you receive anything from Idexx in

16   return for not insisting upon their compliance with

17   the agreement?

18           (The last question was read back by the

19   Reporter.)

20       A.  No.

21       Q.  Had PointCare suffered any losses as a

22   result of Idexx not honoring the agreement?

23       A.  Yes.

24       Q.  Approximately how much in losses?

25       A.  I don't know.

Unsigned

1                P. KRAULEDAT - 4/4/08

2      Q.  Could you give me a magnitude?

3      A.  In the millions.

4      Q.  In the millions?

5      A.  In the millions of dollars.

6      Q.  Did you have shareholder meetings from

7    time to time?

8      A.  Yes.

9      Q.  And was that true throughout PointCare's

10   history, at least after you became CEO?

11     A.  Yes.

12     Q.  And was this breach of the agreement by

13   Idexx discussed at the shareholder meetings?

14     A.  I don't remember.

15     Q.  Was there discussions of the losses that

16   were suffered by PointCare as a result of Idexx's

17   breach of the agreement?

18         MR. CAPLAN:  Objection.  Discussions

19     where?

20         MR. COSTANTINI:  At the shareholder

21     meetings or at board meetings.  Well, let me

22     go --

23   BY MR. COSTANTINI:

24     Q.  There are shareholder meetings

25   occasionally.  And you also had a board of

                    P. KRAULEDAT - 4/4/08

1

2      directors, did you not?

3          A.  Yes.

4          Q.  And the board of directors also met?

5          A.  Yes.

6          Q.  And the board of directors met on a more

7      regular basis than the shareholders as a group met;

8      is that correct?

9          A.  That's correct.

10         Q.  And would I be correct in assuming that

11     most major shareholders are represented in one way

12     or another on the board?

13         A.  Yes.

14         Q.  Focusing on the board meetings -- first of

15     all, with what frequency did PointCare have board

16     meetings?

17         A.  Every two months on the average.

18         Q.  Was there discussion at any of these board

19     meetings about Idexx's breach of the agreement and

20     all the losses that were suffered from PointCare as

21     a result?

22         A.  Yes.

23         Q.  What was the nature of those discussions,

24     as best you could recall?

25             MR. CAPLAN:  Do you need to consider

1          P. KRAULEDAT - 4/4/08

2     whether there was the participation of counsel

3     on those discussions?

4          THE WITNESS:  Yes.  But I can answer the

5     question to a certain degree.

6          A.  The essence of the discussions revolved

7     around what it would take to continue on with the

8     mission of PointCare and a strategy and the

9     development of the strategy how to do this.

10          Q.  And what strategy was developed on how to

11     do this?

12          A.  It was decided that we would try to find a

13     suitable replacement for -- no.  Let me take that

14     back.  That would be inaccurate.

15          It was decided to find a new hardware

16     platform that could work with the CD4 assay where

17     the problems that we had encountered with Idexx

18     Laboratories could not be repeated.

19          Q.  Okay.  Why a new platform?

20          A.  Let me correct what I said.

21          A different platform, in the sense of

22     different.

23          Q.  And what problems did you want not

24     repeated?

25          A.  Idexx had originally manufactured its

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2    products according to good manufacturing practices,

3    and then decided to abandon that practice, which

4    caused a lot of problems.  And we did not want that

5    to happen again.

6         Q.   What type of problems was caused by the

7    abandonment of -- I assume quality controls is what

8    you're talking about?

9         A.   Yes.

10            It became extremely costly for PointCare

11   to make the devices that were delivered by Idexx FDA

12   compliant.

13        Q.   What was making that process particularly

14   costly?

15        A.   I had to essentially take every device

16   apart and put it back together according to FDA

17   rules and regulations.

18        Q.   So Idexx was assembling them incorrectly,

19   in your view?

20        A.   Yes.

21        Q.   Did PointCare receive customer complaints

22   in relation to the 60 or 70 products that it had

23   sold?

24        A.   Yes.

25        Q.   And was there a particular pattern to

Unsigned

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2    acceptable for PointCare," what did you mean?

3         A.   The quality control system in a very large

4    company is very difficult to match with the quality

5    control system of a small company.

6         Q.   Is Idexx and Beckman Coulter affiliated in

7    some way?

8         A.   No.

9         Q.   I'm not sure what -- what was the problem

10   with Beckman Coulter's quality system that -- their

11   being the distributor?

12        A.   Nothing.

13        Q.   What was the organizational difference

14   between PointCare and Beckman Coulter that is the

15   subject of that second sentence on page 3?

16        A.   Size.

17        Q.   Just pure size?

18        A.   Pure size.

19        Q.   Okay.  Going back -- I know it's getting

20   near lunchtime.

21             Going back quickly to the 2005 era, was

22   there a reason why no sales were made during the

23   course of 2005?

24        A.   Yes.

25        Q.   What was that reason?

1              P. KRAULEDAT - 4/4/08

2        A.  Matching the PointCare and the Beckman

3    Coulter quality systems.

4        Q.  And the sales were made directly then in

5    the first part of 2006 by PointCare, at least until

6    you ran out of inventory, correct?

7        A.  That's correct.

8          MR. COSTANTINI:  At this juncture, I think

9    it will be a good time.

10         (Luncheon Recess at 12:53 p.m.)

11         (Deposition resumes at 1:38 p.m.)

12   BY MR. COSTANTINI:

13       Q.  Now, I believe before the break, you were

14   saying that you had made a decision as a group to go

15   forward with a different platform, and that you

16   would search for a platform that was suitable for

17   PointCare's needs.

18         Do you recall that testimony?

19       A.  I do.

20       Q.  Okay.  How did you go about doing that?

21       A.  We identified companies that were

22   fulfilling the criteria we deemed to be important to

23   not repeat the problems that we've had with Idexx,

24   and we made appointments with these companies and

25   tried to find out if they wanted to work with us.

Unsigned

Petra Krauledat

1            P. KRAULEDAT - 4/4/08

2      Q.  Okay.  Let's start with the criteria.

3            Were the criteria written down in some

4    form?

5      A.  I don't think so, no.

6      Q.  Who was it that developed these criteria?

7      A.  The management team at the time.

8      Q.  Who was the management team at the time?

9      A.  It was Peter Hansen, KC, myself.

10   Essentially the three of us.

11     Q.  And what happened to Mr. Barry, Sr.?  Last

12   we left him, he was president.

13     A.  He had left by that time.

14     Q.  And approximately when did he leave?

15     A.  Sometime mid to late 2004, I believe.

16     Q.  And what was his reason for leaving?

17     A.  He did not find himself to be suitable for

18   being the president.  He didn't think he had the

19   right experience.  And he -- the job that he would

20   have liked was already taken by somebody else, so he

21   left.

22     Q.  What was the job that he would have liked?

23     A.  He would have liked to direct engineering

24   or systems development.

25     Q.  And who --

Unsigned

Petra Krauledat

1             P. KRAULEDAT - 4/4/08

2        A.  He said he had discussed the design of the

3    optical subsystem with Roger Bouree; and from that

4    discussion, he believed that it was potentially

5    quite compatible.

6        Q.  Now, in addition to the meeting with

7    Mr. Matuszak that you've told us about, did you

8    personally meet with anyone from Drew at this Medica

9    conference?

10       A.  Yes.

11       Q.  When did that occur?

12       A.  I don't remember exactly.  Sometime during

13   the meeting.

14       Q.  Who did you meet with?

15       A.  Harry Rimmer, Frank Matuszak and Roger

16   Bouree.

17       Q.  Who was there from your side?

18       A.  I believe it was Dr. Hansen and myself.  I

19   don't think Dan O'Connor was there.

20       Q.  And is there a reason why you decided not

21   to follow Dan O'Connor's suggestion that you don't

22   deal with Drew?

23       A.  Yes.

24       Q.  What was that reason?

25       A.  Peter Hansen was quite positive about the

                        Unsigned

Petra Krauledat

```
 1              P. KRAULEDAT - 4/4/08

 2    technology, and I therefore believed I needed to get

 3    my own feeling for the company, rather than

 4    believing Mr. O'Connor.

 5        Q.  Okay.  So what occurred at the meeting

 6    that you did attend?

 7        A.  I think we decided it was worth having

 8    further discussions and signed a confidentiality

 9    agreement.

10        Q.  Did you sign a confidentiality agreement

11    right then and there in Düsseldorf?

12        A.  I don't remember exactly.

13        Q.  Did you sign such confidentiality

14    agreements with any of the other companies that

15    you -- were concerned?

16        A.  The one we visited, yes.  The ones we

17    visited, yes.

18        Q.  And what happened next vis-a-vis Drew?

19        A.  We did sign a confidentiality agreement.

20        Q.  Whether at that meeting or shortly

21    thereafter, what happened after a confidentiality

22    agreement was signed?

23        A.  To the best of my recollection, Peter

24    Hansen and Don Barry traveled to Drew's Dallas

25    facility to take a closer look at the
```

Unsigned

Petra Krauledat

P. KRAULEDAT - 4/4/08

1

2    instrumentation identified as potentially

3    compatible.

4        Q.  And you did not go on that trip?

5        A.  I did not.

6        Q.  Did Peter and Don Barry, Jr., I assume?

7        A.  Don Barry Jr., yes.

8        Q.  Did they conduct any test to determine the

9    feasibility of your assay being integrated with the

10   Drew machine?

11       A.  To the best of my knowledge, they did.

12       Q.  And what did they report back to you?

13           I suppose the right question is, did they

14   report the results of the trip back to you?

15       A.  Yes, they did.

16       Q.  And what did they report?

17       A.  In essence, it was a positive report.  I

18   don't recall any more detail from it.

19       Q.  Did they report to you that the assay

20   could be made to work with the Drew hardware with

21   relatively minor changes?

22       A.  No.

23           MR. COSTANTINI:  I'm going to ask the

24   reporter to mark as Krauledat Exhibit 2 a memo

25   from Harry Rimmer -- or really a series of

Unsigned

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2      e-mails that begins with an e-mail from Harry

3      Rimmer to Petra Krauledat, dated February 12,

4      2006.

5              (Krauledat Exhibit 2 was received and

6      marked for identification, as of this date.)

7      A.   (Witness reviews document.)

8              MR. CAPLAN:  Off the record.

9              (A discussion was held off the record.)

10     A.   Okay.

11     Q.   Before we begin asking questions about

12     Exhibit 2, your counsel has pointed out to me that

13     there is a circle appearing on the last page of

14     Exhibit 2.  Or perhaps not a circle, but some kind

15     of elliptical shape.

16              And it's something I added to the

17     document, and it was inadvertently copied and used

18     as an exhibit.

19              With your counsel's permission, I would

20     like to substitute a clean copy later.  It serves no

21     purpose other than perhaps helping direct you to the

22     area where I'm going to ask questions.

23              But don't think that you or anyone at Drew

24     contemporaneously added that circle.

25              My first question was with respect to the

                              Unsigned

Petra Krauledat

```
1                P. KRAULEDAT - 4/4/08

2    additional detector?

3          MR. CAPLAN:  Objection.

4       A.  To the best of my knowledge and

5    understanding, the existing detector was occupied

6    with other tasks.

7       Q.  And what function was the second detector

8    going to serve?

9          MR. CAPLAN:  Objection.

10      A.  To the best of my understanding, it was to

11   measure the CD4-positive lymphocytes simultaneously

12   to other whites blood cell.

13      Q.  So that second detector was going to

14   perform an important function, was it not?

15      A.  Yes.

16      Q.  Why did you then regard it as a relatively

17   minor hardware change, or why was it regarded?  I

18   realize that you're reporting what people said to

19   you.

20      A.  Adding a detector to an existing optical

21   measurement system is minor relative to other things

22   that might have had to be done with other companies'

23   technologies.

24      Q.  And optical measuring systems was one of

25   Dr. Hansen's fortes, was it not?
```

Unsigned

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2       A.   Yes.

3       Q.   And when you said that -- you go on to the

4   next sentence, where it says, "Moreover, we feel

5   that the initial work would need to be done in our

6   facility for approximately two to three months."

7         Do you see that?

8       A.   Yes.

9       Q.   Is the "we" in that sentence some

10  combination of yourself and Dr. Hansen and

11  Mr. Barry?

12      A.   No.

13      Q.   Who is the "we" in that sentence?

14      A.   The entire PointCare team.

15      Q.   Why did you feel that the initial work

16  should be done at your facility?

17      A.   The CD4 test was available in our

18  facility, and we had the knowledge that was

19  necessary to analyze the data that were obtained,

20  and therefore it was prudent to do the work at our

21  facility rather than having people travel.

22      Q.   And do you know how Dr. Hansen and

23  Mr. Barry came to the conclusion that the CD4 assay

24  appeared to be compatible with the Drew system?

25  What test did they run to do that is what I'm trying

Petra Krauledat

```
 1              P. KRAULEDAT - 4/4/08

 2    to --

 3        A.  I don't know.

 4        Q.  They reported to you the conclusions as

 5    opposed to what they had done to reach the

 6    conclusions; is that correct?

 7        A.  That's right.

 8            MR. COSTANTINI:  Off the record.

 9            (A discussion was held off the record.)

10    BY MR. COSTANTINI:

11        Q.  Did you yourself ultimately go to Dallas?

12            MR. CAPLAN:  In this particular time

13    frame?

14            MR. COSTANTINI:  Yes.

15            The reason I'm asking is because there is

16    discussion in this e-mail of potential meeting

17    dates and dinners, et cetera.  But let me be

18    more specific, though.  That's a good point by

19    you.

20    BY MR. COSTANTINI:

21        Q.  In or around this time frame, did you

22    yourself go to Dallas?

23        A.  I don't remember.

24        Q.  Do you remember going to Dallas at all in

25    connection with meetings with Drew prior to the time
```

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2       A.  After having read this exhibit, which

3    refreshed my memory, it must have been in the

4    February time frame of 2006.

5       Q.  Okay.  So it was soon after you received

6    the reports about the initial testing.

7           Did Dr. Hansen and/or Mr. Barry indicate

8    to you -- did they indicate to you whether they

9    thought the Drew machine was more feasible or a

10   better fit for the CD4 analysis than the other

11   machines that they had evaluated?

12      A.  Yes.

13      Q.  And as best you could recall, what was the

14   basis for that recommendation?

15          I know you've already told me about the

16   minor hardware change.  I assume that's one of the

17   bases, so you don't need to go back into that, but

18   are there other bases?

19      A.  To the best of my recollection, the

20   recommendation was made by them based on the optics.

21      Q.  Was the AuRICA machine a high throughput

22   machine?

23      A.  No.

24      Q.  What exactly is a high throughput machine?

25          MR. CAPLAN:  Objection.

                      Unsigned

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2      A.  It's a rather loose term of the industry

3    that typically would indicate a piece of

4    instrumentation that can handle a fairly large

5    number of patient samples without an operator being

6    present and standing in front of it the entire time.

7      Q.  And is that thought of as a competitive

8    advantage?

9          MR. CAPLAN:  Objection.

10     A.  No.

11     Q.  Is it an advantage of any sort?

12         MR. CAPLAN:  Objection.

13         In what context?

14         MR. COSTANTINI:  In the context of this

15    evaluation.

16         MR. CAPLAN:  Because your last question,

17    she defined it generally.

18     A.  No.  In the context of this evaluation,

19    no.

20     Q.  Okay.  The AuRICA was not a high

21    throughput machine.  The machine that you were now

22    contemplating was going to be a high throughput

23    machine; is that correct?

24     A.  That's correct.

25     Q.  Who made the decision to go from the prior

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2      AuRICA machine to a machine with high throughput?

3          A.   That wasn't done.  That was not done.

4      That decision was never made.

5          Q.   Why were people working on a high

6      throughput machine, then?

7              MR. CAPLAN:  Objection.

8          A.   It offered an additional market expansion

9      over what AuRICA was designed for.

10         Q.   And was that additional market expansion

11     thought to be a good thing?

12         A.   Yes.

13         Q.   Who suggested adding the high throughput

14     feature?

15         A.   Nobody did suggest that.

16         Q.   I'm having a hard time following this.

17             Did this just come about one day that all

18     of a sudden people started designing a high

19     throughput machine instead of a non high throughput

20     machine?

21             MR. CAPLAN:  Objection.

22         A.   The Drew Excel 22 was already a high

23     throughput machine.

24         Q.   Okay.  So adopting it, you would have a

25     high throughput.  I understand now.

Unsigned

Petra Krauledat

1          P. KRAULEDAT - 4/4/08

2          Was that a factor in the decision to go

3    forward to negotiate an agreement with respect to

4    the Excel machine?

5          MR. CAPLAN:  Objection.

6      A.   It was one factor.

7      Q.   And what were the other factors that

8    played into that decision?

9      A.   The fact that it appeared relatively low

10   risk to convert the Drew instrument to make it

11   suitable for the CD4 lymphocyte assay in a short

12   period of time.

13     Q.   Any other factors that you presently

14   recall?

15     A.   The fact that Drew was a smallish company

16   and not a large company.

17     Q.   I assume you viewed that as an

18   advantageous factor; is that correct?

19     A.   That is correct.

20     Q.   And why did you view that as an

21   advantageous factor?

22     A.   Typically smaller companies work much

23   faster than larger companies.

