Anthony J. Costantini
John Dellaportas
Brian Damiano
Duane Morris LLP
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Plaintiff Drew Scientific, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

DREW SCIENTIFIC, INC.,                            :                    08 CV 1490 (AKH)
                                                  :
                         Plaintiff,               :
                                                  :
            -v-                                   :
                                                  :
POINTCARE TECHNOLOGIES, INC.,                     :
                                                  :
                         Defendant.               :
--------------------------------------------------------x

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

DUANE MORRIS LLP
1540 Broadway
New York, NY 10036
(212) 692-1000
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS................................................................................(i)

TABLE OF AUTHORITIES........................................................................(iii)

PRELIMINARY STATEMENT....................................................................1

COUNTER-STATEMENT OF FACTS.........................................................5

    1.    PRE-CONTRACT FEASIBILITY STUDY..............................5

    2.    PRE-CONTRACT DISCUSSIONS.........................................6

    3.    THE AGREEMENT................................................................7

    4.    THE POST-CONTRACT ENGINEERING MEETING..........9

    5.    THE TIMETABLE...............................................................10

    6.    SOFTWARE INTEGRATION...............................................13

    7.    OTHER HARDWARE PROBLEMS......................................14

    8.    WORKING TOGETHER ....................................................15

    9.    THE NP PROJECT .............................................................17

    10.    THE O'CONNOR SIDESHOW............................................18

    11.    DISTRIBUTORS AND SALES.............................................18

ARGUMENT.............................................................................................20

THIS COURT SHOULD GRANT DREW A PRELIMINARY INJUNCTION..............20

    Drew is Likely to Succeed on the Merits................................................20

        1.    Drew did not Breach the Agreement ............................................20

        2.    Even if there were a Breach, Drew Cured It.................................23

        3.    PointCare's Breach of the Agreement...........................................27

Drew is Facing Immediate and Irreparable Harm..................................................30

    Drew's Assertions of Irreparable Harm
    are Distinct and Highly Substantiated..........................................................30

    It Is Patently Clear That the HT and NP Machines are Competitive.........35

    Allegations Concerning PointCare's Illicit Use Of
    Confidential Information More Than Speculative,
    Warranting Injunctive Relief From Irreparable Harm..............................37

The Balance of Hardships Tips in Favor of Drew..................................................39

Drew's Hands are Clean And Its Request for Equitable Relief Stands.................40

An Appropriate Provisional Remedy Would Be to Direct PointCare
to Fill Drew's NP Orders, and Accept Delivery of the HT....................................41

No Security is Needed in the Circumstances.........................................................42

CONCLUSION.......................................................................................................44

## TABLE OF AUTHORITIES

### CASES

Page

1800PostCards, Inc. v. Morel,
153 F. Supp. 2d 359 (S.D.N.Y. 2001)..............................................................29

AB Electrolux v. Bermil Indus. Corp.,
481 F. Supp. 2d 325 (S.D.N.Y. 2007)..............................................................43

AM Cosmetics Inc. v. Solomon,
67 F. Supp. 2d 312 (S.D.N.Y. 1993)................................................................27

Aim Int'l Trading, L.L.C. v. Valcucine S.p.A.,
2002 U.S. Dist. LEXIS 10373 (S.D.N.Y. June 11, 2002) ......................................32, 43

B.G. Soft Ltd. v. BG Soft Int'l, Inc.,
2002 U.S. Dist. LEXIS 13508 (E.D.N.Y. Apr. 29, 2002) ............................................42

BGW Dev. Corp. v. Mount Kisco Lodge No. 1552 of the Benevolent Order of Elks of
the United States,
247 A.D.2d 565 (2d Dep't 1998)........................................................................29

Brenntag Int'l Chems., Inc. v. Norddeutsche Landes,
1998 U.S. Dist. LEXIS 13109 (S.D.N.Y. Aug. 25, 1998)............................................43

Carvel Corp. v. Diversified Management Group, Inc.,
930 F.2d 228 (2d Cir. 1991)...........................................................................29

Clark Oil Trading Co. v. J. Aron & Co.,
256 A.D.2d 196 (1st Dep't 1998).....................................................................24

Cohen v. Kranz,
12 N.Y.2d 242 (1963) ...................................................................................26

Doctor's Associates, Inc. v. Stuart,
85 F.3d 975 (2d Cir. 1996)............................................................................42

Estate of John Lennon v. Screen Creations,
939 F. Supp. 287 (S.D.N.Y. 1996)....................................................................40

Experience Hendrix, LLC v. Chalpin,
461 F. Supp. 2d 165 (S.D.N.Y. 2006)................................................................39

Gasser Chair Co. v. Infanti Chair Mfg. Corp.,
943 F. Supp. 201 (E.D.N.Y. 1996) ...................................................................37

Geneva Pharmaceuticals Technology Corp., v. Barr Laboratories Inc.,
386 F.3d 485 (2nd Cir. 2004)................................................................................30

Hammond Packing Co. v. Arkansas,
212 U.S. 322 (1909)..............................................................................................39

Hawes Office Systems, Inc. v. Wang Laboratories, Inc.,
580 F. Supp. 812 (E.D.N.Y. 1984) .......................................................................29

Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.,
441 F. Supp. 2d 552 (S.D.N.Y. 2006)...................................................................42

Intermetal Fabricators, Inc. v. Losco Group, Inc.,
2000 U.S. Dist. LEXIS 11622 (S.D.N.Y. Aug. 11, 2000)....................................29

Interphoto Corp. v. Minolta Corp.,
417 F.2d 621 (2d Cir. 1969)..................................................................................33

Jacobson & Co. v. Armstrong Cork Co.,
548 F.2d 438 (2d Cir. 1977)..................................................................................33

LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,
424 F.3d 195 (2d Cir. 2005)..................................................................................21

Leadsinger, Inc. v. Cole,
2006 U.S. Dist. LEXIS 55550 (S.D.N.Y. April 4, 2006) .....................................39

Lumex Inc. v. Highsmith,
919 F. Supp. 624 (E.D.N.Y. 1996) .......................................................................36

Manganaro v. InteropTec,
874 F.Supp. 660 (E.D. Pa 1995) ......................................................................34-35

Marino Industries Corp. v. Chase Manhattan Bank,
686 F.2d 112 (2d Cir. 1982)........................................................................23-24, 26

Medinol Ltd. v. Boston Sci. Corp.,
346 F. Supp. 2d 575 (S.D.N.Y. 2004)...............................................................21-22

Miller v. Forge Mench Pshp. Ltd.,
2001 U.S. Dist. LEXIS 13046 (S.D.N.Y. Aug. 29, 2001)...................................21

National Kitchen Products, Inc. v. Kelmort Trading & Company, et. al.,
1992 U.S. Dist. LEXIS 657 (S.D.N.Y. Jan. 24, 1992) .....................................32-33

Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.,
992 F.2d 430 (2d Cir. 1993)...........................................................................41

Residential Funding Corp. v. DeGeorge Financial Corp.,
306 F.3d 99 (2d Cir. 2002)...........................................................................39

Reuters Ltd. v. United Press Intern., Inc.,
903 F.2d 904 (2d Cir. 1990)........................................................................ 32-33

Richbell Info. Servs. v. Jupiter Partners, L.P.,
309 A.D.2d 288 (1st Dep't 2003)...................................................................28

Shaw Group, Inc. v. Triplefine Int'l Corp.,
322 F.3d 115 (2d Cir. 2003)...........................................................................21

Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.,
5 Misc. 3d 285 (Sup. Ct., N.Y. County 1997) ...............................................37

Time Warner Cable, Inc. v. DIRECTV, Inc.,
2007 U.S. Dist. LEXIS 32672 (S.D.N.Y. May 2, 2007) ................................42

Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,
60 F.3d 27 (2d Cir. 1995) ..............................................................................31

Travellers Int'l, A.G. v. Trans World Airlines,
41 F.3d 1570 (2d Cir. 1994)......................................................................... 28-29

Tucker Anthony Realty Corp. v. Schlesinger,
888 F.2d 969 (2d Cir. 1989)......................................................................... 37-38

Ulysses I & Co. v. Feldstein,
2002 U.S. Dist. LEXIS 14541 (S.D.N.Y. Aug. 8, 2002) aff'd, 2003 U.S. App. LEXIS
20115 (2d Cir. Oct. 2, 2003) ..........................................................................40

WPA/Partners LLC v. Port Imperial Ferry Corp.,
307 A.D.2d 234 (1st Dep't 2003)...................................................................24

Westwoods Aviation, LLC v. Atl. Aviation Flight,
2007 U.S. Dist. LEXIS 63535 (S.D.N.Y. August 28, 2007) .........................27

Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.,
946 F.2d 1003 (2d Cir. 1991).........................................................................28

Zeising v. Kelly,
152 F. Supp. 2d 335 (S.D.N.Y. 2001).............................................................28

**STATUTES**

Federal Rule of Civil Procedure 65..........................................................................passim

Plaintiff Drew Scientific, Inc. ("Drew") respectfully submits this Reply Memorandum of Law in further support of its motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 as against defendant PointCare Technologies, Inc. ("PointCare").

## I.    **PRELIMINARY STATEMENT**

PointCare's Opposition to Drew's Motion for Preliminary Injunction is astounding. After the parties were allocated a short time-span to conduct extensive discovery, both parties applied themselves vigorously.  Over 26,000 documents were produced, and eleven depositions, most of them full-day, were conducted over thirteen days.  Supported by the record produced in that discovery, Drew served its Motion for Preliminary Injunction on April 16, 2008 (seven days after the last deposition), a date it voluntarily pushed up to accommodate its adversary.  Aside from the discovery, pleadings and correspondence in the litigation, Drew submitted only one document outside the record:  a three-page Affidavit dated April 15, 2008 from Drew's Sales Manager, Frank Matuszak, on the subject of the irreparable harm suffered by Drew, an issue that PointCare unaccountably had not touched on in its three-hundred plus page deposition of Mr. Matuszak.

At this point, PointCare clearly understood that the record as it existed did not support any Opposition to the Preliminary Injunction.  Its solution was to change the record.  In addition to a Memorandum of Law a third longer than Drew's, it submitted _five_ Affidavits totaling ninety-two pages in length.  Four of the five affiants had been deposition witnesses, including PointCare's two principals whose Affidavits totaled sixty-seven pages.  The Affidavits hardly touched on any issues not covered in the discovery process, but are instead a wholesale effort to replace the inadequate testimony given by the six PointCare deposition witnesses.  So arduous was the attempt to expand the record that PointCare could not complete

1

it on time (April 25) and instead served its papers two days late without the permission of the Court or the consent of Drew.

After all that, the attempt is a colossal failure, although it has regrettably necessitated the submission of three additional declarations by Drew[1] to correct the otherwise distorted factual record that PointCare belatedly attempts to create. At the end, everything remains much the same as when Drew filed its Motion.