24     Q.   In any event, you said you decided to go

25   forward with the attempt to negotiate a contract

Unsigned

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2        MR. CAPLAN:  Thank you.

3        A.   Without looking through it page by page

4    carefully, it does appear to be that agreement.

5        Q.   Okay.  And does your signature appear on

6    page 26 of the agreement?

7        A.   Yes, it does.

8        Q.   Okay.  And was that signature entered onto

9    the agreement on or about June 5, 2006?

10       A.   It appears that way.

11       Q.   And do your initials appear on pages of

12   this agreement?

13       A.   On all pages?

14       Q.   Let's start off with "pages."

15            On any page of the agreement, and then

16   we'll go from one to here.

17       A.   Yes.

18       Q.   And what does your initials signify when

19   it appears?

20       A.   That I have read through the page and

21   agreed with it.

22       Q.   Okay.  And do your initials in fact appear

23   on every page of the agreement, including the

24   annexes and attachments?

25       A.   All except the signature page.

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2       Q.  And the signature page of course has the

3    signature.

4          Now, does someone else's initials appear

5    on that agreement?

6       A.  Yes.

7       Q.  And whose initials are those?

8       A.  I believe that is Harry Rimmer's.

9       Q.  And do Harry Rimmer's initials appear on

10   every page of the agreement?

11      A.  All except the signature page, obviously,

12   and it does not -- Harry Rimmer's initials do not

13   appear on Attachment 1 to Annex 1.

14      Q.  And Attachment 1 to Annex 1, is that the

15   timetable for the HT project?

16      A.  Yes.

17      Q.  Do you recall why Mr. Rimmer did not

18   initial that particular page?

19      A.  I'm seeing this for the first time on this

20   copy.

21      Q.  Have you seen another copy with his

22   initials on it?

23      A.  Never paid any attention to it.  I may

24   have.

25      Q.  Let's see if I can try to refresh your

Unsigned

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2    recollection, and maybe this will work, maybe it

3    won't.

4        Could you turn to Annex 2.

5        A.   (Witness complies.)

6        Q.   And do you see where in the last bullet it

7    makes reference --

8        A.   Hold on.  I'm not there yet.  Sorry.

9        Q.   I'm sorry.

10       A.   Here we go.

11       Q.   Do you see in the last bullet in Annex 2,

12   it makes reference to a development timetable for

13   the NP product?

14       A.   Yes.

15       Q.   And it says that the NP product timetable

16   was to be delivered by PointCare by June 30th, 2006.

17       Do you see that?

18       A.   I do see that.

19       Q.   Was that timetable delivered by June 30,

20   2006?

21       A.   To the best of my recollection, it was

22   not.

23       Q.   Do you recall when it was delivered?

24       A.   It was later than that, but I don't recall

25   the exact time frame.

Petra Krauledat

1          P. KRAULEDAT - 4/4/08

2    United States prior to receiving the FDA approval?

3        A.  No, it does not mean that.

4        Q.  Under what circumstances can you sell in

5    the United States prior to receiving FDA approval?

6        A.  You have to label the product "For

7    research use only."

8        Q.  And was that the labeling change that you

9    were referring to, or was that some other labeling

10   change?

11       A.  Some other labeling change.

12       Q.  What was that other labeling change?

13       A.  We decided to change the name of the

14   product from AuRICA Now to PointCare Now.

15       Q.  And that reminds me of a question that I

16   meant to ask you before.

17          Why was the AuRICA named the AuRICA?

18       A.  It's an acronym for the technology used.

19   Don't make me say it.  I don't remember it.

20       Q.  It had something to do with "Au" being the

21   chemical designation of gold, correct?

22       A.  That is correct.

23       Q.  And why then did you make the decision to

24   change this particular product from what we're

25   calling the AuRICA Now to the PointCare Now?

Petra Krauledat

1                P. KRAULEDAT - 4/4/08

2        A.  It was marketing feedback.

3        Q.  And who was giving you this marketing

4    feedback?

5        A.  Customers.

6        Q.  And what was the nature of the feedback?

7        A.  They were confused.

8        Q.  Because of the prior AuRICA product?

9        A.  Yes.

10       Q.  And since it has been released to the

11   market, how many of these NP machines have you been

12   able to sell?

13           MR. CAPLAN:  This is attorneys' eyes only.

14           MR. COSTANTINI:  Even the number?  I can

15       understand the next question, to whom.  But,

16       okay.  Attorneys' eyes only.  I'll kick my

17       friends out.

18           Except for you.  You're my friend that can

19       stay.

20           (Mr. DePiano, Ms. Almeida-Halassa and Mr.

21   Matuszak leave the conference room.)

22           (Following portion deemed confidential.)

23

24

25

Petra Krauledat

1          P. KRAULEDAT - CONFIDENTIAL - 4/4/08

2          (Continued from non-confidential portion

3      of the transcript.)

4          THE WITNESS:  Can you just quickly repeat

5      it.

6          THE REPORTER:  And since it has been

7      released to the market, how many of these NP

8      machines have you been able to sell?

9          (The last question was read back by the

10     Reporter.)

11     A.   Approximately 125.

12     BY MR. COSTANTINI:

13     Q.   And are there -- 125 units have been sold

14     and delivered?

15     A.   Yes.

16     Q.   And to whom have these products been sold

17     and delivered?

18     A.   Distributors and NGOs, nongovernment

19     organizations.

20     Q.   I don't want to go through each one of

21     them, but what are the three biggest NGO sales?

22     A.   Can you rephrase that question.  What do

23     you mean?

24     Q.   Of the NGO sales -- have there been some

25     multi-unit sales to NGOs?

Unsigned

Petra Krauledat

P. KRAULEDAT - CONFIDENTIAL - 4/4/08

1

2      A.  Yes.

3      Q.  Okay.  Of those multi-unit sales, can you

4   tell me to whom the three largest sales have been

5   made?

6      A.  The American Center for Disease Control.

7      Q.  How many units have been sold to them?

8      A.  I don't know the exact number.

9         The Catholic Relief Services.

10     Q.  And do you know the number there?

11     A.  No.

12        And I believe it's Family Health

13   International, but I can't be sure of that.

14     Q.  Where are each of these entities located?

15     A.  They're all multi-national.

16     Q.  Do they have a central office?

17     A.  Yes.

18     Q.  And the first one is the American Center

19   for Disease Control.

20        Is that what you said?

21     A.  Yes.

22     Q.  And where is the American Center for

23   Disease Control's main office located?

24     A.  I believe it's in Atlanta, Georgia.  In

25   the US.

Petra Krauledat

1          P. KRAULEDAT - CONFIDENTIAL - 4/4/08

2          Q.  And the Catholic Relief Services, where is

3     their main office located?

4          A.  I actually don't know.

5          Q.  I always thought it was New York, because

6     that's who solicits money from me, but ...

7          A.  I don't know.

8          Q.  Well, did you have a face-to-face meeting

9     with someone from Catholic Relief Services?

10         A.  Yes.

11         Q.  Where did that meeting take place?

12         A.  In Nairobi.

13         Q.  Nairobi, Kenya?

14         A.  Nairobi, Kenya, yes.

15         Q.  And, I'm sorry, the international

16    organization that you mentioned?

17         A.  Family Health International.

18         Q.  Where is their main office?

19         A.  I don't know either.

20         Q.  Do you have a belief?

21         A.  Not even that.

22         Q.  Is there a place where you met with their

23    representative?

24         A.  Yes.

25         Q.  Where was that?

Petra Krauledat

1          P. KRAULEDAT - CONFIDENTIAL - 4/4/08

2      A.  In Dar Es Salaam, Tanzania.

3      Q.  The next group of sales, you said there

4   was a number of sales to distributors?

5      A.  That's right.

6      Q.  How many distributors?

7      A.  Five.

8      Q.  And who are those five distributors?

9      A.  Phillips Pharmaceuticals.

10     Q.  And where is Phillips based?

11     A.  In Nairobi, Kenya.

12         Pantech, P-A-N-T-E-C-H.  GSS.  Biomedical

13   International.

14     Q.  Where is Biomedical located?

15     A.  Miami, Florida.

16     Q.  And the entity -- the Pantech organization

17   that you mentioned earlier, where are they located?

18     A.  Johannesburg, South Africa.

19         And OmniMet.

20     Q.  And where is OmniMet located?

21     A.  Also Johannesburg, South Africa.

22     Q.  I think that brings us up to four.

23     A.  GSS.

24     Q.  That's a separate one?

25     A.  Yes.

Unsigned

Petra Krauledat

1          P. KRAULEDAT - CONFIDENTIAL - 4/4/08

2       Q.  I thought you were helping her spell it.

3       A.  No, no.  That's a company.

4       Q.  Where is GSS located?

5       A.  The Democratic Republic of Congo.

6       Q.  Now, I understand that you're contending

7   that this agreement that we've been looking at is

8   null and void, but would some of these sales fall

9   within Drew territories?

10        MR. CAPLAN:  Objection.

11      A.  No.

12      Q.  So if -- to take an example, if I'm

13  correct that Catholic Relief Services, based here in

14  New York, you believe that it would still be an

15  appropriate sale for PointCare to make rather than

16  something they should turn over to Drew?

17      A.  Yes.

18      Q.  And what is your basis for that conclusion

19  under the contract?

20      A.  The language in the contract.

21      Q.  What particular language are you referring

22  to?

23      A.  The co-marketing annex.

24      Q.  Which says that Drew is the marketing

25  leader in the United States?

Petra Krauledat

1          P. KRAULEDAT - CONFIDENTIAL - 4/4/08

2          MR. CAPLAN:  Objection.

3          Q.  Is that what you were referring to?

4          A.  That's not what I'm referring to.

5          Q.  I'm sorry?

6          A.  That's not what I'm referring to.  I said

7     the co-marketing annex.

8          Q.  The co-marketing annex.

9             Could you point out the -- I was thinking

10    that you were referring to Annex 3, Sales and

11    Marketing Territories, but perhaps you were

12    referring to something else, so let -- why don't I

13    just ask you what annex you're referring to.  That

14    would be the easiest way.

15         A.  Take the exhibit and check the annex

16    number.

17            (Witness reviews document.)

18         A.  Yes, it is Annex 3.

19         Q.  Under the terms of Annex 3, who is the

20    market leader in the United States?

21         A.  Drew.

22         Q.  And PointCare would be the supporter under

23    this agreement, correct?

24         A.  That's correct.

25         Q.  And the supporter is required to properly

Unsigned

Petra Krauledat

```
1          P. KRAULEDAT - CONFIDENTIAL - 4/4/08

2     refer all sales leads -- the leads from the market

3     leader's territories to the market leader, correct?

4          A.  Yes.

5          Q.  Now, is there a carve-out or an exception

6     for the type of sale to an organization like

7     Catholic Relief Services?

8          A.  Yes.

9          Q.  And where is the language that you're

10    referring to here?

11         A.  It is bullet point 6.

12         Q.  Okay.  Gotcha.  I understand what you're

13    contending.

14             But that's what permits a sale to an NGO?

15         A.  That's correct.

16         Q.  Okay.  And where it is -- well, what is an

17    NGO, exactly?

18             MR. CAPLAN:  Objection.

19         A.  It's a nongovernment organization.

20         Q.  What does that mean?  I mean, Duane

21    Morris, my law firm, is a nongovernment

22    organization.  Do we qualify as an NGO?  Can I buy

23    any products from you?

24         A.  That was two questions at once.

25         Q.  Well, the second one is being facetious.
```

Unsigned

Petra Krauledat

1          P. KRAULEDAT - CONFIDENTIAL - 4/4/08

2          I'm trying to get an understanding of what

3    NGO means over above what the words mean.

4          A.  An NGO is generally considered any

5    organization that is not the government itself of

6    any given country.

7          Q.  Would it refer to any corporate entity?

8          A.  No.  It's a noncorporate entity.

9          Q.  A known corporate entity?

10         A.  A noncorporate entity.

11         Q.  I see.

12         Does it have to have a particular function

13   or purpose, such as a not-for-profit organization or

14   something like that?

15         A.  I don't know exactly.

16         Q.  Okay.  The -- moving back to that

17   Exhibit 4, that timetable that we looked at, do you

18   know who prepared that timetable?

19         I think it's the last two or three pages

20   of Exhibit 4.

21         A.  I don't know.

22         Q.  Would a timetable like that be something

23   that you would ordinarily review in carrying out

24   your responsibilities as chief executive officer?

25         A.  No.

Unsigned

Petra Krauledat

1              P. KRAULEDAT - 4/4/08

2         You're anticipating my next question.

3    A.  Not assigned on the piece of paper.  Did I

4    get that right?

5    Q.  Yes.

6    A.  Okay.

7         No.  Yes, I see that.

8    Q.  Were those tasks ever assigned?

9    A.  To the best of my knowledge, they were.

10   Q.  Okay.  And was that assignment documented

11   in any place?

12   A.  To the best of my knowledge, it was.

13   Q.  Where was it documented?

14   A.  One document I recall specifically was a

15   time line in a letter that Mr. DePiano sent to me

16   sometime last year.

17   Q.  Was it in the latter part of the year?

18   A.  Yes.

19   Q.  And --

20   A.  There may have been others.

21   Q.  Other than that document, do you

22   specifically recall any other documentation of

23   assignments?

24        MR. CAPLAN:  Assignments concerning the

25        unassigned functions on this page?

Unsigned

Petra Krauledat

1                P. KRAULEDAT - 4/4/08

2          MR. COSTANTINI:  Yes.  The bottom half of

3      the page from "integration of system" downward.

4          MR. CAPLAN:  Okay.

5      A.  I do recall some having seen some other

6      documents, but not that specifically.

7      Q.  Okay.  So the only specific document that

8      you recall was the one that was attached to one of

9      Mr. DePiano's letters, correct?

10     A.  At this time, yes.

11     Q.  And you believe there was another one, but

12     you can't be more helpful in terms of your

13     recollection than you just bore in your testimony,

14     correct?

15     A.  I think there was more than one that I

16     have seen, but I can't be more helpful with regard

17     to detail.

18     Q.  Did you ever see any document where any

19     aspect of software integration was a Drew function?

20     A.  Document.

21         I don't specifically recall one.

22     Q.  Could I turn your attention to Annex 1.

23     A.  (Witness complies.)

24         Yes.

25     Q.  And turn your attention to the bottom half

                        Unsigned

Petra Krauledat

1                P. KRAULEDAT - 4/4/08

2       of the page which talks about PointCare's

3       responsibilities under Annex 1.

4              Do you see that, Doctor?

5       A.   Yes.

6       Q.   The first bullet where it says, "PointCare

7    is responsible for" -- I'm not going to read the

8    whole thing, but basically it says "responsible

9    for" -- I'll read the whole thing.

10             "PointCare is responsible for and will

11   bear the costs associated with and related to the

12   development and approval for sale in the United

13   States of PointCare's CD4SURE Lymphocyte Enumeration

14   assay that will be compatible with Drew's HTc and

15   HTw diagnostic instrumentation platforms."

16          Do you see that?

17      A.   I do.

18      Q.   What in your view was PointCare required

19   to do to carry out that responsibility?

20      A.   It was required to adjust its assay to the

21   requirements of the optical subsystem of the HT

22   unit, the HT instrument.  It was required to test --

23   to develop all other -- all test components to the

24   point that they were manufacturable and stable as to

25   the specification given in the agreement.

Unsigned

1

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4        -------------------------------X

5     DREW SCIENTIFIC, INC.,

6              Plaintiff,    Case No. 08 CV 1490-AKH

         -vs-

7     POINTCARE TECHNOLOGIES, INC.,

8              Defendants.

9        -------------------------------X

10

11            DEPOSITION OF FRANCIS MATUSZAK

12               New York, New York

13                  March 28, 2008

14

15

16

17

18

19

20

21     Reported by:

       Bonnie Pruszynski, RMR

22     JOB NO. 15874

23

24

25

Frank Matuszak

1                    F. Matuszak

2        Q    Each one of them stands up and gives

3    a report?  It's not, they don't have one

4    manufacturing person give a consolidated report?

5        A    Yes.  They would.  Each individual

6    would give their status on their manufacturing

7    facility.

8        Q    I'm going to skip ahead and move

9    back.

10           At some point after -- strike that.

11           At Drew, who was in charge of product

12   development concerning the HT in the

13   Drew/PointCare relationship at the beginning?

14       A    What is the beginning?

15       Q    I thought I could jump forward and go

16   backwards.

17           Why don't we get to that?

18           You told us the first time you heard

19   of PointCare was in or about November of '05?

20       A    Yes.

21       Q    What was that event?

22       A    Medica, M-E-D-I-C-A.

23       Q    Where did that take place?

24       A    Düsseldorf.

25       Q    And what happened there concerning

Unsigned

Frank Matuszak

1                F. Matuszak

2     PointCare?

3         A     We met with Dan O'Connor, and we

4     meaning, the first meeting was with Roger Borray

5     and Dan O'Connor.  I was not involved in it.

6             I think subsequent, during that week,

7     we came to meet Petra Krauledat and Peter Hansen,

8     and I believe our meeting was Roger Borray from

9     Drew, Harry Rimmer and myself.

10            MR. COSTANTINI:  Off the record.

11            (Discussion held off the record.)