As the Court will recall, the central dispute revolves around the high throughput ("HT") device that the parties were developing together pursuant to their Agreement until PointCare effectively abandoned the effort in June 2007. The central technical problem that held up the development was the fact that when PointCare's gold assay interacted with Drew's HT machine, the gold adhered to the machine's interior surface and obscured the vision of Drew's optical sensors to the point where CD4 counts were unreliable.

In its opening brief, Drew presented evidence showing that both parties entered into the Agreement in reliance upon a thorough feasibility study done by PointCare and that Drew in particular relied upon a critical conversation that the CEO of its corporate parent Escalon had with the Chief Scientific Officer of PointCare. In response, PointCare tries to separate itself on both points claiming that the feasibility study was not theirs and that Escalon's CEO was insufficiently specific about the conversation. As shall be seen below, the feasibility study itself, the actual testimony of the Escalon CEO, and the circumstances under which the parties first came together all rebuke PointCare's position.

---

[1]    The additional declarants are Frank Matuszak, who addresses certain new marketing-related claims made by PointCare; Karl Gu, who addresses brand-new software issues PointCare is trying to interject; and George Chappell, who addresses some new claims made by PointCare's scientists. Their declarations are being filed simultaneously herewith.

From this less than promising start, PointCare moves on to attack Drew's interpretation of the Agreement. Whereas Drew had argued that the HT development was a mirror-image responsibility, i.e., Drew had to make its hardware work with PointCare's assay and PointCare had to make its assay work with Drew's hardware, PointCare's Chief Scientific Officer argues that the entire compatibility responsibility was Drew's. Unfortunately, that argument is not consistent with either the plain language of the Agreement or the testimony of PointCare's CEO (or, for that matter, common sense).

In the same vein, PointCare argues that a timeline attached to the Agreement is absolutely binding on Drew, notwithstanding the gold adherence problem unanticipated by PointCare. This argument is not consistent with the timeline itself, the manner in which the parties interacted, or how major technical developments are accomplished.

Realizing that the timeline was thrown off by the unanticipated gold adherence problem, PointCare's Chief Scientific Officer belatedly remembers that he warned Drew about the problem. Not only do the circumstances not support his position, the document he cites in support says the exact opposite of what he is now claiming.

PointCare then begins in earnest to try to find problems other than the gold adherence issue in order to obscure the central issue that delayed the HT's development. PointCare points to software problems, other hardware problems, and claimed chagrin over a Drew letter that supposedly so upset PointCare that it justifies their proven abandonment of the Agreement. All of these sideshows lack factual foundation, as does the biggest sideshow of all: the fact that a fired PointCare sales manager, who also happened to be a PointCare shareholder, shared information (most of it non-confidential) with his counterpart at Drew. Lost is the fact that Drew never acted on any of this information whether it was confidential or not.

Once the smoke clears, certain central facts remain.  Drew and PointCare had a mutual obligation to work on this project <u>together</u> and to solve unanticipated difficulties <u>together</u>, such as the gold adherence problem which was the principal cause of delay.  When this problem proved to be resistant, PointCare's response of effectively abandoning the HT and jumping the NP was not appropriate.  Nor is its response of invading territories assigned to Drew under the Agreement, recruiting distributors, and making NP sales in violation of the Agreement.  Also inappropriate was their response of refusing delivery of the HT when Drew solved the intractable gold adherence problem and had the HT proven fit for delivery by an independent expert, first recommended by PointCare.

Against this background, the application of law is simple.  Drew did not breach the Agreement, and PointCare's declaration otherwise is without basis.  Even if it had a basis, Drew has cured the breach by offering delivery of equipment responsive to PointCare's Notice of Breach, notwithstanding PointCare's unjustified refusal to take delivery.

As discussed further below, there is more than enough evidence to support a holding that Drew has suffered, or is about to suffer, an irreparable harm, especially when one considers that PointCare's CEO has conceded that the original Affidavit she filed with this Court is untrue in several respects.  The notion that Drew lacks concrete support is without merit.  Taken with a likelihood of success that is off the charts, an injunction should issue.

 The only real question is the scope of the preliminary injunction.  Certainly PointCare should be compelled to cease its invasions of Drew territories and to take delivery of the HT so that it can perform its responsibilities under the Agreement.  While it is tempting to ask this Court to enjoin further NP sales until the HT is marketable, Drew realizes that the NP (as well as the HT) serve humanitarian purposes, and that distribution should not be delayed by a business

dispute.  Instead, Drew suggests that the Order direct PointCare to honor Drew's NP orders both

to remediate some of the negative effect of PointCare's foot-dragging and to further serve the

humanitarian purpose of the device.

## II.    COUNTER-STATEMENT OF FACTS[2]

1.    PRE-CONTRACT FEASIBILITY STUDY

The parties met because PointCare had an immediate need and approached Drew; they

did not, as PointCare claims, meet by chance (See Matuszak Tr. at 110:22-113:8).  In any event,

PointCare cannot contest that, before it entered into a contract with Drew, it performed a

thorough feasibility study of whether its CD4 assay could be utilized with Drew's Excell 22 (the

precursor for the HT).  PointCare now tries to explain that a Drew employee, Roger Bouree, was

also involved in the feasibility study.  His involvement, whether heavy or light, is irrelevant.  The

simple fact of the matter is that both sides relied on the feasibility study (See Exhibit 1 to Barry

Dep.), which PointCare's Project Manager Don Barry prepared under Dr. Hansen's supervision.

(See Hansen Tr. at 180:7-182:16).  Notably, the only two other names appearing on the study

other than Messrs. Hansen and Barry are Romiya Glover and Maurice Diore, both of whom are

also PointCare employees.  (See Exhibit 1 to Barry Dep.).

The central conclusion of the study, which Hansen endorsed (See Hansen Tr. at 179:15-

181:10) could not be clearer:

> The Excell 22 system can be modified to accommodate a
> CD4 immunogold assay.  The Excell 22 can be adapted to meet the
> needs of a developing world market for high volume CD4 analysis.

(See Exhibit 1 to Barry Dep. at PointCare Supp. 05511).

---

[2]    This section addresses PointCare's attempts to distort the evidentiary record.

The study is even clearer as to the modifications[3] to the Excell optics PointCare thought necessary for the CD4 assay.

> The Excell 22 optics can be used for the CD4 immunogold assay with the following modifications:
>
> i. An additional PMT now should be placed on the opposite side of the "super-wide angle" detector to act as a "right-angle scatter" detector. There should be no mask on the side and testing will need to be done to determine the need for a light collection lens.
>
> ii. The interior of the optical assembly should have a black finish.
>
> iii. A power increase or change to the current Excell 22 laser may be necessary. This should be pursued as part of assay and system optimization when rapid sample delivery is available. Options for integration on the RAS detector will also have to be examined. The beam size appears to be appropriate for CD4 analysis.

(See id. at PointCare Supp. 05512)

There can be no hiding the simple truth: the critical feasibility study done by PointCare, relied upon by both parties before entering into the contract, did not anticipate that the gold assay would adhere to the interior surfaces of the HT and obscure the optics. While there may be reasons why an outstanding scientist like Dr. Hansen failed to anticipate this gold adherence problem, PointCare should not blame Drew for his failure.

2.    PRE-CONTRACT DISCUSSIONS

Dr. Hansen, who had only the vaguest recollection of pre-contract discussions at his deposition, now vigorously recalls that he never told Escalon CEO DePiano that PointCare, with its familiarity with the AURICA and the gold assay, would guide Drew through the development

---

[3]    Barry testified that it was Hansen who recommended the modifications necessary for the optics to be used with the assay (See Barry Tr. at 12-25; see also Exhibit 2 to Barry Dep.).

process. (See the Affidavit of W. Peter Hansen dated April 25, 2008 (the "Hansen Aff.") at ¶ 51). Presumably, this is an attempt to create a credibility issue.

If so, it does not take long to resolve.  Who is likelier to have the more accurate recollection:  Mr. DePiano, a CEO whose company has just taken over a struggling Drew and who saw the HT project as a deviation from the strategic plan he had recently promulgated (See DePiano Tr. at 66:16-68:10).  Or Dr. Hansen, a man desperate to replace the revenue of the now-deceased AURICA (See Hansen Aff. at ¶ 25).  Not only does it make sense that such a conversation occurred; it had to occur.  CEO DePiano did not hide his skepticism; he asked Dr. Hansen to address it and he did[4].

In any event, the proof is in the pudding:  the contract.

3.    THE AGREEMENT

PointCare denies that the Agreement imposes mirror-image duties.  Such a view is contrary to the language of Annex 1.  The topmost portion of the Annex, which PointCare loves to quote, states Drew is responsible for making the HT compatible with the CD4.  But the bottom portion of the Annex, which PointCare never quotes, states that:

> "PointCare is responsible for and will bear the cost associated with and related to the development and approval for sale in the United States of PointCare CD4 sure™ Lymphocyte Enumeration Assay that will be compatible with Drew's HTc and HTw diagnostic instrumentation platforms."

(Emphasis added).

Parallel language appears in the respective Drew and PointCare second bullet points, and the third Drew bullet point makes clear that software development for the machine was a joint

---

[4]    PointCare portrays DePiano as being vague on this conversation.  The full text is on pp 135-140 of Mr. DePiano's deposition.  The Court is invited to make its own judgment.

development, as does Attachment 1. Indeed, even Dr. Hansen admits to assigning such duties to personnel from both companies (See Hansen Tr. at 198:4-205:19).

Dr. Hansen resists the obvious, standing by his incredible deposition testimony that PointCare did not need to do a thing to make its assay compatible with the Drew hardware. (See Hansen Aff. at ¶¶ 52-56; Hansen Tr. at 194:4-197:20). He should have checked with the Company's CEO (his wife, Petra Krauledat) who testified:

> Q. And turn to your attention to the bottom half of the page which talks about PointCare's responsibilities under Annex 1. Do you see that, Doctor?
>
> A. Yes.
>
> Q. The first bullet where it says, "PointCare is responsible for" - - I'm not going to read the whole thing, but basically it says "responsible for" – I'll read the whole thing.
>
> "PointCare is responsible for and will bear the costs associated with and related to the development and approval for sale in the United States of PointCare's CD4SURE Lymphocyte Enumeration assay that will be compatible with Drew's HTc and HTw's diagnostic instrumentation platforms."
>
> Do you see that?
>
> A. I do.
>
> Q. What in your view was PointCare required to do to carry out that responsibility?
>
> A. It was required to adjust its [PointCare's] assay to the requirements of the optical subsystem of the HT unit, the HT instrument. It was required to test - - to develop all other - - all test components to the point that they were manufacturable and stable as to the specification given in the agreement. (See Krauledat Tr. at 203:25-204:25) (emphasis added); see also Krauledat Affidavit of February 19, 2008 at ¶ 36[5].)