12    BY MR. CAPLAN:

13        Q     At the time of the Medica conference,

14    what was Roger Borray's position at Drew?

15        A     I don't know his exact title.

16        Q     What was his area?

17            MR. COSTANTINI:  You mean what

18    function did he perform?

19        Q     Sure.

20        A     I would say the best wording would be

21    business development.

22        Q     So, you permanently met with Peter,

23    Petra and Harry Rimmer and yourself at Medica?

24        A     Yes.

25        Q     Anyone else at the meeting?

Frank Matuszak

1                F. Matuszak

2       A    Can you repeat the names?

3       Q    Krauledat, Hansen, Rimmer, Matuszak.

4       A    And Roger Borray.  I can't be certain

5    whether or not Dan O'Connor was there.  I believe

6    he was not.

7       Q    What was the purpose of this meeting?

8       A    Dan O'Connor had said the purpose of

9    the meeting to be that this company, PointCare,

10    was looking for a quick -- an instrument to bring

11    in quickly to the market to do CD4, CD4 percent

12    measurement.

13       Q    And who was Mr. O'Connor at the time?

14       A    He worked at PointCare.  Yes, he did.

15       Q    What was his title or function?

16       A    I think it was business development.

17       Q    Did he explain to you or was it

18    explained at this meeting why PointCare was

19    looking to quickly bring an instrument to the

20    market?

21       A    I don't know if that was expressed in

22    the first sets of meetings.

23       Q    Well, when he said that PointCare was

24    looking to quickly bring an instrument to the

25    market, did you understand what the urgency was?

Unsigned

Frank Matuszak

1                F. Matuszak

2     A    The urgency as it pertains to what?

3     Q    To why it was urgent for them.

4         MR. COSTANTINI:  He didn't say it was

5     urgent.  He said they wanted to do it

6     quickly, that is different from urgently.

7     Q    Did you understand why they wanted to

8     get a product to the market quickly?

9     A    I don't think at the initial meetings

10    that that was expressed to us.

11    Q    Was it explained to you at some

12    point?

13    A    Yes.

14    Q    What was the explanation given?

15    A    The explanation was that PointCare

16    had a handshake agreement with Idexx Laboratories,

17    and that Idexx Laboratories was significantly

18    increasing their price to PointCare.

19    Q    Connect the dots.  So why did that --

20    A    The price increase, as we were told

21    from PointCare, was unacceptable in their point of

22    view and, therefore, they needed to look for

23    alternate suppliers.

24    Q    And they needed an alternate supplier

25    quickly?

Unsigned

Frank Matuszak

1                  F. Matuszak

2      A    Yes.

3      Q    Who explained that to you?

4      A    I think all three, Dan O'Connor,

5    Petra Krauledat and Peter Hansen at various times.

6      Q    At various times prior to the parties

7    signing their written agreement?

8      A    Yes.

9      Q    So, prior to signing the agreement,

10   at various times O'Connor, Krauledat and Hansen

11   explained to you that PointCare needed to find a

12   new supplier, who could help them quickly get an

13   instrument to market; correct?

14     A    Yes.

15     Q    They did express that it was of some

16   urgency to PointCare to enter a relationship with

17   a supplier who could get an instrument to market

18   quickly; correct?

19     A    Yes.

20     Q    And before signing the contract with

21   PointCare, you understood that getting a new

22   instrument to market quickly was important to

23   PointCare?

24     A    Yes.

25     Q    That was one of the reasons that they

Unsigned

Frank Matuszak

1                F. Matuszak

2    were signing the contract with Drew?

3        A    That was not evident when the

4    contract was signed, given the time frame that it

5    took to execute the agreement.

6        Q    You understood, from your discussions

7    leading to the signing of a contract, that

8    PointCare's objective was to contract with a

9    supplier who would help them quickly get a product

10   to market; correct?

11       A    Can you repeat the question?

12       Q    No.

13           (Record read.)

14       A    Can you rephrase that?

15       Q    I will try.  Fair enough.

16           You understood -- strike that.

17           Prior to signing a written agreement

18   with PointCare, you understood from discussions

19   with Dan O'Connor, Peter Hansen and Petra

20   Krauledat that PointCare's objective in reaching

21   an agreement with a new supplier was to quickly

22   get a new instrument to market; correct?

23       A    Yes.  However, as I mentioned, given

24   the time that it took to negotiate the agreement,

25   that did not become -- that time frame became less

Frank Matuszak

1              F. Matuszak

2        A    Yes.  And the reason why we asked for

3   it was we were providing R&D for the HT at no

4   cost.  So, in exchange for our investment in the

5   R&D of the HT, we were also getting another

6   product to sell.

7        Q    So, Drew was underwriting some

8   portion of the R&D for the HT; right?

9        A    I wouldn't say underwriting the R&D,

10   but what I would say is we were looking to

11   increase sales with both products, because they

12   were both complimentary and competitive based on

13   the features that each one offered.

14        Q    I think you described, in general

15   terms, the bargain that was struck was that Drew

16   would put money into research software and

17   development in the HT and, in return, it would get

18   certain rights to market, sell and distribute the

19   NP that PointCare and C2 were going to bring to

20   market; right?

21        A    Yes.

22        Q    And did Drew put any R&D money,

23   effort, time, energies into the NP, to your

24   knowledge?

25        A    Not to my knowledge.

Frank Matuszak

1                    F. Matuszak

2        Q    To your knowledge, did Drew

3    contribute anything to the development, to

4    PointCare and C2's development of the NP?

5        A    Not to my knowledge.

6        Q    I think you testified that the HT and

7    the NP were, in some respects, intended to be

8    complimentary and in some respects competitive;

9    correct?

10       A    Well, they were not intended to be

11   competitive.  They just happened to also be

12   competitive because of the features that they

13   offer.

14           MR. COSTANTINI:  There was no intent

15       in his answer.  He just made a statement

16       that they were complimentary and

17       competitive.

18       Q    Is it your opinion that these

19   instruments were or would be competitive in some

20   respects?

21       A    Yes.

22       Q    What do you mean when you say that?

23       A    Due to the fact that they ran,

24   basically, the same battery of tests.

25       Q    Were they intended to serve the same

1          F. Matuszak

2    or different markets?

3       A    There is crossover.

4       Q    What is the crossover?

5       A    Can you explain the question or

6    rephrase it?

7       Q    What did you mean when you said there

8    was crossover?

9       A    Obviously, the two had features that

10   were similar, and that there would be customers

11   that would look at both, and if one was available

12   over the other, they would be happy taking either

13   one of them.

14      Q    Did you develop a marketing or

15   distribution plan for the HT instrument?  Did Drew

16   have one?

17      A    We have a general marketing plan for

18   all -- for the entire company.

19      Q    So, you have one for every product --

20      A    It's in a document.

21      Q    What is that document called?

22      A    It's called a marketing plan.

23      Q    Did you come up with that?

24      A    Yeah.  That's why they pay me big

25   bucks.

Frank Matuszak

1              F. Matuszak

2        Q    And is that marketing plan updated on

3    a -- updated from time to time?

4        A    I believe I do it on a somewhat

5    yearly basis.

6        Q    You are the author of the Drew

7    marketing plan?

8        A    Yes.

9        Q    You own it, corporately speaking.

10        A    Yeah.  It's nothing that -- it's not

11    formal.  It's one that I use as my direction.

12        Q    And have you had a written marketing

13    plan in place throughout the time that Drew and

14    PointCare inked their contract?

15        A    Well, yes.  Because I have kept it

16    for the time I have been here, that -- yeah, it

17    would be available.

18        Q    And does your Drew marketing plan

19    include a section concerning the HT?

20        A    I haven't reviewed it recently.  It's

21    due for review and I don't recall.

22        Q    At any point in time has your

23    marketing plan at Drew included a section on the

24    HT?

25        A    I don't recall.

Unsigned

Frank Matuszak

1                F. Matuszak

2    right?

3       A    Yes.

4       Q    So, when you were anticipating being

5    able to sell HTs and being able to sell NPs, were

6    there any places that you -- places or markets or

7    types of customers that you intended to sell the

8    NP that you thought it would be a better, more

9    saleable product than the HT?

10      A    Yeah.  Smaller volume accounts.

11      Q    Why do you say that?

12      A    Just because it's a smaller volume

13   analyzer.

14      Q    So, when you say smaller volume

15   accounts, what does "smaller volume" refer to?

16      A    Probably anyone running -- our

17   definition or my definition was anyone doing

18   probably less than five CD4's a day.

19      Q    So, smaller volume refers to the

20   amount of tests run on the machine; correct?

21      A    Right.

22      Q    It doesn't refer to that it was a

23   smaller volume customer for you?

24      A    Exactly.  By default it would be.

25      Q    Right, because tests are products?

Unsigned

1                    F. Matuszak

2        A    Yes.

3        Q    And as a salesperson, thinking about

4    how you might most fruitfully sell NP's and sell

5    HTs, were you aware of any advantages that the NP

6    had in terms of its ability to operate effectively

7    outside of hospital settings and doctors' offices

8    where there is electricity and trained staff and

9    all the niceties that we have in our western

10   hospitals?

11       A    Can you repeat the question?

12           (Record read.)

13       A    It's a difficult question to answer.

14   Due to the fact before, as you mentioned, there is

15   a somewhat competitive versus feature tradeoff,

16   and until you actually talk to the customers, and

17   visit with them and find out what their needs are,

18   you can't accurately or appropriately market a

19   specific product.  You need to really know what

20   their needs are, first, and then say, okay, this

21   is your -- this is the best product.

22           For instance, a resource-poor area

23   may need also a hematology analyzer, and in which

24   case the HT would have been the better one to

25   recommend, even though the NP was designed to be

Unsigned

Frank Matuszak

1                    F. Matuszak

2      in resource poor areas.

3      Q      Has Drew ever conducted any market

4      research concerning the NP?

5      A      We have visited accounts in our

6      areas, and we have distributors that have fed back

7      information to us about the interest, the tests

8      that they would like to run.  And we have also

9      identified in the U.S. two key users that are

10     currently using reference labs and are spending

11     quite a lot of money.  So, we do have quite a few

12     leads surrounding that.

13     Q      Shifting gears, I will show you the

14     contract again, and I will show you attachment one

15     to annex one, the timetable for the HT

16     development.

17            I direct your attention to the

18     timeline.  Do you see the very last entry is the

19     conservative release to market day of July 27 of

20     2007?

21     A      Yes.

22     Q      Last line at the bottom of the page.

23            When this contract was signed, did

24     you have an expectation of when you would be able

25     to sell HT's?

                    Unsigned

Frank Matuszak

1                 F. Matuszak

2        A    Yes.

3        Q    What was your expectation?

4        A    In terms of units forecasted, I

5    believe we forecasted units to be shipped in the

6    second calendar quarter of '07, second to third.

7               So, it -- based on my assumptions,

8    with this date I forecasted products for this

9    date.  I have no other knowledge around the

10   development timeline, other than if I look at this

11   last date, this is when I start forecasting sales

12   of instruments.

13       Q    As the VP of sales for Drew, you

14   relied upon this forecast date in making your

15   business plans about when you would be able to

16   sell an HT; right?

17       A    As I mentioned, we forecasted sales

18   around this date.

19       Q    And we all know the schedule wasn't

20   met; right?

21       A    Likewise, we did the same for the NP,

22   and that wasn't met, either.

23       Q    If we could stick with my question.

24   The schedule for the HT wasn't met; right?

25       A    Yes.

Frank Matuszak

1                    F. Matuszak

2    was always an animosity between marketing and R&D

3    in almost any company I have ever been.  I don't

4    think I have ever heard of a project that has been

5    released as fast as sales would want it.  I,

6    myself, may be personally biased due to the --

7        Q    He didn't meet what you were looking

8    for in a director of R&D, fair enough?

9        A    Yes, as I mentioned, from a vision

10   standpoint.

11       Q    And when was he director of R&D at

12   Drew until?

13       A    I don't know the exact date.

14       Q    Best recollection.

15       A    I couldn't even give you --

16       Q    '06 or '07?

17       A    It was a process due to the laws in

18   the U.K.  It wasn't something that was a --

19       Q    It took a while to get rid of him.

20       A    Yes.

21           MR. COSTANTINI:  I was going to say

22   I'm not sure whether you want title or

23   responsibility.

24       A    Responsibility.

25           MR. COSTANTINI:  Responsibilities

Frank Matuszak

1                    F. Matuszak

2      ended long before his title.

3        Q      When was Mr. Kinney relieved of his

4      responsibilities as director of R&D at Drew?

5        A      I believe -- well, let's be specific

6      for HT.

7        Q      Fair enough.

8        A      Because Dr. Hansen requested this of

9      Rich DePiano Sr., and I believe it was -- it was

10     with immediate effect, if not.

11       Q      When?

12       A      I think the e-mail was in the end of

13     December '06, and I think we were moving pretty

14     quickly right after that.

15       Q      Did Dr. Hansen complain that the

16     development of the HT was behind schedule due to

17     Mr. Kenny's failures to move the project forward?

18       A      I don't think it was that.  I think

19     it was -- that Dr. Hansen wanted some more direct

20     input with the engineering and did not want

21     filter; that was the recollection of, I believe,

22     his e-mail to me, but I can't be for sure.

23       Q      You don't recall him raising an issue

24     about progress along a timeline relative to

25     Mr. Kenny's skill set.

                           Unsigned

Frank Matuszak

1              F. Matuszak

2      A    No.  But if you have something that

3   could refresh my memory, I would be happy to --

4          MR. COSTANTINI:  I know we produced

5      his e-mail to you.  I am sure you produced

6      it, too.  It's someplace out there.

7          MR. CAPLAN:  If I brought 70,000

8      pieces of paper to me, I wouldn't be able to

9      move from point A to point B.

10      Q    Did you make it a point to keep in

11   touch with Gary Young from that point forward to

12   keep tabs on the progress of the HT development?

13      A    From that point, it was more on an ad

14   hoc basis.  So, if I was in Dallas, I would peak

15   my head in see how things were going.

16          Occasionally, I would get -- I think

17   the last e-mail we got regarding delays from

18   Andrew Kenny was related to software development

19   at PointCare.

20          So, after that time, I did not get as

21   many regular updates about problems that were

22   being encountered, and it was more, as I

23   mentioned, stopping in and kind of hearing things

24   and getting feedback from various people, various

25   people, but nothing formal.

Unsigned

Frank Matuszak

1                    F. Matuszak

2        A     That all of the problems resulting

3    around the gold particle deposits, that we were

4    able to come to solutions and fix those problems.

5        Q     Were any and all problems with the HT

6    hardware fixed at this point to your knowledge?

7        A     Yes, I believe -- well, as best as we

8    can determine.

9        Q     And since are you not the technical

10    guy, did you figure that out or did someone tell

11    you that?

12        A     Somebody else basically conveyed to

13    me.

14        Q     Who is the technical person that told

15    you that?

16        A     Well, I think at this time we

17    probably would have gotten some data on -- from

18    Herb Chow, but I am not sure of the dates.  But I

19    would have probably seen that and concluded that

20    things started looking, were starting to look

21    good.

22        Q     Do you consider within your expertise

23    to read Herb Chow's report and to interpret what

24    it's telling you?

25        A     I mean, from some of my field

Frank Matuszak

```
1              F. Matuszak

2       A     That all of the problems resulting

3    around the gold particle deposits, that we were

4    able to come to solutions and fix those problems.

5       Q     Were any and all problems with the HT

6    hardware fixed at this point to your knowledge?

7       A     Yes, I believe -- well, as best as we

8    can determine.

9       Q     And since are you not the technical

10   guy, did you figure that out or did someone tell

11   you that?

12      A     Somebody else basically conveyed to

13   me.

14      Q     Who is the technical person that told

15   you that?

16      A     Well, I think at this time we

17   probably would have gotten some data on -- from

18   Herb Chow, but I am not sure of the dates.  But I

19   would have probably seen that and concluded that

20   things started looking, were starting to look

21   good.

22      Q     Do you consider within your expertise

23   to read Herb Chow's report and to interpret what

24   it's telling you?

25      A     I mean, from some of my field
```

Frank Matuszak

1              F. Matuszak

2     engineering experience, I could read some of it

3     and say, okay.  There are some conclusions that he

4     reached that, obviously, I could understand and

5     say, yeah, that looks good.  The whole, the whole

6     piece of it; probably not.

7        Q     The last paragraph of that e-mail

8     that you wrote to Doug Nickols, you told him "just

9     keeping you up-to-date and, hopefully, PointCare

10    backs down."

11             What did that refer to?

12       A     Well, by this time things had really

13    just blown up totally.

14       Q     I was there.

15       A     And, really, all we wanted to do was

16    get things moving, get things selling and,

17    hopefully, we could come to a mutual agreement,

18    and the relationship probably wouldn't be the way

19    it was, but at least we could start selling and

20    moving things along.

21       Q     To your understanding, was Drew open

22    to the possibility of reaching a new, mutually

23    agreeable agreement at that time?

24       A     At some point in that era, yes.

25       Q     And then continuing on that sentence,

1              F. Matuszak

2     engineering experience, I could read some of it

3     and say, okay.  There are some conclusions that he

4     reached that, obviously, I could understand and

5     say, yeah, that looks good.  The whole, the whole

6     piece of it; probably not.