---

[5]    PointCare cites Mr. DePiano's testimony at p. 129 to argue the contrary. A reading of the full text on this subject between pp. 129-135 creates a different picture.

Once again, the truth is inescapable.  This is a contract which required both parties to work together to make their respective products compatible with each other.  It provides no excuse for Dr. Hansen to abandon the contract when he encountered problems that he had not anticipated and for which he had no ready answers.

4.    THE POST-CONTRACT ENGINEERING MEETING

Dr. Hansen interjects the thought that he and Don Barry had a meeting with Drew engineers on June 13, 2006 just after the contract was signed at which some critical issues were discussed.  He says that the Drew engineers insisted on following certain approaches that led to the gold adherence problem, which he supposedly warned them about at the meeting.

The first part of his statement makes no sense.  The meeting took place <u>after</u> the contract was signed, and thus <u>after the PointCare specifications (which were drafted by Barry (see Barry Tr. at 74:11-74:13)) were incorporated into the Agreement.</u>  (See Exhibit 1 to Complaint at Attachment 2 to Annex 1).  These specifications required a high-volume automated platform (which, together with the gold, caused the adherence problem).  Nor does it make sense that PointCare was suggesting that Drew copy the single-dosage AURICA when the high-volume HT was available.  The simple fact is that both parties liked the high-volume feature (See DePiano Tr. at 135:23-137:11; Krauledat Tr. at 155:20-157:6) and were as yet unaware of the gold adherence problem created by the combination.  There was no rejection of the AURICA-model at the meeting; a different approach had already been adopted.[6]

_____

[6]    The AURICA was a single-dose device, while the Excell was a multi-dose device.  PointCare was enamored with the multi-dose feature because it required less human intervention and never suggested reverting to a single-dose system even when the adherence problem became apparent.  Indeed, PointCare had Drew <u>remove</u> the single-dose option from the machine - - a fact which strongly suggests that Dr. Hansen is engaged in revisionist history.  (<u>See</u> the Declaration of George Chappell dated April 30, 2008 (the "Chappell Dec.") at ¶¶ 4-6).

The second part of his statement is belied by the very document that "supports" it.  The

supposed support is the handwritten contemporaneous notes of the Drew Project Engineer which

state in relevant part:

> Gold Reagent turns acrylic brown after one month.  No affect on
> teflon or delrin.   Reagent contact times (short) make reaction
> minimal.

Clearly, these notes are the exact opposite of what Dr. Hansen is now saying.  The notes

show that he <u>downplayed</u> the risk.  Even if the acrylic turning brown after a month can be

viewed as a suggestion of the future adherence problem, the speaker, whether it be Hansen or

Barry, is clearly saying that the reagent will work with other designated materials because of the

short contact time between the reagent and the surface.  Although there may be reasons why Dr.

Hansen proved to be dead wrong in his view, he should not try to tell this Court that his view

was something other than it was.[7]

Furthermore, if this "warning" occurred in June 2006, why did Barry, nine months later,

apologize for his failure to detect the problem and admit that he and several outside engineers

were "stumped".[8]   (<u>See</u> Exhibit 4 to Barry Dep.).  The truth is inescapable: the problem, if it was

perceived at all, was not thought by PointCare to be a major impediment.

5.      THE TIMETABLE

PointCare takes the view that the HT timetable appearing as Attachment 1 to Annex 1

– the sole document in the Agreement not initialed by Drew's President – is a final timetable

that is contractually binding on the parties and that requires the HT machine to be fully

---

[7]      Drew had been making high-class optical equipment for years, but had never experienced this problem before.  Of course, it had never worked with gold before. (<u>See</u> Chappell Tr. at 191:6-25).

[8]      Barry's present explanation for this e-mail - - that he was just trying to cheer up the Drew Project  Engineer - - does not require serious comment. (Barry Aff., ¶ 10).

marketed by July 27, 2007. In her latest Affidavit, PointCare's CEO now tries to explain this curious lack of initialing although she could not explain it at her deposition (See April 25, 2008 Krauledat Aff. at ¶ 18; Krauledat Tr. at 161:9-21).

However, the proffered explanation – that Drew's engineers had not approved the schedule – hardly helps PointCare since there is no evidence that the engineers ever approved the schedule. Rather, the engineers have testified that the schedule was rough and preliminary, with much missing information (See Young Tr. at 56:7-57:7, 61:7-18; see Exhibit 3 to Young Dep.; see Chappell Tr. at 82:24-83:7, 84:18-25). They also testified there were several successive timetables, as the parties updated them as events required – a strange activity if the contractual timetable were as final as PointCare now pretends. (See Young Tr. at 36:22-37:16; Chappell Tr. at 33:12-17).

All of this testimony is consistent with the schedule itself, since there is no assignment of responsibilities for approximately 50% of the specified tasks, some of which (e.g., software integration) are clearly PointCare responsibilities. It is also consistent with the very nature of an engineering project dealing with a new technological combination. Unforeseen events happen and schedules change as a result.

One of the key events that happened here was the discovery of the gold adherence problem,[9] which, at least from Drew's perspective, occurred on or about March 16, 2007, when Barry apologized for his non-anticipation of the problem:[10]

---

[9]    As Barry admitted in his testimony, this problem was the primary cause of delay in the project (See Barry Tr. at 99:14-99:18).

[10]    Previously, PointCare had not shipped enough gold reagent to Drew so that it could detect the problem. (See Chappell Tr. at 147:19-149:2).

> I feel bad and somewhat responsible that we are having trouble with that optical sensor. I know that you guys sent me some Lexan to test with and I had said that it would be ok. This reagent is very difficult to deal with and we have been stumped and have had three of four other engineering groups stumped at finding materials that can be machined and are compatible. (See Barry Tr. at 96:16-97:11; see Exhibit 4 to Barry Dep.).

Obviously, this apology makes clear that PointCare had been aware of the problem for some time and was loathe to bring it to Drew's attention. The record is also clear that the parties thereafter tried for three months to find solutions that retained the optical sensors (contrary to PointCare's present position, Drew implemented virtually every materials suggestion that PointCare made (see Chappell Dec. at ¶ 7), even designing a detachable part so that this could be done easily[11] (See Chappell Tr. at 143:10-144:25; Young Tr. at 131:6-134:6; 139:5-141:6), before Drew decided it would try ultrasonics instead.[12] (See Chappell Tr. at 145:22-146:4; see Exhibit 22 to Chappell Dep.). This solution was successful, but required a substantial redesigning of the HT

---

[11]    The one exception was materials requiring molding. As Drew's Project Engineer testified, many of these materials would not work with the machine and molding substantially prolonged the production cycle (See Young Tr. at 133:5-134:23) a fact that would have driven the parties further from their goal of having a marketable product quickly. Even if some material had been injection molded, it would not have worked with the gold because it was the gold's ionic charge that was creating the problem, not the smoothness of the material. (See Young Tr. at 142:16-145:11; Chappell Dec. at ¶ 8).

[12]    PointCare now claims that it made the ultrasonic suggestion. Suffice it to say that there is no documentation of such a suggestion, and neither Hansen or Barry saw fit to mention it at their deposition. Barry now says in his Affidavit that he made the ultrasonic suggestion in March 2007, but the document he cites in support (See Affidavit of Donald E. Barry, Jr., In Opposition to Preliminary Injunction dated April 25, 2008 (the "Barry Aff."), Exhibit 2) makes no mention of ultrasonics; he only asks whether Drew had any suggestions to solve the problem. The existing documentation supports Drew's position. (See Exhibit 22 to Chappell Dep. at DR00027961). Whoever should get credit is unimportant; the important thing is the seemingly insolvable problem is now solved.

machine (and several weeks) to accommodate the new system. (See Chappell Tr. at 175:17-176:12; see Exhibit 29 to Chappell Dep.).

No timetable can account for the unexpected. Rather, the unexpected happens and timetables must be adjusted. PointCare would have this Court penalize Drew for PointCare's failure to anticipate the problem that drove the entire project seriously off-schedule.

6.    SOFTWARE INTEGRATION

As is clear from Annex 1, the solution of software problems is a joint responsibility. It is also clear that PointCare had at least four software engineers working on the HT project with Karl Gu, the Drew software engineer and an outside consultant hired by PointCare. And it is clear that the project was significantly delayed at the start when PointCare's software engineers missed various deadlines in 2006, throwing the real work into 2007. (See Exhibit 5 to the Reply Declaration of Karl Gu in Further Support of Motion for Preliminary Injunction dated April 30, 2008 (the "Gu Dec."). Until recently, PointCare has claimed that the software engineering was complete (See February 19, 2008 Krauledat Aff. at ¶ 24). Faced with a storm of deposition testimony showing that to not be the case, including the testimony of its own witnesses (See Hansen Tr. at 217:14-219:10; Desrosiers Tr. at 74:17-79:21), PointCare has now switched horses. It admits that the software was incomplete and that therefore some systems could not be fully tested. Then it blames Karl Gu for this failure[13].

Gu, whom PointCare previously thought was not important enough even to depose, vigorously denies that this is the case and points to irrefutable evidence that PointCare's software engineers stopped working on the project in the summer of 2007, when the abandonment

---

[13]    Compare with the deposition testimony of Dr. Krauledat and Dr. Hansen, both of whom unequivocally and rightly testified that software implementation was PointCare's responsibility (Krauledat Tr. at 203:18-203:21; Hansen Tr. at 217-220).

occurred.  (See Gu Dec. at ¶ 30).  He also shows, with extensive date-by-date documentation, how PointCare failed in its UI and CD4 projects for the entire period between June of 2006 and June of 2007.  (See Gu Dec. generally and Exhibits 2, 4, 5, 6, 7, 9 to 12 and 14 to 17 of the Gu Dec.).  Further, he demonstrates beyond doubt that the so-called CD4 algorithim he received in June 2007 was not a finished product and that he so advised Jennifer Waite of PointCare, who said she would get back to him when she returned from working on the NP in France.  (See Gu Dec. at ¶ 29).  And then she disappeared from the project.[14]  (See id. at ¶ 25).

Whatever the truth of this newly-introduced software blame game, it does not detract from the central fact that completion of this project was thrown off schedule by an unanticipated problem (i.e., the gold adherence problem) that neither party could solve for several months. These facts are not an excuse for one party's abandonment of a joint project.

7.    OTHER HARDWARE PROBLEMS

As PointCare points out, there were several other hardware problems some of which were attributable to bad information coming from PointCare. (See Chappell Tr. at 156).  None of these problems were critical and all of them were solved, including the optical cytometer specifically mentioned.  (See Chappell Tr. at 193:3-193:14).  Indeed, they were solved by September (not November), when Dr. Hansen specifically requested a hardware modification (i.e., the installation of a bi-metal switch) before he took delivery (See Young Tr. at 223:15-224:8[15]) after he was advised of the solution.