7        Q    The last paragraph of that e-mail

8     that you wrote to Doug Nickols, you told him "just

9     keeping you up-to-date and, hopefully, PointCare

10    backs down."

11             What did that refer to?

12       A    Well, by this time things had really

13    just blown up totally.

14       Q    I was there.

15       A    And, really, all we wanted to do was

16    get things moving, get things selling and,

17    hopefully, we could come to a mutual agreement,

18    and the relationship probably wouldn't be the way

19    it was, but at least we could start selling and

20    moving things along.

21       Q    To your understanding, was Drew open

22    to the possibility of reaching a new, mutually

23    agreeable agreement at that time?

24       A    At some point in that era, yes.

25       Q    And then continuing on that sentence,

1              F. Matuszak

2    you say, "hopefully PointCare backs down, but we

3    should, in the meantime, also find another

4    manufacturer of gold antibodies for CD4."

5              What did you mean there?

6       A    We invested a lot of time in our

7    development of the HT, and if we weren't going to

8    be able -- it seemed like it was going to the

9    point where we weren't even going to be able to

10   get gold reagent; that we should at least be able

11   to run an assay using gold reagent.

12      Q    And at that time, you understood that

13   the gold reagent for CD4 was proprietary to

14   PointCare; right?

15      A    No.  When we were at Medica, we found

16   multiple vendors of gold reagent.  So, gold

17   reagent is a known commodity.

18      Q    From -- by whom?

19      A    I don't know.  I don't have any

20   direct knowledge of who.

21      Q    I thought you said at Medica you

22   found a bunch of folks who could sell it to you.

23      A    Yeah.  Roger Borray had met with some

24   and told me, yeah, we could probably do this.

25      Q    So, it's your understanding that here

Unsigned

Frank Matuszak                                                            303

1              F. Matuszak

2      you say, "hopefully PointCare backs down, but we

3      should, in the meantime, also find another

4      manufacturer of gold antibodies for CD4."

5              What did you mean there?

6      A      We invested a lot of time in our

7      development of the HT, and if we weren't going to

8      be able -- it seemed like it was going to the

9      point where we weren't even going to be able to

10     get gold reagent; that we should at least be able

11     to run an assay using gold reagent.

12     Q      And at that time, you understood that

13     the gold reagent for CD4 was proprietary to

14     PointCare; right?

15     A      No.  When we were at Medica, we found

16     multiple vendors of gold reagent.  So, gold

17     reagent is a known commodity.

18     Q      From -- by whom?

19     A      I don't know.  I don't have any

20     direct knowledge of who.

21     Q      I thought you said at Medica you

22     found a bunch of folks who could sell it to you.

23     A      Yeah.  Roger Borray had met with some

24     and told me, yeah, we could probably do this.

25     Q      So, it's your understanding that here

Unsigned

Frank Matuszak

1                    F. Matuszak

2      you were referring to the availability of gold

3      antibodies for CD4, other than PointCare's

4      proprietary assay?

5          A      But our understanding was that we

6      wouldn't be infringing on any proprietary

7      information that PointCare had.

8          Q      That is not quite my question.  I'm

9      asking for you to explain what you meant here when

10     you wrote that "Drew should find another

11     manufacturer of gold antibodies for CD4."

12                 Is it your testimony that you meant

13     that someone at Drew had told you that there were

14     other gold antibodies for CD4 that other folks

15     were manufacturing and you could go buy from them?

16         A      Yes.

17         Q      And who told you that?

18         A      I believe Roger Borray had mentioned

19     it to us.

20         Q      When did he tell you that?

21         A      Probably sometime after Medica in

22     '07.

23         Q      And then at the end of the sentence

24     you say, "that Drew should also find out if we can

25     get the accelerant analyzed to see what is in it."

Unsigned

Frank Matuszak

1              F. Matuszak

2      you were referring to the availability of gold

3      antibodies for CD4, other than PointCare's

4      proprietary assay?

5          A      But our understanding was that we

6      wouldn't be infringing on any proprietary

7      information that PointCare had.

8          Q      That is not quite my question.  I'm

9      asking for you to explain what you meant here when

10     you wrote that "Drew should find another

11     manufacturer of gold antibodies for CD4."

12             Is it your testimony that you meant

13     that someone at Drew had told you that there were

14     other gold antibodies for CD4 that other folks

15     were manufacturing and you could go buy from them?

16         A      Yes.

17         Q      And who told you that?

18         A      I believe Roger Borray had mentioned

19     it to us.

20         Q      When did he tell you that?

21         A      Probably sometime after Medica in

22     '07.

23         Q      And then at the end of the sentence

24     you say, "that Drew should also find out if we can

25     get the accelerant analyzed to see what is in it."

Unsigned

Frank Matuszak

1              F. Matuszak

2      What did you mean by that.

3      A    To do an analysis.

4      Q    What accelerant?

5      A    I'm not technical.

6      Q    I didn't mean that technically.

7          A PointCare accelerant.

8      A    I'm not entirely sure if it was a

9      PointCare accelerant or if there were other

10     accelerants out in the market.

11     Q    The accelerant that Drew had

12     anticipated using for the HT was a PointCare

13     accelerant; right?

14         MR. COSTANTINI:  If he knows.

15     Q    Please don't tell me anything you

16     don't know, sir.

17     A    It may have been a PointCare

18     accelerant.

19     Q    And you understood at the time that

20     PointCare's accelerant was proprietary to it;

21     right?

22     A    Yes.

23     Q    And you were suggesting to

24     Mr. Nickols that Drew should find out if it could

25     analyze the accelerant and see what's in it so

Unsigned

Frank Matuszak

1                    F. Matuszak

2    What did you mean by that.

3        A    To do an analysis.

4        Q    What accelerant?

5        A    I'm not technical.

6        Q    I didn't mean that technically.

7            A PointCare accelerant.

8        A    I'm not entirely sure if it was a

9    PointCare accelerant or if there were other

10    accelerants out in the market.

11        Q    The accelerant that Drew had

12    anticipated using for the HT was a PointCare

13    accelerant; right?

14            MR. COSTANTINI:  If he knows.

15        Q    Please don't tell me anything you

16    don't know, sir.

17        A    It may have been a PointCare

18    accelerant.

19        Q    And you understood at the time that

20    PointCare's accelerant was proprietary to it;

21    right?

22        A    Yes.

23        Q    And you were suggesting to

24    Mr. Nickols that Drew should find out if it could

25    analyze the accelerant and see what's in it so

Unsigned

Linsey Rockingham

1

2          UNITED STATES DISTRICT COURT

            SOUTHERN DISTRICT OF NEW YORK

3          ----------------------------X

4          DREW SCIENTIFIC, INC.,

5                    Plaintiff,

6                vs.         Case No.

                              08 CV 1490-AKH

7          POINTCARE TECHNOLOGIES,

            INC.,

8

                    Defendant.

9

            ----------------------------X

10

11

12              DEPOSITION OF LINSEY ROCKINGHAM

13                  New York, New York

14                Thursday, April 3, 2008

15        Contains Confidential - Attorneys' Eyes Only Portions

16

17

18

19

20

21

22

23        Reported by:

24        JOAN WARNOCK

25        JOB NO. 15878

Linsey Rockingham

1       Attorneys' Eyes Only - L. Rockingham

2       A.   Um-hmm.

3       Q.   Have you had discussions with

4    respect to Cormay being a distributor of

5    PointCare in any or all of those other

6    territories?

7       A.   No.

8       Q.   What did you mean when you say, "If

9    the training is going to be at your offices

10   in Poland and PointCare ships the instruments

11   and reagents to you in Poland as our

12   distributor"?

13          MR. CAPLAN:  Where are you, Tony?

14   I'm sorry.

15          THE WITNESS:  Page 2.

16          MR. COSTANTINI:  Page 2, the fourth

17   paragraph.

18          MR. CAPLAN:  Thank you.

19          MR. COSTANTINI:  And I had asked

20   whether there was any discussions with

21   respect to Cormay being the distributor

22   in those four countries other than

23   Russia.  And I think her answer was in

24   the negative.  I'm now asking about the

25   fourth paragraph which seems to use

Linsey Rockingham

1    Attorneys' Eyes Only - L. Rockingham

2       "Poland" and "distributor" in the same

3       sentence.

4          THE WITNESS:  Sorry.  I was

5       reading.  Could you just repeat that

6       question.

7          (Record read.)

8       Q.  Let me do better.  Does seeing that

9    paragraph refresh your recollection as to

10    whether or not you had a discussion with

11    Cormay as to Cormay possibly being a

12    distributor of PointCare products in Poland?

13         MR. CAPLAN:  Objection.

14         THE WITNESS:  Could you just repeat

15      that question.

16         (Record read.)

17      A.  No.

18      Q.  Do you recall why you would be

19    interested as to whether or not PointCare

20    needed to have its product registered in

21    Poland?

22      A.  Because if you're going to -- yes.

23      Q.  Okay.  Tell me why.

24      A.  Because if you're going to ship an

25    instrument into a country, even if it's for

Unsigned

Linsey Rockingham

1     Attorneys' Eyes Only - L. Rockingham

2     training, you have to know whether or not --

3     you have to have it registered, even if it's

4     for training.  Otherwise, you might not get

5     it into the country.

6         Q.   And what was the response to that

7     question?

8         A.   I didn't get a response.

9         Q.   Did you ever ship a product into

10    Poland?

11        A.   No.

12        Q.   Did you ever ship a product into

13    Russia?

14        A.   No.

15        Q.   Do you know which party under the

16    Drew PointCare agreement was allocated the

17    territory of Poland?

18            MR. CAPLAN:  Objection.

19            THE WITNESS:  Could you restate

20        that question again, please.

21            (Record read.)

22        A.   Drew.

23        Q.   And let me go back, turn back to

24    the March 10th document, the email that

25    Mr. Tuora sent to you.  Did you, in fact,

Linsey Rockingham

1     Attorneys' Eyes Only - L. Rockingham

2     receive that document on or about March 10th?

3         A.   Yes.

4         Q.   Do you know whether the special

5     meeting about PointCare that Mr. Tuora refers

6     to ever occurred?

7         A.   No, it did not.

8         Q.   Do you know why it didn't occur?

9         A.   Yes.

10        Q.   What was the reason it did not

11    occur?

12        A.   Because we put on hold anything to

13    do with Russia.

14        Q.   By whom?

15        A.   Petra Krauledat.

16        Q.   And when did Dr. Krauledat give you

17    that instruction?

18        A.   I presume it was sometime in March.

19        Q.   Was it after March 10th, 2008?

20        MR. CAPLAN:  We're not asking for

21        presumptions and guesses.  Just what you

22        know, what you remember.

23        THE WITNESS:  Sorry?

24        MR. CAPLAN:  We're not going on

25        presumptions here.  Just what you know

Unsigned

Linsey Rockingham

1      Attorneys' Eyes Only - L. Rockingham

2          and what you remember, please.

3              THE WITNESS:  Okay.

4      A.  I don't remember the exact date.

5      Q.  How long ago was it?  And today is

6      April 3rd, if that helps.

7      A.  It was sometime this year.

8      Q.  Well, we could go through lots and

9      lots of emails between you and potential

10     Russian distributors that occurred this year,

11     so I'm assuming that you did not continue to

12     have such emails after Dr. Krauledat gave --

13     A.  Correct.

14     Q.  -- such an instruction.  But is

15     your recollection any better of how recent

16     the instruction was other than sometime in

17     2008?

18     A.  March 2008.

19     Q.  And did you respond to Mr. Tuora's

20     email of March 10th in any form?

21     A.  No.  Oh, yes, I did.  Sorry.  I

22     did.

23     Q.  In what form did you respond?

24     A.  I spoke to him on the phone.

25     Q.  And can you recount that

Unsigned

Linsey Rockingham

1      Attorneys' Eyes Only - L. Rockingham

2      conversation as best you can recall?

3          A.  I told him that we were putting our

4      plans for Russia on hold.

5          Q.  And how long after this March 10th

6      email did that conversation occur?

7          A.  Very soon afterwards.

8          Q.  In addition to the three Russian

9      distributors we covered, or potential Russian

10     distributors, I think you told me about

11     Block, I think you've told me about DRG, and

12     you've told me about Cormay.  Did you have

13     discussions with any other potential Russian

14     distributors?  Let me broaden it to say

15     communications, because I realize a lot of

16     things are done by the internet these days.

17         A.  I don't remember.

18         Q.  And you told me as to the

19     conversation you had with Dr. Krauledat about

20     her meeting with DRG at Medica and her

21     reasons for not going forward with them.  Did

22     she report to you about her meeting with the

23     Cormay representatives at Medica?

24         A.  Yes.

25         Q.  What did she say?

Unsigned

Linsey Rockingham                                                                164

1       Attorneys' Eyes Only - L. Rockingham

2       A.  She said that she had met them at

3   Medica and they were also a distributor for a

4   company called Orphea.

5       Q.  And who had she met with?

6       A.  She had met with the senior

7   Mr. Tuora.

8       Q.  And did she convey to you any

9   impressions of that meeting?

10      A.  Yes.

11      Q.  And what were those impressions

12  that she conveyed?

13      A.  That she thought that they were a

14  good company because they already were a

15  distributor for Orphea.

16      Q.  And who is Orphea?

17      A.  Orphea is another medical device

18  distributor.

19      Q.  What types of medical devices do

20  they distribute?

21      A.  I only know of one.

22      Q.  And what is that one that you know

23  of?

24      A.  It's one that is manufactured by

25  C2.

James Young

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4

5      DREW SCIENTIFIC, INC.,      )

                           ) Case No.

6              Plaintiff,    ) 08 CV 1490-AKH

                           )

7          vs.          )

                           )

8      POINTCARE TECHNOLOGIES, INC.,)

                           )

9              Defendant.    )

       ----------------------------)

10

11

12

13

14          DEPOSITION OF JAMES GARY YOUNG

15             New York, New York

16          Wednesday, April 9, 2008

17

18

19

20

21

22

23    Reported by:

24    KRISTIN KOCH, RPR, RMR, CRR, CLR

25    JOB NO. 16196

James Young

1                    Young

2    know what his priorities were.  Do you know of

3    any document or instruction from somebody else

4    that set the priorities that he would have had?

5       A.   I am aware of the specification.

6    You previously referred to the CBPR, but

7    whether or not the tasks were specifically

8    spelled out in there, I can't say for sure.  I

9    don't know.

10      Q.   Did you have any timeline or

11   development project line that set forth what

12   tasks the people in the Drew side of the

13   project had?

14      A.   Yes, sir, we did.

15      Q.   Okay.  And was that something

16   internal to Drew?

17      A.   No, sir.  It was shared with

18   PointCare.

19      Q.   And do you know where this -- first

20   of all, how would you -- what word would you

21   use to describe it?

22      A.   Timeline.

23      Q.   Okay.

24      A.   Gantt chart.

25      Q.   Did it have line items on it?

James Young

1                    Young

2       A.   Yes, sir, it did.

3       Q.   And did it have start dates and end

4    dates for the various line items?

5       A.   As I recall, yes, sir.

6       Q.   Whose responsibility on the Drew

7    side was it to monitor that and make sure that

8    the Drew team was following that?

9       A.   That was my responsibility.

10      Q.   Now, with respect to Mr. Gu's tasks

11   or the tasks that would fall to Mr. Gu, was it

12   also your responsibility to monitor to make

13   sure those tasks were being followed?

14      A.   Indirectly, yes.

15      Q.   Okay.  So your understanding was

16   that Mr. Gu was aware of that timeline?

17      A.   I don't know if Mr. Gu was or not.

18   I can only say that he was presented with a

19   copy of the timeline.

20      Q.   Who presented it to him?

21      A.   Myself.

22      Q.   Do you know when that was?

23      A.   There were numerous times that the

24   timeline was updated and it was e-mailed out.

25      Q.   Who was doing the updating?

James Young

1                    Young

2        A.   I was.

3        Q.   On how many occasions did you do

4    that?

5        A.   I don't recall the exact number.  It

6    was approximately four, five.  Could have been

7    one or two more or less.  More, probably.

8        Q.   We are talking about throughout the

9    life of the project?

10       A.   Yes, sir.

11       Q.   And each time that you updated this

12   timeline who did you share it with?

13       A.   I shared it with PointCare, Don

14   Barry, and then I also shared it with Peter

15   Hansen.  I shared it with the engineering group

16   and I shared it with Drew management.

17       Q.   When you say "the engineering

18   group," are you referring to the Drew

19   engineering group?

20       A.   Yes, sir.

21       Q.   Now, was the complete Drew

22   engineering group involved in the PointCare

23   project?

24       A.   No, sir.

25       Q.   Who was not involved in the

James Young

1                    Young

2     PointCare HT project?

3        A.   There were two engineers, Vincent

4     Phan and Lee Carter, that were not directly

5     involved.

6        Q.   And why were they not involved in

7     the project?

8        A.   They were senior production support

9     engineers.  Their function was to support the

10    existing product lines that we were currently

11    building.

12       Q.   So were they slated to become

13    involved in the PointCare HT project at some

14    point?