---

[14]    PointCare correctly states that it was never given access to Drew's source code but then falsely implies that this access was necessary to complete its tasks (See Gu Dec. at ¶¶ 37, 41 and 46).  It also states that Mr. Gu did not complete certain work, without revealing that this work could not be done until PointCare completed theirs.  (See id. at ¶¶ 4, 28 and 31; see also Exhibit 7 to Gu Dec.).

[15]    The suggestion (see Opposition Brief at p. 13) that Drew failed to deliver when it said it would is disingenuous.  Hansen's request is the only reason delivery did not take place at that time.

The ultimate proof is Dr. Chow's report, which PointCare does not seriously dispute in its opposition papers on this Motion[16].  Testing key areas in a manner that he himself designed, Dr. Chow determined that the HT was ready to be shipped to PointCare for the software integration that PointCare had not yet done.  He performed the testing in late November 2007 and signed his report December 11.

As discussed further below, this report asserts that the "breach", if "breach" there had been, had been cured.  While Dr. Chow estimates that it would take another four months plus to have the HT in marketable condition (See Errata Sheet to Chow Tr. at p. 277:4), a machine delivered on December 11 would have been marketable today.

8.    WORKING TOGETHER

After mischaracterizing the reason that Amy Coughlin was sent to Dallas in early 2007,[17] and falsely suggesting that there were PointCare personnel other than Ms. Coughlin continually on site at Drew, PointCare claims that the HT machine was sent to Boston so that PointCare could come to Drew's rescue.  This statement is at odds with the sworn testimony of PointCare's CEO that she had specifically requested a year earlier that the prototype machine be sent to Boston as soon as it was ready and before any "problems" arose because it was "prudent" to do

---

[16]    PointCare does say that not all specifications were tested.  It does not dispute Dr. Chow's testimony that he tested all specifications he deemed significant to the extent he could with incomplete software (a PointCare responsibility) and no reference instrument (PointCare having kidnapped Drew's NP the month before).  There is no question Dr. Chow believed the instrument to be ready for software integration and testing by PointCare, and the intimation otherwise in PointCare's opposition is at best wishful thinking.  (See Exhibits M and U to DePiano Aff.).  So desperate is PointCare that they point to Mr. Chappell's testimony (see Opposition Brief at pp. 22-23) as to what Drew had to have done after PointCare completed its remaining tasks as evidence that the equipment was not ready for shipping.  (See Opposition Brief at pp. 22-23).  The circularity of the reasoning somehow eludes.

[17]    Ms. Coughlin testifies that she was just sent to familiarize herself with the machine, not to do any substantive task as now claimed.  (See Coughlin Tr. at 28:21-29:18).  She also testified that the machine was sent to Massachusetts because Drew was not set up to run manual preps and  samples in Texas.  (Id. at 118:18-119:13).

the work at PointCare's facility rather than have its personnel travel <u>en</u> <u>masse</u> to Dallas for an extended period. (<u>See</u> Krauledat Tr. at 147:15-21).

It is evident from the exchange of e-mails that, at this stage, Drew and PointCare were working together and that Dr. Hansen, who had "ordered" DePiano to relieve Drew's R&D head from project responsibility in November 2006 (<u>see</u> Exhibit 12 to the May 2, 2008 Costantini Dec. at DR00000752), was viewed as the real project leader after this <u>coup</u> <u>d'etat.</u>[18]  It was not until the gold adherence problem resisted easy resolution and the merger negotiations failed that relations became strained.  At this juncture, Dr. Hansen began to separate himself from command of the project.  Suddenly, he is just offering "suggestions" to help Drew out.

When the admiral turned into a cabin boy, it was apparent that Drew had to go it alone, and it did with little support from PointCare[19].  All the remaining problems were solved, including the intractable adherence problems.  Drew's reward was PointCare's refusal to test and otherwise carry out its responsibilities.

PointCare justifies their lack of cooperation by their reported chagrin over receiving a letter from Drew's General Counsel, which said in relevant part:

> While you are correct that PointCare's assay appeared to work in a preliminary trial, you fail to mention that the automated mixing method was built per specifications provided by PointCare.  While you complain that the optics provided by Drew malfunctioned when automated mixing was undertaken, you fail to note that the

---

[18]    In its papers, PointCare suggest that the HT was a "second" priority at Drew. (<u>See</u> Opposition Brief at p. 13) This was true for only a brief period in September 2006, when Drew was finalizing its FDA submission on the Excell 2280, which was the foundation of the HT.  (<u>See</u> Young Tr. at 206:14-207:13).

[19]    As mentioned previously, this amazing turnaround in attitude happened right after the merger negotiations were dropped by Ms. Krauledat and after it became evident that the gold adherence problem was intractable.  Contrary to the statement otherwise by PointCare, the merger was PointCare's idea, not Drew's.  (<u>See</u> DePiano Tr. at 192:4-193:12).

problems encountered as we moved to the automated mixing method were primarily related to PointCare's gold attaching to the surface of the optics (which was of a base material specified precisely by PointCare). As you may recall, Drew had specifically recommended against the use of this surface composite and had proposed an alternative material, which was rejected by PointCare. Further, despite PointCare's assertions that the optic problems being encountered during the automated mixing phase were not related to its choice of surface composite or its gold optical sensor material, this proved to be exactly the case. Drew's engineer confirmed that this was the true root cause and then was able to effectuate an appropriate modification. PointCare's delay in acknowledging this fact (as you may remember, PointCare initially dismissed the possibility that its gold was attaching to the surface of the optical sensor) resulted in further project delay.

(See Exhibit 2 to DePiano Dep.).

That this right-on letter was written in response to Dr. Hansen's provocative and untrue letter of July 2, 2007 somehow escapes PointCare's attention. If its encapsulation of the gold adherence problem provoked something other than dialogue, the reaction shows PointCare's abandonment of the HT project and/or blind arrogance. The simple fact is that while there may be blame to share, the intractable gold adherence problem was unanticipated and caused much frustration on both sides of the aisle.[20] One side alone should not pay the price.

9.     THE NP PROJECT

Accepting, for present purposes, PointCare's explanation that it carefully balanced the NP and HT projects through June of 2007 (but see Gu Dec. at ¶¶ 21-25), PointCare offers no explanation of what happened next. All its hardware and software personnel were shifted to the completion of the NP project and never shifted back. Software development came to a halt, and

---

[20]    The evidence shows that a Drew technician approached the PointCare gold supplier about the gold adherence problem in June 2008. Barry admitted at his deposition that when he became aware of the contact, he reminded the supplier that the supplier had a confidentiality agreement with PointCare. (See Barry Tr. at 115:4-115:20; see also Barry Ex. 8, p.1.) From this somewhat chilling exchange, we are now given to understand that the supplier was directed to cooperate with Drew. Amazing!

no effort was made to address the gold adherence problem or otherwise continue to work on the HT project. Months of working on the prototype ceased. Even though one prototype continued to be located in Massachusetts, it was used only as a reference instrument for NP testing (without Drew's permission). Day became night, and we are to think nothing of it.

10.    THE O'CONNOR SIDESHOW

PointCare's Sales Manager, Dan O'Connor, left PointCare on June 5, 2007, because Dr. Krauledat thought he had not complied with PointCare policies. O'Connor, who was also a PointCare shareholder, kept in communication with his counterpart at Drew, Frank Matuszak. He advised Matuszak of several PointCare-related developments and urged Escalon (Drew's parent) to go over Dr. Krauledat's head and take its merger proposals to the PointCare Board. Matuszak related these conversations to DePiano.

DePiano refused to go to the PointCare Board as O'Connor had suggested and otherwise took no action in response to any unsolicited information that O'Connor had told Matuszak (See DePiano Tr. at 209:13-210:14; 211:20-212:11). Whether or not any of this information was confidential to PointCare (most of it was clearly not and the one piece of confidential information was given to counsel (see Matuszak Dec. at ¶ 11)), this "evidence" is a complete red herring, unrelated to the merits of the case.[21]

11.    DISTRIBUTORS AND SALES

Of all the "new" facts addressed by PointCare, this is the most fascinating. Dr. Krauledat, who previously denied to this Court (see February 19, 2008 Krauledat Aff. at ¶ 65)

---

[21]    Another "red herring" is the suggestion that Drew, in seeking alternative to working with PointCare on the HT, is somehow acting inappropriately despite the market availability of other gold reagents and the rejection (twice) by the U.S. Patent Office of Dr. Hansen's CD4 application. (See Matuszak Tr. at 302:21-304:7).

that she had met with any distributors for Drew territories at the AACC Convention in July 2007, now admits she met with Block Industries for a limited purpose, i.e. servicing machines in Russia that were sold through the World Health Organization, an NGO.  (See April 25, 2008 Krauledat Aff. at ¶ 56).  Apparently, she did not explain this distinction to her Sales Manager, Linsey Rockingham, who sent Block a standard Distribution Agreement that covered sales of the machine along with detailed pricing information for the NP device.  (See Exhibit 13 to the May 2, 2008 Costantini Dec. at PointCare Supp. 09191 to 09206).  Apparently, she also forgot her explanation of the NGO provision in Annex 3, i.e., that servicing of a machine in Drew territory (such as Russia) was Drew's responsibility. (See Krauledat Tr. at 174:6-176:15).

As to the other potential Russian distributors she met at MEDICA – a fact she denied in her first Affidavit three times (¶¶ 66, 67 and 76, Affidavit of Feb. 19) – PointCare tries to justify this violation by noting that Drew did not complain in writing of Dr. Krauledat's plan to secure her own distributor after she assured DePiano that she would only meet with her existing distributors.  Her promises not to do exactly what she did carry no weight, at least in Dr. Krauledat's mind.

Similarly, her planned invasion of Malaysia is justified by a Drew sales person saying that the Drew's Malaysian distributor was not enamored with the product.  (See April 25, 2008 Krauledat Aff. at ¶ 46).  Even putting aside that the sales person says that no such conversation occurred (see Matuszak Dec. at ¶ 4), the simple fact of the matter is that Dr. Krauledat never discussed any perceived Malaysian problem with Drew's management, as the Agreement requires.

As to sales, Ms. Krauledat admits that sales to U.S. and German entities have been made, but justifies them on the basis that the products are intended for ultimate use in PointCare's

territories, i.e., the Caribbean and Africa. This is a justification which has no support in the Agreement, which assigns the U.S. and Germany to Drew and requires PointCare "to refer all sales leads from the Marketing Leader's territories to the Market Leader."

Similarly, Ms. Krauledat points out that sales to NGOs in Drew territories are permitted under the Agreement, but then denies that she must notify Drew, who has the contractual right to "support the installation, servicing and reagent supply for the instruments sold to the NGO . . . within [Drew's] territories." Despite this rather clear language, Dr. Krauledat is of the belief that it does not apply when ultimate delivery is intended for a PointCare territory.