15       A.   No, sir.  My understanding of their

16    function was to offload part of the

17    responsibility of supporting the manufacturing

18    line on to them to allow the regular

19    engineering staff to work more on the R&D

20    project or work more on R&D projects.

21       Q.   Right, but at some point the HT was

22    supposed to get to a state of

23    manufacturability; right?

24       A.   That is correct.

25       Q.   So was there a plan to then involve

James Young

Young

1

2      A.   7-27-2007?

3      Q.   Left-hand corner.

4      A.   Left-hand corner.  I'm sorry.  6-2

5   of 2006?

6      Q.   Yes.  Do you recall ever seeing this

7   document at that time period?

8      A.   No, sir.

9      Q.   Okay.  What is your recollection as

10   to the first time you saw this document?

11      A.   I would say I saw this document in

12   June of 2006.  Sometime in June.  I can't say

13   for sure exactly when.

14      Q.   Of 2006?

15      A.   Yes, sir.  Just this page.

16      Q.   Okay.  So you don't know that you

17   saw it on June 2nd of 2006?

18      A.   No, sir.

19      Q.   All right.  So do you believe you

20   saw this shortly after the contract was entered

21   into?

22      A.   I believe that's correct, to my best

23   recollection.

24      Q.   Do you have a recollection of the

25   context in which you first saw it?

James Young

1              Young

2      A.   No, sir, I don't.

3      Q.   Do you recall it being shown to you

4   by somebody at Drew?

5      A.   That's a reasonable assumption, but

6   I can't say for certain.  Probably so.

7      Q.   Okay.  Do you recall reviewing a

8   timeline, project timeline, at a meeting early

9   on at Drew?

10     A.   We would have had a meeting early on

11  to have discussed something like this.  We had

12  many, many meetings.

13     Q.   Now, you testified earlier about

14  some of your responsibilities with respect to

15  the project.  Was one of those responsibilities

16  to be aware of this timeline and be aware of

17  the progress with respect to this timeline?

18     A.   Yes, sir.  The -- if I may

19  elaborate, this timeline is a very primitive

20  timeline.  It has very little detail in it.

21  This is just the -- kind of a summation of the

22  major blocks, and as a result of a timeline

23  like this, and I believe we did do this, we

24  took the timeline, if not this one something

25  similar to this, and expanded it into detail as

Unsigned

James Young

1                    Young

2       to what was required to build each of these

3       subsystems.

4          Q.   You fleshed it out a little bit

5       more?

6          A.   Fleshing it out, yes, sir, that's

7       the term we would use.

8          Q.   Okay.  Do you understand that this

9       particular timeline that we are looking at

10      right now is incorporated into the contract

11      between Drew and PointCare?

12              MR. DELLAPORTAS:  Object to form.

13         A.   After I received my copy of the

14      contract, I then knew that it was a portion of

15      the contract.  At the time that I saw this I

16      did not know that it was an actual portion of

17      the contract.

18         Q.   Okay.  And so what was the -- at

19      what point in time did you come to understand

20      that?

21              MR. DELLAPORTAS:  Object to form.

22         Q.   Let me be more specific.. At what

23      point in time did you come to understand that

24      that was part of the contract?  When I say

25      "that," I am talking about the timeline.

James Young

```
 1              Young
 2         MR. DELLAPORTAS:  Object to form.
 3      A.   As I had previously stated, a copy
 4    of the contract was given to me in early 2007
 5    and when I reviewed the contract at that point
 6    in time, that's when I saw that it had this
 7    timeline in it or a timeline similar to this
 8    embedded in it.
 9      Q.   Okay.  And do you recall what the
10    context was of receiving the timeline at that
11    point in time in 2007?
12      A.   I don't understand your question.
13    Sorry.
14      Q.   Do you know why you were given a
15    copy of that in 2007?
16         MR. DELLAPORTAS:  Objection.  Calls
17         for speculation.
18      A.   No, sir.  I did not ask for it.
19    Doug Nickols gave me a copy of it.
20      Q.   Okay.  Did he say anything when he
21    gave it to you?
22      A.   If he did, I do not recall what it
23    was.
24         MR. TWOHIG:  Okay.  Why don't we do
25         this right now.  Why don't we just mark
```

Unsigned

James Young

1                      Young

2    you could flesh out those tasks further?

3        A.   Yes, sir.

4        Q.   And do you see that there are two

5    columns there, there is a start column and an

6    end column?

7        A.   Yes, sir.

8        Q.   And that they have dates under those

9    headings?

10       A.   I see those dates, yes, sir.

11       Q.   Do you have an understanding of what

12   those dates signify in this document?

13       A.   Yes, sir.

14       Q.   And what's your understanding about

15   what they signify?

16       A.   That is the initial proposed

17   timeline which they would like to have these

18   components or subsystems completed by.

19       Q.   And what's the basis for your

20   understanding that you just articulated?

21       A.   It's from my understanding of how

22   Gantt charts work.

23       Q.   Okay, but there were some specific

24   words that you used in your testimony.  I

25   believe that you said, for example, proposed

James Young

```
 1                    Young
 2    that they would like, referring to these dates.
 3    So let me ask it this way:  I take it that you
 4    see these dates as being dates that are not
 5    fixed?
 6       A.   That is correct.
 7       Q.   Okay.  And what I am getting at is
 8    why do you see these dates as not being fixed?
 9           MR. DELLAPORTAS:  Object to form.
10       Q.   Where did you get that
11    understanding?
12           MR. DELLAPORTAS:  Same objection.
13       A.   This is the initial timeline.  Okay.
14    For any of the detail that was put into it this
15    early on, if a person has done much project
16    planning, they realize that it's an iterative
17    process that you start with your best estimate
18    and then you work from there.
19       Q.   Let me ask you this:  Did you
20    participate in the contract negotiations?
21       A.   No, sir.
22       Q.   Did you participate in the drafting
23    of the contract?
24       A.   No, sir.
25       Q.   Did you participate in the drafting
```

Unsigned

James Young

1              Young

2    of the timeline that we are looking at which is

3    Exhibit 3 that was then incorporated into the

4    contract?

5        A.   No, sir.  This timeline, I believe,

6    was done by PointCare.

7        Q.   You believe that?

8        A.   I believe this contract -- excuse

9    me.  I believe this timeline was done by

10   PointCare.

11       Q.   Now, were there later versions of a

12   timeline similar to this that were done by Drew

13   as opposed to PointCare?

14       A.   Yes, sir.

15       Q.   Staying with the questions that I

16   initially asked or was asking there about

17   being -- not being involved in the drafting and

18   negotiation process, so that being the case,

19   that you were not involved in the drafting, you

20   were not involved in the negotiation of the

21   contract, where are you getting your

22   understanding as to what these dates signify on

23   the timeline?

24       A.   My initial interpretation of this

25   was this is PointCare's best guess starting out

James Young

1                    Young

2      that with some testing, since they had access

3      to plenty of the gold, and we had sent them

4      samples in order for them to evaluate, that is,

5      samples of the Lexan.

6         Q.   Were there any particular parts that

7      were of particular concern in terms of matching

8      an appropriate material to work with the gold?

9         A.   Well, the gold reagent, as it was

10     explained to us by Don, was very tenacious, and

11     so one of the things that we asked early on was

12     about the materials, obviously, since they are

13     critical, could we use acrylic plastic,

14     plexi-glass, and they said no, that it wouldn't

15     work with that, and early on we had envisioned

16     that we would use optical sensors and it was

17     agreed to on both sides.  They knew we were

18     using optical sensors and we did.  We discussed

19     the idea of using another material called

20     Lexan, or its generic name is polycarbonate,

21     where it's a clear material, it has optical

22     properties that you could see through, so the

23     optical sensors would work properly with it,

24     but, unfortunately, it proved to have many of

25     the same negative characteristics as the

Unsigned

James Young

```
 1                    Young

 2    acrylic did, and that is that the gold reagent

 3    coated the inside surfaces of the passages in

 4    that material as well.

 5       Q.    What about polypropylene?

 6       A.    We discussed polypropylene, and the

 7    subject --

 8       Q.    When did you discuss it?

 9       A.    It would have been shortly after

10    that. I don't know the exact time frame, but

11    it would have been after that.

12       Q.    Spring of 2007?

13       A.    Yes.

14       Q.    Moving forward?

15       A.    Spring of 2007. The problem with

16    polyethylene -- the subject came up --

17       Q.    I actually said polypropylene, but I

18    was going to also then question about

19    polyethylene, so if you want to address one or

20    the other, feel free.

21       A.    I'm sorry, back up then. Is your

22    question on polypropylene or polyethylene?

23       Q.    The original question was on

24    polypropylene.

25            MR. DELLAPORTAS:  And what's the
```

James Young

1                    Young

2        question?

3        A.    Please restate the question.  I'm

4    sorry.

5        Q.    Did you consider polypropylene?

6        A.    We did at that point.

7        Q.    And, again, that point is the spring

8    of '07?

9        A.    Yes, sir.  I wasn't quite finished,

10    but that's okay.  We did some research.  We

11    called around to a number of people trying

12    to -- people that were -- who had expertise in

13    manufacturing gold nanoparticles and we

14    consulted with them basically via the phone to

15    find out what is a good material to use, since

16    apparently this stuff is extremely tenacious.

17    By this time we had already evaluated the Lexan

18    and it was unacceptable.  We had started

19    working on a stopgap design using glass tubing

20    for that passage.  We got it evaluated to find

21    that the gold coated the inside of it too and

22    that concerned us, because if it's gonna coat

23    the glass, it's probably going to coat just

24    about everything.  So we consulted these

25    people, several different manufacturers, and

James Young

1                    Young

2      they told us several materials that we could

3      evaluate, that some of them worked better than

4      others and one of them might work for us, and

5      those materials were then tested for their

6      properties and the gold coating issue.

7          Q.    Now, all the materials that you

8      tested, were those materials machined?

9          A.    Yes, sir.  If I may --

10         Q.    Sure.

11         A.    One of the stipulations, obviously,

12     relating to this was that because of the

13     volumes that we were looking at and because of

14     the ability to prototype, we had to be able to

15     use a machining process in order to be able to

16     make these parts.  At that point in time if we

17     had opted to go another approach, say for

18     injection molding, the lead time would have

19     moved out into many, many months, and so we

20     tried to narrow our focus again based on

21     materials that we knew that were machineable

22     and that we could fabricate in order to try to

23     solve this problem.

24         Q.    So the gold coating problem had not

25     come to Drew's attention prior to March of

James Young

1              Young

2    2007?

3        A.   I don't recall it coming to our

4    attention before that.  If it was -- I would

5    say that was the first time that we had

6    firsthand knowledge of it.  Any prior knowledge

7    would have been hearsay from perhaps someone at

8    PointCare.

9        Q.   Okay.  Do you personally -- you

10   don't personally recall having any hearsay

11   information from someone at PointCare?

12       MR. DELLAPORTAS:  Object to form.

13       A.   I'm sure that gold was discussed

14   early, simply because early on we opted not to

15   use acrylic, instead to use the Lexan, and so,

16   therefore, I think it was obviously a point of

17   discussion, but I think at that point we

18   deferred our expertise on that to PointCare,

19   simply because it was their reagent and we felt

20   like that they -- well, they should have known

21   more about it than we did, and I think that's a

22   safe assumption to make.

23       Q.   Just so I understand, are you saying

24   that PointCare made the decision to use Lexan?

25       A.   It was a joint effort on our part

Unsigned

James Young

1                     Young

2      lot of effort and a lot of time devoted to

3      making the part.  Ultimately, though, because

4      we were able to narrow down the problem to just

5      one segment of that overall part, we then

6      focused on just redesigning that one area, so

7      we changed or altered the design slightly and

8      just built little blocks that would bolt into

9      that corner that had this passage and the

10     sensor built into it so that we could evaluate

11     the materials that we had been told about on a

12     much quicker basis.

13         Q.   Finished?

14         A.   Yes, sir.

15         Q.   So with that modified piece, what

16     was the time to prepare that?

17         A.   We could have that part made in two

18     days, two and a half days, something like that.

19         Q.   The more complicated piece?

20         A.   It would take a week, maybe more.  A

21     week at the minimum.

22         Q.   And at the outside?

23         A.   As much as two weeks.

24         Q.   Okay.  Would that be something that

25     you would do in house?

James Young

1                        Young

2        A.    Yes, sir.

3        Q.    You have a machine shop?

4        A.    Yes, sir.

5        Q.    Now, just going back to questioning

6    that I was doing a few minutes ago on the

7    materials, polypropylene and polyethylene, so

8    starting with polypropylene, did you ever try

9    polypropylene in that piece?

10       A.    Yes, sir, I believe we did.

11       Q.    And how did that work?

12       A.    It worked fairly well for us.

13       Q.    And when was that in time that you

14   tried that piece?

15       A.    That would have been -- I can narrow

16   it down to about a three-month window.  That

17   will have to do.

18       Q.    The best that you can do.

19       A.    It would have to be in July, August,

20   September 2007.

21       Q.    Now, what about polyethylene, did

22   you ever try polyethylene in that piece?

23       A.    We did not try the polyethylene,

24   because the machinability of polyethylene is

25   like the machinability of chewing gum.

James Young

1                        Young

2        Q.    You can't do it?

3        A.    It is actually a material that is

4    designed to be injection molded efficiently,

5    but not machined efficiently.

6        Q.    So if you wanted to test

7    polyethylene in that piece, you would have to

8    have it molded?

9        A.    Injection molded would be the way

10    you would normally do that.

11        Q.    Now, could you also injection mold

12    polypropylene?

13        A.    Yes, sir, you could; but you could

14    not injection mold the two in the same mold.

15        Q.    Okay.

16        A.    Because the shrinkage rates of the

17    plastics are different, so, therefore, each

18    mold is designed for a specific type of

19    plastic.

20        Q.    Okay.  If you were going to have the

21    piece that we are talking about, just to kind

22    of put it back on the record here, the gold

23    reagent passage piece, if you were going to try

24    that piece in polypropylene injection molded,

25    how would you have gone about doing that?

Unsigned

James Young

1              Young

2      A.  We did evaluate that piece out of

3  machined material polypropylene and we had

4  acceptable results machining the polypropylene

5  and so, therefore, we determined that we would

6  not need to injection mold it.

7      Q.  Now, when you machine it, do you

8  then need to polish it?

9      A.  Polypropylene is not capable of

10  being polished to where you can actually see

11  through it.  The material itself is opaque in

12  nature, so polishing it would have -- polishing

13  the surface on it would have very little effect

14  as far as being able to see through it.  Now,

15  if you are dealing with optical sensors,

16  optical sensors, in the particular case the

17  ones we were working with, operate in the

18  infrared spectrum and they see through it when

19  the human eye cannot see through it.

20      Q.  So your optical sensors were able to

21  see through the polypropylene?

22      A.  They could see through the

23  polypropylene pretty well.

24      Q.  Okay.  Now I just need to ask you to

25  help me here.  I think you testified that you

James Young

```
 1                    Young

 2     never got around to trying polyethylene in the

 3     piece?

 4         A.   To my knowledge, we never tried

 5     polyethylene.  The materials that we did try

 6     were Lexan, we tried glass, we tried Teflon in

 7     the form of PTFE, we tried Teflon in the form

 8     of ECTE, we tried -- did I mention

 9     polypropylene already?  We tried Delrin.

10     Anyway, those are the ones that come to mind,

11     there may have been one more that we evaluated,

12     and we determined that of the materials that we

13     checked, the two that functioned the best were

14     the polypropylene and the Teflon called ECTE or

15     ECTF.  The trade name is Tefzel, T-E-F-Z-E-L.

16         Q.   Now, with respect to polyethylene,

17     if you had used that, if you had tried that in

18     the reagent passage, would the optical sensor

19     have been able to function through that?

20         A.   It is our determination it may have

21     functioned for a short period of time, but not

22     indefinitely.

23         Q.   Why is that?

24         A.   Well, there is an inherent

25     characteristic of gold particles that they have
```

James Young

1                    Young

2        a positive charge on them, and they have a

3        positive charge placed on them so that they do

4        not clump in the container, okay, that they are

5        stored in, because the material is a freeze

6        dried material.  It's quite hygroscopic.  And

7        so as a result you have to keep it dry, so it's

8        in a sealed container and you re-constitute it

9        with deionized water and once you re-constitute

10       it, it becomes extremely reactive with the

11       surfaces that it comes in contact with, and

12       since all materials have molecular charges on

13       them, okay, and these gold particles had

14       positive charges on them, then anything with a

15       negative charge it would stick to, and that's

16       just kind of basic physics 101, so kind of like

17       positive and negative charge on a battery.  So

18       as a result, just about anything you were to

19       try it was going to stick to to a greater or

20       lesser extent, but it was going to stick to it,

21       so it was shortly -- it was in a period of time

22       around August of 2007 when we broke from the

23       concept of using optical sensors and went with

24       the concept of using ultrasonic sensors and

25       that concept came merely from the fact that

James Young

1                       Young

2      if -- since it was a basic inherent nature of

3      the material to stick to any surface it came in

4      contact with and there was no way to get around

5      it that we could see, we would try to sense it

6      in a different way and that's when we moved

7      forward with attempting or making the attempt

8      to evaluate the ultrasonic sensors, which

9      ultimately proved to be a good way to do it.