When all of this is added to her rather fantastical explanation of how references to a Russian distributor were added to PointCare's June 2007 Business Plan[22], one thing is absolutely clear: PointCare decided in June 2007 that the Agreement no longer applied and since then it has been having a gay old time doing whatever it wanted to do until this Court stopped it short[23].

## III.    ARGUMENT

### THIS COURT SHOULD GRANT DREW A PRELIMINARY INJUNCTION

A.    **Drew Is Likely To Succeed On The Merits**

    1.    Drew Did Not Breach The Agreement

---

[22]    This point is covered in ¶ 3 of the April 30, 2008 Declaration of Frank Matuszak, the Drew's Sales Manager. Mr. Matuszak also points out that the argument that Drew did not supply PointCare with sales plans is cut from whole cloth (see id. at ¶ 2). He also responds to several other inaccurate statements made by Dr. Krauledat (See id. at ¶¶ 4, 5, 6, 9 and 10).

[23]    Ms. Krauledat appears to want a medal for advising her people on February 23, 2008 that they should obey this Court's Order. If she said something, it was clearly not understood by her Sales Manager who testified that she received no such instruction until after March 10. (Rockingham Tr. at 159:18-163:7) The e-mail in which Ms. Krauledat's instruction is supposedly embodied is odd in several ways, and we have asked counsel several questions about it, such as why it was not found until long after PointCare had completed its document production. (See the e-mail correspondence among counsel for Drew and counsel for PointCare dated April 22, 2008, which is annexed as Exhibit 14 to the Costantini Dec.) No response to this question has been received.

PointCare's argument that Drew has breached the Agreement rests on two premises: (i) that the obligation to figure out a way for the PointCare assay to conform to the Drew hardware was entirely Drew's; and (ii) that Drew has failed to perform that function within the time allotted by the supposedly hard-and-fast timeline attached to the contract.  Both premises are false, and therefore there has been no breach.

As we have seen, the responsibilities for bringing the HT to life are mutual:  Drew will accommodate its hardware to the assay and PointCare will accommodate its assay to the hardware.  The gold adherence problem made it at least <u>temporarily</u> impossible for each to carry out its responsibilities although both tried to do so.  And eventually Drew did so.  How this problem, unanticipated by a noted scientist who had "invented" the gold assay methodology, becomes a Drew breach is a mystery.

PointCare's responsibility under the Agreement to accommodate its assay to Drew's hardware is clear and unambiguous.  New York law on contract interpretation requires that words be given their plain and intended meaning as written.  <u>See</u> <u>LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.</u>, 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a contract under New York law, 'words and phrases . . . should be given their plain meaning,' and the contract 'should be construed so as to give full meaning and effect to all of its provisions.'") (ellipses in original) (quoting <u>Shaw Group, Inc. v. Triplefine Int'l Corp.</u>, 322 F.3d 115, 121 (2d Cir. 2003)); <u>Miller v. Forge Mench Pshp. Ltd.</u>, 2001 U.S. Dist. LEXIS 13046, at *4 (S.D.N.Y. Aug. 29, 2001) ("Under New York law, words and phrases in a contract are given their plain meaning.")

By contrast, the "conclusory statement of a party to a contract as to what the party really intended by signing" – such as Dr. Hansen's suggestion that PointCare had no obligation to assist Drew in ensuring its gold assay's compatibility with the HT – is "not helpful".  <u>Medinol Ltd. v.</u>

Boston Sci. Corp., 346 F. Supp. 2d 575, 503 (S.D.N.Y. 2004).  Here, the Agreement in plain

language (as well as Dr. Krauledat's testimony) required PointCare to work with Drew to

address such issues, and thus the problems encountered in the HT development cannot be laid

solely at Drew's feet.[24]

As to the timeline being a hard-and-fast requirement, that point of view is not

supported by the history, the document itself, or the manner in which innovative projects of

this sort are carried out.  Even were it the case, the parties' constant revisions of the timelines

and continued cooperation through June 2007 is a waiver of any argument to the contrary.

"The New York doctrine of election of remedies provides that upon learning of a breach, a

party must choose between terminating the contract and continuing performance. ... If a party

chooses to continue performance, it must give notice of breach to the other side, or it waives

its right to sue the breaching party." Medinol Ltd., 346 F. Supp. 2d at 620 (emphasis added,

citations omitted).  Here, the timeline was repeatedly extended, and yet PointCare did not

notice a breach until November 2007.  At most, Drew's only responsibility was just to cure

the "breach" alleged therein (which, as noted above, was no breach) and anything beyond

that has no bearing on its putative attempt to terminate the Agreement.

As for PointCare's actual Notice of Breach, it should be entirely disregarded, as it is

wrongly premised on PointCare's supposed lack of responsibility under the Agreement, and as it

misconstrues the nature of the timeline provided for thereunder.  There is no breach, at least by

Drew, and Dr. Krauledat saying otherwise does not make it so.

---

[24]     If this Court should think there is any ambiguity, Mr. DePiano's unequivocal testimony as to the
circumstances which led him to deviate from the corporate strategy he just adapted should be considered.
(See, e.g. DePiano Tr. at 115:13-117:18).

2.    <u>Even If There Were A Breach, Drew Cured It</u>

Section 6.9 (a) of the Agreement gives either party the right to terminate the Agreement by giving the other party notice of the breach.  In the event of such notice, the breaching party has sixty days after the receipt of the notice to cure the breach.  PointCare purported to give notice of such a breach on November 9, 2007, when its CEO sent Richard DePiano a letter saying in relevant part:

> Section 1.1 of the Agreement calls for Drew to "modify its current Excell 22 platform to accommodate PointCare's proprietary CD4 Lymphocyte Enumeration Assay."  The timeline incorporated in the Agreement by reference specifies a date of 1/5/07 for completion of the modification.  As we have discussed and as documented in the correspondence between PointCare and Drew, none of the prototypes provided to PointCare function as required by the Agreement.

Even assuming, arguendo, the correctness of PointCare's interpretation of the Agreement - - namely, that PointCare had no obligation to work with Drew to solve the gold adherence problem - - the Notice gives Drew sixty days to modify the hardware to accommodate the gold assay.  On December 7, Mr. DePiano advised PointCare that it had performed the necessary hardware modification, that it had the performance tested by Dr. Chow, and that it was ready to ship the instrument to PointCare the week of December 10, subject to certain conditions which PointCare later accepted.  Dr. Hansen reacted curiously to this news, imposing new and impossible conditions on delivery:  "We will need to review your in-house test reports, patient testing and validation reports."  These conditions for delivery cannot be found anywhere in the Agreement.

The courts will not enforce requirements to cure a breach or default that are not contained in the contract itself and are only unilaterally prescribed by one party.  For example, in <u>Marino Industries Corp. v. Chase Manhattan Bank</u>, 686 F.2d 112, 117-118 (2d Cir. 1982), the Second

Circuit rejected the defendant bank's attempt to impose on the plaintiff borrower, in order to cure an alleged breach, various technical requirements that were never specified in the letter of credit. The plaintiff in <u>Marino</u> was the beneficiary of certain letters of credit entered into with the defendant bank which called for payment to the plaintiff upon delivery by the plaintiff of certain goods.  <u>Id.</u> at 114.  To obtain payment, plaintiff was required to submit a certificate that the goods had been inspected prior to shipment and a certificate that the goods were received.  After delivery occurred, plaintiff presented a certificate of delivery to the bank evidencing delivery. <u>Id.</u> at 116. The defendant rejected the certificates on the ground that they did not contain certain authorized signatures and informed plaintiff that those signatures would be needed in order to cure the defect.  <u>Id.</u>  The bank's requirement for those specific signatures was never specified in the letter of credit and the plaintiff was never informed of them. <u>Id.</u>  The Second Circuit held that the plaintiff should not have been held to meet a requirement for cure which was never specified. <u>Id.</u>  Similarly, PointCare attempted to impose new conditions of delivery on Drew which were never specified in the parties' Agreement as a requirement to cure any purported breach.  That is not permitted.

Even if these requirements could be found in the Agreement, they would be impossible for Drew to perform without PointCare's reasonable and good faith cooperation.  New York law recognizes a "general proposition that one who frustrates another's performance may not hold the frustrated party in breach of contract." <u>WPA/Partners LLC v. Port Imperial Ferry Corp.</u>, 307 A.D.2d 234, 237 (1st Dep't 2003).  For example, in <u>Clark Oil Trading Co. v. J. Aron & Co.</u>, 256 A.D.2d 196, 197-98 (1st Dep't 1998), the plaintiff served notice of breach following an allegedly late delivery of oil.  The trial court found, however, that the parties had agreed to extend the initial delivery deadline, and that "defendant would have delivered the oil as per the [modified]

agreement on time but for plaintiff's repudiation, [and] that plaintiff, by failing to act reasonably and by failing to cooperate, frustrated defendant's full performance ...." Id. at 198.

A similar failure is at issue here, Drew did as much as it could do to cure the alleged "breach" in the Notice of Breach without PointCare's reasonable conduct and cooperation. Patient testing and validation were always PointCare's responsibilities under the Agreement, and in-house testing could only be completed after software integration was done. Software integration was also PointCare's responsibility and it had not yet been completed. The most Drew could offer was the testing that Drew was able to accomplish without the software integration and without a reference instrument like the NP which PointCare had refused to return to Drew.

In an apparent "compromise" PointCare's counsel offered, in his letter of December 18, to take delivery on January 7, 2008 if Drew provided PointCare with "the data that support(s) Mr. Chow's opinion that the instruments are ready for reshipment to Drew." (See Exhibit P to DePiano Aff.). Thinking that it had resolved the matter, Drew furnished Dr. Chow's test report which reflected the data Dr. Chow had relied upon to support his opinion. (See Exhibit U to DePiano Aff.).

PointCare then proceeded to pick apart Dr. Chow's test report, complaining that he had not done precision testing on the CD4. This complaint was completely disingenuous, since Dr. Chow performed what testing he could perform without completed software integration (which was PointCare's responsibility) and without a reference instrument (i.e., the NP taken back by

25

PointCare without Drew's consent). PointCare also renewed requests for in-house test reports even though it knew they could not be completed without the software integration[25].

Clearly, PointCare has made it impossible for Drew to "cure" the purported breach by refusing to take delivery for specious reasons. The failure to cure is excused where one party makes it impossible for the other party to cure the defect or default. See Marino, supra; Cohen v. Kranz, 12 N.Y.2d 242, 247-248 (1963) (finding that homebuyer's notice to the seller that property was unmarketable and contained defective title without ever indicating specific nature of violations and without offering chance to cure defects in title made any opportunity to cure such defects by seller impossible). Drew believes it did what it had to do to "cure" the purported breach it had notice of – "modify its current Excell 22 platform to accommodate PointCare's CD4 Lymphocyte Enumeration Assay" – and it has shared with PointCare a report by an independent expert that supports its belief. Assuming this is not itself a cure (which it is), PointCare's refusal to take delivery so that it could complete the necessary software integration and perform its own validation testing is a deliberate frustration of Drew's good faith attempt to cure. Without taking delivery and completing its responsibilities, PointCare has no way of knowing whether the cure is effective.