10        Q.    Just with respect to your testimony

11     about the charge, the positive charge on the

12     gold --

13        A.    Yes, sir.

14        Q.    So where did you gain that

15     understanding of the gold?

16        A.    We gained that understanding I

17     believe it was from either Don or Peter.

18        Q.    Do you recall when?

19        A.    No, sir, I don't.  It would have

20     been in -- you know, I can speculate and say

21     that it would have been after we started having

22     all of the problems with having the gold

23     coating all of the surface and then at that

24     point it became real apparent that optical

25     sensing was going to be a stumbling block.

James Young

1                   Young

2     There again, though, you know, that was a

3     situation where they, "they" PointCare, was the

4     experts when it came to gold, that was their

5     assay, and so we were pretty much dependent

6     upon them to tell us what we needed in order to

7     try to make this work, since they knew we were

8     trying to use optical sensors.  Later on it

9     just became -- got to the point where we just

10    abandoned it.  It was not a functional

11    approach.

12        Q.   And do you recall how that

13    information was communicated to you by Don or

14    Peter?  Was it by e-mail or was it verbally?

15        A.   It was e-mail, it was telephone.  We

16    talked on the phone practically every day, if

17    not every other day.  We e-mailed extensively

18    and that's born out in the e-mails I'm sure

19    that you have access to.  But, you know, going

20    back as far back as March, though, 2007, we had

21    already started to see that gold was adhering

22    to the Lexan and it was just -- and PointCare

23    knew it.  I mean, PointCare was the one that

24    advised us of it and they were, I think, as

25    much taken back by it as anyone, just because

James Young

1                    Young

2    survival.  Do you see that there?

3        A.   Yes, sir.

4        Q.   Just looking down a little bit into

5    the second paragraph in that e-mail, Mr. Kenney

6    mentions -- in the second sentence in that

7    paragraph he says:  "With my continued

8    unavoidable absence, I have asked Doug and Lee

9    to be available for resolving priority

10   conflicts and resource allocation issues on a

11   day-to-day basis."

12           Now, I believe you testified earlier

13   about Mr. Kenney splitting time between Dallas

14   and the United Kingdom; is that correct?

15       A.   Prior to this, yes, he was splitting

16   time between Dallas and the U.K.

17       Q.   Okay.  So was there a point in time

18   where he stopped splitting time between the two

19   places?

20       A.   Yes, sir.

21       Q.   And can you describe what the change

22   was?

23       A.   What the change was or what the time

24   frame was?

25       Q.   What the change was.  He was

James Young

1                    Young

2      splitting time and then I take it he was not

3      splitting time in the same way?

4          A.   What happened was is he was actually

5      called back to the U.K. to head up and finish

6      up the DS 360 project.  It was felt as though

7      he needed to be there more than he needed to be

8      here.  And because he was dividing his time, he

9      was not being able to give full attention to

10     either job.  So in his respect, they brought

11     him back over to the U.K. on a full-time basis

12     and then Doug became the interim engineering

13     manager.

14         Q.   Okay.  And now to go back to the

15     question that you initially posed, which was

16     when was -- when did that happen?

17         A.   In or around the time frame that

18     this was -- this e-mail is dated, September

19     29th of 2006.

20         Q.   Now, looking down to the second

21     paragraph from the bottom, do you see where it

22     starts with "second priority is CD4"?

23         A.   I see the statement, yes, sir.

24         Q.   And do you take that to be referring

25     to the HT project?

James Young

1                    Young

2        A.   I take that at this point that the

3    2280 needs to be finished up so that we can get

4    it to market since we are so close to it being

5    finished and that then the priority would be

6    the CD4, so that at that point in time they

7    wanted to make sure that 2280 was able to go to

8    market.

9        Q.   Okay.  I was actually referring to

10   the second priority is CD4, just to make sure

11   that CD4, you understand, is referring to the

12   HT project?

13       A.   Yes, sir, the CD4 is the HT project.

14       Q.   Okay.  And then he says right after

15   that in the next sentence he says:  "We must

16   catch up with the timeline."

17            Now, were you aware that Drew was

18   behind the timeline at that point in time?

19       A.   I don't recall if we were or not at

20   that point.  I don't recall if we were behind

21   or not.

22       Q.   Okay.  Do you recall what you were

23   working on with respect to the HT project at

24   that point in time?

25       A.   No, sir, I don't recall what I was

James Young

1                    Young

2      working on at this specific time on the HT

3      project.

4          Q.   Do you recall what the other members

5      of the team were working on?

6          A.   Not right offhand.  Not without

7      reviewing the timeline.  I don't recall from

8      memory.  The timeline would describe what it

9      was they were working on.

10         Q.   Now, after that he says:  "If more

11     help is needed, either with subcontractors,

12     equipment, parts, tools, whatever, then say so

13     immediately either to me or to Doug."

14             Was there any -- do you recall there

15     being a sense of having a lack of resources of

16     any type for the HT project at that time?

17         A.   Here again, this goes back to

18     Mr. Kenney, and I really think you would have

19     to ask him that question to get the correct

20     answer out of it.

21         Q.   Since you were a recipient of this

22     e-mail, did you follow up either with an e-mail

23     dialogue or verbal discussions with Mr. Kenney

24     about this?

25         A.   If I followed up with verbal

James Young

1                          Young

2          A.    From that statement, it appears

3     there was.

4          Q.    Were you aware of any problems with

5     the 2280 and defects?

6          A.    I don't recall of any, but that's

7     not to say that there weren't any.

8              MR. TWOHIG:  Okay.  Let's move on.

9              (Young Exhibit 15, e-mail dated

10            9-18-2007, Bates stamped DR00044186 through

11            DR00044188, marked for identification.)

12             (Document review.)

13         Q.    Just let me know when you have had a

14    chance to review it.

15             (Document review.)

16         A.    Is there not an e-mail in here that

17    should have been between the 13th and the 18th?

18         Q.    All I can tell you is that this was

19    the document produced by Drew Bates stamped by

20    Drew and you should have three pages.  If you

21    look in the lower right-hand corner, it should

22    be DR 44186 and 187 and then 188.

23         A.    I have those documents.

24         Q.    Okay.  So just if you would, turn to

25    page 2.  Do you see that e-mail there from you

James Young

1                  Young

2    to Peter Hansen, September 13, 2007 and the

3    subject is progress?

4        A.    Yes, sir.

5        Q.    If we could go down to the second

6    paragraph from the end of that e-mail, and you

7    state there:  "We are confident the unit is

8    working as expected and are ready to ship it

9    back to you on September 18th without the

10   bimetal switch installed."  And then you say:

11   "George thinks another week is needed to verify

12   it is working properly."  Do you see that

13   paragraph there?

14       A.    Yes, sir.

15       Q.    Now, was that unit shipped out in

16   September?

17       A.    No, sir, it was not.  Not to my

18   recollection.

19       Q.    And why was it not shipped out?

20       A.    Because as I referenced a moment

21   ago, it seems like there was another e-mail in

22   here from Peter asking us not to ship that

23   until we had the bimetal switch in place.

24       Q.    Okay.  That's your recollection of

25   why --

James Young

1                      Young

2       A.   That is my recollection why we did

3    not send it.

4       Q.   Okay.  Now, when do you believe that

5    that e-mail from Mr. Hansen came in?  Did you

6    say September 13th e-mail?

7       A.   It would have been after September

8    13th.

9       Q.   Okay.  Do you recall it as being

10   after September 13th, but prior to September

11   18th?

12      A.   I can't answer that.  I don't know.

13      Q.   All right.  Well, I mean, if you

14   flip back to the first page, do you see the

15   e-mail on the first page at the top from you to

16   Doug Nickols, September 18, subject progress?

17   The first page.

18      A.   Yes, sir.

19      Q.   Do you see that e-mail there?

20      A.   Yes, sir.

21      Q.   And then there is an e-mail right

22   below it from Doug Nickols to you and in that

23   e-mail from Doug Nickols to you he says:

24   "Today is September 18th.  Your e-mail below

25   anticipated the machine to be sent back to

James Young

1                      Young

2       PointCare today.  What's the status?"

3            Then you responded up above:

4       "William has performed the shutdown and

5       cleanout.  I've asked him to go over the

6       machine to make sure all boards are tight and

7       everything is secure.  He is being pulled

8       between DS360 and the CD4 unit extensively."

9            So does it seem clear to you that

10      there had been no e-mail by Mr. Hansen saying

11      don't send the machine, at least up until that

12      point in time?

13           MR. DELLAPORTAS:  I am going to

14      object to that.  I can't see how you could

15      possibly draw that conclusion, unless you

16      are making a representation that you have

17      reviewed the files and found no such

18      e-mail.

19           MR. TWOHIG:  No such representation.

20      A.    Looking at that, I would say that

21      since our previous e-mail was on the 13th and

22      it was said that we had approximately a week or

23      a week to verify it working properly, it's

24      plausible at that point in time that the unit

25      was ready to ship on the 18th with switch in

Unsigned

SUPPLEMENT 1 TO ANNEX 1

| ID | Description | Start | End |
|----|-------------|-------|-----|
| 1 | Analysis and Planning | 2/02/2006 | 4/28/2006 |
| 2 | Compatibility Testing | 2/02/2006 | 2/15/2006 |
| 3 | Business Strategy | 2/16/2006 | 4/14/2006 |
| 4 | Staffing/scheduling | 2/16/2006 | 3/15/2006 |
| 5 | Product Requirements | 3/16/2006 | 3/31/2006 |
| 6 | Product Requirement/Review | 4/04/2006 | 4/07/2006 |
| 7 | Quality/maritage | 3/16/2006 | 4/28/2006 |
| 8 | Feasibility of select modules | 3/16/2006 | 4/06/2006 |
| 9 | Right angle scatter modules | 3/16/2006 | 3/31/2006 |
| 10 | Right angle scatter modification | 3/23/2006 | 8/25/2006 |
| 11 | Test light angle scatter modification | 3/23/2006 | 3/31/2006 |
| 12 | Lysa mixing modification | 3/01/2006 | 3/31/2006 |
| 13 | Test lysa mixing modification | 4/03/2006 | 4/06/2006 |
| 14 | Development of selected modules | 3/20/2006 | 8/03/2006 |
| 15 | Mixing | 4/06/2006 | 5/26/2006 |
| 16 | Immunogold delivery module | 4/12/2006 | 6/16/2006 |
| 17 | CD4 controls | 4/12/2006 | 6/09/2006 |
| 18 | Fluid routing | 4/05/2006 | 6/13/2006 |
| 19 | Optical module | 4/17/2006 | 5/16/2006 |
| 20 | Sample age extension | 4/12/2006 | 6/02/2006 |
| 21 | Analytical software for CD4 | 3/20/2006 | 6/30/2006 |
| 22 | User interface | 4/12/2006 | 6/16/2006 |
| 23 | Software Integration | 3/23/2006 | 7/20/2006 |
| 24 | Integration of system | 3/23/2006 | 10/31/2006 |
| 25 | Hardware Integration | 3/23/2006 | 8/25/2006 |
| 26 | CD4 mixing module | 4/12/2006 | 6/16/2006 |
| 27 | Immunogold delivery module | 3/23/2006 | 6/28/2006 |
| 28 | CD4 fluid routing | 3/23/2006 | 6/28/2006 |
| 29 | modified optics | 3/23/2006 | 6/29/2006 |
| 30 | annylidal software for CD4 | 3/23/2006 | 7/20/2006 |
| 31 | software for sample age extension | 3/23/2006 | 8/24/2006 |
| 32 | user interface | 3/23/2006 | 7/20/2006 |
| 33 | In-house testing | 8/01/2006 | 8/31/2006 |
| 34 | Field Testing | 8/01/2006 | 8/31/2006 |
| 35 | Pilotates | 8/01/2006 | 10/31/2006 |
| 36 | Manufacturing engineering | 8/01/2006 | 3/05/2007 |
| 37 | Instrument manufacturing engineering | 10/02/2006 | 3/05/2007 |
| 38 | Reagent manufacturing engineering | 10/02/2006 | 2/23/2007 |
| 39 | QA procedures, manuals, labeling | 10/02/2006 | 2/23/2007 |
| 40 | Transfer to manufacturing - aggressive | 12/01/2006 | 3/05/2007 |
| 41 | Transfer to manufacturing - conservative | 10/1/2007 | 2/23/2007 |
| 42 | Regulatory | 12/01/2006 | 7/27/2007 |
| 43 | 510k data and submission - aggressive | 12/01/2006 | 1/26/2007 |
| 44 | 510k data and submission - conservative | 5/01/2007 | 7/27/2007 |
| 45 | Release to Market (non-510k) | 1/05/2007 | 1/05/2007 |
| 46 | Release to Market (510k) - aggressive | 3/06/2007 | 3/06/2007 |
| 47 | Release to Market (510k) - conservative | 7/27/2007 | 7/27/2007 |

6/07/2008

Young
Exhibit
3
AK 4-9-08

**From:** Peter Hansen
**Sent:** 11/9/2006 8:43:41 PM
**To:** Richard J. DePiano
**CC:**
**Subject:** CD4 Project

Dear Richard,

I have a concern and with your new role in the management of the Dallas group I feel it is best addressed to you. The PointCare CD4 project has received excellent attention from the Dallas group, and Gary Young has served as an excellent interface with Don Barry, his counterpart at PointCare. We have recently experienced some delays that can be corrected and managed in Dallas, but the implementation has been impeded because things seem to need to be passed through Andrew Kenny in the UK. I have no rancor with Andrew, but in the first weeks of planning this project I had asked and thought that I had agreement that for efficient management this would only be a Dallas effort. I knew that time zones and lack of physical presence only work against a fast moving program. I am asking that you reinforce this agreement and consolidate the project and its management in Dallas.

On a positive note. We have tried the system in a semi manual mode on 300+ samples in Barbados with excellent results. The rest is only a matter of timeline management and attention to detail. We at PointCare enjoy our work with the Dallas engineers and look forward to continued success. I think that Gary and Don have worked out a revision to our plan that will get us back on schedule by Jan 1.

Please let me know if you have any questions.

Sinceely,

Peter Hansen
Sent wirelessly via BlackBerry from T-Mobile.

HIGHLY CONFIDENTIAL

**From:**          Linsey Rockingham
**Sent:**          Sunday, September 23, 2007 8:31 AM
**To:**            'Jeremy Linder'
**Subject:**       PointCare Distributor Agreement, pricing and customer demo package

**Attachments:**   F-128 B PCT DISTRIBUTION AGREEMENT BLOCK SCIENTIFIC.doc; F-144 B Distributor's
                   Price List.pdf; F-184 A General Distributor Letter Block Scientific.doc

 
F-128 B PCT        F-144 B          F-184 A General
STRIBUTION AGRE Distributor's Price Li..  Distributor Le...

Dear Jeremy,

Thank you for returning the signed NDA.

Please find attached our distributor agreement , pricing list and customer demo package.
We are in the process of reworking the framework for the pricing list based on feedback
from our distributors . The cost of the PointCare NOW instrument at $24,500 and reagents
at $10 a test and distributor discount will remain the same. I expect to have the updated
price list towards the end of next week.

When we were at the AACC we spoke about Russia as a territory so I have put that in the
agreement, if you would like to represent us in other territories please let me know and
we can discuss them.

As I mentioned last time we spoke, the World Health Organization is going to order 41  CD4
instruments for Russia and we would like to get that contract, if possible. So let's try
and get this wrapped up this week so we can move swiftly on getting your Russian
distributor introduced to the PointCare NOW.

Please let me know if you have any questions,

Best Regards,

Linsey


Linsey Rockingham

Director of Marketing

PointCare Technologies Inc.

181 Cedar Hill Street

Marlboro, MA 01752

USA

1

Attorneys' Eyes Only                                    PointCare Supp 09192

```
Tel:  1 508.281.6925  x 26

Mobile : 1  508 369 5965

E-mail:  Lrockingham@Pointcare.net <mailto:Lrockingham@Pointcare.net>
```

2

Attorneys' Eyes Only

## DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement"), effective as of _____ ("Effective Date"), is between PointCare Technologies, a Massachusetts Corporation with its principal office located at 181 Cedar Hill Street, Marlborough, MA 01752, hereinafter called "SUPPLIER," and Block Scientific, Inc a corporation with its principal office located at 473 South Dean Street, Englewood, New Jersey 07631 hereinafter called "DISTRIBUTOR."

SUPPLIER and DISTRIBUTOR, in consideration of the agreements and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, hereby agree as follows:

1. **Products and Pricing.**

    1.1. The products covered by this Agreement are as set forth on Schedule "A" attached hereto and incorporated in its entirety by reference herein (the "Products"). SUPPLIER shall have the authority, in its sole discretion, to (a) change specifications of any Product and shall notify DISTRIBUTOR of any such change, (b) withdraw, add or replace any Product, or (c) change the prices or any individual price, as the case may be, of a Product or Products upon thirty (30) days prior written notice to DISTRIBUTOR. Notwithstanding the forgoing, DISTRIBUTOR shall have the authority, in its sole discretion, to establish the resale price to its customers for any of the Products.