---

[25]    PointCare points to the fact that Drew requested the test reports on the NP to justify Dr. Hansen's demand. (See Hansen Aff. at ¶ 140; see also Exhibits O and P to DePiano Aff.). This disingenuously ignores the different stages of the two projects. The NP was finished and awaiting FDA approval, and Drew needed completed test reports to install and service the NP. The HT, by contrast, was not finished, and could not be finished until PointCare integrated the software and did its validation testing. Thus any "test reports" were necessarily preliminary and unnecessary to the PointCare input. Whether Drew was required to furnish test reports at some later point in time is irrelevant to whether they are needed for the specific tasks PointCare had to accomplish (which would, at the very least, augment the test reports).

Thus, even if the Notice were valid, which it is not because of PointCare ignoring its mirror responsibility to accommodate its assay to Drew's hardware, the purported breach should be judged to be cured because of PointCare's intransigence.

      3.     <u>PointCare's Breach of the Agreement</u>

The Drew-PointCare Agreement is set up like a joint venture. Drew and PointCare will develop the HT jointly and PointCare will develop the NP separately. The developments were scheduled to be finished relatively simultaneously (<u>i.e.</u>, July 27, 2007 and July 13, 2007 respectively) and sales commenced thereafter. Both Drew and PointCare can sell both the NP and the HT, but primarily in territories allotted to each of them. Drew's ability to sell, however, is contingent upon the successful development of the HT.

This arrangement obviously puts PointCare in the driver's seat. It is key to the development of both projects, and it cannot favor one over the other. Rather, PointCare has a duty to balance resources between the two projects in a fair and equitable manner.

This is not what PointCare has done. It has completed the NP project and brought the HT to a halt. As a consequence, Drew cannot sell either the NP or HT, while PointCare goes on its merry way, selling whatever NPs it can, wherever it can.

PointCare argues that Drew has made no claim for breach of fiduciary duty and that the Agreement is not designated as a joint venture, invoking such a duty. These arguments miss the point: the Agreement is constructed so as to give PointCare tremendous control over the two projects, to the point where it could choke off one project at the expense of another (and at the expense of Drew). <u>See</u> <u>AM Cosmetics Inc. v. Solomon</u>, 67 F. Supp. 2d 312, 320 (S.D.N.Y. 1993) ("a court may examine whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge...Thus, ongoing conduct between parties may give rise to a fiduciary relationship that will be recognized by the courts.") <u>Westwoods Aviation, LLC</u>

v. Atl. Aviation Flight, 2007 U.S. Dist. Lexis 63535, at *8 (S.D.N.Y. August 28, 2007) ("It is established New York law that 'a contractual relationship may give rise to fiduciary duties regardless of whether the contract itself includes specific words or language in that regard.'") see also Zeising v. Kelly, 152 F. Supp. 2d 335, 347 (S.D.N.Y. 2001) ("Principles of partnership law control the analysis of joint venture agreements, and, coventurers, like co-partners, owe each other the finest loyalty and the utmost good faith throughout the course of the enterprise."); Richbell Info. Servs. v. Jupiter Partners, L.P., 309 A.D.2d 288, 298 (1st Dep't 2003) ("There is no merit to [defendant's] position that the interests of the joint venturers are required to be 'sufficiently aligned' to impose a fiduciary relationship.").

Here, PointCare's contractual breaches are more than everyday contractual breaches. They are breaches of the highest responsibility because they reflect an attempt by a joint developer to reward itself at the expense of its partner.  For this reasoning, the cases cited in the Opening Brief (see pp. 22-24) apply.

As set forth above, PointCare's failure to comply with the clear and unequivocal terms of the Agreement constitutes a breach of contract. Unsurprisingly, PointCare's opposition papers cannot establish otherwise.  PointCare intentionally and willfully abandoned the HT project – to Drew's detriment – turning all of its focus and resources instead to its own NP project without paying any attention to its contractual commitment to make the assay work with the HT in order to create an integrated product.

Courts in the Second Circuit have consistently determined that a party's abandonment of a collaborative effort or a party's refusal to cooperate in furtherance of that agreement constitutes breach of contract. See, e.g., Travellers Int'l, A.G. v. Trans World Airlines, 41 F.3d 1570 (2d Cir. 1994);  Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1008-1009

(2d Cir. 1991); Intermetal Fabricators, Inc. v. Losco Group, Inc., 2000 U.S. Dist. Lexis 11622, at **22-23 (S.D.N.Y. Aug. 11, 2000) (holding that plaintiff breached a contract where it "substantially delayed and abandoned work on the project"); BGW Dev. Corp. v. Mount Kisco Lodge No. 1552 of the Benevolent Order of Elks of the United States, 247 A.D.2d 565, 568 (2d Dep't 1998) (holding that defendant "breached its contractual duty of good faith and fair dealing by failing to cooperate with the plaintiff's efforts to recruit joint venturers . . . and by actively attempting to dissuade interested persons from joining with the plaintiff."); Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 232 (2d Cir. 1991) ("Since the contract gave [plaintiff] considerable discretion with regard to matters like advertising campaigns, store location and wholesale sales . . . even if it acted within the bounds of its discretion, [plaintiff] would be in breach if it acted unreasonably.") (emphasis added); 1800PostCards, Inc. v. Morel, 153 F. Supp. 2d 359, 365 (S.D.N.Y. 2001) (noting that "even a material breach [by the other party] would not permit [defendant] to interfere with the business of the allegedly defaulting party."); Hawes Office Systems, Inc. v. Wang Laboratories, Inc., 580 F. Supp. 812, 814 (E.D.N.Y. 1984) (finding that party breached "joint marketing" venture where it tried to "sabotage" plaintiff's company by inter alia, "interference with [plaintiff's] customers") (applying Massachusetts law).

Tellingly PointCare fails to discuss, distinguish, or respond to any of these cases - all of which are applicable here. In its brief, PointCare carelessly dismisses Drew's breach of contract cases by stating "none of them have merit." (See Opposition Brief at p. 34). PointCare does not say anymore because it cannot. PointCare cannot even find room in its 48-page brief to address Travellers, 41 F.3d 1570,1577, Drew's lead case-on-point, wherein the Second Circuit held that defendant's contractually-obligated promotional efforts "were not conducted  in good faith but

were in fact influenced by the improper motive to eliminate" plaintiff – just like here.

PointCare's mysterious silence is instructive as to its indefensible position.

As set forth above, PointCare's consistent and unabashed refusal to cooperate with Drew

in the development of the HT device, its attempts at sabotage, and its wholesale abandonment of

the project constitute a breach of the Agreement. Tellingly, PointCare's opposition papers are

devoid of any credible and reasonable excuse for failing to comply with the express terms of the

Agreement and fulfill its good faith duties to Drew.[26]

**B.    Drew Is Facing Immediate And Irreparable Harm**

1.    Drew's Assertions of Irreparable Harm are Distinct and Highly Substantiated

PointCare, in its argument that there is no irreparable harm, takes the position that Drew's

claims of such harm are "unsubstantiated and wildly speculative," apparently because they are

based primarily on the April 15, 2008 Declaration of Frank Matuszak, Drew's Sales Manager.  It

would appear that PointCare is of the belief that irreparable harm cannot be proven through the

sworn statements of a knowledgeable representative of a party.  This is indeed news.

To recapitulate, Mr. Matuszak's Affidavit and Drew's Opening Brief allege the following

types of harm:

---

[26]    PointCare's critique of Drew's joint venture analysis is also unavailing. Drew and PointCare had mutual obligations to develop and distribute the final HT and NP products as set forth in the Agreement and in Annex 1 of the Agreement.  Applying New Jersey law, the Second Circuit has found that these types of mutual responsibilities under a contract give rise to a joint venture relationship.  See Geneva Pharmaceuticals Technology Corp., v. Barr Laboratories Inc., 386 F.3d 485, 512-514 (2d Cir. 2004). The court in Geneva found that a joint venture existed because the contract was more than a standard supply contract and "in fact envision[ed] a substantial sharing of resources towards a joint enterprise" and involved a "degree of mutual oversight" suggesting a "close relationship."  See id. at 513, 514. Similarly, PointCare and Drew had mutual obligations under the Agreement which included developing the HT product by assuring that each party's respective technology was compatible with the other's.   According to Geneva, these types of mutual obligations and roles regarding the specific objective described in the Agreement reflects that the relationship between PointCare and Drew rose to that of a joint venture. See id. at 513-14.

(i)  lost sales orders on both the NP and the HT;

(ii)  damage to Drew's credibility with its distributors that results from PointCare selling the NP when it is unavailable to Drew distributors after they were told otherwise;

(iii)  the entrenchment of the NP product in potential NP/HT competitive situations;

(iv)  the impact on Drew's credibility with its distributors caused by PointCare's attempted recruitment of distributors in its territories;

(v)  the sales of products in Drew territories in violation of the Agreement further harming distributor relations;[27]

(vi)  the potential use of Drew technology in PointCare's planned HT development; and

(vii)  the apparent use of Drew technology in the development of the NP.

To these may be added the uniqueness of both the HT and NP products,[28] and the vast amount of expenditure that Drew has made without any compensating revenue from the products it was authorized to sell in return.[29] Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27,

---

[27]    There is no dispute that PointCare is selling products to distributors located in Drew territories in direct violation of the Agreement. (See Matuszak Dec. at ¶¶ 5-7; Rockingham Tr. at 181:1-184:17). There is also no dispute that PointCare is selling products to NGOs located in Drew territories without notifying Drew so that Drew could take over installation, servicing, and supply as the Agreement calls for. (See Matuszak Dec. at ¶ 7).  PointCare's defense is that it is allowed to make such sales where the ultimate product destination is a PointCare territory, but it can point to no provision in the Agreement that justifies that argument.  If, as Drew contends, the sales are violative, it is clear from the Matuszak Declaration that much more than lost sales are involved.

[28]    The NP and HT machines are unique and highly specialized products formed from the combined advanced technology and expertise of both parties to serve a distinct and specific demographic.  (See Hansen Aff. at ¶¶ 15-17, 28, 37).