2. **Grant of Distributorship; Reservation of Rights.**

    2.1. SUPPLIER hereby appoints DISTRIBUTOR an authorized non-exclusive distributor of Products solely within Russia (the "Territory"). DISTRIBUTOR shall not sell or cause to be sold Products outside of the Territory without the prior express written consent of SUPPLIER in its sole discretion. The parties hereto acknowledge that this Agreement establishes their relationship solely as distributor and supplier, and nothing herein shall be construed to mean that DISTRIBUTOR is an agent or legal representative of SUPPLIER for any other purpose whatsoever. The parties hereto further acknowledge and agree that SUPPLIER has not granted DISTRIBUTOR any right or authority, and DISTRIBUTOR may not assume or create any obligation or responsibility, expressed or implied, on behalf of or in the name of SUPPLIER or to bind SUPPLIER in any manner whatsoever, without the express prior written consent of SUPPLIER in its sole discretion.

    2.2. SUPPLIER reserves the right, in its sole discretion, to appoint other distributors of the Products, or to distribute Products directly on its own behalf, in and outside the Territory.

3. **Term.**

    3.1. The term of this Agreement shall begin on _____, and shall continue until _____, unless terminated earlier in accordance with the terms of this Agreement (the "Term"). This Agreement shall automatically renew for successive one (1) year terms (each, a "Renewal Term") unless either party provides the other party hereto with written notice at least ninety (90) days prior to the expiration of the Term or any Renewal Term of its intent not to renew this Agreement.

4. **Pricing, Orders and Terms.**

    4.1. Subject to the conditions and in accordance with the terms of this Agreement, DISTRIBUTOR shall purchase and SUPPLIER shall supply the Products as set forth on Schedule "A".

    4.2. DISTRIBUTOR shall purchase Products from SUPPLIER by submitting reasonably detailed written purchase orders to SUPPLIER specifying, at a minimum, the type and quantity of Products to be purchased and the address of the shipping destination for the order (each, an "Order"). Each Order may be submitted to SUPPLIER [via email to sales@pointcare.net, fax to (508) 281-6930. Each Order for Products with a total value of [$500.00] or less, excluding shipping charges and taxes, shall be assessed a [$50.00] per Order service charge. SUPPLIER reserves the right, in its sole discretion, to refuse any Order.

F-126 B

Page 1 of 7

Attorneys' Eyes Only

PointCare Supp 09194

4.3. SUPPLIER shall ship each Order to the location specified on each Order. Except as may otherwise agreed to by the parties in writing, SUPPLIER shall prepay the shipping charges for DISTRIBUTOR and add this cost to DISTRIBUTOR'S invoice related to such Order. SUPPLIER shall assess and DISTRIBUTOR shall pay a *[$50.00]* drop ship fee for each Order shipped directly to DISTRIBUTOR'S customer. Risk of loss for each Order shall transfer from SUPPLIER to DISTRIBUTOR at the time Product is loaded on the common carrier from SUPPLIER'S shipping location.

4.4. Payment Terms:

4.4.1. DISTRIBUTOR shall remit payment in full to SUPPLIER for Orders of Products prior to shipment either by wire transfer or irrevocable letter of payment. Title passes to distributor upon delivery to freight carrier and it is the distributor's responsibility to insure their shipment against damage or loss in transit. Claims damage or loss in route will be the distributor's responsibility.

4.4.2. In the event DISTRIBUTOR fails to remit payments to SUPPLIER in accordance with this Section 4.4, SUPPLIER may, at its sole discretion and in addition to any other rights set forth in this Agreement with respect thereto, hold all shipments of Product until DISTRIBUTOR has remitted payment of all amounts then due to SUPPLIER.

5. DISTRIBUTOR'S Duties.

5.1. DISTRIBUTOR shall:

5.1.1. Maintain an adequate inventory of Products to meet the demand of the DISTRIBUTOR'S customers in a timely fashion.

5.1.2. During the Term and each Renewal Term hereunder, at least four (4) weeks prior to each new calendar quarter, DISTRIBUTOR shall provide a written forecast of the number of all Products it anticipates purchasing from SUPPLIER for the upcoming quarter.

5.1.3. Not make any false or misleading statements to its customers or other third parties regarding SUPPLIER or the Products, or regarding SUPPLIER'S competitors, and shall make no claims, orally or in writing, regarding SUPPLIER or the Products other than those stated in SUPPLIER'S then current approved Product literature.

5.1.4. During the Term, distribute or otherwise sell only disposables for use on the Products that are not likely to affect adversely Product performance, proficiency survey results and/or the ability for SUPPLIER'S technical support personnel to service and troubleshoot problems with such Products.

5.1.5. During the term of this Agreement, DISTRIBUTOR shall defend, indemnify, and hold harmless SUPPLIER from and against any and all damages, losses, expenses, costs, claims, judgments and fees incurred by DISTRIBUTOR (including reasonable attorney's fees) from any third party, arising from or in connection with (a) a breach by DISTRIBUTOR of any covenant, obligation, representation or warranty contained in this Agreement; (b) negligence or willful misconduct by any employee, representative, contractor (other than SUPPLIER) or agent of DISTRIBUTOR and its affiliates; and/or (c) any representations made by DISTRIBUTOR or its employees, representatives, contractors (other than SUPPLIER) or agents concerning Products that are inconsistent with representations made by SUPPLIER concerning Products in its written approved product specifications, other approved written literature, and this Agreement, except to the extent that such losses are due to the gross negligence or willful misconduct of SUPPLIER. The foregoing indemnity shall be contingent upon DISTRIBUTOR receiving notification from SUPPLIER of any claim to be indemnified hereunder in writing promptly after SUPPLIER becomes aware of such claim. SUPPLIER shall, in its sole discretion, either assume the control of the defense of such claim at DISTRIBUTOR'S sole expense (as set forth herein) or appoint DISTRIBUTOR to assume the defense of any such claim. In the event that SUPPLIER appoints DISTRIBUTOR to assume control of the defense of any such claim, DISTRIBUTOR shall provide SUPPLIER with prompt notification of all litigation strategies, and allow SUPPLIER to participate in depositions, other forms of discovery, trial and settlement negotiations; provided however that SUPPLIER may, at its expense and using attorneys of its choice, participate in, but shall not have any control of, the

F-128 B                                                                                           Page 2 of 7

Attorneys' Eyes Only

PointCare Supp 09195

defense of such claim. DISTRIBUTOR further agrees that it shall not engage in any settlement of claims without obtaining SUPPLIER'S express prior written consent in its sole discretion.

5.1.6.  Pay for Orders in accordance with the payment terms specified herein.

5.1.7.  SUPPLIER shall provide after-sales service of systems it sells directly to its customers in the Territory following communication from DISTRIBUTOR indicating repairs are beyond their capability of the DISTRIBUTOR. DISTRIBUTOR shall provide qualified personnel to instruct its customers in the proper operation of the instruments after such personnel have received training from SUPPLIER in accordance with SUPPLIER training documentation.

5.1.8.  At SUPPLIER'S reasonable request, participate with SUPPLIER in meetings (no more frequently than annually, except as may be mutually agreed by the parties) to review sales, marketing and other such matters relating to this Agreement as may be helpful to either party hereto in the performance of their obligations and exercise of their rights under this Agreement.

5.1.9.  Comply in all material respects with all laws and regulations applicable to its activities under this Agreement. In furtherance thereof, DISTRIBUTOR shall maintain complete and accurate records for such periods and in such form as may be required by applicable laws and regulations. DISTRIBUTOR shall reasonably cooperate with SUPPLIER to ensure full compliance with applicable laws, such cooperation to include, without limitation, allowing SUPPLIER to conduct audits and reviews of DISTRIBUTOR'S records to ensure compliance with the terms of this Agreement and any applicable law or regulation.

5.1.10.  Store each Product in accordance with its labeling.

5.1.11.  Maintain traceability with respect to product shipments, including but not limited to instruments, reagents, parts and accessories. This information would include the customer name, address and contact information, item(s) shipped, quantities shipped, lot(s)/serial number(s) shipped, and the date of the shipment.

5.1.12.  Not restock any reagents that have been shipped to a customer location and returned for any reason to the distributor. The supplier's policy is that no reagents are restocked at any time.

5.1.13.  Notify SUPPLIER immediately (within 2 business days) should DISTRIBUTOR receive any Product complaints. In furtherance thereof, DISTRIBUTOR shall promptly provide SUPPLIER with any documents it receives regarding the complaint. DISTRIBUTOR shall also assist SUPPLIER in investigating any complaints that are received, attempt to obtain as much information as reasonably possible from the complainant about the event and promptly transmit that information to SUPPLIER.

5.1.14.  If SUPPLIER determines, in its sole discretion, that a recall or other corrective action is required, promptly and fully assist SUPPLIER in any such effort. This assistance may include, but is not limited to, notifying customers of the recall and providing documentation to SUPPLIER regarding the effectiveness of the recall.

6.  SUPPLIER'S Duties.

6.1.  SUPPLIER shall:

6.1.1.  Provide training for DISTRIBUTOR'S personnel and provide a reasonable amount of SUPPLIER advertising materials to DISTRIBUTOR at no charge for the promotion of Products in the Territory. These materials shall be made available in English and the DISTRIBUTOR shall be responsible for translation into additional languages. SUPPLIER reserves the right to revue any translations of SUPPLIER literature prior to their distribution to end users.

6.1.2.  At DISTRIBUTOR'S reasonable request, participate in instrument demonstrations to SUPPLIER'S qualified prospective customers, provided that the customer lead has not been previously presented to SUPPLIER by another distributor.

F-128 B

Page 3 of 7

Attorneys' Eyes Only

PointCare Supp 09196

6.1.3.  Upon sale of each Product by DISTRIBUTOR, SUPPLIER will provide DISTRIBUTOR an installation and customer training outline, for the installation of the product by the DISTRIBUTOR.

6.1.4.  Label, package and deliver the Products in accordance with this Agreement and all applicable laws.  SUPPLIER shall bear all costs associated with label printing, labeling, and packaging of the Products.

6.1.5.  At DISTRIBUTOR'S reasonable request, participate with DISTRIBUTOR in meetings (no more frequently than annually, except as may be mutually agreed by the parties) to review sales, marketing and other such matters relating to this Agreement as may be helpful to either party hereto in the performance of their obligations and exercise of their rights under this Agreement.

6.1.6.  Make available to DISTRIBUTOR'S personnel training in the operation and service of the Products. Within thirty (30) days of the Effective Date, the parties shall mutually agree to the location and the number of persons to participate in an initial training session. The parties shall mutually agree to all future training sessions as to location and number of attendees. DISTRIBUTOR shall bear all transportation and lodging costs incurred by DISTRIBUTOR'S personnel participating in such training. If any training is performed by SUPPLIER personnel at a location other than SUPPLIER'S facility in Marlborough, MA, DISTRIBUTOR shall bear all transportation and lodging incurred by SUPPLIER'S personnel participating in such training.

6.1.7.  At reasonable times for the fees set forth in Schedule "A" hereto, provide telephone support, consultation, or assistance in the general implementation and operation of SUPPLIERS instruments to DISTRIBUTOR personnel.

7.  Supplier Return Policy.

7.1  Except as set forth in Section 7.3 below, DISTRIBUTOR shall have no right to return Product hereunder unless DISTRIBUTOR makes a request to SUPPLIER in writing for the return of the Products within ten (10) days of receipt of such Products.  Upon timely receipt of a return request, SUPPLIER shall either issue written approval of such return and assign such return a returned materials authorization ("RMA") number, or decline such request for return. SUPPLIER shall refuse delivery of and DISTRIBUTOR shall be solely responsible for any costs associated with (including shipping costs) the return of any Product without such prior written approval and RMA number. Products that are perishable are not returnable.

7.2  SUPPLIER shall assess and DISTRIBUTOR shall pay (a) a restocking fee for each returned Product equal to 20% of the invoiced amount for such Product, and (b) the shipping cost to return such Product; provided however, in the event that the Product is returned solely due to a SUPPLIER shipping error, SUPPLIER order entry error, or due to a Product manufacturing defect, DISTRIBUTOR shall ship the Products back to SUPPLIER at SUPPLIER'S expense and with no restocking fee. The invoiced amount of properly returned Products, exclusive of applicable restocking fees and shipping costs, shall be credited to such DISTRIBUTOR'S account against future purchases, and no cash refunds shall be issued in lieu thereof.

7.3  All shipment shortages and reports of damaged Products must be reported to SUPPLIER within forty-eight (48) hours of receipt of such order. SUPPLIER shall not be responsible for replacement of damaged Products or shipment of shortages if not reported within this time frame.

8.  Limited Warranty.

8.1  SUPPLIER warrants that instruments sold to DISTRIBUTOR shall, for a period of one (1) year from the date of shipment, be free from defects in materials and workmanship, and be of merchantable quality and fit for their intended purpose. SUPPLIER'S sole obligation under the foregoing warranty shall extend to DISTRIBUTOR only. SUPPLIER'S obligation shall be limited to promptly replacing, at no cost, all Products, parts, components and sub-assemblies used by

F-128 B                                                                                   Page 4 of 7

Attorneys' Eyes Only

PointCare Supp 09197

DISTRIBUTOR or its customers to repair or replace any defective Product. DISTRIBUTOR shall provide the labor necessary to perform such repair at its sole expense.

8.2    SUPPLIER shall not be responsible for, and its warranty hereunder shall not apply to, any damage to or breakage of instruments that may be caused by improper or unauthorized use, maintenance, storage, or installation by DISTRIBUTOR, sub-dealers or its customers.

8.3    In the event DISTRIBUTOR notifies SUPPLIER of the occurrence of a warranty claim hereunder, SUPPLIER shall be entitled to inspect any of the instruments or parts which are alleged to have such defect and DISTRIBUTOR shall cooperate with SUPPLIER in such inspection. In the event such defect is not caused by a defect in SUPPLIER'S materials or workmanship, DISTRIBUTOR shall promptly reimburse SUPPLIER for all out-of-pocket expenses incurred by SUPPLIER.

8.4    The express warranty obligations set forth above in this Section, are in lieu of all liabilities or obligations of SUPPLIER for damages including, but not limited to, consequential or special damages occurring out of or in connection with the use or performance of any Product. IT IS FURTHER EXPRESSLY UNDERSTOOD THAT IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES UNDER THIS AGREEMENT.

9.    Termination.

9.1    This Agreement shall continue in full force and effect, and govern all transactions and relations between the parties hereto until expiration of the Term or then applicable Renewal Term unless earlier terminated in accordance with this Section 9.

9.2    *Either party may terminate this Agreement at any time with or without cause, upon one hundred eight (180) days prior written notice to the other party hereto.*

9.3    Either party may terminate this Agreement immediately in the event that the other party hereto commits a material breach of this Agreement and fails to cure such breach within thirty (30) days after receipt of written notice from the non-breaching party.

9.4    Either party may terminate this Agreement immediately in the event that the other party hereto becomes insolvent or seeks protection under any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding, or if any such proceeding is instituted against the other on an involuntary basis and not dismissed within ninety (90) days.

9.5    SUPPLIER may terminate this Agreement immediately in the event that DISTRIBUTOR experiences a change of control including, without limitation, (a) by means of a sale all or substantially all of DISTRIBUTOR'S assets relating to performance of its obligations under this Agreement, or (b) a change in ownership of a controlling portion of DISTRIBUTOR'S voting stock.

9.6    SUPPLIER may terminate this Agreement immediately in the event that DISTRIBUTOR fails to remit payment in accordance with the terms hereof, and fails to cure such breach within ten (10) days after receipt of written notice from SUPPLIER.

9.7    Neither the termination nor expiration of this Agreement shall release or operate to discharge either party from any liability or obligation that may have accrued prior to such termination or expiration or constitute a waiver or relinquishment of any cause of action or claim that a party may have based on events, acts or omissions occurring prior to such termination date. Any termination of this Agreement by a party shall not be an exclusive remedy, but shall be in addition to any legal or equitable remedies that may be available to a party and shall not affect a party's rights to indemnification that are expressly set forth in this Agreement. The mere termination of this Agreement in accordance with its terms shall not, in and of itself, give rise to any damages or liability on the part of the terminating party.

10.    Force Majeure.
F-128 B

Page 5 of 7

Attorneys' Eyes Only

PointCare Supp 09198

10.1    The obligations of SUPPLIER to perform under this Agreement shall be excused during each period of delay by reason of any cause beyond the reasonable control of SUPPLIER including, without limitation, as a result of acts of God, civil disorders or commotions, acts of terrorism, fire, explosions, floods, drought, war, sabotage, embargo, utility failures, labor disturbances, a national health emergency, or appropriations of property, shortages of power or raw material, other materials shortages or failure of any supplier to supply Product or other materials to SUPPLIER or an event of force Majeure suffered by such supplier.

11.    Intellectual Property Ownership and Confidential Information.

11.1 All right, title and interest in and to all the intellectual property (including without limitation computer programs which were created by SUPPLIER or its agents, employees or consultants) (hereinafter referred to as the "Intellectual Property") related to the manufacture, use, sale, performance or operation of any Product, together with all Intellectual Property Rights related thereto, shall be the sole and exclusive property of SUPPLIER. Nothing herein shall preclude SUPPLIER from using such Intellectual Property in any way whatsoever.