[29]    Drew's ability to reap the rewards of its more than one million dollars in investment in the NT and HT have been imminently threatened because PointCare has abandoned the project, in effect, wasting Drew's time and effort and its ability to capitalize on their prolonged investment in the marketing and development of the NT and HT.  Notwithstanding that speculative loss can warrant injunctive relief, Drew's potential customer losses are patently clear by the interest they displayed in the products during the pre-development promotional period.  Drew's losses are not speculative and their time and financial
(Continued…)

38 (2d Cir. 1995) (finding irreparable harm from a "showing that the product is a truly unique opportunity" and where "the loss of prospective business. . . will be largely indeterminate if the opportunity is denied"); Reuters Ltd. v. United Press Intern., Inc., 903 F.2d 904, 907-908 (2d Cir. 1990) (preliminary injunction granted where "terminating the delivery of a unique product. . .almost inevitably creates irreparable damage to the good will of the [Defendant]"); Aim Int'l Trading, L.L.C. v. Valcucine S.p.A., 2002 U.S. Dist. Lexis 10373, at *13-14 (S.D.N.Y. June 11, 2002) (preliminary injunctive granted where relationship of parties had created network of distributors for "relatively unique product" and irreparable harm would result if Defendant not compelled to follow agreement); National Kitchen Products, Inc. v. Kelmort Trading & Company, et. al., 1992 U.S. Dist. Lexis 657, at **6 (S.D.N.Y. Jan. 24, 1992) (holding that, even though the Defendant had made no threat not to fulfill an order and despite the defendant's argument that they were not in substantial negotiations with other potential distributors of the product, irreparable harm was present because the plaintiff's "ability to reap the rewards of its ongoing investment. . .[were] imminently threatened.").

PointCare finds all of this "unsubstantiated and wildly speculative" because Drew did not evidence that its distributors have expressed unhappiness over the miserable state of affairs. Apparently, they would have Drew knock on its distributors doors, point out the wickedness of PointCare's ways, and have those distributors attest that PointCare is indeed evil. Obviously, this suggested course of action would only serve to make the distributors more upset. The law does not require the self-immolation PointCare demands and it cannot point to a single case that

---

(Continued…)

investment in the HP is substantial, warranting injunctive relief and specific performance of the Agreement.

supports this weird point of view.  As the Second Circuit observed in Reuters Ltd, supra, there exists irreparable harm from not being able to meet expectations on product delivery in the form of loss of business relationships, loss of revenue and damage to credibility and good will.  See Reuters Ltd., 903 F.2d at 909 ("Alerting [the defendant's] subscribers to the tentative nature" of the plaintiff's fulfillment of contractual obligations would create the very irreparable harm the defendant was attempting to demonstrate).

Moreover, it is not that hard to judge the merits of Mr. Matuszak's arguments if common sense is employed.  Any distributor authorized to sell and service a certain product, would be disturbed if another distributor came along and usurped their right to distribute.  It follows that if that same distributor were promised a right to sell a product when it became available, it would be upset to learn that someone else was selling that product and they could not.

Not surprisingly, the case law supports Drew's position.  Indeed, cases abound.  In National Kitchen Products, Inc., for example, the threat to end an exclusive distributor relationship amounted to irreparable harm from not only the loss of potential sales, but also from the "threatened interference" the breach would have in the form of "loss of relationships, both actual and potential." National Kitchen Products, Inc., 1992 U.S. Dist. Lexis at **6 ("Nor can the extent of likely damages here be calculated."); see also, e.g., Jacobson & Co. v. Armstrong Cork Co., 548 F.2d 438, 445 (2d Cir. 1977) (affirming finding of irreparable harm because plaintiff "presented ample evidence to show a threatened loss of good will and customers. . . neither of which could be rectified by money damages."); Interphoto Corp. v. Minolta Corp., 417 F.2d 621, 622 (2d Cir. 1969) (affirming finding of irreparable harm from loss of profits and loss of good will from not being able to provide products customers expected to be available); see National Kitchen Products, Inc., 1992 U.S. Dist. Lexis 657, at *7 (quoting Reuters Ltd., 903 F.2d at 907,

in regards to plaintiff's threat to end an exclusive distribution, "even speculative loss may cause immediate irreparable harm to. . . goodwill" of defendant's clients).

Unbelievably, PointCare's only case in support of its unfounded proposition that Drew lacks proof of irreparable harm is one decided in the Eastern District of Pennsylvania.  In that case, which has never been cited or even recognized by any court in this Second Circuit, the defendant was hired to develop, the plaintiff's software to make it commercially viable. See Manganaro v. InteropTec, 874 F.Supp. 660, 661 (E.D. Pa 1995).  After the agreement failed, Plaintiffs soon discovered that the defendants had used their proprietary software with a third party for an unrelated project. Id.  In relevant part, the defendants refused to return the software because they claimed the original agreement between the parties, an Assignment and Security Agreement, only obligated them to give the software to an escrow agent and that if they returned the software directly to Plaintiffs, their security interest would be lost.  Id.

The claim for injunctive relief failed because the plaintiffs' only factual showing that they faced immediate and irreparable harm consisted of an affidavit from plaintiffs' counsel attesting only to the copying of the plaintiff's source code but making no claim that any actual harm had occurred or would occur any time soon.  Manganaro v. InteropTec, 874 F.Supp. at 662) ("Plaintiff's have made no showing that there *will* be any future harms, that the magnitude of any harm is incalculable or that the alleged harm is in any way immediate.").

In stark contrast to the plaintiff in Manganaro, Drew has alleged a very particular, imminent and substantial immediate irreparable harm in the form of, among other things, (1) a loss of a very significant business opportunity to develop and sell the HT and NP machines; (2) the loss of sales from both of these unique machines, which serve a very defined niche market that was in immediate demand for such products; (3) the entrenchment of the NP product in

potential NP/HT competitive situations; (4) the sales of Drew's products in Drew territories in violation of the Agreement which further harms Drew distributor relations; (5) the obvious loss of industry-wide credibility and damage to good will from promoting the products for almost a year and <u>then</u> not having anything to show for it; and (6) the potential and apparent use of Drew technology in the development of the HT.  Once PointCare would start selling into Drew's territories, the damage cannot be undone – to Drew's reputation, to its credibility in the marketplace, and to the impact on its ability to leverage sales discussions relative to the HT and NP instruments to open doors for the sales of other products.

The affidavits and testimony of Frank Matuszak, Richard DePiano, Sr., George Chappell and others provide ample proof of the immediate and irreparable harm that Drew faces in light of PointCare's breaches of the contract.  Unlike in <u>Manganero</u>, the evidence brought forth to substantiate the irreparable harm here demonstrates a history involving many years of product development and more than a million dollars invested in creating a technology that was on the verge of coming to market following an extensive and exhaustive pre-launch promotional period that included trips to various trade shows throughout the world promoting said products. Drew has more than substantiated its claim of irreparable harm by demonstrating the development, investment and promotion of unique products whose sudden collapse in development and failure to be available at the expected time period, now, and at any time in the near future, has and will continue to create immediate irreparable harm in the form of loss of potential and wholly identified business relationships, loss of profits and irreparable damage to goodwill and credibility.

    2.    <u>It Is Patently Clear That the HT and NP Machines are Competitive</u>

In addition to the absurd "unsubstantiated and wildly speculative" argument, PointCare takes issue with Drew's assertion that the NP and HT are, to some extent, competitive products.

They complain that Mr. Matuszak's April 15, 2008 Affidavit is non-specific, conveniently

forgetting that he was very specific at his deposition.  He testified:

> Q    Is it your opinion that these instruments were or would be competitive in
> some respects?
>
> A    Yes.
>
> Q.    What do you mean when you say that?
>
> A    Due to the fact that they ran, basically, the same battery of tests.
>
> Q    Were they intended to serve the same or different markets?
>
> A    There is crossover.
>
> Q    What is the crossover? . . .
>
> A    Obviously, the two had features that were similar, and that there would be
> customers that would look at both, and if one was available over the other, they
> would be happy taking either one of them. . . .
>
> Q    And as a salesperson, thinking about how you might most fruitfully sell NP's
> and sell HTs, were you aware of any advantages that the NP had in terms of its
> ability to operate effectively outside of hospital settings and doctors' offices where
> there is electricity and trained staff and all the niceties that we have in our western
> hospitals? . . .
>
> A    It's a difficult question to answer.  Due to the fact before, as you mentioned,
> there is a somewhat competitive versus feature tradeoff, and until you actually
> talk to the customers, and visit with them and find out what their needs are, you
> can't accurately or appropriately market a specific product.  You need to really
> know what their needs are, first, and then say, okay, this is your -- this is the best
> product.  For instance, a resource-poor area may need also a hematology analyzer,
> and in which case the HT would have been the better one to recommend, even
> though the NP was designed to be in resource poor areas.

(See Matuszak Tr. at 188:18-201:2).

His testimony makes common sense.  The machines perform the same function.

Although intended for different markets, their allure is such that they will be cross-overs.  By

jumping the NP over the HT, PointCare is entrenching itself and the "first to market" cases

apply. See, e.g. Lumex Inc. v. Highsmith, 919 F. Supp. 624, 629 (E.D.N.Y. 1996) (preliminary

injunction granted because the "[t]ime of the introduction of a product is important because a new or innovative machine has a selling advantage. The goal is to be 'first to the market'."); see also Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd., 5 Misc. 3d 285, 299 (Sup. Ct., N.Y. County 1997) ("the loss of the advantage of being a pioneer and a market leader, may constitute irreparable harm.").

3.    Allegations Concerning PointCare's Illicit Use Of Confidential Information More Than Speculative, Warranting Injunctive Relief From Irreparable Harm

Finally, PointCare argues that Drew's arguments about the loss of confidential information are "speculative". For example, PointCare admits, as it must, that it has plans to develop its own HT, but assures the Court that it will not use Drew's technology. This assurance comes from the PointCare CEO who previously assured the Court, in her initial Affidavit that she had no discussions with distributors at the AACC conference or at the MEDICA conference - assurances that have now been proven to be untrue. Why anyone should believe her new assurances is beyond Drew's comprehension and the case law does not require reliance on someone whose prior assurances have proven untrue. See Gasser Chair Co. v. Infanti Chair Mfg. Corp., 943 F. Supp. 201, 207 (E.D.N.Y. 1996) ("Needless to say, these [false] admissions have caused the court to take an exceedingly dim view of [defendant's] testimony as a whole. Falsus in uno, falsus in omnibus has particular applicability to an assessment of his credibility.").

What is more, in support of Drew's contention that irreparable harm will result from what is the obvious use of Drew's proprietary technology to develop the HT machine, PointCare's only case is one where this Court granted a preliminary injunction. In Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 971-974 (2d Cir. 1989) the plaintiff sought to prevent the defendant, who was on the verge of bankruptcy, from paying off debts to a senior creditor because the senior creditor had likely engaged in self-dealing and could wipe out a substantial

amount of potential liquidated assets before the plaintiff had a chance to make this claim. Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 971-974 (2d Cir. 1989). Because there was an obvious relationship between the "self-interested transactions and the danger of bankruptcy", the Court granted the preliminary injunction. Id. at 275. In relevant part, the defendant's shaky financial situation provided "ample incentive for [the plaintiffs] to limit their financial exposure by having their loans repaid ahead of [named third party]. . ." Id. at 275.