11.2 Each party acknowledges that it may receive confidential or proprietary information of the other party in the performance of this Agreement. Each party shall use all necessary efforts to safeguard and to hold such information received by it from the other party in confidence, and shall limit disclosure of the furnishing party's confidential information to those employees of the receiving party and its affiliates who are bound by a written obligation of confidentiality to the receiving party that is consistent with the terms of this Section 11. Each party shall not, directly or indirectly, disclose or publish, or use for the benefit of any third party or itself (except in carrying out its duties under this Agreement), any confidential or proprietary information of the other party, without first having obtained the furnishing party's written consent to such disclosure or use. "Confidential Information" shall include, inter alia, know-how, scientific information, the terms of this Agreement, formulas, methods and processes, specifications, pricing information (including discounts, rebates and other price adjustments) and other terms and conditions of sales, customer information, business plans, and all other intellectual property, sales and marketing information whatsoever relating to the Products. This restriction shall not apply to any information within the following categories: (a) information that is known to the receiving party or its affiliates prior to the time of disclosure to it, to the extent evidenced by written records or other competent proof; (b) information that is independently developed by employees, agents or independent contractors of the receiving party or its affiliates without reference to or reliance upon the information furnished by the disclosing party, as evidenced by written records or other competent proof; (c) information disclosed to the receiving party or its affiliates by a third party that has a right to make such disclosure; or (d) any other information that becomes part of the public domain through no fault or negligence of the receiving party.

11.3 The receiving party shall also be entitled to disclose the other party's confidential information (a) that is required to be disclosed in compliance with applicable laws or by order of any governmental entity, (b) as may be necessary in connection with the enforcement of this Agreement, and (c) to the extent necessary to carry out such party's obligations under this Agreement; provided, however, that the party required to disclose such information shall use commercially reasonable efforts to obtain "confidential treatment" of such information by the governmental entity or other recipient and to redact such terms of this Agreement as the other party shall request, to the extent that such terms may be permissibly redacted under applicable law, and that, in the case of disclosures under (a), shall provide the other Party with a copy of the proposed disclosure in sufficient time to allow reasonable opportunity to comment thereon. The obligations set forth in this Section 11 shall survive the termination or expiration of this Agreement for a period for a period of three (3) years.

11.4 The confidentiality provisions set forth in this Section 11 shall apply to the affiliates of each party, with respect to information furnished or received by an affiliate of a party. Each party shall cause its affiliates to comply with the provisions in this Section 11.

11.5 Each party shall be entitled, in addition to any other right or remedy it may have, at law or in equity, to an injunction, without the posting of any bond or other security, enjoining or

F-128 B

Attorneys' Eyes Only

PointCare Supp 09199

restraining the other party and its affiliates from any violation or threatened violation of the provisions in this Section 11.

12. Miscellaneous.

12.1 Any notice required or permitted under this Agreement shall be in writing and shall be deemed to have been given upon receipt if forwarded by personal delivery, certified mail, or nationally recognized overnight courier properly addressed to the respective parties as set forth below until notice of a different address is supplied in accordance with this Section:

If to SUPPLIER:    PointCare Technologies
                   181 Cedar Hill Street
                   Marlborough, MA 01752
                   Attention:  Eric Newman
                   CFO

If to DISTRIBUTOR:    _____
                     _____
                     _____
                     _____

12.2 This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all previous and contemporaneous verbal and written understandings, agreements, representations and warranties with respect to such subject matter or on which the parties may have relied.

12.3 This Agreement shall be governed by and construed in accordance with the laws of the State of Rhode Island without regard to conflict of laws provisions, and the parties agree to personal jurisdiction and venue in the state and federal courts of Providence, Rhode Island, in any suit or proceeding arising out of the subject matter of this Agreement.

12.4 No amendment or modification of the terms of this Agreement shall be binding on either party unless reduced to writing and signed by an authorized employee of the party to be bound.

12.5 DISTRIBUTOR may not assign or otherwise transfer this Agreement or any interest herein or rights hereunder without the prior written consent of SUPPLIER in its sole and absolute discretion, whether by sale of assets, operation of merger, consolidation, reorganization or similar event, and any such purported assignment, transfer or attempt to assign or transfer any interest herein or right hereunder shall be void and of no effect. SUPPLIER may assign its rights and obligations hereunder, without the prior written consent of the DISTRIBUTOR, to any affiliate, or a successor (whether by merger, consolidation, reorganization or other similar event) or purchaser of all or a portion of its business assets.

12.6 For convenience of the parties hereto, this Agreement may be executed in one or more counterparts, each of which shall be deemed an original for all purposes.

IN WITNESS WHEREOF, the parties have by their duly authorized officers executed this Agreement as of the Effective Date.

POINTCARE TECHNOLOGY, Inc.                    DISTRIBUTOR

By: _____                     By: _____
Name: _____                     Name: _____
Title: _____                     Title: _____
F-128 B                                                    Page 7 of 7

Attorneys' Eyes Only                              PointCare Supp 09200



181 Cedar Hill Street
Marlborough, MA 01752
USA

Tel: +1 508 281 6925
Fax: +1 508 281 6930
www.pointcare.net

## Distributor Price List

| Order Number | Description | List Price | Distributor Price |
|---|---|---|---|
| 36008 | **PointCare NOW System** | $ 24,500 | $ 17,150 |
| | ✓ PointCare NOW Instrument | | |
| | ✓ Tape roll printer | | |
| |     o   includes 1 roll each of ribbon and paper | | |
| | ✓ System user manual | | |
| | ✓ PointCare NOW Preventive Maintenance Pack | | |
| | ✓ Barcode reader | | |
| | ✓ Waste Jug | | |
| 25057 | **PointCare NOW Carrying Case** | $ 500 | $ 500 |
| 36009 | **PointCare NOW Demo Reagent Package** | $ 2,500 | $ 2,500 |
| | * available one per annum | | |
| | ✓ 5 x PointCare NOW Reagent Package 100 | | |
| 36001 | **PointCare NOW Customer Installation Package** | $ 31,400 | $ 22,350 |
| | ✓ PointCare NOW Instrument | | |
| | ✓ Waste Jug | | |
| | ✓ User Manual | | |
| | ✓ Uninterruptible Power Supply (UPS) | | |
| | ✓ Tape roll printer | | |
| | ✓ Printer Accessory Package | | |
| | ✓ Barcode Reader | | |
| | ✓ PointCare NOW Preventive Maintenance Package | | |
| | ✓ PointCare NOW Reagent Package PLUS 100 | | |
| | ✓ 1 x CD4*NOW* Control Normal | | |

F-144 rev. B

Attorneys' Eyes Only

PointCare Supp 09201

# ⊞⊞ PointCare®

161 Cedar Hill Street
Marlborough, MA 01752
USA

Tel: +1 508 281 6925
Fax: +1 508 281 6930
www.pointcare.net

| Order Number | Description | List Price | Distributor Price |
|---|---|---|---|
| | ✓ 1 x CD4*NOW* Control Low | | |
| | ✓ 1 x CBC*NOW* Control Normal | | |
| | ✓ 1 x CBC*NOW* Control Low | | |
| 36002 | **PointCare NOW Reagent Package 100** | $ 1,000 | $ 700 |
| | ✓ 1 x CD4*NOW* GOLD Pack | | |
| | o  CD4*NOW* Gold | | |
| | o  CD4*NOW* Reconstitution Fluid | | |
| | o  CD4*NOW* Accel | | |
| | ✓ 2 x CD4*NOW* LiquiPack | | |
| | o  CD4*NOW* Lyse | | |
| | o  CD4*NOW* Diluent | | |
| | o  CD4*NOW* Clean | | |
| | ✓ 2 x CD4 Patient ID Labels (50 in duplicate) | | |
| | ✓ 1 x CD4*NOW* Waste Tablets (Pack of 6) | | |
| 36003 | **PointCare NOW Reagent Package 300** | $ 3,000 | $ 2,100 |
| | ✓ 3 x CD4*NOW* GOLD Pack | | |
| | o  CD4*NOW* Gold | | |
| | o  CD4*NOW* Reconstitution Fluid | | |
| | o  CD4*NOW* Accel | | |
| | ✓ 6 x CD4*NOW* LiquiPack | | |
| | o  CD4*NOW* Lyse | | |
| | o  CD4*NOW* Diluent | | |
| | o  CD4*NOW* Clean | | |
| | ✓ 6 x CD4 Patient ID Labels (50 in duplicate) | | |
| | ✓ 3 x CD4*NOW* Waste Tablets (Pack of 6) | | |
| 36004 | **PointCare NOW Reagent Package PLUS 100** | $ 1,040 | $ 740 |
| | ✓ 1 x CD4*NOW* GOLD Pack | | |
| | o  CD4*NOW* Gold | | |
| | o  CD4*NOW* Reconstitution Fluid | | |
| | o  CD4*NOW* Accel | | |

F-144 rev. B

Attorneys' Eyes Only

PointCare Supp 09202

181 Cedar Hill Street
Marlborough, MA 01752
USA

Tel: +1 508 281 6925
Fax: +1 508 281 6930
www.pointcare.net

# PointCare®

| Order Number | Description | List Price | Distributor Price |
|---|---|---|---|
| | ✓ 2 x CD4*NOW* LiquiPack | | |
| |     o   CD4*NOW* Lyse | | |
| |     o   CD4*NOW* Diluent | | |
| |     o   CD4*NOW* Clean | | |
| | ✓ 1 x CD4*NOW* Waste Tablets (Pack of 6) | | |
| | ✓ 1 x Phlebotomy Package | | |
| | ✓ 2 x CD4 Patient ID Labels (50 in duplicate) | | |
| 36005 | **PointCare NOW Reagent Package PLUS 300** | $ 3,120 | $ 2,220 |
| | ✓ 3 x CD4*NOW* GOLD Pack | | |
| | ✓ 6 x CD4*NOW* LiquiPack | | |
| | ✓ 3 x CD4*NOW* Waste Tablets (Pack of 6) | | |
| | ✓ 1 x Printer paper roll | | |
| | ✓ 3 x Phlebotomy Package | | |
| | ✓ 6 x CD4 Patient ID Labels (50 in duplicate) | | |
| 36006 | **PointCare NOW Preventive Maintenance Package** | $ 2,500 | $ 2,500 |
| | ✓ PointCare NOW Maintenance Pack | | |
| | ✓ CD4*NOW* Bleach | | |
| | ✓ CD4*NOW* SuperWash | | |
| 36007 | **Printer Accessory Package (300 Uses)** | $ 30 | $ 20 |
| | ✓ Printer paper roll (Pack of 2) | | |
| | ✓ Printer ribbon roll (Pack of 2) | | |
| 30036 | **Phlebotomy Package** | $ 40 | $ 40 |
| | ✓ 100 x K₂EDTA vacuum blood collection tubes | | |
| | ✓ 100 x Venipuncture needles | | |
| | ✓ 100 x Needle holders | | |

F-144 rev. B

Attorneys' Eyes Only

PointCare Supp 09203



181 Cedar Hill Street
Marlborough, MA 01752
USA

Tel: +1 508 281 6925
Fax: +1 508 281 6930
www.pointcare.net

| Order Number | Description | List Price | Distributor Price |
|---|---|---|---|
| | **PointCare NOW Components Available for Individual Purchase** | | |
| | **PointCare NOW Control Reagents** | | |
| 25019 | CD4*NOW* Control Normal | $ 200 | $ 200 |
| 25018 | CD4*NOW* Control Low | $ 200 | $ 200 |
| 25025 | CBC*NOW* Control Normal | $ 200 | $ 200 |
| 25024 | CBC*NOW* Control Low | $ 200 | $ 200 |
| 25070 | Bar code reader | $ 1,500 | $ 1,000 |
| 629108 | PointCare NOW User Manual | $ 2,500 | $ 2,500 |
| 30100 | PointCare NOW Service Manual | $ 2,500 | $ 2,500 |
| 25110 | Uninterruptible Power Supply (UPS) – 110 Volt | $ 1,000 | $ 700 |
| 25115 | Uninterruptible Power Supply (UPS) – 220 Volt | $ 1,000 | $ 700 |
| 25042 | Tape roll printer | $ 1,500 | $ 1,000 |
| 30018 | Waste Jug | $ 30 | $ 20 |

**INFORMATION**

1) Information about PointCare Technologies, Inc. or our products can be obtained by viewing our website (www.pointcare.net) or contacting us at sales@pointcare.net.

2) All orders may be placed with our sales department. Please contact Jennifer Newman at 508-281-6925 extension 24 or email at sales@pointcare.net.

3) All products are shipped FOB shipping point.

4) Payment is expected at the time of customer order placement via wire transfer.

F-144 rev. B

Attorneys' Eyes Only                                    PointCare Supp 09204

**PointCare**®

J81 Cedar Hill Street
Marlborough, MA 01752
USA

Tel: +1 508 281 6925
Fax: +1 508 281 6930
www.pointcare.net

September 21st 2007

Jeremy Linder
Block Scientific
473 South Dean Street
Englewood, New Jersey 07631
USA

Re:    PointCare *NOW* Unit and Reagent Pricing

Dear Jeremy:

We appreciate the opportunity to work with you in our mutual goal to provide affordable healthcare worldwide.  As a valued distributor of PointCare products, we wish to make your program a success, and therefore we are pleased to offer you the following pricing structure that rewards your efforts and assists you in the placement of PointCare *NOW* instruments.

The following pricing outlines our commitment to providing you with lower cost demonstration units, available along with units purchased at the standards distributor price.

**PointCare *NOW* Systems:**

| | |
|---|---|
| List Price: | $24,500.00 |
| Standard Distributor Price: | $17,150.00 |
| Demo Unit Price: | $12,500.00 (available to distributors with the purchase of 5 instruments at the Standard Distributor Price) |

F-184 A

Attorneys' Eyes Only

PointCare Supp 09205

Block Scientific
September 21 st 2007

Page 2

**PointCare *NOW* Reagent Pricing:**

| | |
|---|---|
| List Price: | $10.00 per test |
| Standard Distributor Price: | $7.00 per test |

In order to assist you in the process of instrument demonstrations and customer training, we will allow you to purchase up to 500 tests annually at a special discounted price of $5.00 per test.

Please note that all shipments are FOB shipping point. We hope that you will find the above program to be a beneficial arrangement which will make your relationship with PointCare Technologies, Inc. even more successful. You may contact us at sales@pointcare.net, telephone +1 508 281 6925, extension 24, with any questions about ordering or shipment details.

We look forward to a mutually beneficial relationship with Block Scientific

Sincerely,


Petra B. Krauledat
CEO


F-184 A

Attorneys' Eyes Only

PointCare Supp 09206

**From:**    Costantini, Anthony J.
**Sent:**    Tuesday, April 22, 2008 8:21 PM
**To:**    'Michael P. Twohig'
**Cc:**    Damiano, Brian J.; Dellaportas, John; Andrew F. Caplan
**Subject:** RE: Drew v. PointCare

thx.i await the answer to my other questions

---

**From:** Michael P. Twohig [mailto:mtwohig@burnslev.com]
**Sent:** Tuesday, April 22, 2008 1:52 PM
**To:** Costantini, Anthony J.
**Cc:** Damiano, Brian J.; Dellaportas, John; Andrew F. Caplan
**Subject:** RE: Drew v. PointCare

it was forwarded to me and I produced as soon as I got it (hence the redacted part)...I will try to obtain a direct copy of it and forward to you ASAP

Also, we just received Petra's cell phone records from her provider...they are being bates'd and we will send via e-mail shortly


Michael P. Twohig, Esq.
Burns & Levinson LLP
125 Summer Street
Boston, MA 02110

tel. 617-345-3233 (direct)
tel. 617-345-3000 (reception)
fax 617-345-3299
e-mail: mtwohig@burnslev.com

To ensure compliance with requirements imposed by the IRS, Burns & Levinson LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @burnslev.com, and delete the message.

---

**From:** Giampietro, Grace [mailto:GGiampietro@duanemorris.com] **On Behalf Of** Costantini, Anthony J.
**Sent:** Tuesday, April 22, 2008 1:47 PM
**To:** Michael P. Twohig; Andrew F. Caplan

**Cc:** Damiano, Brian J.; Dellaportas, John
**Subject:** Drew v. PointCare

Dear Michael,

Thank you for your e-mail of Friday night, enclosing a February 23, 2008 e-mail from Petra Krauledat to a number of individuals. We have several questions about this e-mail.

1. Why did it just turn up now, given the extensive efforts made to review e-mails? Even assuming that there may have been a problem with retrieving Ms. Krauledat's blackberry e-mails, there are four recipients.

2. Why is whatever is above the e-mail redacted? I would assume that whatever was redacted had to do with the substance of Ms. Krauledat's e-mail, i.e., hiring distributors in Drew territories.

3. Why doesn't the e-mail have a "from" field? This strikes us as unusual, and we compared it with other e-mails sent from Ms. Krauledat's blackberry (all of which have a "from" field.)

We would appreciate a response as promptly as possible, especially if you plan to use the document in your response to our motion.

**Grace Giampietro**
Legal Assistant

**Duane Morris LLP**
1540 Broadway
New York, NY 10036-4086
P: 212.471.1823 F: 212.692.1020
GGiampietro@duanemorris.com
www.duanemorris.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.