Similarly, PointCare has (1) intimate knowledge of Drew's proprietary information stemming from over a year of collaborative scientific development; (2) PointCare cannot develop a high through-put device without turning to one of Drew's competitors and their business records indicate they are in the process of doing this; and (3) the fact that PointCare has unabashedly refused to provide design history to allow Drew to determine if Drew's proprietary knowledge has been used, provide "ample evidence" that Drew faces irreparable harm from PointCare's illicit use of Drew's proprietary information.

Finally, PointCare assures the Court that it has not used the HT technology in the NP product, but has not produced the design history file on the NP, which would be proof positive one way or another. PointCare's response is a word game, saying that it produced the "device history" and that it was never asked to produce the design history. The premise is false. Drew requested "all documents, including communications, regarding the technical specifications for modifications made to the existing NP platform in accordance with the existing CD4 assay, including but not limited to the device history relating to such modification." (See Exhibit 19 to the April 16, 2008 Costantini Dec.). This formulation is broad enough to include the "design history".

38

Lest there be any doubt, the April 9 letter of Drew's counsel (see Exhibit 19 to the April 16, 2008 Costantini Dec.), which points out the inadequacy of the production, mentions the lack of a "design history" no less than four times.  The letter did not even generate a response from PointCare's counsel who now belatedly tries to conceal his inattentiveness.  "An adverse inference may be drawn. . .from a party's failure to produce evidence in breach of its discovery obligations." Experience Hendrix, LLC v. Chalpin, 461 F. Supp. 2d 165, 172 (S.D.N.Y. 2006) (citing Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 107 (2d Cir. 2002) ("Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to . . . proceed with a trial and give an adverse inference instruction.").  Moreover, in these circumstances, a theft of technology should be presumed. Leadsinger, Inc. v. Cole, 2006 U.S. Dist. LEXIS 55550, at *73 (S.D.N.Y. April 4, 2006) (citing Hammond Packing Co. v. Arkansas, 212 U.S. 322 (1909)) ("Defendant's failure to comply with an order to produce documents because the court could presume, from the failure to produce evidence relating directly to the merits of the matter, that the case was lacking in merit.").

## C.    The Balance Of Hardships Tips In Favor Of Drew

There is no question that because of PointCare's actions, Drew cannot sell the NP as it bargained for and cannot complete the HT device after expending considerable resources in its development.  There can also be no question that Drew's distribution network is threatened by PointCare's invasion of its territories.  Granting appropriate relief will in effect restore the status quo by compelling PointCare to abide by the Agreement it signed.

PointCare, by contrast, will suffer little harm if the relief is granted.  It can still sell the NP in territories assigned to it.  PointCare's revenues will increase if Drew is allowed to sell the NP in Drew's territories.  PointCare also stands to profit if the HT is successfully developed, and

the resources it must commit, it previously bargained to commit.  Any cost of these resources, if PointCare should ultimately prevail, can be covered by an appropriate bond if a damage claim should be thought to be insufficient.

In short, the balance of hardships tips only one way. In tacit recognition that their argument that PointCare will have to spend resources it already committed to spend if this Court compels them to comply with their Agreement, PointCare plays the humanitarian card. Developing the HT serves just as humanitarian a purpose as the NP, and compelling PointCare to deliver NPs to Drew for sales in Drew territories will serve whatever humanitarian need presently exists.

**D.    Drew's Hands Are Clean And Its Request For Equitable Relief Stands**

PointCare's argument that Drew comes to this Court with "unclean hands" and that this is "an independent ground to deny injunctive relief" is baseless.  (See Opposition Brief at pp. 46-47).  "A court may deny injunctive relief based on the defense of unclean hands 'where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party.'" Ulysses I & Co. v. Feldstein, 2002 U.S. Dist. Lexis 14541, at *42 (S.D.N.Y. Aug. 8, 2002) (emphasis added) aff'd, 2003 U.S. App. Lexis 20115 (2d Cir. Oct. 2, 2003)  (quoting Estate of John Lennon v. Screen Creations, Ltd., 939 F. Supp. 287, 293 (S.D.N.Y. 1996)).

Here, PointCare's specious allegations of Drew's supposed "unclean hands" are entirely unrelated to the subject matter of the complaint and preliminary injunction motion. PointCare baldly claims - without providing proof - that Drew acquired from Mr. O'Connor confidential information relating to PointCare finances, customers, and potential deals. (See Opposition Brief at p 3.) The reality is that most of the information was non-confidential and the one piece of

confidential information was given to counsel.  (See Matuszak Dec. at ¶ 11).  As Mr. DePiano

made clear, no one used this alleged "confidential" information. (See DePiano Tr. at 219:21-

220:4).  By stark contrast, Drew's preliminary injunction motion requests, *inter alia*, that

PointCare should be: compelled to complete its obligations under the HT program, enjoined from

further violating the NP marketing and sales provisions, and required to sell the NP instrument to

Drew. PointCare's conclusory allegations that Drew acquired confidential information in bad

faith (which it did not) for illicit purposes, even if true, would not be sufficiently related to

Drew's request for relief enjoining PointCare from further violating the Agreement.

Accordingly, the narrow doctrine of unclean hands does not apply here.

**E.    An Appropriate Provisional Remedy Would Be To Direct PointCare To Fill Drew's NP Orders, And Accept Delivery Of The HT.**

The easiest remedy to apply is to enjoin PointCare's efforts of contacting distributors in

Drew territories and making NP sales in Drew territories until the trial on the permanent

injunction.  There are clear violations of the Agreement.  To the extent that any of the claimed

violations are thought to be ambiguous by this Court, Drew's profits on these sales can be the

subject of a counterclaim.[30]

The more difficult issue is created by PointCare's refusal to take delivery of the HT,

which in turn has negated Drew's ability to sell the NP for several months, much to its harm.

Clearly, this Court has the power to order PointCare to take delivery and perform the software

integrating and testing that stands in the way of the next step.  See Nemer Jeep-Eagle, Inc. v.

Jeep-Eagle Sales Corp., 992 F.2d 430, 433 (2d Cir. 1993) (reversing trial court's denial of

---

[30]    For example, the parties disagree on the responsibility for follow-on sales when a NP sale is made to a NGO.  Drew thinks the Agreement pretty clear, but the proceeds can easily be subjected to a counterclaim.

preliminary injunction for specific performance where: "(1) a valid contract exists between the parties, (2) the plaintiff has substantially performed its part of the contract, and (3) plaintiff and defendant are each able to continue performing their parts of the agreement"). And just as clearly this Court should exercise this power, given the sham nature of PointCare's refusal.

That still would leave an important issue: given PointCare's propensity to delay the completion of the NP, how does this Court provide an incentive that would not require judicial oversight. The simplest way - - prohibition of all NP sales, including ones in PointCare territories -- is not acceptable to PointCare because of its deleterious humanitarian effect, i.e., the NP machine is needed, just as the HT machine is needed.

Drew suggests that the proper balance is to allow it to sell the NP in Drew's territories. There will no longer be a disincentive to developing the HT and humanitarian concerns will be addressed. If it should ultimately be proven that Drew was not entitled to the profits from these sales, damages can accrue. In the interim, PointCare will receive needed revenues from its sales to Drew.

**F.    No Security Is Needed In The Circumstances**

"Rule 65(c) gives the district courts wide discretion to set the amount of a bond, and even to dispense with the bond requirement 'where there has been no proof of the likelihood of harm.'" Time Warner Cable, Inc. v. DIRECTV, Inc., 2007 U.S. Dist. Lexis 32672, at *6 (S.D.N.Y. May 2, 2007) (emphasis added) (quoting Doctor's Associates, Inc. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996)). "As the Court has explained previously, this is intended to afford security only for those damages, if any, that might be 'proximately caused by the [wrongful] issuance of [an] injunction'" Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd., 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006) (quoting B.G. Soft Ltd. v. BG Soft Int'l, Inc., 2002 U.S. Dist. Lexis 13508, at *2 (E.D.N.Y. Apr. 29, 2002)).

"[T]he burden is on the party seeking security to establish a rational basis for the amount of the proposed bond." AB Electrolux v. Bermil Indus. Corp., 481 F. Supp. 2d 325, 337 (S.D.N.Y. 2007)  It is well settled that courts are loathe to set unreasonably high security amounts. See id.; accord Aim Int'l Trading, L.L.C. v. Valcucine S.p.A., 2002 U.S. Dist. Lexis 10373, at **24-25 (S.D.N.Y. June 11, 2002); Brenntag Int'l Chems., Inc. v. Norddeutsche Landes, 1998 U.S. Dist. Lexis 13109, at **2, 6 (S.D.N.Y. Aug. 25, 1998).

Here, PointCare has offered no proof of likelihood of harm arising from a wrongful issuance of a preliminary injunction. PointCare claims that it would "suffer extensive financial harm if it were wrongfully enjoined."  (See Opposition Brief at p. 47.)  Critically, PointCare fails to provide specific and concrete examples or data that would support its contentions. Strangely, PointCare does not even suggest a bond amount. This is telling, given that issuance of a preliminary injunction will only require PointCare to do what it was already contractually obligated to do, and no harm can possibly arise therefrom. Accordingly, as set forth in the case law above, security is not required.

PointCare is not prevented from making NP sales in its own territories. Far from being harmed or suffering damages, PointCare will profit from Drew's efforts in making NP sales in Drew's own territories.  Further, Drew's portion of the profit would actually be lost if PointCare should ever succeed in its claims.  More importantly, PointCare will actually profit from the successful development of the HT device.  On the other hand, if the HT is not successfully developed,  PointCare's only cost will be the time it spent on developing the HT device, time which it was already contractually required to do. Should PointCare ever prove it was not obligated to spend time on the HT project, the only "damage" PointCare will proximately suffer is the cost of that time.

In these circumstances, no bond should be necessary since PointCare can always recover the expended amounts at the end of litigation should it prove victorious.  At most, the bond amount should be the reasonable cost of the work PointCare would be required to exert in developing the HT device, and PointCare should submit its proof on this issue.

## IV.    CONCLUSION

For all of the foregoing reasons and for the reasons set forth in the Complaint and Drew's opening papers, Drew respectfully requests that the Court issue a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, directing PointCare to fully comply with the terms of the Agreement, sell the NP to Drew, and requiring PointCare to cease all related misconduct.

Dated: New York, New York
     May 2, 2008

Respectfully Submitted,

DUANE MORRIS LLP

By:____/s Anthony J. Costantini_____
       Anthony J. Costantini
       John Dellaportas
       Brian Damiano
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000
Facsimile: (212) 692-1020
*Attorneys for Plaintiff*

Of Counsel:

Ben Kuruvilla, Esq.
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, Massachusetts 02210-260030
(857) 488-4209

Enrico Pagnanelli, Esq.
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, Pennsylvania 19103-9146
(215) 979-1928